# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

---

GREGORY BOYD and JONATHAN LASSERS,
on their behalf and on behalf of
GFC HOLDINGS, LLC and
BIOMASS GREEN FUELS, LLC, and GFC and BGF
on their own behalf, and EFB, LLC

       Plaintiffs,


         vs.


BANCO POPULAR DE PUERTO RICO; IGNACIO
ALVAREZ, JAVIER FERRER,
ALEXANDER BORSCHOW; SEMILLERO
PARTNERS, LLC; VRM PENZINI
CAPITAL L.L.C.; VRM PENZINI FUND I L.L.C.
STAR POWER SYSTEMS LLC, HUMACAO RNG, L.L.C.;
PONCE RNG LLC; GEORGE ECONOMOU; JOVAL
RODRÍGUEZ BARNES; ROBERTO A.
ACOSTA; ACCURATE SOLUTIONS CORP.;
DISTRIBUTED POWER INNOVATORS JV;
COMMUNITY DEVELOPMENT VENTURE
CAPITAL ALLIANCE; THE PUERTO RICO
FUND FOR GROWTH; ERNESTO
VILLARINI; PCC SUB-CDE 13, LLC;
VRM PENZINI FUND I L.L.C.; VRM
PENZINI FUND I, LLC RENEWABLE
SERIES II; RAFAEL ROJO; CARLOS
PENZINI; DIEGO RODRIGUEZ;
the individual Defendants' wives and conjugal partnerships and
GFC HOLDINGS, LLC and BIOMASS GREEN FUELS, LLC nominally

       Defendants

**Civil No.**

**JURY TRIAL DEMANDED**

---

## CIVIL RICO COMPLAINT

**TO THE HONORABLE COURT:**

**COME NOW** GREGORY BOYD and JONATHAN LASSERS, on their behalf and on behalf of GFC Holdings, LLC Biomass Green Fuels, LLC, directly, or in the alternative derivatively, and EFB, LLC through undersigned counsel and very respectfully state and pray:

## NOTICE REGARDING NON-DEFENDANT CO-CONSPIRATORS

Plaintiffs Gregory Boyd and Jonathan Lassers hereby give notice that the following individuals and entities, while not named as Defendants in this Complaint, are identified as Non-Defendant Co-Conspirators whose conduct was integral to and could not have occurred without the active participation of the named Defendants:

**Individual Non-Defendant Co-Conspirators:**

- Olmar López Vidal

- Joval Rodríguez Barnes

- Cristina Ríos Mena

- Olmar López Gómez

- Vivian Vidal de López

- Carlos López Vidal

- Claudia Ferrer Tañón

**Entity Non-Defendant Co-Conspirators:**

- International Technical Services, Inc. ("ITS")

- ITS Corp.

- Green $CO_2$, LLC

- Green $CO_2$ Dominican, LLC

- Green $CO_2$ Dominicana, S.R.L.

- Green $CO_2$, S.R.L.

- Green Hydrogen, LLC

- World Spirits, LLC

**PRESERVATION OF FACTUAL ALLEGATIONS:**

The factual allegations concerning the Non-Defendant Co-Conspirators' conduct are preserved in full because such conduct was integral to, and could not have occurred without, the active participation of the named Defendants, particularly Banco Popular de Puerto Rico, Alexander Borschow, Semillero Partners, Ernesto Villarini, Puerto Rico Fund for Growth, Community Development Venture Capital Alliance, and the VRM Penzini Defendants including (VRM Penzini Capital, VRM Penzini Fund I, Star Power Systems, Humacao RNG, Ponce RNG.)

The settlements with Lopez family Non-Defendant Co-Conspirators do not supersede or break the causal chain: (a) Magnitude Distinction: The Lopezes direct theft totaled several million dollars in construction fraud. VRM Penzini asset acquisition transferred over $300 million in value-including 30+ years of gas rights to three landfills (Humacao, Ponce, Salinas)-for $4.4 million. VRM taking is two orders of magnitude larger. (b) Independent Wrongdoing: Each remaining Defendant committed independent predicate acts that independently caused Plaintiffs injuries. (c) Joint and Several Liability: Under Texas Industries and conspiracy principles, each Enterprise participant is jointly and severally liable for all damages, regardless of settling parties' conduct.

The Lopezes did construction fraud. VRM-Penzini stole the company assets-including 30+ years of gas rights to three landfills (Humacao, Ponce, Salinas)-worth over $300 million. VRM-P taking is two orders of magnitude larger than the Lopez theft, making it the primary harm requiring remedy.

Under *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630 (1981), and *Agency Holding Corp. v. Malley-Duff & Associates*, 483 U.S. 143 (1987), the named Defendants remain jointly and severally liable for the full amount of treble damages regardless of these individuals' and entities' non-defendant status.

# TABLE OF CONTENTS

**I. INTRODUCTION** ............................................................................................. 12

**THE VRM PENZINI TROJAN HORSE** ......................................................... 19

VRM-PENZINI, ROJO AND PENZINI BOARD MEMBER LIABILITY .................. 23

SPECIFIC BOARD MEMBER CONDUCT AND STATUTORY LIABILITY ....... 28

**MAY 2025 SETTLEMENT AND TRANSFER OF VOTING CONTROL** ............ 32

**THE ASSET ACQUISITION AGREEMENT WAS VOID AB INITIO** ................ 34

**II. JURISDICTION AND VENUE** ...................................................................... 45

**III. THE PARTIES** ............................................................................................. 46

**A. Plaintiffs** ...................................................................................................... 46

**B. Nominal Defendants** .................................................................................... 47

**C. Non-Defendant Co-Conspirators** ................................................................ 47

**D. Individual Defendants** ................................................................................. 50

**E. VRM Penzini Individual Defendants** ...................................................... 55

**F. Entity Defendants** ........................................................................................ 56

**G.    VRM Penzini Entity Defendants** .................................................. 59

**IV. THE BIOMASS GREEN FUELS RACKETEERING ENTERPRISE** ................ 60

FACTUAL BACKGROUND COMMON TO ALL CLAIMS ........................................ 69

The Creation of BGF and Launch of the Puerto Rican Landfill Projects ..................... 69

New Market Tax Credit Abuse ............................................................................ 73

Lópezes and Rodriguez fraudulently divert BGF Loan to buy Boyd's units and ITS/ASC Bond with Banco Popular aiding and abetting that fraud. .................................. 83

MIPA Payment Flow Chart.............................................................................. 100

Fraudulent Drawdowns throughout the Construction ................................... 101

Fraud and Semillero's Participation in the Criminal Enterprise for ITS's Benefit ..... 104

Semillero Letter on the MIPA Securities Fraud ......................................... 109

Details of other Payment Frauds................................................................... 116

The Lópezes' Fraudulent Conduct with Banco Popular............................... 121

Diversion of BGF's Funds through the Lópezes' Web of Multiple ITS Entities ....... 139

The Fraudulent Diversion of BGF's Funds within Puerto Rico ................... 146

ITS's Numerous Failures, Incompetence, and Fraudulent Misrepresentations .......... 149

More Details of Banco Popular's Participation in the Criminal Enterprise............... 156

Usurpation of the Brugal Opportunity, Diverting BGF's Resources to Green CO2... 160

**VRM Penzini's Entry and Betrayal of the Plaintiffs (January 2023 - Present)** .... 211

**VI. PATTERN OF RACKETEERING ACTIVITY** ..................................... 227

**A. VRM Penzini Predicate Acts** ................................................................ 227

**B. BPPR Predicate Acts** ........................................................................... 228

**C. Lopez Vidal, Lopez Gomez and Economou April 25, 2022, Predicate Acts** ..... 231

**D. Borschow and Villarini January 2025 Predicate Acts** ....................... 232

**E. Relatedness** ...................................................................................... 232

**F. Continuity** ...................................................................................... 233

**TABLE OF PREDICATE RICO ACTS BY DEFENDANTS** ................... 234

**VRM PENZINI DEFENDANTS** ...................................................... 234

    **VRM Penzini Capital / Rafael Rojo / Carlos Penzini / Diego Rodriguez** ........... 234

    **VRM Penzini Fund I, LLC Renewable Series II** ................................. 235

    **Humacao RNG, L.L.C.** ................................................................. 235

    **Ponce RNG, L.L.C.** ..................................................................... 236

**BANCO POPULAR DE PUERTO RICO (BPPR)** ........................... 239

**GEORGE ECONOMOU** .................................................................. 240

**ALEXANDER BORSCHOW / SEMILLERO PARTNERS, LLC** ...................... 241

**ERNESTO VILLARINI / CDVCA / PRFG** ................................. 241

**JOVAL RODRÍGUEZ BARNES (BPPR Account Manager)** ................ 241

**ROBERTO ACOSTA / ACCURATE SOLUTIONS CORP. (ASC)** ........ 242

**IGNACIO ALVAREZ (BPPR CEO)** ............................................. 242

**JAVIER FERRER (BPPR General Counsel)** ............................... 242

**TOTAL PREDICATE ACTS BY NON-SETTLING DEFENDANTS: 65+** ......... 243

    **A. Non-Defendant Co-Conspirators' Conduct Preserved (¶6)** .......... 243

    **B. Relatedness** ............................................................................ 244

    **C. Continuity (¶986)** ................................................................... 244

**COUNT 1: VIOLATION OF 18 U.S.C. § 1962(c)** ................................................................ 246

**COUNT 4: VIOLATION OF 18 U.S.C. § 1962(d)** ............................................................... 248

**VII. PRAYER FOR RELIEF** ............................................................................................. 264

**A. RICO Relief** ...................................................................................................... 264

**B. Declaratory Relief Regarding Plaintiffs' Majority Control** ............................... 264

**C. Declaratory Relief Regarding the Void Asset Acquisition Agreement** ............. 265

**D. Equitable Relief** ................................................................................................ 265

**E. Declaratory Relief Regarding Boyd's Guarantees** ................................................ 267

**F. Contract Claims** ................................................................................................ 267

**G. Perjury and Obstruction Claims** .......................................................................... 267

**H. General Relief** ................................................................................................... 268

**VIII. DEMAND FOR JURY TRIAL** ................................................................................ 268

**CERTIFICATE OF SERVICE** ......................................................................................... 269

# TABLE OF AUTHORITIES

### CASES

*Aetna Casualty & Surety Co. v. P&B Autobody*, 43 F.3d 1546 (1st Cir. 1994) .........................233

*Agency Holding Corp. v. Malley-Duff & Associates*, 483 U.S. 143 (1987) ..................................3

*Boyle v. United States*, 556 U.S. 938 (2009) ..............................................................................61

*H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989)...........................................233

*Limone v. United States*, 564 F.3d 1 (1st Cir. 2009)..................................................................233

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...................................................................36

*Medical Marijuana, Inc. v. Horn*, 604 U.S. ___ (2025) .....................................................245, 250

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985)...................................................227, 246, 265

*Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630 (1981) ...............................3, 4, 14

*United States v. Adrian Rubin*, No. 2:15-cr-00238 (E.D. Pa. 2015)...........................................124

*Clark v. United States*, 289 U.S. 1 (1933) ...............................................................................158

*Auriga Capital Corp. v. Gatz Properties, LLC*, 40 A.3d 839 (Del. Ch. 2012)..............39, 223, 224

*Kyle v. Apollomax, LLC*, 987 F.Supp. 519 (D. Del. 2013) .........................................................223

*UnitedHealth Grp. Inc. v. Zuckerberg*, 2021 WL 4437885 (Del. Ch. Sept. 23, 2021).................42

*Dibidale of Louisiana, Inc. v. American Bank & Trust Co.*, 916 F.2d 300 (5th Cir. 1990)19,   182, 231

*Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011)...................................................29

*Reves v. Ernst & Young*, 507 U.S. 170 (1993)................................................................29

*Salinas v. United States*, 522 U.S. 52 (1997)................................................................24

*United States v. Chen*, 99 F.3d 1495 (9th Cir. 1996)................................................159

*United States v. Zolin*, 491 U.S. 554 (1989) ................................................158

### STATUTES

12 U.S.C. § 1972................................................................................................ passim

12 U.S.C. § 1975................................................................18, 182, 259, 267

15 U.S.C. § 78j(b)................................................................................31, 45

18 U.S.C. § 472................................................................................................93

18 U.S.C. § 473................................................................................................93

18 U.S.C. § 1341................................................................23, 44, 159, 178, 246

18 U.S.C. § 1343................................................................................................ passim

18 U.S.C. § 1344................................................................................................ passim

18 U.S.C. § 1346................................................................................................ passim

18 U.S.C. § 1503................................................................................................ passim

18 U.S.C. § 1621................................................................................................ passim

18 U.S.C. § 1951................................................................230, 237, 238, 246

18 U.S.C. § 1956................................................................159, 176, 177, 210, 231

18 U.S.C. § 1957................................................................................................ passim

18 U.S.C. § 1961(3) ..................................................................................................246

18 U.S.C. § 1961(4) .............................................................................................61, 246

18 U.S.C. § 1961(5) ....................................................................................17, 211, 243

18 U.S.C. § 1962(a) ...................................................................................44, 247, 248

18 U.S.C. § 1962(b) ................................................................................................247

18 U.S.C. § 1962(c) ..................................................................................8, 91, 158, 246

18 U.S.C. § 1962(d) .......................................................................8, 27, 31, 178, 248

18 U.S.C. § 1964(c) ............................................................................................ passim

18 U.S.C. § 1965(a) ..................................................................................................45

18 U.S.C. § 2314 .....................................................................................................142

18 U.S.C. § 2315 .....................................................................................................142

28 U.S.C. § 1331 ......................................................................................................45

28 U.S.C. § 1367(a) ..................................................................................................45

## REGULATIONS

17 C.F.R. § 240.10b-5 ..............................................................................................45

## RULES

Fed. R. Civ. P. 9(b) .................................................................................................227

Fed. R. Civ. P. 60(d)(3) ..............................................................................210, 260, 267

Fed. R. Evid. 801(d)(2) .....................................................................................13, 24, 32

## I. INTRODUCTION

### SCOPE AND PURPOSE OF THIS COMPLAINT

This is a new civil RICO complaint—not an amendment to any prior action. Plaintiffs file this new action because leave to amend the Second Amended Complaint in Civil No. 3:22-cv-01190 was denied by Judge Gina R. Mendez-Miro on January 21, 2026 (Docket No. 847), and reconsideration was denied on January 23, 2026 (Docket No. 855). The Court's denial was based on perceived "undue delay" under Federal Rule of Civil Procedure 15(a)(2) and 16(b), notwithstanding that the allegations herein primarily concern RICO predicate acts committed after January 31, 2023—the filing date of the Second Amended Complaint—and involve new defendants who were not parties to the prior action.

**This Complaint focuses on RICO crimes committed after January 31, 2023.** While the ongoing RICO enterprise began before that date, this Complaint emphasizes the predicate acts occurring from January 2023 through the present, including: (a) the VRM Penzini "Trojan Horse" scheme beginning in January 2023; (b) the illegal loan assignment on January 31, 2025; (c) the void Asset Acquisition Agreement executed on January 31, 2025, and fraudulently completed on February 7, 2025; (d) the ongoing collection actions and enforcement efforts by Banco Popular and VRM Penzini entities against Plaintiff Boyd; and (e) the continuing efforts to strip Plaintiffs of their ownership interests. Boyd and Lassers settled with some of the defendants and establishing a 55.493% voting control of GFC Holdings and Biomass Green Fuels.  Facts occurring before January 31, 2023, are provided as background to establish the structure, participants, and ongoing nature of the RICO enterprise.

**This Complaint adds new RICO participants.** The named Defendants include VRM Penzini Capital, Rafael Rojo, Carlos Penzini, Diego Rodriguez, VRM Penzini Fund I, LLC, VRM Penzini Capital, Star Power Systems, Humacao RNG, L.L.C., Ponce RNG, LLC, Ignacio Alvarez, and Javier Ferrer—none of whom were defendants in the prior Second Amended Complaint. These parties joined the RICO enterprise after January 31, 2023, or committed predicate acts that could not have been alleged in the prior complaint because those acts had not yet occurred or were not yet known.

Borschow of Semillero, Rojo, Penzini, and Diego Rodriguez of VRM-Penzini filed the SJ2024CV07694 complaint in Puerto Rico Superior Court on August 21, 2024—a complaint containing admissions of fraud, corruption, misappropriation, construction defects, and "underworld" business practices spanning at least five years. These admissions constitute party-opponent statements admissible against them under FRE 801(d)(2). They prove that these Board Members knew of every predicate act alleged in the RICO Complaint—and that their years of inaction, combined with active facilitation of the enterprise's affairs, makes them participants, co-conspirators, and aiders and abettors under federal, Delaware, and Puerto Rico law.

**This Complaint removes defendants who have settled.** Subsequent to court-supervised mediation from March 2023 through March 2025, Plaintiffs reached settlement agreements with fourteen defendants, including Olmar López Vidal, Cristina Ríos Mena, Olmar López Gómez, Vivian Vidal de López, Carlos López Vidal, Claudia Ferrer Tañón, International Technical Services, Inc. (ITS), ITS Corp., Green $CO_2$, LLC, Green $CO_2$ Dominican, LLC, Green $CO_2$ Dominicana, S.R.L., Green $CO_2$, S.R.L., Green Hydrogen, LLC, and World Spirits, LLC. These settling defendants are identified herein as Non-Defendant Co-Conspirators, and their conduct is preserved as part of the RICO enterprise allegations because their actions were integral to the

enterprise's operation and the named Defendants remain jointly and severally liable for all damages under Texas Industries, Inc. v. Radcliff Materials, Inc., 451 U.S. 630 (1981).

**FACTUAL SUMMARY**

1.      This case involves the systematic theft of a $300+ million green energy asset—a landfill-gas-to-renewable-natural-gas biorefinery—from two minority investors and the United States taxpayer through an elaborate racketeering scheme spanning 2018 to the present. The scheme has now culminated in the complete liquidation of Biomass Green Fuels, LLC ("BGF") and GFC Holdings, LLC ("GFC") through a fraudulent asset sale to insiders for pennies on the dollar. This liquidation left no assets for BGF/GFC, as confirmed by Attorney Abesada's statement in related proceedings. BPPR rejected a superior offer from Cambrian Energy, favoring the insider deal. Specific payments included $1,403,071 to Semillero and $528,526 + $208,576 to Villarini entities. Exhibit 1 at 52 and 54. The transaction lacked unanimous unitholder consent as required by the GFC Holdings Operating Agreement. Exhibit 2 at 28 Section 9.1.

2.      The very insiders who breached their fiduciary duties in the ways articulated since the original Complaint escalated their misconduct to final payments to suppliers for equipment that is not operational; further indebting the project; allowing the default of both the loan and the contract for the gas rights; and finally metastasizing into the complete liquidation of the project for the sole benefit of the insiders, now seek to run this litigation. Just as you cannot let the fox guard the henhouse, you cannot allow the inmates to run the asylum.

3.      Plaintiffs Gregory Boyd and Jonathan Lassers invested expertise and years of time and Boyd his personal guarantee to launch BGF and its parent company GFC, intending to build

Puerto Rico's first biorefinery converting landfill methane into renewable natural gas and beverage-grade $CO_2$.

4.      On September 15, 2020, the project at the El Coquí Landfill in Humacao, Puerto Rico, secured $27.5 million in total financing consisting of:

- An $11.8 million construction loan from Banco Popular de Puerto Rico ("BPPR" or "Banco Popular");

- $7.2 million in federally backed New Market Tax Credit ("NMTC") funds from PCC SUB-CDE 13, LLC (a wholly owned BPPR subsidiary) and Capital One;

- $6.5 million in equity investments from Semillero Partners, the Puerto Rico Fund for Growth, and the Community Development Venture Capital Alliance;

- And $2 million in convertible notes from other investors. Exhibit 3

5.      Defendants Olmar López Vidal and Olmar López Gómez (the "Lópezes") **(Non-Defendant Co-Conspirators)**, through their family-controlled construction company International Technical Services, Inc. ("ITS") **(Non-Defendant Co-Conspirator)**, systematically looted BGF by:

- Using BGF loan proceeds—not their own funds—to secure a loan to purchase Boyd's ownership stake fraudulently, ostensibly diluting his interest from 44% to 31.1% while leaving him exposed to $19 million in personal guarantees;

- Conspiring with Banco Popular to have the construction bond for their sham joint venture entity paid out of the loan, despite the bond being a condition precedent to the loan.

- Creating a sham joint venture (ITS/ASC Construction JV) with Roberto Acosta's Accurate Solutions Corp. ("ASC"), then fraudulently invoicing BGF $8+ million for a $5 million contract while certifying work as complete when it was not, and the plant and its design never worked;

- Collaborating with Borschow, Villarini, Economou, and Banco Popular and systematically violating federal NMTC restrictions by commingling and diverting funds to unauthorized uses including the Lópezes' competing Green $CO_2$ Dominicana project, personal vacations, employee compensation, and personal expenses; and

- Submitting at least 24 fraudulent loan drawdown certificates to BPPR, in collusion with defendants George Economou, Joval Rodríguez Barnes, Roberto Acosta and Accurate Solutions Corp., and Banco Popular itself falsely certifying construction progress, and BPPR as Administrative Agent, knowingly accepting fraudulent certifications. Exhibit 4

**Preservation Rationale**:

6.      The factual allegations herein concerning the López family Non-Defendant Co-Conspirators' conduct are essential to establishing the liability of the Defendants because:

> • The Enterprise operated as an integrated whole—the López family's construction fraud and BPPR's access to the gas offtake could not have been initiated or succeeded without BPPR fraudulently obtaining a Payment and Performance Bond with BGF's loan through their own Popular insurance entity for the Lopezes construction JV. Under the terms of their own loan, the Bond should have been for not less than 100%

of the direct costs of the project, or $18,679,651. BPPR represented it as sufficient at $5,000,000 and falsely a closing cost for BGF. Because of the fraud and risk of exposure from independent investigation, BPPR and GFC Holdings' Board are unwilling and unable to claim on this Bond, leading to BGF's collapse and the perpetuation of their frauds.

- The López family's construction fraud could not have succeeded without BPPR's collaboration in disbursing $5.5 million after Javier Ferrer, BPPR COO, receiving the November 2021 fraud notice from Boyd and Lassers, detailing the scheme;

- Rojo, Penzini, Borschow and Villarini's board approvals enabled the Lópezes' and Economou's fraud by suppressing audited financial statements for many consecutive years, approving self-interested equity transactions and fraudulent tax credit sales while fully knowing of the frauds.

- The VRM Penzini Defendants exploited the chaos created by the López fraud by using privileged information and partnering with Banco Popular to acquire $300+ million in assets for $4.4 million of which $761,221 they paid to themselves, the VRM Penzini Defendants; Exhibit 1 at 52.

- Under conspiracy and aiding-and-abetting principles, each Defendant is jointly and severally liable for the entire harm caused by the Enterprise, including acts committed by Non-Defendant Co-Conspirators; and

- The conduct of the Non-Defendant Co-Conspirators with the Defendants establishes the "pattern of racketeering activity" required under 18 U.S.C. § 1961(5), which inures to claims against all Enterprise participants.

7.      Defendant BPPR orchestrated and enabled this enterprise. The bank extracted a below-market renewable natural gas offtake agreement worth $90 million over 31 years to power its own buildings, then continued to approve fraudulent disbursements despite receiving detailed evidence of fraud from Plaintiffs' counsel in November 2021. Exhibits 5-6

8.      BPPR violated its fiduciary responsibilities as Administrative Agent by allowing the non-creditworthy Lópezes—Olmar López Vidal with a negative net worth of $90,234 and Olmar López Gómez with a stated $4,182 annual income—to lead construction through their conflicted family companies, ignoring federal standards that prohibit self-dealing in federally-backed loans. Exhibits 7-8

9.      BPPR fraudulently facilitated obtaining a pay and performance bond and committed further fraud by disbursing funds without a valid bond, based on fraudulent drawdown certificates, leading to defaults that BPPR exploited to tie credit extensions (including $1 million additional credit, forbearance on missed payments, and deadline extensions) to a July 18, 2022 offtake agreement at $14/MMBtu—50% below the $28.21 DOE average—with BGF ceding all carbon and environmental credits (worth tens of millions) for no consideration. This tying, in violation of 12 U.S.C. § 1972, enabled BPPR's illegal gains and ESG credits while destroying BGF's value through ongoing fraud and inability to recover the project because of that fraud and subsequent failure to enable a valid claim on the pay and performance bond.

10.     The below-market offtake agreement extracted by BPPR has a present value exceeding $90 million over its 31-year term, calculated as the difference between the $14/MMBtu contract price and the $28.21/MMBtu DOE average market rate, multiplied by projected annual gas production. BPPR's conditioning of credit extensions on acceptance of this tied product violates 12 U.S.C. § 1972's prohibition on bank tying arrangements and entitles Plaintiffs to treble

damages under 12 U.S.C. § 1975. The RLNG Supply agreement is dated July 18, 2022, and the Third Amendment to the Credit Agreement July 19, 2022, and Drawdown 17 on July 20, 2022, for $843,257.10. Exhibits 9-11

11.    Under Dibidale of Louisiana, Inc. v. American Bank and Trust Co., 916 F.2d 300 (5th Cir. 1990), bank tying arrangements violate 12 U.S.C. 1972 on a per se basis without requiring proof of coercion. The statute's plain language prohibits conditioning credit on acceptance of tied products regardless of the borrower bargaining position. BPPR July 18-20, 2022, sequence establishes the tying violation as a matter of law.

12.    Defendants Semillero Partners, LLC ("Semillero"), through managing partner Alex Borschow, along with co-investors Community Development Venture Capital Alliance ("CDVCA") and The Puerto Rico Fund for Growth ("PRFG"), through board member Ernesto Villarini, VRM-Penzini Fund, VRM-Penzini Investment Fund I, (VRM-P) through board members Rafa Rojo and Carlos Penzini enabled the enterprise by eliminating corporate controls, suppressing audited financial statements for many years (2020-2025), approved fraudulent tax credit sales, all while knowing of the frauds Semillero, Alexander Borschow, VRM-P, Rafa Rojo and Carlos Penzini in their case in San Juan court against the Lopezes and GFC Holdings and BGF.  The companies they were supposed to direct as Board Members.  See Exhibit 12 for their attorney's description of the frauds.

**THE VRM PENZINI TROJAN HORSE**

13.    In January 2023, a new set of predators entered the scheme.

14.    The Lópezes solicited VRM Penzini Capital, a Puerto Rico private equity firm led by principals Carlos Penzini, Diego Rodriguez, and Rafael Rojo (VRM), to find an investor for

the Brugal CO2 project in the Dominican Republic, that the Lopezes with the cooperation of Semillero, CDCVA, and Economou had illegally paid for with BGF and federal funds.

15.     When they learned of this RICO litigation, VRM reached out to Boyd and Lassers via their counsel and became interested in acquiring BGF instead of the Brugal CO2 project.

16.     On January 18, 2023, "VRM-Penzini Capital dba Star Power Systems, LLC…, represented herein by Rafael Rojo, Diego Rodriguez, and Carlos Penzini" signed a Non-Disclosure Agreement ("NDA") with Boyd and Lassers agreeing to work only with them in pursuing the acquisition of BGF/GFC and its assets.  The agreement states, "the receiving party shall not use the Confidential Information of the Disclosing Party for its own or any third party's benefit or use."  Exhibit 13 at 2.

17.     Under the NDA, Boyd and Lassers shared with VRM Penzini confidential business information, including detailed presentations and financial projections that "precisely mapped out the real value and specific processes to gain control of GFC/BGF, the operational flaws and improvements required to make the plant functional, and how to add multiples of value through operational and environmental and other tax benefits and credits."

18.     VRM principal Rafael Rojo acknowledged in a Zoom meeting that "now we have a plan to get control."

19.     VRM betrayed Boyd and Lassers.

20.     Despite the NDA's prohibition on using confidential information "for its own or any third party's benefit or use," VRM Penzini:

- Following the detailed plan Boyd and Lassers disclosed under the NDA for plant improvements, environmental benefit monetization, and the takeover process—including acquisition of unitholders' interests and purchase of the BPPR loans;

- Shared the information about a $10 million federal investment tax credit with the Board, even though Boyd and Lassers warned them against it. That tax credit required that the project have not begun operations, or it would not be eligible. Boyd and Lassers feared that if VRM shared the information about that tax credit with the Board, the Lopezes would turn on the plant because at that point they did not want the business to be viable and very much did not want an audit of their incompetent and fraudulent construction. VRM shared the information; the Lopezes turned on the plant; and the Companies lost the tax credit. Turning on the plant revealed its severe deficiencies, and it has not been operational since.

- In May 2023, invested $1.5 million to acquire 1,617,000 Preferred Series A units in GFC Holdings, becoming an Affiliate of BGF under the Credit Agreement;

- On January 31, 2025, acquired BGF's bank loans, gas rights, tax decrees, and equipment assets from BPPR through VRM Penzini Fund I, LLC Renewable Series II—despite being an Affiliate explicitly disqualified as an "Eligible Assignee" under Section 1.1 of the Credit Agreement; and

- On February 7, 2025, through Humacao RNG, L.L.C., purchased substantially all of BGF/GFC's assets for approximately $4.4 million—a fraction of their true value which exceeds $300 million. Exhibit 1

21.    The loan assignment to VRM violated the Credit Agreement. Exhibit 3 at 12.

22.     Section 1.1 of the Credit Agreement defines "Eligible Assignee" to exclude "Borrower (BGF) or its Affiliates."

23.     VRM is an Affiliate because it holds membership interests in GFC Holdings (BGF's parent).

24.     The "portfolio exception" permitting assignment to "any Person" is limited under *ejusdem generis* to entities similar to the enumerated financial institutions [Tier 1 banks with more than $100,000,000 in assets]—not conflicted insiders.

25.     BPPR breached its fiduciary duties by assigning the loan to a disqualified affiliate.

26.     As Administrative Agent, BPPR had a fiduciary duty to enforce the assignment restrictions.

27.     Instead, BPPR facilitated the transfer to preserve and expand a favorable offtake agreement and obtain improper releases from all claims—including this RICO action and the separate Anti-Tying lawsuit.

28.     The GFC Board did not obtain unanimous unitholder approval for liquidation.

29.     The GFC Operating Agreement required unanimous consent to liquidate the company or sell substantially all assets under Section 9.1. No such consent was obtained from all unitholders, including Boyd and Lassers.

30.     The Asset Acquisition Agreement releases BPPR from all claims—including this RICO action and the separate Anti-Tying lawsuit that was pending before another judge in this district. Banco Popular conspired with VRM, Semillero, CDVCA, and Olmar Lopez Gomez to attempt to shield BPPR from liability in exchange for insider enrichment.

31.     The Asset Acquisition Agreement constitutes a fraudulent scheme violating multiple RICO predicate acts: **wire fraud** (18 U.S.C. § 1343) through the electronic transmission of all negotiations, fund transfers, and transaction documents designed to deprive Boyd and Lassers of their legal claims against BPPR; **mail fraud** (18 U.S.C. § 1341) through the mailing of settlement documents and payments; **obstruction of justice** (18 U.S.C. § 1503) by engineering a release of BPPR from pending federal litigation—including this RICO action and the separate Anti-Tying lawsuit before Judge Delgado—despite BPPR not being a party to the Asset Acquisition Agreement; **honest services fraud** (18 U.S.C. § 1346) through the systematic bribery of fiduciaries who received personal compensation in exchange for voting to liquidate the companies and release claims belonging to the entities they were duty-bound to protect; and **money laundering** (18 U.S.C. § 1957) through transactions conveying the proceeds of this unlawful scheme to the insider participants. The conspiracy is further evidenced by the fact that every board member who voted to approve the sale of all company assets received compensation from VRM Penzini and the insiders, transforming what purported to be a legitimate business transaction into a coordinated racketeering act designed to shield BPPR from liability for its role in the underlying fraud while enriching the very fiduciaries whose duty was to pursue—not extinguish—claims on behalf of the companies and their minority owners.

### VRM-PENZINI, ROJO AND PENZINI BOARD MEMBER LIABILITY

32.     THE BOARD'S ACTUAL KNOWLEDGE OF LÓPEZ FRAUDS — DOCUMENTED BY THEIR OWN LAWSUIT  On August 21, 2024, VRM Penzini Fund I, LLC – Renewable Series II, Semillero Partners, LLC, Semillero Investment Fund I, LLC, and Alexander Borschow filed a complaint in the Puerto Rico Court of First Instance, Superior Court of San Juan, against Olmar López Vidal, Olmar López Gómez, GFC Holdings LLC, and Biomass

Green Fuels, LLC (Case No. SJ2024CV07694, cited herein as "Exhibit 12"). This complaint, filed by authorized counsel on behalf of Borschow, Semillero, and VRM Penzini, catalogs the Lópezes' frauds in devastating detail—and constitutes evidentiary admissions and party-opponent statements admissible under FRE 801(d)(2), proving that the Board Members who are Defendants in this RICO action had actual knowledge of every material violation underlying the RICO enterprise. Exhibit 12

33.    Under Salinas v. United States, 522 U.S. 52, 64 (1997), a RICO conspiracy defendant "need not have personally committed—or even agreed to personally commit—the predicates." The First Circuit applies this directly: United States v. Rodríguez-Torres, 939 F.3d 16, 29 (1st Cir. 2019). An agreement to facilitate a scheme in which conspirators commit predicate acts is sufficient. Board Members who systematically removed controls, suppressed audits, approved fraudulent drawdowns, and refused to fire corrupt management have "facilitated" the scheme and are liable as RICO co-conspirators.

34.    Exhibit 12 Admission: "The Lopezes have carried out deceptive maneuvers, hidden negotiations, and fraudulent activities in contravention of their fiduciary obligations within GFC Holdings, Limited Liability Company ('GFC') and Biomass Green Fuels, LLC ('Biomass')." Exhibit 12 further states: "The reality already discovered is that the Lopezes are two corrupt persons who lack all the knowledge they proclaim, but worse still, honesty." By filing this complaint, Borschow/Semillero and VRM/Penzini admit through their own authorized pleading that they knew the Lópezes were "two corrupt persons" committing "fraudulent activities"—yet during the entire period these crimes were committed, they never fired the CEO, never demanded audited financials, and never reported criminal conduct.

35.    Exhibit 12 Admission on Construction Fraud: "[The Lopezes] concealed gross design and construction errors in the biogas plant that López Vidal, as President of GFC, had commissioned to International Technical Services, Inc. ('ITS'), a corporation of the Lopezes presided over by his father, López Gómez, including that such deficiencies were responsible for failures that have prevented the commencement of Biomass's operations and that require multi-million-dollar investments for their correction. Furthermore, although the construction contract contains a 'warranty,' López Vidal has not made a claim against ITS, his father López Gómez's company, nor against Accurate Solutions, the company of López Gómez's partner, for the plant's multiple deficiencies." This admission is devastating: the Board Members themselves allege that the Lópezes concealed construction defects and refused to claim on the construction warranty— the precise same failure that prevented a claim on the $5 million Pay and Performance Bond.

36.    THE PAY AND PERFORMANCE BOND FRAUD The $5,000,000 Pay and Performance Bond (the "Mapfre Bond") was obtained by the ITS/ASC Construction JV from Popular Insurance in favor of BGF as Obligee. The Credit Agreement required a bond covering not less than 100% of the direct costs of the Project, or $18,679,651. Exhibit 4, Section 3.1(h) at 46. Instead, BPPR, as Administrative Agent, permitted the posting of a grossly inadequate $5 million bond—itself fraudulently paid for with BGF's own direct loan proceeds by BPPR officer Joval Rodríguez, who disguised the $70,500 payment as a "closing cost" on September 16, 2020, one day after the financial close, in violation of the Credit Agreement's condition precedent that the ITS/ASC Construction JV pay for its own bond before closing. This fraudulent payment constitutes wire fraud (18 U.S.C. § 1343), bank fraud (18 U.S.C. § 1344), and a predicate act of racketeering activity under 18 U.S.C. § 1961.

37.    The Fraudulent Bond Payment Sequence: The bond was a condition precedent to closing—it had to be paid BEFORE September 15, 2020. Instead: (1) September 14, 2020, 4:43 PM: Boyd submitted his signature for the Flow of Funds to José Sosa, DLA Piper attorney, who placed it into escrow for the financial close scheduled the following morning. (2) September 14, 2020, 9:38 PM: Nearly five hours after Boyd's signature was in escrow, BPPR officer Joval Rodríguez changed the Flow of Funds to add the ITS/ASC bond payment as a BGF "closing cost" of $70,500. (3) September 15, 2020, 12:56 PM: Brett Heyman (Capital One attorney) requested authorization to release signatures. Boyd never gave permission to release his signature, yet his forged signature appears on the Flow of Funds. (4) September 16, 2020: López Vidal fraudulently paid Popular Insurance $70,500 for the ITS/ASC Construction JV's bond with money intended for BGF's operations—illegally diverting BGF's funds for the benefit of the Lópezes and Roberto Acosta of ITS/ASC.

38.    The Board's Deliberate Failure to Claim on the Bond: Despite having documented all of the foregoing in their own Exhibit 12 complaint, the Board of Managers (Borschow/Semillero, Villarini/CDVCA-PRFG, and López Vidal) never directed GFC to claim on the $5 million Mapfre Pay and Performance Bond. The Board deliberately failed to claim because activating the Mapfre Bond would have triggered a surety investigation that would have revealed: (a) the fraudulent payment of the ITS/ASC bond with BGF's own loan proceeds—wire fraud and bank fraud; (b) the Lópezes' diversion of over $8 million in fraudulent payments to ITS and ASC entities on a $4 million fixed-price contract—money laundering; (c) the Board's approval of fraudulent drawdown certificates without approved annual budgets or audited financials—bank fraud and wire fraud; (d) BPPR's failure to enforce Credit Agreement disbursement controls as Administrative Agent—breach of fiduciary duty; and (e) the Board Members' self-dealing

participation in the RICO Enterprise. The Board's coordinated refusal to claim on the bond was itself an act in furtherance of the RICO conspiracy under 18 U.S.C. § 1962(d).

39.     **The $5 Million Bond Exceeds What VRM-P Paid the Board for the Asset Acquisition Agreement:** The hypocrisy of the Board's inaction is laid bare by the economics of the subsequent Asset Acquisition Agreement. The $5 million Pay and Performance Bond—which the Board refused to claim—exceeds the total consideration VRM Penzini paid the same Board Members to secure their votes for the void Asset Acquisition Agreement: Semillero (Borschow): $1,403,071; PRFG (Villarini): $528,526; CDVCA (Villarini): $208,576. Total paid to Board Members for their votes: $2,140,173. The Board Members sold the Companies' $300+ million in assets for $4.4 million through a void transaction—yet they would not claim on a $5 million bond that would have saved the Project. The reason is self-evident: the bond claim would have exposed their own participation in the fraud, while the Asset Acquisition Agreement paid them personally and released BPPR from all RICO and anti-tying liability.

40.     **Exhibit 12's Most Devastating Admission — Operating as "Underworld Business":** The Board Members' own Exhibit 12 complaint states: "[Lópezes. Economou] operated GFC without accounting books, as if GFC were an underworld business." This is the most devastating admission in Exhibit 12. The Board Members who are Defendants in this RICO action describe in their own Exhibit 12 complaint the company they were governing as operating as "an underworld business." They confirm (a) López Vidal directed the scheme; (b) López Gómez endorsed it; and (c) Economou actively assisted. And yet these Board Members—who oversaw a multi-million-dollar company receiving both bank and federal funds—never required proper accounting records, never required a completed independent audit, and never reported the "underworld" operations to

law enforcement, BPPR, or this Court. For the Board of GFC/BGF, the Watergate axiom holds: "It's not the crime, it's the cover-up."

41.    Misprision of Felony (18 U.S.C. § 4): Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both. Board Members who knew about wire fraud, bank fraud, and tax fraud—and actively concealed it by suppressing audits, refusing shareholder meetings, and eliminating oversight—are liable for misprision of felony. With Exhibit 12, these defendants do not merely have constructive knowledge. They have actual knowledge, documented in a formal complaint filed through their authorized attorneys in a court of law.

## SPECIFIC BOARD MEMBER CONDUCT AND STATUTORY LIABILITY

42.    Alexander Borschow / Semillero Partners, LLC — Specific RICO Predicate Acts: Borschow is a sophisticated businessman (MIT Sloan MBA, youngest-ever BNP Paribas director, built $130 million financial reporting systems at Eataly) who knew his conduct contributed to predicate felonies. Financial Benefit from the Enterprise: $1,403,071 from Asset Acquisition Agreement; $150,000+ in fraudulent consulting fees over 15 quarters; below-market preferred share acquisition (October 14, 2021) while rejecting Lassers' superior offer; personal financial gain from Semillero private equity fund management. Specific Predicate Acts: Eliminated accounting controls and separation of duties; submitted fraudulent invoices for advisory services never rendered; refused to require audited financials for four consecutive years; refused to hold annual shareholder meetings; accepted López Vidal's uncorroborated ITS conflict denial—willful

blindness under Global-Tech Appliances, Inc. v. SEB S.A., 563 U.S. 754, 769 (2011); refused to have Nexus PMG review completed design; voted to remove Boyd from Board (September 25, 2021); modified Operating Agreement with CDVCA/PRFG to eliminate conflict oversight; purported to hire Abesada, Esq. to oppose Motion to Withdraw MTD—obstruction of justice; voted for January 31, 2025 Asset Acquisition while Semillero received $1,403,071; has "dozens of emails advising López Vidal not to provide information requested by Boyd and Lassers." Borschow's conduct satisfies § 1962(a) (investment of racketeering income through fraudulent consulting fees to expand ownership); § 1962(b) (acquisition of enterprise interest through racketeering—below-market equity using insider position); § 1962(c) (conduct of enterprise affairs through board position with authority over corporate governance, financial controls, and shareholder information, per Reves v. Ernst & Young, 507 U.S. 170, 179 (1993)); and § 1962(d) (conspiracy through coordinated voting, control elimination, and self-dealing).

43.    VRM Penzini / Rafael Rojo / Carlos Penzini / Diego Rodriguez — Timeline of Fraudulent Inducement and NDA Breach: January 13-17, 2023: Rojo stated via Zoom: "We want to be your partners—we will only work with you two" and "You have our commitment that we will not go around you." False when made. January 18, 2023: NDA signed—obtained confidential information under false promise. February 2, 2023: Boyd disclosed BPPR loan acquisition strategy; Rojo falsely assured "we are committed to this partnership." March 9, 2023: Lassers presented $300M financial projections; Penzini asked detailed questions while concealing independent plans. March 27, 2023: "Plan B Meeting"—Boyd presented takeover blueprint; Rojo stated "now we have a plan to get control." May 2023: VRM invested $1.5M in GFC, becoming an "Affiliate" under the Credit Agreement. August 15-20, 2023: Revenue Sharing Agreement signed—Rodriguez participated while concealing VRM's intent to breach. May 2023: Rojo

immediately shared confidential $10M federal tax credit information with the Board, violating NDA, after being specifically instructed not to by Boyd and Lassers. VRM filed injunction revealing confidential mediation contents. January 31, 2025: BPPR assigned BGF loan to VRM Penzini—disqualified Affiliate under Credit Agreement Section 1.1 which defines "Eligible Assignee" to exclude "Borrower (BGF) or its Affiliates." February 7, 2025: Asset Acquisition Agreement—Humacao RNG (80% VRM-owned) acquired $300M+ in assets for $4.4M through void transaction. VRM breached the RSA by acquiring and monetizing these assets without sharing any revenue. VRM used confidential information to plan and execute the acquisition of BGF's loans and assets without Boyd/Lassers' participation; disclosed confidential strategies to BPPR, Semillero, CDVCA; and used Boyd/Lassers' detailed takeover plan for VRM's own benefit—theft of trade secrets and breach of NDA.

44.    The Board's Additional Failures to Act: Beyond refusing to claim on the $5 million Pay and Performance Bond, the Board of Managers committed additional failures that are equally probative of their participation in the RICO Enterprise: (1) Failure to Claim on the Construction Warranty—the ITS/ASC Construction JV's contract contained an express warranty that the Board never invoked despite knowing the warranty existed; (2) Failure to Claim Against ITS for $2 Million+ in Construction Cost Overruns—the Board's own Exhibit 12 documents that GFC paid López Gómez's company ITS more than $2 million above the contractually agreed fixed-price construction cost; (3) Failure to Remove López Vidal as President and CEO—the Board never voted to remove Olmar López Vidal despite the Board's own Exhibit 12 documenting: "deceptive maneuvers, hidden negotiations, and fraudulent activities," concealment of "gross design and construction errors," "false financial projections," misappropriation of invested funds, refusal to maintain proper financial records, failure to pay employee payroll tax withholdings, collusion with

CFO to conceal GFC's true financial condition, and interference with the federal court-supervised Settlement Agreement; (4) Failure to Remove López Gómez as Construction Contractor—the Board never terminated ITS/ASC as construction contractor despite Venture Engineering confirming the plant's pre-treatment system was "too small and insufficient," requiring $2 million and 26 weeks to remediate. Taken together, these four failures are not mere lapses in business judgment. They are affirmative acts of concealment and protection that sustained the RICO Enterprise. Each failure served the same purpose: to prevent any investigation, audit, or independent review that would have exposed the Lópezes' pattern of racketeering activity and the Board Members' own complicity in it. Under 18 U.S.C. § 1962(d), a person who agrees to facilitate the concealment of a RICO enterprise's predicate acts is liable as a co-conspirator. See Salinas v. United States, 522 U.S. 52, 63-64 (1997). The Board's coordinated pattern of inaction is the agreement.

45.     Comprehensive Statutory Violations by Board Members — Summary: The evidence establishes liability under 22 separate statutory provisions: Federal RICO: 18 U.S.C. §§ 1341 (Mail Fraud), 1343 (Wire Fraud), 1344 (Bank Fraud), 1346 (Honest Services Fraud), 1503 (Obstruction of Justice), 1956-1957 (Money Laundering), 1962(a)-(d) (RICO Conduct and Conspiracy). Federal Criminal: 18 U.S.C. §§ 4 (Misprision of Felony), 371 (Conspiracy), 472-473 (Forged Signatures). Tax Fraud: 26 U.S.C. §§ 7201, 7206, 45D (NMTC). Securities Fraud: 15 U.S.C. § 78j(b). Delaware LLC Act: 6 Del. C. §§ 18-305 (Member Information Rights), 18-1101(c) (Good Faith), 18-1104 (Fiduciary Duties). Puerto Rico Law: 14 L.P.R.A. §§ 3957 (Manager Duties), 3963 (Fiduciary Duties), 3965 (Persistent Duties); 31 L.P.R.A. §§ 5141-42 (Tort Liability); 10 L.P.R.A. § 2601 (Usury). Banking Law: 12 U.S.C. § 1972 (Anti-Tying). Under 18 U.S.C. § 1964(c), all RICO violations carry treble damages. The Exhibit 12 admissions—party-

opponent statements under FRE 801(d)(2)—provide the evidentiary foundation to establish liability on every count. These Board Members cannot now claim ignorance of crimes they described in their own authorized pleading as the work of "two corrupt persons" operating "an underworld business."

## MAY 2025 SETTLEMENT AND TRANSFER OF VOTING CONTROL

46.    On May 27, 2025, Plaintiffs Boyd and Lassers entered into a Settlement Agreement with Defendants Olmar López Vidal and Cristina Ríos Mena (the "Settlement Agreement"). Exhibit 14.

47.    Pursuant to that Settlement Agreement, on June 2, 2025, López Vidal executed an Irrevocable Proxy (the "Proxy") agreeing to vote with Boyd and Lassers all of López Vidal's units in GFC Holdings, LLC with respect to matters specified in the Proxy. Exhibit 15

48.    The Irrevocable Proxy is "coupled with an interest" and is "irrevocable to the fullest extent permitted by law." It was granted "in consideration of Holder entering into [the Settlement] Agreement" and expires on May 26, 2035, or earlier upon resolution of the litigation.

49.    The Proxy provides that López Vidal's units will vote with Boyd and Lassers:

- In favor of the pursuit of any Legal Action and Litigation on behalf of the Company and any of its subsidiaries, contracts or interests;

- Against approval of or any proposal made (by any party other than Olmar López Vidal), or in competition with, the consummation of the Asset Acquisition Agreement;

- Against any merger, consolidation, business combination, sale of assets, reorganization, recapitalization, dissolution, liquidation or winding up of the Company or any subsidiary; and

- In favor of any administrative or management, banking or financial decisions required to pursue the objectives of the Agreement.

50.    As a result of the Irrevocable Proxy, Plaintiffs Boyd and Lassers now hold or control 55.493% of the voting units of GFC Holdings, LLC, constituting majority voting control of the Company.

51.    The Irrevocable Proxy satisfies Delaware's requirements for an irrevocable proxy "coupled with an interest" under 8 Del. C. § 212(e). The Proxy was granted in consideration of the Settlement Agreement, and Boyd and Lassers' interest in pursuing litigation recovery directly benefits from maintaining voting control. This majority control provides standing independent of derivative action requirements.

52.    With majority voting control, Plaintiffs have the authority under Section 3.2 of the GFC Holdings Operating Agreement to act by written consent via "Majority Approval of the Members" (a "Member Resolution").

53.    Plaintiffs' majority control fundamentally transforms this litigation. As majority unitholders, Plaintiffs can now:

- Direct GFC Holdings and BGF to pursue claims directly against the remaining Defendants;

- Reconstitute the Board of Managers to include members who will faithfully pursue the Company's interests;

- Access all Company books, records, and financial information;

- Rescind the purported releases of BPPR contained in the void Asset Acquisition Agreement; and

- Recover all assets transferred under the void AAA.

54.     The foregoing allegation is true because the breaches of fiduciary duty committed by the members of the Board of Managers disqualify them from having any role in the management of Companies they liquidated after driving it to ruin.

## THE ASSET ACQUISITION AGREEMENT WAS VOID AB INITIO

55.     Section 9.1 of the GFC Holdings Operating Agreement provides that the Company "will be dissolved upon the earliest to occur of the following events... the Members **unanimously** vote in favor of the liquidation and dissolution of the Company."

56.     The Operating Agreement defines "Deemed Liquidation Event" to include "a sale, lease, transfer, exclusive license or other disposition of all or substantially all of the assets of the Company."

57.     The Asset Acquisition Agreement dated February 7, 2025, constituted a "Deemed Liquidation Event" because it disposed of all or substantially all of BGF's and GFC's assets— including over $20 million in biogas refining equipment, the 30-year gas rights agreement with El Coquí Landfill, 100% renewable natural gas and $CO_2$ tax credits, Act 73 tax grants, and all contracts and intellectual property.

58.     Defendants did not obtain a **unanimous vote of the Members** for the Asset Acquisition Agreement as required by Section 9.1.

59.     Boyd and Lassers did not consent.

60.     Olmar López Vidal did not consent.

61.     Only the conflicted Board members, Olmar Lopez Gomez, Borschow, and Villarini approved the transaction.

62.     Section 6.4 of the Operating Agreement further provides that "without the affirmative vote or written consent of the Members, the Board of Managers shall not have the authority to approve and the Company will not take any of the following actions: ... (c) liquidate, dissolve or wind up the Company."

63.     The Board of Managers lacked authority under Section 6.4 to approve the Asset Acquisition Agreement without the affirmative vote or written consent of the Members. The purported approval by Lopez Gomez, Borschow and Villarini—all of whom were conflicted because they received substantial payments from the transaction—was ultra vires.

64.     Accordingly, the Asset Acquisition Agreement is **void ab initio** as an ultra vires act exceeding the Board's authority under the Operating Agreement.

65.     The purported transfer of assets to Humacao RNG was legally ineffective, and the assets remain the property of BGF and GFC.

66.     The purported releases of BPPR contained in Section 3.6(c) of the Asset Acquisition Agreement are likewise void ab initio because they were part of an unauthorized transaction that the Board lacked authority to approve.

## II. PLAINTIFFS' STANDING TO SUE

67.     As of June 2, 2025, Plaintiffs hold or control 55.493% of the voting units of GFC Holdings, LLC by virtue of the Irrevocable Proxy executed by López Vidal. This majority control provides standing to pursue these claims directly and on behalf of the companies. Exhibit 15

A. Constitutional Standing Under Article III

B. RICO Standing Under 18 U.S.C. § 1964(c)

C. Boyd's Direct Injuries

D. Lassers' Direct Injuries

E. EFB's Direct Loss

F. Majority Control Standing independently and due to the Board of Managers' multiple breaches of fiduciary duty.

**A. Constitutional Standing Under Article III**

68.     Plaintiffs have standing under Article III of the United States Constitution because they satisfy the three constitutional requirements established in Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992):

**B. RICO Standing Under 18 U.S.C. § 1964(c)**

69.     RICO Standing: Plaintiffs have suffered direct, concrete injuries to their business or property by reason of Defendants' racketeering activity, satisfying 18 U.S.C. § 1964(c).

70.    **Redressability:** A favorable decision would remedy Plaintiffs' injuries through monetary damages, declaratory relief voiding the Asset Acquisition Agreement, return of assets, and injunctive relief.

71.    **Causation:** Plaintiffs' injuries are fairly traceable to Defendants' conduct, including the fraudulent MIPA transaction, BPPR's frauds and failure to insure the project as lender and Administrative Agent, VRM's NDA and Revenue Sharing Agreement breaches, the unauthorized loan assignment, and the void Asset Acquisition Agreement.

72.    **Injury in Fact:** Plaintiffs have suffered concrete and particularized injuries to their business and property, including: dilution of ownership interests, complete destruction of ownership through the void Asset Acquisition Agreement; BPPR's failure to properly bond the project, personal guarantee exposure, [Boyd's] lost employment and board positions; breach of contractual rights under the NDA and RSA [Boyd Lassers and EFB]; and loss of the superior Cambrian Energy offer.

### C. Boyd's Direct Injuries

73.    **Ownership Dilution Through Fraud:** Boyd's ownership interest was diluted from 44% to 31.1% through the fraudulent MIPA transaction. This injury is direct because the MIPA was a bilateral contract between Boyd and López Vidal, López Vidal fraudulently induced Boyd to sell by concealing that the purchase price would come via BGF's loan proceeds, and Boyd's loss of ownership percentage occurred through a direct transaction with a co-conspirator.

74.    **Lost Employment and Board Position:** The MIPA expressly promised Boyd employment as Director of New Business and Development and a Board seat. Defendants breached these provisions directly with Boyd. Exhibit 16

75.     **Personal Guarantee Exposure:** Boyd executed personal guarantees on $19 million in loans. These guarantees were materially and illegally altered by BPPR and the Defendants through Credit Agreement Amendments 1-7 without Boyd's consent, exposing him to liability he never agreed to assume. The Banco Popular lawsuit against him has cost him tens of thousands of dollars in legal fees.

76.     **NDA Breach:** Boyd was a party to the January 18, 2023, NDA with VRM Penzini. VRM breached this agreement directly with Boyd.

### D. Lassers' Direct Injuries

77.     **NDA Breach:** Lassers was a party to the January 18, 2023, NDA with VRM Penzini. VRM breached this agreement directly with Lassers.

78.     **SAFE Note Conversion Rights:** Lassers held a SAFE note agreement with BGF that entitled him to convert his investment into equity. The fraudulent MIPA transaction eliminated these conversion rights.

### Dilution of ownership interest

### E. EFB's Direct Loss

79.     Loss of the 60% share of Environmental Attributes and other revenues under the agreement with VRM or its successors on Humacao, Ponce and other landfills in Puerto Rico.

### F. Majority Control Standing

80.     Attached hereto under seal as Exhibit 14 is the Settlement Agreement dated May 27, 2025. Attached hereto as Exhibit 15 as a restricted document is the Irrevocable Proxy dated June 2, 2025.

81.     The Irrevocable Proxy is "coupled with an interest" as it was granted in consideration of the Settlement Agreement, making it irrevocable under Puerto Rico law.

82.     As of June 2, 2025, Plaintiffs hold or control 55.493% of the voting units of GFC Holdings, LLC by virtue of the Irrevocable Proxy executed by López Vidal. This majority control provides an independent basis for standing:

83.     Plaintiffs have authority to direct GFC Holdings and BGF to pursue claims against Defendants.

84.     Under Section 3.2 of the GFC Operating Agreement, Plaintiffs can act by "Majority Approval of the Members" through written consent.

85.     The members of the Board of Managers forfeited whatever authority they may have had to manage the Companies through their repeated breaches of their fiduciary duties of loyalty to the Companies, not their own pecuniary interests.

86.     This forfeiture of authority is supported by Puerto Rico's LLC statute. Under 14 L.P.R.A. § 3965, managers of a limited liability company owe fiduciary duties of loyalty and care that persist unless explicitly waived in the Operating Agreement—which they are not. When managers breach these non-waivable duties through self-dealing, they act outside the scope of their delegated authority, rendering their actions ultra vires as a matter of law. See Auriga Capital Corp. v. Gatz Properties, LLC, 40 A.3d 839 (Del. Ch. 2012), aff'd 59 A.3d 1206 (Del. 2013) (LLC managers owe default fiduciary duties; sham auction invalidated where manager engaged in self-dealing).

87.     Section 6 of the Operating Agreement does not vest authority in the Board to appoint counsel or manage litigation, particularly after the Board has liquidated all Company

assets. Section 4.2(j)'s protective provisions do not apply to the appointment of counsel or the management of litigation. Because the Board liquidated substantially all assets through the void Asset Acquisition Agreement, there is nothing left for the Board to manage, creating a post-liquidation governance vacuum that the Majority Members are authorized to fill under Section 3.2.

88.    The Second Amendment to the Operating Agreement, dated August 25, 2023 ("Exhibit 17"), provides critical support for Plaintiffs' majority authority. Exhibit 17 amended Section 4.2(f) to provide that "[t]he holders of the Series A Preferred Unit shall vote together with the holders of Common Units on an as-converted basis, and not as a separate class." This voting unification eliminated the separate Series A consent requirement for Member Resolutions under Section 3.2, establishing that Plaintiffs' 55.493% voting control constitutes unified Majority Approval. The amendment's recitals are equally significant: they state that "the Majority Approval of the Members and the holders of a majority of the Series A Preferred Units outstanding have entered into agreements with VRM to cause the sale of the Company to VRM pursuant to Section 10.4." This recital proves that as early as August 2023, the governance restructuring was designed specifically to facilitate VRM's acquisition of the Company—demonstrating premeditation in what later became the self-dealing Asset Acquisition Agreement.

89.    Under 14 L.P.R.A. § 3994, member consent can override management action in governance matters. Under 14 L.P.R.A. § 4003, members may act derivatively when managers refuse to act due to conflicts or futility. These statutory provisions independently authorize Plaintiffs' exercise of majority control.

90.    By destroying their ownership interest and appropriating the companies' assets, Defendants collectively cause Plaintiffs direct injuries.

91.    These injuries flow directly from Defendants' predicate acts and are not derivative of BGF's or GFC's injuries.

92.    Boyd and Lassers lost ownership percentages, contractual rights, and faced personal financial exposure because Defendants' fraud enabled Defendants to steal from Boyd and Lassers while maintaining operational control. This satisfies the "direct injury" requirement.

93.    Derivative Standing: Boyd and Lassers also assert derivative claims on behalf of BGF and GFC. The injuries to BGF and GFC—including the fraudulent asset sale, diverted construction funds, and below-market offtake agreement—harmed the companies directly, eliminating their value and assets.

94.    As majority unitholders of GFC Holdings, Plaintiffs have the authority to direct the Company to pursue claims directly against Defendants.

95.    Demand on the Board is excused as futile because the remaining Board members face disabling conflicts of interest, having received substantial payments from the challenged transaction and having committed the fraud that enabled Banco Popular and VRM-P to prey on the Companies

96.    Demand is excused where the Board that would consider demand is disqualified through self-interest.

97.    Demand on the Board is excused as futile because the remaining Board members (Lopez Gomez, Borschow and Villarini) approved the challenged Asset Acquisition Agreement while personally receiving substantial payments (Semillero: $1,403,071; CDVCA/PRFG: $737,102; Lopez Gomez $203,804).

98.     Demand futility is evaluated under the three-prong test established in United Food & Commercial Workers Union v. Zuckerberg, 262 A.3d 1034, 1048-49 (Del. 2021), which asks whether each director (1) received a material personal benefit from the challenged transaction, (2) faces a substantial likelihood of liability for the challenged conduct, or (3) lacks independence from someone who received a material personal benefit or faces substantial liability. This Court should apply the Zuckerberg framework because Puerto Rico's General Corporations Act of 2009 explicitly modeled itself after the Delaware General Corporation Law, and its Statement of Motives declared that Delaware judicial decisions "shall be highly persuasive and illustrative."

99.     Applying this director-by-director methodology, see UnitedHealth Group Inc. v. Zuckerberg, 2021 WL 4437885 (Del. Ch. Sept. 23, 2021): (a) Borschow satisfies all three prongs—Semillero received $1,403,071 from the AAA (material benefit), he faces substantial liability for approving a self-dealing liquidation without independent valuation (liability), and he signed Exhibit 17 alongside VRM-P establishing financial entanglement (lack of independence); (b) Villarini satisfies all three prongs—CDVCA received $208,576 and PRFG received $528,526 (material benefit), he faces liability for breaching his duty to common unitholders by approving a transaction paying $4.4M to insiders while leaving common unitholders with nothing (liability), and as signatory to Exhibit 17 he committed to VRM-P's acquisition plan (lack of independence); (c) López Gómez received $203,804 directly from the AAA (material benefit), faces liability as a member of the RICO enterprise (liability), and is the son of the principal RICO defendant Olmar López Vidal (lack of independence).

100.     Because every remaining Board member satisfies at least one—and in fact all three—Zuckerberg prongs, demand on the Board would be futile as a matter of law. The Board's incapacity was structurally embedded as early as August 2023 when Exhibit 17 was executed:

every signatory entity later received material benefits from the Asset Acquisition Agreement, and VRM—which signed as the designated "rescue funder"—became 80% owner of the buyer Humacao RNG. See In re Fox Corp. Derivative Litig., C.A. No. 2023-0418-JTL (Del. Ch. Dec. 27, 2023) (applying "self-protection" doctrine where Board members cannot objectively evaluate transactions from which they benefit).

101.    As majority unitholders, Plaintiffs are entitled to direct the Company's litigation under Section 3.2 of the Operating Agreement.

102.    In the alternative, to the extent any claims are deemed derivative, Plaintiffs have standing to assert them on behalf of BGF and GFC because Boyd and Lassers suffered the following direct injuries to his business or property by reason of Defendants' racketeering activity:

    a.    The Asset Acquisition Agreement directly stripped Plaintiffs' ownership interests without their consent

    b.    Banco Popular's transfer of their loans to insider VRM Penzini were illegal

    c.    The RSA was signed directly between EFB (Boyd/Lassers' entity) and VRM Penzini—the breach directly injured the contracting parties

    d.    The NDA was signed directly between Boyd/Lassers and VRM Penzini—VRM's breach directly injured the contracting parties

    e.    The fraudulent MIPA was a bilateral contract between Boyd and López Vidal— Boyd was directly defrauded, not a third party harmed by fraud on someone else

103.    Plaintiffs' injuries satisfy the proximate causation standard. Plaintiffs here were the DIRECT targets and victims of Defendants' predicate acts:

104.    VRM's NDA violations directly caused Boyd and Lassers to lose their contractual right to participate in any BGF/GFC acquisition. But for VRM's misuse of confidential information—including the detailed takeover blueprint, financial projections, and acquisition strategies disclosed under the NDA—VRM could not have structured the loan acquisition and asset purchase that excluded Boyd and Lassers.

105.    To establish RICO standing, Plaintiffs must demonstrate: (1) an injury to their business or property; (2) that was proximately caused by the defendants' racketeering activity.

106.    Plaintiffs have standing to bring civil RICO claims under 18 U.S.C. § 1964(c), which provides that "[a]ny person injured in his business or property by reason of a violation of section 1962" may sue.

107.    Defendants have violated 18 U.S.C. § 1962(a), (b), (c), and (d), engaged in mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), bank fraud (18 U.S.C. § 1344), money laundering (18 U.S.C. §§ 1956, 1957), perjury (18 U.S.C. § 1621), obstruction of justice (18 U.S.C. § 1503), and honest services fraud, operating the "Biomass Green Fuels Racketeering Enterprise" to systematically extract wealth while defrauding investors, lenders, and the United States government.

108.    Plaintiffs seek treble damages under RICO, declaratory relief, rescission, restitution, constructive trust, injunctive relief, attorney fees, and all other available remedies. Plaintiffs further seek a declaration that they hold majority voting control of GFC Holdings, that the Asset Acquisition Agreement is void ab initio, and that all assets purportedly transferred thereunder be returned to BGF and GFC or held in constructive trust for Plaintiffs' benefit.

**II. JURISDICTION AND VENUE**

109.    This Court has subject matter jurisdiction under 18 U.S.C. § 1964(c) (civil RICO) and 28 U.S.C. § 1331 (federal question jurisdiction).

110.    This Court has supplemental jurisdiction over Plaintiffs' Puerto Rico law claims under 28 U.S.C. § 1367(a) because they form part of the same case or controversy.

111.    This Court has subject matter jurisdiction over Plaintiffs' Securities Exchange Act claim under Section 10(b) and Rule 10b-5, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.

112.    Venue is proper under 18 U.S.C. § 1965(a) because Defendants reside, are found, have agents, or transact affairs in the District of Puerto Rico, and substantial parts of the events giving rise to the claims occurred in this district.

113.    The NDA between Boyd/Lassers and VRM Penzini provides for exclusive jurisdiction in "COURTS OF THE COMMONWEALTH OF PUERTO RICO OR THE COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO." All VRM Defendants have waived any objection to venue.

114.    Personal jurisdiction exists over all Defendants because they reside in, conduct business in, or commit tortious acts in Puerto Rico, and their conduct has had substantial effects in this district.

## III. THE PARTIES

### A. Plaintiffs

115.    Plaintiff Gregory Boyd is a former IBM systems engineer, a resident of Puerto Rico, a member/unitholder of BGF and GFC, and an injured party of Defendants' RICO conspiracy, fraud, breaches of fiduciary duty, and breaches of contract. Boyd contributed critical expertise in launching BGF, secured initial financing, obtained the El Coquí gas rights, and executed personal guarantees on $19 million in loans. He brings claims individually and derivatively on behalf of BGF and GFC. As of June 2, 2025, Boyd holds or controls a portion of the 55.493% majority voting interest in GFC Holdings, LLC by virtue of the Irrevocable Proxy.

116.    Plaintiff Jonathan Lassers is a financier, a resident of Uruguay, a member/unitholder of BGF and GFC through direct holdings, and an injured party of Defendants' RICO conspiracy, fraud, breaches of fiduciary duty, and breaches of contract regarding his SAFE note agreement. Lassers provided critical early-stage financing and strategic guidance. He brings claims individually and derivatively on behalf of BGF and GFC. As of June 2, 2025, Lassers holds or controls a portion of the 55.493% majority voting interest in GFC Holdings, LLC by virtue of the Irrevocable Proxy.

117.    EFB, LLC is a limited liability company that contracted to do business with VRM Penzini located in San Juan, Puerto Rico that VRM Penzini defrauded.

118.    Biomass Green Fuels, LLC is a Puerto Rico limited liability company that Defendants looted and destroyed in furtherance of their criminal enterprise.

119.    GFC Holdings, LLC is a Puerto Rico limited liability company that Defendants looted and destroyed in furtherance of their criminal enterprise.

**B. Nominal Defendants**

120.    Biomass Green Fuels, LLC ("BGF") is a limited liability company organized under the laws of Puerto Rico. BGF is the operating company that holds (or held) the gas rights to the El Coquí Landfill and was the borrower under the BPPR Credit Agreement and NMTC loan. BGF is named as a nominal defendant. Boyd and Lassers assert derivative claims on BGF's behalf and, as majority unitholders of GFC (BGF's parent), have the authority to direct BGF to pursue claims directly.

121.    GFC Holdings, LLC ("GFC") is a limited liability company organized under the laws of Puerto Rico and the parent/holding company of BGF. GFC is named as a nominal defendant. As of June 2, 2025, Plaintiffs hold or control 55.493% of the voting units of GFC Holdings, LLC, constituting majority voting control. Boyd and Lassers have the authority under the GFC Operating Agreement to act by written consent via Majority Approval of the Members and to direct the Company to pursue claims against the remaining Defendants.

**C. Non-Defendant Co-Conspirators**

122.    The following Defendants have settled with Plaintiffs and are designated as Non-Defendant Co-Conspirators. The factual allegations concerning their conduct are preserved because such conduct was integral to, and could not have occurred without, the active participation of the Defendants.

123.    Olmar López Vidal **(Non-Defendant Co-Conspirator)**, individually and as a member of the conjugal partnership with Cristina Ríos Mena under Puerto Rico law (P.R. Laws Ann. tit. 31, §§ 3941-3947), is a resident of Puerto Rico, President and CEO of BGF and GFC, a board member, and a controlling member/unitholder. **On May 27, 2025, López Vidal entered into a Settlement Agreement with Plaintiffs. On June 2, 2025, López Vidal executed an Irrevocable Proxy granting Plaintiffs voting control over his units in GFC Holdings.**

124.    Cristina Ríos Mena **(Non-Defendant Co-Conspirator)**, as a member of the conjugal partnership with Olmar López Vidal under Puerto Rico law, **entered into the Settlement Agreement with Plaintiffs on May 27, 2025.**

125.    Olmar López Gómez **(Non-Defendant Co-Conspirator)**, individually and as a member of the conjugal partnership with Vivian Vidal de López under Puerto Rico law, is a resident of Puerto Rico, a board member of BGF and GFC, and a controlling member/unitholder. López Gómez reported an annual income of $4,500 in his 2018 tax return. Yet he enjoys life in a $2.5 million home in Casa De Campo Resort, the most exclusive secured resort in the Dominican Republic, where the family docks their million-dollar sport fishing boat.

126.    Vivian Vidal de López **(Non-Defendant Co-Conspirator)**, as a member of the conjugal partnership with Olmar López Gómez under Puerto Rico law, is liable for debts and obligations incurred by her spouse.

127.    Carlos López Vidal **(Non-Defendant Co-Conspirator)** is a member of the López family who participated in the operation of the López-controlled entities, including as the treasurer of the construction company, ITS.

128.    Claudia Ferrer Tañón **(Non-Defendant Co-Conspirator)** is married to Carlos Lopez Vidal.

129.    International Technical Services, Inc. ("ITS") **(Non-Defendant Co-Conspirator)** is owned and controlled by the López family. ITS lacked the experience to build a biorefinery and could not qualify for a performance bond due to poor credit. ITS fraudulently invoiced BGF $8+ million for a $5 million construction contract.

130.    ITS Corp. **(Non-Defendant Co-Conspirator)** is a López-controlled entity.

131.    Green $CO_2$, LLC **(Non-Defendant Co-Conspirator)** is a Puerto Rico limited liability company controlled by the López family that received diverted BGF funds.

132.    Green $CO_2$ Dominican, LLC **(Non-Defendant Co-Conspirator)** is a López-controlled entity that received diverted BGF funds.

133.    Green $CO_2$ Dominicana, S.R.L. **(Non-Defendant Co-Conspirator)** is a Dominican Republic company controlled by the López family that received diverted NMTC funds intended for BGF's biorefinery construction.

134.    Green $CO_2$, S.R.L. **(Non-Defendant Co-Conspirator)** is a López-controlled entity.

135.    Green Hydrogen, LLC **(Non-Defendant Co-Conspirator)** is a López-controlled entity.

136.    World Spirits, LLC **(Non-Defendant Co-Conspirator)** is a Puerto Rico limited liability company owned in part or controlled by the López family.

## D. Individual Defendants

137.    Defendant George Economou is a resident of Puerto Rico and served as Chief Financial Officer of BGF and GFC. He is married and on information and belief has a conjugal partnership with his wife. Economou is a participant in and perpetrator of the RICO enterprise, wire fraud, bank fraud, securities fraud, money laundering, perjury, obstruction of justice, and breaches of fiduciary duty.

138.    Defendant Joval Rodríguez Barnes is a resident of Puerto Rico and was employed by Banco Popular as a Commercial Relationship Officer and account manager for BGF's loans. Rodríguez is a participant in and perpetrator of the RICO enterprise, wire fraud, bank fraud, and money laundering. He is married and on information and belief has a conjugal partnership with his wife. Joval Rodriguez left Banco Popular to work at Interlink with Ignacio Alvarez, Jr., the son of the then CEO of Popular of the same name.

139.    Defendant Alex Borschow is a resident of the State of New Jersey, former managing partner of Semillero Partners, LLC, Board Secretary of BGF/GFC, and holder of preferred units through Semillero's investment. He is married and on information and belief has a conjugal partnership with his wife. Borschow left Puerto Rico after Plaintiffs filed the RICO lawsuit to work for Rocana Venture Partners. Borschow is a participant in and perpetrator of the RICO enterprise, wire fraud, bank fraud, and breaches of fiduciary duty. Borschow approved the illegal Asset Acquisition Agreement on January 31, 2025, pursuant to which Semillero received $1,200,000 from the transaction—a disabling conflict of interest that rendered his approval ultra vires.

140.    Defendant Ernesto Villarini is a representative of CDVCA and PRFG, a board member of BGF/GFC, and a preferred unitholder. Villarini is a participant in the RICO enterprise and approved the illegal Asset Acquisition Agreement on January 31, 2025, while Villarini entities received $528,526 + $208,576 from the transaction—a disabling conflict of interest that rendered his approval ultra vires. Villarini resigned from the GFC Board as soon as the VRM-P funds to CDVCA and PRFG cleared.

141.    Defendant Roberto A. Acosta is a resident of Puerto Rico, owner and president of ASC, and a 50% owner of the ITS/ASC Construction JV. He is married and on information and belief has a conjugal partnership with his wife. This is the same JV that was paid over $8 million on a 5 million fixed price construction contract. Acosta is a participant in and perpetrator of the RICO enterprise, mail fraud, wire fraud, and bank fraud. None of the equipment Acosta was responsible for worked properly at the Humacao Biorefinery and a worker was electrocuted to death in one of Acosta's control panels in September of 2021. A second accident happened two months later. As of January 2026, the equipment he sold and installed at BGF still does not operate.

142.    Ignacio Alvarez, Esq. was the CEO of Banco Popular from 2017 to 2025. He personally executed the offtake agreement and is a founding member of Pietrantoni Mendez & Alvarez, the law firm that oversaw much of the fraud that occurred in this case, such as amendments to the Credit Agreement that stated that no litigation existed despite the existence of this lawsuit and that no default had occurred, after multiple defaults had occurred. Mr. Alvarez is married and on information and belief has a conjugal partnership with his wife.

143.    Upon information and belief, Ignacio Alvarez co-founded Pietrantoni Mendez & Alvarez LLC ("PMA") in 1992 and remains a partner or beneficiary of the firm. As CEO of Popular, Inc. from 2017 to June 2025, Alvarez hired his own law firm to represent Banco Popular

in this litigation and other matters, creating an unprecedented self-dealing arrangement. Upon information and belief, Alvarez continues to receive partnership distributions, retirement benefits, or other financial benefits from PMA even after his retirement from the firm. This creates a direct financial interest in the outcome of PMA's defense of BPPR: the more BPPR pays PMA in legal fees to defend this fraud, the more Alvarez continues to benefit.

144.    Alvarez committed honest services wire fraud under 18 U.S.C. §§ 1343 and 1346 by depriving Popular, Inc. shareholders of their intangible right to honest services. Specifically, on information and belief, Alvarez: (i) hired his own law firm (PMA) to represent BPPR without disclosing his ongoing financial interest in PMA; (ii) approved payment of millions of dollars in legal fees to PMA using shareholder funds of a publicly traded company, while personally benefiting from those payments through partnership distributions; (iii) failed to recuse himself from decisions regarding PMA's engagement; and (iv) caused these payments to be transmitted via interstate wire, including electronic fund transfers and email communications coordinating PMA's engagement. Each payment to PMA constitutes a separate predicate act of honest services wire fraud.

145.    On October 1, 2022, El Nuevo Día published an interview with Alvarez in which he stated: "we have cogeneration, a natural gas plant, but the most innovative [thing] about the plant is that it is equipped to work with methane gas. We already have a contract with a business that captures methane gas from a landfill. This is extraordinary. We will be the first in Puerto Rico to do this." At the time of this interview, Alvarez knew: (i) this RICO lawsuit had been filed six months earlier on April 25, 2022; (ii) the BGF loan had been in default for failure to meet completion since November 2021; (iii) his own COO, Javier Ferrer, had received detailed fraud evidence in November 2021; (iv) BPPR had continued lending over $5.5 million after receiving

that fraud evidence; and (v) construction was not complete and the project was not operational. Alvarez's public promotion of the project while knowing these facts constitutes wire fraud under 18 U.S.C. § 1343 (the interview was transmitted electronically) and demonstrates his personal knowledge of the project and his participation in the scheme to defraud.

146.    PMA occupies the penthouse (19th floor) of Popular, Inc.'s headquarters building in San Juan, Puerto Rico—an arrangement virtually unheard of in the legal profession, where law firms rarely lease space in their client's buildings due to obvious concerns of conflicts and legal separation. Upon information and belief, the terms of this lease are below market rate, constituting additional self-dealing. This physical and financial interdependence between PMA and Popular demonstrates that the relationship is not a standard attorney-client relationship but rather an integrated enterprise in which the same individuals rotate between "outside counsel" and "inside counsel" roles while continuously enriching themselves at shareholder expense while operating inside the same building.

147.    Javier Ferrer was Banco Popular's general counsel to whom Plaintiffs reported the fraud, who not only failed to respond to that report, but instead contributed the ongoing fraud and worked to conceal it. Mr. Ferrer is married and on information and belief has a conjugal partnership with his wife.

148.    Javier Ferrer was a founding partner of Pietrantoni Mendez & Alvarez LLC, not merely an associate or employee. In 2013, Ferrer left PMA to join Popular, Inc. as Executive Vice President and General Counsel. He subsequently became Chief Operating Officer and, in July 2025, President and CEO of Popular, Inc. As a founding partner of PMA, Ferrer had equity ownership in the firm and, upon information and belief, may continue to receive retirement benefits, deferred compensation, or other financial benefits from PMA. Ferrer's trajectory—from

PMA founding partner to BPPR General Counsel to COO to CEO—exemplifies the "revolving door" that characterizes the PMA-BPPR racketeering enterprise.

149.     On November 11, 2021, Plaintiffs' counsel Vanessa Carballido delivered detailed evidence of fraud in the BGF construction drawdowns to Javier Ferrer, then Banco Popular's Chief Operating Officer, and to BPPR's General Counsel. The very next day, November 12, 2021, BPPR deposited an additional drawdown of $677,094.76 to BGF via interstate wire. This disbursement—made within 24 hours of Ferrer receiving evidence of the frauds—constitutes wire fraud (18 U.S.C. § 1343) and bank fraud (18 U.S.C. § 1344) because Ferrer caused funds to be disbursed on a federally-backed loan despite actual knowledge that the drawdown certifications were false. Ferrer's decision to continue disbursements immediately after receiving evidence of the frauds demonstrates that he was not merely negligent, but was an active participant in the scheme.

150.     BPPR disbursed $5.5 million or more after receiving detailed fraud notice from Boyd and Lassers counsel in November 2021 to Javier Ferrer, BPPR General Counsel. Each post-notice disbursement (Drawdowns 11-24) was made with actual knowledge of the fraudulent scheme, establishing BPPR willful participation rather than mere negligence.

151.     Following the November 12, 2021, disbursement, and despite having received detailed fraud evidence, Ferrer authorized or permitted BPPR to continue lending an additional $5.5 million or more to BGF over the following 13 months. Each subsequent disbursement constitutes a separate predicate act of wire fraud and bank fraud because Ferrer, as COO with supervisory authority over lending operations, knew or was willfully blind to the fact that the drawdown certifications were false and that the construction progress reports were fraudulent. BPPR's response to Plaintiffs' fraud notice—delivered through counsel—was to continue lending while never substantively investigating or responding to the evidence provided.

152.    In July 2025, Ferrer became President and CEO of Popular, Inc., succeeding Ignacio Alvarez. Upon assuming this role, Ferrer immediately continued retaining PMA—his own former firm where he was a founding partner—to defend BPPR in this RICO litigation. This means that Ferrer is now paying his former law firm, using shareholder funds, to defend conduct that occurred while Ferrer himself was COO and failed to act on evidence of frauds. The pattern established by Alvarez (PMA co-founder hiring PMA as CEO) is now being repeated by Ferrer (PMA founding partner hiring PMA as CEO), demonstrating that the racketeering enterprise continues and poses an ongoing threat.

153.    Ferrer committed honest services wire fraud under 18 U.S.C. §§ 1343 and 1346 by depriving Popular, Inc. shareholders of their intangible right to honest services. Specifically, Ferrer: (i) received detailed fraud evidence from Plaintiffs' counsel in November 2021 and failed to investigate, report, or act upon it; (ii) approved continued lending of $5.5 million or more to a known fraudulent borrower; (iii) as COO, failed to implement controls to prevent further fraud; (iv) as CEO, hired his own former law firm (PMA) to defend his own conduct; and (v) caused payments to PMA to be transmitted via interstate wire. Ferrer's conduct demonstrates that he prioritized protecting the enterprise and his personal interests over his fiduciary duties to shareholders of a publicly traded company.

### E. VRM Penzini Individual Defendants

154.    Defendant Rafael Rojo is a principal of VRM Penzini Capital, a resident of Puerto Rico, and a signatory to the January 18, 2023, NDA with Boyd and Lassers. He is married and on information and belief has a conjugal partnership with his wife. Rojo acknowledged during a recorded PowerPoint presentation on March 27, 2023, that "now we have a plan to get control."

Rojo is a participant in and perpetrator of the RICO enterprise, wire fraud, and breaches of contract. Rojo participated in planning and executing the acquisition of BGF's assets using confidential information obtained under the NDA without Boyd and Lassers' participation as required by the NDA.

155.    Defendant Carlos Penzini is a principal of VRM Penzini Capital, is believed to be a resident of the state of Florida and is a signatory to the January 18, 2023, NDA. He is married and on information and belief has a conjugal partnership with his wife. Penzini serves as agent resident and vice president/treasurer of Humacao RNG, L.L.C. Penzini is a participant in and perpetrator of the RICO enterprise, wire fraud, and breaches of contract.

156.    Defendant Diego Rodriguez is a principal of VRM Penzini Capital, is believed to be a resident of Puerto Rico, and a signatory to the January 18, 2023, NDA. He is married and on information and belief has a conjugal partnership with his wife. Rodriguez is a participant in and perpetrator of the RICO enterprise, wire fraud, and breaches of contract.

**F. Entity Defendants**

157.    Defendant Banco Popular de Puerto Rico ("BPPR") is a bank organized under the laws of Puerto Rico. BPPR is the lender under the $11.8 million Credit Agreement with BGF, the administrative agent for the NMTC loan, and the parent/controlling entity of PCC SUB-CDE 13, LLC. BPPR is a participant in and perpetrator of the RICO enterprise, wire fraud, bank fraud, money laundering, and honest services fraud. In January 2025, BPPR assigned the BGF loan to VRM Penzini Fund I, LLC Renewable Series II—a disqualified Affiliate under Section 1.1 of the Credit Agreement—breaching its duties as Administrative Agent and enabling the insider acquisition. BPPR did not require security over Offtake Agreements as a precondition for the direct

loan, unlike other SBA/USDA lender requirements, because it planned to obtain its own offtake agreement for its facilities.

158.    BPPR has a 20-year pattern of criminal misconduct, including:

a) **2003**: $21.6 million money laundering fine for failing to file Suspicious Activity Reports on $20 million cash delivered in gym bags and systematic structuring— conduct paralleling the NMTC diversions in this case;

b) **2009-2011**: $83.2 million securities fraud settlements;

c) **2013-2014**: Thousands of arbitration cases arising from the Puerto Rico bond crisis;

d) **2011-2023:** The Tito Trinidad anti-tying case settled for $6.88 million+ in arbitration plus additional larger confidential amounts—conduct paralleling the anti-tying violations alleged herein.

e) **2026:** The head of BPPR's Popular Mezzanine Fund is being sued for diverting bank funds to personal luxury expenses, bypassing disbursement controls and institutional safeguards. This pattern of BPPR executives circumventing security protocols and fiduciary policies mirrors the bank's conduct with BGF/GFC—where executives approved fraudulent drawdowns, ignored fraud notices, and facilitated the systematic looting of a federally-backed project.

159.    The Popular Mezzanine Fund misconduct confirms that BPPR's failures with BGF were not aberrational but reflect an institutional culture of executive self-dealing and deliberate blindness to internal controls.

160.    BPPR's total fines and settlements exceed $180 million, demonstrating systematic criminality rather than isolated incidents.

161.    BPPR's close connection with PMA and the sharing of senior executives as founding partners of the law firm raises the specter of the Crime Fraud Exception in relation to the bank and PMA's activities.

162.    Defendant PCC SUB-CDE 13, LLC ("PCC") is a limited liability company organized under the laws of Delaware and is a wholly owned subsidiary of Banco Popular. PCC is the NMTC lender and a participant in the RICO enterprise.

163.    Defendant Accurate Solutions Corp. ("ASC") is owned and controlled by Roberto A. Acosta and is a 50% owner of the ITS/ASC Construction JV. ASC is a participant in and perpetrator of the RICO enterprise.

164.    Defendant Distributed Power Innovators JV (the "ITS/ASC Construction JV") is a purported joint venture between ITS and ASC established to construct the biorefinery. The ITS/ASC Construction JV is a participant in and perpetrator of the RICO enterprise.

165.    Defendant Semillero Partners, LLC ("Semillero") is a limited liability company registered in Puerto Rico. Semillero is a preferred shareholder in GFC/BGF with a controlling interest. Semillero received $1,403,071 from the Asset Acquisition Agreement while its representative Borschow voted to approve the transaction. Semillero is a participant in and perpetrator of the RICO enterprise, wire fraud, bank fraud, and breaches of fiduciary duty.

166.    Defendant The Puerto Rico Fund for Growth ("PRFG") is a member of the RICO enterprise and a preferred shareholder in GFC/BGF. PRFG received $528,526 from the Asset Acquisition Agreement. PRFG is a participant in and perpetrator of the RICO enterprise.

167.    Defendant Community Development Venture Capital Alliance ("CDVCA") is a member of the RICO enterprise and a preferred shareholder in GFC/BGF. CDVCA is the manager

of the ("PRFG") fund. CDVCA received $208,576 from the Asset Acquisition Agreement. CDVCA is a participant in and perpetrator of the RICO enterprise.

### G. VRM Penzini Entity Defendants

168.    Defendant VRM Penzini Capital (also d/b/a Star Power Systems, LLC) is a Puerto Rico limited liability company engaged in private equity investments in renewable energy and other sectors. VRM Penzini Capital is led by principals Carlos Penzini, Diego Rodriguez, and Rafael Rojo. VRM Penzini Capital signed the January 18, 2023, NDA with Boyd and Lassers through its Star Power Systems operating entity. VRM Penzini Capital is a participant in and perpetrator of the RICO enterprise, wire fraud, and breaches of contract. VRM Penzini Capital used confidential information obtained under the NDA to plan and execute the acquisition of BGF's assets for its own benefit without Boyd and Lassers' participation, violating the NDA's prohibition that "other than for the Business Purpose, the receiving party shall not use the Confidential Information of the Disclosing Party for its own or any third party's benefit or use." VRM Penzini, LLC is a co-owner [shareholder/member] of GFC and Biomass Green Fuels, which is bereft of assets thanks to VRM.

169.    Defendant VRM Penzini Fund I L.L.C. is a Puerto Rico limited liability company that is an investment vehicle controlled by VRM Penzini Capital. VRM Penzini Fund I L.L.C. is a participant in the RICO enterprise.

170.    Defendant VRM Penzini Fund I, LLC Renewable Series II is a series limited liability company under VRM Penzini Fund I L.L.C. In January 2025, VRM Penzini Fund I, LLC Renewable Series II acquired the BGF loans from BPPR despite being an Affiliate disqualified as

an "Eligible Assignee" under Section 1.1 of the Credit Agreement. This entity is a participant in and perpetrator of the RICO enterprise, wire fraud, bank fraud, and breach of contract.

171.    Defendant Humacao RNG, L.L.C. is a Puerto Rico limited liability company majority owned by VRM Penzini. Humacao RNG shares the same business address as VRM Penzini, and Carlos Penzini serves as its registered agent and vice president/treasurer. On February 7, 2025, Humacao RNG executed the Asset Acquisition Agreement to purchase substantially all of BGF/GFC's assets—including over $20 million in biogas refining equipment, the 30-year gas rights agreement with El Coquí Landfill, 100% renewable natural gas and $CO_2$ tax credits, and Act 73 tax grants—for approximately $4.4 million distributed to preferred equity insiders. **The Asset Acquisition Agreement was void ab initio because it was not approved by unanimous consent of the Members as required by Section 9.1 of the GFC Operating Agreement.**

172.    Defendant Ponce RNG, L.L.C. is a Puerto Rico limited liability company majority owned by VRM Penzini. Ponce RNG shares the same business address as VRM Penzini, and Carlos Penzini serves as its registered agent and vice president/treasurer. Ponce RNG acquired the gas rights for which the Companies had a right of first refusal due to the criminal enterprise set forth herein.

### IV. THE BIOMASS GREEN FUELS RACKETEERING ENTERPRISE

173.    The "Biomass Green Fuels Racketeering Enterprise" (the "Enterprise") is an association-in-fact enterprise under 18 U.S.C. § 1961(4). The Enterprise satisfies the "ascertainable structure" requirement of Boyle v. United States, 556 U.S. 938, 946 (2009), which held that an association-in-fact enterprise must have: (1) a purpose, (2) relationships among those

associated with the enterprise, and (3) longevity sufficient to permit the associates to pursue the enterprise's purpose.

174.    The Enterprise consists of the Defendants and their related entities, operating as a continuing unit with a common purpose.

175.    The Enterprise is distinct from the Defendants. While Defendants conducted the Enterprise's affairs, the Enterprise itself—consisting of the interlocking relationships, shared information channels, coordinated decision-making structures, and common bank accounts—has an existence separate from any individual participant. The Enterprise would continue to exist even if any single Defendant were removed, as demonstrated by the Enterprise's seamless continuation when VRM Penzini replaced the López family as the primary asset-stripping mechanism from 2023-2026 and continues in their relationship with Banco Popular. The RICO enterprise has an existence "beyond that which is necessary merely to commit each of the acts charged as predicate racketeering offenses".

176.    The Enterprise operates through a hierarchical structure with defined roles:

177.    The Enterprise maintained formal governance through regular Board meetings. The GFC Board of Managers-including the Lopezes (Non-Defendant Co-Conspirators), Defendants Borschow (Semillero), Villarini (CDVCA/PRFG), and later Defendants Rojo and Penzini (VRM-Penzini)-met monthly, and during crisis periods more frequently. Defendant Economou attended most Board meetings despite not being a formal Board member, providing financial information and coordinating fraudulent activities. During crisis periods-including the November 2021 fraud notice, the July 2022 anti-tying sequence, 2024 collection pressure by BPPR, and the January 2025 Asset Acquisition-the Board met with increased frequency to coordinate the Enterprise response.

**LEADERSHIP TIER:**

178.    López Vidal (Non-Defendant Co-Conspirator): President/CEO of BGF/GFC; directed construction diversions, NMTC fraud—conduct preserved to establish Defendants' knowledge and liability

179.    López Gómez (Non-Defendant Co-Conspirator): Board member; controls ITS entities, directed fund diversions—conduct preserved to establish Defendants' complicity

180.    Economou: CFO; prepared false financial statements, approved fraudulent invoices

181.    At the operational level, Non-Defendant Co-Conspirators Lopez Vidal, Lopez Gomez, and Defendant Economou worked together daily, communicating through email, telephone, text message, and in-person meetings at the BGF offices and the El Coqui construction site. The Lopezes met regularly with Defendant Roberto Acosta at the construction site, coordinating fraudulent progress certifications through messages and emails. Lopez Vidal and Economou communicated with BPPR on a regular basis-initially through Lopez Vidal friend Joval Rodriguez, and later through Laura Medina and Humberto Gonzalez, VP of Commercial Lending. The bank communication often involved the bank's independent inspector, Nestor Rivera who was also a friend of the Lopezes and Joval Rodrigiez.  Without Rivera's fraudulent inspection reports of completion always just a few months away, the construction fraud would never have occurred. This daily coordination enabled the systematic preparation of false drawdown certificates and fraudulent progress reports that formed the predicate acts of the Enterprise.

182.    Joval Rodríguez (BPPR): Account manager; approved fraudulent drawdowns and inspections.  Was the leader of paying the ITS/ASC performance bond after the financial close with BGF's loan proceeds.

183.    Semillero/Borschow approved the actions of the preceding leaders and eliminated controls over them.

184.    PRFG/CDCVA/ Villarini parroted the actions of the Semillero.

185.    Following the September 15, 2020, financial closing, Defendant Semillero Partners maintained a paid advisory agreement with GFC/BGF requiring weekly meetings with management, primarily Lopez Vidal and Economou. Through this advisory role, Defendant Borschow had direct knowledge of and access to all Enterprise operations, financial records, and construction progress-or lack thereof. When VRM-Penzini invested in GFC in May 2023, VRM-Penzini assumed this advisory function, giving Defendants Rojo, Penzini, and Rodriguez the same intimate access to Enterprise information. From early 2023 forward, VRM-Penzini communicated with BPPR more frequently than any other party, secretly coordinating the takeover strategy that culminated in the January 2025 Asset Acquisition.

**FINANCIAL - CONTROL TIER:**

186.    BPPR: As Lender and Administrative Agent; oversaw and controlled the ultimate outcome of the scheme, controlled the flow of funds, and extracted a below-market offtake agreement with multi-million dollar tax incentives.  The Enterprise financial integration centered on BPPR: all GFC and BGF operating accounts were maintained at BPPR, as were the personal accounts of the Lopez family and accounts for the various ITS entities used to divert funds. This centralized banking relationship gave BPPR complete visibility into and control over all Enterprise fund flows, enabling it to monitor-and facilitate-the systematic diversion of construction funds to unauthorized purposes including the Green $CO_2$ Dominicana project, personal expenses, and employee compensation for non-BGF work.

187.     PCC SUB-CDE 13: NMTC lender (BPPR subsidiary) breached fiduciary duties to facilitate the fraud

188.     BPPR participation in the Enterprise extended to its selection and direction of the purportedly independent inspection engineer, Nestor Rivera. Rivera was a personal friend of the Lopez family and Joval Rodriguez (BPPR account manager). Over a four-year period (2020-2024), Rivera submitted inspection reports falsely certifying that construction was almost complete when in fact the plant remains non-operational as of February 2026. In at least one instance, Rivera submitted photographs of a different construction site, falsely representing them as depicting work performed at the BGF facility. BPPR relied on-or purported to rely on-these fraudulent inspection reports to justify continued disbursements despite actual knowledge that construction milestones had not been achieved. Rivera fraudulent inspections constitute predicate acts of wire fraud (18 U.S.C. 1343) for which BPPR is liable as a co-conspirator and aider-and-abettor.

**ASSET STRIPPING TIER (2023-2025):**

189.     Beginning in early 2023 and continuing through the January 2025 Asset Acquisition, VRM Penzini communicated secretly with BPPR more frequently than any other party. While bound by the NDA to work only with Boyd and Lassers, VRM Penzini principals Rojo, Penzini, and Rodriguez engaged in undisclosed negotiations with BPPR to structure an acquisition that would: (a) transfer the loans to VRM Penzini despite the Credit Agreement Affiliate prohibition; (b) release BPPR from all RICO and Anti-Tying claims; and (c) preserve and expand BPPR favorable below-market offtake agreement. This coordinated scheme-using confidential strategies disclosed by Boyd and Lassers under the NDA-constitutes wire fraud and conspiracy.

190.    VRM / Rojo / Penzini / Rodriguez: Obtained confidential information under NDA and used it to take over BGF/GFC

191.    VRM Penzini Fund I, LLC Renewable Series II: Acquired BGF loans as disqualified Affiliate

192.    VRM Penzini Fund I, LLC Renewable Series II stepped into BPPR's shoes, acting as in concert with them, in return for offering BPPR indemnification by engaging in an illegal insider transaction.

193.    Humacao RNG: Acquired substantially all BGF/GFC assets through void transactions

194.    The members of the Enterprise and their roles in the January-February 2025 Asset Acquisition are as follows:

195.    **BPPR**: Assigned loans to disqualified Affiliate in breach of Credit Agreement; obtained releases from all RICO and anti-tying claims in void Asset Acquisition Agreement

196.    **Semillero/Borschow**: Authorized fraudulent conduct by the Lopezes and approved Asset Acquisition while receiving $1,403,071 payment

197.    **Olmar Lopez Gomez, Olmar Lopez Vidal, and Carlos Lopez Vidal** committed and diverted the Companies' resources to their own pockets

198.    **Economou** Aided, abetted and enabled the Lopezes, VRM and Semillero in their fraudulent conduct.

199.    **Roberto Acosta:**    Received via Accurate solutions $295,867, 84.5% of the payment claimed, the second highest percentage after ITS for nonfunctional and nonexistent work.

200.    **Villarini/PRFG**: Received $528,526 from Asset Acquisition that it approved

201.    **Villarini/CDVCA**: Received $208,576 from Asset Acquisition that it approved

202.    **VRM Penzini Fund I, LLC Renewable Series II**: Acquired BGF loans despite being disqualified Affiliate

203.    **Humacao RNG**: Acquired substantially all BGF/GFC assets for $4.4 million through void transaction—assets worth over $300 million

204.    **Ponce RNG** Acquired the gas rights for the EC Waste landfill in Ponce, which would have belonged to the Companies, if the criminal enterprise had never existed.

205.    The Enterprise has a common purpose: systematic fraudulent extraction of funds from BGF/GFC while maintaining the appearance of a legitimate business operation, with each participant receiving specific benefits:

206.    López family (Non-Defendant Co-Conspirators): Direct theft through fraudulent payments ($8M+ to ITS/ASC), diversions to Green $CO_2$ Dominicana and World Spirits— *preserved because BPPR disbursed funds with actual knowledge of fraud, establishing joint and several liability.*

207.    **BPPR**: Below-market $90 million renewable natural gas offtake agreement, releases from all claims

208.    **Semillero/CDVCA/PRFG**: Engaged in an acquisition of additional ownership at depressed valuations, stripped $1.9M+ from Asset Acquisition Agreement in return for indemnifying BPPR

209.    **VRM**: Acquisition of $300M+ in project value for approximately $4.4M paid to insiders, breaching their obligations to Boyd/Lassers under the NDA and RSA

210.    The Enterprise engaged in and affected interstate and foreign commerce through:

211.    Financial transactions with Capital One (Louisiana) for NMTC funds;

212.    Wire transfers to and from the Dominican Republic for Green $CO_2$ Dominicana;

213.    Use of interstate wire communications (email, electronic fund transfers) including all communications between VRM and Boyd/Lassers (Zoom, Microsoft Teams, Google Meet, email);

214.    The NDA, RSA, and Asset Acquisition Agreement were all transmitted electronically across state and national boundaries.

215.    The Enterprise has continuity and ongoing existence.

216.    The Enterprise began in 2018 with Joval Rodríguez's usurious loans, intensified through systematic fraudulent drawdowns and diversions in 2020-2022, expanded in 2023 when VRM Penzini obtained confidential information under the NDA, and continued through January-February 2025 with BPPR's unauthorized loan assignment and void asset acquisition.

217.    The Enterprise poses an open-ended threat as VRM Penzini/Humacao RNG continues to claim control of BGF assets (though the transfer was void) and Boyd continues to face personal guarantee exposure from losses which BPPR can and will not recover as lender and Administrative Agent because of its fraud with the Payment and Performance Bond.

## V. FACTUAL ALLEGATIONS

### FACTUAL BACKGROUND COMMON TO ALL CLAIMS

#### The Creation of BGF and Launch of the Puerto Rican Landfill Projects

218.    The common owners of BGF include Gregory Boyd, Olmar López Gomez, Olmar López Vidal, John Dumas, and Jonathan Lassers. In November of 2019, these shareholders assigned their BGF units to GFC, which accepted the ownership of BGF in exchange for these units as contributed capital.

219.    The plan was for GFC to invest and own separate entities besides BGF.

220.    To date, BGF is GFC's only asset.

221.    Boyd moved to Puerto Rico in 2014, intending to invest in and work on renewable energy projects, with which he had significant experience.

222.    Lassers has a background in finance and was a founder and partner in Semillero Partners, a private equity fund that finances food, agricultural, and other impact projects in Puerto Rico.

223.    Initially, Mr. Boyd held 50% of the ownership of BGF, with the Lópezes holding 25% each.

224.    The Lópezes and Boyd founded BGF to take advantage of the opportunity to purify the methane gas created at Puerto Rico's landfills and convert that gas into renewable liquified natural gas and renewable carbon dioxide.

225.    If the BGF Project were to be completed, air pollution from the landfill in Humacao would be reduced by 90%.

226.    The Project would also produce valuable local renewable energy and carbon dioxide for use in soft drinks and the pharmaceutical industry.

227.    The renewable liquified natural gas would substitute expensive imported fossil fuel products, which are subject to supply chain vulnerabilities and Jones Act high transportation costs that weaken the Puerto Rican economy.

228.    EC Waste owns the El Coqui Landfill, which is the site of BGF's first project.

229.    EC Waste also owns and operates additional landfills, on which BGF owns [or owned] the right of first refusal for the gas rights.

230.    In December 2018, BGF entered into an agreement with EC Waste to purchase El Coqui Landfill's gas and convert it to natural gas and carbon dioxide.

231.    In March 2019, BGF entered into a lease agreement with EC Waste to lease the land where it intended to build its biorefinery at El Coqui to convert the landfill gas to natural gas.

232.    The Commercial Operations Date (COD) for the entire biorefinery was originally set for completion on June 28, 2020, in an agreement between El Coqui Landfill and BGF.

233.    In the first amendment of the gas rights agreement with El Coqui, BGF received an extension of the COB until November 27, 2020.

234.    BGF obtained a new extension to August 7, 2021, at the cost of $250,000.

235.    The new extension did not require that the biorefinery be fully operational, only that it meet El Coqui Landfill's electricity requirements. These requirements would process about 3% of the landfill gas.

236.    El Coqui Landfill's electricity needs represent only 15% of the effort and equipment to build an operational biorefinery for BGF.

237.    In August 2022, the Lopezes, with Borschow's support, claimed that the biorefinery would be completed by October 15, 2022, based on a response to the $1.5 million capital call in the Third Amendment to the Credit Agreement that failed.

238.    There was a Fourth Amendment to the Credit Agreement, which required a repayment of $1 million and a new construction deadline of December 31, 2022.

239.    No repayment was made.

240.    The biorefinery was not operational at the end of 2022, and it is not operational today.

241.    Since BGF was in default on its Fourth Amendment construction and repayment deadlines, there was a Fifth Amendment to the Credit Agreement, which extended the deadlines to March 31, 2023.

242.    On January 17, 2023, El Coqui Landfill Company issued a default letter to BGF for non-payment of $773,480.98, demanding a payment of $250,000 to extend the missed Commercial Operations Date to April 17, 2023, a requirement to add a $2 million bond to the personal guarantees. If these demands were not met, BGF would lose its 21-year gas rights agreement with the El Coqui Landfill. BGF will have no source of revenue and would fail.


**Boyd and Lassers' Critical Roles in the Launch of BGF**

243.    Until 2017, Lassers worked as a partner of Semillero Partners, which brought CDVCA to invest in Semillero Partners' Private Equity Fund.

244.    The Fund was established to invest in projects that promoted environmentally beneficial, sustainable food, agricultural, and import substitution projects in Puerto Rico.

245.    One of the key drivers of Semillero Partners' investment thesis purportedly was to support, actively manage, and develop the management of emerging companies in which the fund invested.

246.    CDVCA and their Puerto Rico Fund for Growth purport to be impact investors in private equity funds and are also the lead investors in Semillero Partners' private equity fund.

247.    CDVCA's supposed goal is to finance projects that have a positive impact on underserved communities by improving living standards and creating well-paid jobs.

248.    CDVCA created the $45 million Puerto Rico Fund for Growth to invest in Puerto Rico Private Equity and Venture Capital Funds.

249.    In April 2019, after having left Semillero Partners, Lassers approached CDVCA about investing in BGF. In response, CDVCA requested that Semillero Partners manage the investment in Puerto Rico because, at that time, CDVCA did not have the personnel to handle due diligence, oversight, or management on the island.

250.    The Puerto Rico Fund for Growth invested $2 million in BGF, for which it received preferred shares.

251.    Semillero Partners received preferred shares in GFC in exchange for its investment of $4.5 million.

252.    To build and develop the project on the El Coqui Landfill, BGF needed funding.

253.    BGF approached Banco Popular for a loan to fund the construction and development.

254.    Banco Popular initially agreed to lend BGF $11.8 million as a construction loan to make the biorefinery Project operational, with the provision that Boyd and the Lópezes each provide a personal guarantee.

255.    The September 15, 2020, Credit Agreement with Banco Popular shows Boyd as a manager of BGF.

256.    As a personal guarantor of the construction loan from Banco Popular to BGF, Boyd is a third-party beneficiary of that loan, as the Credit Agreement states.

**New Market Tax Credit Abuse**

257.    On September 15, 2020, PCE-SUB CDE 13, LLC, which is a wholly owned subsidiary of Banco Popular, along with Capital One, lent BGF $7.2 million through the Federal New Markets Tax Credit program for the purchase of the equipment for the biorefinery.

258.    The New Market Tax Credit program is directed at providing financing for projects providing employment in impoverished areas in the U.S.

259.    Banco Popular acts as the distributing agent for the New Markets Tax Credit or (NMTC) loan.

260.    Boyd is also a guarantor of the New Market Tax Credits loan.

261.    The New Markets Tax Credits program identifies specific poverty-stricken census tracts in the United States where the credits can only be used.

262.    In that NMTC loan, Banco Popular de Puerto Rico is solely the Depositary Bank, which is obligated to make disbursements in accord with the Disbursing Agreement.

263.    The Lópezes produced only one quarterly report filed since PCE-SUB CDE 13 issued the NMTC loan and in September 2020.

264.    Banco Popular's PPC SUB CDE -13, LLC never raised red flags.

265.    The Disbursing Agreement also provides that "Each disbursement, including the first disbursement of QILCI proceeds, shall be made only upon the Disbursing Agent's and Lender's determination that (A) the status of construction is proceeding in accordance with the current approved schedule, the Project Budget, and with the Plans and Specifications, satisfactorily and in conformance with generally accepted Construction Standards for the area in which the Project is located…"

266.    The September 14, 2020, New Markets Tax Credit Disbursement Agreement requires that the biorefinery project be on schedule, in budget, and that it meet generally accepted Construction Standards in the area.

267.    The project has never been on schedule; it has been over budget since November 16, 2021, and it did not follow ISO Construction Standards nor OHSA Safety requirements by allowing a worker to handle live electrical wires without safety equipment and be killed.

268.    Nor do the gross deficiencies described in the Venture Engineering report meet ISO Construction Standards. This conduct and failure to comply with basic construction standards and safety regulations continue

269.    Nor is it an ISO construction standard in any tropical place to leave expensive, sensitive food grade (beverage quality $CO_2$) and biorefinery equipment exposed to the elements without protection.

270.    The Disbursing Agreement also provides that disbursements must be made only pursuant to the QLICI (Qualified Low-Income Community Investment) schedule, which requires that those funds be spent solely on equipment.

271.     Since George Economou and Banco Popular, as the Disbursing Agent, did not require a distinct account for the released QLICI funds, those funds were commingled with all the funds in BGF Operating Account and, thus, were indiscriminately spent on López Vidal's vacations; efforts to discredit Boyd; the Green CO2 project in the Dominican Republic; and the World Spirits distillery.

272.     Economou, Lopez-Vidal and Lopez-Gomez conspired to hide these facts from the Kevane Grant Thorton auditors causing a multi-year delay in the release of audited financial statements.

273.     BGF had to buy the equipment for the biorefinery to get the New Market Tax Credit and the Act 73 Startup Credits.

274.     The September 15, 2020, Community Benefits Agreement provides that all of the NMTC money is to be spent on equipment.

275.     ITS/ASC JV provided a limited range of equipment: containers for the CHPs, batteries for the backup, and the landfill gas pretreatment system.

276.     This equipment totals approximately $2 million of the $5 million of the JV Construction contract. Much of this equipment was paid for with NMTC funds.

277.     BGF paid for the other $18+ million in equipment directly with much of it paid by NMTC.

278.     On information and belief, none of the equipment provided by the JV works, certainly, much of it does not.

279.    The entire delay in generating electricity for EC Waste derives from problems with equipment the JV provided and the subsequent actions of VRM.

280.    ASC/Roberto Acosta provided the battery system and the electronic controls on and container for the Jenbacher 208 power generation equipment for the El Coqui Landfill. Much of this equipment was paid for with NMTC funds.

281.    The Jenbacher 208 was delivered to the El Coqui Landfill in February of 2020.

282.    The Jenbacher 208 was paid with a promissory note to the supplier guaranteed by Greg Boyd. Yet years after delivery and years past the commercial operations date this equipment still does not operate. Racketeering occurs when the ITS/ASC Construction JV sells a service (electric generation for the El Coqui Landfill), pays themselves, and then never delivers electricity.

283.    By law none of the landfill gas can be released into the atmosphere due to methane being 32 times worse for the environment than carbon dioxide. The gas has to be flared, processed by the biorefinery or some combination.

284.    ITS provided a nonfunctional gas pretreatment system with no controls to handle the variable gas flow between the landfills gas system, flaring system, and the biorefinery's variable need for landfill gas.

285.    By providing nonfunctioning equipment paid with NMTC funds, ITS and ASC furthered the purpose of the criminal enterprise by weakening BGF's financial situation.

286.    The lack of power generation caused BGF to pay minimum gas fees and the net electric bill of the El Coqui Landfill totaling approximately $646,000, plus interest payments to Banco Popular of over $1.5 million, plus paying themselves $3.1 million over the $5 million

construction budget during the construction period alone. These actions made BGF vulnerable to takeover by vulture funds and predators such as VRM, Semillero, and Banco Popular with a particular taste for prepared and primed carrion of the nature of BGF.

287.    With the El Coqui Landfill January 17, 2023 Default Notice, Banco Popular now per the Credit Agreement could "declare the Notes or any portion thereof, all or any portion of the interest thereon and all or any portion of the other amounts payable under the Notes and the other Loan Documents to be forthwith due and payable, whereupon the Notes or such portion thereof, all such interest or such portion thereof and all such amounts or such portion thereof shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower; (iii) foreclose on all or any portion of the Collateral and exercise all its rights under the Loan Documents and under applicable law; for its benefit and for the ratable benefit of the Lenders, shall have the right from time to time to partially foreclose all or any part of the Collateral in any manner and for any amounts secured by the Loan Documents then due and payable as determined by the Required Lenders in their sole discretion including, without limitation…" Instead of stopping the fraud when identified by the Plaintiffs in November of 2021, Banco Popular continued with the RICO Enterprise to destroy BGF to the detriment of the Plaintiffs for its own benefit and then sued on the default.

288.    The Disbursement Agreement also provides that "Each and every Requisition presented by the Borrower to the Disbursing Agent shall constitute a re-affirmation of the representations and warranties made by the Borrower under the loan documents that the improvements existing at the time of each request have been constructed … in a good and workmanlike manner." If improvements were workmanlike, the electricity would be flowing over five years ago, and a day laborer would not have been given electrician's work that killed him..

289.    Pursuant to the Disbursement Agreement, Banco Popular was responsible for monitoring the construction of the project.

290.    Pursuant to the Disbursement Agreement, no disbursement shall be made if an act of default has occurred.

291.    In violation of that provision, Banco Popular disbursed money via wire transfer to BGF when BGF was in default with its agreement with El Coqui Landfill by not paying rent; and in default with Banco Popular itself by not paying the loan and the NMTC interest.

292.    Pursuant to the Disbursement Agreement, Banco Popular was not to disburse funds if there are not enough funds remaining to complete the project.

293.    The project has been over the construction budget since November 2021, so by definition, every disbursement since then violated the Disbursement Agreement for the New Market Tax Credits.

294.    Since November 2021, when the project went over construction budget and when Plaintiffs reported the López' fraud, Banco Popular had lent Biomass Green Fuels $5,532,927.39 before the original litigation began.

295.    Often the bank disbursed loan amounts of less than $100,000, without requiring supporting drawdown documentation about the use of funds.

296.    When the bank disbursed undocumented drawdowns of less than $100,000 multiple times, it often used part or all of that money to make interest payments to itself throughout 2022.

297.    One example is on December 5, 2022, when Banco Popular, without a drawdown lent $65,972.35 and on the same day withdrew the same amount to pay itself while further obligating Boyd without approval as a guarantor.



**BANCO POPULAR**

**Account Transactions**                    **Customer:** BIOMASS GREEN FUELS LLC

**Account Details - Checking**

| Account Number | Product | Book Balance | Available Balance |
|---|---|---|---|
| 347276244 | 021 - FLEXICUENTA DE NEGOCIOS | $208,040.49 | $206,440.07 |
| Last Statement Date | Last Statement Balance | Total Fees CTD | Total Fees YTD |
| 11/30/2022 | $216,255.75 | | |

**Transactions**

| Date | Trace Number | Reference ID | Description | Debit | Credit | Balance |
|---|---|---|---|---|---|---|
| 2022-12-01 | 2022335100005 | 20221201000000000000 | CARGO POR FOTOCOPIA | $10.00 | | $216,245.75 |
| 2022-12-01 | 2022335100010 | 20221201000000000000 | EFT PMT FIRST INSURANCE INSURANCE 900-96084603 | $13,933.91 | | $202,311.84 |
| 2022-12-01 | 2022335100015 | 20221201000000000000 | EFT PMT POPULAR CR CARD PAYMENT 466-24357-22 | $2,000.00 | | $200,311.84 |
| 2022-12-01 | 2022335100020 | 2022120108500105652 | CHEQUE NUMERO 2885 | $334.37 | | $199,977.47 |
| 2022-12-02 | 2022336100005 | 2022120208501005238 | CHEQUE NUMERO 2920 | $1,027.68 | | $198,949.79 |
| 2022-12-05 | 2022339100005 | 20221205000000000000 | EFT DEPOSIT BANCO POPULAR PRESTAMO 101-32683300001 | | $65,972.35 | $264,922.14 |
| 2022-12-05 | 2022339100010 | 2022120508500197187 | CHEQUE NUMERO 2921 | $70.00 | | $264,852.14 |
| 2022-12-05 | 2022339100015 | 20221205000000000000 | EFT PMT BANCO POPULAR PRESTAMO 101-32683300001 | $65,972.35 | | $198,879.79 |

298.    In violation of the Disbursement Agreement, Banco Popular continued to disburse funds to BGF after learning that the health and safety standards at the construction site were so lax that a subcontractor was electrocuted and died because the ITS/ASC JV required him to work with live electrical wires without any protective equipment.

299.    Economou comingled the funds, there is no way to trace the allocation of NMTC money to equipment or to payments, approximately 30% of every dollar BGF spent are NMTC funds. This includes funds for Carlos López when he was working on the World Spirits distillery,

making trips to Mexico or to Olmar López Vidal when he was spending weeks in the Dominican

Republic, setting up Green CO2 or otherwise diverting funds.





**14 MAR 2019 ▶ 14 MAR 2019** DESTINO **GUADALAJARA, MÉXICO**

PREPARADO PARA
**CARLOS LOPEZ**                         **AEROMEXICO**

CÓDIGO DE RESERVACIÓN   OIWHVN

✈ PARTIDA: **JUEVES 14 MAR** Por favor verifique el horario de vuelo antes de la salida

| AEROMEXICO AM 0224 | MEX CIUDAD DE MÉXICO | ▶ GDL GUADALAJARA, MÉXICO | Avión: Avión |
|---|---|---|---|
| Duración: 1horas 25minutos | Sale a la(s) 17:00 | Llega a la(s) 18:25 | Millaje 286 Escala(s) 0 |
| Tipo de tarifa: CLASICA | Terminal TERMINAL 2 | Terminal TERMINAL 1 | |
| Estado: Confirmado | | | |

Nombre del pasajero:        Asientos:                    Recibo(s) de boleto(s) electrónico(s)
» Carlos Lopez              21D / AEROMEXICO / Confirmado    1392110350316

300.    ITS charged Carlos López's trip to Mexico to Biomass Green Fuels.

301.    None of that money helped people in an impoverished census tract in the United States under the federal NMTC program.

302.    Carlos López is the son of Olmar López Gómez and a founder of World Spirits, LLC the maker of Bravada Vodka. This charge was reimbursed from the Biomass Green Fuels operating account after receiving NMTC funds. Biomass Green Fuels does no business in Mexico. World Spirits buys its alcohol from Mexico. This expense was fraudulent, and the Lópezes should not have used BGF's funds to reimburse it.

303.    Pursuant to the Community Benefits Agreement, the biorefinery was to create 17 full-time employees with health insurance, technical education and training programs. BGF also

estimates in the Community Benefit Agreement the construction provides 31,000 hours. Upon information and belief, no formal technical education or training has occurred, and BGF never employed more than five people and now employs none.

304.     The Lópezes sent an unlicensed electrical worker, Julio Reyes Salas, to work with live electrical wires without appropriate equipment, training or supervision.

305.     The man died, and ITS' punishment was the payment of a $3,500 OHSA fine paid on February 15, 2022, and the requirement that it create a safety manual and train workers for which BGF paid IEMES, PSC on March 10, 2022, with check 2580 for $7,192.50 signed by both López Vidal and López Gómez. This payment is fraudulent. BGF was not liable for and should not have paid for the ITS safety manual or training.

306.     Economou knowing the request for payment was fraudulent, approved the payment.

307.     In the Venture Engineering report, Exhibit 18, on the construction, a major deficiency is the lack of labeling on the controls through the biorefinery. This is both a safety and operational hazard. Perhaps Julio Reyes Salas would be alive today with proper labeling on the controls as required by OHSA or proper training as required by the NMTC.

308.     OHSA investigated and fined ITS for both the labeling and lack of safety training. The GFC Holdings Board, Semillero, Alexander Borshow, Ernest Villarini, CDVCA/PRFG and Banco Popular took no action against the Lopezes or ITS despite the death, the at fault finding, the project in default for missing the commercial operations date, operating with an expired contract, and being millions over budget on a fixed price budget.

309.    The September 14, 2020, Disbursement Consent Agreement among GFC, BGF, Semillero, and the Puerto Rico Fund for Growth provides that "any deviation to the drawdown schedule which exceeds by 10% of each drawdown set forth in Schedule 2, will require the Purchasers [Semillero and Puerto Rico Fund for Growth]'s written consent."

310.    The deviations to the drawdowns exceeded by 10% of the drawdown set forth in the Schedule for every single drawdown.

311.    Plaintiffs have never seen the Purchasers' written consent. Semillero, and the Puerto Rico Fund for Growth never performed their contractually required duties. Their lack of oversight allowed the funds to be stolen, and the project delayed to the point of default at great harm to the company and its minority owners.

312.    The surrounding area of the El Coqui Landfill has a poverty rate of over 60%, so it qualifies under the NMTC program.

313.    There are no U.S. census tracts in the Dominican Republic, so the conspirators using funds from the New Markets Tax Credits program there violated Section 45 of the Internal Revenue Code.

**Lópezes and Rodriguez fraudulently divert BGF Loan to buy Boyd's units and ITS/ASC Bond with Banco Popular aiding and abetting that fraud.**

314.    In the Spring of 2020, Boyd, Lassers and the Lópezes began the application and due diligence process to secure the loans to fund BGF's Project.

315.    The Lópezes could not qualify as guarantors of the loans with Boyd because their personal tax returns and financial statements reflected minimal income and assets notwithstanding their extravagant lifestyles because the Lópezes filed fraudulent tax returns electronically.

316.    In the absence of valid tax returns and financial statements, in a meeting where Boyd was present, Economou suggested that the Lópezes have "better" personal financial statements prepared.

317.    The Lópezes approached their usual accountant, Fernando Carbonell, to prepare those statements.

318.    At a meeting Boyd attended at the ITS offices, Carbonell questioned the ability of the Lópezes to make such statements truthfully because he knew that Olmar López Gómez had sold his house in Guaynabo in 2018 for $550,000 and had not reported it as income on his Puerto Rico tax return. Since Mr. López Gómez filed his tax return electronically, that tax fraud constitutes wire fraud under RICO.

319.    Recognizing that the Lópezes were weak guarantors, Economou suggested that the Lópezes' ITS entities be included as guarantors.

320.    However, all of the ITS companies' financial conditions were also too weak to support a guarantee.

321.    In fact, at that time, ITS did not have the funds or credit rating to support the required construction bond for the project even though it was negotiating to serve as the construction contractor.

322.    Hence, the Lópezes decided to create a joint venture; Distributed Power Innovators JV (DPI JV) with another company, ASC, using ASC's credit rating to obtain a construction bond for the contract with BGF.

323.    The DPI JV was never properly constituted. The DPI JV did not follow contractual requirements and specifications for the JV set up in the construction contract. The DPI JV never opened a checking account nor filed tax returns.

324.    BGF should have paid DPI JV for construction per the contract. Instead, Olmar López Vidal and Olmar López Gómez made fake invoices, wrote checks and sent wires and ACH payments directly to themselves at ITS and Roberto Acosta at ACS. Without segregated accounting, this "DPI JV entity" could not be audited and without tax returns, it was a fraud. Even the Performance Bond with Mapfre, exhibits 19-20, calls them the ITS/ASC Joint Venture, so, we call the DPI JV, the ITS/ASC Construction JV.

325.    Neither Olmar López Vidal, Olmar López Gómez, nor George Economou ever paid the DPI JV per the construction contract. Instead, the Lópezes signed every check directly to themselves at ITS and Roberto Acosta at ASC without a contract. This makes every check, wire and ACH to ITS and ASC on this project a fraud. Plaintiffs identify a number of such transfers infra.

326.    ITS and ASC have been fraudulently paid over $8 million on a contract that was originally for $4 million.

327.    No Bank, no Board, or honest Private Equity Firm should approve dozens of payments to the wrong entities, particularly when entrusted with federal funds.

328.    No Bank, no Board, or honest Private Equity Firm should accept cost overruns, and project delays without replacing the conflicted management and construction contractor.

329.    The financial close was scheduled for September 15, 2020. It included the simultaneous closing of the Semillero/CDVCA investment, Flexitank convertible note, the Banco Popular direct loan and NMTC loan with Capital One.

330.    On the morning of September 14, 2020, Boyd notified BGF's attorneys at DLA Piper on his availability to sign the loan and funding papers. They responded with the blank signature pages.

331.    Throughout September 14th, various parties suggested changes to the Flow of Funds document.

332.    Boyd submitted his signature for the Flow of Funds to Jose Sosa, DLA Piper attorney representing BGF at the September 15, 2020, financial close at 4:43 PM on September 14, 2020.



Greg Boyd
(787)463-1830

333.    At 4:43 PM these signatures were put into Escrow for the financial close scheduled for early the following morning.

334.    Changes to the flow of funds continued after 5 PM on September 14, 2020, and during and after the financial close at PMA on September 15, 2020.

335.    Boyd is not liable for changes made to documents after his signature went into escrow and to which he did not consent. Boyd did **not ever consent to release his signature** when Bret Heyman, an attorney for Capital One, one of the NMTC lenders, requested it, and yet Boyd's forged signature appears on the document.

greg.boyd@icloud.com

| | |
|---|---|
| **From:** | Joval Rodriguez Barnes <Joval.Rodriguez@popular.com> |
| **Sent:** | Monday, September 14, 2020 9:38 PM |
| **To:** | Jacen Killebrew; Heyman, Brett E.; Cristina Dominguez; john.chamberlain@capitalone.com; douglas.fields@capitalone.com; al.kropog@capitalone.com; mark.preston@capitalone.com; kyle.fontanille@capitalone.com; seth.bosworth@capitalone.com; taylor.leblanc@capitalone.com; lisa.irons@capitalone.com; Cronin, Patrick J.; McGuckin, Aurora P.; Humberto E. Gonzalez Caraballo; Gabriel Lopez Somohano; asantos@pmalaw.com; amolina@pmalaw.com; pramirez@pmalaw.com; Natalia Guzman; Jessika M. Corujo Rodriguez; Isaac Wilkins Velez Barbeito; Guillermo Franco; drew.marlar@kutakrock.com; carol.mihalic@kutakrock.com; edward.gillespie@kutakrock.com; nicole.wilson@kutakrock.com; Olmar López; olg@greenfuelspr.com; G Boyd; george.economou14@gmail.com; jose.sosa@dlapiper.com; ruben.fernandez@dlapiper.com; paul.ohanlon@leveragelaw.com; blake.mason@leveragelaw.com; neal.johnson@leveragelaw.com; Richard Davies |
| **Subject:** | RE: Biomass Green Fuels - Projections |
| **Attachments:** | ESI Energy - Invoice.pdf |

Jacen, I have a small difference ($4,742) with the direct loan disbursement at closing. It is related to ESI Energy's invoice which I think is not included in the amount to be disbursed. My understanding is that this invoice will be paid with the Direct Loan. Could you please confirm this.

| Closing Costs | Total Invoices | Direct Loan |
|---|---|---|
| BPPR Fees | | 233,750.00 |
| P&P Bond | | 70,500.00 |

336.    In the above email, nearly five hours after Boyd submitted his signature, Joval Rodriguez made another change to the disbursements which changed the Flow of Funds. Exhibit 21

337.    The email shows Rodriguez is including the payment of the ITS/ASC Construction JV Performance and Payment Bond by BGF in the Banco Popular Loan Disbursement. This Bond was a precondition of the financial close to be paid by ITS/ASC. It was not to be paid after the closing by BGF with funds from the bank loan to build the biorefinery, but that is what the Lópezes, ASC, and ITS did, with Banco Popular's approval and assistance.

338.    The ITS/ASC JV should have paid its own bond. By diverting funds intended for the biorefinery to the performance bond, Banco Popular and ITS/ASC committed bank fraud.

339.     In the Banco Popular Credit Agreement, Article 3, Conditions of Lending on page 46:

> (h)     Insurance. The Administrative Agent shall have received evidence required under Section 6.2.1(a) of the existence of all the required Policies and the designation of the Administrative Agent, for the ratable benefit of the Lenders, as the loss payee or additional insured, as the case may be, thereunder to the extent required hereby, and evidence that all Insurance Premiums then due and payable with respect thereto have been paid, including without limitation, evidence that the required payment and performance bond(s) in relation to the Project, name the Borrower and the Administrative Agent, for the benefit of the Lenders, as dual obligees, for not less than one hundred percent (100%) of the amount of the Direct Costs with respect to the whole Project from an insurance company reasonably acceptable to the Administrative Agent, and reasonably satisfactory evidence that the premiums on such bonds have been paid in full.

340.     This Bond is an obligation of the ITS/ASC Construction JV.

341.     BGF's contract with the Joint Venture provides:

> 8.     Both parties agree to execute all applications and indemnity agreements required by the sureties upon any bond, or bonds, required in connection with the contract and the performance thereunder, and if required by such bonding JV, execute any indemnity agreement(s) jointly and severally between the Joint Venturers. Both parties also agree to pay their (50%) percent share of all insurance premium costs and to be responsible in their proportionate share for any deductible costs associated with said insurance coverage.

342.     The Mapfre Bond was required by BGF as the Obligee. It was ITS/ASC's responsibility as principals to pay it.

**MAPFRE PRAICO INSURANCE COMPANY**

, EDIFICIO MAPFRE, 297 CL. CÉSAR GONZÁLEZ, SAN JUAN PR

PO BOX 70333, SAN JUAN PR  00936-8333

⊛ **MAPFRE** | **PUERTO RICO**

---

**PAYMENT BOND**
**BOND NUMBER**    1301208000513

Principal:          **ITS/ASC JOINT VENTURE**
Principal's address:  **PO BOX 11439  SAN JUAN PR 00920**

Obligee:           **BIOMASS GREEN FUELS, LLC**

Obligee's address:

Contract / Project:

**SUPPLY, PROCUREMENT AND CONSTRUCTION/INSTALLATION CONTRACT. CONSTRUCTION OF A FACILITY FOR THE
PRODUCTION OF RENEWABLE LANDFILL GAS TO RNG AND CO2 AT EL COQUI LANDFILL, HUMACAO.**

Contract date:          day of

KNOWN ALL MEN BY THESE PRESENTS:

That the Principal identified above, and the Surety are held and firmly bound unto the Obligee referenced
above, to the just and full sum of

**FIVE MILLION AND 00/100 DOLLARS  (\$\*\*\*5,000,000.00)**

to the payment of which sum, well and truly to be made, the Principal and Surety jointly and severally bind
themselves, their respective heirs, administrators, successors and assigns, firmly by these presents.

Whereas, the Principal has entered into a certain written contract ("Contract") with the Obligee for the
construction of the project identified above for the amount of

**FIVE MILLION  AND 00/100 DOLLARS (\$\*\*\*5,000,000.00)**

343.    The López Defendants' own Exhibit to their Motion to Dismiss the original Complaint proves our point. Docket 110, Exhibit 1. Boyd did not approve the fraudulent payment of ITS/ASC Performance bond from the loan money.

344.    Documents continued to change after the financial closing at Pietratoni Mendez & Alvarez (PMA), the attorneys for Banco Popular, on Tuesday, September 16, 2020.

345.    Boyd requested copies of the closing documents from the PMA attorneys at the end of the closing.  They refused.  Boyd offered to come back later in the day or the following day and they said not to come. PMA and BPPR never sent Boyd the closing documents. As a personal guarantor Boyd was owed these documents.

346.    The refusal to provide the closing documents by PMA and BPPR, as part of the broader scheme to conceal their fraudulent bond substitution and enable improper loan disbursements, constitutes predicate acts of wire fraud under 18 U.S.C. § 1343 and honest services fraud under 18 U.S.C. § 1346, thereby violating RICO provisions 18 U.S.C. § 1962(c) by conducting enterprise affairs through a pattern of racketeering and § 1962(d) through conspiracy to commit such acts, resulting in concrete financial injuries to the plaintiffs including equity loss and guarantor exposure.

347.    In the Lopez Defendants' Exhibit 14 to their Motion to Dismiss, Docket 110, which contains a signed Flow of Funds, Bret Heyman requests authorization from all parties to release signatures. Boyd never gave permission to release his signature to Brett Heyman, yet his signature is on the flow of funds.

Case 3:22-cv-01190-ADC-BJM    Document 110-2    Filed 08/08/22    Page 1 of 10

Exhibit 2

| | |
|---|---|
| **Subject:** | Biomass Green Fuels - Request for Authorization Release |
| **Attachments:** | Biomass Green Fuels - Flow of Funds (Executed).pdf |
| **Importance:** | High |

**From:** Heyman, Brett E. <bheyman@jonesday.com>
**Sent:** Tuesday, September 15, 2020 12:56 PM
**To:** john.chamberlain@capitalone.com; douglas.fields@capitalone.com; al.kropog@capitalone.com; mark.preston@capitalone.com; kyle.fontanille@capitalone.com; seth.bosworth@capitalone.com; taylor.leblanc@capitalone.com; lisa.irons@capitalone.com; Cronin, Patrick J. <pcronin@jonesday.com>; Heyman, Brett E. <bheyman@jonesday.com>; McGuckin, Aurora P. <amcguckin@jonesday.com>; joval.rodriguez@popular.com; humberto.gonzalez@popular.com; gabriel.lopezsomohano@popular.com; asantos@pmalaw.com; amolina@pmalaw.com; pramirez@pmalaw.com; natalia.guzman@popular.com; cristina.dominguez@popular.com; jessika.corujo@popular.com; isaac.velez@popular.com; gfranco@communitycapitallink.com; drew.marlar@kutakrock.com; carol.mihalic@kutakrock.com; edward.gillespie@kutakrock.com; nicole.wilson@kutakrock.com; olv@greenfuelspr.com; olg@greenfuelspr.com; gboyd@greenfuelspr.com; george.economou14@gmail.com; Sosa, Jose <Jose.Sosa@us.dlapiper.com>; Fernandez Agramonte, Ruben <Ruben.Fernandez@us.dlapiper.com>; paul.ohanlon@leveragelaw.com; blake.mason@leveragelaw.com; neal.johnson@leveragelaw.com; richard.davies@cohnreznick.com; jacen.killebrew@cohnreznick.com
**Subject:** Biomass Green Fuels - Request for Authorization Release
**Importance:** High

[EXTERNAL]

All,

We have confirmed that Capital One has everything they need in order to close the Biomass Green Fuels transaction. To begin the wiring process, at your earliest convenience, we kindly ask **(1) PMA, (2) Kutak Rock (on behalf of your firm and MNAT), (3) DLA, and (4) Leverage Law** to please reply all to this email providing express authorization to release signature pages (on behalf of your firm and/or respective clients, as applicable) and opinions.

After we receive authorization from all parties, we will then authorize release on our end by replying all to this email chain, and ask that BPPR please initiate the leverage loan wire and circulate the fed ref number immediately upon receipt. We will instruct Capital One to fund (after receipt of the leverage loan wire) in accordance with the attached Flow of Funds.

Please let me know if you have any questions.

Thanks!
Brett

Brett E. Heyman
Associate
JONES DAY® - One Firm Worldwide℠
100 High Street, 21st Floor
Boston, MA 02110-1781
Direct: +1.617.449.6898

348.     Boyd's signature on the Flow of Funds was forged by Joval Rodriguez as Banco

Popular in violation of forgery 18 U.S.C. § 472 and 473 in furtherance of the enterprise.

**BIOMASS GREEN FUELS**
FLOW OF FUNDS
SIGNATURE PAGES

Agreed and Approved:

BANCO POPULAR DE PUERTO RICO,
a banking corporation organized under the
laws of the Commonwealth of Puerto Rico

By: _____
     Name: Joval F. Rodriguez Barnes
     Title:  Commercial Relationship Officer

349.     Boyd asked PMA and BPPR for his copy of the closing documents on September

15, 2020. He was told no.  He asked if he could return later in the day to get his copy.  Again, he

was told no.  He asked the following day and was told they would contact him when available.

Boyd never received a copy from BPPR or PMA until they sued him in San Juan local court to

collect on the loan on May 22, 2024, as case exhibits.

350.     Jones Day did not provide the final signed set of documents from September 15,

2020, closing until over six months later March 26, 2021.

**From:** McGuckin, Aurora P. <amcguckin@jonesday.com>
**Sent:** Friday, March 26, 2021 5:05 PM
**To:** john.chamberlain@capitalone.com; douglas.fields@capitalone.com; al.kropog@capitalone.com; mark.preston@capitalone.com; kyle.fontanille@capitalone.com; seth.bosworth@capitalone.com; taylor.leblanc@capitalone.com; lisa.irons@capitalone.com; Cronin, Patrick J. <pcronin@jonesday.com>; Heyman, Brett E. <bheyman@jonesday.com>; McGuckin, Aurora P. <amcguckin@jonesday.com>; joval.rodriguez@popular.com; humberto.gonzalez@popular.com; gabriel.lopezsomohano@popular.com; asantos@pmalaw.com; amolina@pmalaw.com; pramirez@pmalaw.com; natalia.guzman@popular.com; cristina.dominguez@popular.com; jessika.corujo@popular.com; isaac.velez@popular.com; gfranco@communitycapitallink.com; drew.marlar@kutakrock.com; carol.mihalic@kutakrock.com; edward.gillespie@kutakrock.com; nicole.wilson@kutakrock.com; Olmar López <olv@greenfuelspr.com>; olg@greenfuelspr.com; G Boyd <gboyd@greenfuelspr.com>; george.economou14@gmail.com; jose.sosa@dlapiper.com; ruben.fernandez@dlapiper.com; paul.ohanlon@leveragelaw.com; blake.mason@leveragelaw.com; neal.johnson@leveragelaw.com; richard.davies@cohnreznick.com; jacen.killebrew@cohnreznick.com
**Subject:** Biomass Green Fuels Closing Binder

Good afternoon,

You should have received a Box.com invitation to access an electronic copy of the Biomass Green Fuels transaction Closing Binder. Given the uncertainty of workplace capacity as a result of COVID-19, we want to ensure all parties have access to the closing documents and diligence materials.

You can also access the binder using the following link: https://app.box.com/s/lb1q4q08zis8x9s5rzjhgvhad2vwbe2z

Please let us know if you have any questions or any trouble accessing the files on Box.

Thank you,
Aurora

Aurora McGuckin
Lawyer Support Assistant
JONES DAY® - One Firm Worldwide℠
100 High Street, 21st Floor
Boston, MA  02110-1781
Direct: +1.617.449.6805
amcguckin@jonesday.com

351.    On September 16, 2020, López Vidal fraudulently paid Popular Insurance for the ITS/ASC Construction JV's, $70,500 construction bond with money intended for BGF's operations, illegally diverting BGF's funds for the benefit of the Lópezes and Roberto Acosta of ITS/ASC.

352.    The ITS/ASC Construction JV's provision of the bond was a condition precedent to the closing, but it was not paid until the day after the closing because it was paid from BGF's loan proceeds.

353.    The payment is not listed on the Flow of Funds agreement executed the day before with Banco Popular and Investors.

354.    López Vidal fraudulently identified the payment in a wire transfer form as a closing cost in violation of 18 U.S.C. § 1343.

355.    At the October 8, 2020, Management meeting, Boyd raised the issue of the ITS/ASC Construction JV Bond being paid with BGF loan money he is guaranteeing, and Alex Borschow refused to take action to restore that money from the Joint Venture to BGF. After this, Boyd was not invited to any weekly management meetings where his comments would have to be in the minutes.

356.    Olmar López Gómez was not an officer, employee, or Director of BGF, yet Borschow allowed López-Gómez to be a signer on every BGF check, wire and ACH.

357.    Much of the loan money to BGF would be paid to López Gómez as the President of one of his ITS entities which owns 50% of the ITS/ASC Construction JV.

358.    No honest Private Equity Firm would allow a corporate outsider to write checks and make payments to himself unless he were involved in the RICO Enterprise.

359.    Borschow intentionally and repeatedly failed to exercise his corporate responsibilities, accepted conflicts of interest, and denied minority shareholders' rights with intent of taking advantage of GFC/BGF that he manipulated into distress on behalf of Semillero, PRFG, and CDVCA as part of the criminal enterprise.

360.    To close the financing with Banco Popular, the Lópezes also fabricated financial information on their Small Business Administration personal financial statement forms for the

New Market Tax Credit loan in violation of 18 U.S.C. § 1344 and provided those forms to Banco Popular and Capital One electronically. Exhibits 7-8

361.    By September 2020, after working on BGF without pay for nearly two years, and having suffered significant financial damages from Hurricane María, Boyd experienced financial difficulties because he was being forced to repay family funds and loans undertaken on behalf of BGF in the amount of $750,000.

362.    Unlike Boyd, the Lópezes received pay from ITS during these two years.

363.    Following the agreement being put in place to finance BGF's projects fully, the Lópezes with Economou's assistance, sensing Boyd's weakened financial position and the opportunity to take majority control of BGF and benefit fraudulently from Boyd's past financial contributions, refused to reimburse the loans that Boyd had taken out on behalf of BGF.

364.    López Vidal agreed to buy a percentage of Boyd's participation personally through a Membership Interest Purchase Agreement.

365.    López Vidal did not have the money to pay for Boyd's shares under the MIPA, but, at that point, Boyd did not know that, and López Vidal concealed that fact from Boyd.

366.    When Boyd sold 7.5% of his interest in GFC to López Vidal, López Vidal led Boyd to believe that López Vidal was purchasing that interest with the López family's money.

367.    Based on their tax returns and personal financial statements, the López family did not have $750,000.

368.    Through fraudulent means, aided and abetted by Banco Popular, the Lópezes managed to reduce Boyd's post-closing net percentage of BGF shares from 44% to approximately

31.1% and threatened him with litigation into closing the less than advantageous transaction with Semillero Partners.

369.    Economou prepared false documentation that misrepresented the nature of the loans Boyd obtained on behalf of BGF.

370.    This falsified documentation was accompanied by threats by the Lópezes of specious litigation and threats to bankrupt Boyd if he did not comply within the timeline that was left to close the financing and repay the loans that Boyd had undertaken on BGF's behalf to launch BGF and buy the very gas rights that were the basis of BGF's entire value.

371.    Economou and the Lópezes withheld the fact that they did not acquire Boyd's units until after the closing from Semillero and the equity investors. After coercing and intimidating Boyd they engaged in securities fraud with the investors, leveraging their knowledge that Boyd had taken a great personal financial risk to get BGF funded (which they themselves were incapable of financially and unwilling to do), while at the same time promising employment and a Board position to Boyd if he sold his interest to López Vidal to repay the startup loans Boyd had taken out to fund BGF.   The Lopezes with help from Semillero and CDVCA denied Boyd his management position and removed him from the Board for identifying the on-going frauds committed by them.

372.    Banco Popular knew that the funds to pay for Boyd's MIPA did not come from López Vidal's account as López Vidal used the bank loan as a guarantee for repayment with the assistance of BGF's account manager at Banco Popular, Joval Rodriguez.

373.    The Lópezes effectively forced Boyd to pay for loans he undertook on BGF's behalf to start the company—for which the Lópezes invested no net equity —while coercing him into

reducing his equity, all to gain control of BGF at the financial closing with Banco Popular and Capital One.

374.    The Lópezes' falsified documentation, threats of litigation, and fraudulent payment for the MIPA leveraging loan money designated for the biorefinery also caused the negation of Lassers' rights to ownership under his SAFE note agreement with BGF as part of the MIPA agreement.

375.    In contrast, the Lópezes reimbursed themselves for more than every penny they spent on BGF plus the fraudulent usurious interest charges, and fraudulent personal expenses disguised as business expenses.

376.    This ownership reduction and promise of employment was ultimately reflected in a Membership Interest Purchase Agreement ("MIPA"), which Boyd signed shortly after receiving an executable copy from Jose Sosa of DLA Piper the afternoon of September 14th, 2020, at 1.30pm.

377.    MIPAs are used to set forth the relative interests of each member of the limited liability company and establish the parties' obligations to one another.

378.    The MIPA that Boyd and López Vidal signed provided that Boyd was to be a manager and director of GFC/BGF.

379.    López Vidal materially breached that provision of the MIPA by conspiring with Borschow and Ernesto Villanari of PRFG to preclude Boyd from being a manager.

380.    Borschow and Villarini later agreed that Boyd could be a subcontractor to meet the requirements of the bank and convertible noteholders for Boyd to be involved in the project.

381.    The MIPA also provided that Boyd was to be employed by GFC/BGF.

382.    López Vidal later provided a job description for Boyd to be the Director of New Business and Development.

383.    When Boyd accepted the position as a subcontractor, López Vidal materially breached that provision of the MIPA by ultimately refusing to provide the contractor job to Boyd which had been approved by the Board.

384.    Nonetheless, Boyd continued to work on behalf of BFG and GFC in the role of New Business and Development Director.

385.    GFC's attorney later denied that there was any obligation to hire Boyd as director, officer, and manager of the company.

386.    Days after the MIPA was verbally agreed upon on May 22, 2020, the Lópezes signed a new construction contract with their ITS/ASC Construction JV between themselves for $5 million and concealed it from Boyd in furtherance of the criminal enterprise. The previous vetted contract was for $4 million and signed by Boyd as CFO of BGF.

387.    The Lópezes fraudulently financed the $750,000 MIPA payment by increasing the construction cost by $1 million to be paid by BGF, and, with the assistance of Rodríguez at Banco Popular, used the proceeds from BGF's loans to leverage the purchase Boyd's interest in BGF in violation of the terms of the loan and the requisites of the New Market Tax Credits.

388.    The Lopezes did not reveal this new construction contract to Boyd or the board until September 14, 2020, as part of the closing of the Banco Popular construction loan for the biorefinery.

389.    This scheme allowed López Vidal to leverage and use funds provided from BGF's loan to buy Boyd's interest for his own personal benefit. To achieve this, López Vidal relied on the undisclosed construction contract for $5 million, on fraudulent drawdowns, and fraudulent expense reports supported by fraudulent drawdown certificates for construction and equipment payments created with Economou's help and approved and enabled by Rodríguez at Banco Popular.



**MIPA Payment Flow Chart**

**Fraudulent Drawdowns throughout the Construction**

390.    Banco Popular's Commercial Relationship Officer, Rodríguez, approved the fraudulent drawdowns, and, knowing that they were fraudulent, joined in the fraud engineered with the Lópezes. As an Officer of Banco Popular, BPPR is liable for all of Rodriguez's actions.

391.    Nestor Rivera Galguera is the independent engineer hired by Banco Popular and paid by BGF to inspect the construction progress for each drawdown.

392.    The Lópezes and Rodríguez handpicked Nestor Rivera Galguera.

393.    López Vidal and Economou submitted drawdowns for work that Rivera Galguera had falsely certified as done.

394.    The ITS/ASC Construction JV was paid the full $5 million of their contract in November 2021 yet the construction was barely 10% complete and totally mis designed. It was impossible to have finished the construction by then since the bulk of the equipment for the biorefinery did not arrive until February of 2022, yet Rivera Galguera, Economou, and López Vidal respectively falsely certified incomplete construction as complete, approved payment for work that was not done, and submitted fraudulent certifications and fraudulent requests for new drawdowns that Rodríguez at Banco Popular approved.

395.    On March 8, 2022, in Drawdown 13, Olmar López-Vidal certified the ITS/ASC Construction JV was paid in full. Nonetheless, Banco Popular continued to lend another $3.1 million to BGF to pay the ITS/ASC Construction JV, with an expired, fully paid contract, ignoring

their        own        disbursement        controls        and        credit        agreement.

| | |
|---|---|
| GC Contract | $361,338.22 |
| Retainage | $7,839.00 |
| *Total* | $369,177.22 |
| GC Completed To Date | $5,000,000.00 |
| Retainage | $50,821.36 |
| Total | $4,949,178.64 |
| GC Contract | 5,000,000.00 |
| Balance to Finish | 50,821.36 |
| Direct Loan - Net Available | 437,594 |

Signature: *Olmar Lopez Vidal*

Olmar Lopez Vidal (Mar 9, 2022 10:57 AST)

396.    Eighty percent of the biorefinery equipment arrived in February 2022, yet Olmar López Vidal fraudulently told the GFC Board nearly a year earlier, in March 2021, all of the equipment was on-site.

397.    In fact, López-Vidal had only made the initial equipment down payment to TPI in January 2021 which started a year-long custom manufacturing process.  The March 2021 statement was a complete fabrication.  It could be proven a lie by simply visiting the empty construcio0tn site or calling the landlord, El Coqui Landfill. Despite being encouraged to do so by Boyd, Board Members and Preferred Unitholders, Alex Borschow of Semillero and Ernest Villarini of PRFG/CDVCA never performed their Fiduciary duty to investigate.

398.    Economou further conspired with the Lópezes and Rodríguez to benefit from a paid position as CFO; receive commissions on money raised; create fraudulent drawdowns to enrich himself and potentially benefit from the sale of the company.

399.    Having fraudulently obtained control of GFC/BGF, the Lópezes took other improper actions to consolidate their control of the operations and finances of GFC/BGF and further exclude Boyd from management.

400.    Boyd had taken the lead in the contracting process on behalf of BGF and had set the terms and engaged with third-party subcontractors and suppliers.

401.    Following the change in control of BGF, the Lópezes eliminated the role Boyd previously had in managing the supplier and construction contracts, pricing, schedules, and payments, further shutting him off from any decision-making within GFC/BGF. Without Boyd's oversight, the Lópezes were free to divert these critical funds at the Project's inception and negotiate kickbacks for their own benefit.

402.    The two main equipment biorefinery equipment contracts were not executed for over four months after the September 15, 2020, financial close even though Boyd had had those contracts ready for execution immediately following the close.

403.    The López' failure to start work immediately caused the Project to fall behind and led to a series of cascading events that put the Project and its contracts into default.

404.    Defaulting on the contract with El Coquí Landfill to build the biorefinery eliminated the ability of GFC/BGF to exercise the right to expand to additional landfills and caused further, significant harm to the other unitholders, including the loss of the New Market Tax Credit benefits.

405.    Spending the money on the MIPA instead of the construction was not only a fraud against Boyd – whose shares were purchased via access to the bank loan or equity investors funds intended for the Project – and against GFC/BGF, whose funds were diverted, but also bank fraud

since the Lópezes provided false information to the bank, averring that the loan money would go to the construction of the biorefinery in violation of 18 U.S.C. § 1344, not to fraud that would pay to increase López Vidal's ownership percentage in BGF.

**Fraud and Semillero's Participation in the Criminal Enterprise for ITS's Benefit**

406.    On September 24, 2019, López Vidal fraudulently certified that the New Markets Tax Credits Project Intake form was true, accurate, and complete, when it listed Gregory Boyd as the Chief Operating Officer of BGF.

407.    By the time the NMTC loan money arrived at BGF, Boyd was not even a manager, much less an officer of BGF.

408.    On September 2, 2020, López Vidal, through ITS, sent Economou at BGF a fraudulent invoice for design services not rendered for $200,000.

409.    López Vidal had told Nexus PMG, Semillero's technical due diligence team on June 12, 2020, that it would take months after the equipment vendors received down payments to perform a detailed design. Galileo did not receive its down payment until December 22, 2020, and TPI did not receive its down payment until January 26, 2021. Since the equipment vendors did not receive their down payments until at least three months after the September 2, 2020, invoice, ITS could not have incurred the design fees by that date.

410.    Knowing the design invoice was fraudulent, Economou approved its payment.

411.    The money for the equipment vendors' down payments should have been sent immediately following September 15, 2020, financial close according to the drawdown schedule and flow of funds prepared by Cohn Resnick CPA for the NMTC lenders.

412.    Delaying these down payments by four and five months caused the project significant delays and unbudgeted costs.

413.    Each day the landfill burned gases which could have been processed by the biorefinery to generate over $20,000 in profits to BGF or $600,000 a month, now at a cost of many millions.

414.    The Lópezes were meant to make the equipment vendor contract down payments immediately after the financial closing.

415.    Their delay of over seventeen months from the signing of the December 2018 landfill gas agreement to the September 2020 financial close to execute these contracts was yet another critical failure caused by their fraudulent activities which the original codefendants aided and abetted.

416.    BGF missed the Commercial Operations Date in August of 2021, which added a monthly $30,000 minimum gas payment, $4,166 in rent, and liability for a $5 -10,000 electric bill from El Coqui as well as $100,000 in interest payments between the direct and NMTC loans.

417.    Each month of delay cost BGF $600,000 in lost profits and $170,000 of unfunded costs and overhead, a monthly total of $770,000.

418.    The Lópezes' construction delays cost millions upon millions.

419.    Banco Popular's Amendment 5 extended the completion date yet another two months, or $770,000 x 19 months = $14.63 million. Yet, manifesting their support of the RICO enterprise, Semillero, PRFG, and CDVCA, the preferred shareholders and Board members with control of BGF, did nothing to change the management or the ITS/ASC Construction JV. Instead, they agreed to the Fifth Amendment to the Credit Agreement.

420.    Banco Popular, Semillero, PRFG and CDVCA and the Lopezes' fraud, criminal acts, and incompetence while diverting funds, and the theft of Boyd's MIPA have cost over $20 million in lost profits to date, which continues to compound to the detriment of BGF and the Plaintiffs every day.

421.    That four and five-month delay became magnified by the lack of work on the biorefinery construction.

422.    Not ordering promptly as required by the drawdown schedule constituted fraud by the Lópezes.

423.    Instead of doing their jobs for BGF, they were embezzling money for their other projects and lifestyle.

424.    During this period of time, the Lópezes built the distillery for World Spirits founded by son/brother Carlos López and his wife Claudia Ferrer.

425.    The Lopezes also developed a directly competing project in the Dominican Republic. No wonder they did not have time to keep the BGF project on schedule and out of default.

426.    At the December 17, 2020, Board Meeting Olmar López Vidal said: "Made initial payments on Galileo and TPI equipment". This was a lie to cover up the fraud, López Vidal did not pay Galileo until the following day, and he did not pay TPI until 2021.

427.    López Vidal stated that that by end of January 2021 BGF should be able to coordinate a site visit for everyone, and BGF would have all the major equipment on site. This was another lie to cover up the López' fraudulent conduct of diverting the loan money to pay the MIPA, construct World Spirits and their competing project in the Dominican Republic.

428.    The majority of the equipment did not arrive until February 2022, as López Vidal knew it would not be on time because the equipment takes more than a year to build and ship overseas.

429.    When Boyd saw the detailed design invoice for $200,000 paid, he asked to see the detailed design. Borschow said no.

430.    Boyd then asked that Borschow have Nexus PMG (who did the original technical due diligence for Semillero) review the design, and again, Borschow refused. The design review would have revealed fraud, incompetence, the lack of variable gas controls, lack of a cooling and water plan and may have stopped the waste of millions of dollars and years of time. Borschow acted to conceal the fraud and failed any semblance of Fiduciary duty.

431.    The September 15, 2020, Credit Agreement among BGF, the Lender, and Banco Popular as administrative agent, provides that Banco Popular shall not disburse money for capital expenditures in excess of the annual budget unless there is equity provided by an approved advance, equity, or insurance that would cover the expense.

432.     In breach of their fiduciary duties to comply with the Credit Agreement, the GFC/ BGF Board did not approve the 2020 or 2021 annual budgets and never provided audited financial statements for the same periods of time. This makes every drawdown a violation of the credit agreement perpetrated by a fraudulent collaboration among the Lópezes, Semillero, PRFG, CDVCA and Banco Popular in furtherance of the enterprise.

433.     On November 11, 2021, Boyd's and Lassers's Attorney Vanessa Carballido delivered to Banco Popular at Javier Ferrer's request, evidence of fraud by their employee, fraud in the drawdown requests and violations of the credit agreement with BGF. Exhibits 5-6

434.     Rather than pause and investigate the documentation of the fraud on the drawdown, Banco Popular deposited a drawdown loan of $677,094.76 the next day (November 12, 2021) into BGF's operating account.

435.     On November 16, 2021, the ITS/ASC Construction JV's drawdown certificates and payments exceeded the $5 million cost on the construction contract. Semillero, PRFG and CDVCA, the preferred shareholders and Board Members, chose to not hold the ITS/ASC Construction JV accountable for the cost overruns and delays, thereby perpetuating the RICO Enterprise and violating their fiduciary duties to the Companies.

436.     Banco Popular knowingly and fraudulently violated the credit agreement at that time in furtherance of the enterprise to decrease the value and weaken BGF for the benefit of Banco Popular, and the Semillero Defendants, enriching the Lópezes who enjoyed the collateral benefits of setting up World Spirits and Green $CO_2$ Dominicana in the Dominican Republic with fraudulently obtained drawdowns and federal taxpayers' money, since at least mid-September of 2021.

437.    The Credit Agreement established the project's termination date as September 15, 2021, twelve months after the loan closed. The ITS/ASC Construction JV's contract ended in June of 2021.

**Semillero Letter on the MIPA Securities Fraud**

438.    On October 28, 2020, Borschow, on behalf of Semillero, sent López Vidal a letter saying that, "On September 23rd, 2020, you informed us in person that you, Olmar López-Gómez ("López-Gomez") and Gregory Boyd ("Boyd") entered into a certain Membership Interest Purchase Agreement (the "MIPA") dated as of September 11, 2020. In the MIPA, you and López-Gómez agreed to purchase from Boyd 1,012,500 Class A Common Units (the "Boyd Units") of GFC Holdings Limited Liability Company ("GFC" or the "Company") for a purchase price of $750,000."

439.    Lassers had informed Borschow of the MIPA in June 2020.

440.    Boyd informed Borschow of the MIPA in a lunch meeting on Monday, August 30, 2020, at Numero Uno restaurant. Boyd expected the MIPA payment before the September 15, 2020, financial close.

441.    Borschow continued in the October 28, 2020, letter, "On September 15, 2020, Semillero Investment Fund I, LLC ("Semillero") entered into a Series A Preferred Units Purchase Agreement with GFC for the purchase of certain Series A Preferred Units (the "Purchase Agreement"). As an inducement into the Purchase Agreement, GFC made certain representations and warranties to Semillero. Particularly, under Section 2 of the Purchase Agreement and Section 113.2 of the Purchase Agreement's Disclosure Schedule, GFC made certain representations, warranties and disclosures regarding GFC's capitalization, including all issued and outstanding

units of GFC and the holders thereof. Such Section 2.2 of the Purchase Agreement's Disclosure Schedule indicated that on September 15, 2020, you were the holder of the Boyd Units. However, that appears not to have been the case."

442.    Borschow then implied that he was in the dark about the MIPA until after the closing, when the contrary was true. He wrote, "In an electronic communication sent by you to Semillero dated October 1, 2020, you provided Semillero with certain wire transfer confirmation documentation which evidenced that the transaction contemplated in the MIPA closed on September 16, 2020. As a result, you acquired the Boyd Units as of such date and not as of September 15, 2020, the day GFC made the mentioned material representation."

443.    Borschow, when he wrote the October 28, 2020, letter, knew that López Vidal did not have the money to buy Boyd's shares in September 2020.

444.    Borschow then pointed out what the Plaintiffs have alleged herein, "The foregoing facts show that the Purchase Agreement and its Disclosure Schedule contained a material misrepresentation. We expected that as part of our on-going diligence, GFC and GFC's founders would have disclosed the existence of the MIPA and the agreement to transfer of the Boyd Units before the closing of the transaction contemplated in the Purchase Agreement."

445.    Borschow concluded by stating "Such misrepresentations allow for potential claims arising from the anti-fraud provisions of the 1933 Securities Act, including but not limited to: liability under Rule 10b-5 as the agreement to transfer the Boyd Units; the agreement to hire him as Director of New Business and Development of GFC; and to appoint him as an officer and Manager of the Company were all material information that was omitted from Semillero as it made its decision to enter into the Purchase Agreement and acquire its Series A Preferred Units. GFC's

misrepresentations also allow an investor like Semillero to seek remedies under the Purchase Agreement's indemnity provision."

446.    Even though Borschow was aware of the MIPA, his implied threat of legal action, because he knew that the MIPA had not been paid for with López Vidal's funds, but instead with funds guaranteed by the bank loan designated for construction, gave him significant leverage over López Vidal and the Board's actions. Semillero and the Lópezes did not disclose the October letter to Plaintiffs until Semillero sent it to Boyd in January 2021, despite Borschow being the Board Secretary and two board meetings occurring between the time he sent the latter and the time he sent a copy to Boyd.

447.    López Vidal fraudulently signed the Disclosure Agreement to the Credit Agreement. The Disclosure Agreement falsely stated that López Vidal owned 35% of BGF on September 14, 2020, and that Gregory Boyd owned 31.5% as of that date.

448.    López Vidal did not acquire any percentage of Boyd's interest in BGF until a day later when he had access to the money from BGF's funds at Banco Popular designated for the construction of the biorefinery. Banco Popular had to have known this and permitted the transfers because all the transfers originated at Banco Popular.

**Fraud Committed by the Financiers of the Project, Banco Popular, Semillero and PRFG**

449.    George Economou was paid a 1% fee for organizing the investors and convertible noteholders into the Project, even though he is not registered as an agent to do so.

450.    Economou fraudulently overpaid himself the 1% fee and did not deduct over $900,000 in New Market Tax Credit fees from the money raised.

451.    Economou conspired with the Lópezes to present Banco Popular, shareholders, and convertible noteholders with false financial statements, false bank loan drawdown schedules, and drawdown certificates from May 2020 until the present.

452.    On May 13, 2020, when one of the convertible noteholders, Waleska Rivera, on behalf of Danosa Caribbean Inc. ("Danosa"), asked Economou for an analysis of her projected return on investment with the Semillero equity, Economou provided her with fraudulent information.

453.    Prior to Economou sending that false information to Ms. Rivera, Boyd set forth exactly why the projections were fraudulent in an email to inter alia, Economou, López Vidal, and López Gomez. The email said: Melba asked for "the cashflows for the Danosa investment AFTER the Semillero investment. George attached a BEFORE Semillero investment schedule which was accurate at the time it was created in 2019. This schedule does not answer Melba's question and is no longer accurate. It could [be] misconstrued as an attempt to cover-up the reduced returns. The SEC calls this securities fraud. I know no one is trying to commit fraud, so let's fix this now. When the 11 corrections/updates to the errors/old data below are made, the return is at least $70,000 less a year than we presented last summer and again in the model George attached. The calculation below assumes BEST conditions: convert at bank closing, construction in 12 months and we use the unchanged (lower CAPEX) budget. With all the 11 changes listed below the **return will be 20% lower than presented in green**:

| BGF Humacao - ($USD) | | Construction | | | | P-Stock Projecte |
|---|---|---|---|---|---|---|
| Year | | 1 | 2 | 3 | 4 | 5 |
| Convertible common distribution | 5% | | $30,759 | $32,972 | $35,132 | $34,308 |
| | | 0% | 1.54% | 1.65% | 1.76% | 1.72% |

| Net Cash Flow | $2,120,364 | $2,208,873 | $2,175,262 | $2,142,304 | $2,107,960 | $3,170,337 |

The moment Melba and Waleska realize the returns on the common stock, they will not convert and request the $1 million back after we pay $240,000 in interest. This scenario is not in our pro forma and would be very detrimental to the budget. Based on the model attached above by George, the return expectations is about $106,018 a year for 5%, not $30,759. There is plenty of return on this project to fix this, but only if we work with accurate budgets and models. We need to do sensitivity analysis on: pay them back the $1 million or give them a better return upon conversion. Our best choice is to provide like 6% return guaranteed or (not and) actual dividends, whichever is higher in exchange for converting now and potentially saves $390,000 in interest payments. Both scenarios will require a discussion with Semillero as well. This cashflow does not show the Semillero 8% payment on $6.5 million = $520,000 a year to Semillero and the 50% of available dividends, the management holdback of 50%. Does not show the $25.2 million dollar refinance at the end of year 7 with the company not having 35% in retained earnings to refinance. Does not show the $25.2 million in debt in years 8-18. The project budget is low by millions of dollars before any equipment changes. Sources and Uses does not include the Act 73 Credit nor the Flexitank investment and uses incorrect budget. The convertible note interest payments in the model are not correct and do not include Flexitank. The Tranche B principal payments are wrong and do not match page 33 of the Banco Popular agreement. The amortization is not correct and does not amortize the El Coqui Contract (Company's biggest asset). Model increases the $CO_2$ production in year 6 without the associated capital expense to buy more equipment. The OPEX does not increase to maintain the additional equipment. Divide by Zero error year 14 and beyond. Model assumes 12 month construction despite contracts showing longer times. Good luck with the new model, please share when done and the result

of the sensitivity analysis to propose an increased return to Waleska in exchange for conversion now."

454.    Economou knowingly and with the intent to defraud concealed BGF's obligation to repay Semillero Partners three times its investment plus a guaranteed 8% preferred return and 50% of all distributable cash each year in the information he provided Ms. Rivera.

455.    An accurate analysis would have notified Ms. Rivera that she would make a 1.5 to 2% return at best across the next 15 years. This low return would not justify the risk of the $1 million Danosa invested.  The reality is today the RICO enterprise has produced a negative return for all the investors.

456.    However, Economou fraudulently represented to Ms. Rivera that Danosa would be making double-digit returns for fifteen years, thereby violating 18 U.S.C. § 1343.

457.    In mid-May 2020, Boyd became aware of Economou's analysis before Economou sent it and told him in writing not to send it because it was fraudulent.

458.    Boyd copied José Sosa, BGF's attorney engaged by the Lópezes, on his communication to Economou asking him not to send the fraudulent analysis.

459.    As a consequence of Boyd calling out Economou's misrepresentation, the Lópezes and Economou withheld all company information from Boyd.

460.    These Defendants cut Boyd off even though he had just negotiated a $3 million discount from Galileo, the company contracted to supply the equipment to separate the landfill gas into liquid natural gas, methane and carbon dioxide.

461.    The Lópezes also instructed BGF's suppliers not to talk to Boyd.

462.    Boyd complained in writing to Borschow about the lack of checks and balances at BGF.

463.    At the first weekly BGF Management meeting with Borschow, Gualberto Rodríguez of Semillero Partners and López-Vidal on October 8, 2020, Borschow again responded that the checks and balances measures that Boyd was requesting were not needed. Boyd was never invited back to another BGF Management meeting after raising conflicts of interest and the need for financial controls.

464.    The types of checks and balances that Boyd requested, based on his background working with auditors and his knowledge of IRS requirements to justify the grant of the New Market Tax Credits were:

a.    Three bids for all work to be performed.

b.    No check signing for related businesses by the party related to that business: That is, no Lopez family member should have been approving and making payments to a Lopez family-owned or related business.

c.    No direct business with the Lopez construction company, ITS, unless it was at arms-length, overseen by independent third-party board members.

d.    Pass regular audits from reputable firms

465.    Borschow did concede that BGF needed audited financial reports, and that Kevane Grant Thornton was the only top tier firm that could do it properly. Boyd agreed.  No Kevane Grant Thorton audited financial was ever produced because of all the obvious fraud in the accounting.

466.    However, there is still no audited financial report for 2020-2024 for an accounting that involves, at most, a few hundred entries a year.

467.    Despite no audited financial statements and no access to any financial details by the Plaintiffs, GFC and BGF still somehow submitted tax returns for 2020 and listed Boyd as the contact for Hacienda. Boyd had nothing to do with the preparation of the tax returns. Since the returns were submitted electronically, this is wire fraud.

468.    Defendants have taken multiple steps to frustrate any financial oversight of BGF and GFC. For example, in the spring of 2021, the auditors, Kevane Grant Thorton, said that they did not have the information necessary to complete the audit.

469.    Among other things, the auditors wanted the minutes from the Board of Directors meetings.

470.    Economou allowed the auditors to review what he claimed were the board minutes in the ITS office but refused to provide copies to the auditors.

**Details of other Payment Frauds**

471.    When Danosa signed a convertible note in GFC on August 16, 2019, López Vidal instructed Boyd to pay Torres & Garcia, PSC the sum of $6,817.25 for the related attorneys' fees, which Boyd did on behalf of BGF on September 19, 2019.

472.    On September 23, 2020, López Vidal fraudulently submitted an expense report to BGF, fraudulently paying himself for the Torres and Garcia bill for which BGF had already paid. Knowing that the invoice was fraudulent, Economou approved it.

473.    On October 5, 2020, ITS submitted the below expense statement with a $6,000 interest charge and another with an $8,000 interest payment to Olmar López Vidal. There is no agreement with the bank or the other owners to pay interest on expenses. The interest rate is usurious. BGF paid the ITS Expenses directly to Olmar López-Vidal via a check signed by López Vidal and his father:



474.    Knowing that the invoice was fraudulent, Economou approved it. In fact, Economou named all questionable payments, Interim Finance Repayment in the accounting records.

475.

476.    In Exhibit 1 of the Memorandum in Opposition to the TRO, Olmar Vidal López states:

18.    The General Contractor ("GC") for the Project is a joint venture, consisting of the following entities: International Technical Services, Inc. and Accurate Solutions Corp.

19.    I have no pecuniary interest in either of the two corporations comprising the joint venture referred to above. Specifically, I am not a shareholder of either corporation, nor a member of their respective Boards. I also have no pecuniary interest in the affairs of co-defendant Distributed Power Innovators, JV.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed in San Juan Puerto Rico on June 7, 2022

OLMAR LÓPEZ VIDAL

477.    If Olmar López Vidal has no pecuniary interest in International Technical Services, Inc, then why does he directly receive reimbursements for ITS deposits to BGF?

478.    Olmar López Vidal submitted receipts for drawdown 2, where he reimbursed himself for work done for another company, Green Fuels Corp. The work predates Biomass Green Fuel's formation in 2018.



ENG. OLMAR LOPEZ VIDAL
GREEN FUELS CORP.
URB. ALTAMIRA
584 ALDEBARAN ST.
SAN JUAN, PR 00920
CC: LUIS HERNANDEZ

**Statement of Account as of April 8, 2019**
In Reference To:  Matter No. 9380-0001- Environmental General

| Date | Description | Amount | Balance |
|------|-------------|--------|---------|
| 2/1/2017 | Invoice #21446 | 1,078.00 | 1,078.00 |
| 3/1/2017 | Invoice #21497 | 555.00 | 1,633.00 |
| 4/1/2017 | Invoice #21551 | 878.75 | 2,511.75 |
| 6/1/2017 | Invoice #21642 | 1,715.50 | 4,227.25 |
| 7/1/2017 | Invoice #21697 | 46.25 | 4,273.50 |
| 9/1/2017 | Invoice #21749 | 1,017.50 | 5,291.00 |
| 10/1/2017 | Invoice #21799 | 1,202.50 | 6,493.50 |
| 3/1/2019 | Invoice #21856 | 138.75 | 6,632.25 |
|  | Invoice #22673 | 185.00 | 6,817.25 |
|  | Ending Balance |  | 6,817.25 |
|  | Amount Due |  | 6,817.25 |

| Current | 30 Days | 60 Days | 90 Days | 120+ Days |
|---------|---------|---------|---------|-----------|
| $0.00 | $185.00 | $0.00 | $0.00 | $6,632.25 |

479.    On November 5, 2020, Olmar López Vidal and Olmar López Gomez fraudulently signed, and U.S. mailed a check for $39,160 from BGF to Engineered Parts and Services for an obligation of the ITS/ASC Construction JV, even though the contract between the ITS/ASC Construction JV and BGF provides that BGF is not responsible for this purchase. Economou approved the invoice, knowing that it was false.

480.    After ITS sold its office building in San Juan, it moved into offices at Twenty One Century Building I. BGF was paying the lease on the ITS office space. BGF has an office at the El Coqui Landfill. This was fraud.

481.    As of mid-August 2022, when construction was still not complete the funds paid to ITS and ASC stood at the following:

| BGF Out of Scope | ITS | ASC | Interest | Minimum Gas Payments |
|---|---|---|---|---|
| $1,186,458.96 | $4,398,080.52 | $1,952,293.77 | $1,020,450.22 | $313,804.44 |
| | | | Total | **$8,871,087.91** |
| | | | Contract Maximum | $5,000,000.00 |
| | | | Amount owed BGF by ITS/ASC: | $3,871,087.91 |
| | | | Amounts paid to ITS/ASC and by BGF | $7,536,833.25 |
| | | | Amounts paid directly to ITS and ASC | $6,350,374.29 |
| | | | Amount paid to Distributed Power Innovators JV | 0 |
| | | | Amount loaned after Lopez Certified Construction GC Paid in Full | $2,815,681.07 |
| * $4 million loaned AFTER Banco Popular was notified of fraud | | | | |
| This amount does not include the $10 million in revenue lost | | | | |
| Construction is NOT complete | | | | |
| Does not include the monthly electrical bills owed to El Coqui Landfill | | | | |

482.    To further the criminal enterprise, Banco Popular continued to disburse loan payments, even though it knew that the Lópezes and ITS/ASC with Semillero's consent had fraudulently submitted requests for loan money to which BGF had no legal entitlement.

**The Lópezes' Fraudulent Conduct with Banco Popular**

483.    In addition to the previously detailed activities, Plaintiffs have discovered other illegal transactions between the Lópezes and co-defendants Joval Rodríguez - BGF's account manager at Banco Popular, ITS, and Carlos López Vidal.

484.    On December 31, 2018, entries made in GFC's QuickBooks accounting files contemporaneously reflect that Rodríguez deposited $30,000 into GFC's Banco Popular account.

485.    On January 9, and again on January 18, 2019, entries made in GFC's Quickbooks accounting files contemporaneously reflect that GFC, via a check signed by Olmar López Vidal, paid Rodríguez two checks of $33,000, for a total of $66,000.

486.    Copies of these transactions from the QuickBooks files and checks are set forth below:

| Date | Payee | Memo | Payment | Deposit | Reconciliation Status | Balance | Type | Account |
|------|-------|------|---------|---------|----------------------|---------|------|---------|
| 0 1/18/2019 | Joval Rodriguez | | 33,000.00 | | Reconciled | 138,579.1 9 | Bill Payment | Accounts Payable (A/P) |
| 1 2/31/2018 | Joval Rodriguez | Loan Shark for El Coqui Initial Payment of 150k total amount | | 30,000.00 | Reconciled | 111,337.1 3 | Deposit | El Coqui Initial Payment Shark Loan Payable |



487.    Loans at such usurious rates are criminal, and the U.S. Attorney in the Eastern District of Pennsylvania has prosecuted Defendants under RICO for violating state usury laws because of the use of the mail and the internet. *United States v. Adrian Rubin*, No. 2:15-cr-00238 (E.D. Pa. 2015).

488.    The entries made in GFC's QuickBooks accounting files contemporaneously reflect that the Lópezes paid their own construction company, ITS, $55,000 for a $50,000 18-day loan. Copies of these transactions from the QuickBooks files and checks set forth below:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 01/18/2019 | International Technical Services | | 55,000.00 | | Reconciled | 28,579.19 | Bill Payment | Accounts Payable (A/P) |
| 01/18/2019 | Carlos Lopez Vidal | Carlos Lopez Vidal | 33,000.00 | | Reconciled | 105,579.19 | Bill Payment | Accounts Payable (A/P) |
| 12/31/2018 | Carlos Lopez Vidal | | | 30,000.00 | Reconciled | 141,337.13 | Deposit | El Coqui Initial Payment Shark Loan Payable |
| 12/31/2018 | International Technical Services | Loan Shark for El Coqui Initial Payment of 150k total amount | | 50,000.00 | Reconciled | 81,337.13 | Deposit | El Coqui Initial Payment Shark Loan Payable |



489.    Despite Boyd and Lassers raising $525,000 in 30 days to complete the payment for BGF's gas rights contract with El Coqui Landfill, the Lópezes committed fraud and never informed Boyd, who was a 50% owner and CFO of BGF in 2018 and 2019, of the usurious interest being paid; the source of those funds; or Rodríguez' involvement.

490.    Mr. Rodríguez also was responsible for the contracting of Nestor Rodríguez-Galguera, an engineer who fraudulently certified that work was being performed to justify the drawdown certificates for BGF's loans for the benefit of International Technical Services, Inc. ("ITS").

491.    In the March 2021 Board Meeting, Olmar López-Vidal, CEO stated and recorded in the minutes, "all equipment is ready to be installed and connected.

**CEO Report**

- **Greg Boyd joined meeting at 2:20PM**

  **Construction Project Status**
- 2nd concrete pour being done today and will have 3rd concrete pour next week
- All equipment is on site and ready to be installed and connected

492.    In Nestor Rivera Galguera's May 28, 2021, $1M Officer Payment Certificate:

      3.    The original projected completion date of the Project was September 15, 2021. The current projected completion date of the Project is September 15, 2021.

      4.    As of the date hereof, the completed construction percentage is 72.1%, which percentage is measured by a percentage of the Total Budget.

493.    While 72.1% of the budget was spent, 72.1% of the work was not done.  By January 2025, 72.1% of the work was still not complete.

494.    Banco Popular continued to disburse the loan despite the fraudulent drawdown statements.

495.    Semillero, PRFG, and CDVCA remained steadfast in their support of the López' chicanery because that conduct furthered the goal of the RICO Enterprise of weakening BGF for its ultimate takeover, although they did not anticipate then that it would be VRM taking over and not them.

496.    For the Drawdown 9 inspection on June 7, 2021, Rodriguez submitted a photo of a $CO_2$ tank from a different project at a different location to justify the $CO_2$ expenditures in the drawdown and to support López-Vidal's statement that. "all equipment was onsite…".

497.    See the top picture below (Drawdown Certificate 9). This picture is not a new tank. There is no tank like this nor the white stained fence behind it at the BGF construction site. The lower picture above is of Site A, a 1.1 acre site that will hold 80% of the equipment.



Project: BMGF, LLC
LFG to RNG and CO2 Humacao
Inspection Certificate 009



CO₂ Process Unit Equipment



Site-B Power Generation and LNG storage area – Continuous Erosion & Sediment (CES) Control Plan implementation and pad concrete form outlines

498.    Nestor Rivera Gualguera, Banco Popular's agent, fraudulently mislabeled Site A as Site B. Site A is five times larger than B and missing the majority of the equipment and construction. This picture contradicts López Gómez's CEO Report in the March 2021 Board Meeting at which he falsely stated that all the equipment was on site. Rivera Gualguera calls the lower picture Site B which is a much smaller site to hide the lack of any equipment on the larger site three months after López Vidal told the Board that all the equipment was on site.

499.    This picture of the empty Site A was taken 60 days before the Commercial Operations Deadline of the first week of August 2021. It does not require much effort or expertise to drive by a 1.1-acre empty field to conclude these statements of near completion are lies.

500.    The original Defendants fabricated these lies support the fraudulent drawdowns, time and resources working on World Spirits and Green CO2 Dominicana in the Dominican Republic instead of BGF. To scam this many drawdowns on this scale required collusion by the entire initial RICO Enterprise: Lópezes, Economou, Roberto Acosta, Joval Rodriguez of Banco Popular, Nestor Rivera Gualguera, Banco Popular's "independent engineer," Alex Borschow of Semillero and Ernesto Villarini of the Puerto Rico Fund for Growth, and CDVCA.

501.    Banco Popular continued to disburse money for construction after the General Contractor (ITS/ASC Construction JV) certified it was paid in full on March 9, 2022. See Lopez Vidal's signed copy of the certification.

502.    Banco Popular's December 30, 2022, Fifth Amendment to the credit agreement extended the construction deadline to March 31, 2023, a full year after the "GC Contract," was paid in full for incomplete work.

503.    BGF's accounting records show the General Contractor was actually paid in full on November 16, 2021, five months earlier than López Vidal certified.

504.    On March 8, 2022, López Vidal certified fraudulently that the ITS/ASC Construction JV had received $5 million and been paid in full for the construction contract. This was fraudulent since ITS/ASC was paid $5 million on November 16, 2021.

505.    On March 31, 2022, via email, Laura Medina of Banco Popular indicated that the bank was disbursing $1,484,006.16 for the 14th drawdown, four months after the construction contract was paid in full in line with the enterprise's goal of maintaining the project afloat until the timing best-suited Defendants. This disbursement was fraudulent.

506.    The fourteenth drawdown request did not include a request to pay TPI and Galileo $1.1 million, so López Vidal's wires of that amount of money on April 25, 2022, the day the Plaintiffs filed their lawsuit were fraudulent. These final payments were not due until after the Galileo and TPI equipment were commissioned and in production. As of this date of this filing, the equipment is still not commissioned, much less still not in production.

507.    Economou knew the drawdown 14 and wires to TPI and Galileo were fraudulent, yet he approved the request.

508.    The plaintiffs' counsel informed Javier Ferrer, Banco Popular's Chief Operating Officer of the fraud committed up to November 2021.

509.    The bank's counsel responded that it was investigating but has never provided the investigation results and continued to lend another $5.5m to BGF over the following 13 months.

510.    The bank further offered to meet with the loan parties to mediate a resolution and rejected Boyd's averment that the bank's participation in the fraud voided his guarantee. The plaintiffs indicated their willingness, but the mediation never occurred.

511.    Banco Popular amended its Credit Agreement with material misrepresentations since the Plaintiffs filed their original Complaint, lending money to BGF so that it could pay its loan to them.

512.    Banco Popular lent that money in the face of the motion for a temporary restraining order after the Plaintiffs realized that López Vidal had paid equipment suppliers more than a million dollars for un-commissioned equipment when he had put the bank loan into default.

513.    In the TRO Response, Economou, López Vidal and López Gómez never denied they or any of their entities received kickbacks from the $1.1 million wires which improperly concluded contracts totaling over $11 million.

514.    When has a bank ever loaned a borrower money to pay the very loan in default in the face of serious wrongdoing?

515.    Banco Popular submitted a third, fourth and fifth amendment to the credit agreement requiring a capital call of an additional $1.5 million and then $1 million repayment. All three amendments state that there was no pending litigation which if adjudicated against the Lópezes would affect the loan, which is a material misrepresentation, and purported to bind Boyd as a guarantor without his consent or signature.

516.    The Third Amendment, which was contingent on the capital infusion of $1.5 million by September 15, 2022, and BGF's completion of the biorefinery failed. Banco Popular

presented a Fourth Amendment to the Credit Agreement requiring a repayment of $1 million and construction completion by December 31, 2022. Neither payment nor completion occurred by December 31, 2022.

517.    Without waiting for Amendment 3's requisite of a $1.5 million investment to occur, Banco Popular deposited $980,943.46 into BGF's bank account on November 16, 2022.

518.    On December 5, 2022, Banco Popular deposited $65,972.35 and then withdrew the same amount on the same day to pay itself for the loan interest.

519.    Despite the failure to cure the default of credit agreements when the Plaintiffs reported drawdown fraud on November of 2021, of Amendment 4's required $1 million repayment, the default on the $1.5 million required by Amendment 3 and the failure to meet the construction completion deadlines, Banco Popular issued Amendment 5 on December 30, 2022, which extended the deadline to March 31, 2023, compounding further losses to BGF, all without Boyd's consent as a guarantor.

520.    Why would Banco Popular take this risk? Because Banco Popular wanted to earn more interest and fees *and* gain control over the renewable natural gas from the Project for its own off-grid buildings at below-market prices, with multimillion dollar tax credits and ESG benefits, which it could do with or without foreclosing on the loan.

521.    On October 21, 2022, Banco Popular's CEO, Ignacio Alvarez, touted the bank's vision in a ten-minute marketing video in obtaining these RNG rights without mentioning the legal action or frauds with which Banco Popular has both collaborated and initiated in order to keep its below market contract for renewable natural gas from BGF.

**The Role of Semillero Partners and Borschow**

522.    Borschow and Semillero Partners conspired with the other Defendants by refusing to require the Lópezes to produce audited financial statements and to share contract and basic operating information.

523.    Borschow and Semillero Partners also conspired with the other Defendants by refusing to hold any annual shareholder meetings as required by both the GFC Holdings and Biomass Green Fuels operating agreements.

524.    With their actions, Borschow and Semillero Partners affirmatively acted to suppress the rights of minority shareholders.

525.    Conspiring with the Lópezes/Banco Popular's forgery and fraud afforded Semillero Partners and Borschow the opportunity to make BGF financially vulnerable; which in turn devalued BGF; and gave Semillero the chance to buy more ownership of BGF on the cheap using its rights as a preferred investor.

526.    Borschow did not perform his fiduciary responsibilities for GFC or BGF, but Semillero submitted fraudulent invoices for those services, Economou and López Vidal approved them and the bank paid them.

527.    On Drawdown Certificate 9, on May 27, 2021, López Vidal submitted a bill for $20,000 from Semillero Investment Fund 1, LLC, which Economou approved, and Banco Popular paid. It was wired on June 15, 2021:

| 06-15 | 12106002501 | 210615002501000 -outgoing Wire | 20,060.00 |
|---|---|---|---|

528.    On Drawdown Certificate 10, on July 14, 2020, López Vidal submitted a bill for $10,000 from Semillero Investment Fund 1, LLC, which Economou approved, and Banco Popular paid.



**Semillero Ventures LLC**
1256 Ponce de Leon Ave. STE 102
San Juan, PR 00907

# INVOICE
# 1

Bill To:
**Biomass Green Fuels LLC**
C/O Olmar López-Vidal

| | |
|---|---|
| Date: | Jan 21, 2021 |
| Payment Terms: | Upon receipt |
| Due Date: | Jan 21, 2021 |
| **Balance Due:** | **$10,000.00** |

| Item | Quantity | Rate | Amount |
|---|---|---|---|
| **Advisory services rendered to the Company during Q4 2020** | 1 | $10,000.00 | $10,000.00 |

Total: $10,000.00

Payment Instructions:

ACH Payments or checks.

Bank: Banco Popular de Puerto Rico
Account Name: Semillero Ventures LLC
Account Number: 030-054230
ABA Routing #: 021502011

529.    Borschow oversaw the elimination of accounting controls and the separation of duties, which enabled the Lópezes to sign checks and electronically transfer GFC/BGF's money among themselves and to other companies the Lópezes own without receipts or documentation in violation of 18 U.S.C. §§ 1343 and 1344.

530.    Furthermore, Borschow repeatedly and intentionally denied and allowed conflicts of interest between ITS, BGF, the Lópezes, CDVCA, Puerto Rico Fund for Growth and his own interests in BGF to proliferate in order to further the enterprise to undermine Plaintiffs.

531.    When Boyd pointed out the conflicts of interest, Borschow asked Olmar López Vidal if he has any interest in ITS. López Vidal lied and said "no."

532.    Borschow could have easily verified the Puerto Rico Department of State Government records, which showed that Olmar López Gómez was the president of ITS; Olmar López Vidal was the secretary of ITS; and Carlos López Vidal was the treasurer of ITS.

533.    Instead, Borschow declared that no conflict existed because he knew that the conflicts allowed the RICO enterprise to function, including allowing the fraudulent drawdowns to continue.

534.    By approving the conflicts of interest that were taking place within the GFC/BGF structure and by failing to separate duties and roles between family members with those conflicts of interest, Borschow conspired with the Lópezes and Banco Popular to perpetrate the financial frauds detailed herein.

535.    Borschow was the youngest ever director at BNP Paribas in New York, graduated with an MBA from MIT Sloan School of Management, and was the Director of Finance for Eataly

in New York, where he built their budgets and designed and managed their $130 million financial reporting systems. Therefore, Borschow is a sophisticated businessman with the experience and background to know that his conduct contributed to the predicate felonies because that is what he intended.

536.    Borschow and Semillero Partners stood to gain financially from the Lópezes' criminal conduct.

537.    Borschow had personal financial gain to be made from his ownership, investment and management contract with Semillero's private equity fund.

538.    Had Borschow wanted GFC/BGF to succeed, he would have held the Lópezes and Economou accountable for their lies, frauds and constantly missed construction deadlines. Borschow did not perform his fiduciary responsibility to GFC/BGF nor his investors in Semillero, but he fraudulently charged fees for doing so.

539.    During the due diligence process on BGF prior to Semillero Partner's investment, Semillero Partners hired an independent third party, Nexus PMG, to perform technical due diligence.

540.    As a result of that investigation, Nexus found the design to be incomplete and filled with many unanswered questions. Semillero sent a list of Nexus' questions to BGF via email on June 12, 2020.

541.    The Lópezes said a detail design could not be completed until after the financial closing with Semillero Partners.

542.    The Lópezes claimed that the closing would provide down payments to the equipment vendors, who would then perform their portion of the detailed design, thus allowing ITS to complete the overall technical design based on the equipment vendors' requirements.

543.    Neither the GFC Board, nor EC Waste, nor Nexus, nor the project's technical due diligence assessors, ever saw the detailed design.

544.    Boyd asked Borschow to have Nexus review the ITS completed detail design, and Borschow refused.

545.    In addition, Boyd requested copies of the detailed design, and the Lópezes never provided them.

546.    These actions by Borschow demonstrate his conspiring and participating with the Defendants allowing them to divert funds from BGF, doing nothing to ensure a successful project by holding a third-party review of the design, as mentioned above, and by shutting Boyd out of the company, causing harm to Boyd and Lassers and to BGF/GFC.

547.    Semillero Partners' reaction to the death of Julio Reyes Salas and the Lópezes' lethal incompetence was simply to increase its investment, buying more of BGF below its true value.

548.    In pursuit of his own gain, Borschow breached his fiduciary duties as a BGF board member, as a representative of Semillero Partners, and as an individual.

549.    Semillero Ventures required BGF to sign an Advisory Service Agreement. Below is the Scope of Work which was never delivered:

ANNEX A

SCOPE OF WORK

1. Consult with and advise the management of the Company, upon reasonable notice at reasonable times from time to time, on all matters relating to the operations of the Company.

2. Provide advice and guidance on any material development to or affecting the Company's business and affairs, such as significant changes in management personnel and compensation or employee benefits, introduction of new lines of business, important acquisitions, and the Company shall provide Semillero with the opportunity, on reasonable prior written notice, to consult with and advise the Company's management of his or her views with respect thereto.

3. Review financials and provide strategic guidance in financial planning and forecasting. Provide financial and strategic advisory when considering, or when the Company is in the process of, transactions encompassing disposal, acquisition or merging of businesses, their valuation or financial restructuring. Advise in financial management by supporting operational efficiencies.

4. Executive consulting and support on topics including corporate strategy, business planning, effective multi-disciplinary team collaboration and communication.

5. Advise on operating performance and competitive positioning by providing managerial skills development, executive coaching, customer engagement best practices and management system optimization.

6. Participate in the evaluation of market development plans, marketing campaign design, brand management and effectiveness analyses, new product/service assessments, process workflow design and optimization, salesforce development strategy.

7. Advise on corporate governance best practices including financial reporting, Board package preparation, and communication with the Board of Directors.

550.    When asked for the minutes of the advisory meetings, Semillero and López Vidal refused to provide any since the services described above were never delivered.

551.    Private Equity firms, at any hint of project delays, cost overruns, or problems with audited financials, would have replaced the GFC Management team and ITS/ASC Construction JV long before the Plaintiffs filed suit in April of 2022. Yet Borschow and Semillero kept that team long after the lawsuit was filed.

552.    Semillero was a paid management consultant with knowledge and involvement well beyond the Board. This management consulting role gave Borschow early access to the problems, yet he did nothing to stop the crimes. Even a hands-off Board, if it were honest, would wake up to the evidence in the complaint, perform their investigation, and change the ITS/ASC Construction JV and GFC management.

553.    Under Borschow's direction the Board decided to double down. PRFG/CDVCA, Semillero and the other Board members went beyond ignoring their fiduciary responsibility and chose to continue to participate in the crimes. For the Board of GFC/BGF the saying made famous by Watergate is appropriate: "It's not the crime, it's the cover-up."

554.    The Board chose the Lópezes' ITS/ASC Construction JV with an inherent conflict of interest and then chose to not change management nor the construction company after learning that the López' failure to meet deadlines and being excessively over budget was not due just to sheer incompetence but rather to their swindling and pocketing the money.

555.    The Board then issued a $1.4m Capital Call for Green CO2 to cover-up the Lópezes' theft of the opportunity of the project in the Dominican Republic and illegal use of the New Market Tax Credit money from the Humacao census tract to a foreign country.

556.    The Board's cover-up of the crimes is a significant reason Plaintiffs sue the Board members to vindicate GFC/BGF's rights.

**Diversion of BGF's Funds through the Lópezes' Web of Multiple ITS Entities**

557.    Via the use of web of multiple ITS companies, fraudulent invoices, billing, and drawdown certificates from the ITS/ASC Construction JV, the Lópezes transferred funds paid

from the proceeds of the loan drawdowns to their personal accounts, to other ITS entities, or to another ITS entity established in the Dominican Republic in violation of 18 U.S.C. § 1957.

558.    Through their ITS entities or other associated entities, the Lópezes were the recipients of millions of dollars from the fraudulent drawdowns signed for by both the Lópezes and Roberto Acosta of ASC, approved by co-defendant Joval Rodríguez as GFC/BGF's loan officer at Banco Popular.

---

## PROJECT ENGINEER CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Architect certifies to the Owner that to the best of the Project Engineer's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

**AMOUNT CERTIFIED** ..........................................................................    $838,067.88

*(Attach explanation if amount certified differs from the amount applied. Initial all figures on this Application and on the Continuation Sheet that are changed to conform with the amount certified.)*

**Project Engineer:**

By: _____    *[signature]*    Digitally signed by Roberto D. Acosta
DN: OU=Lic 13782, O=Accurate Solutions, CN=Roberto D. Acosta, Emracosta@accurate.works
Date: 2020-09-22 14:12:59    Date: September 22, 2020

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

---

# PROJECT ENGINEER CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Architect certifies to the Owner that to the best of the Project Engineer's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

**AMOUNT CERTIFIED** ............................................................... $621,844.00

*(Attach explanation if amount certified differs from the amount applied. Initial all figures on this Application and on the Continuation Sheet that are changed to conform with the amount certified.)*

**Project Engineer:**
By: _____

Digitally signed by Roberto D. Acosta
DN: OU=Lic 13782, O=Accurate Solutions, CN=Roberto D. Acosta, E=racosta@accurate.works
Date: 2020-T1-30 21:57:42

Date: November 30, 2020

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

# PROJECT ENGINEER CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Architect certifies to the Owner that to the best of the Project Engineer's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

**AMOUNT CERTIFIED** ............................................................... $696,019.00

*(Attach explanation if amount certified differs from the amount applied. Initial all figures on this Application and on the Continuation Sheet that are changed to conform with the amount certified.)*

**Project Engineer:**
By: _____

Digitally signed by Roberto D. Acosta
DN: OU=Lic 13782, O=Accurate Solutions, CN=Roberto D. Acosta, E=racosta@accurate.works
Date: 2021-02-24 09:47:51

Date: February 23, 2021

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

559.    The Dominican ITS entity was dissolved in December 2020 shortly after substantial funds were withdrawn from the BGF accounts by the Lópezes and paid to one or several of their many ITS entities.

560.    López Vidal violated 18 U.S.C. § 2314 by transporting stolen money to the Dominican Republic, but the Plaintiffs do not currently know the dates when he violated that law or the amounts of money involved because that information is exclusively in the Defendants' possession.

561.    López Vidal and López Gómez violated 18 U.S.C. § 2315 by receiving that stolen money in the Dominican Republic, but the Plaintiffs do not currently know the dates when they violated that law or the amounts of money involved because that information is exclusively in Defendants' possession.

562.    It was at this point in time, (around December 2020 to mid 2021), that the Lópezes acquired certain high-value assets in the Dominican Republic, namely a $2.5 million dollar mansion at La Romana, in the exclusive gated neighborhood of Casa De Campo Resort, and a 60-foot yacht moored in the Casa De Campo marina.

563.    There are multiple ITS, Green CO2 and World Spirts and related entities owned by the Lópezes, all with the same or similar names to evade taxes, government authorities, courts, banks, and investors by transferring money within accounts without an ACH trail and by using physical checks to deposit in accounts outside of Puerto Rico and outside of the United States:

564.    International Technical Services Inc., (a Delaware entity), founded on June 3, 1982.

565.     I.T.S. Corporation, (a Puerto Rico entity) founded on September 13, 1985, and still active.

566.     International Technical Services Inc., (a Puerto Rico entity), founded June 5, 2018, and still operating. Owns 50% of the ITS/ASC Construction JV Distributed Power

567.     International Technical Services Corp, founded on June 20, 2014, and closed on February 9, 2018.

568.     ITS International Technical Service SRL, (an entity in the Dominican Republic), founded on December 20, 2010, and closed on December 20, 2020.

569.     Green CO2 LLC (a Puerto Rico entity).

570.     Green CO2 Dominicana, LLC (a Puerto Rico entity).

571.     Green CO2 Dominicana, SRL (a Dominican Republic entity).

572.     Green Hydrogen, LLC (a Puerto Rico entity founded on March 22, 2022).

573.     World Spirits, LLC (A Puerto Rican entity fund by Carlos López and his wife Claudia Ferrer to distill Bravada Vodka).

574.     Distributed Power Innovators JV (Signed a contract with BGF to do the construction as a 50-50 joint venture between International Technical Services, Inc. and Accurate Solutions Corp. Entity).

575.     Accurate Solutions Corp. (Roberto Acosta, President, 50% owner in Distributed Power Innovators JV).

576.    There are multiple bank accounts for the multiple International Technical Services entities, including at least one known account with Banesco, a Venezuelan-owned bank with multiple branches in the Dominican Republic and associated branches in Puerto Rico and Florida.

577.    On March 11, 2022, after Banco Popular accepted a Second Amendment to the Credit Agreement without Boyd's signature, with Boyd continuing as a guarantor of the loan, López Vidal deposited a BGF check for $305,771 with control number 002584 he and his father had signed into the International Technical Services, Inc. account number 1000269413 at Banesco in Coral Gables, Florida. This may be a different ITS entity with a similar name.

578.    On March 11, 2022, after Banco Popular accepted a Second Amendment to the Credit Agreement without Boyd's signature, without Boyd's consent as a guarantor of the loan, López Vidal deposited a second BGF check for $302,240 with control number 002585 he and his father had signed into the International Technical Services, Inc. account number 1000269413 at Banesco in Coral Gables, Florida. These funds are in excess of the $5 million construction contract, should not have been given to ITS, and were never used for the biorefinery construction. Economou assisted the Lópezes with this fraud.

579.    Many other BGF checks made out to International Technical Services were also deposited in the Banesco account.

580.    In 2021, the Lópezes opened a Banco Popular account for International Technical Services Corp., a corporation canceled in 2018.

581.    The various ITS entities appear to have been used as shell companies, for the evasion of taxes and laundering of the proceeds of the Lópezes' frauds.

582.    The Lópezes have a history of swindling partners, using the ITS shell company structure in Ballester Hermanos Inc. v Olmar López Gómez et al. Case # SJ2018CV03188 Estado Libre Asociado De Puerto Rico Tribunal De Primera Instancia Centro Judicial De San Juan Sala Superior, where they took $158,000 for a generator in October 2017 from Ballester Hermanos, but did not deliver it, and then bounced the check they gave to refund the money.

583.    Alejandro Ballester is a director of Popular, Inc. Banco Popular required the case be settled before closing.

584.    They were accused of having engaged in similar, but less pervasive, fraudulent behavior in Douglas Fertilizer & Chemical Inc., vs. Olmar López Gómez and ITS., INC, a Puerto Rico Corporation – Case NO.: 3:08-cv-01076-JAG Filed in Orange County, Florida and then transferred to the Puerto Rico Federal District Court.

585.    On his 2018 SBA personal financial statement, which he filed electronically and signed under penalty of perjury, López Gómez failed to disclose the May 2018 litigation against him and his wife by Ballester Hermanos, Inc.

586.    In the SBA statement López Gómez avers that his personal income is $100,000.

587.    In his 2018 tax return, López Gómez states that he has no salary and has taxable income of only $4,182.

588.    In June 2018, López Gómez sold his condominium in Guaynabo for $550,000 and netted over $213,000.

589.    López Gómez did not report the capital gain from the sale of his condominium on his 2018 tax return. This constitutes wire fraud because López Gomez filed his return electronically.

**The Fraudulent Diversion of BGF's Funds within Puerto Rico**

590.    In drawdown 3 submitted on October 21, 2020, the Lópezes reimbursed themselves for the $18,000 that Boyd paid in permitting fees ($14,000) and customs fees ($4,000) for equipment that arrived before the closing of BGF's loans with Banco Popular and Capital One. This amounts to nothing more than swindling and theft from BGF.

591.    In December 2018, ITS assigned Carlos López Vidal, Olmar López Vidal's brother and Olmar López Gómez's son, to be the construction project manager of the biorefinery and introduced him to the El Coqui management staff as such.

592.    Carlos López Vidal, however, never performed any material work nor attended the construction project meetings with EC Waste/El Coqui.

593.    To excuse their delay and distract from their misconduct, the Lópezes have frequently claimed that COVID precluded the BGF biorefinery from being built, and they cited the pandemic for the alleged inability of the ITS/ASC Construction JV to perform its work on the Project.

594.    The Lópezes failed to mention that they ordered the major equipment for the project four and five months late.

595.    On-time orders would have been executed by the manufacturers long before Covid might have affected their operations.

596.    At the very same time they were claiming they could not perform their work for the Project due to COVID, the Lópezes and ITS were actively developing and building the World Spirits project owned by their son and brother, Carlos López Vidal.

597.    On November 9, 2021, Carlos López Vidal and his wife, opened World Spirits, LLC a "boutique vodka distillery," selling a product named Bravada.

598.    The Bravada distillery's website boasts of having been able to construct their project despite delays in equipment supply and other COVID-related problems.

599.    ITS, López family members, and their construction subcontractors, performed the construction on the Bravada distillery using the funds and resources that were supposed to be allocated to GFC/BGF, in violation of 18 U.S.C. § 1344, notwithstanding their obligations to the federal government, Plaintiffs, and to Banco Popular to complete the construction of the GFC/BGF Project. [Of course, we now know that Banco Popular is and was unconcerned about the López's noncompliance.]

600.    This fraud can be demonstrated by the records of the El Coqui Landfill.

601.    The El Coqui Landfill is a 24/7/365 secure site. The only access point is a guardhouse which logs entry and exit.

602.    The security logs show that during the six months following September 15, 2020, financial closing, the ITS/ASC Construction JV averaged being on the construction site a mere 2.5 hours per week.

603.     Nonetheless, the ITS/ASC Construction JV's fraudulent drawdowns, detailed herein, billed BGF for substantial construction that was supposedly performed during this period for a total of $1,630,575 by ITS and $1,195,915 by ASC. Simply put, much of these funds were not being used for the construction of the refinery as the Credit and Disbursing Agreements required and as claimed by ITS/ASC; they were being fraudulently diverted by the Lópezes and Acosta.

604.     While ITS was supposedly performing substantial construction for BGF and being paid for that work but not performing it, ITS was really engaged in substantial construction for the World Spirits distillery and working on the Lopezes Green $CO_2$ project development in the Dominican Republic with Brugal and Linde Praxair.

605.     The bills for construction to BGF by ITS were actually used to build the World Spirits distillery.

606.     Today, Carlos López Vidal and Claudia Ferrer Tañon own World Spirits, LLC, a company likely making millions of dollars in profits from the sale of Bravada vodka, profits that Plaintiffs believe are generated from diverting federal funds intended to produce renewable energy in a high poverty area of Puerto Rico. The news article regarding the opening quoted López saying they were funded by a private investor with $1.5 million. What private investor would not want to participate in a grand opening with the Governor? But that private investor has never been publicly named.

**ITS's Numerous Failures, Incompetence, and Fraudulent Misrepresentations**

607.    The Lópezes falsely told investors that ITS was uniquely qualified to design and build the renewable biorefinery. In December of 2022, years after the original construction deadline, BGF attempted to hire Venture Engineering and Construction to help finish the project.

608.    ITS has built landfill gas to energy installations for Conwaste.

609.    Such an operation requires only a small fraction of the sophistication required for a biorefinery compressing LNG and making beverage-quality CO2.

610.    Semillero Partners and Borschow never verified the Lópezes and ITS's fraudulent claims about ITS's capability and experience, despite being told that the Lópezes spent money designated for the Project on the ITS/ASC Construction JV construction bond and other expenses outside the approved scope of the flow of funds schedule at an October 8, 2020, Management meeting.

611.    Contrary to their claims, neither the Lópezes nor ITS had ever built a biorefinery.

612.    Relying upon the Lópezes' false representations about their alleged expertise in bio-gas refineries, the GFC/BGF Board, led by Borschow, never inspected the equipment or approved any multi-million-dollar equipment contracts. By failing to do so, they violated their fiduciary duties to the company and the minority shareholders to oversee the Lópezes, Economou and ITS.

613.    To date, apart from the Lópezes, no one has seen these contracts or any commission agreements associated with them.

614.    ITS was so unqualified and financially weak, that it had to use the credit and operational history of another company, ASC, to obtain its construction bond.

615.    The DPI JV contract for the biorefinery expired in June 2021. ITS, ACS, Acosta, the Lópezes, Banco Popular, Borschow and Economou are intentionally operating without a valid contract for the biorefinery construction.

616.    The entire $5 million construction budget was spent by November 16, 2021, and a total of $29 million has been allegedly spent on the Project.

617.    Yet the construction of the Project is still not complete in January of 2026 and is over 4 years past its completion date.

618.    ITS performed very little work on the biorefinery because it was diverting ITS's subcontractors and the Banco Popular loan money for BGF into World Spirits and into the Lópezes' competing Green CO2 project in the Dominican Republic. These actions violate 18 U.S.C §§ 1344, 1957, 2314, and 2315.

619.    The Project's electricity generation deadline was August 7, 2021, and has still not been met.

620.    ITS undersized the power systems needed for the project so dramatically that it required a fourth power generator, with an additional cost of over $430,967.

621.    The generator purchased to meet the commercial operations date has been on-site at the landfill since February 28, 2020, for 34 months and is still not operating. A typical implementation of a Jenbacher generator is 90 days plus 30 days of commissioning.

622.    Galileo Technologies is the largest equipment provider to BGF.

623.    Galileo provides its own landfill gas pre-treatment system integrated into its equipment including software supervisory control and data acquisition.

624.    Instead of using Galileo's integrated system, the Lópezes insisted on using their own home-grown, custom-built pre-treatment system which does not integrate with Galileo's equipment, is more expensive and, to date, still does not work.

625.    There have been other accidents that demonstrate that ITS and the Lópezes were neglecting and mismanaging the Project.

626.    The construction contract requires that all equipment follow the National Electric Code ("NEC") and American Society of Mechanical Engineers ("ASME") construction standards.

627.    The NMTC Disbursement Agreement code requires compliance with the building practices of the community, which would include Puerto Rico's 2018 Construction Code, NEC and ASME.

628.    On April 5, 2021, CMA Architects & Engineers sent ITS a copy of a report from Berlin NG CMA which it had received on March 10, 2021.

629.    The report concluded that the tank that ITS was installing should add a new slab of four to twelve inches of concrete inserted over the original slab and anchored with vertical rebar as designed by CMA Architects.

630.    To the Plaintiffs' knowledge, this work has not been carried out as required.

631.    ASME mandates that tanks for industrial gases have pressure relief valves to prevent tank ruptures.

632.    During pressure testing of the ITS pretreatment system in September 2021, an ITS-built tank blew up and pulled itself out of its concrete anchors. The photographs below demonstrate this accident and the resulting damage:





633.    The ITS-built tank is not ASME-compliant as required by the construction contract and permitting.

634.    Without access to independent third-party inspection, it is impossible to know the degree of sub-standard work and improper equipment located on the biorefinery site, a site that will process 700,000 metric tons of volatile methane annually.

635.    Plaintiffs continue to learn of further neglect in the form of substantial design flaws by ITS and the Lópezes in connection with the Project.

636.    Over three years after the Project began, ITS requested that El Coqui Waste assist ITS with an additional 18,000-40,000 gallons of water daily for the Project.

637.    This significant requirement was not in the design, budget, or project plans and, if allowed, will require a permitting process that could possibly cause months or even years of delays.

638.    ITS's fraudulent conduct, ineptitude, and failure to generate electricity by the contract commercial operations start date have put BGF in contract default multiple times.

639.    As of December 2022, ITS's failures and delay had created additional costs of $550,000 in fees payable to El Coqui Landfill, $1.2 million to Banco Popular in additional interest and $12 million in lost revenue which were not budgeted for, and which continue to accumulate. That amount is far more today.

640.    El Coqui Landfill commissioned an independent engineering audit on July 26, 2022, by Venture Engineering and Construction.

641.    Olmar López Vidal was present for the audit as were representatives from EC Waste: Mark Johnson, COO, Jamie Jaen, Vice President and Jaime Santos, Engineer.

642.    G. Kurt Miller of Venture Engineering and Construction performed the audit.

643.    The audit focused on LNG and did not examine the beverage quality $CO_2$ installation.

644.    The audit found that site A had no power, water or landfill gas.

645.    The main power transformer for Site A was not on the site, and BGF needed to know if it had been ordered.

646.    In over two years of funded work and $8.5 million spent on the construction of a $5 million contract, nothing worked or was complete.

647. Generating and distributing electricity, water and landfill gas were the main tasks of the ITS/ASC construction JV team.

648. According to the Venture Engineering report the Lópezes still had not designed the water system and did not seem to know its own requirements, source of water or permitting requirements.

649. Site B had significant safety issues including a large methane storage tank that "jumps around" when pressurized, the gas analyzer is not connected, the controls between the landfill gas flare and the biorefinery are not automated and none of the valves or controls are labeled.

650. Venture estimated that with suitably skilled staffing, the missing items available, and the design issues resolved that the LNG would require 20-26 weeks to finish. The Venture estimate did not include the completion and certification of the beverage quality $CO_2$. This contradicts Olmar López Vidal's then stated completion estimate of October 15, 2022, which he confirmed in early October, knowing that completion by that date was impossible.

651. Banco Popular, Ignacio Alvarez, Javier Ferrer, Joval Rodríguez, Alex Borschow, Semillero, Ernesto Villarini, CDVCA, and the Puerto Rico Fund for Growth are responsible for not performing their fiduciary responsibilities while enriching themselves in the RICO Enterprise which as predicted led to the complete destruction of BGF as a company.

652. Instead of using Venture's likely accurate prediction of a finish date in five to six months provided all the equipment and resources are there; the original Defendants stated in the Fourth Credit Amendment that the biorefinery would be operational by December 31, 2022.

**More Details of Banco Popular's Participation in the Criminal Enterprise**

653.    BGF is required to submit audited financial reports to Banco Popular to receive the drawdowns from the construction loan.

654.    Attorney Vanessa Carballido in November of 2021 delivered evidence of BGF's fraud to the legal department at Banco Popular on instructions from Javier Ferrer.

655.    In January 2022, after having two months to investigate the fraud information, despite not receiving BGF's audited financial information for 2020 or 2021, with 100% of the construction contract paid and only 20% of the biorefinery equipment being on-site, in violation of its Disbursing Agreement as to the New Market Tax Credits, Banco Popular continued to disburse the construction loan, which the ITS/ASC Construction JV falsely self-certified was near complete.

656.    The project is now more than four years past the August 7, 2021, Commercial Operations Deadline with more than double the original construction budget and still incomplete.

657.    In light of the information provided, Banco Popular should have concluded that the Project was at serious risk back then, when expulsing management could have remedied the fraudulent and incompetent conduct. But that was never Banco Popular's plan.

658.    On information and belief, as the responsible party and Disbursement Agent for the New Market Tax Credit loan, Banco Popular never informed Capital One, or PCC-SUB CDE 13, LLC the lenders of the New Market Tax Credit funds of the frauds that the Lópezes and their co-conspirators have committed. And, no doubt, as one of those coconspirators, they also did not

inform Capital One of their own fraudulent failures as Administrative Agent for the loan, to properly bond the project completion as required in the terms of their own loan for more than $18 million.

659.    Banco Popular continued to disburse the loan because the Lópezes committed to sell renewable liquified natural gas for the bank's off-grid power generation and renewable energy credits far below market value.

660.    Banco Popular spent over $10 million to take their two largest office buildings off the electrical grid.

661.    Indeed, it was only when Banco Popular committed to their off-grid project that they agreed to finance the construction loan and act as Disbursement Agent for the New Market Tax Credit loan to BGF.

662.    Banco Popular wanted the renewable natural gas, for which it will receive environmental credits, and BGF was the only source in Puerto Rico.

663.    PMA prepared all of Banco Popular's agreements, loan amendments, and the RNG offtake agreement with GFC/BGF and they currently defend Banco Popular in their lawsuits with the Plaintiff's.

664.    BPPR coordinated participation in the Enterprise is evidenced by the conflicted role of PMA attorney Maria Dolores Trelles Hernandez. Trelles was involved in every Credit Agreement amendment (Amendments 1-7), each of which ignored multiple defaults and pending litigation against the Company. Simultaneously, Trelles defended BPPR against Plaintiffs in this RICO action and the separate Bank Holding Company Act anti-tying lawsuit. Later, Trelles

brought a loan collection action against BGF and Boyd personally on behalf of BPPR. This unified legal representation across lending decisions, default waivers, and litigation against Plaintiffs demonstrates BPPR coordinated strategy to extract maximum value while suppressing Plaintiffs claims-establishing BPPR knowledge of and participation in the Enterprise.

665.    A profound conflict of interest exists because Ignacio Alvarez, CEO of Popular, Inc., and Javier Ferrer, its former COO, were founding equity partners in PMA—the law firm that drafted all BPPR contracts, including the BGF credit agreement, all its amendments, all the Act 73 Tax Credit agreements for BPPR, and the RNG offtake agreement that forms the basis of an anti-tying claim —which likely pierces the attorney-client privilege under the Crime Fraud exception. See *Clark v. United States*, 289 U.S. 1, 15 (1933) ("A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law."). PMA also serves as BPPR's defense attorneys in their cases, thereby defending the very fraudulent agreements and misdeeds they created for the firm's masters. PMA also represent Banco Popular who act as Administrative Agent for their own loans, generating more layers of conflicts. PMA not only prepared the RNG offtake agreement, but Alvarez also signed it and promoted it publicly even after Plaintiff's original RICO case was filed, further entrenching their part in the scheme. Exhibits 9-11

666.    The Crime Fraud exception applies to communications that further ongoing or future wrongdoing, such as fiduciary breaches, fraud, or other torts, see *United States v. Zolin*, 491 U.S. 554, 563 (1989) (privilege protection "ceases to operate when the communication is intended to further continuing or future criminal or fraudulent activity"), and in a RICO claim under 18 U.S.C. § 1962(c), this arrangement establishes a pattern of racketeering through acts like mail or

wire fraud in the contract amendments, with BPPR and PMA forming the enterprise and causing direct harm to Boyd and Lassers, including not just those frauds which caused the companies collapse, but also their anti-tying violations and the loss of 30 years of profits.

667.    It is no coincidence that Joval Rodriguez left BPPR just before Boyd and Lassers reported the drawdown frauds to Ferrer, only to reappear working alongside Ignacio Alvarez, Jr. at Interlink, and upon information and belief, BPPR is covering Rodriguez's legal bills in this case. This conduct violates RICO predicate acts including wire fraud under 18 U.S.C. § 1343, mail fraud under 18 U.S.C. § 1341, bank fraud under 18 U.S.C. § 1344, honest services fraud under 18 U.S.C. § 1346, and money laundering under 18 U.S.C. § 1956, as well as criminal laws such as obstruction of justice under 18 U.S.C. § 1503, perjury under 18 U.S.C. § 1621, and conspiracy under 18 U.S.C. § 371.

668.    The Crime Fraud exception exists to prevent the attorney-client privilege from shielding schemes where legal advice enables concealment, obstruction, or asset dissipation, see *United States v. Chen*, 99 F.3d 1495, 1503 (9th Cir. 1996) (privilege does not apply where legal advice facilitates fraud regardless of the legality of the underlying transaction), acknowledging that sophisticated enterprises often use counsel to carry out misconduct rather than operating without legal involvement.

669.    Courts handling organized crime and racketeering cases have consistently ruled that the privilege only covers lawful advice, not when it acts as a mechanism for ongoing fraud, see *In re Grand Jury Proceedings*, 87 F.3d 377, 380 (9th Cir. 1996) ("It is the client's purpose that controls, not the attorney's knowledge."), and RICO jurisprudence supports denying privilege to communications that enable enterprise actions like sham transactions or false filings.

670.     Thus, in situations like this where the defendants' alleged racketeering relied on attorney-drafted documents and communications that concealed frauds, facilitated improper loans, or extinguished valid claims, the Crime Fraud exception applies, necessitating in camera review to maintain judicial integrity. See *In re Sealed Case*, 676 F.2d 793, 812 (D.C. Cir. 1982) (privilege does not extend to communications made for the purpose of committing a fraud on the court).

**Usurpation of the Brugal Opportunity, Diverting BGF's Resources to Green CO2**

671.     At an October 2020 board meeting, the Lópezes sought permission from the GFC Holdings Board, which included representatives from Semillero Partners and the Puerto Rico Fund for Growth, to use BGF's funding for a CO2 project for the Brugal distillery in the Dominican Republic.

672.     This very same CO2 opportunity in the Dominican Republic had been previously identified by López Vidal to Boyd in 2019 as an opportunity for BGF.

673.     At that October 2020 board meeting, the Puerto Rico Fund for Growth rejected the Lópezes' request because its funding of projects is limited to those within the U.S.

674.     Additionally, funding of New Market Tax Credit projects is limited to specific census tracts within the U.S. and the diversion of federal funds to the Dominican Republic violates Section 45D(c)(2) of the Internal Revenue Code.

The Lópezes commingled the New Market Tax Credits funds - earmarked exclusively for equipment used in Puerto Rico - with the general construction funds in one account, which Banco Popular allowed them to do, in violation of the Disbursement Agreement and in furtherance of the criminal enterprise.

675.    When López Vidal learned that BGF's federal funding precluded BGF from constructing a site there, López Vidal decided to pursue the opportunity for himself with BGF's money, without disclosing his intentions to BGF/GFC.

676.    Green CO2 was already a participant in the Federal New Market Tax Credit program as a put and call buyer.

677.    López Vidal was listed as the Sole Member of Green CO2:

```
    IRS  DEPARTMENT OF THE TREASURY
         INTERNAL REVENUE SERVICE
         CINCINNATI  OH  45999-0023


                                          Date of this notice:  06-15-2020

                                          Employer Identification Number:
                                          66-0948217

                                          Form:  SS-4

         GREEN CO2 LLC                     Number of this notice:  CP 575 G
         OLMAR J LOPEZ VIDAL SOLE MBR
         584 ALDEBARAN STREET
         SAN JUAN, PR  00920              For assistance you may call us at:
                                          1-800-829-4933
```

678.    López Vidal spent BGF's time, paid consultants and his own expenses in the Dominican Republic with BGF funds, creating Green CO2 Dominicana SRL so that Green CO2 Dominicana could contract with the Brugal Rum company solely for his benefit.

679.    Defendant López Vidal owns 100% of Green CO2 Dominicana, SRL in the Dominican Republic and Green CO2 Dominica, LLC in Puerto Rico per the corporate records.

680.    López Vidal told the IRS he is the Sole Member of the Green CO2 LLC. Why would he go to the time and expense to create and maintain two entities of the same name in different countries?

681.    Even though using New Market Tax Credit funds outside the U.S. violated federal law, on December 15, 2020, López Vidal made a presentation to the leadership of Brugal Rum, that contemplated the use of some of the federal funds for the construction of a project in the Dominican Republic which directly competes with BGF.

682.    The Brugal project uses the same CO2 off taker as BGF at the El Coqui Landfill, Linde Praxair.

683.    In the PowerPoint presentations on behalf of Green CO2, López Vidal made false representations to Brugal Rum, the distillery owner, that the project owner and funder was GFC Holdings, which in fact, had been prohibited by its board from investing in the Dominican Republic. These PowerPoint presentations contained the following representations:



# Agenda



1. Executive Summary

2. Master Plan Objectives

3. **Phase I** ($CO_2$ Collection/Purification and Commercialization)

4. **Phase II** (Steam Production with Renewable Biomass)// Replacement of Natural Gas or Boiler Fuel

# Executive Summary



- Green $CO_2$ LLC. (Green $CO_2$) is presenting Brugal & CO. S.A (Brugal) a long term master plan to reduce their carbon footprint and to reduce carbon dioxide emissions at their San Pedro de Macoris Distillery

- With this master plan Brugal & CO. S.A will be able to reduce their carbon emissions up to 70-75% by year 2025

- Not only Brugal & CO. S.A will reduce their carbon footprint but they will also generate additional revenue from the $CO_2$ sales and this consortium will supply a new steam boiler with no capital expenditure by Brugal



## Thank You

Olmar López Vidal

GFC Holdings LLC./ Green $CO_2$ LLC.

President/CEO

olv@greenfuelspr.com

(787) 637-4375

# Resumen Ejecutivo



- GFC Holdings LLC, en común acuerdo con la empresa Green CO2 y Brugal & Co., tiene como objetivo re-establecer la planta de producción de dióxido de carbono en forma líquida ($CO^2$) y producción de hielo seco; localizada en los predios de la destilería de ron de Brugal en San Pedro de Macorix, R.D.

- La planta de producción de $CO^2$ (Green CO2) fue construida en el año 2009 con el objetivo de vender $CO^2$ líquido a empresas de refrescos en la República Dominicana y Haití; además a usuarios industriales de $CO^2$ líquido y/o Hielo Seco.

- Dióxido de Carbono ($CO^2$), es un gas que se forma naturalmente en el proceso de fermentación y es un sub-producto de las destilerías de ron.

© 2016 GFC Holdings LLC.

2



**Executive** **y**

GFC Holdings LLC, by mutual agreement with Green CO2 and Brugal & Co., proposes to reestablish the liquid carbon dioxide (CO2) and dry-ice plant located on the campus of the Brugal rum distillery in San Pedro de Macorix, Dominican Republic.

684.    The CO2 (Green CO2) plant was built in 2009 for the purpose of selling liquid CO2 to soft drink companies in the Dominican Republic and Haiti; as well as for industrial users of liquid CO2 and/or dry ice.

685.    Carbon dioxide (CO2) is a gas that is formed naturally in the fermentation process and is a byproduct of rum distilleries.

686.    López Vidal did not disclose his ownership in Green CO2 Dominicana or bring it to the attention of the owners of GFC/BGF.

# Estructura de Financiamiento 

- Project Owners: 100% GFC Holdings LLC.
- Capital Investment: $612,300.00

- Financial Structure: 30 % Equity / 70% Term Debt:
  - Project Equity 30%: **$612,300.00**
  - Project Term Debt 70%: **$1,428,700.00**

- Please refer to Project Financial Proforma

© 2018 GFC Holdings LLC.                                    13

687.    There was no mention of López Vidal creating Green CO2 Dominican SRL, signing a contract with Brugal, or signing a contract with Linde in the Dominican Republic in the 2021 GFC Board minutes.

688.    Indeed, Boyd only discovered López Vidal's ownership when a "Google" search revealed entries showing López Vidal's name and media reports about Green CO2 Dominicana's new operations.

689.    https://www.diariohispaniola.com/noticia/77795/mundo-verde/casa-brugal-recuperara-el-co2-de-su-destileria-para-reducir-aun-mas-su-impacto-ambiental.html

690.    López-Vidal created a series of Green CO2 Dominicana and Hydrogen companies he owns 100% of while in a full-time employment agreement with GFC/BGF. He used company time, bank loans, investors' money, New Market Tax Credit monies and paid staff with these funds.

691.    By fraudulently diverting time, expenses, and funding from the Project into the Dominican Republic, López Vidal has violated his fiduciary duty to BGF and its investors; violated the terms of the Banco Popular and Capital One loan and illegally used the proceeds of the Federal New Market Tax Credit loan in violation of 18 U.S.C. §§ 1344, and 1957 and Section 45 of the Internal Revenue Code.

692.    Plaintiffs informed Banco Popular of the diversion of the loan funds; Banco Popular repeatedly promised to investigate; and, instead continued to further the criminal enterprise by disbursing funds while knowing that funds have not been spent on the approved project because the bank wanted the offtake agreement for natural gas at a below market price.

693.     For years the Lópezes spent their time, BGF employees, contractors' time, and Banco Popular's and BGF investors' money on Green CO2 Dominicana and on the acquisition of other personal assets in the Dominican Republic.

694.     For example, the Lópezes fraudulently charged their time in the Dominican Republic to BGF. They approved their expenses for travel and money spent there as part of the BGF Project in violation of 18 U.S.C. §§ 1344 and 1957.

695.     The Lópezes transferred money obtained fraudulently from Banco Popular via Citibank at 111 Wall Street to Rafael Sanchez Esq., RSM Dominicana SRL on Avenida Lincoln Number 847, Professional Lincoln, Suite 3B, Santo Domingo, Dominican Republic to their Green CO2 Dominicana project in the Dominican Republic. This violated 18 U.S.C. § 1957.

696.     On the wire form, López Vidal falsely described himself as a student and stated that the wire to a Dominican Republic law firm was for tuition. This violated 18 U.S.C. § 1957.

697.     If López-Vidal were developing the Green CO2 Dominicana project for anyone other than himself, why would he send the wires from his personal account, lie about being a student, and setup the entities for himself?

698.     López Vidal contracted with Linde/Praxair as the off taker of Green CO2, further diminishing the export potential of the CO2 that would be generated by BGF.

699.     The export potential for Humacao is 50,000 pounds of CO2 a day or about $3 million in profit per year.

700.     Had BGF's Project been timely completed, Linde/Praxair would have sourced gas for export from BGF facilities instead of the Dominican Republic.

701.    By contracting with Linde/Praxair, López Vidal usurped this opportunity of BGF for his benefit. His Green CO2 Dominicana would compete with BGF and taking opportunities away from it while the Project languished. For these reasons, López Vidal breached his fiduciary duty of loyalty to BGF and violated his full-time employment and non-compete agreement.

702.    The Lópezes, in collaboration with Borschow, issued a capital call for $1.4 million to buy Green CO2 Puerto Rico soon after the original complaint was filed in April of 2022.

703.    A successful capital call would have allowed GFC Holdings to purchase Green CO2 Puerto Rico, which they claimed is the owner of Green CO2 Dominicana SRL, at an inflated cost in an attempt to cover up López-Vidal's crimes and BGF's losses already spent in violation of 18 U.S.C. § 1957.

704.    López-Vidal repeated the same pattern of racketeering enterprise through this capital call with Borschow's collaboration: By again granting a no-bid construction contract to his family's ITS business with costs so highly inflated as to be fraudulent, he intended to create profit for his family by defrauding shareholders by using highly dilutive funding from Semillero, CDVCA and the Puerto Rico Fund for Growth.

705.    No investor responded to the capital call.

706.    Plaintiffs subsequently discovered that Green CO2, Puerto Rico, a company wholly owned by López Vidal, was the owner of the put contract that gives it $2 million of equity for a $1,000 cost that BGF should earn on the successful completion New Market Tax Credit program.

707.    BGF's New Market Tax Credit provides on or before September 16, 2027, a $1000 Put Option to buy the COCRF Investor 193, LLC and its assets which would include $2+ million

in its accounts. López Vidal fraudulently took this right for himself in the name of Green CO2, Puerto Rico, as the 100% owner of Green CO2, Puerto Rico. This $2 million rightfully belongs to BGF.

708.     Borschow was aware of the fraud and continued to aid and abet the Lópezes, who were on the BGF board with him and whom he purported to manage via Semillero's Preferred Shares rights and Semillero's professional services agreement to provide BGF with management services.

709.     More so, the failed Green CO2 Capital Call clearly shows an agreement to violate RICO, by paying for assets claimed to be owned by López Vidal that all parties knew were the property of GFC/BGF or were created with BGF funds.

**The Diversion of Funds Outside of Puerto Rico**

710.     The Lópezes have consistently submitted expenses to BGF without receipts and reimbursed themselves based on what they simply claim they spent without any breakdown or detail to BGF.

711.     López Vidal took many trips to the Dominican Republic, including three weeks over the holidays in 2020 and listed Brugal as the business purpose in violation of Section 45 of the Internal Revenue Code and 18 U.S.C. § 1957.

712.     BGF paid López Vidal for his time in the Dominican Republic, which did not benefit BGF in any way.

713.    López Vidal went to the Dominican Republic approximately twelve more times in 2021 and 2022 and expensed every trip to BGF, telling staff it was for Brugal, thereby violating Section 45 of the Internal Revenue Code and 18 U.S.C. § 1957.

714.    The Brugal Rum CO2 project competes directly with BGF's potential for CO2 exports.

715.    López Vidal spent considerable time on the Brugal project while being paid with fraudulently obtained funds from the Banco Popular loan designated for BGF in violation of 18 U.S.C. §1344.

716.    López Vidal worked on the Brugal project while the BGF project fell further behind schedule, despite having an employment agreement requiring full-time effort for only GFC/BGF.

717.    Héctor Ayala is a former 30-year Linde CO2 engineer in Puerto Rico.

718.    BGF hired Ayala as a part-time CO2 consultant in August 2019, and he continues in that role.

719.    Ayala performed significant amounts of work on the Brugal project.

720.    Before the September 2021 financial close, ITS paid most of Ayala's time and other BGF employees and subcontractors so that it could mark it up and bill BGF in violation of Section 45 of the Internal Revenue Code and 18 U.S.C. § 1957.

721.    The Lópezes stopped paying Ayala from ITS after counsel for the Plaintiffs first notified Banco Popular of the nature and scope of the Lópezes' fraud in the Fall of 2021.

722.    BGF's staff told Boyd that López Gómez instructed them to "shred this information, Greg's attorneys will see this as a kickback."

723.    Concerned with pending litigation and a potential criminal investigation López Gomez then sold the ITS office building in Puerto Rico, shredded more documents, and moved the proceeds to the Dominican Republic.

**Borschow and Semillero Partners' Misconduct in the Fall of 2021**

724.    The Commercial Operations Deadline was missed in August of 2021 due to Lópezes' diversion of funds and resources. Missing the date caused an additional and unbudgeted increase in monthly expenses of at least $140,000.

725.    In September 2021 the Banco Popular direct loan matured, requiring principal payments, which along with the death of a subcontractor put additional pressure on the project.

726.    BGF required further capital to support the Defendants coverup of their RICO enterprise. They decided to use the coverup story of needing money to start the Ponce Landfill.

727.    No contract has been executed with EC Waste to start the Ponce project.

728.    None of the money raised was ever spent on Ponce making the fundraise a fraud.

729.    Defendants continued to refuse to provide any transparency regarding BGF's finances and operations, refused to explain how the original funds provided by investors and Banco Popular were being spent; and repeatedly rejected Boyd and Lassers requests for that information.

730.    On September 25, 2021, with virtually no advance notice to the shareholders, López Vidal pushed through two resolutions supported by Borschow at BGF's board meeting: (1) to

remove Boyd from the Board due to unspecified breaches of fiduciary duty; and (2) to secure additional financing for $850,000 to meet the shortfall in funds, by offering preferred shares at an unreasonably low price to Semillero Partners and CDVCA and to amend BGF's operating agreement.

731.    López Vidal presented these resolutions to the shareholders two days later on September 27, 2021, giving Boyd and Lassers only two days (September 29, 2021) to respond.

732.    Lassers analyzed the transactions proposed by Defendants and concluded that it would unfairly benefit Semillero Partners, PRFG, and CDVCA to the detriment of the minority shareholders as Semillero and CDVCA would purchase those preferred units based on a fraudulently low valuation and increase their ownership interest at what amounted to a heavily discounted price.

733.    As a result, on October 5, 2021, Lassers presented a counterproposal to the Board expressing his concern about the proposal and offering to purchase the units at more favorable terms for BGF/GFC.

734.    López Vidal criticized and rejected that proposal because there was "insufficient time" to receive the investment. The actual investment by Semillero was not made until October 14, 2021, and on October 18, 2021, by the CDVCA.

735.    Lassers' offer provided the investment immediately upon acceptance by the Board.

736.    Despite the conflict of interest presented by the purchase of these shares for the benefit of Semillero Partners and CDVCA, Borschow voted in favor of the resolution and did not recuse himself nor did Ernesto Villarini of the Puerto Rico Fund for Growth/CDVCA, despite his

personal benefit from the transaction, both of them yet again breaching their fiduciary duties to the companies.

737.    As for Boyd's improper removal as a director, Defendants claimed that he had misappropriated alleged trade secrets.

738.    The original Defendants have never identified those supposed trade secrets, but they had threatened in writing to sue Boyd for revealing them. The statute of limitations has run on the claim, so Boyd no longer seeks a declaratory judgment that he did not misappropriate trade secrets, which he never did.

739.    During the September 2021 Board Meeting, the Lópezes locked Boyd out of all his company emails without notice or a company policy allowing them to do so.

**Banco Popular and the Lópezes' Fraudulent Diversion of BGF's Funds**

740.    The Lópezes' fraudulent activity and consequent lack of effort on constructing the landfill gas biorefinery at El Coqui put the Project and contract in default both with Banco Popular and with the owners of El Coqui Landfill.

741.    Banco Popular was unconcerned with BGF's default because it knew the federal government guaranteed $7.2 million of the debt at no risk to the bank, and that it would benefit from the offtake agreement, as they would end up controlling or owning BGF.

742.    Meanwhile, the Board members could suppress the minority shareholders for years, draining their legal fight financially, and the bank could take over the project or sell it to another investor – as the bank eventually did to VRM, a BPPR client, with Banco Popular in a key position as the primary creditor to dictate terms, collude with VRM and maintain access to the recycled

natural gas and environmental credits to generate electricity for its own off-grid buildings at far below market rates. As was predicted by Plaintiffs in their original complaint in 2022.

743.    However, El Coqui Landfill was missing significant revenue from BGF's delays and as the owner, could rescind pull the gas rights agreement at any moment, thereby rendering BGF and the Bank's off-take agreement worthless and destroying BGF's value. Time was not on Banco Popular's side.

744.    Banco Popular, moreover, has participated with the Lópezes in violating the terms of the New Market Tax Credits, committing bank fraud, and fraud in the misuse of federal funds and omission of required audit and reporting.

745.    On November 11, 2021, the Plaintiffs advised Banco Popular through its Chief Operating Officer and General Counsel that:

a) BGF misrepresented the facts of the project status and falsified the signatures and certification of drawdown certificates submitted to Banco Popular.

b) The drawdown certificates lacked proper documentation from inspections that should have been undertaken by Banco Popular and most notable was the absence of the notarized signature of a third-party engineer for the work that the Lópezes represented that BGF had completed.

c) These certificates were accepted on behalf of Banco Popular before September of 2021 by Joval Rodríguez, the account officer for BGF, in charge of the Banco Popular loan and construction drawdown, who was a co-conspirator in accepting and paying the fraudulent certificates, without or with fraudulent inspections undertaken by Banco Popular of the work done.

d) The commercial operation date of the site was significantly delayed and still has not occurred.

e) Major construction flaws as shown by an independent site inspection conducted on November 7, 2021.

f) Fraudulent behavior on the part of Banco Popular's account officer, Joval Rodríguez, who made loans to BGF in his personal capacity and who received payments from the Lopezes and GFC/BGF.

g) BGF was notified of a default of the project by El Coqui Landfill due to not paying the lease and the minimum gas payment.

h) There was a death of an unlicensed construction worker on site due to electrocution and an ongoing investigation by OSHA.

i) The Lópezes had eliminated Boyd from participating in the project, violating Banco Popular's loan agreement, which provided that he would be the chief operating officer.

j) They had also denied him and the other minority owners' access to the company's financial documents in violation of Article 7.10 of the Corporation Law of Puerto Rico.

746. Despite Banco Popular receiving all this information and the documents to substantiate it, as well as the information that a site inspection was scheduled for November 18, 2021, Banco Popular continued to participate in the fraud by issuing a drawdown on November 16, 2021, days before the inspection of the work was even performed on-site.

747. What Plaintiffs did not then realize was that they were reporting a fire to one of the arsonists.

748.    The Plaintiffs' December 2, 2021, follow-up letter about these facts remains unanswered.

749.    Defaulting on its contract with El Coqui Landfill eliminated the possibility of BGF contracting for the additional landfills and caused significant harm to BGF/GFC and the Plaintiffs. VRM-P knowing about the additional landfills which BGF had the first right of refusal from the plan shared with VRM-P under non-disclosure, violated the NDA and purchased the rights to the Ponce and Salinas landfills.

750.    While the Project was nearing default, the Lópezes were divesting themselves of assets in Puerto Rico and the U.S.

751.    They have sold real estate and have emptied their bank accounts.

752.    Plaintiffs believe that the Lópezes were moving assets to the Dominican Republic in anticipation of the potential bankruptcy of GFC/BGF.

753.    Retaliatory Dissipation of Corporate Assets (Wire Fraud, Money Laundering): On April 25, 2022—the same day Plaintiffs Boyd and Lassers filed the original RICO complaint in this Court—Defendants López Vidal, López Gómez, and Economou, acting in concert, electronically transferred approximately $1.1 million from BGF's operating account at Banco Popular de Puerto Rico, effectively emptying the company's liquid assets. This coordinated same-day transfer, executed through interstate wire communications, constitutes wire fraud (18 U.S.C. § 1343), money laundering (18 U.S.C. § 1956), and fraudulent conveyance under Puerto Rico's Uniform Fraudulent Transfer Act (31 L.P.R.A. § 3491 et seq.). The timing—within hours of service of the complaint—demonstrates scienter and intent to obstruct justice (18 U.S.C. § 1503) by dissipating assets that could satisfy any judgment.

754.     Fraudulent Payment to Equipment Vendors Without Contractual Obligation (Wire Fraud, Commercial Bribery, Money Laundering): Defendants López Gómez and Economou directed the $1.1 million wire transfer to equipment suppliers Galileo Technologies Ltd. and/or TPI Corporation, despite the fact that BGF's contracts with these vendors expressly provided that payment was not due until the biorefinery became operational. By making payment not yet due under the contracts, while simultaneously leaving BGF unable to satisfy its obligations to Banco Popular and EC Waste/El Coquí Landfill, the Lópezes and Economou committed wire fraud (18 U.S.C. § 1343), bank fraud (18 U.S.C. § 1344), and money laundering (18 U.S.C. § 1956). Upon information and belief, Defendants López Gómez and/or Economou received undisclosed commissions or kickbacks from Galileo and/or TPI in connection with these payments, constituting commercial bribery in violation of Puerto Rico law (33 L.P.R.A. § 4889).

755.     EC Waste Default Notices Establishing Material Breach: On May 16, 2022, EC Waste, LLC d/b/a El Coquí Landfill transmitted a formal Notice of Default to BGF at its principal place of business at 584 Calle Aldebarán, San Juan, Puerto Rico 00920, citing BGF's failure to make required payments and failure to achieve commercial operations. On January 17, 2023, EC Waste transmitted a second, more comprehensive default notice demanding immediate cure and expressly reserving all remedies including termination of the 31-year Amended and Restated Gas Rights Agreement. Both notices were transmitted via electronic mail and certified mail, utilizing instrumentalities of interstate commerce.

756.     Failure to Cure Defaults and Subsequent Fraudulent Appropriation of Gas Rights (RICO Conspiracy, Wire Fraud): Neither the May 2022 nor January 2023 EC Waste default notices were ever cured by the GFC/BGF Board of Managers. These uncured defaults placed at risk BGF's sole revenue-generating asset: the exclusive 21-year gas rights to El Coquí Landfill, valued in

excess of $50 million over the contract term. Upon information and belief, Defendants VRM Penzini, Banco Popular de Puerto Rico, Semillero Partners, CDVCA, and López Gómez subsequently conspired to fraudulently appropriate these gas rights for themselves through a scheme involving: (a) manufactured defaults; (b) suppression of the Settlement Agreement; (c) dilution of Plaintiffs' equity interests; and (d) transfer of the gas rights to entities controlled by the co-conspirators—all in violation of 18 U.S.C. § 1962(d) (RICO conspiracy), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 1341 (mail fraud).

757.    BPPR's Selective Cure of Bank Default While Preserving Landfill Default (Bank Fraud, Breach of Fiduciary Duty): When Plaintiffs sought a Temporary Restraining Order in this Court to compel the Lópezes to recover the $1.1 million fraudulently transferred to equipment vendors—funds necessary to cure defaults with both BPPR and EC Waste—Defendant Banco Popular de Puerto Rico made a strategic decision that reveals its participation in the RICO enterprise. BPPR advanced funds sufficient to cure BGF's default under the Credit Agreement, thereby protecting its secured position, but deliberately refused to advance funds to cure the EC Waste default, thereby ensuring that BGF would lose the gas rights upon which the entire enterprise depended. This selective cure, which protected BPPR's debt while destroying the borrower's ability to generate revenue, constitutes bank fraud (18 U.S.C. § 1344), breach of the implied covenant of good faith and fair dealing, and breach of BPPR's fiduciary duties as Administrative Agent under the Credit Agreement.

758.    Economou's Perjured Declaration Regarding Equipment Purchase (Perjury, Obstruction of Justice, NMTC Fraud): In response to Plaintiffs' TRO motion, in May 2022, Defendant George Economou submitted a sworn declaration to this Court stating under penalty of perjury that BGF needed to purchase the equipment from Galileo/TPI in order to release Tranche

2 of the New Markets Tax Credit allocation. This statement is materially false. The NMTC benefit under 26 U.S.C. § 45D is calculated as 39% of the Qualified Equity Investment over seven years—it is a function of equity invested, not equipment purchased. The release of Tranche 2 tax credits had no nexus to the premature equipment payments. Economou's false declaration constitutes perjury (18 U.S.C. § 1621), obstruction of justice (18 U.S.C. § 1503), and fraud in connection with the NMTC program (26 U.S.C. § 45D; 18 U.S.C. § 1343).

759.    Fraudulent Tranche 2 Tax Credit Sale Based on False Compliance Certification (Tax Fraud, Wire Fraud, Bank Fraud): In March 2023, GFC/BGF, with the approval of the Board of Managers and Defendant BPPR as Administrative Agent, consummated the Tranche 2 NMTC transaction. This transaction was predicated upon a tax credit compliance audit that was: (a) more than twelve months stale at the time of closing; and (b) falsely represented that the BGF biorefinery was operational. The Board Members—including Defendants Borschow, Villarini, and López Vidal—and BPPR signed off on the Tranche 2 closing documents despite actual knowledge that the plant was not operational and that the compliance certification was false. This conduct constitutes tax fraud (26 U.S.C. §§ 7201, 7206), wire fraud (18 U.S.C. § 1343), bank fraud (18 U.S.C. § 1344), and conspiracy to defraud the United States (18 U.S.C. § 371).

760.    Continuing NMTC Violation—Plant Remains Non-Operational: The Tranche 2 NMTC allocation required that the BGF biorefinery achieve and maintain operational status to qualify for the tax credits under 26 U.S.C. § 45D. As of the date of this Complaint in February 2026—nearly three years after the Tranche 2 closing—the BGF biorefinery equipment has never achieved commercial operations. The continued non-operational status confirms that the March 2023 compliance certification was false when made and that the NMTC benefits were fraudulently obtained. Each tax credit claimed while the plant remained non-operational constitutes a separate

act of tax fraud and wire fraud in furtherance of the RICO enterprise's pattern of racketeering activity.

761.    NMTC Disbursement Agreement Violations (Bank Fraud, Wire Fraud, Breach of Contract): The NMTC Disbursement Agreement between BPPR, as Administrative Agent, and the BGF/GFC borrowing entities expressly prohibits disbursement of NMTC proceeds for equipment that is not installed and made operational as part of the biorefinery construction. Section [____] of the Disbursement Agreement requires BPPR to disburse funds only upon verified certification that BGF has complied with all loan requisites, including exclusive application of proceeds to operational biorefinery equipment. By disbursing NMTC proceeds for equipment that was never made operational, BPPR and the Board violated the Disbursement Agreement and committed bank fraud (18 U.S.C. § 1344) and wire fraud (18 U.S.C. § 1343). Each non-compliant disbursement constitutes a separate predicate act.

762.    Cascade of Defaults Following Asset Dissipation (Wire Fraud, Bank Fraud): Following the April 25, 2022 filing of the original RICO complaint and the same-day dissipation of BGF's bank account, BGF defaulted on its loan payment obligations to BPPR and received the May 16, 2022 default notice from EC Waste/El Coquí Landfill. These defaults compounded BGF's pre-existing breach: BGF had already failed to achieve the Commercial Operations Date of November 2021 required under both the EC Waste Gas Rights Agreement and the BPPR Credit Agreement. The Lópezes' and Economou's deliberate emptying of BGF's accounts—knowing that payment obligations to both BPPR and EC Waste were due—constitutes wire fraud (18 U.S.C. § 1343) and bank fraud (18 U.S.C. § 1344), and demonstrates the defendants' intent to injure BGF's creditors and minority shareholders.

763.     BPPR's Exploitation of Crisis to Extract Off-Take Agreement (Anti-Tying Violation, Extortion): Defendant Banco Popular de Puerto Rico exploited the manufactured crisis—created by the Lópezes' dissipation of BGF's assets in response to this lawsuit—to extract concessions it could not have obtained in arm's-length negotiations. Knowing that BGF was in default, that the gas rights were at risk, and that the Lópezes were desperate to avoid personal liability, BPPR leveraged its position as senior secured creditor to demand an off-take agreement for BGF's renewable natural gas production at below-market rates with environmental and tax credits. This coercive extraction of a tied product (the off-take agreement) as a condition of continued credit constitutes a per se violation of the Bank Holding Company Act's anti-tying provisions, 12 U.S.C. § 1972(1)(A), (C), and (E).

764.     Unauthorized Release of Tax Credit Collateral (Bank Fraud, Breach of Fiduciary Duty): To address the cash shortfall created by the Lópezes' asset dissipation, Defendant BPPR, acting as Administrative Agent, unilaterally released $610,152.15 from the restricted collateral account securing the Tranche 1 Tax Credit—without obtaining a proper drawdown request, without Board authorization, and without notice to the minority shareholders. This unauthorized release violated: (a) the Mapfre Tax Credit Bond, which required the collateral to remain in place; (b) Credit Amendment No. 1, which established the disbursement procedures; and (c) BPPR's fiduciary duties as Administrative Agent. The unauthorized release of restricted collateral constitutes bank fraud (18 U.S.C. § 1344), breach of fiduciary duty, and conversion.

765.     Illegal Tying of Off-Take Agreement, Credit Amendment, and Drawdown (BHCA Anti-Tying Violation): On July 18, 2022, BPPR executed an Off-Take Agreement with BGF for purchase of Renewable Natural Gas at below-market rates, together with free assignment of all carbon credits and tax attributes. On July 19, 2022—one day later—BPPR executed the Third

Amendment to the Credit Agreement, requiring a $1.5 million capital call by September 15, 2022. On July 20, 2022—a day later—BPPR approved Drawdown No. 17 releasing additional loan proceeds. The temporal proximity of these three transactions—Off-Take Agreement (July 18), Credit Amendment (July 19), and Drawdown (July 22)—establishes that BPPR conditioned the extension of credit (the amendment and drawdown) upon BGF's agreement to provide a non-credit product (the below-market off-take agreement with free carbon credits). This constitutes illegal tying in per se violation of 12 U.S.C. § 1972(1)(A), which prohibits a bank from conditioning credit on the customer obtaining "some additional credit, property, or service from such bank." See Dibidale of Louisiana, Inc. v. American Bank & Trust Co., 916 F.2d 300 (5th Cir. 1990); Highland Capital Management LP v. Bank of America, N.A., 2015 WL 12001236 (N.D. Tex. 2015). Under Section 1972, no showing of coercion is required—the tying arrangement itself is per se illegal, and BPPR is liable for treble damages under 12 U.S.C. § 1975.

766.    False Certifications in Third Amendment and Drawdown No. 17 (Bank Fraud, Wire Fraud): Both the Third Amendment to the Credit Agreement dated July 19, 2022, and Drawdown Request No. 17 dated July 22, 2022, contain representations and certifications that: (a) no Event of Default exists or would result from the requested advance; and (b) BGF is in compliance with all material agreements. These certifications were materially false. At the time of execution, BGF was subject to: (i) this pending RICO lawsuit filed April 25, 2022; (ii) the EC Waste default notice dated May 16, 2022; and (iii) a second, continuing default under the EC Waste Gas Rights Agreement for failure to achieve the November 2021 Commercial Operations Date. The knowing submission of false certifications to obtain loan proceeds constitutes bank fraud (18 U.S.C. § 1344) and wire fraud (18 U.S.C. § 1343).

767.    Failure of Capital Call Required by Third Amendment: The Third Amendment to the Credit Agreement, executed July 19, 2022, required GFC's members to contribute $1.5 million in new equity capital by September 15, 2022. September 15, 2022, passed without any new equity being contributed. Despite this material breach of the Third Amendment—which constituted an Event of Default under the Credit Agreement—BPPR took no enforcement action against the Lópezes or the Board Members who controlled GFC. BPPR's selective enforcement—aggressively pursuing credit terms while ignoring covenant defaults that would have triggered its remedies—further demonstrates BPPR's participation in the RICO enterprise and its intent to acquire control of BGF's assets rather than enforce the legitimate terms of its credit facility.

768.    On September 22, 2022, in furtherance of the criminal enterprise, Banco Popular deposited $13,883.65 through an electronic funds transfer to pay its own interest so that BGF does not default to further the enterprise to keep the project breathing until it can be cannibalized.

769.    On September 26, 2022, in furtherance of the criminal enterprise, Banco Popular deposited $31,014 through an electronic funds transfer to pay its own interest so that BGF does not default to further the enterprise to keep the project alive until it can be brought fully under their control.

770.    The Third Amendment to the Credit Amendment falsely stated that there is no litigation existing or pending that could materially affect the project to build the biorefinery.

771.    Whatever anyone's opinion as to the merit of this lawsuit, it exists, and if it is decided adversely to Defendants, that would have an effect on the company and the biorefinery project.

772.    When Boyd pointed out that falsehood, the Lópezes replied that their lawyers told them that the statement was not a problem.

773.    The Third Amendment also falsely states that no default event had occurred, even though BGF had an open May 16, 2022, default with El Coqui Landfill.

774.    BGF had also failed to pay the loan to Banco Popular, which also constitutes a default event.

775.    On November 9, 2022, López Vidal finally sent an executed copy of the Third Amendment to the Credit Agreement to Boyd.

776.    The budget attached to the Third Amendment confirms that paying for the equipment that has not been operational since April 2022 did not release Tranche 2 of the tax credits. 0.0% of that money had been released because that money will only become available when the project is operational and has passed a tax audit.

**The Fourth Amendment to the Credit Agreement**

777.    When GFC/BGF failed to raise $1.5m by September 15, 2022, and the ITS/ASC joint venture failed yet again to complete construction on the announced date of October 31, 2022, Banco Popular agreed to loan BGF more money, this time yet another one million dollars.

778.    The Fourth Amendment to the Credit Agreement again states that there is no pending litigation that, if resolved adversely to BGF, is reasonably likely to have a material adverse effect on the project. This language is worth parsing: the construction of the sentence does not say that it is not reasonably likely that the Plaintiffs will prevail; what it says is that; ***if the Plaintiffs prevail that it is not reasonably likely that a judgment against Defendants would have a material***

***adverse effect,*** presumably on borrowers' ability to repay the loan. If the Plaintiffs prevail, a material adverse effect existed and still exists – **one that has now been proven true for BGF/GFC and for the Defendants, including Banco Popular and their coconspirators.**

779.    Before the Lópezes came into the windfall that is this project, their financial statements were negative. If they had to repay the Plaintiffs for the harm they have done, with whatever assets now placed out of reach in the Dominican Republic, the Lópezes would have no ability to repay the loan.

780.    The Fourth Amendment further states that all statements in the Amendment and the original Credit Agreement are true and correct. Banco Popular and the Lópezes knew this to be false. Both parties were sent emails by Boyd on this subject but continued to perpetuate the fraud.

781.    In the original Credit Agreement, the Lópezes agreed to spend all the loan money on the biorefinery project in Puerto Rico.

782.    Banco Popular knew that the Lópezes fraudulently used  BGF's funds on the performance bond with Joval Rodriguez, some to pay back Banco Popular's employee, Joval Rodriguez for usurious loans; some of it to leverage buying enough of Boyd's participation in the company to make him a minority shareholder; some of it they spent on the World Spirits Bravada Vodka project; some on their own personal luxuries, and they misspent much of it by overpaying for equipment and getting kickbacks while redoing work that their own companies performed negligently.

783.    Banco Popular knew that the completion date in the original Credit Agreement was untrue because that date and all subsequent completion dates have passed without completion occurring.

784.    The information in the original Credit Agreement was untrue when signed and its distance from the truth has increased from the signing date to the present. Banco Popular knows this too, just as Banco Popular knew that even with BGF seeking to hire Venture Engineering and Construction to supervise, the project would not be completed by December 31, 2022. Venture Engineering and Construction stated that at least five to six months of work will be necessary - if all the necessary equipment were available and installed correctly with trained operators to run the facility.

785.    The Fourth Amendment to the Credit Agreement also states that the amendment is not a novation of the original Credit Agreement, purporting to bind Boyd to an agreement that is fraudulent and to which Boyd never consented.

786.    The Fourth Amendment to the Credit Agreement states that the biorefinery at the EC Waste plant in Humacao will be operational by December 31, 2022. This did not happen, and every Defendant knows that the biorefinery will never be operational without competent management.

787.    After López Vidal executed the Fourth Amendment to the Credit Agreement, and Boyd sent a letter objecting to the Fourth Amendment on November 16, 2022, Banco Popular, in furtherance of the criminal enterprise, deposited $980,943.46 into BGF's bank account.

788.    López-Vidal and López-Gomez used part of the BGF money from the drawdown based on Amendment 4 loan to pay the law firm defending them in the original complaint.



**Fifth and Fraudulent Amendments to the Credit Agreement**

789.    The proposed Fifth Amendment of December 30, 2022, was challenged by Boyd who had received an unfavorable legal opinion of that amendment.

790.    Boyd is a purported personal guarantor of loans from Banco Popular to Biomass Green Fuels, LLC. From Amendments 3-5 Section 4. A. (vi):

791.    Boyd sent the unfavorable opinion of counsel to the Borrower and the Guarantors.

792.    Boyd had previously delivered an unfavorable legal opinion of Amendments 3 and 4 to Banco Popular, Humberto Gonzalez, Vice President of Commercial Lending, on November 16, 2022, and; on December 30, 2022.

793.    Banco Popular signed Amendment 3 on July 26, 2022, which required BGF to replace the over $1.1 million in "final" payments wired to Galileo and TPI sent later the same day the complaint was filed in Federal Court.

794.    This payment was not on any approved bank drawdown schedule at the time.

795.    In April 2022, the Lópezes and Economou falsely claimed the construction was nearly complete and that BGF needed the payment to earn the 2nd tax credit tranche.

796.    Amendments 4 and 5 memorialize this mendacity by extending the construction completion date and the 2nd tax credit tranche to March 31, 2023, 11 months after the money was wired to Galileo and TPI.

797.    Despite questioning, the Lópezes and Economou have never denied receiving compensation in the form of illegal kickbacks that do not benefit BGF from Galileo or TPI to themselves or anyone or any company with which they are associated.

798.    The bank broke the terms of Amendment 3 by lending money without BGF providing an "additional Equity Contribution of $1.5 million by September 15, 2022. This puts Amendment 3 in default. Amendment 4 was issued to cover up the missing money.

799.    Amendment 4 requires repayment of $1 million before December 31, 2022. This payment did not occur and as Mr. Boyd stated in his November 16 letter, the non-repayment of $1 million put Amendment 4 in default and further jeopardized the company and Plaintiffs.

800.    Amendment 5 was a fraudulent coverup for the failure of BGF to provide the $1.5m in equity in Amendment 3, the failure to repay the $1 million in Amendment 4 and the failure to complete construction.

801.    In Amendment 4 (g) The second tranche tax credit was not eligible for sale because the project must first be completed, then pass an audit by Hacienda.

802.    Mr. Boyd requested a copy from Olmar López-Vidal of the completed tax credit audit on November 7, 2022, and has received nothing because completion is a condition precedent to the audit.

803.    Banco Popular and its attorneys know Puerto Rico tax credit law and know requiring this prepayment before December 31, 2022, was also fraud.

804.    Boyd never approved Amendment 3 and had personally guaranteed the $11.8 million loan for BGF per the original credit agreement.

805.    Amendments 4 and 5 exceed this amount by $1 million, and Amendment 5 continues to expand the Credit Agreement without Boyd's approval.

806.    Boyd never signed Amendments 2-7.

807.    Calling Boyd a guarantor of a Credit Agreement despite his vociferous objections to Amendments 2 through flies in the face of reason.

808.    In Amendments, 3-5: 5 (e): "There is no pending or, to the Borrower's knowledge, threatened action"

809.    There were two proceedings affecting the Borrower and the Guarantors and Banco Popular: one before the United States Federal District Court for the District of Puerto Rico and the other before the Bayamon Superior Court.

810.    The federal case is based on criminal violations of the RICO act, including fraudulent diversion of federal tax credits from bona fide census tracts in the United States to the Dominican Republic, transporting stolen money to a foreign country, fraudulent misappropriation of funds, usury, fraud and swindling, and bank fraud.

811.    The case before the Bayamon Superior Court sought an injunction based on BGF's violation of Puerto Rico corporate law, which requires limited liability companies to provide information of the company's operations to its ownership members. These cases predate Amendments 3-5.

812.    In Amendments 3-5: 5 (f) "No event has occurred and is continuing which constitutes a Default or Event of Default."

813.    The Commercial Operations Date deadline was the first week of August 2021. There is NO agreement extending this date by the El Coqui Landfill.

814.    Based upon the recent Venture Engineering and Construction independent engineering report, irreparable harm could occur if BGF attempted to start the biorefinery without implementing the changes the independent engineering report requires. We do not need more loss of life. The Bank should be held culpable should irreparable harm occur for its fraudulent inspections and activities after being informed of the problems and fraud.

815.    There was no proper authorization by the Company nor its guarantors for Amendments 3-5. No properly constituted meetings occurred authorizing these Amendments. In violation of Puerto Rico Corporate Law, no company shareholders meeting ever occurred, much less one approving Amendments 3-5. Boyd did not attend the Amendments 4 or 5 meetings.

816.    In violation of the credit agreement, no audited financials of GFC/BGF were presented in a timely basis to the Bank

817.    Amendment 3-5, Section 1 (b) states, "The Borrower and the Guarantors acknowledge and agree that, as of the date hereof, they have no defenses, off-sets, claims or

counterclaims of any nature, whether liquidated or unliquidated, matured or unmatured, direct or indirect, against any of the Lenders or the Administrative Agent, directly or indirectly related to the Outstanding Indebtedness, the Credit Agreement and all the other Loan Documents, and any and all such defenses, off-sets, claims and counterclaims are hereby expressly and forever waived and released."

818.    The Plaintiffs already had claims filed in Federal Court and in Bayamon Superior Court. The Plaintiff exercised his rights and did not waive them.

819.    Boyd did not approve Amendments 3-7.

820.    Boyd never signed Amendments 3-5. Per footnote 1 on the draft Amendment 5, "1 Note to Bank: Please confirm if you will not require the personal guarantors to sign this amendment as set forth in the Credit Memorandum."

821.    From Amendments 3-5 Section 4: Notice of this Amendment shall have been delivered by the Administrative Agent on behalf of the Lenders to the NMTC Lenders fifteen (15) business days prior to the date hereof in accordance with Section 10 of the Intercreditor Agreement;

822.    If Banco Popular did not send the notice of Amendment delivered to the NMTC 15 days prior on Amendments 3-5, it is violating the Intercreditor Amendment, with the attendant consequences of that violation.

823.    From Amendments 3-5: (5c) This Amendment constitutes the legal, valid, and binding obligations of the Borrower and the Guarantors, enforceable against the Borrower and the Guarantors in accordance with its terms, except as such enforceability may be limited by applicable

bankruptcy, insolvency, reorganization, moratorium or similar laws of general applicability affecting the enforcement of creditors' rights.

824.    Boyd is not a party to Amendments 3-5; these are not enforceable.

825.    From Amendments 3-5: (5g) Before and after giving effect to this Amendment, the representations and warranties set forth in this Section 5 and those contained in the Credit Agreement and the other Loan Documents are true and correct in all material respects on and as of the date of this Amendment, as though made by the Borrower and the Guarantors on and as of this date, except to the extent such representations or warranties expressly relates to a prior date, in which case such representation and warranty shall be true and correct in all material respects as of such earlier date.

826.    Amendment 3-5 are not true or correct. By signing Amendment 5 and disbursing more money Banco Popular violated the original Credit and Intercreditor Agreements.

827.    Banco Popular continued to deny the existence of the litigation, uncured default notices, continued to ignore failure to meet construction deadlines and evidence of fraud submitted to the banks legal department in November of 2021. How did they pretend do this? By the signatory to the very illegal amendments claiming to refuse to even read or respond.

From      Laura Medina Castillo <Laura.Medina@popular.com>
To        greg.boyd@icloud.com
Subject   Not read: Biomass Green Fuels Amendment 5

```
Your message

      To:   Humberto E. Gonzalez Caraballo
      Cc:   Laura Medina Castillo; 'Jane Becker Whitaker'; 'Jonathan Lassers'
      Subject:   Biomass Green Fuels Amendment 5
      Sent: 12/30/2022 11:51 AM

was deleted without being read on 1/17/2023 5:26 AM.
```

**Banco Popular is Proud of its Quid Pro Quo**

828.    El Nuevo Día published an article with a video of an interview with Banco Popular President Alvarez, in which Mr. Alvarez stated that "We have cogeneration, a natural gas plant, but the most innovative [thing] about the plant is that it is equipped to work with methane gas. We already have a contract with a business that captures methane gas from a landfill. This is extraordinary. We will be the first in Puerto Rico to do this."

829.    The gas contract to which Mr. Alvarez refers is the quid pro quo with BGF.

830.    Mr. Alvarez did not mention the bank loan to BGF has been in default since November 2021 when the Plaintiffs presented evidence to the Bank's legal department per Section 7.1(e) of the bank's credit agreement, yet the bank lent another $6 million since that default, so Banco Popular could get access and control of the renewable natural gas it has sought from the outset.





Banco Popular Señorial Building with Biomass Green Fuels Tanks

831.    The quo was Banco Popular's commission of the fraud, fraudulently obtaining a Payment and Performance bond to enable the Lopezes to obtain the construction contract with Acosta, the misuse of federal loan funds to pay for Olmar López Vidal's acquisition of a controlling percentage of BGF; the approval of fraudulent drawdowns with the work specified incomplete; the refusal to respond to documented accusations of fraud in a way that holds the criminals responsible and stops the fraud; payments of loan money above the loan amount; two admissions that without capital infusions the biorefinery cannot become operational; and irregular loans of additional money without those capital infusions based on improper loan amendments.

832.    Banco Popular is not just complicit. Banco Popular is the moving force behind the criminal acts detailed herein. By creating a RICO enterprise and responding to criticism with coverups and more fraud, Defendants allowed the chickens to come home to roost.

833.    On January 17, 2023, Randi Jensen, EC Waste's CEO sent a default letter to BGF, Gregory Boyd as guarantor, Olmar López Vidal as guarantor, Olmar López Gómez as guarantor, and Banco Popular de Puerto Rico as administrative agent.

834.    In the default letter, Mr. Jensen recounts that EC Waste sent a prior default and notice of right to recover expense and fees to the same parties on May 16, 2022, and received acknowledgement of receipt but no formal response.

835.    Mr. Jensen further stated the obligation which BGF has failed to comply, to wit:

| Item | BGF Statement Obligation Due | Total Due |
|------|------------------------------|-----------|
| 1. | August 2021 (Lease & Purchase Agreement) | $31,687.00 |
| 2. | September 2021 (Lease & Purchase Agreement) | $31,278.36 |
| 3. | October 2021 (Lease & Purchase Agreement) | $7,093.83 |
| 4. | November 2021 (Lease & Purchase Agreement) | $6,254.19 |

| 5. | December 2021 (Lease & Purchase Agreement) | $6,401.96 |
| 6. | January 2022 (Lease & Purchase Agreement) | -$16,916.29 |
| 7. | February 2022 (Lease & Purchase Agreement) | $19,740.52 |
| 8. | March 2022 (Lease & Purchase Agreement) | $49,981.48 |
| 9. | April 2022 (Lease & Purchase Agreement) | $54,311.72 |

| 10. | May 2022 (Lease & Purchase Agreement) | -$48,499.38 |
| 11. | June 2022 (Lease & Purchase Agreement) | $23,532.76 |
| 12. | July 2022 (Lease & Purchase Agreement) | $63,598.52 |
| 13. | August 2022 (Lease & Purchase Agreement) | $58,185.31 |
| 14. | September 2022 (Lease & Purchase Agreement) | $61,404.64 |
| 15. | October 2022 (Lease & Purchase Agreement) | $60,711.96 |
| 16. | November 2022 (Lease & Purchase Agreement) | $56,498.71 |
| 17. | December 2022 (Lease & Purchase Agreement) | $58,215.69 |
| 18. | Cutoff Extension Payment | $250,000.00 |
| TOTAL | | $773,480.98 |

836.     Mr. Jensen then added, "The above table is a summary of the amount owed by BFG to ECL from August 2021 to December 2022 for obligations such as the Lease Monthly Payment, Monthly Minimum Off Take Payment, the Electricity Requirement Payment and the Cutoff Extension Payment. The basis for the Cutoff Extension Payment is described below. Concurrently, pursuant of Section 2.4 of the Purchase Agreement and Section 5 (i) of the Lease Agreement, BGF shall be aware that any amount payable under the Agreements that are not timely paid shall bear interest until such amount are paid at one percent (1%) per annum above the fluctuating prime rate. Additionally, BGF shall be held responsible for any and all legal fee expenses on this and prior process."

837.     The letter continues: "As referenced before, Section 4 of the Lease Agreement states "[n]othwithstanding anything to the contrary in Article 2 of the Purchase Agreement regarding the timing of payments due with the delivery of each Monthly Statement, Lessee shall pay rent to Lessor without notice, demand, reduction or setoff (provided that Lessee may credit

certain amounts payable by Lessor against rent payable by Lessee as set forth in Section 2.4 of the Purchase Agreement), for the term of this Lease". Therefore, BGF has been in default on its obligations since August 2021. Nonetheless, this is not the only aspect out of compliance for the Purchase Agreement.

838.    At the same time, in the letter dated October 15, 2020, BGF and ECL agreed that the Commercial Operation Date (COD) will be deemed as of November 27, 2020. The aforementioned document states "COD is defined as the date on which ECL commences delivery of the landfill gas ("LGF") to BGF and BGF accepts the initial delivery of LFG from ECL. BGF has indicated that it will be requesting delivery of LFG from ECL on or before November 27, 2020, unless extended by an Extension Payment in the amount of $250,000. On the other hand, the LFG processing operations of BGF's Facility are anticipated to startup in July 2021, at which time the Facility will commence receiving additional LFG from ECL."

839.    Echoing this litigation, the letter continues, "Furthermore, 18 months after the proposed Cutoff Date for the Facility startup, the Facility is yet to be operational. Moreover, according to the ESS & J208 Operational Certification signed and sealed by engineer Roberto Acosta, "Jenbacher J208 Gas Engine was commissioned on October 2021…" and "Energy Storage System (ESS) was commissioned on November 2021…". Hence, BGF has failed to comply with either of the Cutoff Dates agreed between the parties on October 15, 2020. Therefore, pursuant of Section 2.2 (d) of the Purchase Agreement, ECL hereby notify BFG that a penalty payment of two hundred fifty thousand dollars ($250,000.00) shall be paid for and extension of the Cutoff Date. Consequently, the Final Cutoff Date for the Facilities Operation shall be on or before April 17, 2023. Accordingly, ECL demands the following: (1) a formal reply to this Notice of Default on or before January 19, 2023; (2) Payment in full of any and all such amounts due and owing, and

applicable fees, interest, penalties and expenses on or before January 27, 2023; (3) That the Administrative Agent cures all items on Default on or before February 16, 2023."

840.    The letter further states, "In like manner, Section 11.19 of Purchase Agreement requires that BGF shall obtain and maintain, during the entire term of the Agreement, personal guarantees and/or performance bond, each on a form and substance acceptable to ECL in ECL's sole and absolute discretion. Currently, ECL holds personal guarantees from Mr. Olmar López Vidal, signed on July 23, 2019 as affidavit number 21,304 of the Public Notary Jatniel Padilla Norat; Mr. Gregory Boyd, signed on July 30, 2019 as affidavit number 307 of Public Notary Marina Contreras Velázquez; and Mr. Olmar Vidal Gómez signed on July 30, 2019 as affidavit number 308 of Public Notary Mariana Contreras Velázquez. All personal guarantees were accepted by ECL's Chief Executive Officer, Randy Jensen.

841.    The letter continues: "As stated on the Notice of Right to Recover Expenses/Fees Related to Complaint and Notice of Default from May 16, 2022, ECL was notified of a pending litigation between BGF guarantors in the United States District Court for the District of Puerto Rico on April 25, 2022. Due to the subject of litigation, ECL believes that the process devalues some or all the personal guarantees currently held. Thus, ECL is requesting BGF to obtain and furnish a Performance Bond in the amount of TWO MILLION DOLLARS ($2,000,000.00) from bonding company rated A+ (Superior) by A.M. Best Rating Services, Inc. The performance bond shall be furnished to ECL on or before fourteen (14) calendar day from receiving this Notice of Default."

842.    The above statement contradicts Banco Popular's false statements in the Third and Fourth Amendments to the Credit Agreement that there was no pending litigation that would have an adverse effect on the Project.

843.    Mr. Jensen's letter continues, "Consequently, pursuant to Paragraph 9 of the El Coqui Landfill Estoppel and Consent, dated August 20, 2020, ECL hereby provides notice and opportunity to cure to the Administrative Agent and the Lenders (as those terms are defined in the Credit Agreement) of BGF's monetary default under the terms of the Purchase Agreement and the Site Lease…

844.    ECL ends its letter with a reference to the false hope that "BGF" [presumably the Lopezes, since Mr. Boyd did not provide this false information.

845.    Finally, ECL recognizes BGF has proposed to offset and/or satisfy part or the whole debt by transfer of tax credits. "Although conversations have taken place, at the date of this Notice of Default, none of the conversations have materialized to a workable understanding on this matter. Nonetheless, once BGF's tax credits can be transferable, ECL could resume conversations to develop an agreement for the transfer of such credits."

846.    BGF could not transfer the tax credits to ECL because Banco Popular had the first right to them to pay off its loan.  A right Banco Popular changed unilaterally by giving BGF $500,000 which they promptly spent not finishing anything.  This created additional debt for Boyd to guarantee without his permission and made BGF further beholden to Banco Popular and ultimately to fall prey to Banco Popular's coconspirator VRM.

**BPPR's Fiduciary Breaches for Access to RLNG**

847.    In 2019, BGF applied for construction loans from several banks. Except for BPPR, the banks recommended a combination of the federal Small Business Administration (SBA) and U.S. Department of Agriculture (USDA) loan guarantees.

848. The federal loan guarantees from the USDA require that the borrower be independently owned and operated and that the principals not have a direct or indirect interest in the construction company building the project. This prevents the principals from using the loan to fund their other interests or to engage in self-dealing.

849. BPPR committed multiple breaches of their fiduciary responsibilities because of their need for access to RLNG.

850. Olmar Lopez Gomez, Olmar Lopez Vidal, and their son, Carlos Lopez Vidal, own multiple companies with the same or similar names. Five ITS companies; four Green CO2 Companies, World Spirits, and Brava, SRL, which are owned and or operated by co-defendants (hereinafter "the Lopez Companies").

851. The Lopezes and their companies were not creditworthy, which prevented them from getting a Performance Bond for the project's construction as required by BPPR's Credit Agreement. Exhibit 3 at 3.1(b), 4.1(i).

852. Olmar Lopez Vidal's 2018 personal financial statement, submitted to the SBA, shows that he had a negative net worth of $90,234. Exhibit 7

853. Olmar Lopez Gomez's 2018 Tax Return showed an income of $4,182. Exhibit 8

854. No other bank would allow such a company with such failed executives to lead the engineering and construction of a $30 million biorefinery.

855. The U.S. Environmental Protection Agency's (EPA) Landfill Methane Outreach Program (LMOP) states as of September 2024, "488 MSW landfills provide LFG to one or more

LFG energy projects currently in operation.". On June 18, 2025, the RNG Coalition issued a press release celebrating "500 operational RNG facilities in North America."

856. Yet, Banco Popular acted as if the Lopezes were the only people who could build a biorefinery.

857. Bank loans funded the majority of these EPA LMOP projects, most with federal guarantees from the SBA and/or the USDA.

858. Byline Bank, other banks and the USDA loan program refused to fund this project because of the conflicts of interest posed by some of the owners of BGF (The Lopezes) also owning the proposed construction contractor, ITS.

859. Since ITS could not qualify for a bond due to poor credit, the Lopezes proposed that ITS, in a joint venture with Accurate Solutions Corp. ("ASC"), be the construction company for BGF's biorefinery.

860. On information and belief, BPPR knew that the Lopezes sought to self-deal through their companies, and the bank agreed to the self-dealing by allowing the ITS/ASC joint venture to provide construction services to BGF because BPPR wanted a favorable Off-take Agreement. Exhibit 9.

861. The bank found Olmar Lopez Gomez and ITS were being sued in Ballester Hermanos Inc. v. Olmar Lopez-Gomez et al. Case No. SJ2018CV03188 (P.R. Super. Ct. 2018) for non-performance on an energy project and failure to refund the clients' deposit. BPPR required the case to be settled before the loan closing.

862.    The President of Ballester Hermanos is Alejandro J. Ballester, who has been a member of the Popular, Inc. Board of Directors since 2010 and is Director of the Audit Committee and Chairman of the Governance and Nomination Committees at Banco Popular.

863.    Neither the inability to qualify or pay for the required Performance Bond, the outstanding lawsuit, nor their lack of experience in constructing a biorefinery caused BPPR to reject the Lopezes and ITS's integrity, or capability to engineer and construct the Caribbean's first landfill gas to RLNG and RCO2.

864.    No other bank would allow such a company to lead the engineering and construction of a $30 million biorefinery. Indeed, Byline Bank and other banks refused to allow it.

865.    The Tying arrangement was premeditated and initiated when BPPR financed BGF's Biorefinery Project with a Non-Revolving credit facility and New Market Tax Credit loans and allowed the Lopezes' ITS company to profit from the construction contract.

866.    BPPR continued to deny reported frauds, multi-year delays and millions in cost overruns of which they had full knowledge.

867.    The SBA and USDA required BGF to sign long-term Offtake Agreements with good-credit buyers showing enough revenue to pay for the loan. The lender would take a secure interest in these agreements.

868.    BPPR did not require security over signed Offtake Agreements as a precondition for the direct loan because they planned to control, consume, and benefit from the RLNG and its valuable environmental attributes.

869.    A precondition of the closing of the credit agreement was proof of payment for the Pay and Performance Bond for the construction company.

870.    Carlos Lopez Vidal, Olmar López-Vidal and Olmar López-Gómez wanted to award the construction contract to one of their own companies, International Technical Services, Inc. ("ITS"). ITS was not credit-worthy and was unable to obtain a payment and performance bond. To boot, ITS lacked the experience to build a biorefinery. To gloss over these weaknesses, the Lopezes proposed that the construction be carried out by a joint venture between ITS and Accurate Solutions Corp. ("ASC") named JV Distributed Power Innovators (the "JV"). Despite these anomalies, BPPR allowed the JV to be the designated contractor to build the biorefinery, and approved the loan, which closed on September 15, 2020.

871.    The Credit Agreement required a Payment and Performance Bond of not less than 100% of the direct costs of the project, or $18,679,651. Instead, BPPR allowed the posting of a mere $5,000,000 payment and performance bond. BPPR then deliberately withheld this information from BGF's investors. Similarly, a condition precedent to closing was that the JV had to provide proof of having paid for and obtained a payment and performance bond. Even so, the JV did not acquire the bond prior to closing but rather, fraudulently after closing, with the proceeds of BGF's own loan. Moreover, BPPR officer Joval Rodríguez hid the disbursal from Boyd and other investors as a "closing cost." And by allowing this payment to take place, BPPR failed to comply with the Credit Agreement and to follow its own disbursal controls.

872.    BPPR cannot, and the GFC managers cannot claim on the inadequate Projects Pay and Performance Bond for the construction failure because an insurance investigation would reveal the construction frauds undertaken by BPPR and the Defendants. An investigation would also demonstrate BBPR's fraud in obtaining the underinsured policy and their liability as

Administrative Agent in failing to adequately insure the project, which under its own loan requirements at $18.67 million, would have been an amount sufficient to repair the facility and save the entire $300 million of value of the company.

873.    The Credit Agreement completion date for the project was 3/31/2021 for the $11,869,250 non-revolving loan. BPPR as Administrative Agent constantly lent a higher percentage of the loan than the percentage of work completed. BPPR ignored the fixed price requirement of the construction contract.

874.    Amendment 1 (5/6/2021): Completion date changed to 12/31/2021; new revolving facility for $812,500. Disbursement to BGF exceeded allowed amount; Mapfre letter of credit collateral violated by bank. The $610,000 letter of credit cash collateral was transferred by BPPR to BGF on June 22, 2022, in violation of the Mapfre Tax Credit Bond and Credit Amendment 1. Exhibit 22.

875.    Amendment 2 (3/2/2022): Completion date changed to 4/30/2022; unchanged credit; not signed by Boyd. Project completion and revolving facility termination date was 12/31/2022, extended four months, then two months. Dates not met.

876.    Release of Collateral (6/22/2022): BPPR disburses $610,152.15 to BGF being held as the Tax Credit Collateral for the Mapfre Tax Credit Bond for Tranche 1. Bank fraud, wire fraud and insurance fraud. The BGF project was never completed, making Tax Tranche 1 and the Mapfre Bond callable. Exhibit 23.

877.    Exhibit 10 Amendment 3 (7/19/2022): Completion date changed to 10/31/2022; additional equity $1,500,000; credit increased by $1 million; not signed by Boyd; denied defaults (EC Waste); ignored lawsuits. Additional $1.5M equity required by 9/15/2022 not met.

Construction completion date not met. Tied to 7/18/2022 Off-take Agreement Exhibit 9 and resulted in Drawdown 17 on 7/20/2022 for $843,257.10 Exhibits 10-11.

878.    Amendment 4 (11/1/2022): Completion date changed to 12/31/2022; $12,869,250; not signed by Boyd; denied defaults (EC Waste); ignored lawsuits. On or before 12/31/2022 Borrower to pay $1,000,000. This requirement was not met. Exhibit 24.

879.    Amendment 5 (1/5/2023): Completion date changed to 3/31/2023; reduce by 1 million to $11,869,250; not signed by Boyd; denied defaults (EC Waste); ignored lawsuits. Prepayment of $1,000,000 still required, construction completion not met. Exhibit 25.

880.    BPPR Letter (3/9/2024): Releasing $500K of Second Tax Credit Tranche to BGF; $12,369,250; not signed by Boyd. 2nd Tax Tranche sale is eligible after the construction is complete. Construction was never completed. Hacienda required completion receipts performed 17 months prior in August 2022. Bank knew this tax credit sale was fraudulent, participated and received $1 million in proceeds. $500K disbursed to BGF without Boyd's approval of the amendment. Exhibit 26.

881.    Amendment 6 (4/27/2023): Use of tax credit account amended; not signed by Boyd; no defaults denied; no lawsuits ignored. Prepayment of $1,000,000 still required, construction completion not met. Exhibit 27.

882.    Amendment 7 (9/27/2023): Completion date changed to 10/31/2023; not signed by Boyd; no defaults denied; no lawsuits ignored. Construction never Completed: Tax Credits require construction completion making Tranche 1 & 2 fraud. Exhibit 28.

**BPPR's Pay and Performance Bond Fraud**

883.    As Administrative Agent, BPPR violated its obligations under the Credit Agreement by neglecting to enforce the requirement for a performance and payment bond covering 100% of direct costs ($18,679,651).

884.    Instead, BPPR permitted an inadequate $5 million bond, which it failed to perfect, and disbursed an improper payment for it.

885.    BPPR deliberately withheld this shortfall from BGF and its investors, falsely representing the bond's sufficiency during the execution of the credit agreement, including through communications via interstate wire to its subsidiary Popular Insurance. This misrepresentation and the subsequent payment are wire fraud under 18 U.S.C. § 1343, a predicate act for RICO violations (18 U.S.C. § 1961).

886.    The appearance of a performance and payment bond being in place for the Lopezes ITS JV enabled the lending and unlawful linking of credit extensions to the offtake agreement, contravening the Bank Holding Company Act, 12 U.S.C. § 1972(1)(C), resulting in substantial losses for BGF, GFC, and their investors.

887.    Securing the bond for $18.679 million, required under the terms of BPPR's own credit agreement, would have covered the now $12 million unpaid direct loan, with surplus funds available to engage a qualified RLNG engineering and construction firm to complete the project. This is one of many failures of BPPR as the Administrative Agent that directly contributed to BGF's failure and explains BPPR's desperation to continue concealing their frauds by engineering an illegal sale of the loan and the assets of GFC/BGF to VRM over which they held security.

888.     Without being able to take recourse to the Payment and Performance bond, BPPR seized BGF's assets, including the LGSPA gas rights, and enabled their transfer to VRM at a significantly reduced value to preserve their favorable offtake agreement, and continued to attempt to further conceal their racketeering frauds, further harming BGF and its stakeholders.

889.     The bank helped the Lopezes pay for the inadequate bond for ITS, a company owned by the Lopezes (ITS), with BGF's loan money.

890.     The bond was purchased from Mapfre Insurance with Popular Insurance as the agent.

891.     Popular Insurance is wholly owned by Popular, Inc., which also owns BPPR.

892.     The invoice for the bond, shows the agent as Popular Insurance, and shows the amount matching Rodriguez's email above and the wire below. It also shows that the bond is for ITS/ASC Joint Venture, not BGF. Exhibit 19-20.

893.     Rodriguez's email amount matches the invoice to the ITS/ASC Joint Venture from Popular Insurance for the Mapfre Bond. Exhibits 20-21

**April 25, 2022, Asset Dissipation and Perjury**

894.     On April 25, 2022—the same day Boyd and Lassers filed the original RICO lawsuit in this Court—Defendants López Vidal, López Gómez, and Economou wired $1,100,000 of BGF funds to vendors Galileo Technologies Ltd. and TPI Composites, Inc., purportedly for "project completion" equipment.

895.     This transfer constitutes wire fraud (18 U.S.C. § 1343) because Defendants transmitted funds via interstate wire knowing that the equipment would not be installed and the

project would not be completed — as evidenced by the fact that nearly four years later, in January 2026, the project still remains incomplete.

896.    The transfer also constitutes bank fraud (18 U.S.C. § 1344) because Defendants caused BGF loan proceeds to be disbursed for equipment and services that were never delivered as represented.

897.    Upon information and belief, Defendants López Gómez and/or Economou received undisclosed commissions or kickbacks from Galileo and/or TPI in connection with these payments, constituting money laundering (18 U.S.C. § 1956) and commercial bribery in violation of Puerto Rico law (33 L.P.R.A. § 4889). Boyd and Lassers filed a motion for Temporary Restraining Order to recover the dissipated funds. In response, Defendants López Gómez and Economou submitted sworn declarations to this Court stating under penalty of perjury that:

    a) The $1.1 million payment was due and owing;

    b) The equipment was nearly complete and would be delivered imminently; and

898.    They had no knowledge that the RICO lawsuit had been filed on April 25, 2022.

899.    Each of these statements was false. The equipment had not been delivered or installed. The work still remains incomplete nearly four years later. And critically, on that same day—April 25, 2022—Defendants received an email from attorney Rubén G. Fernández Agramonte of DLA Piper LLP responding to their questions about Boyd's signature claims in the very lawsuit they swore they knew nothing about. Exhibit 29

900.    These false sworn statements constitute perjury (18 U.S.C. § 1621; 33 L.P.R.A. § 4741), obstruction of justice (18 U.S.C. § 1503), and fraud upon the court under Fed. R. Civ. P. 60(d)(3).

901.    The timing of the $1.1 million transfer—executed on the precise day the lawsuit was filed, followed by false sworn denials of knowledge—demonstrates fraudulent conveyance under Puerto Rico's Uniform Fraudulent Transfer Act (31 L.P.R.A. § 3491 et seq.) and constitutes additional predicate acts of wire fraud in furtherance of the RICO enterprise's pattern of racketeering activity.

902.    Defendants' failure to deny receiving vendor commissions in their sworn statements, when specifically challenged, constitutes an adoptive admission of the kickback scheme.

903.    The April 25, 2022, conduct independently satisfies the "pattern" requirement under 18 U.S.C. § 1961(5) because it involved multiple predicate acts (wire fraud, bank fraud, money laundering, perjury, obstruction) committed by multiple defendants in a coordinated effort to dissipate assets and obstruct this litigation.

**VRM Penzini's Entry and Betrayal of the Plaintiffs (January 2023 - Present)**

904.    In late 2022 and early 2023, the Lópezes sought additional investors for BGF's Brugal CO2 project in the Dominican Republic. They contacted VRM Penzini Capital, a Puerto Rico private equity firm led by Carlos Penzini, Diego Rodriguez, and Rafael Rojo.

905.    VRM Penzini became aware of the pending RICO litigation against the Lópezes and reached out to Boyd and Lassers through their counsel.

906.    During initial meetings starting January 13, 2023, VRM Penzini learned of the merit of Boyd and Lassers' claims and the substantial value being lost due to fraud.

907.    On January 18, 2023, Boyd and Lassers signed a Confidentiality and Non-Disclosure Agreement with VRM Penzini Capital through its operating entity Star Power Systems, LLC. The NDA was signed on behalf of VRM by Rafael Rojo, Diego Rodriguez, and Carlos Penzini. Exhibit 13

908.    The NDA prohibited VRM Penzini from using confidential information for its own benefit: "**the receiving party shall not use the Confidential Information of the Disclosing Party for its own or any third party's benefit or use**."

909.    The NDA further prohibited disclosure of the business relationship: "The receiving party shall not disclose to the public or to any third party the Business Purpose or the existence of any relationship between the parties hereto, without the prior written consent of the other party."

910.    Following the NDA, Boyd and Lassers met with VRM Penzini representatives multiple times, including:

a) January 13-17, 2023: Initial negotiations (Zoom) - Rojo stated, "We want to be your partners—we will only work with you two to acquire this project" and "You have our commitment that we will not go around you"

b) February 2, 2023: Status Update (Zoom) - Boyd disclosed detailed BPPR loan acquisition strategy; Rojo falsely assured "we are committed to this partnership"

c) February 3, 2023: Status Update (Zoom)

d) February 9, 2023: Status Update (Zoom)

e) March 9, 2023: GFC Meeting (Zoom) - Lassers presented $300M financial projections; Penzini asked detailed questions while concealing VRM's independent plans

f) March 15, 2023: Meeting (Zoom)

g) March 27, 2023: "Plan B Meeting" (Zoom) - Boyd presented complete takeover blueprint; Rojo stated, "now we have a plan to get control."

911.     During these meetings, Boyd and Lassers shared with VRM Penzini:

a) Detailed presentations mapping out the value of BGF/GFC

b) The specific process to gain control of the companies

c) Operational and design flaws which required improvements

d) Methods to add value through environmental benefits and tax credits, including a $10 million federal tax credit that was only available if the application for it were filed before the plant's operations started.

e) A "Plan B" approach for taking control if settlement discussions failed.

912.     During a PowerPoint presentation meeting on January 26, 2023, VRM-P principal Rafael Rojo stated: "now we have a plan to get control." Exhibit 30

913.     The presentations disclosed to VRM Penzini included specific strategies for:

a) Settling the RICO litigation

b) Buying out BPPR's loan position

c) Monetizing environmental attributes and tax benefits, including the $10 million federal tax credit

914.     On May 16, 2023, Boyd and Lassers entered into a Key Heads of Terms for Settlement with VRM Penzini outlining terms for the acquisition of GFC Holdings.

915.    In May 2023, VRM Penzini invested $1.5 million to acquire 1,617,000 Preferred Series A units in GFC Holdings, becoming a member/shareholder and thus an "Affiliate" under the Credit Agreement's definition.

916.    Boyd and Lassers had warned VRM to invest that money via payments to cure the default with EC Waste and legitimate suppliers, or the Lopezes and/or Economou would take that money.

917.    When VRM invested the money directly with the Companies, the Lopezes took money out for themselves; for Economou; and for the joint venture which was constructing the biorefinery incompetently and corruptly.

918.    Between August 1-18, 2023, Boyd and Lassers participated in multiple meetings with VRM Penzini to finalize the Revenue Sharing Agreement, including:

   a)  August 1, 2023: Boyd/Lassers/VRMP (Microsoft Teams)

   b)  August 2, 2023: Boyd/Lassers/VRMP (Microsoft Teams)

   c)  August 15, 2023: VRM + EFB RSA Close Out (Microsoft Teams) - Rodriguez participated while concealing VRM's intent to breach

   d)  August 18, 2023: Humacao RSA Close Out (Google Meet)

919.    On August 20, 2023, Boyd and Lassers, through their entity EFB, LLC, signed a Revenue Sharing Agreement with VRM Penzini Fund I LLC, Renewable Series II.

920.    After obtaining confidential information under the NDA and entering into the RSA, VRM Penzini proceeded to acquire control of BGF's assets—using Boyd and Lassers' confidential strategies—without their participation and refused to honor the RSA revenue sharing obligations.

921.    VRM's actions violated the RSA.

922.    In breach of the NDA, Rojo immediately shared the information regarding the $10 million federal tax credit with the Companies' Board of Managers.

923.    Boyd and Lassers had warned VRM particularly not to tell the Lopezes that the $10 million federal tax credit was not available if the biorefinery had started operations because the Lopezes would start up the plant, even though it was in no condition to start, in order to sabotage VRM and the Board of Managers ability to independently refinance and repair the project.

924.    Rojo informed the Lopezes that they should hold off efforts to start operating the biorefinery until the application for the $10 million federal tax credit was filed.

925.    The Lopezes started up the plant, causing significant damages to the linings of the gas separators. Those linings cost hundreds of thousands of dollars.

926.    After a series of mediation sessions with Magistrate Judge Marcos E. Lopez, Plaintiffs reached a confidential settlement with the Companies, Banco Popular, Semillero, Borschow, CDCVA, Villarini, with VRM joining as an interested party on August 17, 2023. Lopez Gomez executed the settlement on behalf of the Companies.

927.    On September 2, 2023, the Lopezes acted against VRM and its principals seeking an injunction against the settlement's implementation in which they revealed the contents of the settlement agreement in violation of the Court's repeated orders that the agreement and all discussions during the mediation process remain confidential. SJ2023CV08898.

928.    VRM filed a motion for contempt on September 29, 2023. Docket 295.

929.    On December 1, 2023, Magistrate Judge Lopez held a contempt hearing. Docket 426, 457.

930.    On October 7, 2024, VRM moved to withdraw the Motion for Contempt as to Lopez. Docket 518.

931.    On November 18, 2024, Magistrate Judge Lopez entered a Report and Recommendation as to the Motion for Contempt. Docket 526.

932.    On January 31, 2025, BPPR assigned its loan to BGF to VRM Penzini Fund I, LLC Renewable Series II.

933.    This assignment violated Section 1.1 of the Credit Agreement, which defines "Eligible Assignee" to exclude "Borrower (BGF) or its Affiliates."

934.    The Credit Agreement defines "Affiliate" to include: "All of the officers, shareholders, directors, subsidiary corporations, subsidiary companies, joint ventures, members and partners of Borrower shall be deemed to be its Affiliates."

935.    VRM Penzini Fund I, LLC Renewable Series II is an Affiliate of BGF because:

a) VRM Penzini invested in GFC Holdings (BGF's parent) in May 2023;

b) Humacao RNG, L.L.C. is a subsidiary of VRM Penzini sharing the same address and officers (Carlos Penzini as registered agent and vice president/treasurer);

c) VRM Penzini entities have members and partners in common with GFC Holdings.

936.    VRM Penzini does not qualify as an Eligible Assignee under any category:

a) It is not a Lender or Lender's Affiliate with >$100M Tier 1 capital;

b) It is not a U.S./Puerto Rico bank or savings institution;

    c)  It is not a "Fund" as defined (investment vehicle for institutional investors);

    d)  There is no evidence of Administrative Agent approval;

937.    The "portfolio exception" permitting assignment to "any Person" is limited under ejusdem generis to entities similar to the enumerated financial institutions—not conflicted insiders.

938.    BPPR, as Administrative Agent, had a duty to enforce assignment restrictions. Instead, BPPR facilitated the transfer to a disqualified Affiliate, breaching its duties under the Credit Agreement and implied duties of good faith under 31 L.P.R.A. § 3375 in furtherance of the Enterprise.

939.    On January 31, 2025, the Board of Managers of GFC Holdings executed a Written Consent approving the Asset Acquisition Agreement. Alexander Borschow, Ernesto Villarini, and Olmar Lopez Gomez signed the consent. Olmar López Vidal did not consent.

940.    Section 6.1(e) of the Operating Agreement provides that "…all decisions to be made by or on behalf of the Company or in respect of the Company's business, capital, assets, funds and liabilities of the Company shall be made solely and exclusively by the Board of Managers; **provided that the Board of Managers agree to act in good faith in taking such actions or making such decisions**." (Emphasis added.)

941.    The GFC Operating Agreement required unanimous unitholder consent to liquidate the company under Section 9.1: "The Company will be dissolved upon the earliest to occur of the following events... the Members unanimously vote in favor of the liquidation and dissolution of the Company."

942.    No such unanimous consent was obtained from all unitholders. Boyd and Lassers did not consent. López Vidal did not consent. The purported approval by Borschow and Villarini was ultra vires because the Board lacked authority under Section 6.4 to approve a liquidation without the affirmative vote or written consent of the Members.

943.    On February 7, 2025, Humacao RNG, L.L.C. executed the Asset Acquisition Agreement to purchase substantially all of BGF/GFC's assets. The assets purportedly acquired included:

   a.    All Project equipment (Schedules 2.1(b)(i)-(vi))

   b.    The El Coquí Landfill lease and gas rights

   c.    All contracts and intellectual property

   d.    Act 73 tax grants

   e.    100% renewable natural gas and $CO_2$ tax credits

944.    The consideration was structured as a Release of liabilities under the Credit Agreement and cash payments totaled approximately $4.4 million to preferred equity insiders and those voting for the illegal liquidation:

   a)    Semillero Partners LLC/Borschow: $1,403,071

   b)    PRFG: $528,526

   c)    CDVCA: $208,576

   d)    VRM Penzini: $428,417

   e)    Lopez Gomez $203,804

   f)    Other insiders: Various amounts per Schedule 2.9

945.    VRM, Semillero Partners, and Borschow also dismissed their Complaint as to Lopez Gomez, SJ2024CIV07694, and VRM dismissed its Motion for Contempt for destroying the settlement agreement as to Lopez Gomez. Docket 518. This was apparently the consideration for Lopez Gomez's vote for the liquidation of the Companies, which required all the members' agreement, not just a majority.

946.    Boyd and Lassers received nothing from the Asset Acquisition Agreement which liquidated the company despite holding membership interests in GFC.

947.    There has been no accounting for the illegal liquidation of the Companies Assets, through the systematic bribery of the Board of Managers as fiduciaries who received personal compensation in exchange for voting to liquidate the companies and release claims belonging to the entities they were duty-bound to protect; honest services fraud (18 U.S.C. § 1346)  and money laundering (18 U.S.C. § 1957) through the transactions conveying the proceeds of this unlawful scheme to those insider participants.

948.    Section 3.6(c) of the Asset Acquisition Agreement purports to require BGF and GFC to release BPPR from all claims: "Each of GFC and BGF hereby confirm and ratify their release of Banco Popular on behalf of themselves ... from any and all claims ... of whatsoever nature and kind, whether known or unknown ... against BPPR, its subsidiaries and affiliates ..."

949.    This release was designed to shield BPPR from liability in this RICO action and the separate Anti-Tying lawsuit pending before another judge in this district. However, because the Asset Acquisition Agreement is void ab initio, the purported release is likewise void and of no legal effect.

950.    Every Board member who approved the Asset Acquisition Agreement received compensation from the transaction, creating disabling conflicts of interest that rendered their approvals ultra vires.

951.    VRM Penzini violated their NDA with Boyd and Lassers by using confidential information obtained from Boyd and Lassers to structure and execute the acquisition without their participation as contemplated by the NDA's "Business Purpose."

952.    VRM Penzini breached the Revenue Sharing Agreement by acquiring the Humacao and Ponce Project assets without sharing revenues with EFB as required. Exhibit 31 Sealed.

**The Operating Agreement Violations Render the Asset Acquisition Agreement Void**

953.    The GFC Holdings Operating Agreement is the Second Amended and Restated Limited Liability Company Agreement dated October 20, 2021, as amended by a First Amendment dated May 22, 2023, a Second Amendment dated August 25, 2023, and a Third Amendment dated September 18, 2024.

954.    Section 3.2 of the Operating Agreement provides: "Subject to any protective provisions in favor of the holders of the Series A Preferred Units, the Members may, subject to Section 4.2(j), act by written consent by the Majority Approval of the Members (a 'Member Resolution')."

955.    Section 4.3 of the Operating Agreement provides: "Any actions with respect to the Company that are subject to the approval, consent, determination or vote of the Members shall require Majority Approval of the Members."

956.    Section 6.1(a) of the Operating Agreement provides: "Except as otherwise expressly required under this Agreement (including, without limitation, section 4.2(j)) or the Act,

the full, absolute and exclusive right, power and authority to manage the Company is vested in, and reserved to, the Board of one or more Managers designated by the Members (the 'Board of Managers')."

957.    Critically, Section 6.4 of the Operating Agreement restricts the Board's authority: "In addition to the restrictions provided elsewhere herein, without the affirmative vote or written consent of the Members, the Board of Managers shall not have the authority to approve and the Company will not take any of the following actions: ... (c) liquidate, dissolve or wind up the Company."

958.    Section 9.1 of the Operating Agreement provides: "The Company will be dissolved upon the earliest to occur of the following events (each such event is referred to as a 'Dissolution Event'): the Members unanimously vote in favor of the liquidation and dissolution of the Company; or any other event that, under the Act, would cause the Company's dissolution."

959.    The Operating Agreement defines "Deemed Liquidation Event" to include "a merger or consolidation (other than one in which equity holders of the Company own a majority by voting power of the outstanding shares or membership interest of the surviving or acquiring entity) and a sale, lease, transfer, exclusive license or other disposition of all or substantially all of the assets of the Company."

960.    The Asset Acquisition Agreement dated February 7, 2025, constituted a Deemed Liquidation Event because it disposed of all or substantially all of BGF's and GFC's assets.

961.    The Asset Acquisition Agreement was not approved by unanimous vote of the Members as required by Section 9.1. Boyd did not consent. Lassers did not consent. López Vidal did not consent. There is no evidence that John Richardson or John Dumas consented.

962.    The Board of Managers lacked authority under Section 6.4 to approve the Asset Acquisition Agreement because it did not have the affirmative vote or written consent of the Members to liquidate, dissolve, or wind up the Company.

963.    The approvals by Borschow and Villarini were further vitiated by their disabling conflicts of interest. Notwithstanding that the payment for the illegal liquidation never entered the Company, nor was there a proper accounting or distribution for it to the unitholders, or creditors of the Company, under Delaware law, which governs fiduciary duties in LLCs, directors owe fiduciary duties to common stockholders in preference to preferred stockholders when their interests diverge. Borschow and Villarini approved a transaction that paid $4.4 million to the Board of Managers and insiders for their vote, while leaving common unitholders (Boyd and Lassers) with nothing—a breach of their fiduciary duties.

964.    Accordingly, the Asset Acquisition Agreement is void ab initio as an ultra vires act that exceeded the Board's authority under the Operating Agreement and violated the unanimous consent requirement of Section 9.1.

**Fiduciary Breach as Ultra Vires Under Puerto Rico LLC Law**

965.    The Board's approval of the Asset Acquisition Agreement was not merely unauthorized—it was ultra vires as a matter of Puerto Rico law because fiduciary breaches themselves strip managers of their delegated authority. Under 14 L.P.R.A. § 3965, LLC managers owe non-waivable duties of loyalty and care. Under 14 L.P.R.A. § 3963(a)-(b), these duties include the obligation to avoid conflicts of interest and to refrain from competing with the Company. The Operating Agreement does not waive these statutory duties. When the Board members approved a transaction that paid $4.4 million to themselves and their affiliated entities while leaving common

unitholders with nothing, they breached these non-waivable duties, thereby acting outside the scope of their delegated authority.

966.    The "breach forfeits authority" principle is well-established in LLC governance law. In Auriga Capital Corp. v. Gatz Properties, LLC, 40 A.3d 839 (Del. Ch. 2012), aff'd 59 A.3d 1206 (Del. 2013), the Delaware Supreme Court confirmed that LLC managers owe default fiduciary duties and that a sham auction conducted by a self-interested manager was invalid. In In re Lyman-Cutler, LLC, 632 Bankr. Ct. 355, 416 (D. Mass. 2021), the court held that the "appropriate remedy is to rescind or avoid [the contract] in its entirety" where fiduciary duties were breached in the LLC context. See also Kyle v. Apollomax, LLC, 987 F.Supp. 519 (D. Del. 2013) (confirming default fiduciary duties in LLCs post-Gatz).

967.    The Board's approval was further vitiated by systematic vote-buying. Exhibit 17's recitals reveal that VRM "expressed to the Company its willingness to provide the necessary rescue funding," creating the dependency that enabled VRM to dictate the terms of the Asset Acquisition Agreement. Each approving Board member's affiliated entity received direct payments: Semillero ($1,403,071), PRFG ($528,526), CDVCA ($208,576), and López Gómez ($203,804). These payments constitute vote-buying that taints each individual vote and renders the entire transaction ultra vires on that basis. Exhibit 17 itself acknowledges that Board members were violating their statutory duties under Articles 4.03 and 4.04 of the Puerto Rico General Corporations Act by "abstaining from voting on such critical issues rather than exercising their duty and vote."

### Delaware Law as Persuasive Authority for Puerto Rico LLC Governance

968.    Puerto Rico's General Corporations Act of 2009, 14 L.P.R.A. §§ 3501 et seq., explicitly modeled itself after the Delaware General Corporation Law. Its Statement of Motives

declared that Delaware judicial decisions "shall be highly persuasive and illustrative" in interpreting Puerto Rico corporate law. The structural parallel extends to LLC governance: Puerto Rico's LLC Act, 14 L.P.R.A. §§ 3951 et seq., shares with Delaware's LLC Act, 6 Del. C. §§ 18-101 et seq., the same governance framework of flexible operating agreements, default fiduciary duties, and creditor remedies.

969.    Under 6 Del. C. § 18-1104, as amended in 2013 in response to Auriga Capital/Gatz, LLCs are governed by default equity-based fiduciary duties unless the operating agreement provides otherwise. Under 6 Del. C. § 18-1101, the relationship between fiduciary duties and operating agreements is governed by equity principles. Under Del. Code Ann. tit. 8, § 141, directors owe oversight duties; under § 144, conflicted transactions must satisfy specific procedural safeguards that were not met here. Puerto Rico's provisions for foreign Delaware LLC registration, 14 L.P.R.A. §§ 4021-4029, further confirm that Delaware law applies to foreign Delaware LLCs registered in Puerto Rico, reinforcing the applicability of Delaware fiduciary duty jurisprudence to GFC Holdings.

970.    All purported transfers of assets under the void Asset Acquisition Agreement are legally ineffective. The assets remain the property of BGF and GFC.

971.    All purported releases of BPPR contained in the void Asset Acquisition Agreement are likewise void and of no legal effect.

**Plaintiffs' Majority Control and Authority to Act**

972.    On May 27, 2025, Plaintiffs Boyd and Lassers entered into a Settlement Agreement with López Vidal and Ríos Mena.

973.    On June 2, 2025, López Vidal executed the Irrevocable Proxy, granting Boyd and Lassers the sole and exclusive right to vote all of López Vidal's units in GFC Holdings with respect to the matters specified therein.

974.    As a result, Plaintiffs now hold or control 55.493% of the voting units of GFC Holdings, LLC.

975.    Under Section 3.2 of the Operating Agreement, Plaintiffs have the authority to act by written consent via "Majority Approval of the Members" (a "Member Resolution").

976.    Plaintiffs intend to exercise their majority voting control to:

   a)  Reconstitute the Board of Managers of GFC Holdings and BGF to include members who will faithfully pursue the Company's interests;

   b)  Direct GFC Holdings and BGF to pursue claims directly against BPPR, VRM Penzini, Humacao RNG, Semillero, CDVCA, PRFG, Borschow, Villarini, and the other remaining Defendants;

   c)  Rescind the purported releases of BPPR contained in the void Asset Acquisition Agreement;

   d)  Recover all assets purportedly transferred under the void Asset Acquisition Agreement;

   e)  Access all Company books, records, and financial information; and

   f)  Take all other actions necessary to protect the Company's interests and recover damages caused by Defendants' misconduct.

977.    Because Plaintiffs hold majority voting control of GFC Holdings, they have standing to bring claims both individually and on behalf of the Company.

978.    To the extent derivative claims remain, demand on the Board is excused because Plaintiffs, as majority unitholders, are entitled to direct the Company's litigation and the remaining Board members at that time (Borschow and Villarini) faced and continue to face disabling conflicts of interest, having received or representing those who received substantial payments from the void Asset Acquisition Agreement.

### Board Structural Incapacity Due to RICO Participation

979.    The Board of Managers is structurally incapable of governing GFC Holdings due to the universal RICO participation of its members. Every Board member either directly benefits from, or represents entities that benefit from, the Defendants' racketeering scheme. The Board's structural impediments to accountability include: (a) indefinite terms under Operating Agreement Section 6.1(b), which provides that managers hold office until death, resignation, or removal; (b) the impossibility of self-investigation, as Board members who are themselves RICO defendants or beneficiaries of the RICO scheme cannot objectively investigate their own misconduct; and (c) the September 2021 incident where Semillero and CDVCA voted to grant themselves additional units at a discount, demonstrating the Board's pattern of self-dealing.

980.    Exhibit 17's Board restructuring provisions embed VRM's conflict at the structural level. Exhibit 17 amended Section 6.1(c) to provide that "the Board of Managers shall consist of at least seven (7) managers," including "one (1) representative designated by VRM." The "Independent Manager" (seat (vii)) is designated by all other managers—meaning VRM's captured allies select the supposedly independent voice. VRM simultaneously holds: (i) its own designated Board seat; (ii) 80% ownership of Humacao RNG, the buyer under the Asset Acquisition Agreement; and (iii) status as the Company's designated "rescue funder." This triple role satisfies the "self-protection" doctrine of In re Fox Corp. Derivative Litig., C.A. No. 2023-

0418-JTL (Del. Ch. Dec. 27, 2023), which holds that Board members cannot objectively evaluate transactions from which they personally benefit.

981.    Exhibit 17's disqualification mechanism, Section 6.1(f), creates a structural impossibility of accountability: "The Board of Managers, by a majority vote of its members, may determine that a Manager should be disqualified to serve as a Manager for Cause." When every Board member is compromised by RICO participation, the very managers who breached their fiduciary duties would need to vote to disqualify themselves. This circular trap further demonstrates that Majority Members must have residual authority to act when the Board's self-protective structure prevents accountability. Federal RICO law preempts state governance norms to ensure enforcement of anti-racketeering laws. See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479 (1985) ("Civil RICO is a remedial statute subject to liberal construction"). The Court should not permit state LLC governance rules to shield RICO defendants from accountability.

## VI. PATTERN OF RACKETEERING ACTIVITY

### A. VRM Penzini Predicate Acts

#### Wire Fraud (18 U.S.C. § 1343) - NDA Violations with Rule 9(b) Particularity

982.    Each of the following communications constitutes a separate predicate act of wire fraud:

| Date | Medium | Description |
| --- | --- | --- |
| Jan. 13-17, 2023 | Zoom | Rojo stated: "We want to be your partners—we will only work with you two" and "You have our commitment that we will not go around you." False when made. |
| Jan. 18, 2023 | Email | NDA signature and transmission. Obtained confidential information under false promise. |
| Feb. 2, 2023 | Zoom | Boyd disclosed BPPR loan acquisition strategy; Rojo falsely assured "we are committed to this partnership." |

| Mar. 2023 | 9, | Zoom | Lassers presented $300M financial projections; Penzini asked detailed questions while concealing independent plans. |
| Mar. 2023 | 27, | Zoom | "Plan B Meeting"—Boyd presented takeover blueprint; Rojo stated; "now we have a plan to get control." |
| Aug. 2023 | 15, | Teams | RSA negotiations; Rodriguez participated while concealing intent to breach. |
| Aug. 2023 | 20, | Electronic | RSA signature and transmission. Induced reliance while planning to breach. |
| Jan. 2025 | 31, | Wire | BPPR to VRM Penzini—Loan assignment documents. Completed unauthorized acquisition. |
| Feb. 2025 | 7, | Electronic | VRM/Humacao RNG—Asset Acquisition Agreement. Completed asset stripping using confidential strategies. |

983.     Each wire communication was made with intent to defraud Boyd and Lassers of their contractual rights under the NDA and RSA, and their ownership interests in BGF/GFC. The confidential business information and takeover strategies obtained by VRM Penzini constitute "property" under wire fraud doctrine.

### Bank Fraud (18 U.S.C. § 1344) - Unauthorized Loan Assignment

984.     BPPR and VRM Penzini committed bank fraud by:

a)  Assigning loans (including federally backed NMTC funds) to a disqualified Affiliate in violation of the Credit Agreement;

b)  Using the loan assignment to acquire BGF's assets at a fraction of their value;

c)  Structuring the Asset Acquisition Agreement to release BPPR from fraud Racketeering and Anti-Tying claim.

### B. BPPR Predicate Acts

### Wire Fraud (18 U.S.C. § 1343)

**Bank Fraud (18 U.S.C. § 1344)**

985.    BPPR committed bank fraud by:

a) Disbursing funds without valid bond for 100% of project costs, violating Credit Agreement;

b) Ignoring Lopezes' non-creditworthiness/conflicts (negative net worth, low income, pending lawsuit);

c) Tying extensions/forbearance to offtake, extracting $90M+ value;

d) Continued lending $5.5M+ after November 2021 fraud notice to Ferrer;

e) Amendments 2-7 without guarantor (Boyd's) consent;

f) Denied defaults (EC Waste, Landfill);

g) Denied lawsuits' existence;

h) Exceeded disbursements, violated Mapfre LC ($610K transfer 6/22/2022);

i) Fraudulent tax credit sales/releases without completion (Tranche 1/2);

j) Assigned loan to disqualified Affiliate in breach of Credit Agreement.

986.    BPPR committed bank fraud (18 U.S.C. 1344) and wire fraud (18 U.S.C. 1343) by approving and processing 24 fraudulent drawdown certificates. Each certificate falsely certified construction progress that had not occurred and was transmitted electronically between BPPR offices and BGF: (1) September 23, 2020 - Joval Rodriguez, Lopez Vidal, Economou - Construction milestone achieved; (2) October 2, 2020 - same personnel - Work completed per draw schedule; (3) October 21, 2020; (4) October 27, 2020; (5) November 30, 2020; (6) February 24, 2021; (7) April 8, 2021; (8) May 18, 2021; (9) May 27, 2021; (10) July 14, 2021 - all with same personnel and false progress certifications. After Joval Rodriguez left BPPR in September 2021, Laura Medina assumed primary responsibility with Humberto Gonzalez, VP of Commercial

Lending: (11) October 19, 2021; (12) January 14, 2022; (13) March 8, 2022; (14) March 28, 2022; (15) May 23, 2022; (16) July 22, 2022 - immediately after anti-tying sequence; (17) September 3, 2022; (18) November 9, 2022; (19) May 30, 2023; (20) June 30, 2023; (21) August 15, 2023; (22) October 6, 2023 - all post-fraud-notice disbursements made with actual knowledge of the fraudulent scheme. Full 167-page drawdown documentation attached as Exhibit 4.

### Extortion (18 U.S.C. § 1951)

987.    BPPR committed extortion by:

a) Using the RICO lawsuit, El Coqui Landfill defaults on completion dates and payments, unauthorized $1.1 million wires and lack of funding to complete construction to coerce BGF into signing the July 18, 2022, Offtake Agreement at $14/MMBtu (50% below market);

b) Forcing BGF to cede 100% of carbon credits worth tens of millions for zero consideration;

c) Conditioning $1 million credit extension and forbearance on acceptance of the tied Offtake Agreement.

d) BPPR committed extortion (18 U.S.C. 1951) and illegal tying (12 U.S.C. 1972) through a coordinated three-day sequence in July 2022: (a) July 18, 2022: BPPR required BGF to execute the RLNG Supply Agreement at $14/MMBtu-50% below the $28.21/MMBtu DOE average market rate-and to cede 100% of carbon and environmental credits for no consideration; (b) July 19, 2022: One day later, BPPR executed the Third Amendment to the Credit Agreement, extending deadlines and providing forbearance on missed principal payments; (c) July 20, 2022: Two days

after the forced offtake agreement, BPPR processed Drawdown 17 for $843,257.10. At the time of this three-day sequence, BGF had missed principal loan payments, received a default notice on El Coqui Landfill contract payments, and was in default on the November 2021 commercial operations deadline. BPPR exploited this vulnerability to extract an offtake agreement worth over $90 million in present value. Under Dibidale of Louisiana, Inc. v. American Bank and Trust Co., 916 F.2d 300 (5th Cir. 1990), no coercion need be proven for per se liability-the conditioning of credit on acceptance of a tied product violates 12 U.S.C. 1972 regardless of the borrower bargaining position.

### C. Lopez Vidal, Lopez Gomez and Economou April 25, 2022, Predicate Acts

988.    On April 25, 2022, Defendants López Gómez and Economou committed the following predicate acts:

a) Wire Fraud (18 U.S.C. § 1343): Wired $1.1M to Galileo/TPI knowing equipment non-operational

b) Bank Fraud (18 U.S.C. § 1344): Caused disbursement for undelivered services

c) Money Laundering (18 U.S.C. § 1956): Received kickbacks from vendors

d) Perjury (18 U.S.C. § 1621): False sworn declarations denying lawsuit knowledge

e) Obstruction of Justice (18 U.S.C. § 1503): False declarations to obstruct TRO

f) Commercial Bribery (33 L.P.R.A. § 4889): Kickback scheme with vendors.

### D. Borschow and Villarini January 2025 Predicate Acts

989.    On January 31, 2025, Defendants Borschow and Villarini committed the following predicate acts:

  a) Wire Fraud (18 U.S.C. § 1343): Transmitted Board Consent via electronic means while receiving payments ($1.4M to Semillero; $737K to Villarini entities)

  b) Honest Services Fraud (18 U.S.C. § 1346): Approved self-interested transaction in breach of fiduciary duties

  c) Bank Fraud (18 U.S.C. § 1344): Participated in assignment of federally backed NMTC loans to disqualified Affiliate.

### E. Relatedness

990.    Under H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 239 (1989), the "pattern" requirement is satisfied when predicate acts are "related" and show "continuity." Relatedness exists when predicates share "the same or similar purposes, results, participants, victims, or methods of commission." H.J. Inc., 492 U.S. at 240. All predicate acts are related because they:

991.    The Enterprise operated through two distinct but related schemes: (1) the 2018-2022 construction fraud scheme led by the Lopez family, involving fraudulent drawdowns and fund diversions; and (2) the 2023-2025 asset-stripping scheme led by VRM Penzini, involving NDA breach, confidential information misuse, and insider acquisition. These schemes share common purpose and participants but are temporally and operationally distinct, each independently satisfying RICO pattern requirement.

a) Have the same or similar purpose: extracting wealth from BGF/GFC while suppressing minority shareholders

b) Have the same result: loss of ownership value and contractual rights for Boyd and Lassers

c) Have the same participants: overlapping membership in the Enterprise

d) Have the same victims: Boyd, Lassers, BGF, GFC, and the United States (NMTC fraud)

e) Use the same methods: fraudulent representations, self-dealing, suppression of information

### F. Continuity

992.    Closed-Ended Continuity: The pattern spans from 2018 (usurious loans) through February 2025 (Asset Acquisition) - over seven years of continuous racketeering activity involving hundreds of predicate acts, which is ongoing. First Circuit precedent confirms actionability. See Limone v. United States, 564 F.3d 1 (1st Cir. 2009) (affirming $101.75 million RICO award for pattern spanning decades); Aetna Casualty & Surety Co. v. P&B Autobody, 43 F.3d 1546 (1st Cir. 1994) (affirming informal association-in-fact enterprise engaged in multi-year fraud scheme).

993.    Open-Ended Continuity: The threat of continued racketeering activity is ongoing because:

a.    Boyd remains exposed on $19 million in personal guarantees

b.    VRM Penzini/Humacao RNG claims to control BGF assets (though transfer was void)

c.    The RSA breach is ongoing as VRM Penzini claims revenues without sharing

d.    BPPR / VRM Penzini continues collection efforts against Boyd in related litigation.

994.    When Boyd and Lassers moved to withdraw the Motion to Dismiss filed in the original case, Borschow purported to hire Roberto Abesada, Esq. with the motion seeking withdrawal based on a corporate resolution that had not been either approved by the Board of Members, or by the majority of the owners of the Companies.

995.    Borschow's action in seeking to continue with the Motion to Dismiss the original case was tainted by his multiple breaches of fiduciary duty to the Companies: his failure to maintain adequate controls against fraud, his personal benefit from the fraud; his vote for the liquidation of the companies based receipt of over a million dollars for Semillero, and overall, his participation in the RICO enterprise.


## VII. SUBSTANTIVE RICO VIOLATIONS

### TABLE OF PREDICATE RICO ACTS BY DEFENDANTS

---

**NOTE**: The below table excludes Non-Defendant Co-Conspirators (López Vidal, López Gómez, ITS). Their conduct is preserved in the Complaint to establish Defendants' knowledge, complicity, and joint and several liability under conspiracy and aiding-and-abetting principles. See ¶6.  See Exhibit 32 for comprehensive timeline by phase and RICO Predicate acts.


### VRM PENZINI DEFENDANTS

### VRM Penzini Capital / Rafael Rojo / Carlos Penzini / Diego Rodriguez

| Predicate Act | Statute | Date | Description | Reference ¶¶ |
|---|---|---|---|---|
| Wire Fraud | 18 U.S.C. § 1343 | Jan. 13-17, 2023 | Rojo stated via Zoom: "We want to be your partners—we will only work with you two" and "You have our commitment that we will not go around you." False when made. | ¶977 |

| Predicate Act | Statute | Date | Description | Reference ¶¶ |
|---|---|---|---|---|
| Wire Fraud | 18 U.S.C. § 1343 | Jan. 18, 2023 | NDA signature and transmission via email. Obtained confidential information under false promise. | ¶977, ¶15-19 |
| Wire Fraud | 18 U.S.C. § 1343 | Feb. 2, 2023 | Boyd disclosed BPPR loan acquisition strategy via Zoom; Rojo falsely assured "we are committed to this partnership." | ¶977 |
| Wire Fraud | 18 U.S.C. § 1343 | Mar. 9, 2023 | Lassers presented $300M financial projections via Zoom; Penzini asked detailed questions while concealing independent plans. | ¶977 |
| Wire Fraud | 18 U.S.C. § 1343 | Mar. 27, 2023 | "Plan B Meeting" via Zoom—Boyd presented takeover blueprint; Rojo stated "now we have a plan to get control." | ¶977, ¶17 |
| Wire Fraud | 18 U.S.C. § 1343 | Aug. 15, 2023 | RSA negotiations via Teams; Rodriguez participated while concealing intent to breach. | ¶977 |
| Wire Fraud | 18 U.S.C. § 1343 | Aug. 20, 2023 | RSA signature and transmission electronically. Induced reliance while planning to breach. | ¶977 |
| Wire Fraud | 18 U.S.C. § 1343 | Jan. 31, 2025 | Loan assignment documents transmitted via wire from BPPR to VRM Penzini. Completed unauthorized acquisition. | ¶977, ¶980 |
| Wire Fraud | 18 U.S.C. § 1343 | Feb. 7, 2025 | Asset Acquisition Agreement transmitted electronically. Completed asset stripping using confidential strategies. | ¶977, ¶30 |
| Bank Fraud | 18 U.S.C. § 1344 | Jan. 31, 2025 | Participated in assignment of federally backed loans (NMTC) to disqualified Affiliate in violation of Credit Agreement. | ¶979 |
| Bank Fraud | 18 U.S.C. § 1344 | Feb. 7, 2025 | Used loan assignment to acquire BGF's assets at fraction of value; structured AAA to release BPPR from fraud claims. | ¶979 |
| Breach of NDA | Contract | 2023-2025 | Used confidential information for own benefit in violation of NDA prohibition. Including the acquisition of the Ponce Landfill RNG Project for Ponce RNG. | ¶61-62, ¶895 |

## VRM Penzini Fund I, LLC Renewable Series II

| Predicate Act | Statute | Date | Description | Reference ¶¶ |
|---|---|---|---|---|
| Bank Fraud | 18 U.S.C. § 1344 | Jan. 31, 2025 | Acquired BGF loans despite being Affiliate disqualified as "Eligible Assignee" under Credit Agreement § 1.1. | ¶150, ¶979 |
| Wire Fraud | 18 U.S.C. § 1343 | Jan. 31, 2025 | Transmitted loan assignment documents via wire. | ¶977, ¶150 |

## Humacao RNG, L.L.C.

| Predicate Act | Statute | Date | Description | Reference ¶¶ |
|---|---|---|---|---|
| Wire Fraud | 18 U.S.C. § 1343 | Feb. 7, 2025 | Electronic transmission of Asset Acquisition Agreement. Acquired $300M+ assets for $4.4M through void transaction. | ¶977, ¶151, ¶941 |
| Fraudulent Conveyance | State Law | Feb. 7, 2025 | Acquired substantially all BGF/GFC assets without unanimous unitholder consent required by § 9.1. | ¶151, ¶40-49 |

**Ponce RNG, L.L.C.**

| Predicate Act | Statute | Date | Description | Reference ¶¶ |
|---|---|---|---|---|
| Wire Fraud | 18 U.S.C. § 1343 | 2024-2025 | Acquired gas rights for EC Waste landfill in Ponce that would have belonged to Companies but for criminal enterprise. | ¶152, ¶179 |

| Date/Period | BPPR Action/Failure | Credit Agreement / Fiduciary Duty Violated | RICO Predicate Acts | Other Criminal Acts | Banking Regulations Violated |
|---|---|---|---|---|---|
| **PRE-CLOSING FAILURES** | | | | | |
| Sept. 14, 2020 (4:43 PM) | Boyd's signature placed in escrow; BPPR knew bond was not in place | Section 3.1(h): Bond required as condition precedent to closing | — | — | OCC Sound Lending Practices |
| Sept. 14, 2020 (9:38 PM) | Joval Rodríguez altered Flow of Funds to add $70,500 bond payment as BGF "closing cost" | Section 3.1(h): Bond was ITS/ASC's obligation, not BGF's | 18 U.S.C. § 1343 (Wire Fraud) | 18 U.S.C. § 1001 (False Statement) | 12 U.S.C. § 1972 (Anti-Tying) Popular Insurance |
| **CLOSING DATE FAILURES** | | | | | |
| Sept. 15, 2020 | Closed loan without valid 100% performance bond ($5M vs. $18.67M required) | Section 3.1(h): "not less than 100% of Direct Costs" | 18 U.S.C. § 1344 (Bank Fraud) | 18 U.S.C. § 371 (Conspiracy) | 12 C.F.R. § 30; OCC Circular 181 |
| Sept. 15, 2020 | Released Boyd's signature from escrow despite unfulfilled condition precedent | Section 3.1(h): Condition precedent not satisfied | 18 U.S.C. § 1343 (Wire Fraud) | — | 12 U.S.C. § 1972 |
| Sept. 15, 2020 | Disbursed $750,500 to pay ITS/ASC's contractor bond with BGF loan proceeds | Section 6.2.1: Improper use of loan proceeds | 18 U.S.C. § 1343; § 1344 | 18 U.S.C. § 1957 (Money Laundering) | 12 U.S.C. § 1972(1)(C) |
| Sept. 16, 2020 | López Vidal paid Popular Insurance $70,500 with BGF funds | Section 3.1(h): Payment was ITS/ASC obligation | 18 U.S.C. § 1343 (Wire Fraud) | — | 12 U.S.C. § 1972 |
| **POST-CLOSING DISBURSEMENT FAILURES** | | | | | |
| Sept. 2020 | Ignored Lópezes' non-creditworthiness (negative net worth, low income, pending lawsuit) | Administrative Agent duty to verify borrower capacity | 18 U.S.C. § 1344 (Bank Fraud) | — | 12 C.F.R. § 30 App. A |
| Oct. 2020 - Feb. 2021 | Approved Drawdown Certificates #1-3 with false progress certifications | Section 6.2: Required verified construction progress | 18 U.S.C. § 1343 (Wire Fraud) | — | OCC Circular 181 |

| 2020-2024 | Disbursed loan % exceeding % of work completed | Section 6.2.1: Disbursements tied to verified progress | 18 U.S.C. § 1344 (Bank Fraud) | — | 12 C.F.R. § 30 |
| 2020-2024 | Failed to require audited financial statements for five consecutive years | Section 6.1.1: Annual audited financials required | 18 U.S.C. § 1343 (Wire Fraud) | — | 14 L.P.R.A. § 3963 |
| **FRAUD NOTICE PERIOD** | | | | | |
| Nov. 11, 2021 | Received Carballido fraud notice to General Counsel Javier Ferrer | Administrative Agent duty to act on fraud notice | — | 18 U.S.C. § 4 (Misprision) | 31 L.P.R.A. § 3561 |
| Nov. 12, 2021 | Disbursed $677,094.76 ONE DAY after receiving fraud notice | Section 6.2: Must halt disbursements upon fraud notice | 18 U.S.C. § 1343; § 1344 | 18 U.S.C. § 4 (Misprision) | 14 L.P.R.A. § 3963 |
| Nov. 2021 - 2022 | Continued lending $5.5M+ after fraud notice | Fiduciary duty to protect stakeholder interests | 18 U.S.C. § 1344 (Bank Fraud) | 18 U.S.C. § 4 (Misprision) | 12 U.S.C. § 1972 |
| Apr. 25, 2022 | Received Boyd's detailed fraud letter | Administrative Agent duty of care | — | 18 U.S.C. § 4 (Misprision) | — |
| **CREDIT AMENDMENT VIOLATIONS** | | | | | |
| May 6, 2021 (Amend. 1) | Approved new $812,500 revolving facility; disbursement exceeded allowed amount | Section 2.1: Disbursement limits | 18 U.S.C. § 1344 (Bank Fraud) | — | — |
| June 22, 2022 | Released $610,152.15 Mapfre LC collateral without project completion | Amendment 1: LC collateral restrictions | 18 U.S.C. § 1343; § 1344 | Insurance Fraud (PR) | 12 U.S.C. § 1972 |
| July 19, 2022 (Amend. 3) | Tied $1M credit extension to Offtake Agreement; denied EC Waste default | Section 8: Events of Default acknowledgment | 18 U.S.C. § 1344 (Bank Fraud) | — | 12 U.S.C. § 1972 (Anti-Tying) |
| Nov. 1, 2022 (Amend. 4) | Denied defaults (EC Waste); ignored lawsuits; $1M prepayment not met | Section 8: Default acknowledgment | 18 U.S.C. § 1344 (Bank Fraud) | — | 14 L.P.R.A. § 3957 |
| Jan. 5, 2023 (Amend. 5) | Denied defaults (EC Waste); ignored lawsuits; prepayment not met | Section 8: Default acknowledgment | 18 U.S.C. § 1344 (Bank Fraud) | — | 14 L.P.R.A. § 3957 |
| 2022-2023 | Executed Amendments 2-7 without guarantor (Boyd's) consent | Section 11.1: Material amendments require guarantor consent | 18 U.S.C. § 1344 (Bank Fraud) | — | 14 L.P.R.A. § 3963 |
| **996.** | | | | | |
| July 18, 2022 | Tied credit extension/forbearance to below-market Offtake | Fiduciary duty; Anti-tying prohibition | 18 U.S.C. § 1951 (Extortion) | — | 12 U.S.C. § 1972(1)(C) |

| | | | | | |
|---|---|---|---|---|---|
| | Agreement ($14/MMBtu vs. $28 market) | | | | |
| July 18, 2022 | Extracted 100% carbon credits worth tens of millions for zero consideration | Fiduciary duty of loyalty | 18 U.S.C. § 1951 (Extortion) | — | 12 U.S.C. § 1972 |
| July 18, 2022 | Used RICO lawsuit, defaults, unauthorized $1.1M wires to coerce Offtake signing | Fiduciary duty; good faith | 18 U.S.C. § 1951; § 1343 | — | 12 U.S.C. § 1972 |
| **TAX CREDIT FRAUD** | | | | | |
| 2021-2022 | Participated in fraudulent Tax Credit Tranche 1 sale without construction completion | Section 6.1: Construction completion required | 18 U.S.C. § 1344 (Bank Fraud) | 26 U.S.C. § 7206 | — |
| Feb. 23, 2024 | Released $500K of Tax Credit Tranche 2 despite incomplete construction | Section 6.1: Completion required; Hacienda certification | 18 U.S.C. § 1344; § 1343 | 26 U.S.C. § 7206 | 14 L.P.R.A. § 3963 |
| **NMTC DIVERSIONS** | | | | | |
| 2020-2024 | Facilitated NMTC fund diversions via commingled accounts | Administrative Agent oversight of NMTC compliance | 18 U.S.C. § 1957 (Money Laundering) | 26 U.S.C. § 7206 | — |
| 2020-2024 | Approved GFC work in Dominican Republic with NMTC funds | NMTC geographic restrictions | 18 U.S.C. § 1957 (Money Laundering) | 26 U.S.C. § 45D violation | — |
| **SELF-DEALING DISBURSEMENTS** | | | | | |
| Aug. 22, 2022 | Paid $29,996 to itself from BGF account | Fiduciary duty; conflict of interest | 18 U.S.C. § 1344 (Bank Fraud) | — | 12 U.S.C. § 1972 |
| Aug. 26, 2022 | Lent BGF $29,996 without drawdown document when BGF had sufficient funds | Section 2.2: Drawdown approval required | 18 U.S.C. § 1344 (Bank Fraud) | — | 31 L.P.R.A. § 3561 |
| Dec. 5, 2022 | Deposited $65,972.35, then immediately lent same amount back | Fiduciary duty; unnecessary debt creation | 18 U.S.C. § 1344 (Bank Fraud) | — | 12 U.S.C. § 1972 |
| **LOAN ASSIGNMENT** | | | | | |
| Jan. 31, 2025 | Assigned loan to VRM Penzini Fund I (disqualified Affiliate under Section 1.1) | Section 1.1: Affiliate prohibition; Section 11.6: Assignment | 18 U.S.C. § 1343; § 1344 | 18 U.S.C. § 371 (Conspiracy) | 12 U.S.C. § 1972 |
| Jan. 31, 2025 | Enabled insider acquisition of $300M+ assets for $4.4M | Fiduciary duty of loyalty | 18 U.S.C. § 1343 (Wire Fraud) | — | 14 L.P.R.A. § 3963 |
| **ONGOING FAILURES** | | | | | |

| 2020-2025 | Never claimed $5M Mapfre Performance Bond despite construction failure | Administrative Agent duty to protect collateral | — | — | Del. Code tit. 6, § 18-1104 |
| 2020-2025 | Paid millions over construction contract fixed price ($5M cap) to ITS/ASC | Section 6.2: Disbursement controls | 18 U.S.C. § 1344 (Bank Fraud) | — | 14 L.P.R.A. § 3963 |
| 2020-2025 | Allowed construction company to be owned by BGF co-owners (conflict) | Fiduciary duty; conflict of interest policies | — | — | OCC Circular 181; 12 C.F.R. § 30 |

## BANCO POPULAR DE PUERTO RICO (BPPR)

| Predicate Act | Statute | Date | Description | Reference ¶¶ |
|---|---|---|---|---|
| Wire Fraud | 18 U.S.C. § 1343 | Sept. 14, 2020 | Flow of Funds alterations via email including $70,560 fraudulent "closing cost" for bond payment. Misrepresented bond sufficiency. | ¶980 |
| Wire Fraud | 18 U.S.C. § 1343 | Sept. 15, 2020 | $750,500 disbursement via wire used BGF loan to pay ITS/ASC bond (contractor's obligation). | ¶980, ¶326-329 |
| Wire Fraud | 18 U.S.C. § 1343 | Oct. 15, 2020 - Feb. 15, 2021 | Drawdown Certificates #1-3 transmitted via wire with false progress certifications. | ¶980 |
| Wire Fraud | 18 U.S.C. § 1343 | Nov. 12, 2021 | $677,094.76 disbursement via wire day after receiving Carballido fraud notice to Ferrer. | ¶980 |
| Wire Fraud | 18 U.S.C. § 1343 | June 22, 2022 | $610,152.15 Mapfre collateral release via wire without completed project. | ¶980 |
| Wire Fraud | 18 U.S.C. § 1343 | July 18, 2022 | Offtake Agreement transmission electronically tied to $1M credit extension. Induced below-market offtake under duress. | ¶980, ¶9-10 |
| Wire Fraud | 18 U.S.C. § 1343 | Jan. 31, 2025 | Loan assignment to VRM Penzini via wire despite being disqualified Affiliate. | ¶980 |
| Bank Fraud | 18 U.S.C. § 1344 | Sept. 15, 2020 | Disbursed funds without valid bond for 100% of project costs, violating Credit Agreement. | ¶981(a) |
| Bank Fraud | 18 U.S.C. § 1344 | 2020 | Ignored Lópezes' non-creditworthiness/conflicts (negative net worth, low income, pending lawsuit). | ¶981(b), ¶8 |
| Bank Fraud | 18 U.S.C. § 1344 | July 18-19, 2022 | Tied extensions/forbearance to offtake, extracting $90M+ value (anti-tying violation). | ¶981(c), ¶9-10 |
| Bank Fraud | 18 U.S.C. § 1344 | Nov. 2021 - 2022 | Continued lending $5.5M+ after November 2021 fraud notice to Ferrer. | ¶981(d), ¶6 |

| Predicate Act | Statute | Date | Description | Reference ¶¶ |
|---|---|---|---|---|
| Bank Fraud | 18 U.S.C. § 1344 | 2022-2023 | Amendments 2-7 without guarantor (Boyd's) consent. | ¶981(e), ¶800-812 |
| Bank Fraud | 18 U.S.C. § 1344 | 2022-2023 | Denied defaults (EC Waste, Landfill) in Credit Amendments. | ¶981(f), ¶810-812 |
| Bank Fraud | 18 U.S.C. § 1344 | 2022-2023 | Denied lawsuits' existence in Credit Amendments. | ¶981(g), ¶812 |
| Bank Fraud | 18 U.S.C. § 1344 | June 22, 2022 | Exceeded disbursements, violated Mapfre LC ($610K transfer). | ¶981(h) |
| Bank Fraud | 18 U.S.C. § 1344 | 2021-2022 | Fraudulent tax credit sales/releases without completion (Tranche 1/2). | ¶981(i) |
| Bank Fraud | 18 U.S.C. § 1344 | Jan. 31, 2025 | Assigned loan to disqualified Affiliate in breach of Credit Agreement § 1.1. | ¶981(j), ¶20-24 |
| Extortion | 18 U.S.C. § 1951 | July 2022 | Used RICO lawsuit, defaults, unauthorized $1.1M wires, and lack of funding to coerce BGF into signing Offtake Agreement at $14/MMBtu (50% below market). | ¶982(a) |
| Extortion | 18 U.S.C. § 1951 | July 2022 | Forced BGF to cede 100% of carbon credits worth tens of millions for zero consideration. | ¶982(b) |
| Extortion | 18 U.S.C. § 1951 | July 2022 | Conditioned $1M credit extension and forbearance on acceptance of tied Offtake Agreement. | ¶982(c) |
| Anti-Tying | 12 U.S.C. § 1972 | July 18-19, 2022 | Tied credit extensions to RLNG offtake agreement at below-market rate. | ¶9-10, ¶850 |

## GEORGE ECONOMOU

| Predicate Act | Statute | Date | Description | Reference ¶¶ |
|---|---|---|---|---|
| Wire Fraud | 18 U.S.C. § 1343 | Apr. 25, 2022 | Wired $1.1M to Galileo/TPI knowing equipment non-operational. | ¶983(a) |
| Wire Fraud | 18 U.S.C. § 1343 | 2020-2022 | Approved fraudulent invoices knowing they were fraudulent. | ¶282, ¶385, ¶449 |
| Wire Fraud | 18 U.S.C. § 1343 | 2021 | Fraudulently represented to investor Ms. Rivera that Semillero equity valid. | ¶429, ¶431 |
| Wire Fraud | 18 U.S.C. § 1343 | 2020-2022 | Concealed BGF's true financial condition. | ¶429, ¶889 |
| Bank Fraud | 18 U.S.C. § 1344 | Apr. 25, 2022 | Caused disbursement for undelivered services. | ¶983(b) |
| Bank Fraud | 18 U.S.C. § 1344 | 2020-2022 | Prepared false financial statements enabling fraudulent drawdowns. | ¶159-160 |
| Money Laundering | 18 U.S.C. § 1956 | Apr. 25, 2022 | Received kickbacks from vendors. | ¶983(c) |

| Predicate Act | Statute | Date | Description | Reference ¶ |
|---|---|---|---|---|
| Perjury | 18 U.S.C. § 1621 | Apr. 25, 2022 | False sworn declarations denying lawsuit knowledge. | ¶983(d) |
| Obstruction of Justice | 18 U.S.C. § 1503 | Apr. 25, 2022 | False declarations to obstruct TRO proceedings. | ¶983(e) |
| Breach of Fiduciary Duty | State Law | 2020-2023 | Overpaid himself 1% fee; aided and abetted fraud. | ¶425, ¶174 |

## ALEXANDER BORSCHOW / SEMILLERO PARTNERS, LLC

| Predicate Act | Statute | Date | Description | Reference ¶ |
|---|---|---|---|---|
| Wire Fraud | 18 U.S.C. § 1343 | Jan. 31, 2025 | Transmitted Board Consent via electronic means while receiving $1,403,071 payment. | ¶984(a), ¶172 |
| Honest Services Fraud | 18 U.S.C. § 1346 | Jan. 31, 2025 | Approved self-interested transaction (AAA) in breach of fiduciary duties. | ¶984(b) |
| Bank Fraud | 18 U.S.C. § 1344 | Jan. 31, 2025 | Participated in assignment of federally backed NMTC loans to disqualified Affiliate. | ¶984(c) |
| Wire Fraud | 18 U.S.C. § 1343 | 2020-2023 | Submitted fraudulent consulting invoices (15 quarters). | ¶3553, ¶3623 |
| Aiding & Abetting Fraud | 18 U.S.C. § 2 | 2020-2023 | Authorized fraudulent conduct; eliminated corporate controls; suppressed audited financials for 4 years. | ¶172, ¶693, ¶2678, ¶11, ¶374 |

## ERNESTO VILLARINI / CDVCA / PRFG

| Predicate Act | Statute | Date | Description | Reference ¶ |
|---|---|---|---|---|
| Wire Fraud | 18 U.S.C. § 1343 | Jan. 31, 2025 | Transmitted Board Consent via electronic means while receiving $737,102 payment ($528,526 PRFG + $208,576 CDVCA). | ¶984(a), ¶175-176 |
| Honest Services Fraud | 18 U.S.C. § 1346 | Jan. 31, 2025 | Approved self-interested transaction (AAA) in breach of fiduciary duties. | ¶984(b) |
| Bank Fraud | 18 U.S.C. § 1344 | Jan. 31, 2025 | Participated in assignment of federally backed NMTC loans to disqualified Affiliate. | ¶984(c) |
| Aiding & Abetting Fraud | 18 U.S.C. § 2 | 2020-2023 | Parroted Semillero approvals enabling fraud. | ¶162 |

## JOVAL RODRÍGUEZ BARNES (BPPR Account Manager)

| Predicate Act | Statute | Date | Description | Reference ¶ |
|---|---|---|---|---|
| Wire Fraud | 18 U.S.C. § 1343 | 2020-2022 | Approved fraudulent drawdowns as BPPR account manager. | ¶160, ¶2498 |
| Bank Fraud | 18 U.S.C. § 1344 | Sept. 15, 2020 | Led payment of ITS/ASC performance bond with BGF loan proceeds. | ¶160 |
| Bank Fraud | 18 U.S.C. § 1344 | 2020-2022 | Approved fraudulent inspections and activities. | ¶5017 |

## ROBERTO ACOSTA / ACCURATE SOLUTIONS CORP. (ASC)

| Predicate Act | Statute | Date | Description | Reference ¶¶ |
|---|---|---|---|---|
| Wire Fraud | 18 U.S.C. § 1343 | 2020-2022 | Participated in fraudulent invoicing scheme through ITS/ASC JV. | ¶5, ¶345 |
| Bank Fraud | 18 U.S.C. § 1344 | 2020-2022 | Fraudulently billed $8M+ on $5M contract. | ¶302, ¶1069, ¶2152 |
| Mail Fraud | 18 U.S.C. § 1341 | 2020-2022 | Mailed fraudulent payment certificates and invoices. | ¶456-458 |
| Bank Fraud | 18 U.S.C. § 1344 | 2020-2022 | Certified work as complete when plant never operational. | ¶5, ¶1142 |

## IGNACIO ALVAREZ (BPPR CEO)

| Predicate Act | Statute | Date | Description | Reference ¶¶ |
|---|---|---|---|---|
| Honest Services Fraud | 18 U.S.C. §§ 1343, 1346 | 2020-present | Deprived Popular, Inc. shareholders of honest services by directing BPPR to participate in enterprise. | ¶125 |
| Wire Fraud | 18 U.S.C. § 1343 | Oct. 1, 2022 | El Nuevo Día interview misrepresenting BPPR's position (electronic transmission of false statements). | ¶200, ¶813-816 |
| Anti-Tying Violation | 12 U.S.C. § 1972 | July 18, 2022 | Personally signed tied Offtake Agreement (DocuSign ID: AA882844-5C58-44F6-BF6B-906519E3588F) conditioning $1M credit extension on below-market RLNG purchase ($14/MMBtu vs. $28.21 market rate). | ¶9-10, ¶850, Exhibit 9 |
| Extortion | 18 U.S.C. § 1951 | July 2022 | Used economic duress to coerce BGF into signing below-market Offtake: (i) exploited defaults and lack of funding; (ii) forced 100% carbon credits cession worth tens of millions for zero consideration; (iii) conditioned $1M credit extension and forbearance on acceptance of tied agreement. | ¶979, ¶982(a)-(c) |

## JAVIER FERRER (BPPR General Counsel)

| Predicate Act | Statute | Date | Description | Reference ¶¶ |
|---|---|---|---|---|
| Honest Services Fraud | 18 U.S.C. §§ 1343, 1346 | Nov. 2021-present | Received fraud notice from Carballido Nov. 11, 2021; allowed $677,094.76 disbursement next day; constitutes wire and bank fraud. | ¶133, ¶980, ¶1242-1243 |
| Wire Fraud | 18 U.S.C. § 1343 | Nov. 12, 2021 - 2023 | Each subsequent disbursement after fraud notice constitutes separate predicate act. | ¶1254 |
| Bank Fraud | 18 U.S.C. § 1344 | Nov. 12, 2021 - 2023 | Caused funds to be disbursed on federally-backed loan despite actual knowledge that drawdown certifications were false. Each disbursement after Nov. 11, 2021, fraud notice constitutes separate bank fraud predicate act. | ¶130, ¶981(d) |

## SUMMARY: PREDICATE ACT COUNT BY NON-SETTLING DEFENDANT

| Defendant | Wire Fraud (§1343) | Bank Fraud (§1344) | Mail Fraud (§1341) | Money Laundering (§1956/57) | Extortion (§1951) | Perjury (§1621) | Obstruction (§1503) | Honest Services (§1346) | Other | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| **VRM Penzini (all entities)** | 10+ | 3 | - | - | - | - | - | - | Contract breach | 13+ |
| **BPPR** | 7+ | 10+ | - | - | 3 | - | - | - | Anti-tying | 20+ |
| **Economou** | 4+ | 2+ | - | 1 | - | 1 | 1 | - | Fiduciary | 9+ |
| **Borschow/Semillero** | 2+ | 1 | - | - | - | - | - | 1 | Aiding | 4+ |
| **Villarini/CDVCA/PRFG** | 1 | 1 | - | - | - | - | - | 1 | Aiding | 3+ |
| **Rodríguez Barnes** | 1+ | 2+ | - | - | - | - | - | - | - | 3+ |
| **Acosta/ASC** | 1+ | 2+ | 1+ | - | - | - | - | - | - | 4+ |
| **Alvarez** | 1+ | - | - | - | - | - | - | 1 | - | 2+ |
| **Ferrer** | 1+ | - | - | - | - | - | - | 1 | - | 2+ |

**TOTAL PREDICATE ACTS BY NON-SETTLING DEFENDANTS: 65+**

## A. Non-Defendant Co-Conspirators' Conduct Preserved (¶6)

987.    The factual allegations concerning López Vidal, López Gómez, and ITS are preserved because: - The Enterprise operated as an integrated whole - BPPR's collaboration required disbursing $5.5M after November 2021 fraud notice - Borschow and Villarini's board approvals enabled the fraud - VRM Penzini exploited the chaos created by the non-defendant co-conspirators - Under conspiracy and aiding-and-abetting principles, Defendants are jointly and severally liable for entire harm - Non-Defendant Co-Conspirators' conduct establishes the "pattern of racketeering activity" under 18 U.S.C. § 1961(5)

**B. Relatedness**

988.    All predicate acts are related because they share: - Same participants (enterprise members) - Same victims (Boyd, Lassers, BGF, GFC, federal government) - Same methods (fraud in loan drawdowns, false certifications, electronic transfers) - Same purposes (steal project, enrich enterprise members) - Same enterprise (Biomass Green Fuels Racketeering Enterprise), See Exhibit 32 for comprehensive timeline by phase including RICO Predicate acts.

**C. Continuity (¶986)**
- **Closed-ended**: Predicate acts span 7+ years (2018-2025)
- **Open-ended**: Threat of continued activity; enterprise acquired assets and continues operations
- There is pattern of criminal conduct satisfies

997.    CAUSATION AS TO PLAINTIFF BOYD. Plaintiff Boyd injuries flow directly from Defendants racketeering activity: (a) Reliance: Boyd provided personal guarantees totaling $19 million in reliance on BPPR representations that it would properly manage BGF disbursements as Administrative Agent, enforce the Credit Agreement financial controls, ensure construction funds were used for designated purposes, and require a valid payment and performance bond for 100% of project costs. (b) But-For Causation: Had BPPR fulfilled these representations-instead of facilitating fraudulent drawdowns, ignoring the invalid bond, and approving disbursements to conflicted Lopez family entities-construction would have been completed with proper oversight, the plant would be operational, and Boyd guarantees would not have been called. (c) Proximate Causation: The fraudulent Asset Acquisition Agreement of February 7, 2025-orchestrated by BPPR and VRM Penzini-directly caused Boyd to lose his ownership percentage of assets worth over $300 million, sold to insiders for $4.4 million. Boyd was further denied his position at the

company, losing five years of salary and benefits at $150,000/year ($750,000). (d) Continuing Harm: Boyd remains exposed to $19 million in personal guarantee liability that BPPR and VRM Penzini continue to enforce through collection litigation.

998.    CAUSATION AS TO PLAINTIFF LASSERS. Plaintiff Lassers injuries flow directly from Defendants racketeering activity: (a) Investment and Reliance: Lassers invested capital and years of expertise in BGF/GFC in reliance on the same representations made to Boyd regarding proper financial controls and administrative oversight. (b) But-For Causation: Had the Enterprise not systematically looted BGF through fraudulent drawdowns, diversions to unauthorized projects, and self-dealing transactions, Lassers ownership stake would retain its projected value. (c) Proximate Causation: The void Asset Acquisition Agreement directly stripped Lassers of his ownership percentage of assets worth over $300 million. Lassers received nothing from the $4.4 million insider sale while VRM Penzini paid itself $700,000+ from the transaction proceeds. (d) VRM Penzini Breach: VRM Penzini breach of the NDA and RSA-using confidential strategies disclosed by Lassers to acquire the Company assets without his participation-independently caused Lassers to lose the benefit of his bargain.

999.    The Supreme Court decision in Medical Marijuana, Inc. v. Horn, 604 U.S. ___ (April 2, 2025), confirms that Plaintiffs economic injuries-including lost employment opportunity, diminished equity value, and personal guarantee exposure-constitute cognizable injury to business or property under 18 U.S.C. 1964(c). Horn rejected restrictive interpretations and held that injured means harmed, adopting a broad, textualist approach to RICO remedial provisions.

**COUNT 1: VIOLATION OF 18 U.S.C. § 1962(c)**

*Conduct of Enterprise Through Pattern of Racketeering* (Civil RICO is a remedial statute subject to liberal construction. Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 497-98 (1985).)

989.    Plaintiffs repeat and reallege all prior allegations.

990.    Each Defendant is a "person" under 18 U.S.C. § 1961(3).

991.    The "Biomass Green Fuels Racketeering Enterprise" is an enterprise under 18 U.S.C. § 1961(4).

992.    The Enterprise is distinct from the persons conducting it. The Enterprise includes corporate entities (BGF, GFC, BPPR, ITS, ASC, VRM entities, Humacao RNG) whose affairs were conducted by individual and entity defendants.

993.    Each Defendant conducted or participated in the conduct of the Enterprise's affairs, by having "some part in directing the enterprise's affairs," *id.* at 179, through a pattern of racketeering activity, including:

a) Mail fraud (18 U.S.C. § 1341)

b) Wire fraud (18 U.S.C. § 1343)

c) Bank fraud (18 U.S.C. § 1344)

d) Money laundering (18 U.S.C. §§ 1956, 1957)

e) Honest services fraud (18 U.S.C. § 1346)

f) Extortion (18 U.S.C. § 1951)

g) Perjury (18 U.S.C. § 1621)

h) Obstruction of justice (18 U.S.C. § 1503)

994.    As a direct and proximate result, Plaintiffs suffered injuries to their business or property.

**COUNT 2: VIOLATION OF 18 U.S.C. § 1962(a)**

**Investment of Racketeering Income**

995.    Plaintiffs repeat and reallege all prior allegations.

996.    The Lopezes received income derived from a pattern of racketeering activity and invested that income in acquisition of interest in or establishment of the Enterprise.

997.    VRM Penzini invested racketeering income (proceeds obtained through NDA violations) to acquire BGF loans and assets.

998.    BPPR invested racketeering income (proceeds from fraudulent loan disbursements) to acquire the below-market offtake agreement, including ESG/carbon benefits from tied credits.

**COUNT 3: VIOLATION OF 18 U.S.C. § 1962(b)**

**Acquisition/Maintenance Through Racketeering**

999.    Plaintiffs repeat and reallege all prior allegations.

1000.    Defendants acquired and maintained interest in and control of the Enterprise through a pattern of racketeering activity.

1001.    VRM Penzini acquired control of BGF through wire fraud (NDA violations) and bank fraud (unauthorized loan assignment).

1002.    BPPR maintained control via tying and fraud.

**COUNT 4: VIOLATION OF 18 U.S.C. § 1962(d)**

  **Conspiracy**

1003.    Plaintiffs repeat and reallege all prior allegations.

1004.    Each Defendant conspired with one or more other Defendants to violate 18 U.S.C. § 1962(a), (b), and (c).

1005.    Each conspirator need not personally commit predicate acts; agreement to participate in the enterprise through a pattern of racketeering is sufficient.

1006.    Evidence of conspiracy includes:

   a)  Coordinated communications between VRM Penzini, BPPR, Semillero, and CDVCA regarding the asset acquisition

   b)  Coordinated communications between VRM Penzini and BPPR regarding BGF loan acquisition, asset acquisition and releases for lawsuits.

   c)  Board members voting to approve self-interested transactions while receiving compensation

   d)  BPPR assigning loans to a disqualified Affiliate while obtaining releases from all claims

   e)  Parallel conduct in suppressing minority shareholders and eliminating oversight

   f)  BPPR/Lopezes coordination on bond fraud and offtake tying

**VIII. DIRECT INJURY AND PROXIMATE CAUSATION**

1007.    Plaintiffs repeat and reallege all prior allegations.

1008.    Plaintiffs will present expert testimony quantifying their damages, including: (a) an independent valuation of BGF/GFC assets demonstrating fair market value exceeding $300 million; (b) analysis of the Cambrian Energy offer rejected by BPPR in favor of the insider VRM transaction; (c) calculation of lost profits from the below-market offtake agreement over its 31-year term; and (d) quantification of environmental credits and Production Tax Credits improperly retained by Defendants. The damages methodology will be disclosed pursuant to Fed. R. Civ. P. 26(a)(2).

1009.    Plaintiffs' damages are quantifiable as follows: (a) Asset Value Destruction: BGF/GFC assets had a fair market value exceeding $300 million; the void Asset Acquisition Agreement transferred these assets for approximately $4.4 million, resulting in direct damages of at least $295 million; (b) Below-Market Offtake Agreement: The difference between the $14/MMBtu contract price and the $28.21/MMBtu DOE average market rate, multiplied by projected annual gas production over the 31-year term, yields present value damages exceeding $90 million; (c) Boyd's Personal Guarantee Exposure: Boyd remains exposed to approximately $19 million in personal guarantees on loans that were amended without his consent and used to fund the fraudulent scheme; (d) Ownership Dilution: Boyd's ownership was fraudulently diluted from 44% to 31.1% through the MIPA, then reduced to zero through the void Asset Acquisition Agreement; and (e) Environmental Credits and Tax Benefits: The Production Tax Credits, carbon credits, and ESG benefits improperly retained by Defendants have substantial additional value to be proven at trial.

1010.    RICO TREBLE DAMAGES CALCULATION (18 U.S.C. § 1964(c)): A. Asset Value Destruction: Net Direct Damages: $295,600,000. B. Below-Market Offtake Agreement:

Present Value Damages: $90,000,000+. C. Boyd's Personal Guarantee Exposure: $19,000,000. D. Lost Carbon Credits/ESG Benefits: TBD at trial. SUBTOTAL BASE DAMAGES: $404,600,000+. TREBLE DAMAGES (×3): $1,213,800,000+. Plus: Reasonable attorneys' fees (mandatory under § 1964(c)); costs; injunctive relief.

1011.    Plaintiffs have suffered direct, concrete injuries to their business or property by reason of Defendants' racketeering activity, satisfying 18 U.S.C. § 1964(c). Under the expanded framework established by Medical Marijuana, Inc. v. Horn, 604 U.S. (Apr. 2, 2025), "injured" means "harmed" and there is no requirement that business or property injury be direct, original, or free from personal injury causation. The Supreme Court's holding in Horn confirms that economic harms—including lost employment, lost investment value, and diminished earning capacity—constitute cognizable RICO injuries.

1012.    Boyd's Direct Injuries:

a)  Dilution: From 44% to 31.1% ownership through fraudulent MIPA ($750,000+ value)

b)  Complete Ownership Destruction: 31.1% reduced to zero through void Asset Acquisition

c)  RSA Breach: Entitled to 60% of Production Tax Credits and Environmental Attributes

d)  Personal Guarantee Exposure: $19 million on loans amended without consent

e)  Lost Employment: Breach of MIPA employment provision

f)  Lost Board Seat: Removed on false pretenses

g)  Lost Cambrian Offer: BPPR rejected superior offer in order to sell to VRM

h)  Loss of Ownership: BPPR's failure to bond the project for $18.67 million

1013.    Lassers' Direct Injuries:

a) Lost SAFE Conversion: Rights eliminated through fraudulent MIPA timing

b) Complete Ownership Destruction: Received nothing from void Asset Acquisition

c) RSA Breach: Entitled to 60% of Production Tax Credits and Environmental Attributes

d) Loss of Ownership: BPPR's failure to bond the project for $18.67 million

**Boyd and Lassers are direct victims of the fraud, not indirect parties**

1014.    The predicate acts directly caused their injuries (fraudulent MIPA, NDA breach, RSA breach, unauthorized asset sale)

1015.    There is no risk of multiple recovery because their injuries are unique to them

1016.    EFB was directly injured by the rescission of its revenue sharing agreement which was a part of the RICO enterprise.

1017.    Defendants injured GFC Holdings by illegally appropriating its assets.

1018.    Defendants injured Biomass Green Fuels by illegally appropriating its assets.

1019.    Proximate causation is satisfied because Defendants' racketeering acts were the "but for" cause of Plaintiffs' injuries. Specifically, but-for Defendants' racketeering:

(a) Boyd would not have executed the MIPA at the fraudulently depressed valuation;

(b) Boyd would not have lost his ownership through BPPR's fraud, and failure to be able to claim on the inadequate Payment and Performance bond.

(c) Boyd would not have remained exposed on $19M in guarantees on a loan used to fund the fraud;

(d) Boyd would not have lost his ownership through the void Asset Acquisition;

(e) Boyd would retain his 44% ownership in a $300M+ enterprise, worth at least $132M.

  The causal chain is direct and foreseeable.

## IX. SUPPLEMENTAL CLAIMS

## COUNT V: BREACH OF FIDUCIARY DUTY

1020.  Plaintiffs repeat and reallege all prior allegations against, Economou, Borschow, Semillero, Villarini, CDVCA, PRFG, BPPR who all benefited from the sale of Boyd's units to Lopez Vidal providing the Lopezes majority control of the common units.

1021.  Boyd seeks compensatory damages, punitive damages, rescission of the MIPA in the alternative, plus interest, costs, and attorneys' fees.

1022.  Defendants' conduct was willful, wanton, and malicious, entitling Boyd to punitive damages.

1023.  As a direct and proximate result, Boyd suffered damages including the difference in fair market value, lost employment compensation, and exposure on personal guarantees.

1024.  Boyd justifiably relied on these representations. His reliance was reasonable because he had no reason to believe López Vidal would use his access to BGF loan proceeds, the representations were made by his trusted business partners.

1025.  Defendants made these representations with the intent to induce Boyd to enter into the MIPA.

1026.  Defendants knew these representations were false or made them with reckless disregard for their truth or falsity.

1027.    These representations were false when made.

1028.    Economou prepared false documentation misrepresenting the nature of loans Boyd had obtained on behalf of BGF.

1029.    López Vidal represented that Boyd would be employed by GFC/BGF, when Defendants had no intention of honoring this commitment;

1030.    López Vidal represented that the construction contract with ITS/ASC JV was for $4 million, when the Lópezes had secretly executed a new contract for $5 million; then later kept paying themselves well over $8 million for work that was never designed correctly not completed.

1031.    López Vidal represented that the $750,000 payment would come from López family funds, when in fact Defendants planned to and did use BGF loan proceeds;

1032.    López Vidal represented that he had the personal financial capacity to pay $750,000 for Boyd's units, when in fact López Vidal's 2018 personal financial statement showed a negative net worth of $90,234;

1033.    Plaintiffs repeat and reallege all prior allegations as if fully set forth herein.

1034.    (Boyd v. Economou)

**COUNT VII: FRAUDULENT INDUCEMENT - MIPA**

1035.    Plaintiffs repeat and reallege all prior allegations.

1036.    Boyd seeks compensatory damages, plus pre- and post-judgment interest, costs, and attorneys' fees.

1037.    As a direct and proximate result of Defendants' breach, Boyd has suffered damages including the fair market value of the ownership percentage, lost wages and benefits, lost opportunities as manager and director, and consequential damages.

1038.    Defendants are liable for López Vidal's breach as a co-conspirators who participated in and benefited from the fraudulent scheme by:

1039.    Refusing to provide Boyd the management position denied by the Board, then denied the contractor position that had been approved by the Board.

1040.    Failing to employ Boyd as Director of New Business and Development as promised;

1041.    Conspiring with Borschow and Villarini to exclude Boyd from serving as a manager of GFC/BGF;

1042.    Failing to pay the $750,000 purchase price from López Vidal's own funds as represented, instead fraudulently using access to BGF loan proceeds designated for biorefinery construction.

**COUNT VI: BREACH OF CONTRACT**

1043.    Plaintiffs repeat and reallege all prior allegations.

1044.    As directors, managers, and controlling unitholders, Defendants owed fiduciary duties of loyalty, care, and good faith to BGF, GFC, and all unitholders under Puerto Rico law (14 L.P.R.A. §§ 3951 et seq.).

1045.    Defendants breached these duties by:

a) Approving the September 2021 self-interested transactions at fraudulently low valuations while rejecting Lassers' superior offer;

b) The stated purpose of the September 2021 transaction was to fund the Ponce project. This was fraud because no money was spent on the Ponce project causing BGF to lose its rights to the project costing GFC/BGF, Boyd and Lassers millions in future earnings.

c) Approving the void Asset Acquisition Agreement while receiving compensation from the transaction;

d) Failing to obtain unanimous unitholder consent for liquidation as required by Section 9.1;

e) Purporting to release non-party to the contract BPPR from all claims without authority;

f) Suppressing audited financial statements for five consecutive years;

g) BPPR: Allowing self-dealing construction, participating in bond fraud, tying offtake, assigning loan to disqualified Affiliate.

**1046.**       Under Delaware law, directors owe fiduciary duties to common stockholders in preference to preferred stockholders when their interests diverge.

### COUNT VIII: BREACH OF CREDIT AGREEMENT

1047.       Plaintiffs repeat and reallege all prior allegations.

1048.       BPPR breached the Credit Agreement by:

a) Assigning the loan to VRM Penzini Fund I, LLC Renewable Series II—an Affiliate disqualified as an Eligible Assignee under Section 1.1;

b)  Disbursing without valid 100% bond;

c)  Tying extensions to offtake; Releasing Mapfre collateral without project completion.

d)  Approving Amendments 1-7 without Boyd's consent;

## COUNT IX: BREACH OF NDA

1049.    Plaintiffs repeat and reallege all prior allegations.

1050.    (Boyd and Lassers v. VRM Penzini Capital, Rafael Rojo, Carlos Penzini, Diego Rodriguez)

1051.    On January 18, 2023, Boyd and Lassers entered into the NDA with VRM Penzini Capital through its operating entity Star Power Systems, LLC.

1052.    VRM Penzini breached the NDA by:

a)  Using confidential information to plan and execute the acquisition of BGF's loans and assets without Boyd and Lassers' participation;

b)  Disclosing the $10 million the Investment Tax Credit causing the Lopezes to intentionally start the plant to disqualify the company from being eligible.

c)  Disclosing confidential strategies to third parties (BPPR, Semillero, CDVCA) in negotiating the Asset Acquisition;

d)  Using Boyd and Lassers' detailed takeover plan for VRM's own benefit.

1053.    The NDA provides for equitable relief and indemnification: "VRM shall indemnify the Disclosing Party from and against all costs, expenses, losses or damages (including but not limited to legal expenses) which may arise directly or indirectly from the unauthorized disclosure or use of Confidential Information."

1054.    Star Power Systems LLC, VRM corporately and Rafael Rojo, Carlos Penzini, and Diego Rodriguez who are individually liable as signatories.

### COUNT X: BREACH OF REVENUE SHARING AGREEMENT

1055.    (Plaintiffs v. VRM Penzini Fund I LLC Renewable Series II)

1056.    Plaintiffs repeat and reallege all prior allegations.

1057.    On August 20, 2023, EFB, LLC entered the RSA with VRM Penzini Fund I LLC, Renewable Series II.

1058.    VRM Penzini breached the RSA by acquiring the Humacao Project and failing to share revenues with EFB as required.

1059.    Plaintiffs seek compensatory damages and specific performance.
VRM-P falsely induced EFB including the plaintiffs to sign the RSA to gain their votes as unit holders to support the settlement, with no intention of ever honoring the agreement.

### COUNT XI: DECLARATORY RELIEF - ASSET ACQUISITION AGREEMENT VOID AB INITIO

1000.    The void Asset Acquisition Agreement is not merely a contract dispute but constitutes the culminating predicate act of the seven-year RICO Enterprise. The transaction demonstrates BPPR and the Board pattern of illegal conduct: (a) BPPR assigned loans to a disqualified Affiliate in knowing violation of Credit Agreement 1.1; (b) the Board approved without unanimous unitholder consent required by Operating Agreement 9.1; (c) conflicted directors voted to approve while receiving payments ($1.4M to Semillero, $737K to Villarini

entities); (d) the transaction purported to release BPPR from RICO and Anti-Tying liability-an unauthorized act constituting obstruction of justice. This is not a contract breach; it is the final act of a racketeering pattern.

1060.    Plaintiffs repeat and reallege all prior allegations.

1061.    The Asset Acquisition Agreement dated February 7, 2025, is void ab initio because:

The loan assignment to VRM Penzini violated Section 1.1 of the Credit Agreement;

The Board did not obtain unanimous unitholder consent for liquidation as required by Section 9.1 of the Operating Agreement;

a) The Board lacked authority under Section 6.4 to approve a liquidation without the affirmative vote or written consent of the Members;

b) The Board members who approved of the transaction had disabling conflicts of interest;

c) The purported releases of BPPR were unauthorized.

1062.    A genuine and justiciable dispute exists regarding the validity of the Asset Acquisition Agreement.

1063.    Plaintiffs seek a declaration that the Asset Acquisition Agreement is void ab initio and that all assets be returned to BGF/GFC or held in constructive trust.

## COUNT XII: DECLARATORY RELIEF - PLAINTIFFS' MAJORITY CONTROL

1064.    Plaintiffs repeat and reallege all prior allegations.

1065. On June 2, 2025, López Vidal executed an Irrevocable Proxy granting Boyd and Lassers voting control over his units in GFC Holdings.

1066. As a result, Plaintiffs hold or control 55.493% of the voting units of GFC Holdings, LLC.

1067. Plaintiffs seek a declaration that they hold majority voting control of GFC Holdings, LLC and have the authority under Section 3.2 of the Operating Agreement as well as due to the Board of Managers' abdication of their fiduciary duties, to act by written consent via Majority Approval of the Members.

## COUNT XIII: DECLARATORY RELIEF - RELEASES VOID

1068. Plaintiffs repeat and reallege all prior allegations.

1069. Section 3.6(c) of the void Asset Acquisition Agreement purports to release BPPR from all claims.

1070. Plaintiffs seek treble damages under 12 U.S.C. § 1975 in an amount to be proven at trial, plus costs and reasonable attorneys' fees.

1071. Pursuant to 12 U.S.C. § 1975, any person injured by a violation of Section 1972 "may sue therefor in any district court of the United States... and shall recover three times the amount of damages sustained by him, and the cost of suit, including a reasonable attorney's fee."

## COUNT XVI: PERJURY

1072. (Against Lopez Vidal, López Gómez, Economou)

1073.    Plaintiffs repeat and reallege all prior allegations.

1074.    Defendants submitted false sworn declarations to this Court on April 25, 2022.

1075.    Plaintiffs seek sanctions.

## COUNT XVII: OBSTRUCTION OF JUSTICE

1076.    (Against , Economou)

1077.    Plaintiffs repeat and reallege all prior allegations.

1078.    Defendant made multiple false declarations to obstruct the TRO proceedings.

## COUNT XVIII: FRAUD ON THE COURT

1079.    (Against  Economou)

1080.    Plaintiffs repeat and reallege all prior allegations.

1081.    Defendants' false declarations constitute fraud upon the court under Fed. R. Civ. P. 60(d)(3).

## COUNT XIX: FRAUDULENT CONVEYANCE

1082.    (Against Economou)

1083.    Plaintiffs repeat and reallege all prior allegations.

1084.    The $1.1M transfer on April 25, 2022, was a fraudulent conveyance under 31 L.P.R.A. § 3491 et seq.

## COUNT XX: UNJUST ENRICHMENT

1085.    (Against VRM Defendants, Semillero, CDVCA, PRFG, BPPR)

1086.    Plaintiffs repeat and reallege all prior allegations.

1087.    Defendants have been unjustly enriched by receiving BGF/GFC assets through the void Asset Acquisition Agreement.

1088.    Plaintiffs have been unjustly impoverished as a result.

1089.    Plaintiffs seek disgorgement and restitution.

## X. DERIVATIVE CLAIMS ON BEHALF OF BGF AND GFC

1090.    Plaintiffs repeat and reallege all prior allegations.

1091.    Plaintiffs' Majority Control: As of June 2, 2025, Plaintiffs hold or control 55.493% of the voting units of GFC Holdings, LLC. Under Section 3.2 of the Operating Agreement, Plaintiffs have the authority to act by written consent via Majority Approval of the Members and to direct the Company to pursue claims against Defendants.

1092.    Plaintiffs intend to exercise their majority voting control to direct GFC Holdings and BGF to pursue claims directly against the remaining Defendants.

1093.    To the extent derivative claims remain, demand on the Board is futile because the Board Members are interested parties: The remaining Board members (Borschow and Villarini) and members approved the void Asset Acquisition Agreement while receiving substantial compensation:

    a.  Borschow: Semillero received $1,403,071

    b.  Villarini: CDVCA/PRFG entities received $737,102

1094.    Directors Failed to Inform themselves and Members: The boards suppressed audited financials for four consecutive years (2020-2023) and failed to recuse themselves and obtain independent valuations before approving the Asset Acquisition Agreement.

1095.    Transactions Are Egregious: Selling $300M+ in project value for $4.4M to insiders while purporting to release BPPR from all claims including fraud and failure to adequately bond the project could not be the product of sound business judgment.

1096.    Bad Faith: Approving liquidation without unanimous unitholder consent as required by Section 9.1, structured to benefit insiders while excluding minority unitholders, demonstrates bad faith.

1097.    Ultra Vires: The Asset Acquisition Agreement was void ab initio because the Board lacked authority under Section 6.4 to approve it without the affirmative vote or written consent of the Members.

1098.    The Board's incapacity is further demonstrated by the conduct of Attorney Roberto Abesada, whom Borschow purported to hire to represent the Companies. Abesada does not represent the Companies' interests; he works to conceal and justify the self-dealing of the Board of Managers. His specific litigation failures include: (a) failure to appeal the Partial Summary Judgment of $13,418,352.07 entered in favor of BPPR against the Companies; (b) failure to move to lift the default judgment entered against the Companies in favor of George Economou; (c) failure to conduct discovery in the ARMC case because, according to Abesada, the Companies "are not operating"; and (d) the Board's direction to Abesada to withdraw the Bank Holding Companies Act case against Banco Popular because the Board "agreed not to sue Banco Popular in the Asset Acquisition Agreement" (Sections 2.9, 2.10, and 3(c)).

1099.    On July 10, 2025, Abesada stated to the Superior Court of San Juan that "GFC Holdings, LLC is not operating and has no assets." This admission confirms that the Board's strategy—which Abesada defends—succeeded in stripping all assets from entities whose fiduciary guardians chose self-enrichment over preservation. Given that the Companies have no assets or operations, the question of who is paying Abesada to obstruct Plaintiffs' recovery efforts further underscores the conflicted nature of his representation.

1100.    Under ABA Model Rule 1.13(a), an attorney representing an organization acts through its "duly authorized constituents." Plaintiffs, as holders of 55.493% majority voting control, are the duly authorized constituents of GFC Holdings. Under ABA Model Rule 1.7(a)(2), no concurrent conflict exists for Plaintiffs' counsel Becker and Vissepó because the interests of Plaintiffs and the Companies align in the joint pursuit of recovery—there is no conflict of interest but rather a confluence of interest. Abesada is the attorney who is inescapably conflicted: he purports to represent the Companies while defending the very Board members whose self-dealing destroyed those Companies. Realigning the parties and counsel is not a conflict or ethics violation but a fiduciary imperative under 14 L.P.R.A. § 3965.

1001.    Actual damages will be determined by expert witnesses at trial. DAMAGES CALCULATION. Plaintiffs damages are calculated as follows: A. DAMAGES TO DATE ($119,517,201): Monthly lost profits (43 months x $1,811,330) = $77,887,190; Biorefinery repairs and cost overruns = $13,900,000; Lost Investment Tax Credit = $10,000,000; Lost Act 73 Rescue Credit = $8,000,000; Interest payments (direct and NMTC) = $4,727,678; El Coqui Landfill minimum payments = $1,813,167; Deadline extension fees = $1,791,667; Salaries and insurance = $1,397,500. B. PRESENT VALUE OF FUTURE PROFITS ($595,581,281): Humacao landfill (30-year contract, 2.5% annual growth, 4% discount rate) = $295,000,000; Ponce, Salinas, and

other EC Waste landfills = $300,581,281. C. TOTAL BASE DAMAGES = $715,098,482. D. TREBLE DAMAGES (18 U.S.C. 1964(c)) = $2,145,295,447. E. BOYD PERSONAL DAMAGES: Lost salary and benefits (5 years x $150,000) = $750,000; Personal guarantee exposure = $19,000,000. ,Pricing sources: U.S. DOE 2022-2025 Annual Alternative Fuel Price Reports establishing average RLNG price of $33.22/MMBtu and average CO2 price of $0.325/lb.

### VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

### A. RICO Relief

1.    Enter judgment against the Defendants on Counts I-IV;

2.    Award treble damages of a base damages of $715,098,482, trebled to $2,145,295,447 pursuant to 18 U.S.C. 1964(c), plus Boyd lost salary of $750,000 and personal guarantee exposure of $19,000,000; final amount to be determined at trial with expert witnesses

3.    Award attorney fees and costs under 18 U.S.C. § 1964(c);

4.    Judgment against the Defendants for their joint and several liability for all damages caused by the Enterprise, including conduct of the Non-Defendant Co-Conspirators, under conspiracy and aiding-and-abetting principles

### B. Declaratory Relief Regarding Plaintiffs' Majority Control

5.    Declare that Plaintiffs Boyd and Lassers hold or control 55.493% of the voting units of GFC Holdings, LLC, constituting majority voting control;

6.    Declare that Plaintiffs have the authority under Section 3.2 of the GFC Holdings Operating Agreement to act by written consent via Majority Approval of the Members;

7.    Authorize Plaintiffs to act on behalf of GFC Holdings, LLC and Biomass Green Fuels, LLC in pursuing claims against Defendants;

8.    Order the reconstitution of the Board of Managers of GFC Holdings, LLC and Biomass Green Fuels, LLC under Plaintiffs' direction;

**C. Declaratory Relief Regarding the Void Asset Acquisition Agreement**

9.    Declare that the Asset Acquisition Agreement dated February 7, 2025, is void ab initio because it violated Sections 6.4 and 9.1 of the GFC Holdings Operating Agreement;

10.  Declare that the loan assignment to VRM Penzini Fund I, LLC Renewable Series II is void as unauthorized under Section 1.1 of the Credit Agreement;

11.  Declare that all purported transfers of assets under the void Asset Acquisition Agreement are legally ineffective and that the assets remain the property of BGF and GFC;

12.  Declare void the purported releases of BPPR contained in Section 3.6(c) of the void Asset Acquisition Agreement;

**D. Equitable Relief**

In support of equitable relief, Plaintiffs invoke this Court's broader equitable powers in RICO cases. Federal courts wield expanded equitable authority specifically to enforce anti-racketeering laws. Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479 (1985). The First Circuit has recognized the "protean nature" of equitable relief in fiduciary breach cases, holding that equity permits courts to "deny a breaching fiduciary undue gain received by virtue of this position." In re PHC, Inc., Shareholder Litigation, 894 F.3d 419, 435 (1st Cir. 2018). This Court may reform the Operating Agreement itself as an equitable remedy for the Board's breaches. See Allison v. Eriksson, 479 Mass. 626, 98 N.E.3d 143 (2018) (court may reform operating agreement as equitable remedy for bad-faith mergers). Exhibit 17 confirms that

the Operating Agreement is amendable by Majority Members under Section 11.3—the Court's equitable intervention merely accelerates a remedy the Members could pursue on their own.

Because the Asset Acquisition Agreement transferred all Company assets, GFC Holdings and BGF are now shell LLCs with no remaining assets or operations. Courts may intervene in shell LLCs post-liquidation to ensure that the RICO statute's remedial purposes are fulfilled. The Court's equitable powers extend to recognizing the Majority Members' Written Consent as the valid governing instrument of the Companies, overriding the Board's conflicted governance decisions. See Demalous v. Demalous, 428 Mass. 555, 703 N.E.2d 1149 (1998) (broad scope of equitable remedy for fiduciary breach).

13.  Issue a permanent injunction prohibiting Defendants from further racketeering;

14.  Impose a constructive trust over all BGF/GFC assets in favor of Plaintiffs;

15.  Order disgorgement of all payments received from the void Asset Acquisition Agreement:

    a.    Semillero Partners LLC: $1,403,071

    b.    PRFG: $528,526

    c.    CDVCA: $208,576

    d.    VRM Penzini: $428,417

    e.    Lopez Gomez $203,804

16.  Order VRM Penzini to specifically perform the RSA in any potential settlement by accounting for and sharing all Project Benefits with EFB;

17.  Rescind the MIPA and restore Boyd's ownership;

18. Disgorgement of BPPR's ESG/Carbon favorable offtake agreement from tying with BGF and Humacao RNG;;

19. Order return of all assets purportedly transferred under the void Asset Acquisition Agreement to BGF and GFC

### E. Declaratory Relief Regarding Boyd's Guarantees

20. Declare Boyd's personal guarantees unenforceable due to material amendments without consent;

21. Declare Credit Agreement Amendments 1-7 void ab initio;

### F. Contract Claims

22. Award compensatory and punitive damages for breach of the NDA against VRM Penzini, Rojo, Penzini, and Rodriguez;

23. Award compensatory damages for breach of the RSA against VRM Penzini;

24. Award treble damages under 12 U.S.C. § 1975 for anti-tying violations;

1002. Pursuant to 12 U.S.C. 1975, Plaintiffs are entitled to treble damages for BPPR anti-tying violations independently of the RICO claims. The offtake agreement extracted through illegal tying has a present value exceeding $90 million over its 31-year term, based on the difference between the $14/MMBtu contract price and the $33.22/MMBtu DOE average market rate.

### G. Perjury and Obstruction Claims

25. Void $1.1M April 25, 2022, transfer as fraudulent conveyance; disgorge kickbacks;

26. Sanctions for fraud on court under Fed. R. Civ. P. 60(d)(3); strike false declarations;

27. Punitive damages for perjury/obstruction; refer for criminal investigation;

### H. General Relief

28.  Award pre- and post-judgment interest;

29.  Award reimbursement of all legal expenses incurred by Plaintiffs in this action, including but not limited to attorneys' fees, expert witness fees, court costs, and other litigation-related expenditures, as justice and equity require;

30.  Grant such other relief as the Court deems just and proper.

### VIII. DEMAND FOR JURY TRIAL

31.  Plaintiffs demand trial by jury on all issues so triable.

Dated: February 7, 2026

Should the Court identify any pleading deficiency requiring clarification or amendment, Plaintiffs respectfully request leave to amend under Federal Rule of Civil Procedure 15(a)(2).

### RESPECTFULLY SUBMITTED,

/s/ Jane A. Becker Whitaker
**JANE A. BECKER WHITAKER**
USDC No. 205110
P.O. Box 9023914
San Juan, PR 00902-3914
Tel: (787) 585-3824
Email: janebeckerwhitaker@gmail.com

/s/ Luis E. Miñana
**LUIS E. MIÑANA, ESQ.**
USDC-PR No. 225608
ESPADA, MIÑANA, & PEDROSA LAW OFFICES, PSC
123 Calle Manuel Domenech Altos
Urb. Baldrich, San Juan, PR 00918
Email: minanalaw@yahoo.com
Tel: (787) 758-1999

**CERTIFICATE OF SERVICE**

We hereby certify that on this 7th day of February, 2026, we have presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system, which will notify all counsel of record.

**/s/ Jane A. Becker Whitaker**
**JANE A. BECKER WHITAKER**