**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **GREGORY BOYD and JONATHAN LASSERS,** | **Civil No. 3:26-cv-01066-MAJ** |
| **Plaintiffs,** | |
| **v.** | **MOTION TO DISQUALIFY** |
| | **ROBERTO ABESADA-AGÜET** |
| **BANCO POPULAR DE PUERTO RICO,** | |
| **et al.,** | **Hon. Maria Antongiorgi-Jordan** |
| **Defendants.** | |

**PLAINTIFFS' OPPOSITION TO THE SPECIAL APPEARANCE AND**

**SANCTIONS MOTION FILED BY BANCO POPULAR'S ATTORNEY**

**(ECF NO. 49)**

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................ 4

II. THE TRUE DISPUTE .................................................................................... 6

III. ATTY. ABESADA-AGÜET FAILED TO COMPLY WITH RULE 11(c)(2)'S MANDATORY SAFE-HARBOR.................................................................... 16

IV. GOVERNING RULE 11 STANDARD ................................................. 18

V. ECF NO. 49 SEEKS MERITS ADJUDICATION DISGUISED AS SANCTIONS .............. 20

VI. THE § 1927 ALTERNATIVE FAILS FOR INDEPENDENT REASONS.......................... 21

VII. PLAINTIFFS POSSESS A SUBSTANTIAL BASIS FOR THEIR POSITIONS................ 22

A. June 2, 2025, Irrevocable Proxy Consolidates Majority Voting Control in Plaintiffs......... 22

VIII. PRIOR DISTRICT COURT RULINGS DO NOT RENDER PLAINTIFFS' POSITIONS SANCTIONABLE........................................................................................... 24

IX. ECF NO. 49 CONTAINS MATERIAL MISSTATEMENTS AND IS THE FOURTH INSTALLMENT OF A COORDINATED CROSS-FORUM SUPPRESSION SEQUENCE ............................................................................**Error! Bookmark not defined.**

X. THE RECORD SUPPORTS PLAINTIFFS' CONFLICT AND CAPTURED-COUNSEL CONCERNS ................................................................................................. 25

XI. PLAINTIFFS' GOVERNANCE-AUTHORITY ARGUMENTS ARE NON-FRIVOLOUS 38

A. The Operating Agreement Reserves the Disputed Authority to the Members. ................... 38

B. The Court Has Authority to Override Contrary Management Instructions Where the Management Is Itself Conflicted............................................................................ 39

XII. CONCLUSION ........................................................................................... 40

# TABLE OF AUTHORITIES

**CASES**

Apparel Art Int'l, Inc. v. Amertex Enters., Ltd., 48 F.3d 576 (1st Cir. 1995) ............................... 24

Bell Atl. Corp. v. Bolger, 2 F.3d 1304 (3d Cir. 1993).................................................................... 23

Bell v. Nat'l Credit Servs. Inc., No. 2:19-cv-01727 RAJ-BAT, 2020 WL 8832899 (W.D. Wash. Oct. 14, 2020) ...................................................................................................................... 21

Brickwood Contractors, Inc. v. Datanet Eng'g, Inc., 369 F.3d 385 (4th Cir. 2004) ..................... 18

Cooter &amp; Gell v. Hartmarx Corp., 496 U.S. 384 (1990)........................................................ 19

Costello v. United States, 365 U.S. 265 (1961) .............................................................................. 24

CQ Int'l Co. v. Rochem Int'l, Inc., USA, 659 F.3d 53 (1st Cir. 2011)........................................... 19

Cruz v. Savage, 896 F.2d 626 (1st Cir. 1990)................................................................................. 19

In re Murrin Bros. 1885, Ltd., 603 S.W.3d 53 (Tex. 2019)............................................................ 41

Jensen v. Phillips Screw Co., 546 F.3d 59 (1st Cir. 2008) ............................................................. 21

Lamboy-Ortiz v. Ortiz-Vélez, 630 F.3d 228 (1st Cir. 2010) .......................................................... 21

Navarro-Ayala v. Hernandez-Colon, 3 F.3d 464 (1st Cir. 1993) .................................................. 23

Novitsky v. TransUnion LLC, No. 2:23-cv-04229-SPG-MAR, 2025 U.S. Dist. LEXIS 81891 (C.D. Cal. Mar. 14, 2025) ....................................................................................................... 21

Nyer v. Winterthur Int'l, 290 F.3d 456 (1st Cir. 2002) .................................................................. 19

Ridder v. City of Springfield, 109 F.3d 288 (6th Cir. 1997) .......................................................... 18

Rosman v. Shapiro, 653 F. Supp. 1441 (S.D.N.Y. 1987)............................................................... 41

Triantos v. Guaetta &amp; Benson, LLC, 91 F.4th 556 (1st Cir. 2024) ....................................... 18

Young v. City of Providence ex rel. Napolitano, 404 F.3d 33 (1st Cir. 2005)............................... 19

**STATUTES**

14 L.P.R.A. §§ 3951, 3963, 3965, 3967, 4003–4004 ................................................................... 23

28 U.S.C. § 1927............................................................................................................... 21, 22

**RULES**

Fed. R. Civ. P. 11............................................................................................................... 19, 24

**OTHER AUTHORITIES**

18B Charles Alan Wright et al., Federal Practice and Procedure § 4433 (3d ed. 2024) .............. 24

Restatement (Second) of Judgments § 13 cmt. f (Am. L. Inst. 1982) ........................................... 24

**TO THE HONORABLE COURT:**

COME NOW Plaintiffs Gregory Boyd and Jonathan Lassers and respectfully state and pray.

## I. INTRODUCTION

Roberto Abesada-Agüet, Esq., showing his ignorance of how Rule 11 functions, has filed a Rule 11 Motion for Sanctions without sending a prior safe-harbor letter, as the rule requires. Plaintiffs preface their rebuttal of Atty. Abesada-Agüet's arguments with the below discussion that demonstrates that his appointment as counsel for GFC Holdings, LLC and Biomass Green Fuels, LLC (the Companies) has nothing to do with representation of the Companies and everything to do with defending the entity he has represented since at least 2009, and continues to represent contemporaneously today: Banco Popular. Indeed, Atty. Abesada-Agüet is concurrently representing BPPR in at least two active matters litigated alongside this case: (1) Catala-Del Valle v. NSSK San Juan, LLC, No. 3:26-cv-01205-JAG (D.P.R.) — a case filed against BPPR on April 6, 2026 in which Atty. Abesada-Agüet entered a Notice of Appearance for BPPR on April 24, 2026 (AO 458 Appearance of Counsel, Doc 9, signed by Roberto Abesada-Agüet, Bar No. 216706) (Ex. 1), just four days before he signed ECF No. 49 in this action against Plaintiffs; and (2) Banco Popular de P.R. v. [Defendant], No. SJ2025CV07110 (T.P.I. San Juan), an active mortgage-foreclosure proceeding in which Atty. Abesada-Agüet appears as counsel for BPPR, with three public auctions noticed for April 20, April 27, and May 4, 2026 — contemporaneous with this case. These two contemporaneous BPPR representations are among 26 federal court matters since 2006 and 15 Puerto Rico local-court matters since 2013 in which Atty. Abesada-Agüet has appeared for BPPR — all catalogued in Ex. 2 (Docket-Citation Appendix). See Ex. 2 Tables 1-4. That contemporaneous, conflicted representation is the leading fact of this Opposition. The difference between the two positions is stark: Banco Popular's attorney maintains that the

bank's adversary may dictate who represents the Companies in litigation against the bank; Plaintiffs maintain that the Companies' majority members, acting through the June 2, 2025, Irrevocable Proxy, have already authorized independent representation by undersigned counsel.

In January 2025, two conflicted members of the GFC Holdings, LLC ("GFC") Board of Managers and a conflicted single common unit holder approved the sale of substantially all assets of Biomass Green Fuels, LLC ("BGF") — the fruit of years of work to develop the first biorefinery in Puerto Rico — to RNG Humacao, LLC, where each approving member held a direct personal interest. The disposition required, but did not obtain, the unanimous vote that BGF's Operating Agreement mandates for such a deemed liquidation; Plaintiffs Gregory Boyd and Jonathan Lassers were neither consulted nor compensated. Olmar Lopez Vidal was consulted but objected to the sale. He was not compensated.

The same transactions purported to extinguish BGF's and GFC's pending RICO and Bank Holding Company Act § 1972 anti-tying claims against Banco Popular de Puerto Rico ("BPPR") — claims in which BPPR was a principal defendant and which the conflicted members had no independent authority to abandon. Boyd and Olmar Lopez Vidal remained personally liable as guarantor on BGF's underlying loan from BPPR, which BPPR thereafter transferred to Humacao RNG in violation of Credit Agreement § 10.4.

After the liquidation, one of the members of the Board of Managers resigned. This left only two members on the Board of Managers, Alexander Borschow and Olmar Lopez Vidal, a founding member of the Companies. Borschow agreed to the Companies' liquidation in a sale to the VRM entities and his company, Semillero, received $1,468,071 as a result. Mr. Lopez Vidal did not agree, preferring a more lucrative offer beneficial to the Companies, which would have kept the Companies operating and would have paid the Companies' suppliers, a key element of getting the

biorefinery online. But the more lucrative offer did not include the dismissal of the lawsuits, and it would have required Banco Popular to pay something closer to market price for the renewable natural liquid gas the Companies were to produce.

Plaintiffs recognize they acted hastily in seeking out Atty. Pedrosa's representation for the Companies. Whatever his version of the content of his conversations with Atty. Abesada is will never be known because, tragically, he died on April 1st. As for any insult to Mr. Borschow, it was unintended, and counsel apologizes for it.

When Lopez Vidal, Boyd and Lassers questioned the authority of Abesada's appointment to represent GFC Holdings and BGF, Alexander Borschow, ex post facto, sought out Javier Feliciano, a notary for many of the property sales of VRM. Borschow appointed him to the Board without a meeting or even a consultation with Mr. Lopez Vidal, and  — purported to hire Atty Abesada, Esq. to represent the Companies.

In state court matters where Atty. Abesada-Agüet has purported to represent BGF, he has informed the court that BGF has ceased operations and has no assets, which begs the question of who pays his fees. See Ex. 3, Translation of AMRC, LLC v. López Vidal, No. SJ2024CV10727 Initial Conference Minute, July 16, 2025, in which Atty. Abesada-Agüet represented to the court that GFC Holdings "is not operating and has no assets". The Puerto Rico Court of Appeals previously granted a motion to disqualify the Abesada law firm as BPPR's counsel because attorneys from the firm had participated in the very transaction that became the subject of litigation. *Balcones al Castillo, S.E. v. Banco Popular de P.R.*, No. KLCE201301132 (P.R. Trib. Apel. 2013).

## II. THE TRUE DISPUTE

¶ 1.  This action is not a routine commercial dispute. Civil No. 3:26-cv-01066 is a civil RICO action arising from coordinated conduct involving the illegal stripping, transfer,

neutralization, and foreclosure-driven acquisition of biomass-energy assets and related claims belonging to Biomass Green Fuels, LLC ("BGF") and GFC Holdings LLC ("GFC"). The challenged conduct extends across multiple proceedings in both federal and Puerto Rico courts.

¶ 2. Defendants and Atty. Abesada, who has joined forces with them, want this Court to see this case through their narrow blinders. They never address the substance of Plaintiffs' arguments. Is it appropriate for Board members who are the only owners of the LLC to receive compensation to improperly vote to liquidate that LLC, or does that conflict disqualify them from running the Companies' affairs? Can a new Board member be designated without a meeting, without a vote, and sign a backdated resolution to appoint counsel? Atty. Abesada never tries to justify the conflicted acts. There is no justification. Atty. Abesada never tries to explain the timing of his appointment as counsel. It does not stand up under scrutiny.

¶ 3. Plaintiffs ask this Court to focus on the underlying actions of Defendants, which lead them to shout "Fire" so loudly, when it is they who are burning down the house. The Board's conflicts— its self-dealing in the Asset Acquisition Agreement and improper liquidation without unanimous approval—voided its authority. *Auriga Capital Corp. v. Gatz Properties, LLC*, 40 A.3d 839, 843, 850 (Del. Ch. 2012), *aff'd, sub. nom. Gatz Properties, LLC v. Auriga Capital Corp., 59* A.3d 1206 (Del. 2013). In *Auriga Capital Corp*., the Delaware Chancery Court held that LLC managers owe default fiduciary duties of loyalty and care under equity principles and statutory defaults, unless the LLC agreement explicitly displaces those duties. Id. at 849-50; see also 6 Del. C. § 18-1104. The Chancery Court found breaches of such duties where the majority manager rejected a favorable third-party offer; misled minority members; and orchestrated a sham auction to acquire assets at a discount price, enriching himself at the expense of the LLC and its minority members. Auriga Capital, 40 A.3d at 843, 856-57, 870-71. These actions violated the

duty of loyalty and a contractual "entire fairness" standard requiring fair dealing and fair price in affiliate transactions. Id. at 851-52, 870. The Delaware Supreme Court affirmed on contractual grounds, upholding findings of bad faith and self-dealing, while noting that default fiduciary duties apply absent contrary provisions, and deeming the Chancery Court's broader discussion on defaults as dicta. *Gatz Properties, LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1213-14, 1216-17 (Del. 2013).

¶ 4.  The *Gatz* decision led to a 2013 amendment to 6 Del. C. § 18-1104, which explicitly confirmed that "in any case not provided for in this chapter, the rules of law and equity, including the rules of law and equity relating to fiduciary duties and the law merchant, shall govern." [2] Del. H.B. 126, 147th Gen. Assemb., § 8 (2013) (effective Aug. 1, 2013). This amendment resolved ambiguity by incorporating default fiduciary duties of loyalty and care via equity, unless modified, reinforcing contractual freedom while providing clarity. *See id.* (synopsis) (noting that absent contrary provisions, "these default fiduciary duties would apply as a matter of equity," and the agreement may not eliminate core elements of loyalty like good faith and fair dealing).  Cases post *Gatz* confirm these defaults unless disclaimed. *See Kyle v. Apollomax, LLC,* 987 F.Supp. 519, 524 (D.Del. 2013), *Cf. Allison v. Ericksson,* 479 Mass. 626 (2018) (Remedies where breach of fiduciary duty occurs are not constrained to the statutory right of distribution, and the trial court was within its discretion in fashioning an equitable remedy that amended the operating agreement.)

5. The First Circuit has cited the *Allison* case with approval. "The hallmark of equitable relief is its protean nature and - within wide limits – a court sitting in equity [as this Honorable Court sits] may tailor the relief to fit the circumstances of the particular court." *In re PHC, Inc., Shareholder Litigation,* 894 F.3d 419, 435 (1st Cir. 2018), *citing Allison,* 98 N.E. at 154; *Demalous v. Demalous,* 428 Mass. 555, 703 N.E. 2d 1149, 1169 (1998). The *PHC* Court continued: "Within

this remedial realm, it is standard fare for a court to fashion remedies that deny a breaching fiduciary undue gain received by virtue of this position." *In re PHC* at 435. Here, Plaintiffs ask this Court to find a remedy that the Operating Agreement authorizes.

¶ 6. The Board of Managers has breached its fiduciary duties. They have acted in their own best interests by fraudulently pocketing money from the liquidation and not the best interests of the Companies. They pretend without any basis to have hired counsel who has failed to defend the Companies. They have approved such counsel's filing a Rule 11 in violation of the rule itself in order to attempt to get this case dismissed because *they* agreed in the Asset Acquisition Agreement not to sue Banco Popular in exchange for their illegitimate payoffs. *See* Exhibit 4, Sections 2.9 and 2.10 and Section 3(c) at 17.[2.] Under the Asset Acquisition Agreement, Banco Popular receives a release of all claims by the Companies, to which the Plaintiffs and members did not agree. *See* Exhibit 4 at 17, Section 3(c). Banco Popular is not a party to the Asset Acquisition Agreement, yet it apparently inserted requirements on the Companies in the context of a liquidation that the members never unanimously approved as the Operating Agreement requires.

¶ 7. The Acquisition Price under the AAA is itemized in § 2.7 as three components: (i) $13,000,000 in partial *dación en pago* (a Spanish-civil-law mechanism by which a debtor satisfies part of a debt by transferring assets to the creditor) of the Popular Loan and the PCC Loans; (ii) a Cash Component of $4,465,966 payable to the Approving Members and to discharge identified trade-creditor accounts payable; and (iii) the Buyer's assumption of the Assumed Liabilities. *See* Ex. 4 § 2.7 (DocuSign Envelope ID 2A177EF1-CC9B-42AB-9117-FD78E1E11C63). The $4,465,966 Cash Component is distributed almost entirely to the Series A constituency — approximately $1,468,071 to Semillero (Mr. Borschow's investment vehicle); approximately $761,221 to VRM-Penzini; approximately $528,526 to PRFG; approximately $208,576 to

CDVCA; and approximately $230,804 to International Technical Services (the López Gómez family's engineering firm). The Founding Members — Plaintiffs Boyd and Lassers — receive $0. The asymmetry is structural, not incidental: AAA § 6.8 indemnifies the Buyer *only* for claims brought by Mr. Olmar López Vidal, his spouse Cristina Rios Mena, and their conjugal partnership. **No comparable indemnity protects any Boyd-side claim.** Ex. 4 § 6.8. The transaction was approved in part by a DocuSigned Written Consent of Member (Envelope ID 5F1EEE3B-A84C-487D-9665-015CD5737B73) executed February 6, 2025 by Mr. Olmar López Gómez and Vivian Vidal de López — one day before the February 7, 2025 closing.

¶ 8.   The contemporaneous documentary record establishes that the AAA was not unanimously approved and that the Companies' Members and the BGF Board majority formally objected before closing. On January 31, 2025 — the same day the AAA was executed — the majority of the Board of Managers of Biomass Green Fuels LLC, comprising Messrs. López Vidal and Boyd, signed a Board Resolution *objecting to the Asset Purchase Agreement and refusing to authorize transfer of BGF's assets, tax attributes, permits, or licenses*. *See* Ex. 5-A (January 31, 2025 BGF Board Resolution Denying Asset Purchase by VRMP). Mr. López Vidal, the Companies' President and CEO, had separately reduced his objection to writing on February 24, 2025. *See* Ex. 5-B (López Vidal Objection to APA dated February 24, 2025). And on February 6, 2025 — one day before the February 7, 2025 closing — Plaintiffs Boyd and Lassers issued a formal Cease and Desist letter to the Board of Managers and Members of GFC Holdings demanding that the transaction not proceed. *See* Ex. 5-C (February 6, 2025 Cease and Desist letter from Mr. Gregory Boyd and Mr. Jonathan Lassers to the Board of Managers and Members of GFC Holdings). Together, those three documents establish — on the contemporaneous record — that (i) the AAA was opposed by the Companies' President and CEO in writing; (ii) the BGF Board

majority formally refused to authorize the asset transfer; and (iii) the Founding Members put the entire group on notice before closing that the transaction was not unanimously approved as required. The AAA closed anyway, and the Series A constituency proceeded to distribute the $4,465,966 Cash Component to themselves while paying the Founding Members $0.

---

[2]  3.(c)Release of Banco Popular. Each of GFC and BGF hereby confirm and ratify their release of Banco Popular on behalf of themselves. their predecessors, successors, direct and indirect parent companies, direct and indirect subsidiary companies, companies under common control with any of the foregoing. affiliates, and assigns, and its and their past, present and future officers, directors, shareholders, interest holders, members, partners, attorneys, agents, employees, managers, representatives, assigns, and successors in interest and all persons acting by, through, under, or in concert with it, and each of them does hereby forever waive, release and discharge any and all claims (including without limitation, cross-claims, counterclaims, right to extinguish litigious credit, rights of setoff and recoupment), defenses, causes of action, demands, suits, costs, expenses and damages that it now has or hereafter may have, of whatsoever nature and kind, whether known or unknown, whether now existing or hereafter arising, whether arising at law or in equity (collectively, "Popular Claims"), against BPPR, its subsidiaries and affiliates, and each of their respective successors, assigns, officers. directors, employees, agents. attorneys and other representatives (collectively, the "Releasees"), based in whole or in part on facts, whether or not known, existing or occurring on or prior to the date of this Agreement, and agrees to hold the Releasees harmless from and against all such Popular Claims.

¶ 9.   The Board of Managers entered into that agreement knowing that the BHCA case could make the Companies whole. But they wanted to get paid, and destroying the Companies without recourse was the price for that payment. This action breached their fiduciary duties to the Companies. The so-called Board of Managers also directed counsel to seek the dismissal of this case because each of the members who voted in favor of the Asset Acquisition Agreement [which liquidated the Companies] is a Defendant in this case.

¶ 10.   Atty. Abesada and Banco Popular shrug all of this damning analysis as being drivel about an internal dispute among the owners of the Companies, not a coordinated plan to gift the Companies to the VRM parties and immunize Banco Popular from two valid federal claims and the other co-efendants from "just" the Racketeering Influenced and Corrupt Organization claims.

The Companies had in their hands a project that would reduce air pollution in Humacao by 90% and rendered substantial financial benefits to all parties. For that to happen, the members of the Companies needed to act properly towards the goal of building and operating the biorefinery. Banco Popular needed to play its fiduciary role and abstain from conditioning financing on below market terms. Sadly, neither of those things happened. The end result is Humacao RNG barely producing enough gas for BPPR because the bank and VRM conspired to exclude a viable operator.

¶ 11.   When Plaintiffs notified BPPR of the fraud being committed by the bank's co-defendants, the bank did nothing because the bank had been contributing to the fraud from day one in pursuit of the Companies' gas; the acceptance of conflicted relationships between owners of the Companies and the contractors for the project and those contractors not qualifying to perform the necessary work. At that point Plaintiffs did not know they were reporting a fire to the arsonist. When the Lopezes destroyed the carefully crafted settlement — VRM and the bank decided on the Asset Acquisition Agreement as a means to extract the bank from this case and usurp VRM's contract with the Plaintiffs. As detailed herein, that Asset Acquisition Agreement is fatally flawed, which opens the door for the Plaintiffs to recover all of the Companies assets in federal court..

¶ 12.   Plaintiffs very respectfully ask this Court to recognize the Members' Resolution because it is in the best interest of the Companies and to deem the Board of Managers' actions null and void because such actions are the product of their breaches of fiduciary duties.

¶ 13. The Board's approval of the AAA — by Managers whose principals (VRM, Borschow, Semillero, PRFG/CDVCA) were the AAA's economic beneficiaries — breached every component of the fiduciary duty owed to the Companies under both Puerto Rico law and the parallel Delaware authority on which this Court routinely draws. First, the approving Managers breached the duty of loyalty. Under Puerto Rico law, an interested-manager transaction is voidable

unless cleansed by (a) informed disinterested-manager approval, (b) informed disinterested-Member approval, or (c) proof that the transaction was *justo y razonable* to the Company at the time of approval. 14 L.P.R.A. § 3565 (Art. 4.05 PR Gen. Corps. Act of 2009); *see also* 14 L.P.R.A. § 3564 (Art. 4.04, duty of loyalty). PR LLC managers are subject to these same fiduciary duties by judicial application of common-law fiduciary principles, modeled on Delaware practice. See Auriga Capital Corp. v. Gatz Properties, LLC, 40 A.3d 839, 849–53 (Del. Ch.), aff'd, 59 A.3d 1206 (Del. 2012). The Delaware analog is 8 Del. C. § 144 and the *Guth v. Loft* line. *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). For LLCs, default fiduciary duties apply absent contrary OA provision. *Auriga Capital Corp. v. Gatz Properties, LLC*, 40 A.3d 839, 849–53 (Del. Ch.), *aff'd*, 59 A.3d 1206 (Del. 2012).

Second, the AAA constitutes corporate waste. The Cash Component of $4,465,966 to insiders — paid against transfer of substantially all of the Companies' assets, including the $19 million BHCA tying claim — is "so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 74 (Del. 2006); *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. 1997).

Third, the approving Managers' refusal to consider Plaintiffs' competing offers and their failure to investigate VRM's affiliate-counterparty status constitute bad-faith oversight failure under the *Caremark / Stone v. Ritter* line. *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 970 (Del. Ch. 1996); *Stone v. Ritter*, 911 A.2d 362, 369–70 (Del. 2006); *Marchand v. Barnhill*, 212 A.3d 805, 821 (Del. 2019). Bad-faith breaches cannot be exculpated. 8 Del. C. § 102(b)(7).

Fourth, the sale-of-all-assets framework required disinterested-Member approval. 8 Del. C. § 271 (corporate analog); 6 Del. C. § 18-302 (Delaware LLC analog). No such approval was

obtained, and OA § 4.3 makes Member-level Majority Approval the operative authorization standard for any matter subject to Member vote.

¶ 14. Federal RICO law's broad remedial purpose under 18 U.S.C. § 1964(c) reinforces these conclusions. The Supreme Court in *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985), confirmed that "legitimate" enterprises enjoy no inherent incapacity for criminal activity nor immunity from RICO's consequences. Any reliance on OA § 6.1(a) — vesting the Board with "the full, absolute and exclusive right, power and authority to manage the Company" — ignores both the OA's introductory limiter ("[e]xcept as otherwise expressly required under this Agreement (including, without limitation, section 4.2(j))") and the controlling principle that a Board controlled by self-interested fiduciaries lacks authority to bind the entity in transactions adverse to the entity's interests. *See* 14 L.P.R.A. § 3565; *Auriga Capital*, 40 A.3d at 849–53.

¶ 15.  Against that backdrop, Atty. Abesada-Agüet seeks the remedy of Rule 11 sanctions based on Plaintiffs' efforts to assert derivative governance authority and to challenge Atty. Abesada-Agüet's authority to appear on behalf of BGF and GFC. It is Atty. Abesada-Agüet who is ethically challenged, his appointment apparently arranged by VRM, Banco Popular and Borschow, the very parties that engineered the improper transfer of the Companies' assets so that Banco Popular could escape liability and still continue to access below-market renewable natural gas prices and multiple tax incentives. Nor does it escape our attention that VRM is now the owner of Island Finance, formerly a Banco Popular entity. The motion fails legally, procedurally, and factually:

¶ 16.  Plaintiffs have not filed a frivolous case. With respect to Atty. Abesada's specific grievance, Plaintiffs filed a RICO-governance dispute founded on well settled law, not even a good faith extension of existing law. Rule 11 was not designed to adjudicate those issues, and BPPR's

and RNG Humacao's dissatisfaction with Plaintiffs' refusal to capitulate does not constitute sanctionable conduct. Defendants' rush to rid themselves of these Plaintiffs has entangled them further. If the VRM Defendants were not scrambling to avoid Plaintiffs' refusal to acquiesce to the consequences of their invalid sale, they probably would not have nominated an "board member" so obviously and so closely aligned with Humacao RNG's principals to act in their stead while directly conflicted in the sale of the company's assets to themselves. This is particularly true given that there is no evidence of Atty.Feliciano obtaining the title of Board member: no meeting, no vote, no nothing until a Board Resolution purportedly dated March 21, 2025 was transmitted by Ms. Carla S. Pérez on April 1, 2025. *See* Ex. 5-D.

¶ 17.  The Feliciano and Goytía board designations referenced in the preceding paragraph were announced by Mr. Borschow in his March 31, 2025 email, *see* Ex. 5-E (2025-03-31 Borschow email Closing and Board Designations), one day before Ms. Carla S. Pérez transmitted the March 21, 2025 Board Resolution on April 1, 2025, *see* Ex. 5-D, and seven days after Atty. Abesada filed his Notice of Appearance for the Companies in *Boyd v. López-Vidal*, No. 3:22-cv-01190-GMM, ECF No. 644 (D.P.R. Mar. 24, 2025). The chronology — January 31 AAA execution; March 21 backdated Resolution; March 24 Abesada Notice of Appearance and López Vidal email asking who authorized the engagement, *see* Ex. 5-F; March 31 Borschow designation email; April 1 Pérez transmittal — establishes that the "board designations" followed rather than authorized the captured-counsel arrangement.

¶ 18.  Atty. Juan E. Goytia's revolving-door placement is itself documentary. He served as Manager, Loss Mitigation — Mortgage Servicing Division of Banco Popular de Puerto Rico from January 2023 through February 2025 — the BPPR division responsible for managing distressed commercial credits, including the Companies' Credit Agreement default. He resigned from BPPR

in February 2025, one month after the January 31, 2025 execution of the Asset Acquisition Agreement that transferred substantially all the Companies' assets to Humacao RNG. Two months after leaving BPPR, on March 31, 2025, Mr. Borschow designated Atty. Goytia to the GFC Holdings Board alongside Atty. Feliciano. *See* Ex. 5-E. In May 2025, Atty. Goytia took an Executive Vice President position at Sunvida. The chronology — BPPR Loss-Mitigation Manager (Jan. 2023 – Feb. 2025) → GFC Board designee (Mar. 31, 2025 – present) → Sunvida Executive Vice President (May 2025 – present) — places one of the two purported Board members who authorized Atty. Abesada's appointment directly within BPPR's mortgage-default-management apparatus until weeks before that authorization.

¶ 19.   Atty. Abesada-Agüet, the attorney whom Mr. Borschow and VRM's designee Feliciano purported to appoint, has represented Banco Popular repeatedly. His Commonwealth Court litigation practice consists of approximately 250 cases, all the while he certifies to the federal court in *Office of Police Reform*, No. 12-2039 (JAG), that he is paid $16,000 monthly - for time not billed hourly. *See* Exs. 2 & 6.

¶ 20.   Plaintiffs allege that BPPR and its co-defendants engaged in a pattern of racketeering activity involving the acquisition, control, foreclosure, neutralization, and transfer of BGF and GFC assets and claims, including coordinated litigation conduct, governance manipulation, obstruction-related conduct, suppression of corporate claims, and the use of litigation control to prevent BGF and GFC from pursuing affirmative recovery. *See* Compl. ¶¶ 47-54, 80-87, 115-116, 230, 943-948 (ECF No. 1). Whether Plaintiffs ultimately prevail on those theories is a merits question. It is not, in any way, shape, or form, sanctionable conduct.

## III. ATTY. ABESADA-AGÜET FAILED TO COMPLY WITH RULE 11(c)(2)'S MANDATORY SAFE-HARBOR

ECF No. 49 must be denied for five independent reasons. **First**, Atty. Abesada-Agüet failed to comply with Rule 11(c)(2)'s mandatory safe-harbor, and separate-motion — a procedural defect that is alone dispositive under *Triantos*. **Second**, the motion improperly attempts to convert sharply disputed merits questions — derivative authority, LLC governance, conflicts of interest, and litigation control — into a collateral sanctions proceeding. **Third**, Plaintiffs possess substantial factual and legal grounds for their positions, including Atty. Abesada-Agüet's invalid appointment, the June 2, 2025, Irrevocable Proxy, the GFC Operating Agreement's textually reserved member powers, derivative-standing doctrines, fiduciary-conflict principles, and Atty. Abesada-Agüet's documented concurrent representation of BPPR. **Fourth**, ECF No. 49 materially overstates the preclusive effect of prior District Court rulings, none of which adjudicated the operative Irrevocable Proxy. **Fifth**, Atty. Abesada-Agüet fails to disclose his longstanding and contemporaneous representation of BPPR and the basis for his own appointment. Each ground is independently dispositive. The discussion that follows addresses them in turn.

The contrast on the safe-harbor point is stark. Other counsel actively moving against Plaintiffs in this very docket complied with Rule 11(c)(2)'s safe-harbor requirements. Attorney Alfredo Fernández-Martínez (Delgado & Fernández LLC, for Humacao RNG, VRM-Penzini) served his Rule 11(c)(2) safe-harbor letter and proposed motion on April 10, 2026. Attorneys María D. Trelles-Hernández and María Elena Martínez Casado (Pietrantoni Méndez & Álvarez LLC, for BPPR and CEO Javier Ferrer) served their Rule 11(c)(2) safe-harbor letter and 24-page draft sanctions motion on April 16, 2026. Atty. Abesada-Agüet served nothing. That asymmetry is not accident or oversight — it is a deliberate procedural shortcut that Rule 11(c)(2) does not permit.

The sanctions request herein is embedded within broader opposition briefing concerning representation and corporate governance disputes. The First Circuit reaffirmed these safe-harbor principles in *Triantos v. Guaetta & Benson, LLC*, 91 F.4th 556 (1st Cir. 2024), reversing a Rule 11 sanctions award for the very procedural defects Atty. Abesada commits. *See also Lamboy-Ortiz v. Ortiz-Vélez*, 630 F.3d 228, 245-46 (1st Cir. 2010) (vacating Rule 11 sanction where movant failed to serve separate sanctions motion twenty-one days before filing) The *Triantos* court explained that the safe-harbor provisions provide a "safe harbor" for attorneys, law firms, or parties accused of sanctionable conduct, *id.* at 561, and that these requirements "are mandatory rather than suggested." *Id.* Specifically, "a party seeking sanctions must follow a two-step process": "[t]he party seeking sanctions must serve the [Rule 11] motion on the opposing party at least twenty-one days before filing the motion with the district court, and [second,] sanctions may be sought only if the challenged pleading is not withdrawn or corrected within twenty-one days after service of the motion." *Id.* (quoting *Ridder v. City of Springfield*, 109 F.3d 288, 294 (6th Cir. 1997), and *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 389 (4th Cir. 2004) (en banc)). "[I]nformal notice is not a substitute" for service of the actual motion. *Triantos* at 563. Rule 11 "sets forth inflexible rules governing the circumstances under which Rule 11 sanctions may be sought and granted." *Id.* at 564 (quoting *Brickwood*, 369 F.3d at 394).

Applied here, Atty. Abesada-Agüet filed ECF No. 49 on April 28, 2026; he served no Rule 11(c)(2) notice or proposed motion on Plaintiffs at any time during the 21 days preceding that filing. The safe-harbor defect is dispositive and warrants denial of ECF No. 49 with prejudice on that ground alone.

## IV. GOVERNING RULE 11 STANDARD

Rule 11 sanctions are extraordinary remedies reserved for filings that are objectively unreasonable at the time submitted. "Sanctions under Rule 11 should not be imposed … so as to 'chill an attorney's enthusiasm or creativity in pursuing factual or legal theories.'" ; *Cruz v. Savage*, 896 F.2d 626, 631 (1st Cir. 1990) *citing* the Advisory Notes to Rule 11.

The inquiry is whether counsel conducted an objectively reasonable investigation and possessed a non-frivolous basis for the challenged filing at the time it was submitted. Rule 11 does not authorize sanctions merely because a legal position is disputed, novel, ultimately unsuccessful, or contrary to a prior district court ruling. Rule 11 expressly permits non-frivolous arguments seeking the extension, modification, or reversal of existing law. Fed. R. Civ. P. 11(b)(2). That principle is especially important in complex RICO and derivative-governance litigation involving evolving factual records and active appellate proceedings.

Rule 11 is, moreover, a deterrent rule, not a prevailing-party fee-shifting mechanism. The First Circuit affords "extraordinary deference" to a district court's decision *not* to impose sanctions where challenged contentions, though unpersuasive, are not patently frivolous. *CQ Int'l Co. v. Rochem Int'l, Inc., USA*, 659 F.3d 53, 60 (1st Cir. 2011). The *CQ Int'l* case held that the "Rule 'is not a strict liability provision, and a showing of at least culpable carelessness is required before a violation of the Rule can be found.'" *citing Citibank Global Mkts., Inc. v. Santana,* 573 F.3d 17, 32 (1st Cir. 2009) (alteration omitted by the *CQ Int'l* Court)

The First Circuit's caution is well-captured by the District of Massachusetts in *Anaqua, Inc. v. Schroeder*, which denied Rule 11 sanctions on facts far more colorable than those alleged here. The court observed that Rule 11 is a "potent weapon," and so "a judge should resort to [sanctions] only when reasonably necessary — and then with due circumspection." *Anaqua, Inc. v. Schroeder*, No. 12-10710-FDS, 2014 U.S. Dist. LEXIS 22078, at *8 (D. Mass. Feb. 21, 2014) (R. & R.),

*adopted*, No. 12-10710-FDS, 2014 U.S. Dist. LEXIS 61993 (D. Mass. May 5, 2014) And "[t]he mere fact that a claim ultimately proves unavailing, without more, cannot support the imposition of Rule 11 sanctions." *CQ Int'l*, 659 F.3d at 60.

Arguments that seek to apply the law are not sanctionable under Rule 11(b)(2). *See Protective Life Insurance v. Dignity Viatical Settlement Partners,* 171 F.3d 52, 57 (1ˢᵗ Cir. 1999).

## V. ECF NO. 49 SEEKS MERITS ADJUDICATION DISGUISED AS SANCTIONS

Rule 11 is a procedural deterrent. It is not a vehicle for adjudicating disputed corporate-control issues, and the relief ECF No. 49 actually seeks is unavailable through Rule 11 as a matter of law. The motion before this Court seeks relief that substantially resembles merits adjudication. Questions concerning proxy authority, derivative standing, LLC governance, fiduciary conflicts, and counsel authority are merits issues requiring ordinary adjudication and evidentiary development. Rule 11 is not a substitute for that process.

Federal district courts have consistently refused to entertain Rule 11 motions deployed in this manner. *See, e.g., Novitsky v. TransUnion LLC*, No. 2:23-cv-04229-SPG-MAR, 2025 U.S. Dist. LEXIS 81891, at *5-7 (C.D. Cal. Mar. 14, 2025) (collecting authorities and holding that a Rule 11 motion for sanctions "is not an appropriate substitute for summary judgment proceedings" and "should not be used to test the legal sufficiency of a party's claims"). Deploying Rule 11 as a substitute for Rule 12 or Rule 56 "fully realizes the Supreme Court's stated concern that Rule 11 motions spawn satellite litigation and chill vigorous advocacy." *Bell v. Nat'l Credit Servs. Inc.*, No. 2:19-cv-01727 RAJ-BAT, 2020 WL 8832899, at *7 (W.D. Wash. Oct. 14, 2020) (quoting *Cooter &amp; Gell*, 496 U.S. at 393). The Magistrate Judge in *Anaqua* identified the same pathology that ECF No. 49 exemplifies: a Rule 11 motion that "appears to have devolved into

exactly the type of satellite litigation against which the First Circuit has warned." *Anaqua*, 2014 U.S. Dist. LEXIS 22078, at *16 n.11.

## VI. THE § 1927 ALTERNATIVE FAILS FOR INDEPENDENT REASONS

Defendants invoke 28 U.S.C. § 1927 as an alternative basis for sanctions. Section 1927 imposes liability only on counsel whose conduct "multiplies the proceedings . . . unreasonably and vexatiously." The First Circuit has been emphatic that § 1927 does not apply to "[g]arden-variety carelessness," *Lamboy-Ortiz*, 630 F.3d at 245, and that the statute is reserved for serious misconduct. Plaintiffs have carefully and methodically presented their arguments. Atty. Abesada-Agüet was not appointed by the members of the Companies. Even if he were, Alexander Borschow's improper conduct in accepting the liquidation of the Companies in exchange for compensation for his company Semillero Partners forever excluded him from pretending to represent the Companies' interests. With the only remaining member of the Board of Managers — other than López Vidal, who opposed the appointment of Javier Feliciano — disqualified from serving on the Board, the only way new members could have been integrated into the Board of Managers would have been for López Vidal to select and confirm them.

Independently, § 1927 authorizes only an award of "excess costs, expenses, and attorneys' fees reasonably incurred." 28 U.S.C. § 1927. As with Rule 11(c)(4), the statute does not authorize dismissal of an underlying motion, vacatur of an answer, or modification of pleading schedules. The relief Atty. Abesada requests is unavailable under § 1927 for the same reason it is unavailable under Rule 11. For these procedural and remedial reasons alone, ECF No. 49 must be denied. The substantive deficiencies addressed in Sections VII through XI below provide independent and additional grounds for denial.

## VII. PLAINTIFFS POSSESS A SUBSTANTIAL BASIS FOR THEIR POSITIONS

**A. June 2, 2025, Irrevocable Proxy Consolidates Majority Voting Control in Plaintiffs.**

On June 2, 2025, the Founding Members' Manager Olmar López-Vidal executed an Irrevocable Proxy in favor of Boyd and Lassers, coupled with an interest under 8 Del. C. § 212(e) (applied by analogy to LLCs), 6 Del. C. § 18-302, and 14 L.P.R.A. § 3956(b) (Puerto Rico LLC Act authorizing proxies coupled with an interest); see also In re First Bancorp Derivative Litig., 465 F. Supp. 2d 112, 117–18 (D.P.R. 2006). Together with the May 27, 2025, Settlement Agreement, the Proxy consolidates 55.493% majority voting control of GFC in Boyd, Lassers, and the López-Vidal-aligned founders. *See* Ex. 7; Compl. Exs. 14, 15; Compl. ¶¶ 47-54, 80-87, 115-116.

The Irrevocable Proxy has not been adjudicated by any court. The August 12, 2025, ruling at Dkt. No. 800 addressed only the validity of a separate June 24, 2025, Written Consent under OA § 11.3 procedural grounds. The December 22, 2025, ruling at ECF No. 131 addressed Article III standing under Rule 12(b)(6). The March 18, 2026, ruling at ECF No. 874 addressed Rule 12(b)(1) and 12(b)(6) threshold defects on the Second Amended Complaint. None of those three rulings adjudicated the legal effect of the June 2, 2025, Irrevocable Proxy. Plaintiffs' good-faith invocation of the Proxy as the operative authority basis in this action is not foreclosed by orders that did not consider it.

Plaintiffs conducted a substantial factual and legal investigation before filing the instant Complaint. Counsel reviewed the GFC Operating Agreement, including governance, voting, management, and derivative-rights provisions; the June 2, 2025 Irrevocable Proxy documents and related settlement materials (Ex. 7); the procedural history and rulings in Civil Nos. 22-1190 and

24-1569; the pending First Circuit appeals (Nos. 26-1357 and 26-1424); the Puerto Rico Limited Liability Company Act; and the First Circuit's derivative-governance jurisprudence.

Plaintiffs relied on fiduciary principles recognizing that individuals accused of wrongdoing cannot automatically invoke corporate authority to extinguish claims directed at their own alleged misconduct. *In re PHC, Inc. Shareholder Litigation*, 894 F.3d 419 (1st Cir. 2018), and *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304 (3d Cir. 1993). Defendants themselves invoke *Bolger*. That decision recognizes a fact-specific framework under which joint representation of an entity and individuals connected to its alleged misconduct becomes inappropriate when their interests diverge. *Id.* at 1316-17. The record here — Atty. Abesada's purported appointment by the conflicted Borschow with Atty. Feliciano materializing on a signed resolution where there had been no meeting announced; no meeting held; and no vote held appointing him. *See* Ex. 5 (López-Vidal Declaration).

Atty. Abesada's longstanding representation of BPPR, his contemporaneous appearances in BPPR matters, and the alignment of his litigation positions with BPPR's interests — supplies precisely the divergence *Bolger* identifies as triggering the need for independent counsel.

Even assuming arguendo that the Court ultimately rejects Plaintiffs' legal positions, Rule 11 does not authorize sanctions merely because a litigant advances an unsuccessful theory. The First Circuit has long held that Rule 11 cannot be deployed to penalize positions resting on a colorable factual and legal basis. *See Navarro-Ayala v. Hernandez-Colon*, 3 F.3d 464, 466-67 (1st Cir. 1993) (Breyer, C.J.) (reversing a Rule 11 sanction imposed in the District of Puerto Rico where the challenged motion was grounded in a reasonable reading of prior precedent: "the object of Rule 11's inquiry requirement is to avoid filings that are baseless"); *accord Cruz v. Savage*, 896 F.2d at 631-32.

## VIII. PRIOR DISTRICT COURT RULINGS DO NOT RENDER PLAINTIFFS' POSITIONS SANCTIONABLE

Atty. Abesada contends that prior District Court rulings conclusively foreclosed Plaintiffs' positions. That characterization materially overstates the procedural posture and legal effect of those rulings. First, both orders are on appeal. Second, the cited orders are jurisdictional and procedural rulings, not adjudications on the merits. The December 22, 2025, Opinion was Rule 12(b)(6) dismissal grounded on Article III standing. August 12, 2025, Order denied the undersigned's effort to disqualify Atty. Abesada. The March 18, 2026, dismissal at ECF No. 874 rests predominantly on jurisdictional grounds (RICO standing, Article III, and absence of a private right of action against aiders and abettors). A dismissal for lack of jurisdiction is not on the merits and does not bar a later action. *Costello v. United States*, 365 U.S. 265, 285 (1961) (case dismissed for lack of an affidavit could be refiled).

Third, none of the cited orders adjudicated the June 2, 2025, Irrevocable Proxy that supplies the independent authority basis for Plaintiffs' motion at ECF No. 41. Each cited order ruled on the validity of June 24, 2025, Written Consent — not the operative instrument before this Court. The Irrevocable Proxy predates every cited order but was never presented to any of those courts.

Beyond these grounds, Plaintiffs rely on subsequent governance developments, and Rule 11 expressly permits parties to argue for reconsideration, modification, or reversal of existing law. Fed. R. Civ. P. 11(b)(2). A litigant does not become sanctionable merely because prior District Court rulings rejected related arguments. If that were the standard, appellate practice itself would be sanctionable.

The doctrinal distinction matters. An adverse ruling is not preclusion, nor would preclusion justify sanctions. Even where prior rulings might ultimately prove persuasive or preclusive on the

merits, Rule 11 sanctions still require objective frivolousness *at the time of filing* — not subsequent legal disagreement, not subsequent unfavorable rulings, and not subsequent appellate posture. *See* Fed. R. Civ. P. 11(b); *Cruz v. Savage*, 896 F.2d at 631-32. Atty. Abesada conflates all three concepts.

## IX. THE RECORD SUPPORTS PLAINTIFFS' CONFLICT AND CAPTURED-COUNSEL CONCERNS

Two presently-active BPPR representations — the federal Catala-Del Valle matter (Notice of Appearance entered April 24, 2026, four days before Atty. Abesada signed ECF No. 49) and the Court of First Instance mortgage foreclosure Banco Popular de P.R. v. [Defendant], No. SJ2025CV07110, with public auctions noticed for April 20, April 27, and May 4, 2026 — are alone sufficient to defeat ECF No. 49. The chronology of Atty. Abesada's representation and compensation by BPPR is directly relevant to the reasonableness of Plaintiffs' conflict concerns and to Plaintiffs' challenge to his authority to appear on behalf of BGF and GFC in litigation directly adverse to BPPR. Representative federal court matters include actions involving BPPR and its affiliate Popular Auto, Inc. See, e.g., *Popular Auto, Inc. v. Reyes-Colón*, 922 F.3d 13 (1st Cir. 2019) (Abesada firm appearing for Popular Auto in consumer-finance litigation); *Reyes-Colón v. Banco Popular de P.R.*, 110 F.4th 54 (1st Cir. 2024) (Abesada firm appearing for BPPR in mortgage-foreclosure dispute). The full chronology of these representations — including the Catala-Del Valle proceeding filed April 6, 2026, in which Atty. Abesada-Agüet entered a Notice of Appearance for BPPR on April 24, 2026 Docket 9, just four days before he signed ECF No. 49, and the active Banco Popular de P.R. v. [Defendant] mortgage-foreclosure at No. SJ2025CV07110 (T.P.I. San Juan), with public auctions noticed for April 20, April 27, and May 4, 2026 — is set forth in Ex. 2 (Docket-Citation Appendix), which catalogues twenty-six federal-court and fifteen

Puerto Rico local-court matters in which Atty. Abesada-Agüet has appeared for BPPR. Plaintiffs

identified, on the public dockets, the following representative matters:

| Case / Forum | Role | Time Period | Relevance |
|---|---|---|---|
| Multiple foreclosure and collection proceedings in P.R. courts | Counsel for BPPR | ≈ 17 years | Documented long-standing attorney-client relationship |
| Bankruptcy-related proceedings | Counsel for BPPR-related interests | Multiple years | Continuing representation of BPPR financial interests |
| Puerto Rico appellate matters | Counsel for BPPR | Multiple years | Sustained litigation alignment with BPPR |
| *Catala-Del Valle et al. v. NSSK San Juan, LLC*, No. 3:26-cv-01205-JAG (D.P.R.) | Counsel for BPPR | Apr. 24, 2026 NoA (Doc 9) | Atty. Abesada-Agüet entered Notice of Appearance for BPPR (Doc 9; Ex. 1) on Apr. 24, 2026 in a case filed Apr. 6, 2026 — just four days before he signed and filed ECF No. 49 in this action against the Plaintiffs |
| *Banco Popular de P.R. v. [Defendant]*, No. SJ2025CV07110 (T.P.I. San Juan) (mortgage foreclosure) | Counsel for BPPR (per published edictos) | Public auctions Apr. 20, Apr. 27, May 4, 2026 | Concurrent BPPR representation in active T.P.I. mortgage-foreclosure proceeding with three public auctions noticed in the weeks immediately surrounding ECF No. 49 |

The litigation record also reflects repeated filings by BPPR's attorney at PMA directly

supporting, reinforcing, or aligning with Atty. Abesada's positions:

| Filing | Description | Relevance |
|---|---|---|
| Mem. in Opp'n to Motion to Eliminate Attorney Abesada, Dkt. No. 757 (July 2025), *Boyd v. BPPR*, 3:22-cv-01190 | BPPR Joinder opposing Plaintiffs' motion to eliminate Abesada | BPPR affirmatively supported Abesada's continued authority |
| Supplemental Mem. in Opp'n to Motion to Eliminate Attorney Abesada, Dkt. No. 776 (July 2025), 3:22-cv-01190 | BPPR Supplemental Joinder reaffirming opposition to disqualification | Reinforced BPPR's alignment |
| Reply in Support of Motion to Dismiss, Dkt. No. 31 (2024), *Boyd v. BPPR*, 3:24-cv-01569 | BPPR reply supporting standing-based dismissal | Continued standing challenge to GFC/BGF participation |
| Mem. in Further Support of Motion to Dismiss, Dkt. No. 42 (2024), 3:24-cv-01569 | BPPR additional briefing supporting standing-based dismissal | Expanded and reinforced standing attack |
| Mem. Regarding GFC Standing, Dkt. No. 113 (2025), 3:24-cv-01569 | BPPR continued standing-focused briefing | Continued effort to exclude or limit GFC/BGF claims |
| Mem. Regarding GFC Standing (Additional), Dkt. No. 115 (2025), 3:24-cv-01569 | BPPR additional standing briefing | Continued alignment with positions adverse to GFC/BGF |
| Civil No. 3:24-cv-01569, ECF Nos. 117 & 127 (2025) | BPPR final filings in standing-based dismissal sequence | Directly preceded December 22, 2025 dismissal of GFC/BGF as plaintiffs |
| Informative Motion to Correct Inaccuracies, Appeal No. 26-1357 (1st Cir., May 7, 2026) | BPPR Informative Motion arguing GFC/BGF should not appear as Plaintiffs-Appellants because Abesada represents them | BPPR expressly relied on Abesada's asserted authority over GFC/BGF; acknowledged relatedness of 22-1190, 24-1569, and 26-1066 |

Taken together, these charts depict a litigation pattern no reasonable litigant in Plaintiffs' position could disregard. Atty. Abesada has represented BPPR continuously for more than twenty years (2006 through 2026) and has continued to appear for BPPR-related interests in 2025 and

2026 — at the same time that he purported to represent BGF and GFC against BPPR. BPPR itself filed multiple joinders and supporting briefs reinforcing his positions across related federal cases. That record supplied a substantial, non-frivolous basis for Plaintiffs' belief that BGF and GFC litigation authority was being exercised in alignment with BPPR's interests rather than for the benefit of the Companies. Whether the Court ultimately credits that inference is a merits question. Its objective reasonableness defeats Rule 11.

The May 7, 2026, Informative Motion filed by Banco Popular de Puerto Rico in Appeal No. 26-1357 is particularly revealing. In that filing, BPPR expressly invoked Atty. Abesada's purported authority to represent GFC Holdings, LLC and Biomass Green Fuels, LLC, stating that those entities "are represented by counsel Roberto Abesada, Esq, as the District Court record shows, not by Mr. Boyd's and Mr. Lassers' attorneys." BPPR Informative Motion at 4, Appeal No. 26-1357 (1st Cir. May 7, 2026). At the same time, BPPR characterized Civil Nos. 22-1190, 24-1569, and the present action (No. 26-1066) as interrelated proceedings involving overlapping factual and legal issues. Notably, Atty. Abesada had neither entered an appearance in Appeal No. 26-1357 nor objected to Ms. Becker-Whitaker's appearance on behalf of the Companies in that appeal. That BPPR's counsel would file an informative motion affirmatively endorsing the authority of an attorney who has not appeared in the appellate proceeding — while simultaneously seeking to exclude the Companies from the caption — illustrates the extent to which Atty. Abesada's representation is being directed by, and is aligned with, the interests of BPPR rather than those of GFC and BGF.

The captured-counsel concerns above are confirmed by the June 19, 2025 letter from Picó Advisors LLC to undersigned counsel, deployed by Atty. Abesada into the federal record at *Boyd v. López-Vidal*, No. 3:22-cv-01190-GMM, ECF No. 751-1 (D.P.R.). *See* Ex. 5-G (Picó

Threatening Letter dated June 19, 2025). The letter's opening sentence is a documentary admission that it was issued at Atty. Abesada's direction: Picó Advisors LLC writes that it issues the letter "on behalf of GFC Holdings Limited Liability Company . . . as its corporate counsel and **pursuant to a request from Attorney Roberto Abesada, Esq.**, the Company's litigation counsel, and the Company's Board of Managers." Ex. 5-G at 1 (emphasis added). The letter then directs express threats of "civil and criminal liability" at the Companies' own Members for the act of asserting their § 3.2 written-consent rights — *see id.* at 1–2 ("any action intended to mislead a third-party into believing otherwise and to cause such third-party to act in reliance thereon is a fraudulent misrepresentation, for the consequences of which the persons making the misrepresentation will be wholly liable under applicable civil and criminal law"); *id.* at 2 ("any contrary assertions by individual members have no effect under the Operating Agreement and may expose any members making such assertions to civil and criminal liability") — supplying independent predicates under 18 U.S.C. § 1512(b)(1) (witness tampering) and 18 U.S.C. § 1503 (obstruction of justice). *See United States v. Aguilar*, 515 U.S. 593, 599 (1995). The District Court relied on the letter at Mem. & Order, *Boyd v. López-Vidal*, No. 3:22-cv-01190-GMM, Dkt. No. 800 at 6, 18 (D.P.R. Aug. 12, 2025).

The size of the exposure in SJ2024CV07694 illuminates the cost of Atty. Abesada's defensive posture: the Commonwealth plaintiffs — themselves defendants in this federal action — seek approximately $223 million from the Companies (and the López defendants) across ten causes of action, including direct money judgments of $110,000 against BGF on the Ninth Cause and $280,937 against GFC on the Tenth Cause, the latter being the very indemnification stream that funds Mr. Borschow's defense in this RICO matter. *See infra*, § X.E.

## X. THE COMMONWEALTH CONTROVERSIES IN SJ2024CV07694 CONFIRM THE INVERSION AT THE PLEADING LEVEL.

The limited Rule 11 inquiry here is whether Plaintiffs' conflict and captured-counsel beliefs are objectively reasonable. The Commonwealth Controversies and illiquidity admissions catalogued below establish that they are.

The conflict documented in subsections X above is mirrored, at the pleading level, in a parallel Commonwealth (Puerto Rico) trial-court action. That action is captioned *VRM Penzini Fund I, LLC – Renewable Series II v. López Vidal*, Civil No. SJ2024CV07694, filed in the Sala Superior of San Juan of the Puerto Rico Court of First Instance in August 2024. The plaintiffs in that Commonwealth action are VRM-Penzini Fund I, LLC – Renewable Series II; Semillero Partners, LLC; Semillero Investment Fund I, LLC; and Mr. Alexander Borschow individually. Each of those four Commonwealth plaintiffs is also a *defendant* in this federal RICO action. The defendants in the Commonwealth action are Mr. Olmar López Vidal, his father Mr. Olmar López Gómez, GFC Holdings, LLC, and Biomass Green Fuels, LLC — meaning the Companies that Atty. Abesada purports to represent in this Court are being sued directly, in the parallel Commonwealth court, by the same parties he represents as defendants here. The Commonwealth complaint (in Puerto Rico practice, the "Demanda") spans 172 numbered paragraphs across 34 pages and asserts ten distinct causes of action, seeking aggregate relief of approximately $223 million. Complaint, *VRM Penzini Fund I, LLC v. López Vidal*, No. SJ2024CV07694, Docket 1, at 33–34 (P.R. T.P.I., Superior Court San Juan filed Aug. 21, 2024) [hereinafter Complaint]. *See* Ex. 5-H (Complaint).

Six of the ten causes of action are directed at the López defendants individually, but the remaining four causes seek direct money judgments against the Companies themselves on stand-

alone contractual theories — they are not derivative claims, and they are not claims merely incidental to the dispute between the investors and the López defendants. They are direct claims by the plaintiff investors against the Companies, on contracts the Companies signed. The four direct claims are: (i) the First Cause, against GFC, for breach of a Convertible Note Purchase Agreement dated April 12, 2023, Claim ¶¶ 107–11; (ii) the Eighth Cause, against GFC, for breach of a Pre-Organization Non-Transferable Warrant to Purchase Equity Securities, *id.* ¶¶ 153–57; (iii) the Ninth Cause, against BGF, for $110,000 under an Advisory Services Agreement dated September 14, 2020, *id.* ¶¶ 158–62; and (iv) the Tenth Cause, against GFC, for $280,937 under an Indemnification Agreement and an Undertaking to Repay Advancement of Legal Expenses, *id.* ¶¶ 163–72. The Tenth Cause is structurally central to the conflict at issue here: the Commonwealth plaintiffs allege, in their own words, that the contractual obligation GFC owes is to pay Mr. Borschow's legal fees in this federal RICO case. *Id.* ¶ 168. The Companies that Atty. Abesada purports to represent in this Court are therefore being sued in the Commonwealth court for money they owe to fund Mr. Borschow's defense here — and the lawyer doing that suing is being paid by the same indemnification stream he claims to be defending against.

Until December 2024, the Companies were represented in the Commonwealth action by Atty. Guillermo Ramos Luiña (R.U.A. 8394) of Despacho Jurídico Ramos Luiña, LLC. On December 2, 2024, Atty. Ramos Luiña filed a motion to remove the Companies from the lawsuit on the ground that they were improperly joined with the López defendants. Defs.' Moción para que se Eliminen Partes Indebidamente Acumuladas, *VRM Penzini Fund I, LLC v. López Vidal*, No. SJ2024CV07694, SUMAC #30 (P.R. T.P.I. filed Dec. 2, 2024) [hereinafter Ramos Luiña Severance Mot.]. That severance motion is the posture a non-conflicted lawyer takes for clients facing exposure of this size: it framed the Companies as *victims* of the López defendants' alleged

fraud, not as co-wrongdoers. Atty. Ramos Luiña wrote that any reader of the complaint's first 106 paragraphs would conclude that "**the appearing Parties were additional victims of the deceitful and fraudulent conduct that the Plaintiffs impute to the Messrs. López**". Ramos Luiña Severance Mot. ¶ 3.2. Atty. Ramos Luiña catalogued each of the four direct money claims against the Companies, *id.* ¶ 3.3(a)–(d); admitted nothing on the merits, *id.* ¶ 3.2 n.1; and sought severance under P.R. R. Civ. P. 17.1, 18, 32 L.P.R.A. Ap. V, citing *Meléndez v. Levitt & Sons of P.R., Inc.*, 106 D.P.R. 437, 439 (1977), and *Tosado v. Tenorio*, 140 D.P.R. 859, 867 n.2 (1996). He preserved every defense and every counterclaim. He withdrew because the Companies had stopped paying his fees.

Atty. Abesada then appeared and replaced Atty. Ramos Luiña. His first filing was a two-page Answer to the Complaint dated June 3, 2025 asserting that the Companies were merely nominal codefendants and that "not answering the complaint should not prejudice the appearing parties." Atty. Abesada's Answer to the Complaint, Docket 74, at 1–2 (P.R. T.P.I. June 3, 2025). The trial court rejected that filing and ordered a paragraph-by-paragraph response. SUMAC Order #75, SJ2024CV07694. On June 10, 2025, Atty. Abesada filed a nine-page Amended Answer to the Complaint [hereinafter Am. Answer] that inverts every meaningful position Atty. Ramos Luiña had taken on the same complaint: (i) where Atty. Ramos Luiña had admitted nothing on the merits, Atty. Abesada *admits in whole or in material part* ¶¶ 1–9, 14, 16, 20, 22–27, 29–31, 37–40, 42, 63–69, and 72 of the Complaint, Am. Answer ¶¶ 1–9, 14, 16, 20, 22–27, 29–31, 37–40, 42, 63–69, 72, thereby conceding the plaintiffs' factual narrative of the merger discussions, the federal-court-supervised mediation, the May 2023 Settlement Agreement and Release, the May 31, 2023 unanimous Board vote authorizing that settlement, and the Section 10.4 drag-along sequence; (ii) where Atty. Ramos Luiña had preserved the Companies' defenses, Atty. Abesada pleads no

affirmative defense to the four direct money causes of action against the Companies, *id.*, Affirmative Defenses Nos. 1–5; and (iii) where Atty. Ramos Luiña had preserved the Companies' counterclaims, Atty. Abesada asserts no counterclaim, no crossclaim, and no third-party complaint, *id.*, forfeiting the facially obvious compulsory counterclaims under P.R. R. Civ. P. 11.1, 32 L.P.R.A. Ap. V, r. 11.1.

Most strikingly, Atty. Abesada's first affirmative defense expressly characterizes the Companies' litigation interests as common with — that is, on the same side as — the very plaintiffs suing the Companies. Affirmative Defense No. 1 states: "The focus of the allegations and remedies in the complaint is directed at those individual defendants who are alleged to have failed to act in the best interests of the appearing companies **and the plaintiffs**"). Am. Answer, Affirmative Defense No. 1 (emphasis added). That sentence equates the Companies' interests with the plaintiffs' interests — VRM-Penzini, Semillero, and Mr. Borschow — the very parties whose Indemnification Agreement claim against GFC, Complaint ¶ 168, funds Atty. Abesada's appearance in this Court.

The Amended Answer also contradicts itself across two consecutive affirmative defenses on the threshold question whether the Complaint seeks any relief against the Companies at all. Affirmative Defense No. 3 asserts that *no* relief is sought against the Companies, quoting a 1940 student note for the proposition that "[f]ailure to answer ordinarily cannot harm the corporation, since no relief is asked against it in the complaint and no judgment by default can be taken." Am. Answer, Defensa Afirmativa No. 3 (quoting George T. Washington, *Stockholders' Derivative Suits: The Company's Role and a Suggestion*, 25 Cornell L.Q. 361, 362 n.5 (1940)). The very next paragraph, Affirmative Defense No. 4, then incorporates by reference the Ramos Luiña Severance Motion — whose entire premise is that four direct causes of action *do* seek relief against the

Companies, Ramos Luiña Severance Mot. ¶ 3.3(a)–(d). *Compare* Am. Answer, Affirmative Defense No. 3, *with id.*, Affirmative Defense No. 4. A non-conflicted lawyer would have to pick one. Atty. Abesada did not.

## XI. *THE COMPANIES ADMITTEDLY HAD NO ASSETS — MR. BORSCHOW HAS SAID SO, ATTY. ABESADA HAS SAID SO, AND THE COMPANIES THEREFORE CANNOT BE PAYING ATTY. ABESADA; THE ENGAGEMENT WAS ALSO NEVER AUTHORIZED BY THE BOARD.*

The fee-source question independently undermines Atty. Abesada's claim to represent the Companies, and a second, equally serious question — whether the Board of Managers ever authorized the engagement at all — arises from the same documentary record. The arithmetic begins with two contemporaneous admissions of the Companies' illiquidity — one by Atty. Abesada himself on a public Commonwealth docket, and one by Mr. Alexander Borschow himself, captured in a written communication from the Companies' Manager, Mr. Olmar López Vidal, to Mr. Borschow. Each admission is by a person whose acknowledgment the Court may credit as binding under Federal Rule of Evidence 801(d)(2). Together they foreclose any factual claim that GFC or BGF is itself paying Atty. Abesada. Someone else is.

First, Atty. Abesada has admitted, on the record in a separate Commonwealth proceeding in which he appears as counsel for GFC Holdings, that the Companies are not operating and have no assets. At the July 16, 2025 Initial Conference in *AMRC, LLC v. López Vidal*, No. SJ2024CV10727 (P.R. T.P.I., Sala 603, Hon. Brian Burgos Hernández, J.), Atty. Abesada represented to the court verbatim: "El licenciado Abesada Agüet informó que la compañía la cual representa no está operando y no tienen activos. No estará haciendo descubrimiento de prueba." Ex. 3 (AMRC Initial Conference Minute, July 16, 2025, at 1). The English translation: "Counsel Abesada-Agüet informed [the court] that the company he represents is not operating and has no assets. He will not be conducting discovery." An admission by counsel made on the record on the

client's behalf is a judicial admission binding the client. *See* Fed. R. Evid. 801(d)(2)(C)–(D); *Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co.*, 976 F.2d 58, 61 (1st Cir. 1992).

Second, Mr. Borschow himself — a named defendant in this RICO action and a principal of the Series A constituency — has independently admitted that the Companies are illiquid. The admission is captured in a written communication from Mr. Olmar López Vidal (the Companies' President and CEO, and a Board Director of GFC Holdings) to Mr. Borschow dated March 24, 2025, at 5:12 p.m. — *the very same day* Atty. Abesada filed his Notice of Appearance for the Companies in the related federal action, *Boyd v. López-Vidal*, No. 3:22-cv-01190-GMM, ECF No. 644 (D.P.R. Mar. 24, 2025). *See* Ex. 5-F (Email from Olmar López Vidal to Alexander Borschow (Mar. 24, 2025, 5:12 PM)) (authenticated by López Vidal Declaration, Ex. 5). In Question 3 of his email, Mr. López Vidal asked Mr. Borschow: "Who specifically is responsible for covering the costs associated with this new legal representation? Given that, **as you stated**, the companies have not been able to find legal representation due to the illiquidity." Ex. 5-F (emphasis added). The phrase "as you stated" identifies Mr. Borschow himself as the source of the illiquidity admission attributed to him. Mr. Borschow's admission, recounted by the Companies' Manager in a contemporaneous writing to Mr. Borschow himself (and not contradicted by him), is a party-opponent admission under Federal Rule of Evidence 801(d)(2)(A) and a statement attributable to the Series A constituency under Rule 801(d)(2)(D). The Companies cannot pay for legal representation. *Both* Atty. Abesada and Mr. Borschow have said so.

The same March 24, 2025 email establishes a second, independent ground for concern that has nothing to do with privilege and everything to do with whether Atty. Abesada's engagement was authorized at all. Mr. López Vidal wrote: "I was neither invited to any meetings, notified, nor consulted about this decision [to engage Atty. Abesada]. There was no vote or board meeting held

to discuss or approve this legal engagement of the companies. As you communicated, since Ernesto's resignation, we are the only two (2) board members out of (7) seven. You even stated in this communication that, in your perspective, you and I are the only ones making decisions right now." Ex. 5-F. The implications are not subtle. Of seven Board seats, five were vacant. Of the two remaining Board members, one (Mr. López Vidal) was not consulted, not invited, not notified, and did not vote. The other (Mr. Borschow) is the very Series A representative who is a named RICO defendant, who is concurrently prosecuting the Commonwealth Indemnification Agreement claim against GFC, Demanda ¶¶ 163–72, and whose own statement is the source of the illiquidity admission. A lawyer for an organization is required to act on the authority of the organization's duly authorized constituents. Model Rules of Prof'l Conduct r. 1.13(a) (Am. Bar Ass'n 2024); *Sucesión Santaella v. Srio. de Hacienda*, 96 D.P.R. 442, 451–52 (1968). On the record of Ex. 5-F, the constituent authorization required by Rule 1.13(a) is absent on its face. The engagement is *ultra vires*.

And the retaliatory pattern is itself documented. Six weeks after Mr. López Vidal sent the March 24, 2025 Ex. 5-F email asking Mr. Borschow who had authorized the Abesada engagement and who was paying for it, the same Series A constituency purported to terminate Mr. López Vidal as Chief Executive Officer of Biomass Green Fuels. *See* Ex. 5-I (May 6, 2025 email from Ms. Carla Pérez-Caldera purporting to terminate López Vidal as CEO on the basis of a Board vote of which he was never notified). The Companies' duly authorized constituent under Model Rule 1.13(a) was thus removed for asking, in writing, who had authorized his replacement's counsel — a sequence that establishes both retaliation against the Companies' Manager and the absence of any legitimate corporate-governance process behind the entire Abesada engagement.

The identity of the actual fee payor carries decisive consequences for Atty. Abesada's privilege claims. Three propositions, taken together, eliminate every privilege theory Atty. Abesada might invoke against discovery into the engagement itself. First, the attorney-client privilege belongs to the client — meaning the entity that engaged the lawyer — and to no other party. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348–49 (1985) ("[T]he power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors."); Restatement (Third) of the Law Governing Lawyers § 73 (Am. L. Inst. 2000). Where, as here, the entity itself is not paying the lawyer and has not authorized the engagement through its duly authorized constituents under Rule 1.13(a), the entity has no engagement-based claim to privilege against the very Members it purportedly engaged the lawyer to represent. Plaintiffs Boyd and Lassers, acting as the Companies' duly authorized constituents under the June 2, 2025 Irrevocable Proxy (Ex. 7), invoke and waive any entity-level privilege as to the engagement record itself.

Second, the identity of any third-party payor is not privileged in its own right. *In re Grand Jury Subpoena (Reyes-Requena)*, 913 F.2d 1118, 1123 (5th Cir. 1990) ("[T]he identity of the client and fee information are generally not privileged."); *In re Grand Jury Proceedings (Doe)*, 219 F.3d 175, 187 (2d Cir. 2000); *Vingelli v. United States*, 992 F.2d 449, 452 (2d Cir. 1993). Discovery into who is paying Atty. Abesada therefore does not require a privilege fight at all.

Third, if the actual payor is the Series A constituency — VRM-Penzini, Semillero, or Mr. Borschow individually — the arrangement is itself a per se ethical violation that destroys any privilege Atty. Abesada might otherwise claim. The Series A constituency comprises the very Commonwealth plaintiffs whose Indemnification Agreement claim against GFC, Demanda ¶ 168, would supply the financing for Atty. Abesada's appearance in this Court and in the parallel matters.

A lawyer cannot simultaneously be paid by, and adverse to, the same client. Model Rules of Prof'l Conduct r. 1.7(a)(2) (Am. Bar Ass'n 2024); *id.* r. 1.8(f); P.R. R. Prof'l Conduct r. 1.7(a)(1), r. 1.8(f) (incorporated through D.P.R. L. Civ. R. 83.5). To the contrary, Ex. 5-F establishes that no Board meeting, vote, or notification preceded the engagement at all. Where the fee arrangement itself is the instrument of an ethical violation, the crime-fraud exception strips any residual privilege. *United States v. Zolin*, 491 U.S. 554, 572 (1989).

The arithmetic resolves on every branch in the same direction: the Companies are not paying Atty. Abesada; the Board never authorized his engagement; the identity of the actual payor is not privileged; and if that payor is the Series A constituency, Atty. Abesada cannot lawfully remain in the representation at all. The engagement record is producible, and the companion Motion to Disqualify should be granted on the present record without awaiting further development.

## XII. PLAINTIFFS' GOVERNANCE-AUTHORITY ARGUMENTS ARE NON-FRIVOLOUS

### A. The Operating Agreement Reserves the Disputed Authority to the Members.

The GFC Operating Agreement — appended by Atty. Abesada to ECF No. 49 as Exhibit ECF No. 49-2 — contains an introductory clause to Section 6.2 that subordinates board authority to member-reserved provisions: "Except as otherwise expressly required under this Agreement (including, without limitation, section 4.2(j))." That clause, omitted from ECF No. 49's quotation, is the textual hinge that limits board authority. The enumerated (a)-(m) catalogue of board powers that follows lists administrative and ordinary-course functions; it does *not* include "select corporate counsel for litigation adverse to the members," "amend the Operating Agreement," or "manage

litigation against the members themselves." Section 4.2(j) reserves to the members decisions that exceed ordinary-course management — including the strategic litigation decisions at issue here.

Puerto Rico's General Corporations Act supplies the statutory backbone for these principles. Article 4.05, 14 L.P.R.A. § 3565, provides that an interested-manager transaction is voidable unless cleansed by informed disinterested-manager approval, informed disinterested-Member approval, or proof at the time of approval that the transaction was *justo y razonable* to the Company. Article 4.04, 14 L.P.R.A. § 3564, codifies the duty of loyalty. Puerto Rico LLC managers are subject to these same fiduciary duties of loyalty and care by judicial application of common-law fiduciary principles, modeled on Delaware practice. See Auriga Capital Corp. v. Gatz Properties, LLC, 40 A.3d 839, 849–53 (Del. Ch.), aff'd, 59 A.3d 1206 (Del. 2012). The Series A approval of the AAA fails each cleansing route on the present record: every approving Manager was financially interested in Humacao RNG or its affiliates; the Founding-Members' Manager did not consent; and the $0-to-Boyd / $4,465,966-to-Series-A asymmetry forecloses any *justo y razonable* defense at the pleading stage.

The August 25, 2023, Second Amendment to the Operating Agreement amends § 4.2(f) to unify Series A and Common Unit voting on an as-converted basis, with the result that Series A consent is no longer a continuing class-veto requirement. The September 18, 2024, Third Amendment amends only § 6.1(c) (board seat allocation) and does not alter the textual scope of § 6.2. The textual record confirms what Plaintiffs have asserted throughout: the disputed authority is not allocated exclusively to the Board, and it certainly does not belong with Board members who have illegally ransacked and destroyed the Companies for their own profit.

**B. The Court Has Authority to Override Contrary Management Instructions Where the Management Is Itself Conflicted.**

Rule 1.13(a) supplies the operative authority: a lawyer for an organization represents the organization "acting through its duly authorized constituents," and where the constituents purportedly acting on the organization's behalf are themselves disqualified by their own conflicts, member-level alternative authorization is the proper vehicle for independent representation. Where corporate management is structurally disabled by its own conflicts from authorizing independent representation, federal courts have authority to permit the entity to be represented by counsel authorized through alternative governance channels. *See Bell Atl. Corp. v. Bolger*, 2 F.3d at 1316-17. As the Texas Supreme Court explained, "the proper inquiry is to look to whether the substance of the challenged representation requires the lawyer to take conflicting positions or to take a position that risks harming one of his clients." *In re Murrin Bros. 1885, Ltd.*, 603 S.W.3d 53, 58 (Tex. 2019) (orig. proceeding). Applied here, Becker-Whitaker and Miñana represent: (i) Boyd and Lassers individually as Members; (ii) Boyd and Lassers derivatively on behalf of GFC and BGF; and (iii) the Companies directly through majority-member authority. No client position requires representation in a direction that harms any other. By contrast, every position Atty. Abesada advances for the Companies requires him to take a position that harms the Companies and advances BPPR's defensive interests (*see* BPPR's parallel briefing at Dkts. 31, 42, 113, 115, 117, and 127 in 3:24-cv-01569 and Dkts. 757 and 776 in 3:22-cv-01190) — precisely the inverse of the functional alignment Rule 1.13 requires.

## XIII. CONCLUSION

ECF No. 49 attempts to convert contested governance, fiduciary-duty, derivative-standing, and conflict-of-interest disputes into a collateral sanctions proceeding. Rule 11 was not designed to adjudicate unresolved merits questions, suppress adverse governance claims, or foreclose nonfrivolous efforts to challenge conflicted litigation control. As the First Circuit has cautioned,

Rule 11 "sanctions should be reserved for only [the] most egregious of lawyerly missteps." *Anaqua*, 2014 U.S. Dist. LEXIS 22078, at *9 (citing *McGee v. Town of Rockland*, 2012 WL 6644781, at *1 n.2). This is not such a case.

This case presents intensely disputed issues concerning RICO liability, derivative standing, LLC governance, fiduciary obligations, proxy authority, litigation control, and counsel conflicts. Those issues are properly resolved through ordinary merits adjudication and appellate review. They are not properly resolved through Rule 11 sanctions.

Plaintiffs conducted a substantial factual and legal investigation before filing the challenged motions, relied upon documentary evidence, governance provisions, proxy instruments, litigation history, and controlling legal authorities, and at minimum advanced objectively non-frivolous arguments concerning derivative authority, governance control, and counsel conflicts. Defendants may disagree with our conclusions. That disagreement does not constitute a basis for sanctions.

**WHEREFORE**, for all of the foregoing reasons, Plaintiffs respectfully request that this Honorable Court enter an Order: (i) DENYING ECF No. 49 in its entirety, WITH PREJUDICE, on the ground that Attorney Roberto Abesada-Agüet failed to comply with the mandatory safe-harbor, separate-motion, and specificity requirements of Fed. R. Civ. P. 11(c)(2); (ii) RECOGNIZING Attorneys Jane A. Becker-Whitaker and Luis E. Miñana as counsel for GFC Holdings, LLC and Biomass Green Fuels, LLC pursuant to the June 2, 2025 Irrevocable Proxy (Ex. 7) and (iii) granting such other and further relief as the Court deems just and proper.

Respectfully submitted.

In San Juan, Puerto Rico, this 26th day of May 2026.

| /s/ Jane A. Becker Whitaker<br>**Jane A. Becker Whitaker**<br>USDC-PR No. 205110<br>P.O. Box 9023914<br>San Juan, Puerto Rico 00902-3914<br>Tel.: (787) 754-9191<br>Email: jbw@beckervissepo.com<br>*Counsel for Plaintiffs* | /s/ Luis E. Miñana<br>**Luis E. Miñana**<br>USDC-PR No. 225608<br>ESPADA MIÑANA & PEDROSA LAW<br>OFFICES PSC<br>122 Calle Ing. Manuel Dómenech Altos<br>Baldrich<br>San Juan, P. R. 00918-3503<br>Tel.: (787) 402-2226<br>Email: minanalaw@yahoo.com<br>*Counsel for Plaintiffs* |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 26, 2026, the foregoing Plaintiffs' Opposition to Special Appearance and Sanctions Dated May 26, 2026, was filed with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

/s/ Jane A. Becker Whitaker
**Jane A. Becker Whitaker**

**INDEX OF EXHIBITS**

Ex. 1 — Notice of Appearance of Counsel filed by Roberto Abesada-Agüet on behalf of Banco Popular de Puerto Rico in Catala-Del Valle v. NSSK San Juan, LLC, No. 3:26-cv-01205-JAG (D.P.R.), AO 458 Appearance of Counsel, Doc 9 (Apr. 24, 2026), filed four days before Atty. Abesada signed ECF No. 49 in this action.

**Ex. 2** — Docket-Citation Appendix, indexing twenty-six federal-court matters since 2006 (Table 1) and fifteen Puerto Rico local-court matters since 2013 (Table 2) in which Atty. Abesada-Agüet has appeared for Banco Popular de Puerto Rico and related entities, together with First Circuit appellate background (Table 3) and Puerto Rico Tribunal de Apelaciones matters (Table 4). Active concurrent representations identified at Table 1, Row 1 (*Catala-Del Valle v. NSSK San Juan, LLC*, No. 3:26-cv-01205-JAG (D.P.R.), filed Apr. 6, 2026 — Atty. Abesada-Agüet entered Notice of Appearance for BPPR on Apr. 24, 2026 (AO 458, Doc 9), four days before signing ECF No. 49) and Table 2, Row 1 (*Banco Popular de P.R. v. [Defendant]*, No. SJ2025CV07110, T.P.I. San Juan, with three public auctions noticed April 20, April 27, and May 4, 2026).

**Ex. 3 —** AMRC, LLC v. López Vidal, No. SJ2024CV10727 (P.R. T.P.I., Sala 603), Initial Conference Minute dated July 16, 2025, in which Atty. Abesada-Agüet represented to the court on behalf of GFC Holdings that the company "no está operando y no tienen activos."

**Ex. 4** — Asset Acquisition Agreement dated January 31, 2025, between GFC Holdings, LLC / Biomass Green Fuels, LLC and RNG Humacao, LLC (Sections 2.9, 2.10, and 3(c) at page 17 cited herein).

**Ex. 5** — Declaration of Olmar López Vidal pursuant to 28 U.S.C. § 1746, with:

• Ex. 5-A (January 31, 2025 Board Resolution of the majority of the Board of Managers of Biomass Green Fuels LLC, signed by López Vidal and Boyd, objecting to the Asset Purchase Agreement and refusing to authorize transfer of BGF's assets, tax attributes, permits, or licenses)

• Ex. 5-B (López Vidal February 21, 2025 written objection to APA)

• Ex. 5-C (February 6, 2025 Cease and Desist letter from Mr. Gregory Boyd and Mr. Jonathan Lassers to the Board of Managers and Members of GFC Holdings)

• Ex. 5-D (April 1, 2025 Carla S. Pérez transmittal of March 21, 2025 Board Resolution)

• Ex. 5-E (Borschow March 31, 2025 communication announcing Feliciano and Goytía designations)

• Ex. 5-F (March 24, 2025, 5:12 PM email from Olmar López Vidal, President/CEO of Biomass Green Fuels LLC and Board Director of GFC Holdings, LLC, to Alexander

Borschow, sent the same day Atty. Abesada filed his Notice of Appearance for the Companies in *Boyd v. López-Vidal*, No. 3:22-cv-01190-GMM, ECF No. 644 (D.P.R.), in which Mr. López Vidal asks who authorized Atty. Abesada's engagement, who is paying the fees "given that, as you stated, the companies have not been able to find legal representation due to the illiquidity," and requests the signed engagement letter
• Ex. 5-G (Picó Letter)

• Ex. 5-H (SJ2024CV07694 Demanda)

• Ex. 5-I (May 6, 2025 email from Ms. Carla Pérez-Caldera purporting to terminate López Vidal as CEO on the basis of a Board vote of which he was never notified)

**Ex. 6** — Motion to Approve and Disburse Funds and its Exhibit, Docket No. 3114, Civil No. 12-2039 (JAG) (D.P.R.), evidencing Atty. Abesada's $16,000 monthly compensation as general counsel for the Office of Police Reform in Puerto Rico.

**Ex. 7** — June 2, 2025 Irrevocable Proxy