**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| GREGORY BOYD, individually and derivatively, and<br><br>JONATHAN LASSERS, derivatively,<br>on behalf of GFC HOLDINGS, LLC<br>and BIOMASS GREEN FUELS, LLC,<br>Plaintiffs,<br>v.<br>BANCO POPULAR DE PUERTO RICO; IGNACIO ÁLVAREZ ZATARAÍN; JAVIER D. FERRER; ALEXANDER BORSCHOW; SEMILLERO PARTNERS, LLC; ERNESTO VILLARINI; THE PUERTO RICO FUND FOR GROWTH, L.P.; COMMUNITY DEVELOPMENT VENTURE CAPITAL ALLIANCE; VRM PENZINI CAPITAL, LLC; VRM PENZINI FUND I, LLC; VRM PENZINI FUND I, LLC RENEWABLE SERIES II; STAR POWER SYSTEMS, LLC; HUMACAO RNG, LLC; PONCE RNG, LLC; ISLAND RENEWABLE ENERGIES, LLC; RAFAEL ROJO; CARLOS PENZINI; DIEGO RODRÍGUEZ; GEORGE ECONOMOU; JOVAL F. RODRÍGUEZ BARNES; and the individual Defendants' respective spouses and conjugal partnerships, Defendants, and GFC HOLDINGS, LLC and BIOMASS GREEN FUELS, LLC,<br>Nominal Defendants. | Civil No. 26-01066 (MAJ-MBA)<br>JURY TRIAL DEMANDED |

**PROPOSED VERIFIED FIRST AMENDED AND SUPPLEMENTAL COMPLAINT**

**TO THE HONORABLE COURT**:

**COME NOW** Plaintiffs Gregory Boyd and Jonathan Lassers derivatively on behalf of GFC Holdings, LLC and Biomass Green Fuels, LLC as to Counts I–IX and XI, and Gregory Boyd also individually as to Count X, and in support of their allegations very respectfully state and pray:

**TABLE OF CONTENTS**

I. INTRODUCTION — RESPONSE TO THE COURT'S DUPLICATION CONCERN............ 7

II. PRELIMINARY STATEMENT: HOW THE COMPANIES' MONEY AND CLAIMS WERE TAKEN........ 17

III. PARTIES AND CAPACITY........ 25

IV. JURISDICTION, VENUE AND SUPPLEMENTATION........ 35

V. IDENTIFIED PARTICIPANTS AND ATTRIBUTION........ 36

VI. THE PRIOR CASES DECIDED WHO COULD SUE, NOT THE COMPANIES' CLAIMS........ 37

A. The first RICO action dismissed the Plaintiff founders' personal claims; that ruling is on appeal........ 37

B. In the anti-tying action the Bank's longtime counsel dismiss the Companies' claims; that ruling is on appeal........ 38

C. The collection judgment was entered while the Companies had no lawyer........ 39

VII. THE ASSET SALE LACKED THE REQUIRED MEMBER APPROVALS, AND THE MANAGERS WERE CONFLICTED........ 43

VIII. FACTUAL ALLEGATIONS: THE FINANCING, THE GAS AND THE COMPANY CLAIMS........ 46

A. The Bank closed its $19.07 million financing without the paid bond it required........ 46

B. The Bank financed extra contractor work without the written change approvals the contracts required........ 53

C. Warnings reached the Bank's General Counsel in November 2021; the Bank kept advancing without the required inspections ........ 57

D. The Bank wired $1,137,400 to vendors for unmet milestones while the loan was in default ........ 62

E. After the Plaintiff founders sued, the Bank released $610,152.15 of restricted funds without the required authorization ........ 72

F. The Bank's own fuel contract explains its later accommodations ........ 74

G. The Bank kept extending the loan over Boyd's objections; the tax-credit proceeds bypassed the prepayment ........ 78

H. The 2023 rescue paired new money with control of the Companies and a release of the Bank ........ 84

1. Zavala signed the Seventh Amendment for both Companies without authority ........ 85

2. The Seventh Amendment released the Companies' claims against the Bank without valid authorization or ratification ........ 91

I. The settlement failed; the eventual buyers' own complaint describes the construction and financial failures ........ 97

J. The common holders' recovery fell to zero, and the Bank arranged the sale of its loan to VRM ........ 100

K. The assets moved to Humacao RNG without a member vote; the Bank got an express release ........ 104

1. The transfer exchanged a business valued at $83,305,285 for $17,465,966 in stated consideration ........ 114

L. Conflicted managers chose the counsel who then moved to dismiss the Companies' claims against the Bank ........ 120

M. The federal authority rulings were carried into the Commonwealth collection case ........ 127

N. The Bank endorsed Abesada as the Companies' counsel while he appeared for the Bank ........ 128

O. The defendants moved together to defer scrutiny of the conflict and misdescribed the record ........ 131

P. Humacao RNG demanded the full debt from Boyd without the $13,000,000 credit ........ 133

Q. VRM Penzini used the Companies' NDA-protected models to divert Ponce and Salinas (Count XI) ........ 137

IX. THE BANK RELEASED LOAN MONEY WITHOUT INSPECTIONS OR AUDITS AND KEPT LENDING AFTER NOTICE ........ 143

A. Releases without inspections, money ahead of the work, late amendments, no audits ..... 144

B. The Bank released $677,094.76 the day after written notice, then reported no irregularity ........ 149

X. DISCOVERY, ACCRUAL AND LIMITATIONS ........ 149

XI. THE RICO ENTERPRISE ........ 150

A. The scheme and the predicate acts ........ 155

B. Predicate Acts 1 through 4: the first phase ........ 157

C. Predicate Acts 5 through 11: the second phase ........ 166

D. The scheme continued after the designated acts ... 181

E. The later transactions are pleaded for knowledge and relatedness, not as predicates ... 182

F. Schedule A, Part 12 states each defendant's conduct and the counts retained against it ... 183

XII. RELATEDNESS AND CONTINUITY ... 183

XIII. COMPANY INJURY, CAUSATION AND NONDUPLICATION ... 184

A. The diversions delayed completion and cost the Companies a finished plant's net earnings ... 187

XIV. DERIVATIVE MEMBERSHIP, DEMAND AND ADEQUATE REPRESENTATION 188

XV. THE EFFECT OF THE PRIOR JUDGMENTS ... 193

XVI. CLAIMS FOR RELIEF ... 194

COUNT I — CIVIL RICO, 18 U.S.C. § 1962(c) ... 194

COUNT II — RICO CONSPIRACY, 18 U.S.C. § 1962(d) ... 197

COUNT III — BREACH OF THE FINANCING AND DISBURSEMENT AGREEMENTS ... 201

COUNT IV — BREACH OF THE OPERATING AGREEMENT AND FIDUCIARY DUTIES ... 203

COUNT V — FIDUCIARY BREACH IN DECISIONS CONCERNING COMPANY CLAIMS ... 205

COUNT VI — INVALIDITY OF TRANSFERS AND RECOVERY OF COMPANY PROPERTY ... 206

COUNT VII — UNJUST ENRICHMENT IN THE ALTERNATIVE ... 208

COUNT VIII — DECLARATORY RELIEF ........ 209

COUNT IX — SEVENTH AMENDMENT: AUTHORITY, EFFECTIVENESS AND ALTERNATIVE CONSENT RELIEF ........ 210

COUNT X — BOYD'S INDIVIDUAL CLAIM CONCERNING HIS BPPR GUARANTY ........ 212

COUNT XI — MISAPPROPRIATION OF COMPANY TRADE SECRETS ........ 219

XVII. PRAYER FOR RELIEF ........ 222

XVIII. JURY DEMAND ........ 226

VERIFICATION OF GREGORY BOYD ........ 227

VERIFICATION OF JONATHAN LASSERS ........ 228

## I. INTRODUCTION — RESPONSE TO THE COURT'S DUPLICATION CONCERN

1. At the August 25, 2026 status conference (Docket 128), the Magistrate Judge raised a concern that deserves a direct answer before anything else. She asked, by analogy, whether this is the case of a plaintiff who sued for a tort, lost, and then filed a new complaint based on the same activity. It is not. This Introduction says why in three parts: what is new since the Complaint filed February 7, 2026 (Docket 1); what has changed in the parties, the claims and the pleading; and why the facts from 2020 through 2025 are pleaded again rather than left behind.

2. The answer begins with who was injured. In 22-01190(GMM), the Hon. Gina R. Méndez-Miró held that Boyd and Lassers could not recover personally for losses suffered by GFC Holdings, LLC ("GFC") and Biomass Green Fuels, LLC ("BGF") (together, the "Companies"). Her opinion recognized that a corporation's RICO injury may be asserted by the corporation or through a proper derivative action. It found the earlier pleading defective in four respects: verification, particularized demand or demand futility, adequate representation, and the identification of each defendant's conduct and its causal connection to injury. In the Magistrate Judge's terms, an injury suffered by William Jones does not become John Smith's injury because Smith has an interest in Jones's recovery. The Companies' losses are the Companies' own. This Proposed Verified Amended and Supplemental Complaint pleads the claims as the Companies' claims, brought derivatively — including through GFC for the injury to its subsidiary BGF — with the verification and the particularized allegations that support each representative step. Plaintiffs are not sidestepping appellate review of the earlier rulings; they are pursuing it, and they ask this Court to decide only the claims that can proceed here on their own.

3. **What is new. Six acts have occurred since this action was filed on February 7, 2026, and none of them could have been pleaded before it happened.**

4. On March 12, the counsel the Companies purported to retain moved to withdraw the Companies' answer.

5. On April 24, the same lawyer appeared for Banco Popular de Puerto Rico (the "Bank") in another case in this Court, and four days later he appeared here for the Companies against the Plaintiff members.

6. On May 7, the Bank told the First Circuit that this lawyer, and not the Plaintiff members' counsel, speaks for the Companies.

7. On June 9, that same lawyer — the Bank's lawyer — disclaimed any Company interest in Boyd's collection appeal, while the Bank joined a request to defer any inquiry into the arrangement.

8. On July 6, the Bank, the Companies — acting through the Bank's lawyer — and the buyer group jointly asked this Court to decide other issues before the threshold question of that lawyer's conflict of interest.

9. On September 18, the Bank's assignee demanded $13,418,352.07 from Boyd under a guaranty quoted with words it does not contain, without the $13,000,000 credit its own purchase agreement provides. Four of those six acts are the Bank's own or its assignee's; the other two are the acts of the Bank's lawyer. Plaintiffs plead them under Rule 15(d). ECF Nos. 34, 49, 91, 93, 115; Notice of Appearance, *Catalá-Del Valle v. NSSK San Juan, LLC*, 26-01205(JAG), Docket 9 (D.P.R. Apr. 24, 2026); BPPR Informative Motion to Correct Inaccuracies in Appellants' Docketing Statement and Case Caption, No. 26-1357 (1st Cir. May 7, 2026), Doc. 00118443427,

¶ 12; TA2025AP00277, Docket 19 (June 9, 2026); SJ2024CV04616, Docket 312 (Sept. 18, 2026), at 19, 23–25; Asset Acquisition Agreement (Jan. 31, 2025), §§ 2.7, 2.10.

10. The evidence is new. López Vidal's complete production of the Bank's inspection reports and draw materials is the foundation on which the pre-inspection release claims now rest. The native e-mails from his production are cited below as they arise. Boyd also avers, from his own participation on BGF's board, that the Bank's Commercial Relationship Officer, Joval F. Rodríguez Barnes, approved every advance from the closing through September 2021.

11. The pleading is new in the four ways the March 18 opinion required.

12. Both Plaintiffs verify it under 28 U.S.C. § 1746 and Rule 23.1(b).

13. It pleads the demands actually made, the refusals actually given, and the reasons a further demand would not have succeeded (paragraphs 1024–1043).

14. It pleads the basis on which Boyd and Lassers adequately represent the Companies (paragraphs 1044–1047).

15. For each defendant it states the conduct attributed to that defendant and the counts asserted against it (Schedule A, Part 12).

16. **What has changed.** The plaintiffs and the theory have changed.

17. Docket 1 was a complaint by Boyd, Lassers and EFB, LLC for their own injuries, in which Boyd and Lassers also sued on behalf of the Companies "directly, or in the alternative derivatively."

18. This Complaint is brought by Boyd and Lassers for the Companies — derivatively, for GFC and, through GFC, for BGF — and the Companies are joined as nominal defendants because the persons who control them are adverse to them.

19. EFB is not a party.

20. No personal recovery is sought for corporate losses.

21. Boyd's only individual claim is Count X, which concerns his own consent to his own guaranty.

22. The counts have changed.

23. Docket 1 pleaded counts numbered through Count XX.

24. This Complaint pleads 11, each stated here in full: civil RICO under 18 U.S.C. § 1962(c) and (d) (Counts I and II); breach of the financing and disbursement agreements (Count III); breach of the Operating Agreement and fiduciary duties (Count IV); interested decisions over Company claims (Count V); invalidity of the asset transfers and recovery of Company property (Count VI); unjust enrichment in the alternative (Count VII); declaratory relief (Count VIII); the Seventh Amendment (Count IX); Boyd's guaranty (Count X); and misappropriation of Company trade secrets (Count XI).

25. The following theories of Docket 1 are not asserted: RICO under § 1962(a) and (b); the MIPA and RSA claims; the NDA contract claim, which the Companies' trade-secret claim replaces; the anti-tying claim (the separate anti-tying action is on appeal as No. 26-1357); the "majority control" declaration; and the perjury, obstruction, fraud-on-the-court and fraudulent-conveyance counts.

26. The defendants have changed.

27. Docket 1 named twenty-three defendants.

28. This Complaint names twenty.

29. PCC Sub-CDE 13, the ITS/Accurate Solutions construction joint venture, Accurate Solutions Corp. and Roberto D. Acosta Martín are no longer defendants.

30. Island Renewable Energies, LLC is added.

31. The settled López-family parties, Accurate Solutions Corp. and Acosta Martín are described where their acts matter, but they are not sued. Paragraph 177.

32. The measure of recovery has changed.

33. Each Company seeks its own loss, net of every credit for value received and compensation already paid, and the Complaint states how each loss is measured (paragraphs 985–1013).

34. Two schedules let the Court see all of this at a glance.

35. Schedule A, Part 9, states, count by count, what the earlier courts decided and what this pleading does not ask the Court to revisit. Schedule A, Part 15, lists, paragraph by paragraph, what is new, what is restated from Docket 1 and what is revised, and the treatment of each of Docket 1's counts. No. 22-1190, ECF Nos. 874, 877.

36. **Why the facts from 2020 through 2025 are pleaded again.** The first reason is RICO's pattern element. Under 18 U.S.C. § 1961(5) and *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239–42 (1989), related predicate acts must extend over a substantial period or threaten to repeat.

37. The 2020–2022 acts supply the duration, the repetition and the common purpose, participants and methods of the pattern; the 2023–2026 acts are its continuation. They are part of the pattern element, not background.

38. A complaint that pleaded only the 2026 acts would plead no pattern at all.

39. The second reason is that the claims pleaded here are the Companies' own.

40. The court in No. 22-1190 held that losses suffered by the Companies belong to the Companies, not to Boyd and Lassers individually.

41. The claims on the financing, the 2023 restructuring, the 2025 sale and release, and the assignment of the loan are pleaded here as the Companies' claims.

42. A claim that court held those plaintiffs could not bring is not a claim they lost; where a federal count overlaps what that court decided, Plaintiffs ask for a stay of the overlap pending the appeal, not a second decision (paragraph 1053).

43. Ten of the twenty defendants — Álvarez, Ferrer, Villarini, Rojo, Penzini, Diego Rodríguez, Humacao RNG, Ponce RNG, Star Power Systems and Island Renewable Energies — were never parties to No. 22-1190 because they were involved in the second phase of the criminal enterprise.

44. The third reason is that the Court will rule on one document. An amended complaint replaces the one it amends.

45. This Complaint supersedes Docket 1 and adopts nothing from it, paragraph 182, so the facts of 2020 through 2025 are stated here, under oath and as the Companies' claims, rather than by reference to an earlier pleading that was never verified. The later acts cannot be judged without them: the September 2023 release, the January 2025 sale and release, and the September 2026 demand are the means by which the money obtained from the Companies between 2020 and 2023 was kept. Paragraphs 962–963.

46. For the transactions Docket 1 described, the amended claims relate back under Rule 15(c)(1)(B); the later, independent acts are pleaded as supplemental claims. Paragraph 176.

47. **The dates.** The record answers any suggestion that this action was filed to escape a dismissal then on appeal.

48. Plaintiffs filed this action, No. 3:26-cv-01066, on February 7, 2026.

49. The earlier RICO action was not dismissed until March 18, 2026, at Docket 874 and 876.

50. Plaintiffs there filed a notice of appeal on April 17, 2026, at Docket 877; the First Circuit appeal is No. 26-1424.

51. Both the RICO dismissal and that appeal came after this case was filed. What came before was a refusal of leave to amend: on January 21, 2026 the court in No. 22-1190 denied leave to file a third amended complaint because of the time that had passed since the previous amendment, and on January 23 it denied reconsideration. Those rulings rested on delay and prejudice, not futility; neither reached the merits of the claims tendered, and the April 17 notice of appeal expressly designates both for review. No. 22-1190, Docket 847, 855 (text orders); Docket 877 at 1–4, particularly p. 3 of the notice.

52. The anti-tying case has its own chronology.

53. 24-01569 (PAD) was dismissed on December 22, 2025, before this action began; reconsideration was denied March 10, 2026, and the notice of appeal followed April 1. That appeal is No. 26-1357.

54. This action asserts no claim under the Bank Holding Company Act. No. 24-1569, Docket 131, 133, 140, 141.

55. **What this** case **is about.**

56. BGF, the operating subsidiary of GFC, built a plant at the El Coquí landfill in Humacao, Puerto Rico, to capture the gas that rises from the landfill and turn it into two saleable products: renewable liquefied natural gas and recovered liquid carbon dioxide.

57. The Bank financed the plant.

58. The Credit Agreement of September 15, 2020 is the loan contract between BGF and the Bank. It and the tax-credit loan documents signed the same day protected the loan money in four ways: a paid construction bond covering the full cost of the work; an independent inspector's report before each advance; approved budgets; and disbursement only for the uses the borrower certified.

59. This Complaint pleads that the Bank and the insiders who ran the Companies set those protections aside from the first day.

60. The loan closed on September 15, 2020 without the paid bond the Credit Agreement required — a bond covering 100% of the Project's $18,679,651 of Direct Costs, with BGF and the Bank as its obligees. No such bond ever existed. The only bond was the contractors' own $5,000,000 bond for their $5 million construction contract, naming BGF as its sole obligee, and the next day that bond's $70,500 premium was charged to BGF's loan.

61. Over the following year the Bank released advance after advance without the inspections the loan documents required, until by July 2021 management reported $21.3 million drawn — 72% of the budget — against a plant the Bank's own inspector would find 39% built that November.

62. In November 2021 the Plaintiff founders' lawyers told the Bank's General Counsel in writing that the draw certificates misrepresented the work.

63. The Bank released $677,094.76 the next day and answered in December that its review had found no irregularity.

64. On April 25, 2022, the day the Plaintiff founders filed their first RICO action, the Bank wired $1,137,400 to two equipment vendors for milestones that had not been met.

65. After the suit and the defaults, the Bank released $610,152.15 of restricted tax-credit funds in June 2022 and $380,144.22 more in October 2023, and it extended the loan again and again, each time after the deadline it was extending had already passed.

66. The Bank had its own reason to keep the money flowing.

67. In July 2022, with the first RICO action pending against it and BGF in default, the Bank's chief executive signed a contract to buy the plant's gas for the Bank's own operations at $14 per MMBtu — a third below the $21 to $21.50 prices in the records of two prospective customers, Cambrian and IPR — with the environmental credits retained by the Bank.

68. When the Plaintiff founders sued and the defaults matured, the insiders used disputed corporate authority to give the Bank what it wanted.

69. In September 2023 a Seventh Amendment to the Credit Agreement, signed for both Companies by Rodrigo Zavala — whom the Board had declined to install and whom no resolution authorized — released the Companies' claims against the Bank.

70. In January 2025 the managers transferred the plant and its gas rights to Humacao RNG, LLC, a buyer whose parent held an interest in the seller and the right to name one of its managers. The stated debt-and-cash consideration was $17,465,966, for a completed business worth $83,305,285 on the valuation Boyd verifies with this Complaint.

71. The sale agreement released the Bank and its lawyers.

72. A lender's sale of a distressed asset begins by paying the loan; this one began by releasing the lender.

73. The managers who approved that sale then chose, as the Companies' lawyer, an attorney who had represented the Bank for decades; he moved to dismiss the Companies' claims

against the Bank with prejudice and told a Commonwealth court that the Companies had no interest in Boyd's collection appeal.

74. In September 2026 the Bank's assignee demanded $13,418,352.07 from Boyd under his guaranty without the $13,000,000 credit its own purchase agreement provides.

75. Gregory Boyd and Jonathan Lassers are members of GFC. They sue for the Companies because the Companies' losses belong to the Companies, and the people who control the Companies are the people who caused the losses.

76. Rule 23.1 supplies the procedural requirements for a derivative action; the substantive law that governs the Companies determines what demand is required.

77. **The show-cause order and the conventions of this Complaint.** The Court's April 14 show-cause order, Docket 45, asked why this action should not be dismissed for lack of subject-matter jurisdiction in light of the RICO decision.

78. The answer requires separating two questions: whether the Companies suffered an injury that Article III recognizes, and whether a plaintiff satisfies a statute's own requirements for a cause of action.

79. This Complaint identifies concrete losses to the Companies, the basis on which Boyd and Lassers represent them, and each defendant's conduct and its causal connection to those losses — the four things the March 18 opinion found missing.

80. The documents quoted or described in this Complaint are identified in the text by title, date, author and recipient, and where a document's words matter they are quoted.

81. Schedule A to this Complaint, Parts 1–15, is incorporated by reference under Rule 10(c). Commonwealth court filings are cited by their SUMAC docket-entry number ("Docket Entry").

## II. PRELIMINARY STATEMENT: HOW THE COMPANIES' MONEY AND CLAIMS WERE TAKEN

82. Banco Popular financed a renewable-energy project whose money was supposed to be protected by a paid construction bond, independent review, approved budgets and controlled disbursements.

83. The Bank and the insiders who participated with it knowingly bypassed those protections, depleted the Companies' resources, and then used disputed corporate authority to obtain releases and to control the Companies' claims.

84. The injury pleaded is the resulting loss of Company money, assets and enforceable rights.

85. The Bank's interest in the project went beyond repayment.

86. Its renewable-gas agreement supplied fuel for the Bank's own operations and specified environmental benefits. Those benefits help explain the Bank's repeated accommodations after warnings, defaults and suit.

87. The plant's assets included two saleable products, renewable liquefied natural gas and recovered liquid carbon dioxide.

88. Had the plant been finished on time and its value fairly realized, the proceeds would have serviced the valid debt and left a residual return for distribution through the Companies' distribution waterfall.

89. The challenged acquisition did the opposite: it transferred the income-producing assets, directed the cash component to scheduled recipients, left a conditional remaining debt, and released BPPR. Plaintiffs challenge that combination and its net economic effect.

90. The closing bond transaction is the first concrete financing allegation.

91. On September 14, 2020, at 9:38 p.m., Rodríguez Barnes, the Bank's Commercial Relationship Officer, e-mailed the closing group a schedule that funded the $70,500 premium for the contractor joint venture's bond as a BGF closing cost.

92. The loan closed on September 15, 2020.

93. On September 16, López Vidal authorized BGF's payment to Popular Insurance, plus a $60 charge. BPPR thus knowingly closed without satisfying the paid-premium prerequisite, and it shifted the joint venture's own expense to BGF without the required approval.

94. The protection was absent as well as unpaid. Credit § 3.1(h) required a paid payment-and-performance bond covering 100% of the executed budget's $18,679,651 in Direct Costs, with BGF and the Bank as dual obligees; no bond of that kind was ever issued. The single bond in the record, MAPFRE bond No. 1301208000513 for $5,000,000, was the contractors' bond for their own $5 million construction contract, naming ITS/ASC Joint Venture as principal and BGF as its only obligee. It satisfied no part of § 3.1(h).

95. Boyd was copied on the premium line, but BPPR did not disclose the unsatisfied prerequisite and the inadequate protection before he became bound. Rodríguez Barnes closing e-mail (Sept. 14, 2020), with the bond invoice; MAPFRE payment and performance bond No. 1301208000513; Popular Insurance $70,560 bond-premium transfer record (Sept. 16, 2020); Credit Agreement (Sept. 15, 2020), §§ 3.1(h), 10.1(a) and Project Budget, p. 151; Construction Contract (June 18, 2020) and JV Agreement (May 15, 2020), ¶ 8.

96. No claim under 12 U.S.C. §§ 1972 or 1975 is asserted here, and the Bank Holding Company Act's anti-tying prohibition is not pleaded as RICO racketeering activity.

97. The gas and insurance arrangements provide context for the Bank's alleged motive and benefit. The separate anti-tying appeal is No. 26-1357.

98. Insiders used disputed corporate authority to surrender the Companies' claims against the Bank.

99. A resolution dated March 21, 2025 engaged the law firm of Abesada — a lawyer who had represented BPPR for decades — and purported to ratify prior acts. Borschow and Feliciano signed it; López Vidal did not. An April 1 transmittal described majority approval and separately invited López Vidal's signature.

100. Plaintiffs challenge the signers' authority and the effective designation dates.

101. Abesada then sought dismissal with prejudice of the Companies' anti-tying claims.

102. Borschow's role matters because he, Semillero and the VRM parties were themselves suing the Companies when counsel was selected.

103. That is, Borschow, the manager with those adverse interests, caused the Companies to engage a lawyer with a decades-long relationship with the Bank they were suing.

104. Plaintiffs challenge the engagement of that conflicted lawyer, and the surrender of Company rights that followed, as interested decisions made without valid authority and without informed, disinterested approval. GFC Board resolution dated "March 21, 2025," with the April 1, 2025 transmittal; No. 24-1569, Docket 63 (July 11, 2025); No. 24-1569, Docket 131 at 24; Complaint, *VRM Penzini Fund I, LLC v. López Vidal*, No. SJ2024CV07694 (P.R. Ct. First Inst. Aug. 21, 2024) (of record as Exhibit 12 to Docket 1); López Vidal Decl. (May 26, 2026).

105. When Plaintiff members objected, Picó — writing to their counsel as corporate counsel on June 19, 2025, at the stated request of the conflicted attorney and the Board — stated that the members' consent was null and that members making contrary assertions could expose themselves to civil and criminal liability. Plaintiffs rely on that letter's author, recipients, stated

principals and actual text as evidence of the governance dispute and of the pressure applied. López Vidal Decl. (May 26, 2026), ¶ 18.

106. The concurrent representations are documented.

107. On April 24, 2026, Abesada appeared for Banco Popular in *Catalá-Del Valle v. NSSK San Juan, LLC*, No. 3:26-cv-01205. Four days later he appeared here for the Companies, opposed the members' proposed counsel, and sought sanctions. Those filings establish that he represented the Bank and the Companies at the same time, during this dispute.

108. The authority and loyalty claims concern the engagement, its instructions, the concurrent representation and the identified surrender of Company claims; Plaintiffs attribute each challenged decision to the managers and other actors specified below. Notice of Appearance, *Catalá-Del Valle v. NSSK San Juan, LLC*, No. 3:26-cv-01205-JAG, Docket 9 (D.P.R. Apr. 24, 2026); this action, Docket 49.

109. The April 25, 2022 wires are the clearest example of money leaving under the Bank's approval. That day — the day the first RICO action was filed — BGF wired $1,137,400 in principal to two equipment vendors: $1,029,400 to Galileo and $108,000 to TPI. The contemporaneous requests, the contract milestones and the payment records show that those payments were premature and unauthorized.

110. Economou and López Vidal later submitted declarations containing the same sentence: "At the time these payments were made, I was not aware that the case of caption had been filed." Certificate 14 e-mail chain, Economou and Medina Castillo (Mar. 29–31, 2022); No. 22-1190, Docket 50-1; Drawdown Certificate 14 and Notice of Borrowing (Mar. 28, 2022); No. 22-1190, Docket 50-4.

111. The Bank's exit is documented in two instruments: its November 14, 2024 letter agreement with VRM Renewable Series II, and the Asset Acquisition Agreement dated January 31, 2025 and closed in February 2025, whose § 3.6(c) expressly releases BPPR and its attorneys. That release is a concrete benefit to the Bank. Banco Popular–VRM Penzini Fund I (Renewable Series II) letter agreement (Nov. 14, 2024); Asset Acquisition Agreement (Jan. 31, 2025), § 3.6(c).

112. Plaintiffs assert corporate claims under 18 U.S.C. § 1962(c) and (d) and claims under Puerto Rico law, together with Boyd's separate personal-guaranty claim. They seek the remedies available under each count: trebling of the proven qualifying corporate RICO damages, costs and attorney's fees, and the instrument-specific Commonwealth damages, declaratory relief or annulment, and restitution where the law allows.

113. The same economic objective runs through the whole chronology.

114. First, money was obtained from the Companies through financing certifications and Bank-controlled releases that departed from the written protections.

115. Then, when the Plaintiff founders sued and the defaults matured, BPPR obtained Company releases through the Seventh Amendment, signed for both Companies by Rodrigo Zavala, whom the Companies' Board had declined to install and whom no resolution authorized.

116. Next, the January 2025 asset transaction moved the income-producing assets to a buyer whose parent held a Series A interest in the seller with the right to designate one of its managers — and designated one seven weeks after closing — confirmed the Bank's release, and left a conditional balance whose acceleration is tied to any claims against the transaction.

117. The managers who approved that transaction then selected Company counsel with multiple, longstanding relationships with BPPR, who dismissed the Companies' claims against the Bank with prejudice and disclaimed their interest in the collection appeal; and the assignee now

demands from Boyd the full pre-transaction balance without the credit its own contract records. Each step is pleaded below with its actor, instrument and date.

118. Which steps are alleged as predicate acts, and which as motive, knowledge, enterprise participation or separate Commonwealth claims, is stated in the predicate and defendant schedules.

119. The Bank's endorsement of the disputed lawyer is its own act.

120. Four days after appearing for Banco Popular in another case, Abesada appeared in this case for the Companies. BPPR's May 7, 2026 motion in First Circuit No. 26-1357 then affirmatively identified him, at paragraph 12, as the Companies' counsel and rejected Becker and Miñana.

121. The Bank thereby gave its own endorsement to the lawyer who had sought dismissal of Company claims against it.

122. On June 9, 2026, Abesada renewed the request to withdraw prior counsel's appearance and the Companies' answers here and told the Commonwealth Court of Appeals that the Companies had not appealed and had no interest in Boyd's collection appeal.

123. Plaintiffs challenge the responsible managers' surrender of Company participation and of available claims or defenses — not the June 16 judgment that records the appearance. BPPR Informative Motion to Correct Inaccuracies in Appellants' Docketing Statement and Case Caption, No. 26-1357 (1st Cir. May 7, 2026), Doc. 00118443427, ¶ 12; Docket 49; No. 24-1569, Docket 63 (July 11, 2025); Notice of Appearance, *Catalá-Del Valle v. NSSK San Juan, LLC*, No. 3:26-cv-01205-JAG, Docket 9 (D.P.R. Apr. 24, 2026); Docket 91, pp. 1–7; TA2025AP00277, Docket Entry 19 (June 9, 2026) at 1–2; Sentencia, TA2025AP00276 cons. TA2025AP00277 (June 16, 2026) at 6, 17–19.

124. BPPR's later requests were coordinated with the other defendants.

125. On June 9, BPPR and Ferrer joined the request to defer disqualification and the related discovery.

126. On July 6, they joined the Companies, Semillero/Borschow and the identified VRM defendants in asking for a sequence of threshold decisions that could moot most remaining disputes while leaving the sanctions requests in place. Those are the Bank's own acts, and they show the coordinated litigation positions. ECF Nos. 93, 115, ¶¶ 3–5 and signatures; referral order, Docket 118.

127. Three of the defendants' descriptions of the record are contradicted by the documents.

128. BPPR's September 8 surreply describes the asset agreement as unrelated to the Bank, although § 3.6(c) expressly releases the Bank and its attorneys.

129. Humacao RNG's August 31 opposition says the June appellate judgment does not mention the Companies' appearance, although page 6 records it.

130. VRM's May 21 assertion that the denial of the motion for leave to amend in No. 22-1190 had not been appealed was contradicted by the April 17 notice of appeal and corrected in VRM's June 29 filing. ECF Nos. 68, 106, 129, pp. 6–8; No. 22-1190, Docket 877 at 3; Asset Acquisition Agreement (Jan. 31, 2025); Humacao RNG Mem. in Opp. to Certiorari, CC-2026-0633 (Aug. 31, 2026); Sentencia, TA2025AP00276 cons. TA2025AP00277 (June 16, 2026) at 6.

131. Four judicial developments since February 7, 2026 are part of the procedural record: the March 18 RICO judgment in No. 22-1190; the May 26 Commonwealth authority ruling, which struck the third-party pleading for lateness and for lack of a corporate resolution; the June 16 collection-appeal judgment; and the September 3 denial of Commonwealth Supreme Court

review. No. 22-1190, Docket 874; Sentencia, TA2025AP00276 cons. TA2025AP00277 (June 16, 2026); SJ2024CV04616, Docket Entry 304 (May 26, 2026); Resolución, CC-2026-0633 (Sept. 3, 2026).

132. Later evidence now documents the earlier governance events. López Vidal's declaration of May 26, 2026 gives his personal account of the lack of notice, participation and consent concerning the asset transaction, the counsel selection and the manager designations.

133. On the grounds pleaded below, the January 31, 2025 written consent signed by Borschow and Villarini and the March 21 counsel resolution signed by Borschow and Feliciano did not validly approve the final terms, and the signers lacked authority at the relevant time. López Vidal Decl. (May 26, 2026); GFC Board Written Consent approving the Asset Acquisition Agreement (Jan. 31, 2025); GFC Board resolution dated "March 21, 2025," with the April 1, 2025 transmittal.

134. The financial foundation has been corrected and completed.

135. López Vidal attended every inspection, received the reports, and produced the complete inspection-report set through settlement — facts Boyd states from his own review of that production. On that foundation, the November 5, 2021 funding of $623,583.73 preceded the November 9 site visit and ESI011's November 11 signature (the certificate's cover is dated November 12). The matrices in Schedule A identify, for each release, the actual duty, the waiver provisions, the responsible actor and the transaction. QLICI Loan and Security Agreement (Sept. 15, 2020), § 6.3(b); QLICI Disbursing Agreement (Sept. 15, 2020), §§ 3.1, 3.3; esi Inspection Certificate 011 (Nov. 12, 2021); BGF operating-account statements and check images, Nov.–Dec. 2021.

136. Those financial additions concern earlier events, and the record shows when each was known.

137. The $610,152.15 transfer in June 2022 and the $500,000 release in April 2023 were already identified in partial records in 2024; Plaintiffs plead their specific restrictions, uses and resulting loss below.

138. The premium charge was pleaded in the April 25, 2022 original complaint, and the unpaid-premium prerequisite was pleaded in the January 31, 2023 Second Amended Complaint. Boyd separately recognized the full-Direct-Cost coverage deficiency while rereading the Credit Agreement on another issue during preparation of the Third Amended Complaint. BGF operating-account transactions, April 2023; BGF operating-account statement, June 2022; Seventh Amendment and Forbearance Agreement (Sept. 27, 2023); No. 22-1190, Docket 1, ¶¶ 60–61, 93–94; No. 22-1190, Docket 147, ¶¶ 144–49, 156.

139. This amendment supplies verification and claim-specific demand and futility allegations, separates the Companies' injury from Boyd's personal guaranty claim, and pleads the particular later acts.

140. Plaintiffs seek the Company remedies left available after the earlier authority and merits rulings.

141. The amendment requests no appellate review of those judgments.

**III. PARTIES AND CAPACITY**

142. This section identifies each party and the capacity in which it sues or is sued.

143. Gregory Boyd is a Puerto Rico domiciliary. He has held GFC units continuously from the transactions challenged here through filing. He assembled the project, secured gas rights and personally guaranteed its financing. He sues derivatively in Counts I–IX and XI. He sues

individually only in Count X, which concerns his September 15, 2020 BPPR guaranty. Irrevocable Proxy (June 2, 2025); GFC Majority Members' Written Consent (June 13, 2025); Guaranty Agreement (Sept. 15, 2020), Docket 50-5; El Coquí guaranty (July 30, 2019), Docket 50-6.

144. Jonathan Lassers has held 675,000 Class A Common Units of GFC continuously from the September 2020 closing through filing. Three sets of records show those units: the closing capitalization tables, the Bank's September 2023 schedule, and the 2025 member consents. He seeks recovery for the Companies. Irrevocable Proxy (June 2, 2025); GFC Majority Members' Written Consent (June 13, 2025).

145. Nominal Defendants GFC Holdings, LLC and Biomass Green Fuels, LLC (together, the "Companies") are Puerto Rico limited liability companies. GFC is registered with the Puerto Rico Department of State as GFC Holdings Limited Liability Company, Registry No. 355513; BGF is Registry No. 404180. GFC is the parent. BGF is the operating company: it holds the El Coquí landfill-gas rights and is Banco Popular's borrower.

146. The Companies are the real parties in interest on the derivative claims, which are brought for their benefit. They are joined as nominal defendants because persons adverse to them control their governance and their representation, as pleaded below. BGF Amended and Restated Operating Agreement (Sept. 14, 2020); BGF Second Amended and Restated LLC Agreement (Sept. 11, 2023); P.R. Department of State registry filings of June 13, 2025 (GFC); P.R. Department of State Corporate Information records (GFC and BGF).

147. Defendant Banco Popular de Puerto Rico ("BPPR" or the "Bank") is a Puerto Rico banking corporation. It is a subsidiary of Popular, Inc., a bank holding company. Under the Credit Agreement, BPPR was the Companies' Lender and Administrative Agent. Popular, Inc. Form 10-K; Credit Agreement (Sept. 15, 2020).

148. Defendant Ignacio Álvarez Zataraín was President and Chief Executive Officer of Popular, Inc. and of the Bank from July 1, 2017 until his retirement took effect on June 30, 2025.

149. From 1992 to 2010 he was a founding partner of Pietrantoni Méndez & Álvarez LLC ("PMA"). PMA prepared the Bank's loan documents. PMA sent the December 20, 2021 assurance. PMA defends the Bank here and in No. 24-1569.

150. On July 18, 2022, Álvarez signed the RLNG Purchase, Sale and Delivery Agreement for the Bank as President and Chief Executive Officer. He signed it three months after the first RICO action had named the Bank. He signed it while the Bank's own statements showed BGF's installments past due. He also promoted the arrangement publicly.

151. Popular's 2022 proxy statement, issued over his shareholder letter, reported that "[i]n 2021, Popular completed the combined heat and power generation in one of our buildings located in Puerto Rico, to be fueled mostly by renewable liquid natural gas produced in local landfills," and El Nuevo Día published his video interview on the same subject. That interview appeared on October 1, 2022, under the headline "Banco Popular apuesta al gas metano para generar energía" ("Banco Popular bets on methane gas to generate energy"). That was six months after the first RICO action named the Bank, and BGF was then in default. In the interview he described the Bank's contract with "a business that captures methane gas from a landfill" as "extraordinary." He said the Bank would "be the first in Puerto Rico to do this."

152. Defendant Javier D. Ferrer was also a PMA founding partner. He was the Bank's Executive Vice President and General Counsel from October 2014 through December 2021, its Chief Operating Officer from January 1, 2022, its President from May 2024 and its Chief Executive Officer from July 1, 2025. The November 2021 construction-fraud notices were addressed to him. They included the November 11 e-mail to his popular.com address and the

December 2 letter. The Bank's December 20 assurance followed those notices. So did the Bank's continued releases and its later amendments. Ferrer was the officer to whom the fraud notices were addressed; Álvarez was the officer who signed the agreement that gave the Bank its own return from the financed plant. BGF–Banco Popular RLNG Off-Take Agreement (July 18, 2022); Marsh letters to Muñiz Cotté (Feb. 9, 2022) and to Trelles-Hernández (Feb. 27, 2022); Marsh letter to Ferrer and Coleman Tió (Dec. 2, 2021); Carballido Clerch e-mail to Ferrer (Nov. 11, 2021); BGF bank statement showing the November 5 and 12, 2021 loan draws; Popular, Inc. Forms 8-K, Sept. 26, 2014, Apr. 25, 2017 and Feb. 27, 2025; Popular, Inc. 2022 Proxy Statement, at 4 (Corporate Sustainability); Marian Díaz, *Banco Popular apuesta al gas metano para generar energía*, El Nuevo Día (Oct. 1, 2022) (video interview by Luis Alberto Ferré Rangel); No. 24-1569, Docket 24.

153. Defendant Alexander Borschow served on GFC's Board of Managers.

154. Defendant Semillero Partners, LLC is his affiliated management entity. It is also the General Member of Semillero Investment Fund I, LLC.

155. The Operating Agreement identifies the fund as "Semillero" and as a Series A holder. Partners and Fund I are separate entities.

156. Plaintiffs challenge Partners' own participation, through Borschow, in the management decisions described below. GFC Majority Members' Written Consent (June 13, 2025); Borschow communication to the GFC members (Mar. 31, 2025).

157. Ernesto Villarini served on GFC's Board as the designee of Defendant The Puerto Rico Fund for Growth, L.P. ("PRFG").

158. PRFG is a preferred-equity holder of 2,272,152 units. Its general partner is an affiliate of Defendant Community Development Venture Capital Alliance ("CDVCA"), which

itself holds 982,612 units. Villarini acted for both. Schedule 2.9 of the Asset Acquisition Agreement, which he approved, allocates $528,526 to PRFG and $208,576 to CDVCA.

159. Villarini resigned on February 14, 2025, one week after the asset sale closed. His resignation was sent on the letterhead of PRFG and its general partner, CDVCA Puerto Rico GP, LLC. It stated that "Puerto Rico Fund for Growth LP will not be appointing a replacement manager to the Board of Managers." The seat, in other words, was the fund's. PRFG resignation letter from the GFC Board (Feb. 14, 2025); Asset Acquisition Agreement (Jan. 31, 2025); GFC Majority Members' Written Consent (June 13, 2025).

160. Plaintiffs group seven parties under one name. Borschow, Semillero Partners, Villarini, PRFG, CDVCA and — for their service on GFC's Board in 2023 — Rafael Rojo and Carlos Penzini are the "Manager Defendants." GFC Majority Members' Written Consent (June 13, 2025); Borschow communication to the GFC members (Mar. 31, 2025).

161. Plaintiffs call seven entities the "VRM-Penzini Defendants": VRM Penzini Capital, LLC; VRM Penzini Fund I, LLC; VRM Penzini Fund I, LLC Renewable Series II; Star Power Systems, LLC; Humacao RNG, LLC; Ponce RNG, LLC; and Island Renewable Energies, LLC. Defendants Rafael Rojo, Carlos Penzini and Diego Rodríguez are the principals who acted for those entities. Each of the three signed the January 18, 2023 confidentiality agreement by name, as the representatives of VRM Penzini Capital, doing business as Star Power Systems. Rojo gave the January 2023 assurances through which the Companies' information was obtained. Rojo and Penzini signed the September 11, 2023 GFC board consent as managers. Penzini signed the November 14, 2024 letter agreement with the Bank for Renewable Series II, wrote the November 15, 2024 letter reducing the members' recovery, and signed the Asset Acquisition Agreement for

Humacao RNG. NDA (Jan. 18, 2023); Banco Popular–VRM Penzini Fund I (Renewable Series II) letter agreement (Nov. 14, 2024); Asset Acquisition Agreement (Jan. 31, 2025).

162. Renewable Series II is a series of VRM Penzini Fund I, LLC. Schedule 2.9 of the Asset Acquisition Agreement allocates $428,417 and $332,804 to "VRM Penzini Fund I L.L.C. – Renewable Series II." Four of these entities — Humacao, Ponce RNG, Renewable Series II and Star Power — are referred to as the Transferee Defendants. Humacao signed the Asset Acquisition Agreement as buyer and claimed assignment of the Bank's creditor rights. Ponce RNG received the identified Ponce gas rights. The agreement identifies Humacao as wholly owned by Renewable Series II. That buyer's parent was also a Series A holder with a right to designate a GFC manager. Its interests therefore reached both sides of the challenged sale. The Puerto Rico Department of State registry records for each entity show overlapping officers and addresses. Asset Acquisition Agreement (Jan. 31, 2025); GFC Operating Agreement (Oct. 20, 2021), as amended.

163. George Economou served as BGF's Chief Financial Officer.

164. Joval F. Rodríguez Barnes was the Bank's Commercial Relationship Officer for this financing from its September 2020 closing until he left the Bank in the second half of 2021. He signed the Credit Agreement, the QLICI Disbursing Agreement and the May 6, 2021 First Amendment for BPPR. He sent the closing schedule that funded the contractor's bond premium from BGF's borrowing. He was the addressee of the independent engineer's inspection certificates through June 2021. He approved every advance from the closing through September 2021. Laura Medina Castillo succeeded him as the approving officer, beginning with Draw 11 in November 2021.

165. Rodríguez Barnes also personally advanced $30,000 to GFC and received $66,000.

166. Two January 2019 checks, identified in the December 2021 notice, reflect those payments.

167. Accurate Solutions Corp. and Roberto D. Acosta Martín are not defendants to the retained claims; their acts are described in paragraphs 169–175. Credit Agreement (Sept. 15, 2020); QLICI Disbursing Agreement (Sept. 15, 2020); First Amendment to Credit Agreement (May 6, 2021); Rodríguez Barnes closing e-mail (Sept. 14, 2020); esi Inspection Certificate 007 (Apr. 23, 2021); esi Inspection Certificate 009 (June 8, 2021); GFC/BGF Board minutes and notes; MAPFRE payment and performance bond No. 1301208000513; Marsh letter to Ferrer and Coleman Tió (Dec. 2, 2021).

168. Economou admits that he submitted Drawdown Request Certificate 14 on March 29, 2022. He identifies the second tax-credit tranche as the impetus for the April 25 vendor payments. His submission, Medina Castillo's review and the resulting wires are pleaded separately below. No. 22-1190, Docket 50-4, ¶ 3; Banco Popular debit advices (Apr. 25, 2022).

169. Accurate Solutions Corp. ("ASC") is a Puerto Rico for-profit corporation, Department of State Registry No. 355577, organized June 25, 2015. Its designated office is at 105 José G. Padilla, Módulo 202A, Mayagüez, Puerto Rico 00682, and its mailing address is P.O. Box 6014, Mayagüez, Puerto Rico 00681. Its registered purpose is the manufacture, distribution and service of electrical, automation and instrumentation equipment.

170. ASC is a 50% participant in Distributed Power Innovators, JV, the construction joint venture. The May 15, 2020 JV Agreement identifies International Technical Services, Inc. ("ITS") and ASC as equal participants and allocates the venture's insurance premiums between them. MAPFRE's April 15, 2021 endorsement names the bond's principal as "International Technical Services Inc./Accurate Solutions Corp as a Joint Venture (JV)." The bond's principal,

in other words, was the two companies together. P.R. Department of State registry record, Accurate Solutions Corp., Registry No. 355577; JV Agreement (May 15, 2020), ¶ 8 and signatures; MAPFRE payment and performance bond No. 1301208000513 and endorsement (Apr. 15, 2021).

171. ASC supplied the energy-storage system, the Jenbacher engine enclosures, the main switchgear and the control panels for the Jenbacher J208 generation equipment. It was paid for them as a named line of the Bank's advances: $300,000 and $190,567.88 in Drawdown Certificate 2, $300,000 and $202,644 in Certificate 5, $202,644 in Certificate 6 and $40,336.14 in Certificate 9. That is $1,236,192.02 before Certificate 11. BGF's Certificate 11 request files of October 30 and November 3, 2021 carry $791,702.87 and then $480,294.12, $121,612.63 and $59,023 of ASC items. Among them is invoice 1320-609b of October 4, 2021, "Certification # 3 (Final Invoice)" for the battery system, battery enclosure, inverter and isolation transformer. Another is invoice 1321-1004bR1 of the same date, for $59,023 of J208 panels and master controls that ASC itself described as "[a]dditional equipment not included on ITS/ASC Original Scope." By ASC's own description, that equipment lay outside the original scope. BGF Master Budget workbook, Certificate 2, 5, 6, 9 and 11 request schedules and Budget Recap; ASC invoices 1320-609b, 1321-1004R2, 1321-1004-3R1, 1321-1004bR2 and 1321-1004bR1 (Oct. 4, 2021).

172. After the construction contract's June 30, 2021 term had ended, and without any written change order, ASC was paid three checks directly from BGF's operating account. Check 1202, for $121,612.63, cleared December 7, 2021; that is the amount of the Certificate 11 line. Check 1245, for $114,135, cleared December 30, 2021. Check 2877, for $166,001, is dated November 10, 2022 (Certificate 19).

173. The acquiring investors' own complaint describes ASC as a company of López Gómez's business partner. ASC was a defendant in No. 22-1190. The Companies have not released

it. BGF operating-account statements and check images, Nov.–Dec. 2021 and Nov. 2022; SJ2024CV07694 Compl., at 2.

174. Roberto D. Acosta Martín is a resident of Puerto Rico and an engineer. He was sued as "Roberto A. Acosta" in No. 22-1190. He is ASC's incorporator, resident agent, president and treasurer and, through ASC, a 50% owner of the joint venture. He signed the JV Agreement for ASC. As engineer, he signed and sealed the ESS & J208 Operational Certification. The certification states that the "Jenbacher J208 Gas Engine was commissioned on October 2021" and that the "Energy Storage System (ESS) was commissioned on November 2021." Those statements were false when made. P.R. Department of State registry record, Accurate Solutions Corp., Registry No. 355577; JV Agreement (May 15, 2020), signatures; ESS & J208 Operational Certification (Acosta Martín), as quoted in El Coquí's notice of default of January 17, 2023, reproduced in Docket 1, ¶ 839.

175. On the night of November 23, 2021, López Vidal wrote to Acosta Martín and the Lópezes about that day's attempt to start the engine from the batteries and the inverter, with El Coquí's personnel present. The attempt had ended in a near-accident: someone from Accurate energized the batteries and the inverter while a worker had his head inside the control-center panel. No panel was labeled. The energized panels were not locked. The emergency switches — including those inside the J208 enclosure — were not installed. Acosta Martín had said he would attend and never arrived. The tests to see whether the engine could be started would continue the next morning ("Mañana seguimos con las pruebas para ver si podemos prender el motor"). Eleven days earlier, the Bank's inspector had recorded no testing and 39% construction progress. Seven weeks earlier, ASC had issued its "Final Invoice" for the battery system. El Coquí Landfill Company quoted the certification in its January 17, 2023 notice of default to show that BGF's start-up was late. The

Companies have not released Acosta Martín or ASC. López Vidal e-mail to Acosta Martín, López Gómez and López (Nov. 23, 2021); esi Inspection Certificate 011 (Nov. 12, 2021); ASC invoice 1320-609b (Oct. 4, 2021); ESS & J208 Operational Certification (Acosta Martín), as quoted in El Coquí's notice of default of January 17, 2023, reproduced in Docket 1, ¶ 839.

176. Distributed Power Innovators, JV, the ITS/Accurate Solutions construction joint venture, is not a defendant. It contracted to build the identified works for $5 million. BGF paid the venture's $70,500 bond premium from loan proceeds. The venture obtained payment for an expense allocated to its own participants and for additional construction without the required written changes. Its participants are International Technical Services, Inc., which is not a defendant (paragraph 183), and ASC (paragraphs 169–170). Construction Contract (June 18, 2020) and JV Agreement (May 15, 2020), art. III; MAPFRE payment and performance bond No. 1301208000513; Rodríguez Barnes closing e-mail (Sept. 14, 2020); Venture Engineering Independent Assessment (Aug. 3, 2022).

177. PCC Sub-CDE 13, LLC is not a defendant. It is the New Markets Tax Credit sub-CDE of Popular Community Capital, "a subsidiary of Banco Popular de Puerto Rico" by the Defendants' own sworn account. It is majority-owned by COCRF Investor 193, LLC, whose sole member is Capital One, N.A. Its QLICI Loan and Security Agreement of September 15, 2020 combined QLICI Note A ($5,130,750) and Note B ($2,069,250) into $7,200,000, advanced at closing at 4.83% per year. The loan matures September 15, 2027, and no prepayment is permitted before the seventh anniversary. Under the Intercreditor Agreement, BPPR is the senior lender. Boyd is not a party to any guaranty of those notes; the Payment and Completion Guaranty bears the signatures of López Vidal and Ríos Mena only. The "PCC Loans" are part of the debt the Asset Acquisition Agreement restructured through its § 2.10. Asset Acquisition Agreement (Jan. 31,

2025), p. 14; No. 22-1190, Docket 50-4, ¶ 19; Drawdown Certificate 14 and Notice of Borrowing (Mar. 28, 2022), ¶ 1; QLICI Loan and Security Agreement (Sept. 15, 2020), § 1.1, pp. 1–2; QLICI Loan A and Loan B Notes (Sept. 15, 2020); Payment and Completion Guaranty signature pages (Sept. 15, 2020).

178. No separate wrongdoing is attributed to an unidentified spouse. Any conjugal partnership is joined solely for community liability arising from the named individual's conduct and any benefit to that community.

**IV. JURISDICTION, VENUE AND SUPPLEMENTATION**

179. This section states the grounds for jurisdiction and venue and the rules under which Plaintiffs amend and supplement. The Court has federal-question jurisdiction over Counts I–II under 28 U.S.C. § 1331; 18 U.S.C. § 1964(c) supplies the cause of action. The related Commonwealth claims, including Boyd's Count X, invoke 28 U.S.C. § 1367. Count XI also invokes 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c). The Commonwealth claims arise from the same financing, administration and related transactions as the federal claims. Plaintiffs invoke § 1367(a), subject to the Court's discretion under § 1367(c).

180. Venue is proper under 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b). Defendants reside in or transact affairs in this District, and a substantial part of the events and omissions giving rise to the claims occurred here.

181. The Court has specific personal jurisdiction over each retained Defendant. Each one's conduct in Puerto Rico gives rise to the claim asserted against it, including the financing, management and acquisition acts attributed below. Puerto Rico organization and residence supply additional jurisdictional grounds where they apply.

182. This Complaint supersedes the Complaint filed February 7, 2026 (Docket 1). Plaintiffs adopt no allegation of that pleading by reference. The claims pleaded here are stated in full in this Complaint and its Schedule A, and no other claim is asserted. Plaintiffs request leave to amend under Rule 15(a)(2). They request leave to supplement under Rule 15(d) for the specifically dated acts that occurred after February 7, 2026. The amended claims against the existing defendants arise from the financing, payments, sale and representation transactions that Docket 1 described. For those same transactions, Plaintiffs invoke Rule 15(c)(1)(B). The later, independent acts are pleaded as supplemental claims. The Companies' rights as obligee under MAPFRE bond No. 1301208000513, and the other pre-closing claims that § 2.2(d) of the Asset Acquisition Agreement retained for them, are pleaded here as Company claims.

## V. IDENTIFIED PARTICIPANTS AND ATTRIBUTION

183. This section explains whose conduct the Complaint describes and how that conduct is attributed. Some of the persons described are not defendants to the retained claims: the López-family parties, Goytía, ITS, Accurate Solutions Corp., Roberto D. Acosta Martín, Distributed Power Innovators, JV, Green Hydrogen, and World Spirits. Their acts are attributed individually where relevant. No. 22-1190, Docket 60-2.

184. Counsel's acts are attributed to a named Defendant only where that Defendant authorized or directed the particular conduct. Abesada and AB-AG LAW LLC appeared for the Companies. Picó and Picó Advisors communicated Board positions. The Bank's officers are identified in connection with their own financing acts. GFC Board resolution dated "March 21, 2025," with the April 1, 2025 transmittal; Rodríguez Barnes closing e-mail (Sept. 14, 2020); Picó letter to Becker Whitaker (June 19, 2025).

185. Corporate recovery belongs to the injured Company. It will be reduced by compensation already received for the same injury, including applicable López-family settlement payments; each release is applied to its own parties, claims and terms. Boyd's Count X seeks his own guaranty relief. No Company recovery is payable to him in exchange for a release of his personal exposure.

## VI. THE PRIOR CASES DECIDED WHO COULD SUE, NOT THE COMPANIES' CLAIMS

### A. The first RICO action dismissed the Plaintiff founders' personal claims; that ruling is on appeal

186. Four earlier proceedings bear on this one; this section states what happened in each and what each left for decision here. The first is the original RICO action. On April 25, 2022, Boyd and Lassers filed *Boyd v. López Vidal*, No. 3:22-cv-01190 (D.P.R.), against the López-family insiders and others. The suit arose from the construction and certification fraud described below. Banco Popular was a defendant and was served on April 29, 2022. The Companies were initially named as nominal defendants.

187. The operative pleading there was the Second Amended Complaint, filed January 31, 2023 as Docket 147. It asserted individual and derivative claims. The court addressed the Companies' realignment and representation. No. 22-1190, Docket 1; No. 22-1190, Docket 874 at 23–25.

188. The court's March 18, 2026 opinion addressed direct RICO injury, particularity, and the attempted derivative claims. It found more than a missing verification: it also rejected the demand allegations and the adequate-representation showing. The judgment dismissed all remaining federal claims with prejudice. No. 22-1190, ECF Nos. 874, 876.

189. Before that ruling, on January 20, 2026, Plaintiffs had tendered a proposed verified Third Amended Complaint as Docket 831-1. The motion invoked Rules 15(a)(2) and 15(d). The proposed pleading included the 2023 RSA, the 2025 asset sale and release, the loan assignment, corporate injuries, and allegations concerning control of counsel. On January 21, the court denied leave to amend for delay and prejudice. On January 23, it denied reconsideration. Those orders could not adjudicate acts that had not yet occurred, including the April and June 2026 conduct pleaded here. No. 22-1190, Docket 831, at 1, 6–7; Docket 831-1, at 191–206, 218, 227–230; ECF Nos. 831-2, at 1, and 831-3, at 1; No. 22-1190, ECF Nos. 847, 855.

190. On April 17, 2026, Plaintiffs filed their notice of appeal. It designated the March 18 dismissal and judgment, the January 21 denial of leave to file the third amended complaint, the January 23 denial of reconsideration, and the earlier authority ruling. The notice expressly identifies the amendment rulings in the third and fourth numbered items on page 3. The First Circuit docketed the appeal as No. 26-1424. Plaintiffs seek review through that appeal. Filing it did not vacate the challenged rulings. No. 22-1190, Docket 877 at 1–4; Docket 50-3 here.

**B. In the anti-tying action the Bank's longtime counsel dismiss the Companies' claims; that ruling is on appeal**

191. The second prior case is the anti-tying action, *Boyd v. Banco Popular de P.R.*, No. 3:24-cv-01569 (D.P.R.). On July 2, 2025, the Court granted a motion to amend that added the Companies as co-plaintiffs. Nine days later, on July 11, 2025, Banco Popular's longtime counsel, purporting to act for the Companies, filed a one-page notice voluntarily dismissing the Companies' claims with prejudice. The court held the Bank's answer deadline in abeyance. On December 22, 2025, it granted the notice over Plaintiffs' objection to the authority behind it. Plaintiffs are

appealing those dispositions in the First Circuit. No. 24-1569, Order of July 2, 2025, ¶¶ 2–3, 7; No. 24-1569, Docket 63 (July 11, 2025); No. 24-1569, Docket 131 at 24.

192. The December 22 opinion held that Boyd and Lassers had not alleged a direct, nonderivative injury that would permit them to assert the Companies' anti-tying claims under the BHCA. It also rejected their attempted derivative theory, for three reasons: the theory was raised belatedly, the complaint was unverified, and demand or excuse was not pleaded with particularity. It rejected reliance on the June 13 member consent to override the Board. It declined supplemental jurisdiction over the remaining Commonwealth claim. On March 10, 2026, the court denied reconsideration and described the requested further amendment as futile and untimely. The Commonwealth court separately dismissed the parallel BHCA counterclaim because that claim was being litigated in federal court. No. 24-1569, Docket 131 at 17–24; No. 24-1569, ECF Nos. 133 and 140; SJ2024CV04616, Docket Entry 242 (July 14, 2025).

193. On April 1, 2026, Plaintiffs filed their notice of appeal. It expressly designated Docket 131 and the reconsideration and amendment ruling at Docket 140. The First Circuit docketed the appeal as No. 26-1357. In it, Plaintiffs challenge the authority and conflicts underlying the surrender of the Companies' claims. The appeal did not vacate those rulings. No. 24-1569, Docket 141, at 1 ¶ 1, reproduced in Docket 50-4 here, at 2.

**C. The collection judgment was entered while the Companies had no lawyer**

194. The third prior case is the Bank's collection suit. On May 22, 2024, Banco Popular sued BGF, GFC, and the personal guarantors to collect $12,137,270.01 and execute on its collateral: *Banco Popular de P.R. v. Biomass Green Fuels LLC*, No. SJ2024CV04616 (P.R. Ct. First Inst.).

195. The Companies admitted the debt but disputed the Bank's demand for its fees in the federal action. Their November 29, 2024 opposition left 172 of the Bank's 175 proposed facts uncontested and challenged only the three that addressed those fees. On December 10, their lawyer moved to withdraw after reporting that a member had questioned his loyalty. The Bank then renewed its request for judgment on the conceded items. At the December 18 conference, the court allowed counsel to withdraw, gave the Companies thirty days to obtain new counsel, and allowed five days to respond to the renewed motion. The Bank's lawyer stated that no negotiation then in progress would affect entry of partial judgment. By then, the Bank had signed its November 14 letter agreement with VRM on the indicative terms of a sale of its loan position. On December 27, with no new lawyer appearing for the Companies, the court entered a $13,418,352.07 partial judgment against them. The judgment did not award the disputed federal-case fees or resolve the guarantors' liability.

196. Boyd appealed, for himself and purportedly for the Companies; the authority for the latter appearance was contested. The Puerto Rico Court of Appeals named Boyd and the Companies as appellants. The Bank's assignee, Humacao RNG, later relied on the Companies' admissions and their failure to challenge the judgment. SJ2024CV04616, Docket Entry 162; SJ2024CV04616, Docket Entry 171; SJ2024CV04616, Docket Entry 195 (Dec. 18, 2024 minutes) at 2; SJ2024CV04616, Docket Entry 192 (Dec. 27, 2024) at 2–3; Sentencia, TA2025AP00276 cons. TA2025AP00277 (June 16, 2026) at 2; Humacao RNG Mem. in Opp. to Certiorari, CC-2026-0633 (Aug. 31, 2026) at 7; SJ2024CV04616, Docket Entry 170 (Dec. 10, 2024), ¶ 1; SJ2024CV04616, Docket Entry 178.

197. The Bank opposed reconsideration on alternative grounds. It argued that Boyd lacked standing to oppose a motion directed at BGF's debt and that he had, in any event, failed to

use his opportunities to respond. On July 16, 2025, the court denied reconsideration. It relied on the failure to raise the objection earlier and on the debtor's admission of the debt. Plaintiffs dispute the treatment of the Companies' representation during this period: their counsel withdrew on December 18, 2024, and the Bank's conflicted counsel, Abesada, appeared for them on June 25, 2025. Humacao RNG Mem. in Opp. to Certiorari, CC-2026-0633 (Aug. 31, 2026) at 13; SJ2024CV04616, Docket Entry 238; BPPR opposition to reconsideration, SJ2024CV04616, at 2–3; SJ2024CV04616, Docket Entry 206, ¶ 1.

198. The Commonwealth third-party pleading has a separate procedural history. A September 11, 2025 direction preceded a September 13 resubmission; later entries addressed clarification and a revised September 30 pleading. On May 26, 2026, the court struck the third-party pleading for lateness and for lack of a corporate resolution authorizing Boyd to sue in the Companies' name. Plaintiffs dispute the lateness characterization. The court also denied Boyd's effort to dismiss Humacao RNG's claims and imposed insurance-related contempt sanctions on the personal guarantors. SJ2024CV04616, Docket Entry 304 (May 26, 2026) at 1–6; SJ2024CV04616, Docket Entry 242 (July 14, 2025).

199. On June 9, 2026, Abesada appeared for the Companies in the collection appeal and stated that they had not appealed and had no interest in doing so. The Court of Appeals recorded that position. On June 16, it affirmed the partial judgment, citing its own review of the record and the trial court's application of Rules 36 and 42.3. It also denied the request for relief concerning the May 26 sanctions, permitted execution before mandate, and denied certiorari in the consolidated proceeding. Plaintiffs challenge counsel's authority and conflicts on the grounds pleaded below. Sentencia, TA2025AP00276 cons. TA2025AP00277 (June 16, 2026) at 6; TA2025AP00277, Docket Entry 19 (June 9, 2026) at 1.

200. On July 20, 2026, the Court of Appeals denied both reconsideration motions, including Boyd's June 30 motion. On August 21, it declined further relief on Boyd's August 19 disqualification motion and referred him to its June 16 judgment. TA2025AP00277, Docket Entries 33–35.

201. On September 3, 2026, the Supreme Court of Puerto Rico denied Boyd's petition for certiorari and his motion in aid of jurisdiction without a statement of reasons. Humacao RNG had opposed the petition by a memorandum filed August 31, 2026; its certificate recites service by e-mail that day. The memorandum relied on the Companies' silence as an admission of the debt and on the appearance of the Bank's counsel as the Companies' voice. Boyd's counsel received the memorandum on September 11, 2026, and its 1,294-page appendix the next day. Boyd filed a motion for reconsideration on September 17, 2026. Boyd Mot. for Reconsideration, CC-2026-0633 (Sept. 17, 2026), at 1; Humacao RNG Mem. in Opp. to Certiorari, CC-2026-0633 (Aug. 31, 2026); Resolución, CC-2026-0633 (Sept. 3, 2026).

202. The fourth proceeding is the investors' own suit. On August 21, 2024, Borschow, his Semillero entities, and VRM Penzini Fund I, LLC Renewable Series II sued the Lópezes and the Companies: *VRM Penzini Fund I, LLC v. López Vidal*, No. SJ2024CV07694 (P.R. Ct. First Inst.). Plaintiffs highlight the admissions in that pleading below. SJ2024CV07694 Compl., at 1, Docket Entry 1.

203. Boyd and Lassers proceed as members of GFC, derivatively for GFC and double derivatively through GFC for BGF. They plead below their continuous ownership, their requests for Company action, the actual refusals, and the disabling interests of the decision makers. Irrevocable Proxy (June 2, 2025); GFC Majority Members' Written Consent (June 13, 2025); BGF Amended and Restated Operating Agreement (Sept. 14, 2020); BGF Second Amended and

Restated LLC Agreement (Sept. 11, 2023); SJ2024CV04616, Docket Entry 68 (Aug. 30, 2024), at 9.

204. Plaintiffs seek relief for the defendants' own conduct, including the independently later decisions identified below. They seek no federal order vacating, reducing or enjoining the Commonwealth collection judgment.

205. The claim-specific prior-ruling schedule below identifies the federal judgments, the dismissed Commonwealth claims, the rejected amendment, and the independently later acts.

206. Plaintiffs seek adjudication of those later acts and of the Commonwealth claims left unadjudicated on their merits.

207. For overlapping federal claims whose viability depends on appellate relief, Plaintiffs alternatively request a stay pending the already-filed appeals rather than a contrary determination of the same adjudicated issue. That request does not suspend or diminish the existing judgments.

## VII. THE ASSET SALE LACKED THE REQUIRED MEMBER APPROVALS, AND THE MANAGERS WERE CONFLICTED

208. This section sets out who governed GFC, what approvals the asset sale required and did not receive, and the rulings on who may act for the Companies.

209. The Operating Agreement vests management in GFC's Board, subject to the Agreement and the Act. Section 6.2 lists the Board's powers; § 6.3 requires the Series A Managers' approval for specified matters; and § 6.4 requires member approvals for others. GFC Operating Agreement (Oct. 20, 2021), as amended, §§ 6.1–6.4; also of record at Docket 49-2.

210. Under 14 L.P.R.A. §§ 4003–4005, an LLC member may sue derivatively when the authorized decisionmakers refuse to act or when an effort to make them act is unlikely to succeed. Rule 23.1 governs the pleading; Puerto Rico law supplies the demand rule.

211. Plaintiffs plead the actual requests, the refusals and the disabling interests below. Section 3977 governs the identified loyalty duties.

212. The September 18, 2024 Third Amendment permits a Board of two to seven managers and makes the identified designation rights permissive. The Second Amendment separately addresses disqualification for Cause in § 6.1(f) and removal and successors in § 6.8. GFC Operating Agreement (Oct. 20, 2021), as amended.

213. Section 11.3, as amended May 22, 2023, requires the prior written consent of all Series A Holders to any amendment that modifies their rights and preferences. Plaintiffs allege on information and belief that the August 2023 and September 2024 changes to Board designation and voting rights lacked that approval. The allegation rests on the executed copies, which omit Parliament's and Flexitank's signatures, and on the governance record described below. GFC Operating Agreement, First Amendment (May 22, 2023), § 14.

214. The Companies' counsel identified López Vidal, Borschow, and Villarini as their administrators in the December 10, 2024 Commonwealth filing.

215. A signed February 14, 2025 letter to GFC's members announced Villarini's immediate resignation and stated that PRFG would not appoint a replacement.

216. Borschow's March 31 notice later announced the additional designations described in paragraphs 735–736. López Vidal Decl. (May 26, 2026), ¶ 3; PRFG resignation letter from the GFC Board (Feb. 14, 2025); SJ2024CV04616, Docket Entry 170 (Dec. 10, 2024), ¶ 8; Borschow communication to the GFC members (Mar. 31, 2025), at 1–2.

217. The managers' designation interests matter to the conflict inquiry.

218. Borschow was Semillero's designee, Villarini was PRFG's, and Feliciano was VRM's.

219. Schedule 2.9 allocated consideration to the relevant investment entities. Those designation relationships, the financial interests, and the individual conduct described below impaired the managers' ability to assess the transaction impartially. Asset Acquisition Agreement (Jan. 31, 2025), sched. 2.9.

220. The final asset agreement transferred substantially all operating assets and project rights. It reached after-acquired Project assets, retained specified liabilities and claims in the sellers, and imposed a five-year Caribbean noncompetition restriction.

221. The sale was a Deemed Liquidation Event under the Operating Agreement and required the approvals governing that transaction. Asset Acquisition Agreement (Jan. 31, 2025), §§ 2.1–2.3, 2.6, 3.7; GFC Operating Agreement (Oct. 20, 2021), as amended, art. II.

222. Borschow signed the Asset Acquisition Agreement as Authorized Signatory based on a September 20, 2024 approval. That approval concerned an earlier letter of intent; it did not approve the material changes in the final transaction.

223. Plaintiffs also rely on BGF's Board objection and on the February 6 cease-and-desist. The June 13, 2025 consent expressed the members' later opposition. The transaction required the approval of all the members under § 9.1. Asset Acquisition Agreement (Jan. 31, 2025); GFC Operating Agreement (Oct. 20, 2021), as amended, § 9.1; BGF Board resolution refusing the asset transfer (Jan. 31, 2025); Boyd and Lassers cease-and-desist notice (Feb. 6, 2025); GFC Majority Members' Written Consent (June 13, 2025); GFC Board Written Consent approving the Asset Acquisition Agreement (Jan. 31, 2025).

224. Independently of the need for unanimity, Plaintiffs contest whether the final transaction obtained the approvals required by §§ 4.2(j) and 6.4 and satisfied the closing condition in § 5.1(f) of the Asset Acquisition Agreement.

225. The actual consents and voting strength did not approve the materially changed final terms under those provisions. Asset Acquisition Agreement (Jan. 31, 2025), § 5.1(f); GFC Operating Agreement (Oct. 20, 2021), as amended.

226. Three authority rulings bear on who may act for the Companies. The August 12, 2025 order in No. 22-1190 held that a member majority could not by resolution displace the Board's management or install counsel for the Companies. The December 22, 2025 opinion in No. 24-1569 held the members' June 13, 2025 written consent invalid under the Operating Agreement (paragraph 192). The May 26, 2026 Commonwealth resolution held that majority ownership alone does not authorize a member to sue in the Companies' name absent a corporate resolution. No. 22-1190, Docket 800, at 14–20; No. 22-1190, Docket 877 at 3; Docket 49, ¶¶ 10–11; SJ2024CV04616, Docket Entry 304 (May 26, 2026) at 6.

## VIII. FACTUAL ALLEGATIONS: THE FINANCING, THE GAS AND THE COMPANY CLAIMS

### A. The Bank closed its $19.07 million financing without the paid bond it required

227. This section shows what the Companies owned and how the Bank's loan closed.

228. The Companies held a valuable, long-term gas resource.

229. The Bank committed approximately $19.07 million on written conditions, including a paid performance bond covering 100% of Direct Costs. It then closed without that bond, charged the contractor's premium to BGF, and withheld from Boyd, before he became bound, that the required protection had not been secured.

230. The Companies were formed to develop and operate a renewable-energy project that captures landfill gas at the El Coquí site and converts it into renewable natural gas. Plaintiffs alleged these closing and bond transactions in the Complaint, Docket 1, ¶¶ 329–356; they are restated here as the Companies' claims. P.R. Treasury Act 73 tax-credit determination, Case 19-73-I-011 (Aug. 26, 2020).

231. The gas rights are long and specific.

232. Under the Landfill Gas Sale and Purchase Agreement of December 28, 2018, as amended July 19, 2019, BGF purchases the landfill's gas for an initial term of twenty-five years, with successive ten-year extensions. Section 2.5(b) gives BGF the exclusive right to the revenues from the renewable natural gas it produces and sells. Section 2.5(a) allocates the environmental attributes between the parties: the seller retains specified attributes, and BGF takes the renewable identification numbers and credits generated by its fuel. The July 2019 amendment added carbon-dioxide rights.

233. The project's value came from recurring gas and CO2 sales and from the attributes allocated under those long-term contracts. That value depended on the plant's performance, the applicable credit rules and the contracts' terms. El Coquí Landfill Gas Sale and Purchase Agreement (Dec. 28, 2018), with First Amendment (July 19, 2019).

234. Boyd obtained the gas rights and, under a July 30, 2019 guaranty, guaranteed BGF's obligations to the landfill operator. That instrument benefits El Coquí Landfill Company, LLC. It is distinct from the September 15, 2020 BPPR guaranty challenged in Count X. El Coquí guaranty (July 30, 2019), Docket 50-6.

235. GFC's October 20, 2021 restated Operating Agreement divided authority: it vested management in its Board and reserved specified matters for Series A and member approval. That

division of authority became central when managers later approved releases and the asset sale. GFC Operating Agreement (Oct. 20, 2021), as amended.

236. On September 15, 2020, BPPR, as Lender and Administrative Agent, committed to an $11,869,250 nonrevolving construction facility. The accompanying NMTC structure provided $7.2 million in QLICI loans to BGF. Together, those facilities represented approximately $19.07 million of financing commitments for the new project.

237. The NMTC closing used a $5,130,750 BPPR leverage loan and $2,369,250 of Capital One tax-credit equity.

238. The initial direct-loan credit was $898,247.40.

239. Drawdown 1 occurred at this September 15 financial close; it has no separate post-closing drawdown certificate package. A later September 23 workbook labeled "Drawdown #1," carried forward as Certificate 2, concerns a different, post-closing request. Credit Agreement (Sept. 15, 2020); NMTC closing Flow of Funds (Sept. 15, 2020); BGF September 2020 statement.

240. The financing documents placed the bond obligation on the ITS/ASC construction joint venture, Distributed Power Innovators, JV, and made a paid bond a condition of the loan.

241. The executed JV agreement identifies ITS and Accurate Solutions as equal 50% participants and allocates insurance premiums equally between them.

242. The Credit Agreement made the paid bond a condition of both its effectiveness and the initial advance.

243. Section 3.1 states those conditions at the outset; § 3.1(h) supplies the specific bond requirement. Section 10.1(a) requires a written waiver signed by the Borrower and the required lenders, and it reserves waiver of Article III conditions to all Lenders.

244. Plaintiffs challenge the Companies' bearing the $70,500 premium for that bond under the financing terms and the authorization and reimbursement record described below. Credit Agreement (Sept. 15, 2020); MAPFRE payment and performance bond No. 1301208000513; No. 22-1190, Docket 60-2; Construction Contract (June 18, 2020) and JV Agreement (May 15, 2020), JV agreement ¶¶ 6, 8.

245. The risk of using this contractor was known before the loan closed.

246. ITS could not obtain the required bonding independently.

247. It had an ownership relationship with project insiders and an earlier dispute with Ballester Hermanos. Those were underwriting risks, and Plaintiffs' earlier sworn pleading disclosed them.

248. Boyd's March 31, 2020 correspondence proposed an independent prime contractor to address the bonding and ownership problem, and Economou prepared ITS financial projections for the bond process on April 5.

249. BPPR nevertheless financed the related-contractor arrangement.

250. The promised independent controls were material protections against the known risk of using a contractor that was unable to obtain a performance bond. SJ2024CV04616, Docket Entry 276 (Sept. 30, 2025), ¶¶ 46–49; Boyd's March 31, 2020 bonding correspondence and Economou's April 5, 2020 ITS projected-financial-statements correspondence.

251. The Bank's closing instructions put the contractor's premium on BGF.

252. On September 14, 2020 at 9:38 p.m., Rodríguez Barnes circulated a closing-expense schedule that placed a $70,500 P&P bond premium in BGF's Direct Loan column. Boyd was copied. The invoice made effectiveness contingent on receipt of the premium; BPPR arranged payment from BGF's borrowing after closing. Boyd relied on the written financial protections

when he signed the September 15, 2020 Credit Agreement and the BPPR guaranty. He authorized Sosa/DLA Piper to release his signature for the use of funds furnished shortly before that authorization. He did not authorize an undisclosed departure from that schedule.

253. The separate $70,500 premium entry for the performance bond in Rodríguez Barnes's e-mail did not appear as a separate payment in either supplied flow-of-funds version.

254. The schedule's $898,247.77 total exceeded its "Flow of Funds" figure of $893,505.00 by $4,742.77. That difference was the ESI Energy invoice the same e-mail raised — not the $70,500 premium.

255. The executed Flow of Funds allocates the $898,247.40 Direct Loan Advance among $233,750 in origination fees, $649,925 in legal and professional fees and $14,572.40 in consultant fees, without identifying the premium.

256. Charging the contractor's premium to BGF departed from Boyd's limited authorization and concealed the unsatisfied closing protection. Rodríguez Barnes closing e-mail (Sept. 14, 2020); NMTC closing Flow of Funds (Sept. 15, 2020); Heyman closing e-mail chain (Sept. 14, 2020); Fernández Agramonte and Boyd closing e-mails (Sept. 14, 2020); Heyman release e-mail (Sept. 15, 2020), with the executed Flow of Funds.

257. On September 16, López Vidal authorized a $70,560 debit to Popular Insurance, comprising the $70,500 premium and a $60 fee, as closing costs. BPPR thus presented a contractor obligation as a permitted BGF closing expense while it closed without the required proof of prior premium payment. The misleading presentation went to the eligibility of the expense and the satisfaction of the condition. MAPFRE payment and performance bond No. 1301208000513; Rodríguez Barnes closing e-mail (Sept. 14, 2020); Popular Insurance $70,560 bond-premium transfer record (Sept. 16, 2020); Heyman closing e-mail chain (Sept. 14, 2020); Fernández

Agramonte and Boyd closing e-mails (Sept. 14, 2020); Heyman release e-mail (Sept. 15, 2020), with the executed Flow of Funds.

258. The bond the Bank accepted was not the bond the Credit Agreement required. The bond was dated September 14, 2020, in the amount of $5,000,000; it named ITS/ASC Joint Venture as principal and BGF as its only obligee, and it secured the contractors' own $5 million construction contract.

259. Credit § 3.1(h) required paid coverage for 100% of defined Direct Costs.

260. The Project Budget states $18,679,651 in Direct Costs. No bond covering those costs, with BGF and the Bank as dual obligees, exists in the records of the closing. The Project was short the entire § 3.1(h) bonding, not part of it.

261. The Bank knowingly closed with this deficiency and without the required effective waiver. No effective written waiver authorized this departure. Credit Agreement (Sept. 15, 2020), § 3.1(h) and Project Budget; MAPFRE payment and performance bond No. 1301208000513; Rodríguez Barnes closing e-mail (Sept. 14, 2020).

262. The September 14 e-mail was part of the coordinated interstate financial closing. It addressed CohnReznick's Jacen Killebrew and Jones Day's Brett Heyman, among the Capital One and other closing participants.

263. Killebrew's preceding message transmitted projections synchronized to the flow of funds, and the e-mail chain identifies his mainland telephone contact.

264. On information and belief, Rodríguez Barnes sent that closing instruction from Puerto Rico to the identified mainland closing participants. The transmission furthered obtaining BGF's borrowed money for the JV premium while concealing the unmet conditions. Rodríguez Barnes closing e-mail (Sept. 14, 2020), pp. 1–3; closing e-mail chain.

265. The bond forms identify the ITS/ASC Joint Venture as principal and BGF as obligee. BPPR's September 15, 2020 letter sought additional-obligee status and bears MAPFRE's acknowledgment.

266. The April 15, 2021 endorsement corrected the principal's name, effective September 14, 2020, without increasing the $5 million coverage.

267. The paid, full-Direct-Cost protection was deficient. MAPFRE payment and performance bond No. 1301208000513; Rodríguez Barnes additional-obligee letter to MAPFRE (Sept. 15, 2020).

268. The approved budget contains an Insurance & Bonds category of $266,380.51, including a $104,518 Direct Loan allocation. Plaintiffs challenge this particular JV expense, the paid-premium prerequisite and the deficient coverage.

269. Rodríguez Barnes authored the preclosing funding instruction and accepted Boyd's guaranty for BPPR; López Vidal authorized the outgoing premium wire.

270. The Bank withheld from Boyd the information that the required protection had not been secured before he became bound. Had he known that material fact, Boyd would not have accepted the undertaking on the terms presented. Project Budget (Credit Agreement, Sept. 15, 2020), p. 151; Guaranty Agreement (Sept. 15, 2020), Docket 50-5; Rodríguez Barnes closing e-mail (Sept. 14, 2020); Construction Contract (June 18, 2020) and JV Agreement (May 15, 2020), ¶ 8.

271. BPPR knew the premium remained to be paid when it closed, because its own officer scheduled payment from the closing proceeds.

272. The Companies challenge the unsatisfied condition and the unauthorized expenditure under the contract. Boyd separately challenges the concealment that induced his own

guaranty. Credit Agreement (Sept. 15, 2020), pp. 46–47, 111; MAPFRE payment and performance bond No. 1301208000513; Rodríguez Barnes closing e-mail (Sept. 14, 2020); Popular Insurance $70,560 bond-premium transfer record (Sept. 16, 2020).

273. The Bank's interest in the gas preceded the loan.

274. In a March 22, 2019 e-mail to Jonathan Lassers, Marvin Díaz, then the Bank's Vice President and Credit Manager in its Corporate Credit Division, wrote that he was "aware of Popular's potential interest in buying gas," that the interest "adds to the validation of demand post operation," and that the Bank was "close to being able to submit a term sheet" for the project financing. The November 2020 negotiations and the July 18, 2022 executed gas contract continued that commercial interest.

275. The Bank's motive to sustain the project and secure fuel for itself appears in its own contemporaneous communications. Marvin Díaz (Banco Popular) e-mail to Lassers (Mar. 22, 2019); Marvin J. Díaz, LinkedIn profile, experience (VP & Credit Manager, Corporate Credit Division, Banco Popular de Puerto Rico, June 2016 – Apr. 2019) (viewed Oct. 10, 2026); López Vidal e-mail to Banco Popular forwarding the RLNG/LNG supply agreement and addendum (Nov. 20, 2020); BGF–Banco Popular RLNG Off-Take Agreement (July 18, 2022).

**B. The Bank financed extra contractor work without the written change approvals the contracts required**

276. This section shows that both the construction contract and the Credit Agreement required written approval for changes to the work.

277. The Bank financed additional construction for the related contractor without those approvals.

278. The Construction Contract of June 18, 2020 set compensation of $5 million and a term from June 30, 2020 through June 30, 2021.

279. Article VI separately addressed extra or out-of-scope work, its approval and its supporting records.

280. Article XVI required written modifications signed by the parties.

281. The Bank financed additional construction without the required documented change process. Plaintiffs alleged the contractor transactions in the Complaint, Docket 1, ¶¶ 386, 493, 574 and 615–616; they are restated here as the Companies' claims. Construction Contract (June 18, 2020) and JV Agreement (May 15, 2020), arts. III, IV, VI, XVI.

282. The Credit Agreement added its own controls on changes.

283. Credit Agreement § 2.13 required prior written approval of the Required Lenders and the Independent Engineer for the covered changes. Its limited budget-reallocation exception required advance notice and a revised budget. It capped changes at $50,000 per line and $100,000 in aggregate, and it imposed additional conditions, including no increase in the total Project Budget and no Event of Default. It required AIA G701 or equivalent documentation for the specified changes. Credit Agreement (Sept. 15, 2020), § 2.13, pp. 42–43.

284. No construction change order was requested or approved for the challenged additional costs, and no replacement contract increased the $5,000,000 base price or extended the construction term.

285. The construction contract, the AIA application reporting zero change orders, the additional-cost sheets and the complete draw materials show none.

286. When Plaintiffs raised the absence of change orders in earlier court submissions, defendants supplied none.

287. Approval of a draw did not supply the separate written approvals and change instrument that § 2.13 required. Construction Contract (June 18, 2020) and JV Agreement (May 15, 2020), arts. III, IV, VI, XVI; AIA Application 007 (Nov. 1, 2021); Certificate 17 and Certificate 20 v2 additional-cost sheets; Drawdown Certificate 17 with Notice of Borrowing (July 20, 2022); Certificate 17 source worksheet ("Revised by BPPR"); Certificate 20 (v2) source worksheet.

288. Boyd's October 5, 2020 memorandum reports that a changed remote-access token prevented him from viewing the Companies' accounts after closing. That denial obstructed the oversight on which Boyd relied.

289. The February 2019 account agreement permits any one listed signer. Banco Popular account signature agreement (Feb. 15, 2019).

290. One set of September 16, 2020 transfers is outside this case.

291. The September 16, 2020 closing records also include transfers associated with the López insiders' purchase of Boyd's common units under a Membership Interest Purchase Agreement.

292. Plaintiffs exclude that purchase and its transmissions from the RICO predicates and the damages sought here. Popular Insurance $70,560 bond-premium transfer record (Sept. 16, 2020).

293. Boyd objected to charging BGF the contractor's $70,500 premium at the October 8, 2020 management meeting, and on March 15, 2021 he proposed treating it as a loan to ITS.

294. The Bank's earlier closing schedule had disclosed the charge. Plaintiffs seek the expense improperly borne by the Companies, net of reimbursement and value received. Boyd e-mail to the GFC Board (Mar. 15, 2021); No. 22-1190, Docket 147, ¶ 159; Rodríguez Barnes

closing e-mail (Sept. 14, 2020); Popular Insurance $70,560 bond-premium transfer record (Sept. 16, 2020).

295. The Board received concrete warnings about delay and existing obligations.

296. On April 15, 2021, Boyd warned López Vidal and the Board participants about construction delay, EC Waste obligations and exhaustion of the advance credit.

297. On August 31, EC Waste's Randy Jensen wrote Villarini, copying Company participants, that BGF owed $89,184.29. He then reported that the generator was not running and asserted a commercial-operation-date default.

298. While the Puerto Rico plant stood unfinished, the Board pursued other Company opportunities. Its October 29, 2020 notes identified work at Brugal — a CO2 project in the Dominican Republic — along with proposed equipment and Linde's interest.

299. On September 17, 2021, letters from Semillero and CDVCA separately supported the Companies' pursuit of a Ponce landfill-gas project, subject to due diligence, NMTC eligibility and investment approval. Those opportunities were the Companies' property: the Ponce opportunity is the subject of Count XI, and the Brugal venture is addressed in paragraphs 406–416. GFC/BGF Board minutes and notes; Semillero Partners and CDVCA conditional support letters on the Ponce project (Sept. 17, 2021), both letters.

300. Draw 10 requested $934,810.59, funded in credits on July 28 and August 3, 2021.

301. The identified $480,625 of ITS uses was paid in three installments: $115,000 on August 19, $165,000 on September 28, and $200,625 on October 20. Plaintiffs challenge the work, contract and approvals supporting those payments. Certificate 10 budget; BGF July–October 2021 statements; BGF operating workbook (Oct. 26, 2021), transaction register.

302. López Vidal's progress reports to the Board on specified work components were false.

303. The July 12, 2021 minutes report Parcel B mechanical and electrical work at 90%, with $21.3 million drawn, stated as 72% of budget.

304. The November 2 minutes report electrical wiring at 90%, and $23.8 million drawn against $29.3 million, or 81%; they also record that a first-year budget would be provided at a later meeting. Those completion figures were false: ten days after the November 2 report, the Bank's own inspector measured construction at 39%. The figures supported continued funding, and the contractor applications, engineer reports and later completion work contradict them. GFC/BGF Board minutes and notes, source pp. 21–22, 34.

**C. Warnings reached the Bank's General Counsel in November 2021; the Bank kept advancing without the required inspections**

305. This section shows that specific, documented warnings reached the Bank's General Counsel in November 2021 and that the Bank kept advancing funds anyway. It released money before the required inspection, funded a certificate on duplicated inspection evidence, and kept disbursing while the required audits never arrived.

306. After a November 7, 2021 independent inspection documented deficiencies, Plaintiffs' counsel sent the findings to the Bank's Executive Vice President and General Counsel, Ferrer, on November 11. A $677,094.76 loan deposit followed on November 12.

307. The Bank also had esi's separate Certificate 011, which described satisfactory progress but recorded no testing, 39% construction progress and projected completion in the first quarter of 2022. Plaintiffs alleged the November 2021 notices and releases in the Complaint, Docket 1, ¶¶ 149, 433–434 and 746; they are restated here as the Companies' claims. Carballido

Clerch e-mail to Ferrer (Nov. 11, 2021); BGF bank statement showing the November 5 and 12, 2021 loan draws; Phillips Independent Site Inspection of BGF (Nov. 7, 2021); esi Inspection Certificate 011 (Nov. 12, 2021), ESI011 pp. 1, 4, 7, 22.

308. The Bank released the first Certificate 11 credit before the inspection required for it.

309. On November 5, 2021, BPPR released $623,583.73 of direct-loan funds for Certificate 11.

310. That release came before the November 9 inspection and before ESI011's November 11 signature (November 12 cover).

311. The other credits associated with Certificate 11 were $245,677 on November 10 and $677,094.76 on November 12.

312. The November bank statement reconciles with Certificate No. 11.

313. The deposits of $623,583.73 and $677,094.76 total the requested $1,300,678.49 direct-loan amount. esi's $1,546,355.49 schedule adds $245,677 in ACT 73 Equity items, matching the November 10 interaccount transfer.

314. López Vidal attended every inspection, received every inspection report, and supplied the complete inspection records as part of his settlement. On that factual foundation, Plaintiffs allege that the required inspection and report for the November 5 release had not occurred or been supplied before funding.

315. No effective written waiver excused the Direct Loan condition. esi Inspection Certificate 011 (Nov. 12, 2021), signed certificate and ESI011 schedule, p. 1; Marsh letter to Ferrer and Coleman Tió (Dec. 2, 2021); BGF bank statement showing the November 5 and 12, 2021 loan draws, p. 2; Credit Agreement (Sept. 15, 2020), § 3.2(c); QLICI Disbursing Agreement (Sept. 15,

2020), § 3.4(a)(viii); López Vidal's complete inspection-file production; BGF operating-account statements, Nov.–Dec. 2021, Part A.

316. The contractor's November 1, 2021 AIA application 007 and ESI011's progress measures are reconciled in Schedule A, Part 8 (R02). The application maintained the unchanged $5 million contract baseline after its stated term had ended. Certificate 11 construction support, AIA application 007; ESI011, p. 7; Credit § 2.2(a)(iv); QLICI Disbursement § 3.3(b); QLICI Disbursing Agreement (Sept. 15, 2020).

317. Payments to the contractor participants continued after the warning and the November advance.

318. ITS checks 1190 and 1191 cleared on November 17 and 18 for $95,000 and $204,750.01.

319. Accurate Solutions check 1202 cleared December 7 for $121,612.63, with a construction memo; check 1245 cleared December 30 for $114,135, identifying invoice 1321-0208-2b. These payments establish substantial post-term payments to the contractor participants.

320. Payment exceeded authorized and earned work under the unchanged contract, with credit for services and equipment actually received. BGF operating-account statements, Nov.–Dec. 2021, Part A, pp. 15–16; Part B, pp. 11, 50.

321. The Bank's answer to the warnings was a denial.

322. On December 20, 2021, PMA's María D. Trelles-Hernández e-mailed the Bank's response to John F. Marsh, Boyd's lawyer in Ohio. The response acknowledged his letter as one "dated December 6, 2021"; the preserved copy is dated December 2. The letter stated that the Bank's review to date had found no irregularities in underwriting, approval, or disbursement, and

it promised continued careful administration. It did not address the specific construction and certification evidence Plaintiffs had supplied.

323. Later Board minutes record Boyd's continuing objections. The March 2, 2022 Second Amendment omitted Boyd from its defined Personal Guarantors and from his signature block; the earlier First Amendment had included him. GFC/BGF Board minutes and notes; Trelles-Hernández letter to Marsh (Dec. 20, 2021); Second Amendment to Credit Agreement (Mar. 2, 2022).

324. The Companies' members pressed for basic information, and the Bank disclaimed any role. Lassers's May 3, 2021 follow-up acknowledged records already produced and identified what remained outstanding: operating-agreement schedules, minutes, budget approvals and his executed letter agreement.

325. On February 9, 2022, Boyd's counsel again complained that Boyd, a member and personal guarantor, was being denied basic construction and operating information.

326. Banco Popular's counsel replied on February 9, 2022 that neither the Credit Agreement nor Boyd's guaranty required disclosure of the Bank's internal analysis. The letter identified López Vidal as the Authorized Representative, offered to hear him and Boyd, and disclaimed a management or mediation role. Boyd's counsel continued to challenge the refusal on February 27.

327. A February 17 Company-lawyer e-mail also reports that the Bank wanted a BGF Board meeting with Boyd participating, rather than elimination of the Board. Marsh letters to Muñiz Cotté (Feb. 9, 2022) and to Trelles-Hernández (Feb. 27, 2022), p. 1; PMA letter to Marsh (Feb. 9, 2022), pp. 1–2.

328. BGF undertook in QLICI Loan and Security Agreement § 6.3(b) to deliver annual audited financial statements within 120 days after each fiscal year end, without a Conversion Date condition. BGF never provided those required audits.

329. Credit Agreement § 5.1(b)(i) separately imposes postconversion BGF audit duties and calls for GFC's unaudited statements on written request.

330. GFC's operating agreement also requires consolidated statements, budgets and records. Counsel's 2021 warnings and Boyd's July and December 2022 letters reported the failure, yet BPPR continued its disbursement role. QLICI Loan and Security Agreement (Sept. 15, 2020), § 6.3, p. 33; Credit Agreement (Sept. 15, 2020), § 5.1(b)(i), pp. 65–67; GFC Operating Agreement (Oct. 20, 2021), as amended, §§ 4.2(k), 6.2(g); Marsh letter to Ferrer and Coleman Tió (Dec. 2, 2021); Boyd e-mails and letter to López Vidal and the GFC members (July 25, 2022); Boyd letter to González Caraballo (Dec. 30, 2022).

331. The Bank's inspector reused one site visit for two certificates.

332. esi's Certificate 013 Addendum, addressed to Laura Medina Castillo of Banco Popular, records a March 7, 2022 site visit and her March 9 inquiry about overlapping items. It states that Certifications 012 and 013 share most of their scope, and it directs use of the earlier photographs. The supporting evidence was inadequate. esi Inspection Certificate 013 Addendum (Mar. 9, 2022).

333. The Bank's own Certificate No. 13 review is reconciled in Schedule A, Part 8 (R03).

334. Fernández Osuna requested support on March 9, 2022, after $637,858.62 had been validated and sent.

335. Economou gave item-by-item answers on March 10.

336. The native review sheet marks $964,751.43 disbursed and $22,500 of employment costs still to validate.

337. The record shows review, a reported partial advance and a holdback. Certificate 13 e-mail chain, Fernández Osuna and Economou (Mar. 9–11, 2022); Bank Certificate 13 disbursement worksheet (native).

338. ESI012 and ESI013 print March 2021 on their covers, but their visit narrative, correspondence and signature audit trails identify March 2022.

339. ESI013, which concerns electrical work and interconnection, relies on the same March 7 visit and the same photographs as ESI012, as the engineer's own addendum states. Its attached schedule totals $1,057,654.17; the Bank's review worksheet totals $987,251.43, a $70,402.74 difference the worksheet does not explain, and the worksheet separately marks a $22,500 employment item for validation. The Bank funded Certificate 13 on duplicated inspection evidence and an unreconciled schedule. ESI012 pp. 1, 6–9; ESI013 pp. 1–5; native Certificate 13 bank-review worksheet; esi Inspection Certificate 012 and Drawdown Certificate 13 (Mar. 2022).

**D. The Bank wired $1,137,400 to vendors for unmet milestones while the loan was in default**

340. This section shows how, in the spring of 2022, the Bank approved BGF's fourteenth advance and $1,137,400 of vendor wires on false certifications while the loan was already in default. It begins with the Board. The dispute over Boyd's access to information was followed by discussion of litigation pressure.

341. At the March 31, 2022 board meeting, which Borschow attended, the notes discussed putting Boyd on the defensive and making him bear substantial legal expense to encourage settlement. The notes separately attribute to Carlos Muñiz the view that a lawsuit would

bring Boyd to the negotiating table, and to José Sosa the assessment that tortious interference with the Ponce project was the strongest potential claim.

342. Villarini asked that Boyd's requests for information to which he was entitled be addressed.

343. The Board's answer to Boyd's objections was a plan to make him bear legal expense, not the records to which he was entitled.

344. Plaintiffs alleged the April 25, 2022 vendor payments in the Complaint, Docket 1, ¶¶ 505–507 and 754; they are restated here as the Companies' claims. GFC/BGF Board minutes and notes.

345. The e-mails on Drawdown Certificate 14, BGF's written request for the fourteenth advance, show how the Bank approved it.

346. On March 29, 2022, Economou sent the request, for $1,484,006.16, to Medina Castillo, copying Humberto González, Andrés Fernández Osuna and López Vidal.

347. On March 30, Medina Castillo asked about the absent AIA certificate.

348. Economou answered that the request covered equipment bought directly by BGF, including Galileo and TPI equipment, and nothing under the general-contractor contract.

349. On March 31, Medina Castillo said the Bank would proceed with the aggregate advance with revised classifications, because only $434,080.68 was available in the NMTC account.

350. Schedule A, Part 8 (R04) reconciles this chain with the produced schedule and the May 23 master workbook.

351. The chain corroborates Economou's later account that he submitted the request on March 29 and the Bank approved it on March 31. It also shows the Bank approving the aggregate

advance two days after submission and itself revising the request's classifications so that it fit the $434,080.68 then available in the NMTC account.

352. The Bank, not the Borrower, reallocated the request, and no § 2.13 approval — the Credit Agreement's requirement for reallocating budget lines — accompanied the change. Certificate 14 e-mail chain, Economou and Medina Castillo (Mar. 29–31, 2022), March 29–31 messages; No. 22-1190, Docket 50-4, ¶ 21; BGF Master Budget workbook, Certificate 14 request schedule (Mar. 29, 2022); BGF Master Budget workbook, Certificate #15 Budget Recap (May 23, 2022).

353. BGF's March 2022 bank statement shows how that request was funded.

354. On March 31, BGF received a $388,160.63 BPPR loan credit and two transfers, of $661,764.85 and $434,080.68. Their $1,484,006.16 aggregate matches the request.

355. The direct-loan and other-loan components differ by $1,135 from the initial schedule, with no change in the aggregate.

356. The April statement independently records the April 25 debits of $1,029,460 and $108,060. March 2022 statement p. 1; April 2022 statement p. 2; Trelles-Hernández letter to Marsh (Dec. 20, 2021); Certificate 14 e-mail chain, Economou and Medina Castillo (Mar. 29–31, 2022).

357. The same statements show what Galileo had already been paid.

358. Four grouped wires went out on October 28 and December 22, 2020 and May 26 and August 2, 2021 — $2,258,800, $2,258,800, $2,823,500 and $2,823,500. They match the Galileo request lines in Certificates 3, 5, 8 and 9 and total $10,164,600.

359. The April 25, 2022 wire of $1,029,400 was therefore Galileo's final installment, payable only on the milestones pleaded in paragraph 461. BGF Master Budget workbook,

Certificate #15 Budget Recap (May 23, 2022), Certificate 3, 5, 8 and 9 sheets; BGF operating ledger and the corresponding monthly statements.

360. Drawdown Certificate 14, dated March 28, 2022, contained these representations.

361. Section 3.1 represents that the project-cost spreadsheet is "true, correct and complete."

362. Section 3.2 represents that the scheduled items qualify as satisfactorily performed work, delivered stored materials, goods in transit, indirect costs, or other costs permitted for construction advances.

363. Section 3.6 represents that the available advances and the specified free cash are sufficient to achieve substantial completion by the project termination date.

364. Section 3.7 qualifies the representation about adverse developments by the Borrower's best knowledge and their effect on the likelihood of timely substantial completion. Those representations were false.

365. The schedule included TPI's $108,000 final payment before the startup, training, commissioning and performance-test milestone had been met.

366. The completion-funding representation was contradicted by the Bank's own loan statements, which showed $168,437.12 past due on April 1, 2022, as paragraphs 380–384 sets out. Drawdown Certificate 14 and Notice of Borrowing (Mar. 28, 2022), §§ 3.1–3.2, 3.4, 3.6–3.7; TPI Equipment Purchase Agreement (Jan. 20, 2021).

367. The payment schedule attached to the request included $47,119.59 for February interest and $34,166.67 for El Coquí, the landfill-gas supplier. It listed no principal installment and no additional months of landfill payments.

368. So the schedule paid February interest and the landfill fee but no principal, although $116,100 of principal was already past due.

369. Prepaying the vendors consumed the cash that those obligations and the remaining work required. BGF Master Budget workbook, Certificate 14 request schedule (Mar. 29, 2022); Banco Popular business-loan statements and past-due notices, April–June 2022.

370. The Puerto Rico Treasury's Act 73 tax-credit determination of August 26, 2020 estimated $6,500,000 of eligible investment and an associated $3,250,000 credit.

371. The first half of the credit was available as an advance, subject to funding evidence and an acceptable guarantee. The second half would be certified through a supplemental determination after the specified construction and equipment requirements were met. P.R. Treasury Act 73 tax-credit determination, Case 19-73-I-011 (Aug. 26, 2020).

372. The Deposit Accounts Control Agreement, signed September 15, 2020, identifies the Tranche One Tax Credits Account in its Schedule I.

373. Section 3(b) places the reserved accounts under the exclusive control of the Administrative Agent, a role the Bank held.

374. Section 3(c) separately permits borrower instructions for the Operating and Equity Escrow Accounts until its specified default and notice conditions occur.

375. López Vidal signed for BGF, and Joval F. Rodríguez Barnes signed for BPPR in its Administrative Agent and Depository Bank capacities. Section 12 disclaims a fiduciary relationship. Deposit Accounts Control Agreement (Sept. 15, 2020), §§ 3(b)–(c), 12, signatures and Schedule I, PDF pp. 3, 7, 9–10.

376. The Credit Agreement limited every advance. Credit §§ 2.2(a)(iv) and 2.2(b) limit each advance by reference to eligible project costs, prior advances, QLICI proceeds and equity

already used for the items. They condition advances on the Administrative Agent's reasonable judgment that the remaining facility will suffice to complete the project. And they require funds deposited to cure an imbalance to be used first.

377. Draw 14 combined ACT73 equity, QLICI and Direct Loan components.

378. BPPR approved the advance although the eligible resources were insufficient to complete the remaining work, including the challenged final vendor installments.

379. The May 23, 2022 historical recap allocates $1,137,400 to the Galileo and TPI lines in Draw 14. Schedule A, Part 1, C02–C03; Credit Agreement (Sept. 15, 2020), §§ 2.2(a)(iv), 2.2(b); BGF Master Budget workbook, Certificate 14 request schedule (Mar. 29, 2022); BGF Master Budget workbook, Certificate #15 Budget Recap (May 23, 2022), Budget Recap and Certificate 14.

380. The loan was already in default.

381. The Bank's loan statements show that $168,437.12 was past due on April 1, 2022: $116,100 in principal and $52,337.12 in interest.

382. Another $116,100 principal installment fell due May 1 and was not paid.

383. The Bank's notices applied an 8.50% default rate, compared with the otherwise applicable 6.50% rate. Paying the vendors early reduced the funds available for these existing obligations and caused additional financing losses.

384. El Coquí's May 16 default notice also implicated the Bank's rights under its estoppel agreement with El Coquí. Drawdown Certificate 14 and Notice of Borrowing (Mar. 28, 2022); Banco Popular business-loan statements and past-due notices, April–June 2022.

385. On April 25, 2022 — the day the first RICO action, No. 22-1190, was filed — López Vidal caused two wires to issue from BGF's account at Banco Popular. One sent $1,029,400

to Galileo Technologies Corporation through a New York bank. The other sent $108,000 to Tecno Project Industriale S.r.l. through a bank in Bergamo, Italy.

386. The Bank's debit advices separately show a $60 commission for each transfer. The vendor payments totaled $1,137,400; the account debits, including those commissions, totaled $1,137,520. The two debit advices bear sequential references 22 0425-001789-000 and 22 0425-001790-000. Banco Popular debit advices (Apr. 25, 2022).

387. The record on who authorized the wires is this. The Bank's debit advices for the April 25, 2022 wires show no authorizing signature.

388. The account mandate on file with the Bank, dated February 15, 2019, allowed any one of the three listed signers to act alone.

389. Credit Agreement § 2.12 likewise permits each Authorized Representative to act singly for loan-document matters.

390. The challenge to the April 25 wires is therefore to the uses certified and the eligibility presented, not to the number of signatures. Credit Agreement (Sept. 15, 2020); Banco Popular debit advices (Apr. 25, 2022); Banco Popular account signature agreement (Feb. 15, 2019); Boyd Decl. in support of the TRO motion, No. 22-1190 (May 26, 2022).

391. The correspondence shows the final Galileo payment being arranged before the wires.

392. On April 21, 2022, López Vidal sent Galileo a guarantee letter and asked for its review so that the final payment could be made promptly. On April 22 he said BGF would make the transfer that day.

393. On April 25, Galileo reported that the payment had not arrived and requested the SWIFT record.

394. The debit advices establish April 25 as the transfer date. By then approximately $10,164,600 had already been paid to Galileo.

395. To Boyd's knowledge no further payment was then due, and the requested contracts and invoices had not been supplied. López Vidal–Galileo e-mails (Apr. 21–25, 2022); Banco Popular debit advices (Apr. 25, 2022).

396. TPI's final payment had the same defect.

397. The TPI Annex C that was supplied conditions the final 10% payment of $108,000 on startup, training, commissioning, and performance testing, to be paid through an irrevocable letter of credit. None of those TPI milestones had been met. Banco Popular debit advices (Apr. 25, 2022); TPI Equipment Purchase Agreement (Jan. 20, 2021) (Annex C); Boyd Decl. in support of the TRO motion, No. 22-1190 (May 26, 2022), ¶¶ 6–7.

398. Economou's declaration in the first RICO action explains why the payments were made. He identifies the second Act 73 tax-credit sale as the main impetus for the vendor payments, with completion of the NMTC investment secondary. He describes the Bank's draw review and approval.

399. Economou and López Vidal both denied knowing, when the payments were made, that the Plaintiff founders' suit had been filed.

400. Plaintiffs challenge the eligibility of the payments under the vendor contracts. No. 22-1190, Docket 50-4; No. 22-1190, Docket 50-1.

401. The Credit Agreement's own use restrictions governed, and they are distinct from the NMTC rules.

402. Section 5.1(f) limits Advance proceeds to the purposes in §§ 2.1(a)–(b), including budgeted Project Costs, required reserves and specified closing expenses.

403. Section 1.1 defines the Project by its site, equipment and gas-and-electricity business in Puerto Rico.

404. Section 4.1(mm) represents QALICB compliance, and § 5.1(q) requires compliance with the NMTC Loan Documents.

405. The operative agreements and the contemporaneous certifications — not a federal tax-credit deadline — governed whether the April 25 payments were required and supported when made. A corporate decision to pursue another venture did not amend those restrictions. Credit Agreement (Sept. 15, 2020), §§ 1.1, 4.1(mm), 5.1(f), 5.1(q).

406. The Brugal venture is the context of the vendor payment.

407. López Vidal e-mailed Rodríguez Barnes about Brugal and its projections on April 13, 2021, and May 2021 correspondence on the venture included Popular participants and BHD. In November 2021 he sought the Board's permission to pursue the venture personally with Economou and proposed to recuse himself.

408. Villarini objected to pursuing it outside GFC/BGF.

409. The December 16 recap directed management to address a GFC structure, financing contacts and further Board and Series A approvals before proceeding.

410. The February 3, 2022 Board notes record López Vidal's request for $300,000 of TPI equipment deposits for the Dominican project. Villarini objection to pursuing Brugal outside GFC/BGF (Nov.–Dec. 2021), pp. 1–4; GFC/BGF Board minutes and notes, pp. 1–2.

411. On April 12, 2022, Bank officer Humberto González told López Vidal, after consulting counsel, that a new GFC subsidiary that had signed no loan documents could obtain financing without the Bank's consent.

412. A GFC guaranty or equity pledge, however, would require it. López Vidal relayed that answer to the Board on April 19, noted that NMTC approval was also needed, and urged a decision. González e-mail to López Vidal (Apr. 12, 2022); López Vidal e-mail to the GFC Board (Apr. 19, 2022).

413. TPI's equipment agreement was for $1,080,000. It made the final ten percent — $108,000 — payable after startup, training, commissioning and performance testing. BGF paid that amount on April 25, 2022, with BPPR's approval of the advance, before any of those milestones had been met.

414. The next afternoon TPI told López Vidal, copying López Gómez, that it was buying equipment and developing engineering for the Brugal project.

415. The Credit Agreement, §§ 1.1, 4.1(mm), 5.1(f), 5.1(q), confined advance proceeds to the Project in Puerto Rico and required NMTC compliance.

416. The $108,000 thus went to a vendor that, the next day, reported buying equipment for a venture outside the Project, while the Project's own TPI system was not commissioned. Banco Popular debit advices (Apr. 25, 2022); TPI Equipment Purchase Agreement (Jan. 20, 2021); TPI e-mail to López Vidal (Apr. 26, 2022).

417. The reconciliation of the draws separates revisions from unexplained uses.

418. The $52,286.49 excess of identified credits over the carried Draw 3 request equals the shortfall against the carried Draw 5 request, so their combined totals agree.

419. An earlier Draw 8 budget differs from the later version that matches funding.

420. Drawdown 1 is the September 15, 2020 closing, funded under the executed Flow of Funds without a separate certificate.

421. The master budget workbook dated September 21, 2020 and labeled "Drawdown #1" is the first post-closing request; the budget recap carries it as Certificate 2 dated September 23, 2020. Contemporaneous and carried draw budgets; BGF September/October/December 2020 and May 2021 statements.

**E. After the Plaintiff founders sued, the Bank released $610,152.15 of restricted funds without the required authorization**

422. This section shows that after the founders sued, the Bank gave them no forbearance, yet within a month it extended BGF's loan and released $610,152.15 of restricted tax-credit funds without the authorization the Credit Agreement required.

423. The Plaintiff founders asked for forbearance first.

424. On May 26, 2022, Plaintiffs' counsel wrote PMA. The letter renewed the request that Banco Popular consent to a forbearance agreement, while the litigation was pending, as to the enforcement of the Credit Agreement and of the Bank's estoppel agreement with El Coquí. It also recorded Plaintiffs' concern that PMA had represented World Spirits, LLC, the López family's spirits venture, in its trademark petition before the USPTO, while representing Banco Popular, a defendant with potential cross-claims against World Spirits and its principals.

425. No forbearance for the Plaintiff founders followed.

426. Plaintiffs alleged the June 22, 2022 release in the Complaint, Docket 1, ¶¶ 764 and 876; it is restated here as the Companies' claim. Plaintiffs' counsel letter to Trelles-Hernández (May 26, 2022).

427. BGF got an extension instead.

428. On June 1, 2022, BGF and Banco Popular extended the Non-Revolving Facility Commitment Termination Date from April 30 — a date that had already passed — to June 30, 2022. Humberto González Caraballo signed for the Bank.

429. The letter agreement amended that date, ratified the remaining terms, reserved defaults, and incorporated the loan's jury-waiver provision. It also recited the balance and $56,447.78 in interest.

430. The separate account statement had billed principal installments as past due on April 1 and May 1. Drawdown Certificate 14 and Notice of Borrowing (Mar. 28, 2022); Banco Popular–BGF extension letter agreement (June 1, 2022), p. 6.

431. Three weeks later the Bank released restricted funds.

432. On June 22, 2022, BPPR released $610,152.15 from the Tranche One Tax Credits Account to BGF's operating account.

433. Credit § 6.3.7 placed that reserved account under BPPR's sole dominion and required lender consent, a qualifying officer certificate and a permitted application. The required authorization was absent; BPPR released the funds without satisfying those conditions.

434. The Bank's June 21 correspondence had requested the supporting certificate and QLICI-interest information, which demonstrates its active involvement in the release.

435. On June 23, BGF paid ITS $150,000 by check 2531 for invoice 2022-1135, bearing two signatures. Plaintiffs challenge that payment's authorization and the supporting work under the unchanged construction contract. Credit Agreement (Sept. 15, 2020); BGF operating-account statement, June 2022; Deposit Accounts Control Agreement (Sept. 15, 2020).

436. The fraud did not end when the founders sued.

437. The Bank kept administering the restricted project resources while it negotiated its own supply contract.

438. The same fraudulent drawdown and payment process remained the means by which Company resources were committed despite the reported deficiencies.

**F. The Bank's own fuel contract explains its later accommodations**

439. This section shows what the Bank obtained for itself in July 2022: a contract for BGF's gas to fuel its own facility, signed while the project was unfinished and the loan in default. That bargain is pleaded as the Bank's motive and benefit.

440. Banco Popular's gas purchase served its own operations.

441. The Off-Take Agreement of July 18, 2022 identifies the Bank's El Señorial combined-heat-and-power facility as the delivery site.

442. Álvarez signed it as President and CEO on July 18, 2022. It fixes an initial price of $14 per MMBtu, including a stated delivery allowance subject to adjustments, for an average minimum of 90 MMBtu per day and a maximum of 155.

443. The stated initial term runs through May 31, 2032, subject to termination and other conditions. Securing this fuel source was a substantial commercial motive for the Bank's continued accommodations after operational default and litigation. BGF–Banco Popular RLNG Off-Take Agreement (July 18, 2022).

444. The July agreement followed a negotiation that had been under way since 2020.

445. Company, Bank and counsel e-mails circulated a proposed supply contract in November 2020.

446. The first draft, dated November 19, 2020, already provided that "any current and future environmental incentives and tax credits … will be retained by Buyer" — that is, by the Bank.

447. The signed contract still carries a March 16 Bank-draft header and an April 13 revision date. Its effective date, April 1, is retrospective and distinct from the July 18 signatures. That record establishes the Bank's interest well before signing. López Vidal e-mail to Banco Popular forwarding the RLNG/LNG supply agreement and addendum (Nov. 20, 2020); BGF–Banco Popular RLNG Off-Take Agreement (July 18, 2022).

448. The environmental provisions gave the Bank a commercial benefit.

449. The agreement and its annex allocate to Popular, without added charge, the credits to which Popular is entitled by law. Both preserve the credits to which the Seller is legally entitled.

450. The contract also supports Popular's stated carbon-neutral operating objective, and it gives the Bank an offset right against specified overdue Seller obligations. BGF–Banco Popular RLNG Off-Take Agreement (July 18, 2022), credit allocation and § 2.8, annex.

451. BGF's December 20, 2021 agreement with Hewlett Packard provides a contemporaneous comparison: $14.50 per MMBtu, subject to delivery adjustments and its own volume, start and risk terms.

452. The Bank's operational and contractual benefit is pleaded as the motive for the Bank's participation in the RICO enterprise. BGF–HPE RLNG Supply Agreement (Dec. 20, 2021).

453. The loan amendments followed the gas contract within days.

454. The gas agreement was signed July 18, 2022. PMA circulated the Third Credit Amendment on July 19, and the parties executed it on July 26. It extended the commitment to October 31 and required $1.5 million of additional equity on its terms.

455. The Fourth Amendment of November 8 added $1 million to the commitment and extended the period to December 31.

456. These coordinated commercial and financing negotiations protected the Bank's fuel supply as well as its lending position. Third Amendment to Credit Agreement (July 26, 2022); Fourth Amendment to Credit Agreement (Nov. 8, 2022).

457. Between the circulation and the execution of the Third Amendment, López Vidal dated Drawdown Certificate 17 on July 20, 2022. It requested $843,257.10 and estimated $3,593,276.02 of remaining costs. It represented that completion funds were sufficient and that earlier advances had been used as permitted, and it stated that the approved, pending and proposed change orders were listed in Appendix III. Its additional-cost sheet, headed "Revised by BPPR," added three ITS increases: $300,782 for subcontractors, shipping and handling; $342,813 for materials, subcontractors and labor; and $245,500 for electrical work — $889,095 in all. Each was above the $50,000 line limit, and together they were above the $100,000 aggregate reallocation limit. None had the prior written lender-and-engineer approvals and construction change orders that § 2.13 required. Certificate 20 v2 repeats them. Drawdown Certificate 17 with Notice of Borrowing (July 20, 2022), §§ 3.1–3.9, 3.17 and Appendix III; Certificate 17 source worksheet ("Revised by BPPR"), Additional Costs Breakdown; Certificate 20 (v2) source worksheet; Credit Agreement (Sept. 15, 2020), § 2.13.

458. Six days after Certificate 17, on July 26, 2022, Venture Engineering & Construction inspected the project and reported that it was not operational. Its August 3 report estimated at least

twenty weeks to commissioning and substantial completion, or twenty-six with contingency. It identified incomplete piping and wiring, missing equipment and open control-system work. Those findings bear negatively on the eligibility of the earlier payments. Venture Engineering Independent Assessment (Aug. 3, 2022).

459. The accounting firm VGMM's August 31, 2022 agreed-upon-procedures report presented the project differently. It lists $6,500,000 of eligible investment and the April 25 Galileo and TPI payments. It records a March 8 site observation describing construction as complete and equipment as installed and ready for use. That presentation materially overstated the project's condition. It was false when compared with the incomplete work identified in the engineering records and with the later commissioning record.

460. The report describes no commissioning or contractual performance test, and it gives no audit or review opinion.

461. Galileo's executed contract separately conditions its final ten percent on Services Completion, which includes startup, training and commissioning, subject to notice and deemed-acceptance provisions. Its scheduled final installment was $1,129,400 — $100,000 more than the actual wire. VGMM Agreed-Upon Procedures Report (Aug. 31, 2022), pp. 3, 6–8, 10–11; Galileo Equipment Sale and Purchase Agreement (Oct. 9, 2020), pp. 10, 23, 40, 49; Venture Engineering Independent Assessment (Aug. 3, 2022).

462. The Third through Fifth Loan Amendments each contain borrower representations that no default had occurred and was continuing, and that no proceeding was pending or threatened that, if adversely determined, was reasonably likely to have a material adverse effect. Each of those representations was false: BGF had been in payment default since April 1, 2022, and the founders' action had been pending since April 25, 2022.

463. The amendments also contain claim acknowledgments and reservations of remedies.

464. The Sixth Amendment expressly addresses the pending federal case and requires written cure or waiver of El Coquí's January 17 defaults; its representations include the guarantors. The Bank's continued accommodation was informed. Third Amendment to Credit Agreement (July 26, 2022), § 5(e)–(g); Fourth Amendment to Credit Agreement (Nov. 8, 2022), § 5(e)–(g); Fifth Amendment to Credit Agreement (Jan. 5, 2023), § 5(e)–(g); Sixth Amendment to Credit Agreement (Apr. 27, 2023), §§ 5–6.

465. Boyd, meanwhile, could not get the tax-credit audit. On November 7, 2022, after Boyd requested it, Economou replied that there was no way they should give him a copy. He deliberately withheld the identified report from the member and guarantor who had asked for it. Economou e-mail to López Vidal (Nov. 7, 2022, 8:07 a.m.).

466. The Bank had now obtained a contract for its own fuel while the project still required substantial completion work. Its expected gas and environmental benefits supply a primary reason to sustain the project beyond the ordinary collection of principal and interest. That motive explains many of the Bank's decisions after notice.

**G. The Bank kept extending the loan over Boyd's objections; the tax-credit proceeds bypassed the prepayment**

467. This section shows three things about the period from July 2022 to April 2023.

468. The Bank repeatedly extended the commitment period and enlarged BGF's loan, over Boyd's written objections, after the project encountered arrears and incomplete work.

469. The second tax-credit tranche ended up in BGF's operating account instead of prepaying the loan as the Bank itself had directed. And new investor money arrived tied to the litigation.

470. The Third through Sixth Amendments document the extensions, debt balances, releases and qualified borrower representations.

471. The payment arrears shown for April 1 and May 1, 2022 preceded some later advances.

472. Plaintiffs alleged the amendments in the Complaint, Docket 1, ¶¶ 873–882; they are restated here as the Companies' claims. Drawdown Certificate 14 and Notice of Borrowing (Mar. 28, 2022); Third Amendment to Credit Agreement (July 26, 2022); Fourth Amendment to Credit Agreement (Nov. 8, 2022); Fifth Amendment to Credit Agreement (Jan. 5, 2023); Sixth Amendment to Credit Agreement (Apr. 27, 2023).

473. Before its 2023 accommodations, Banco Popular received further complaints. Its counsel's January 4 response acknowledged that Boyd's November and December letters had been referred to it but denied their allegations. More directly, on January 17, 2023, EC Waste sent its Second Notice of Default to Bank representative Jorge Aldarondo Pérez and to Company participants. It asserted $773,480.98 due and demanded cure by February 16. On that date EC Waste reported that the defaults remained uncured and threatened termination at midnight. The Sixth Amendment later required a written waiver or cure of these defaults. Sixth Amendment to Credit Agreement (Apr. 27, 2023), § 5(f).

474. Boyd's letters went to the Bank directly. His November 16, 2022 letter was addressed to Bank officer Humberto González Caraballo, copying Medina Castillo. It objected to the increased facility, to the absence of the $1.5 million equity the Third Amendment required, to

disputed authority and representations, to missing records and to further releases. His December 30 letter objected again before the Fifth Amendment and stated that he had not approved the Third, Fourth or Fifth Amendments. PMA acknowledged both letters on January 4, 2023. A separate July 25 letter records Boyd's objections to the Third Amendment. Boyd letter to González Caraballo (Nov. 16, 2022), pp. 1–2; Boyd letter to González Caraballo (Dec. 30, 2022), pp. 1–4; PMA letter (Jan. 4, 2023), pp. 1–2; Boyd e-mails and letter to López Vidal and the GFC members (July 25, 2022).

475. The amendments also document the Companies' growing principal exposure after the gas agreement: $10,272,105.07 in the Third Amendment, $11,237,946.53 in the Fourth, $12,284,862.34 in the Fifth, and $12,590,109.80 in the Sixth. They record continued financing despite the known difficulties. On BGF's loan account the Bank posted loan deposits equal to the interest or payment then due and applied them to the loan itself — $29,946.00 in August 2022 and again on January 20 and March 20, 2023; $65,972.35 on December 5, 2022; $74,254.79 on June 9, 2023 — keeping the facility current with freshly disbursed loan proceeds while the plant was not operating. Those postings are pleaded for the Bank's knowledge and its method, not as predicate acts. Third Amendment to Credit Agreement (July 26, 2022); Fourth Amendment to Credit Agreement (Nov. 8, 2022); Fifth Amendment to Credit Agreement (Jan. 5, 2023); Sixth Amendment to Credit Agreement (Apr. 27, 2023); BGF loan-account statements, Aug. 2022 – June 2023.

476. The Third Amendment added a $1.5 million equity requirement and conditioned additional advances above $11,145,474.13 on receipt of that equity and evidence of its eligible use.

477. The Fourth Amendment then increased the construction commitment by $1 million and deleted that particular gate, while prescribing critical uses and repayment.

478. Plaintiffs challenge the advances made while the gate applied, with notice of the equity failure, and separately challenge compliance with the Fourth Amendment's replacement conditions. Third Amendment to Credit Agreement (July 26, 2022), § 2(g)–(i), pp. 3–5; Fourth Amendment to Credit Agreement (Nov. 8, 2022), § 2(a)–(k), pp. 2–5; Boyd letter to González Caraballo (Nov. 16, 2022).

479. The second tax-credit tranche was sold in early 2023. The Board resolution recites that Treasury issued a Supplemental Decree on February 23, 2023 making the second $1,625,000 Act 73 tranche available for sale.

480. By board resolution the Companies authorized the sale of the full $1,625,000 at ninety-three cents on the dollar — a net $1,511,250 — to five purchasers: Design Build LLC, La Hacienda Meat Market, Miguel Maldonado, Roberto J. Gandara, and Tiger Med Corp. On March 9, 2023, Banco Popular, as Administrative Agent and a Required Lender, consented to the sale. Its consent carried an express condition: the proceeds were to be applied to prepay the Bank's own Non-Revolving Facility Advance under Section 2.9(d) of the Credit Agreement.

481. On March 14, 2023, the Treasury's SURI system approved transfers that include a $425,000 credit to Apolinar LLC. The resolution does not name that transferee; its place among the purchasers is a matter within the Defendants' knowledge and the Treasury's records. GFC Board resolution authorizing the tranche-two tax-credit sale (2023), ¶¶ 2–3, p. 2; Banco Popular consent letter on the tranche-two sale (Mar. 9, 2023), sched. 1; SURI notice approving the tax-credit sale (Mar. 14, 2023).

482. The proceeds did not go where the Bank had directed.

483. The account record shows a $500,000 credit to BGF's operating account on April 14. That application was an unauthorized use of the funds under the March 9 consent and the effective loan restrictions, and it accounts for the Sixth Amendment's recited deposit and revised application terms.

484. The April 14 release violated the Bank's March 9 direction requiring loan prepayment. It deprived BGF of the resulting principal reduction, increased its financing costs and exposed the released cash to the challenged uses.

485. The requested recovery accounts for the downstream value BGF received, any principal application and the Sixth Amendment's actual allocation terms. BGF operating-account transactions, April 2023; Sixth Amendment to Credit Agreement (Apr. 27, 2023).

486. The project was still not finished when the second tranche was sold.

487. The March 6–10, 2023 status report assessed Parcel A as 95% and Parcel B as 99% substantially complete, with CO2 piping and storage work outstanding, a Cryobox awaiting a part and TPI's system not yet commissioned.

488. The two Act 73 tranches are treated separately: the particular false completion presentation for the second tranche, and the diversion of its proceeds from the then-effective account restrictions described above. P.R. Treasury Act 73 tax-credit determination, Case 19-73-I-011 (Aug. 26, 2020); VGMM Agreed-Upon Procedures Report (Aug. 31, 2022); GFC Board resolution authorizing the tranche-two tax-credit sale (2023); Banco Popular consent letter on the tranche-two sale (Mar. 9, 2023); SURI notice approving the tax-credit sale (Mar. 14, 2023); Sixth Amendment to Credit Agreement (Apr. 27, 2023).

489. The Sixth Amendment's disclosures show that the Bank's April 2023 accommodation occurred with the federal case and the El Coquí defaults expressly in view.

490. Section 1(c) contains a release of loan-related claims of the Borrower and Guarantors.

491. Plaintiffs challenge particular account applications and duties subject to that release and the later releases; their scope and the challenged grounds are stated in Counts III and IX. Sixth Amendment to Credit Agreement (Apr. 27, 2023).

492. New investor money came through the VRM-Penzini parties, and the negotiations began with confidentiality instruments.

493. The first was a confidentiality agreement dated October 18, 2022, executed with BGF through Olmar López Vidal.

494. The second was a confidentiality and non-solicitation agreement dated January 18, 2023, executed by Gregory Boyd and Jonathan Lassers with "VRM Penzini Capital, dba Star Power Systems, LLC" and signed by name, for that company, by Rafael Rojo, Diego Rodríguez, and Carlos Penzini. SJ2024CV07694 Compl., at 6; NDA (Jan. 18, 2023).

495. The third was the First Amendment to Confidentiality and Non-Disclosure Agreement, effective February 9, 2023, which the same parties negotiated by e-mail between February 5 and February 8 and signed by e-mail on February 9, 2023. It added Regeneration Partners, LLC — the company through which Boyd and Lassers did their work, with Lassers as its Managing Member — as a Disclosing Party. It confined the agreement, as amended, to confidential information about EC Waste's facilities under contract with BGF, Humacao and Ponce. And it bound VRM not to use the Disclosing Party's financial structuring, banking, equity-investor, off-take, insurance, human-resources and management strategies "to circumvent the Business Purpose" as to those facilities, stating that the Disclosing Party was relying on VRM's assent to those terms. Rojo, Diego Rodríguez and Penzini signed it for Star Power Systems, LLC;

Boyd and Lassers signed for themselves; Lassers signed for Regeneration Partners, LLC. First Amendment to Confidentiality and Non-Disclosure Agreement (Feb. 9, 2023); e-mail chain "Agenda for Status Update" (Feb. 8–9, 2023).

496. The VRM-Penzini group's capital came with the litigation attached from the first instrument.

497. Thirty days after the January 18, 2023 confidentiality agreement, on February 17, 2023, VRM circulated its contribution proposal.

498. By López Vidal's sworn account, the proposal promised that "through its capital investment and relations, together with the proposed executive team, favorable terms can be negotiated to cure defaults with EC Waste and Banco Popular," and it asked the Board's leave to deal with the Bank directly. No. 22-1190, Docket 305-1, ¶¶ 36–41.

499. On April 12, 2023, GFC and VRM Renewable Series II executed a Convertible Note Purchase Agreement for $3,000,000 at 13.42% interest. NDA (Jan. 18, 2023); VRM Convertible Note Purchase Agreement (Apr. 12, 2023).

500. The January 2023 confidentiality agreement supplied restricted access for the contemplated financing and acquisition.

501. The specific disclosures and their later misuse are pleaded in the Ponce-and-Salinas chronology below and in Count XI. NDA (Jan. 18, 2023), § 2.A.

**H. The 2023 rescue paired new money with control of the Companies and a release of the Bank**

502. This section shows that the 2023 rescue proposals paired new money with control of the Companies and a release of the Bank, and that the Bank obtained its September 2023 release through Zavala, whom no Company resolution had authorized to sign.

503. Plaintiffs alleged the 2023 rescue proposals, the Seventh Amendment and the VRM Penzini dealings in the Complaint, Docket 1, ¶¶ 882 and 907–919; they are restated here as the Companies' claims.

504. The attempted 2023 rescue already included a Bank release.

505. A May mediation produced terms that the parties memorialized in the July 20 Settlement Agreement and Release. Under those terms, VRM would acquire GFC's membership interests, specified payments would be made, and the founders would dismiss their claims, including derivative claims, when the required closing occurred.

506. The Board approved the settlement.

507. Villarini signed for the Companies, and Boyd, Lassers and BPPR also signed.

508. The Bank sought protection through the transaction.

509. The terms stated here are those recited in the public record — the motion to enforce in No. 22-1190 and the VRM/Semillero complaint — not the agreement's confidential text. Sixth Amendment to Credit Agreement (Apr. 27, 2023); SJ2024CV07694 Compl., at 10; GFC/BGF Board minutes and notes; No. 22-1190, Docket 590, pp. 6–11; Docket 591, pp. 1–2, 6–9.

**1. Zavala signed the Seventh Amendment for both Companies without authority**

510. Zavala's overlapping roles made his authority consequential.

511. The Board record and Picó's correspondence describe him as the Companies' chief operating officer. He was also VRM's proposed leader, and VRM's May 26, 2023 offering memorandum listed him on its Advisory Board.

512. Board minutes and López Vidal's sworn complaint describe a May 19 filing seeking Act 73 benefits for VRM and an alleged promised 8.59% interest for Zavala in a proposed gas-sales entity.

513. VRM's April 12, 2023 note purchase agreement named him, with López Vidal and Economou, as one of the three officers GFC covenanted to appoint to manage its day-to-day operations, required GFC to sign his employment agreement as chief operating officer, and gave VRM direct access to the Companies' customers, vendors and other counterparties; when he was suspended in August 2023, VRM declared the Companies in default of those covenants on August 11. Those documents identify his relationships and incentives when he later signed for both Companies. SJ2024CV07694 Compl., at 18; GFC/BGF Board minutes and notes; VRM Convertible Note Purchase Agreement (Apr. 12, 2023), §§ 5.3(c), 5.7(a)–(b); Economou–Picó e-mail chain of Oct. 12–13, 2023; No. 22-1190, ECF Nos. 305-1, ¶¶ 57–62, 76–77.

514. In August 2023 the Board rejected a proposal to install Zavala as GFC's CEO and an alternative under which he might later succeed to that post.

515. At the August 2, 2023 GFC meeting, reconvened August 7, the proposed VRM package included installing Zavala as GFC's CEO and Penzini as interim CFO, payment-signature controls and observer rights.

516. The minutes record rejection of the Zavala appointment, three votes to three with one abstention.

517. An alternative proposing Rojo as interim CEO, with Zavala potentially succeeding him, also failed, three votes to one with three abstentions.

518. Neither failed proposal appointed Zavala. GFC/BGF Board minutes and notes, source pp. 79–89, particularly pp. 81, 87–88.

519. BGF's board never met with Boyd to approve the Seventh Amendment.

520. Boyd states from personal participation that, from September 2020 through 2025, the BGF board consisted of Boyd, Olmar López Vidal and Olmar López Gómez.

521. BPPR required both Companies' approvals for credit amendments.

522. The earlier amendments were put to the Companies' governing bodies.

523. Boyd voted against them — once through Lassers as his representative, at the July 26, 2022 extraordinary meeting of GFC's members on the Third Amendment — while the two Lópezes voted in favor.

524. The September 27, 2023 Seventh Amendment was different: no BGF board meeting was held with Boyd to approve it, and Boyd neither attended nor authorized a vote approving it. He first learned of that amendment through the exhibits to BPPR's May 22, 2024 San Juan collection complaint. BGF Amended and Restated Operating Agreement (Sept. 14, 2020), §§ 6.1, 6.6 and Exhibit C; Seventh Amendment and Forbearance Agreement (Sept. 27, 2023), § 7(a)(ii); BGF Board resolution refusing the asset transfer (Jan. 31, 2025).

525. Banco Popular knew about the governance contest. Its July 7 letter required $1.6 million of reserves before it would recommend an extension. Its counsel reviewed draft July 11 minutes.

526. The August 2 minutes record that minutes were being shared with BPPR. GFC/BGF Board minutes and notes; GFC Operating Agreement (Oct. 20, 2021), as amended; No. 22-1190, Docket 305-1, ¶¶ 91–96, 109–110.

527. The August 20, 2023 Revenue Sharing Agreement between EFB, LLC and VRM Renewable Series II offered EFB a share of specified project benefits.

528. EFB was formed for that revenue-sharing purpose.

529. The prospect of those benefits was a substantial incentive for EFB's owners to support VRM's September 2024 proposal. The agreement did not distribute all project cash flow. Sections 2.1–2.3 reserved general operating revenue to VRM and provided for sharing specified

benefits after costs and a per-project preference; the schedules allocated investment tax credits entirely to VRM.

530. Section 5.1(a) conditioned the parties' rights and obligations on settlement and dismissal of No. 3:22-cv-01190 and VRM's acquisition of control of GFC. It did not separately state that payment of a specified sum to Boyd and Lassers was a condition.

531. The contemplated settlement, dismissal and plaintiff payments did not occur.

532. The agreement's provisions concerning successors, survival and the absence of third-party beneficiaries remain relevant to any separate rights EFB may have. Revenue Sharing Agreement (Aug. 20, 2023), §§ 2.1–2.3, 5.1, 11.2, 11.7, 11.10 & exs. A-1 to A-3.

533. The August 25, 2023 amendment to GFC's Operating Agreement recites agreements to sell the Company to VRM and resolve the federal litigation. Its drag-along provision, § 10.4, includes conditions governing the allocation of consideration under the unit classes' liquidation preferences.

534. Plaintiffs challenge whether the later asset transaction complied with the applicable approval and allocation provisions. GFC Operating Agreement (Oct. 20, 2021), as amended, § 10.4(f).

535. On September 11, 2023, Picó told GFC's Board, copying VRM principals, that Bank officials had raised concerns about BGF's operating agreement and signing authority. He proposed a restatement that would remove the language naming the founders as BGF managers in favor of GFC's sole-member structure. He also recorded that a proposed June 2022 change had been postponed because of its effect on the Boyd litigation.

536. The transaction correspondence itself thus identified the governance and litigation consequences. Picó e-mail to the GFC Board (Sept. 11, 2023); BGF Amended and Restated Operating Agreement (Sept. 14, 2020).

537. The September 11 GFC board-consent envelope for that restatement bears a VOID watermark and four visible signatures — Borschow, Villarini, Rojo and Penzini — with the other two signature lines blank. Its text already styled Zavala "the President and Chief Executive Officer of the Company" and designated him the Company's "Authorized Representative," "acting singly but upon the advice of Company counsel," to sign the restatement documents "in connection with the aforementioned actions." No Board vote had conferred that title (paragraphs 514–518), and the designation reached the BGF restatement only.

538. Although that envelope was voided, Zavala separately signed the restated BGF operating agreement for GFC as sole member.

539. Zavala was never a member of the Companies. Voided DocuSign sole-member written consent (Sept. 11, 2023), resolutions and signature page; BGF Second Amended and Restated LLC Agreement (Sept. 11, 2023), signatures.

540. The restatement's § 10 places BGF management in GFC; § 12 and Schedule B address officers and list López Vidal as BGF's President and CEO.

541. Plaintiffs allege on information and belief that GFC did not validly authorize the adoption through which Zavala purported to remove BGF's founder-manager structure. They base that allegation on the failed appointment proposals, the voided approval process, the challenged GFC designations and the supplied corporate records.

542. The August 25 GFC amendment permits majority written board consent without a meeting.

543. Section 11.3 of the older BGF agreement requires written member consent, and GFC was BGF's sole member.

544. Plaintiffs therefore challenge the authority actually exercised for GFC. GFC Operating Agreement (Oct. 20, 2021), as amended, August 25 amendment § 5; BGF Amended and Restated Operating Agreement (Sept. 14, 2020), § 11.3; BGF Second Amended and Restated LLC Agreement (Sept. 11, 2023), §§ 10, 12 and Schedule B; voided DocuSign sole-member written consent (Sept. 11, 2023).

545. The Bank also had written notice of the plant's production stoppage a month before it took the Seventh Amendment.

546. On August 28, 2023, Humberto González, a Bank officer, wrote López Vidal, copying Laura Medina Castillo and Jorge Aldarondo, that the Bank's engineer had visited on August 25 and reported that neither LNG nor CO2 was being produced because of failures at the site. He requested an explanation and a repair timetable. He described the production stoppage as a material matter that should have been reported to the Bank. Despite that notice, and despite Zavala's lack of authority, the September 27 forbearance agreement designated Zavala as the Borrower's authorized representative acting singly, accepted his signature for both Companies and included the release, after the Board disputes described above. Seventh Amendment and Forbearance Agreement (Sept. 27, 2023); González Caraballo e-mail to López Vidal (Aug. 28, 2023).

547. Ten days earlier, BPPR's August 18, 2023 notice had documented the defaults it later incorporated into the Seventh Amendment: the unpaid June 30 maturity, unmet conversion conditions, El Coquí contract failures, missing ECL-bond and budget information, and an estimated $2,377,751 in-balance deficit.

548. BPPR described six extensions over more than twenty-one months. The Bank's administration of the financing helped produce the depleted-funds condition, as shown by the earlier notices and transaction records.

549. BPPR then negotiated another extension, with VRM funding, disputed control arrangements and Company releases. Seventh Amendment and Forbearance Agreement (Sept. 27, 2023), Schedule I, source pp. 23–26.

550. The September 27 Seventh Amendment granted at most thirty-four days of conditional forbearance, to October 31. It required contribution to BGF's equity escrow of any later advances under VRM's $1.5 million note, a minimum $2.8 million capital raise by October 31, and continuing interest and performance. In exchange, BPPR obtained purported Company debt acknowledgments, claim releases, indemnity reaffirmation and collateral protections from Zavala, who had no authority, while purporting to preserve its own remedies.

551. Laura Medina Castillo signed for BPPR as lender and Administrative Agent; Zavala signed for both Companies as Authorized Representative.

552. The fraud is knowingly obtaining those Company concessions without valid authorization. Seventh Amendment and Forbearance Agreement (Sept. 27, 2023), §§ 1–3, 6, 9–14, source pp. 1–10.

**2. The Seventh Amendment released the Companies' claims against the Bank without valid authorization or ratification**

553. BPPR used the September 27, 2023 amendment to obtain protection against claims arising from the lending conduct challenged here. The same instrument incorporated BPPR's account of uncured defaults, carried the contractor-bond expense in its budget, named the pending RICO action, and accepted Zavala's unauthorized signatures surrendering Company rights. BPPR

procured those protections through a representative it knew lacked valid Company authorization. Schedule A, Part 10, identifies the precise contractual provisions and the Company claims they purported to reach.

554. The amendment's own terms show the authority defect.

555. Zavala signed as Authorized Representative for each Company, not as CEO. Section 3(a) names him to act singly for BGF. Section 7(a)(ii) requires certified resolutions of both BGF and GFC approving the amendment and the contemplated transactions, and § 8(a) represents that all necessary corporate action had occurred. It had not: no BGF meeting approved the amendment. That representation of valid authorization was false, and BPPR knowingly accepted it to obtain the concessions identified in Schedule A, Part 10. The Bank had received governance information and had raised the BGF authority issue before the September 11 restatement. BPPR's designation of Zavala in its own instrument could not create authority the Companies had not validly conferred. Seventh Amendment and Forbearance Agreement (Sept. 27, 2023), §§ 3(a), 7(a)(ii)–(iii), (vi), 8(a), source pp. 3–5, 10; GFC/BGF Board minutes and notes; Picó e-mail to the GFC Board (Sept. 11, 2023); voided DocuSign sole-member written consent (Sept. 11, 2023).

556. Nothing later cured the defect.

557. No minute or written consent of the GFC Board from May 2023 through January 2024 approves the Seventh Amendment, names Zavala chief executive officer or authorizes him to sign for either Company.

558. The Board's record for that period is the minutes of May 5, 22, 30 and 31, June 21, July 11, 17 and 20, August 2 (reconvened August 7) and August 14, 2023; the three written consents of August 17, 2023, which approve the minutes of May 22, May 31 and July 20; the members' Second Amendment of August 25, 2023; the voided consent of September 11, 2023

(paragraphs 537–539); and the members' written consent of September 16, 2023 approving the sale of the Company to VRM.

559. The Companies' records contain no minute of any Board meeting between August 14, 2023 and May 2024; at the August 25, 2023 gathering at the Bank's offices, López Vidal swears, VRM Penzini "attempted to hold the meeting, in spite of not having quorum." When the Board wanted a document signed, it said so by motion: on July 20, 2023 it designated Villarini by name "as authorized representative of the Company directed by the Board to sign the Settlement Agreement." No motion or consent ever did that for Zavala.

560. No valid separate authorization or subsequent ratification supplied the missing authority, and the objections continued. Ratification under 31 L.P.R.A. § 6268 requires a competent Company decisionmaker acting with knowledge and the applicable formalities, which no one supplied. A lender's waiver of its own document-delivery condition confers no Company authority. GFC Board minutes (May 5–Aug. 14, 2023); GFC Board written consents approving minutes (Aug. 17, 2023); GFC Operating Agreement (Oct. 20, 2021), Second Amendment (Aug. 25, 2023); voided DocuSign sole-member written consent (Sept. 11, 2023); GFC members' written consent (Sept. 16, 2023); No. 22-1190, Docket 305-1, ¶¶ 92–94.

561. Picó's October 12, 2023 e-mail asserts that the GFC board had duly appointed Zavala as GFC's CEO and describes him as BGF's COO, while identifying López Vidal as BGF's CEO. Picó wrote "en mi capacidad como abogado de GFC … y Secretario de la Junta" ("in my capacity as counsel to GFC … and Secretary of the Board"), confirmed the Companies' officers as "debidamente electos o designados por la Junta" ("duly elected or designated by the Board") and listed "Rodrigo Zavala – principal oficial operacional (COO) de BGF y presidente y principal oficial ejecutivo (CEO) de GFC" ("chief operating officer (COO) of BGF and president and chief

executive officer (CEO) of GFC"). The same e-mail introduced Zavala as "oficial de las Compañías y/o como agente autorizado de VRM Penzini" ("officer of the Companies and/or as authorized agent of VRM Penzini").

562. The e-mail postdates the amendment and supplies no appointment resolution or effective date.

563. The title then travelled by repetition.

564. VRM's own counsel addressed its November 2, 2023 Notice of Material Change to "Mr. Rodrigo Zavala, GFC CEO."

565. At the December 1, 2023 contempt hearing in No. 22-1190, the Magistrate Judge, reading the list of parties present as he had "been advised," recorded for the Companies "the CEO of GFC Holdings, Rodrigo Zavala and corporate counsel of Biosmass [sic] and GFC Guillermo Pico."

566. Three days later, on December 4, 2023, Zavala himself wrote to the Board under the subject "Resignation from the Position of CEO at GFC," resigning "from my role as Chief Executive Officer of GFC, effective December 18, 2023," citing "a lack of cohesive direction and decisive action from the board" and offering to assist "in the search for a new CEO." No Board resolution had approved him in that role (paragraphs 514–518), and no minute or consent ever did (paragraphs 556–560). VRM's December 22, 2023 second notice of default, addressed to López Vidal as BGF's CEO, the managers and Picó, no longer listed him.

567. Earlier bank-account and check-signature discussions concern payment authority and did not authorize the separate September release of claims. Boyd and López Vidal's January 31, 2025 BGF action continued to assert the founder board's authority, which the transaction parties disputed. Economou–Picó e-mail chain of Oct. 12–13, 2023, October 12 e-mail; VRM

Penzini Fund I (Renewable Series II) Notice of Material Change (Nov. 2, 2023); No. 22-1190, transcript of the Dec. 1, 2023 contempt hearing, p. 8; Zavala letter to the GFC Board (Dec. 4, 2023); VRM Penzini Fund I (Renewable Series II) second notice of default (Dec. 22, 2023); GFC/BGF Board minutes and notes, May 22, July 11 and Aug. 2–7 minutes; BGF Board resolution refusing the asset transfer (Jan. 31, 2025).

568. The later acquisition documents connect this claim-surrender objective to VRM's asset purchase.

569. Recital C of the Asset Acquisition Agreement identifies Humacao RNG as wholly owned by VRM Renewable Series II, and § 3.6(c) expressly confirms and ratifies the Companies' BPPR release. Penzini signed for the buyer and Borschow for the sellers. This was the VRM parties' continuing effort to obtain Company assets while extinguishing the claims against the financing bank.

570. The September 2023 release and the January 2025 asset agreement remain separate transactions with distinct signers, consideration and authority defects. Asset Acquisition Agreement (Jan. 31, 2025), Recital C; § 3.6(c); signatures.

571. BGF is the sole obligee of MAPFRE PRAICO Insurance Company's payment and performance bond No. 1301208000513.

572. The bond was issued September 14, 2020, with the ITS/ASC joint venture as principal and a penal sum of $5,000,000.

573. Under its performance conditions, the surety's obligation arises when the obligee declares the principal in default by a Notice of Intention and attempts, within thirty days, the conference the bond prescribes.

574. The joint venture stopped work on May 22, 2024, the day the Bank filed its collection action against the Companies, SJ2024CV04616.

575. BGF never issued a Notice of Intention; Boyd knows this of his own knowledge from his participation in the Companies' management.

576. The responsible managers failed to declare the default and to pursue the Companies' remedies under the bond after learning of the construction failures, and thereby lost recoverable protection.

577. Plaintiffs charge the managers under their loyalty and management obligations and BPPR under its specifically undertaken financing duties.

578. The Companies' rights as obligee were not among the assets conveyed to Humacao RNG. Section 2.2(d) of the Asset Acquisition Agreement retained for the Sellers "any rights, claims or causes of action of the Sellers against third parties arising out of events occurring prior to the Closing Date."

579. The bond's payment conditions, which protect claimants who supplied labor or materials, are not pleaded.

580. The requested recovery is the covered value lost through the failure. MAPFRE payment and performance bond No. 1301208000513 and endorsement (Apr. 15, 2021); Construction Contract (June 18, 2020) and JV Agreement (May 15, 2020); Asset Acquisition Agreement (Jan. 31, 2025), § 2.2(d); SJ2024CV04616, Docket Entry 1 (May 22, 2024); Venture Engineering Independent Assessment (Aug. 3, 2022); construction-defect notices.

**I. The settlement failed; the eventual buyers' own complaint describes the construction and financial failures**

581. This section shows that the 2023 settlement never closed, and that the investors who later bought the assets had themselves alleged the Companies' financial-control and construction failures before the sale.

582. After the Seventh Amendment, the October 4, 2023 Certificate 24 cost sheet preceded BGF's October 6 Request for Advance, which asked for release on October 9 of $380,144.22 of identified Company funds under BPPR's administration — $312,144.22 from equity escrow and $68,000 from GFC's operating account. The Bank credited the funds to BGF's account on October 10, 2023. Certificate #24 cost sheet (Oct. 4, 2023); Request for Advance, Certificate 24 (Oct. 6, 2023); BGF operating-account statement (Oct. 10, 2023).

583. The master budget increased from $29,531,750 by $2,992,646, with a negative $64,167.72 adjustment, to $32,460,228.28.

584. Management's Q3 2023 statements reported $195,118.14 in quarterly revenue and a $673,163.78 net loss. They also reported that $390,015 of VRM's stated $1,500,000 funding remained outstanding. A November 15 chain forwarded those statements to Bank officers Medina Castillo, González and Fernández Osuna. BGF Master Budget and Certificate 21 critical-payment schedules (July–Aug. 2023); GFC/BGF Q3 2023 management financial statements, with the Nov. 15, 2023 forwarding chain.

585. On December 6, 2023, NIC Engineering's Nico Carvajal reported to UBE, Galileo and Company participants that membrane degradation had halted operations. His request for immediate and longer-term solutions documents another dated operating failure. Carvajal e-mail to UBE, Galileo and Company participants (Dec. 6, 2023).

586. The contemplated acquisition did not close.

587. The later court opinions recount refusals by López Vidal, López Gómez, Rivera, Parliament and Flexitank to execute the required purchase agreements, and the extended December 1, 2023 deadline passed.

588. On February 10, 2025, the court held the settlement unenforceable in its entirety and explained that the founders' releases depended on performance of all its terms. The Bank therefore did not obtain an effective release through that settlement. No. 22-1190, Docket 590, pp. 21, 29–30; Docket 591, pp. 7 n.2, 12.

589. The adverse parties' own pleading supplies a separate account of the Companies' condition.

590. On August 21, 2024, VRM Renewable Series II, the Semillero entities and Borschow sued López Vidal, López Gómez, GFC and BGF in No. SJ2024CV07694. Their complaint alleges manually prepared, manipulable Excel records and denial of the investors' accountant's access (¶ 75); missing monthly unaudited statements and unauthorized uses (¶¶ 77, 109); false projections presented by López Vidal to the Board (¶ 104); avoided contractor recourse and construction-and-design costs more than $2 million over the agreed price (¶¶ 94–96, where "ITC" follows allegations identifying ITS and López Gómez); serious construction deficiencies, approximately $40 million spent and $7–10 million of additional need, and management's failure to pursue contractor remedies; VRM's commissioning of the October 30, 2023 Venture report and its circulation to the Board on November 2; and Rodríguez Barnes's management of GFC's Bank relationship and a personal loan later repaid at an allegedly usurious rate (¶ 70). SJ2024CV07694 Compl., at 1–3, 12, 17–18, 21–22, 25, ¶¶ 46, 70, 75, 77, 90–105, 109.

591. Those allegations are the acquiring investors' and seller-side decisionmakers' own assertions, made before the 2025 sale, that the financial-control and construction problems were known beyond Boyd and Lassers and that the contractor and bond-claim remedies went unused.

592. Economou also supplied false cost, completion and funding information to the Bank and the Board to conceal the Company's condition and continue the financing. Moreover, no annual independent BGF audit was ever performed or supplied as required by QLICI Loan § 6.3(b). MAPFRE payment and performance bond No. 1301208000513; VGMM Agreed-Upon Procedures Report (Aug. 31, 2022); GFC/BGF Q3 2023 management financial statements, with the Nov. 15, 2023 forwarding chain; Economou e-mail to López Vidal (Nov. 7, 2022, 8:07 a.m.); QLICI Loan and Security Agreement (Sept. 15, 2020); Marsh letter to Ferrer and Coleman Tió (Dec. 2, 2021).

593. Economou had earlier resisted giving Boyd and Lassers contractor information. By October 13, 2023, he expressly opposed disclosure that would place contractor information in Boyd's and Lassers' hands for use in RICO litigation. His e-mail to Rivera, Borschow, Villarini, Penzini, the Lópezes and others addressed Zavala's assertion that ITS/Accurate had been overpaid; Economou disputed that assertion. He also reported BPPR's October 10 transfer authorization and the withholding of noncritical payments until funds reached BGF. The preceding Picó e-mail states that the Board authorized operational and financial access for VRM/Scherrer and Zavala. Plaintiffs allege selective protection of access for the incoming management while resisting access by the members pursuing Company claims. Economou–Picó e-mail chain of Oct. 12–13, 2023, pp. 1–3.

594. The SJ2024CV07694 complaint also alleged that GFC's Board had directed López Vidal to amend Green CO2's formation record to reflect a GFC project and that he had not complied. That position bears on the Companies' opportunity and the managers' knowledge,

alongside Villarini's November 2021 objection, the May 2022 under-GFC approval, and López Vidal's July 2022 ownership representation. SJ2024CV07694 Compl., ¶¶ 32–35, at 10; Villarini objection to pursuing the Brugal opportunity outside of GFC/BGF (Nov.–Dec. 2021); GFC/BGF Board minutes and notes.

**J. The common holders' recovery fell to zero, and the Bank arranged the sale of its loan to VRM**

595. This section shows how the financing alternatives narrowed through late 2024, how the recovery offered to GFC's members shrank, and how the Bank negotiated the sale of its loan rights to VRM.

596. Before the VRM transaction, management considered other financing.

597. The September 2024 VRM proposal contemplated approximately $7.1 million in recovery, allocated among the convertible noteholders, the preferred holders and the common holders. GFC Board–Island Renewable Energies meeting notes (May 2024), preliminary notes; Penzini status letter to the GFC members (Nov. 15, 2024).

598. In June 2024 the Bank set its price for more time.

599. On June 19, 2024 the Bank, signing "as Administrative Agent and Sole Lender," answered a request by Francisco Pujol, the lawyer the Companies had engaged to help them obtain capital, for six more weeks to complete negotiations with investors.

600. Two prospects had withdrawn, the Bank wrote, "leaving only Tote Maritime ('Tote'), and Puerto Rico Energy LLC ('Puma')."

601. The Bank wrote that "delay is not a viable option" and that "[t]he equipment is one of Biomass's most valuable assets." It would "entertain" the request only if Biomass confirmed, by June 24, 2024, that it would "execute a Consent Judgment, agreeing to the issuance of Judgment

and the remedies requested by BPPR" in SJ2024CV04616, and paid the insurance due on the collateral. Banco Popular letter to Pujol (June 19, 2024), pp. 1–3.

602. Three proposals arrived in September 2024. On September 17, 2024 López Vidal forwarded to GFC's members three letters of intent: VRM Penzini's of September 10, "to acquire substantially all of the assets of GFC Holdings, along with certain liabilities"; Linde Gas's of September 13, "proposing to acquire 100% of GFC Holdings/Biomass Green Fuels LLC"; and Laesa Ltd's, received the same day as Linde's, on terms substantially better for the Companies and their members than VRM's.

603. Linde asked for "written authorization from the GFC Board" to deal with Banco Popular and EC Waste before presenting a binding offer. The Board never answered, and Linde presented none.

604. On September 20, 2024 a majority of GFC's members, Boyd and Lassers among them, voted for VRM's letter of intent, and the Board signed it. That letter was non-binding except for its exclusivity and confidentiality terms. It made the transaction contingent on "[a]pproval of the proposed transaction by the required managers and members of the Companies," and it allocated the approximately $7.1 million of expected recovery among the noteholders, the preferred holders and the common holders. López Vidal e-mail to the GFC members (Sept. 17, 2024); Linde Puerto Rico B.V. letter (Sept. 13, 2024); VRM letter of intent (Sept. 10, 2024), with exclusivity extension; Penzini status letter to the GFC members (Nov. 15, 2024).

605. Cambrian and the Cabrer Group's November 26, 2024 nonbinding proposal offered an alternative. It contemplated a new holding company, a 40% nonvoting interest for GFC and $12 million of new equity and refinancing, subject to due diligence and definitive terms.

606. Cabrer sent Bank officers the proposed alternative on December 4. On December 6, the Bank's Eli Sepúlveda identified unresolved conditions, required agreement with GFC before considering consent, and declined a standstill. The customer negotiations remained open. On December 20, HPE accepted consideration of $21 per MMBtu but rejected the proposed later CPI escalation, offering to seek a nonbinding LOI with a fixed 3% increase throughout.

607. On January 7, 2025, López Vidal reported continued discussions but no update.

608. The Companies' own comparison of the two proposals, sent to the Bank, recorded for Cambrian/Cabrer "100% repayment of the Loans and 100% repayment of the interests owed" and a 40% interest in BGF for GFC's members. For VRM Penzini it recorded "50% repayment of the Loans, interests owed unknown," and that "GFC members will not continue to have any equity." Cambrian/Cabrer letter of interest and term sheet (Nov. 26, 2024), pp. 1, 4–9; HPE/Cambrian e-mails with López Vidal (Dec. 2024 – Jan. 2025), pp. 2–5; BGF Investors Comparison (Nov. 2024).

609. Eleven days before the Cambrian proposal, on November 15, 2024, Carlos Penzini had told GFC's members that the proposed recovery had fallen from $7.1 million to $4.1 million. The letter allocated $1 million of the reduction entirely to the common holders, eliminating their proposed recovery, and the remaining $2 million proportionately to preferred holders and convertible noteholders.

610. The $4.1 million comprised a $3.6 million minimum recovery and a $500,000 holdback.

611. The letter also disclosed VRM's agreement to purchase Banco Popular's note and enclosed the Bank's letter agreement. It told the members that "VRM now holds comprehensive rights under the Credit Agreement, granting us the authority to pursue and collect all amounts

currently owed to BPPR as the sole secured lender," and that VRM "reserves the right to act upon its rights as secured creditor" against any member who did not "adhere to the spirit of the accepted LOI." On that day VRM held no such rights.

612. The Bank's enclosed letter of November 14 set out indicative terms subject to credit-committee and Capital One approval.

613. Humacao RNG's own statement of facts in SJ2024CV04616 dates the assignment January 31, 2025, and the Bank first reported it to the Commonwealth court on February 14, 2025.

614. The payments the Asset Acquisition Agreement finally made went to the noteholders and the preferred holders whose approval the agreement required; the common holders, to whom the September proposal had allocated part of the recovery, received nothing. Penzini status letter to the GFC members (Nov. 15, 2024), pp. 1–2; Banco Popular–VRM Penzini Fund I (Renewable Series II) letter agreement (Nov. 14, 2024); SJ2024CV04616, Docket Entries 207 and 312; Asset Acquisition Agreement (Jan. 31, 2025), Schedule 2.9-A.

615. The Asset Acquisition Agreement that closed in February 2025 thus differed materially from the September proposal that had Board approval.

616. The common holders' proposed recovery had fallen to zero.

617. The consents actually given failed to authorize the final agreement and its changed terms. BGF Board resolution refusing the asset transfer (Jan. 31, 2025); GFC Board Written Consent approving the Asset Acquisition Agreement (Jan. 31, 2025).

618. The Bank's letter agreement that Penzini enclosed documents the Bank's own negotiating channel for its loan exit.

619. Banco Popular's November 14, 2024 letter, signed by Lynette Bigio and countersigned by Carlos Penzini for VRM Renewable Series II, refers to an October 15

confidentiality agreement with VRM and reaffirms its continuing effect. It set out indicative terms for the sale of the Bank's loan rights.

620. Humacao RNG was organized that day. The letter also addressed unwinding the leverage-loan structure and preserved the Bank's collection rights until consummation.

621. The related records identify Capital One as COCRF's sole member and COCRF as the majority owner of PCC Sub-CDE 13.

622. Five months after refusing six weeks for investor negotiations unless the Companies consented to judgment, the Bank spent the autumn negotiating the sale of its loan to the buyer group, and the sale agreement that followed released the Bank. Banco Popular–VRM Penzini Fund I (Renewable Series II) letter agreement (Nov. 14, 2024); Banco Popular letter to Pujol (June 19, 2024).

623. The federal anti-tying action, No. 24-1569, began December 9, 2024 and was amended December 12. It challenged the alleged connection between credit accommodations and the Bank's own commercial arrangements. That case supplies the context for the subsequent corporate dismissal and counsel dispute. No. 24-1569 docket; No. 24-1569, Docket 131; SJ2024CV04616, Docket Entry 242.

**K. The assets moved to Humacao RNG without a member vote; the Bank got an express release**

624. This section shows how the Companies' assets passed to Humacao RNG on final terms the members never voted on, over written objections from Boyd, Lassers and López Vidal, and with an express release of the Bank written into the transfer documents.

625. Plaintiffs alleged the asset transfer and the Bank's release in the Complaint, Docket 1, ¶¶ 939–950; they are restated here as the Companies' claims.

626. The January 31, 2025 written consent of GFC's Board approved the acquisition agreement substantially in the form presented. It authorized Villarini or Borschow, acting singly and on advice of counsel, to negotiate and execute the agreement with changes either approved in his discretion. It also ratified implementing acts within the resolutions' scope.

627. The consent invoked the September 2024 approval of the letter-of-intent transaction and a December exclusivity extension.

628. The final agreement materially changed the terms the members had approved.

629. The January consent also relied on the September 2023 BGF restatement, challenged on the limited grounds in paragraphs 535–544.

630. Villarini and Borschow signed the consent; López Vidal's signature line is blank. GFC Board Written Consent approving the Asset Acquisition Agreement (Jan. 31, 2025); VRM letter of intent (Sept. 10, 2024), with exclusivity extension.

631. Plaintiffs separately invoke the member-approval provisions.

632. Section 4.3 of GFC's Operating Agreement prescribes Majority Approval for matters subject to a member vote; § 4.2(j) requires the specified Series A approval for a disposition of substantially all assets, in addition to other required approvals.

633. Section 5.1(f) of the Asset Acquisition Agreement required written evidence of Majority Approval and of the Series A approval required by § 6.4.

634. The January consent recites September approval by holders of 71% of the membership interests and 86.67% of the Series A interests.

635. Plaintiffs allege, based on the recitals and López Vidal's account, that the September vote concerned the letter of intent and did not authorize material changes in the final agreement.

636. The supplied closing instrument does not include the written approval evidence required by § 5.1(f).

637. Plaintiffs allege on information and belief that no sufficient later approval of the challenged asset transfer was obtained. They base that allegation on the governing consent requirements, the executed instruments and the approval records described above. Asset Acquisition Agreement (Jan. 31, 2025), § 5.1(f); PRFG resignation letter from the GFC Board (Feb. 14, 2025); GFC Operating Agreement (Oct. 20, 2021), as amended; GFC Board Written Consent approving the Asset Acquisition Agreement (Jan. 31, 2025).

638. The same day, January 31, 2025, Boyd and López Vidal signed a BGF resolution opposing the proposed asset transfer; López Gómez's line is blank. They relied on the three-manager structure in BGF's September 2020 agreement.

639. If the September 2023 restatement was valid, management instead rested with GFC; if it was ineffective, the earlier BGF governance provisions remain relevant.

640. The resolution records a timely objection under the signers' asserted authority. BGF Board resolution refusing the asset transfer (Jan. 31, 2025); BGF Second Amended and Restated LLC Agreement (Sept. 11, 2023); Picó e-mail to the GFC Board (Sept. 11, 2023); BGF Amended and Restated Operating Agreement (Sept. 14, 2020), art. I.

641. Six days later, on February 6, 2025, Boyd and Lassers e-mailed a cease-and-desist notice to GFC's Board and members, including Borschow, Villarini, Rojo and Penzini.

642. The notice acknowledged the January 31 agreement and the consent signed by Borschow and Villarini. It asserted that the earlier vote had authorized an LOI, that the LOI had expired, and that the changed final terms required a new member vote. It invoked the Operating

Agreement's restrictions on the Board and asserted that an effective liquidation required unanimity.

643. Penzini signed the acquisition agreement for Humacao RNG.

644. No sufficient new vote approved the materially changed final terms. Asset Acquisition Agreement (Jan. 31, 2025); Boyd and Lassers cease-and-desist notice (Feb. 6, 2025).

645. The Asset Acquisition Agreement is dated January 31, 2025.

646. Plaintiffs challenge the authority for the final transaction, the signing managers' conflicts, and the value the Companies received.

647. Section 3.6(c) releases Banco Popular from the defined claims. Asset Acquisition Agreement (Jan. 31, 2025), §§ 2.7–2.10, § 3.6(c).

648. The agreement states the consideration as follows.

649. Section 2.7 identifies a $13 million partial debt payment in kind, a $4,465,966 Cash Component and assumed liabilities.

650. Schedule 2.9-A allocates $4,144,563 at closing and $321,403 as holdback, already included in the Cash Component.

651. The listed noteholder and preferred-holder amounts likewise include their holdbacks.

652. No cash is allocated to the Companies for their assets or to common holders in that capacity. Asset Acquisition Agreement (Jan. 31, 2025), §§ 2.7–2.10, Schedule 2.9-A/B.

653. A $7,052,292 Loan Balance survived the closing.

654. Under § 2.10, that balance continued with interest and security, subject to forbearance and conditional cancellation after five years.

655. Specified rescission claims could trigger the full balance; specified monetary claims could trigger a corresponding amount. Those terms concern defined parties, including Boyd as a Personal Guarantor but not Lassers. Asset Acquisition Agreement (Jan. 31, 2025), §§ 2.7–2.10, Schedule 2.9-A/B.

656. The loan documents said how the Project could be sold.

657. Section 5.2(g)(ii) of the Credit Agreement prohibited any disposition of "all or any part of the Project, the Site or any other Collateral" except one whose net proceeds "are used to pay in full, concurrently with such sale … the then outstanding amount of all of the Advances, all accrued interest thereon and all other amounts required to be paid under this Agreement or any other Loan Document."

658. Section 5.2(e) prohibited the Borrower from releasing "any Indebtedness or claim owed to the Borrower by any Person … except in the ordinary course of the Borrower's business and on commercially reasonable terms."

659. Section 5.2(f) permitted a transaction with an Affiliate of the Borrower, or with a member, director or officer, only on arm's-length terms that "are subordinate to the payment in full of the Obligations."

660. Section 2.9(a) and (f) sent one hundred percent of a Disposition's Net Cash Payments to prepayment of the Non-Revolving Facility Notes "until payment in full thereof." Section 7.2 required every post-default recovery, "including through set-off or realization upon Collateral," to be applied by the Administrative Agent to the debt in a fixed order.

661. Puerto Rico's Commercial Transactions Act imposes the same discipline on a secured creditor that keeps the collateral.

662. An acceptance of collateral in partial satisfaction of the debt requires the debtor's authenticated consent after default and a proposal sent to every secondary obligor, and an acceptance that does not meet those conditions is ineffective. A disposition to the secured party, or to a person related to it, is measured against what a stranger would have paid. The debtor and the obligors may not waive those rules in advance. 19 L.P.R.A. §§ 2362, 2375(f), 2380(a)–(c), 2381(b).

663. Humacao RNG acquired the Popular Loan and the PCC Loans before closing, "with all of the rights of the lenders" (Recital E). It took the Acquired Assets "in lieu of partial payment in cash (dación en pago parcial)" (§ 2.1), "as creditor" (§ 2.10) and "as secured creditor and holder of the Popular Loan and the PCC Loans" (§ 3.6(d)).

664. No proposal under § 2381 was sent to Boyd, the guarantor of the Popular Loan, before or after the agreement was signed. Credit Agreement (Sept. 15, 2020), §§ 2.9(a), (f), 5.2(e)–(g), 7.2; Asset Acquisition Agreement (Jan. 31, 2025), Recital E, §§ 2.1, 2.7, 2.10, 3.6(d); Boyd and Lassers cease-and-desist notice (Feb. 6, 2025).

665. The buyer was not a stranger to the Borrower.

666. The Credit Agreement allowed the Bank to assign the loan only to an "Eligible Assignee," and it provided that, "[n]otwithstanding the foregoing, neither the Borrower nor any Affiliate of the Borrower shall qualify as an Eligible Assignee" (§ 1.1; § 9.1(a)(iii)).

667. An Affiliate includes any Person that "directly or indirectly through one or more intermediaries Controls" the Borrower.

668. Control is "the power to direct or cause the direction of management and policies of a Person, whether through direct or indirect ownership of voting interests, by irrevocable contract or otherwise" (§ 1.1).

669. Humacao RNG is the wholly owned subsidiary of VRM Penzini Fund I, LLC Renewable Series II.

670. Since May 22, 2023 the Operating Agreement has given VRM a designated seat, the "VRM Manager," on the Board of Managers of GFC, the Borrower's sole member. In 2023 its principals Rafael Rojo and Carlos Penzini sat as managers and signed the Board's consents (paragraph 161); on March 31, 2025 VRM designated Javier Feliciano as the VRM Manager (paragraphs 735–736).

671. As a Series A holder, VRM shares the approval without which GFC may not adopt a budget, hire, dismiss or set the compensation of an executive officer, incur debt or enter a strategic relationship above $150,000, enter or leave a line of business, or transact with an officer, manager or employee of the Company, and without which no sale of substantially all of the Companies' assets may occur.

672. Since May 22, 2023 the Operating Agreement has named VRM the provider of "business assistance and guidance advisory services" to GFC under the Advisory Service Agreement of September 14, 2020 between Biomass and VRM, as assignee of Semillero Partners, and it has given VRM an option to subscribe units up to a 25% interest.

673. On August 25, 2023 the Second Amendment to the Operating Agreement recited that, "to cause the settlement of a federal RICO Act litigation against the Company," GFC's majority members and Series A majority "have entered into agreements with VRM to cause the sale of the Company to VRM pursuant to Section 10.4" of that agreement.

674. VRM placed its own employee and officer, Rodrigo Zavala, as the Borrower's chief operating officer.

675. On August 2, 2023 it conditioned its funding of the capital call on Zavala's appointment as chief executive officer of GFC, on Penzini's appointment as interim chief financial officer, on a VRM representative's signature on every payment, and on Board observer seats for Rojo and Diego Rodríguez.

676. On September 27, 2023 the Bank wrote Zavala into the Seventh Amendment as the Borrower's sole "Authorized Representative … acting singly" and took the Companies' release from him (paragraphs 502–580).

677. VRM's hold on the Borrower's management was written into its investment contract. In the Convertible Note Purchase Agreement of April 12, 2023 between GFC and VRM Penzini Fund I, LLC Renewable Series II — the entity that owns Humacao RNG — GFC "covenants and agrees to appoint" three named individuals "to manage the Company's day-to-day operations": López Vidal as "President & CEO," Zavala as "VP & COO" and Economou as "CFO" (§ 5.7(a)), and to sign a COO Employment Agreement with Zavala (§ 5.7(b)). Any use of the investment proceeds for a purpose, or at a time, other than as scheduled required "the Investor's prior written approval" (§ 1.2).

678. The plant could not be placed in service until an engineering inspection satisfied VRM, and BGF could not begin sales before a date VRM agreed to (§§ 5.4, 5.5(a)). VRM took the right to deal directly with the Bank, with EC Waste and with "any clients, customers, vendors, tenants, or other third parties related to the Company" (§ 5.3), and GFC could not sell substantially all of its assets, change the size of its Board or incur more than $2,000,000 of debt outside bank financing without VRM's written consent (§ 5.8).

679. When BGF's president suspended Zavala in August 2023, VRM declared the Companies in default of these covenants (paragraphs 510–513).

680. VRM then put Zavala in as GFC's chief executive officer. Its August 2, 2023 funding conditions had required that appointment; the Board's votes on it failed (paragraphs 514–518); the Board never approved it; yet from September 2023 he was, in his own words, "leading the company" under that title — the voided September 11, 2023 consent already styled him "President and Chief Executive Officer" (paragraphs 537–539), GFC's corporate counsel described him on October 12, 2023 as the Board-appointed CEO, VRM's own counsel addressed him on November 2, 2023 as "GFC CEO," he appeared for the Companies in No. 22-1190 on December 1, 2023 as "the CEO of GFC Holdings," and his own December 4, 2023 letter resigned "from the Position of CEO at GFC" (paragraphs 561–567).

681. Neither Company's board approved the Seventh Amendment he signed for both on September 27, 2023, and no minute or written consent from May 2023 through January 2024 names him chief executive officer or authorizes him to sign for either Company (paragraphs 519–524, 554–555, 556–560). His resignation letter, citing "a lack of cohesive direction and decisive action from the board," confirms what the record shows: he did not have the Board's support.

682. The Companies' three managing officers were the three VRM's contract named, and the one who signed for them was VRM's.

683. VRM obtained exclusivity on September 20, 2024, two days after it signed the Third Amendment to the Operating Agreement. It told the members on November 15, 2024 that it already held the lender's rights (paragraphs 609–614). It was an "Approving Member" whose consent the Asset Acquisition Agreement required, and it bought the plant through Humacao RNG.

684. In the Commonwealth collection case Humacao RNG has rested its status as an Eligible Assignee on the Bank's approval of it as Administrative Agent, within a definition that, in Humacao RNG's own words, excludes the Borrower "o alguna de sus afiliadas" ("or any of its

affiliates”). It has produced no Assignment Agreement, no entry in the Register that § 9.1(c) makes “conclusive and binding for all purposes,” no notice of the assignment to the Borrower under § 9.1(d), and no new Note. The Bank knew these facts.

685. Rojo told the Board in August 2023 that its minutes “are being shared with BPPR”; the Bank is a party to the Seventh Amendment; and its letter of November 14, 2024 offered the loan to VRM “or your affiliate.” Credit Agreement (Sept. 15, 2020), §§ 1.1, 9.1(a), (c), (d); GFC Holdings LLC Second Amended and Restated Operating Agreement (Oct. 20, 2021), §§ 4.2(j), 4.7, 6.1(c), 6.3, 6.14, with the First (May 22, 2023), Second (Aug. 25, 2023) and Third (Sept. 18, 2024) Amendments; Convertible Note Purchase Agreement, GFC–VRM Penzini Fund I, LLC Renewable Series II (Apr. 12, 2023), §§ 1.2, 5.3–5.8; GFC Board minutes (Aug. 2–7, 2023); Seventh Amendment and Forbearance Agreement (Sept. 27, 2023), § 3(a); Banco Popular–VRM Penzini Fund I (Renewable Series II) letter agreement (Nov. 14, 2024); Asset Acquisition Agreement (Jan. 31, 2025), Recital C, §§ 1, 5.1(f); SJ2024CV04616, Docket Entry 273, ¶ 10; Docket Entries 207, 312.

686. The September 5, 2024 broker e-mail questioned the source of BPPR’s $19,264,409.32 equipment values and asked whether an appraisal existed.

687. Section 14 of the Seventh Amendment required disclosure of market value in new appraisals of equipment or real estate securing the obligations.

688. The valuation and sale process failed to protect the Companies’ interests on the particular approval, conflict and consideration facts pleaded here. Seventh Amendment and Forbearance Agreement (Sept. 27, 2023), § 14.

689. The record made at the time, apart from Boyd’s later valuation, supports the business the project was expected to run.

690. The August 31, 2021 valuation note stated stabilized EBITDA of $4,700,000, net debt of $15,380,000, a 9.55% discount rate and a DCF value of $30,500,000, excluding RIN revenue, the second tax-credit tranche, Ponce and the lease extension. BGF's projections priced CO2 at $0.17 per pound, or $340 per short ton, assumed 350 operating days, and carried a 14.5% royalty on both products.

691. The July 2019 amendment recognized BGF's exclusive rights in recovered CO2. The gas prices actually executed and negotiated were BPPR's $14 per MMBtu, HPE's $14.50 and IPR's $21.50 post-prepayment price, together with the Cambrian discussions described above. López Vidal e-mail to the GFC Board (Aug. 31, 2021), with attachments; Green CO2 investment summary (May 2022); El Coquí Landfill Gas Sale and Purchase Agreement (Dec. 28, 2018), with First Amendment (July 19, 2019), source pp. 50–51; CohnReznick final financial projections (Sept. 15, 2020), source pp. 1, 3–4; BGF–Banco Popular RLNG Off-Take Agreement (July 18, 2022); BGF–HPE RLNG Supply Agreement (Dec. 20, 2021); Cambrian/Cabrer letter of interest and term sheet (Nov. 26, 2024); HPE/Cambrian e-mails with López Vidal (Dec. 2024 – Jan. 2025); BGF Appendix II financial projections (100,000 lb/day case).

**1. The transfer exchanged a business valued at $83,305,285 for $17,465,966 in stated consideration**

692. Plaintiffs' current estimate of the value the Companies lost is set out in the valuation prepared by Gregory Boyd and dated September 22, 2026, which Boyd verifies with this Complaint.

693. The valuation values the integrated RLNG and RCO2 business that BGF would have operated after timely completion. It values that business as of February 7, 2025, the scheduled closing date of the Asset Acquisition Agreement. Its assumptions are these. The plant produces

1,500 MMBtu of RLNG and 100,000 pounds of RCO2 per operating day over 350 days. RLNG sells at $21 per MMBtu, the Cambrian benchmark identified in the negotiation record; that price already reflects the buyer's recycling-credit economics, and no further premium is added. RCO2 sells at $400 per short ton, the adopted negotiated-price estimate, informed by the historical $340 budget and the supplied Puerto Rico bulk-market analysis, and tested at $350 and $450. El Coquí receives a 14.5% royalty on both products. The cash operating costs, rent and $500,000 sustaining-capital reserve are those of BGF's own projections, escalating 1.5% per year. The tax rate is the 4% decree rate, and the discount rate is 10%. The term is the remaining El Coquí term through December 28, 2053, including one ten-year renewal under § 3.1 (28.8871 years). On those assumptions, first-year product sales are $18,025,000 ($11,025,000 RLNG; $7,000,000 RCO2), and first-year after-tax operating cash after the reserve is $9,591,640. The treatment of each valuation component in the Company claim is stated in Schedule A, Part 11. Boyd valuation (Sept. 22, 2026); El Coquí Landfill Gas Sale and Purchase Agreement (Dec. 28, 2018), with First Amendment (July 19, 2019), § 3.1, source p. 9; CohnReznick final financial projections (Sept. 15, 2020), pp. 1, 3; Cambrian/Cabrer letter of interest and term sheet (Nov. 26, 2024); HPE/Cambrian e-mails with López Vidal (Dec. 2024 – Jan. 2025).

694. The resulting after-tax operating present value is $83,305,285 ($76,580,713 at $350 per short ton; $90,029,857 at $450). That figure remains the Companies' current estimate of the value lost. The term used rests on the gas contract itself.

695. Under § 3.1 of the El Coquí Landfill Gas Sale and Purchase Agreement dated December 28, 2018, the Initial Term runs twenty-five years, to December 28, 2043. The agreement then continues for ten-year Additional Terms automatically unless either party gives ninety days' written notice before the current term ends.

696. The estimate includes one Additional Term, through December 28, 2053 (28.8871 years).

697. Extension is the expected course on these facts: El Coquí earns a 14.5% royalty on both products for as long as the plant operates and has no other outlet for the gas.

698. If the term is treated as ending with the Initial Term on December 28, 2043, the same model yields $75,688,223 ($69,692,820 at $350 per short ton; $81,683,625 at $450), which Plaintiffs plead as the floor of the estimate.

699. Each figure is the value of the completed operation.

700. The completion capital still required in February 2025 — the $7 to $10 million the acquirers themselves alleged (paragraphs 589–590) — and the delay and execution risk are deducted, as paragraph 701 states, before the comparison with the consideration received. Boyd valuation (Sept. 22, 2026); El Coquí Landfill Gas Sale and Purchase Agreement (Dec. 28, 2018), with First Amendment (July 19, 2019), § 3.1, source p. 9.

701. The $83,305,285 is a completed-operation but-for value. It is stated before any remaining completion-capital or working-capital deduction and before debt or other senior claims. It excludes the Ponce and Salinas opportunities and any separate award for the alleged misconduct. Final values will be proved through expert testimony. Against it, the Asset Acquisition Agreement furnished $17,465,966 in stated debt-and-cash consideration: the $13,000,000 debt reduction and the $4,465,966 cash component, inclusive of the $321,403 holdback. The agreement also provided assumed obligations and the conditional treatment of the $7,052,292 balance. Asset Acquisition Agreement (Jan. 31, 2025), §§ 2.7–2.10, 3.6(c); Boyd valuation (Sept. 22, 2026).

702. The difference — $65,839,319 on the Companies' estimate, and $58,222,257 on the Initial-Term floor — states the scale of the loss before deductions.

703. After deducting the $7 to $10 million of completion capital the acquirers themselves alleged (paragraphs 589–590), the difference is between $55.8 million and $58.8 million on the Companies' estimate; the remaining deductions (working capital, delay and execution risk, debt and other senior claims) will be proved through expert testimony.

704. A properly completed project and an authorized sale for fair net value would have supported repayment of valid Company debt and a positive residual for distribution under the governing priorities.

705. The actual transfer deprived the Companies of greater asset and earning value than the benefits furnished, while releasing valuable Bank claims and leaving collection exposure. The calculation of the difference credits all benefits actually received.

706. No payment to the Companies for the BPPR release was separately identified.

707. A lender's sale of a distressed asset begins by paying the loan. That is what the Companies' own Credit Agreement required of any sale of the Project (paragraphs 656–664), what the Puerto Rico Commercial Transactions Act requires of a disposition of collateral — the proceeds go to the debt and the surplus to the debtor (19 L.P.R.A. § 2375(a), (d)) — and what the NMTC loan agreement required (QLICI Loan and Security Agreement § 8.3(b)).

708. This sale began instead with a release of the lender.

709. The Bank sold its loan to the buyer.

710. The buyer took the assets "as creditor" for a $13,000,000 credit against a business worth $83,305,285 on Boyd's valuation.

711. A $7,052,292 debt was left standing against the Companies and the guarantor as a trigger. Section 3.6(c) released the Bank from every claim the Companies held against it. Asset Acquisition Agreement (Jan. 31, 2025), Recital E, §§ 2.7–2.10, 3.6(c); Credit Agreement (Sept.

15, 2020), §§ 2.9(a), (f), 5.2(g); QLICI Loan and Security Agreement (Sept. 15, 2020), § 8.3(b); Banco Popular–VRM Penzini Fund I (Renewable Series II) letter agreement (Nov. 14, 2024); Boyd valuation (Sept. 22, 2026).

712. On February 7, 2025, the buyers closed anyway. The only member approval ever given concerned the letter of intent, not the sale. Asset Acquisition Agreement (Jan. 31, 2025), § 2.8; López Vidal Decl. (May 26, 2026), ¶ 6; PRFG resignation letter from the GFC Board (Feb. 14, 2025).

713. Plaintiffs challenge Humacao RNG's reliance on the sellers' asserted authority on five grounds: its role in negotiating the transaction; its parent's announcement to the members, before any assignment had closed, that it already held the lender's rights (paragraphs 609–614); the agreement's approval condition; the objections communicated before closing; and its acceptance of the collateral in partial satisfaction of the debt without the proposal to the guarantor that 19 L.P.R.A. § 2381(b) requires (paragraphs 656–664).

714. Humacao RNG signed an agreement that conditioned closing on written evidence of member and Series A approval. The February 6 notice disputed whether that condition had been satisfied. The final terms exceeded those approvals. Asset Acquisition Agreement (Jan. 31, 2025), § 5.1(f); Boyd and Lassers cease-and-desist notice (Feb. 6, 2025); VRM letter of intent (Sept. 10, 2024), with exclusivity extension.

715. Plaintiffs seek against each transferee the transaction-specific relief described in Counts VI–VIII, according to the property that transferee received and its knowledge and participation.

716. Economou's January 28, 2025 closing correspondence distinguishes approximately $4.25 million of member-note and preferred payments from approximately $877,000 in identified

vendor items. Plaintiffs seek an accounting of the payments actually made under those terms. Asset Acquisition Agreement (Jan. 31, 2025).

717. No payment for the Plaintiff founders' common units appears in Schedule 2.9. That omission explains their objection to the changed transaction. Asset Acquisition Agreement (Jan. 31, 2025), sched. 2.9.

718. The agreement retained specified preclosing third-party claims under § 2.2(d) while separately releasing BPPR and its attorneys under § 3.6(c).

719. The interested decisionmakers surrendered valuable Company rights without the required authorization and without proper protection of the Companies' interests. Plaintiffs seek restoration or the resulting net loss, accounting for the actual consideration furnished under the transaction. Asset Acquisition Agreement (Jan. 31, 2025), § 2.2(d), § 3.6(c).

720. What the Companies kept is specific.

721. The Asset Acquisition Agreement conveyed the Acquired Assets of § 2.1(b) and retained for the Sellers, in § 2.2(d), "any rights, claims or causes of action of the Sellers against third parties arising out of events occurring prior to the Closing Date." The Companies' rights as obligee under MAPFRE bond No. 1301208000513, their claims against the joint-venture participants for the construction failures described in paragraphs 169–175 and 276–304, and the claims pleaded in this Complaint against persons other than the Bank are among the rights so retained. The same agreement released the Bank and its attorneys in § 3.6(c). The Companies kept their claims against everyone except the party whose release the sale delivered. Asset Acquisition Agreement (Jan. 31, 2025), §§ 2.1(b), 2.2(d), 3.6(c).

722. The alternative relief for preclosing misuse of Company information rests on the retained preclosing third-party claims. Plaintiffs challenge the conveyance itself in Count VI. Asset Acquisition Agreement (Jan. 31, 2025), §§ 2.1–2.2.

723. The same day the buyers closed, BPPR filed its February 7, 2025 Motion to Dismiss in the anti-tying action, signed by Sullivan & Cromwell and PMA. PMA had also handled transaction documents, including the credit amendments.

724. Popular's public filings and the trade press identify Álvarez's and Ferrer's founding roles at PMA, and Popular announced Álvarez's February 25, 2025 voluntary retirement, effective June 30. No. 24-1569, Docket 24; Popular, Inc. Forms 8-K, Sept. 26, 2014, Apr. 25, 2017 and Feb. 27, 2025 (Item 5.02); Polo Rocha, *Popular Names Javier Ferrer President. Is He Its Next CEO?*, American Banker (May 10, 2024).

**L. Conflicted managers chose the counsel who then moved to dismiss the Companies' claims against the Bank**

725. The paragraphs in this section show how managers with interests adverse to the Companies took control of the Companies' remaining claims. Those managers chose the lawyer who then sought to dismiss the Companies' claims against the Bank.

726. Borschow himself recognized the conflict at the start. On March 4, 2025, he told López Vidal that he had consulted Picó and had hired Luis Palou to answer López Vidal's collection claim. In discussing that defense with López Vidal — the claimant and a fellow manager — Borschow expressly identified the conflict. He later took part in selecting the Companies' counsel while his own side was suing them. The same conflict required him to abstain from directing how the Companies treated claims adverse to his interests. López Vidal e-mail to

Borschow (Mar. 24, 2025), pp. 4–5; GFC Board resolution dated "March 21, 2025," with the April 1, 2025 transmittal; SJ2024CV07694 Compl.

727. The post-sale collection record also includes a Bank instruction of February 18, 2025, identified in the settlement production as OLV-S-00070, to cancel five insurance policies and two financing accounts and to request the unearned premiums.

728. Refunds of premiums the Companies paid must be accounted for to their lawful owner and credited where the governing obligations require.

729. Section 2.2(c) of the Asset Acquisition Agreement excludes the sellers' insurance rights from the assets transferred. This accounting is separate from the original JV construction-bond premium. OLV-S-00070; Asset Acquisition Agreement (Jan. 31, 2025), § 2.2(c).

730. After the asset sale, a GFC Board resolution dated "March 21, 2025" purported to engage the law firm of Attorney Roberto Abesada-Agüet to represent the Companies "in all pending litigations" and to ratify acts already taken. Plaintiffs challenge that decision and the authority asserted for it on the grounds described below.

731. On March 24, 2025, López Vidal e-mailed Borschow, copying members and other participants, to question the new representation of GFC and BGF in the RICO case. He said he had not been consulted, and he asked who had made the decision, who was paying, and for the signed engagement agreement. On April 1 at 11:18 a.m., Carla S. Pérez transmitted the consent dated March 21 and described it as approved by the Board majority. At 12:05 p.m., Picó separately invited López Vidal to sign and return it if he agreed with the engagement. Borschow and Feliciano signed; López Vidal did not. GFC Board resolution dated "March 21, 2025," with the April 1, 2025 transmittal; López Vidal e-mail to Borschow (Mar. 24, 2025), at 1; López Vidal Decl. (May 26, 2026), ¶ 15; PRFG resignation letter from the GFC Board (Feb. 14, 2025).

732. The Board that produced that consent is itself in dispute.

733. Villarini resigned from the GFC Board on February 14, 2025.

734. López Vidal identifies himself and Borschow as the remaining managers, while Borschow's March 31 notice, described next, announced a four-person Board that included Feliciano. The consent dated March 21 bears Borschow's and Feliciano's signatures and purports to ratify prior acts. Based on that sequence and López Vidal's declaration, Plaintiffs allege on information and belief that Feliciano had not been validly designated when his vote was used, and that the engagement therefore lacked the required majority. López Vidal Decl. (May 26, 2026); PRFG resignation letter from the GFC Board (Feb. 14, 2025); GFC Board resolution dated "March 21, 2025," with the April 1, 2025 transmittal; Picó letter to Becker Whitaker (June 19, 2025).

735. That notice was a written communication dated March 31, 2025, which Borschow signed as "Authorized Signatory" under the January 31, 2025 written consent. He announced that the Asset Acquisition Agreement had "closed" on February 7, 2025. On the strength of that closing, he announced, VRM Renewable Series II had designated Javier Feliciano as the VRM Manager, and the majority Series A Preferred holders had designated Juan Goytía as the Preferred Manager.

736. On information and belief, based on public professional records, Goytía had served in Banco Popular's loss-mitigation function from January 2023 through February 2025. López Vidal Decl. (May 26, 2026), ¶ 3; PRFG resignation letter from the GFC Board (Feb. 14, 2025).

737. The same day, March 31, 2025, Borschow told the members that escrowed funds were being held for the Companies' benefit.

738. Villarini, who had resigned as a manager on February 14, asked whether this referred to creditor amounts, the preferred holders' holdback, or both. Borschow replied: "This is the Holdback."

739. Under §§ 2.9 and 6.8 of the Asset Acquisition Agreement, the buyer retains that amount — part of the members' own consideration — to fund the Approving Members' indemnity of the buyer, and any balance returns to those members pro rata; no part of it is the Companies'. Borschow's message to the members said otherwise (Predicate Act 10, paragraph 961). Asset Acquisition Agreement (Jan. 31, 2025), § 2.9; PRFG resignation letter from the GFC Board (Feb. 14, 2025); Borschow e-mail to Villarini (Mar. 31, 2025); Borschow communication to the GFC members (Mar. 31, 2025).

740. Borschow signed the consent approving AB-AG LAW LLC's engagement while he and the Semillero interests were pursuing claims against the Companies in SJ2024CV07694. Their complaint in that case, dated August 21, 2024, sought money from the Companies as well as relief against the Lópezes. Its collection counts sought $110,000 from BGF and $280,937 from GFC; the GFC amount was pleaded as Semillero's defense costs under indemnification and advancement agreements.

741. The consent establishes Borschow's participation in the engagement decision, and his position as both plaintiff and manager supplies the adverse interest in appointing counsel for the Companies. GFC Board resolution dated "March 21, 2025," with the April 1, 2025 transmittal; SJ2024CV07694 Compl., at 1, 4, 31–32, ¶¶ 4, 158–170.

742. Abesada also appeared for the Companies in that same case. The Companies' prior counsel there withdrew in December 2024 after the Companies stopped paying his fees; the court sanctioned the Companies on February 20, 2025; on April 3, 2025 Abesada moved to assume their representation, which the court accepted on April 4; and on June 10, 2025 he filed the Companies' amended answer as "codemandados nominales" ("nominal co-defendants"), admitting the bulk of the numbered allegations and stating, as a defense, that the Companies take "una posición de

neutralidad corporativa" ("a position of corporate neutrality") and that "en estos momentos no hay defensas" ("at this time there are no defenses").

743. Plaintiffs challenge the responsible managers' use of that neutral posture, because the complaint also demanded money from the Companies and alleged misconduct that gave rise to potential Company claims. SJ2024CV07694, Docket Entries 61, 66, 69 and 78 (Feb. 20, Apr. 3, Apr. 4 and June 10, 2025).

744. The disputed managers next removed the Companies' officers.

745. On May 6, 2025, Carla S. Pérez e-mailed that a majority written consent had approved termination of the CEO's and CFO's employment, and she recommended coordination with the Board's labor lawyer. The subject line names BGF; the body refers to GFC's Board and "the Company."

746. The financing agreement — the VRM Convertible Note Purchase Agreement of April 12, 2023 — identifies López Vidal as CEO and Economou as CFO. Notice of termination of the BGF CEO and CFO (May 6, 2025); VRM Convertible Note Purchase Agreement (Apr. 12, 2023), § 5.7(a), sched. 3.12.

747. The May 6, 2025 termination notice followed both the asset closing and the counsel engagement. Two earlier facts frame those decisions.

748. On March 15, 2021, Boyd had addressed the specific bond-payment warning to Borschow and the other Board participants.

749. By August 21, 2024, Borschow was himself a plaintiff in a complaint alleging concealed construction defects and an unpursued contractor warranty. Boyd e-mail to the GFC Board (Mar. 15, 2021); SJ2024CV07694 Compl., at 2–3; Notice of termination of the BGF CEO and CFO (May 6, 2025); López Vidal e-mail to Borschow (Mar. 24, 2025), at 4–5.

750. Members claiming a majority of GFC's votes then acted, and the Board's counsel rejected their consent.

751. On June 13, 2025, members claiming 55.468% of GFC's voting units on an as-converted basis — López Vidal, Boyd, Lassers, and John Lee Dumas, whose signatures the instrument bears — executed a written consent.

752. The consent recites the "improper written consent of the Board of Managers of GFC" dated January 31, 2025 and the "improper closing of the Asset Acquisition Agreement," and it authorizes legal action to recover the value of the Companies' business and assets.

753. Six days later, on June 19, 2025, Picó wrote, at Abesada's and the Board's request, that the June 13 member consent was ineffective and that members making contrary representations could incur civil or criminal liability. The letter states the Board's position and counsel's asserted instructions. GFC Majority Members' Written Consent (June 13, 2025); Picó letter to Becker Whitaker (June 19, 2025).

754. The same day, the Companies' public administration record was changed.

755. On June 13, 2025, registry filings with the Puerto Rico Department of State moved GFC's office, at 10:23 a.m., to a mailbox marked for Rocana-Semillero Advisors. At 10:27 a.m., Picó Corporate Services became resident agent. At 10:47 a.m., a filing listed Borschow and Feliciano and briefly listed Picó as president. At 3:34 p.m., a further amendment added Goytía and removed Picó. The captured registry later listed Borschow, Feliciano, Goytía and López Vidal as administrators. The approval materials attached to those filings are challenged next. P.R. Department of State registry filings of June 13, 2025 (GFC); P.R. Department of State Corporate Information records (GFC and BGF).

756. The filed packet does not show the approval it asserts.

757. Section 6.7 of GFC's Operating Agreement, as amended, requires a written consent signed by managers holding the votes necessary to authorize the action.

758. The packet asserts approval but attaches an unsigned manager consent.

759. On information and belief, based on that packet, the required signatures were not obtained, and Plaintiffs challenge the authority certification on that basis.

760. The packet also identifies GFC as BGF's sole member and administrator — the structure on which Plaintiffs alternatively base their double-derivative claim. GFC Operating Agreement (Oct. 20, 2021), as amended, § 6.7, and Second Amendment (Aug. 25, 2023), § 5; P.R. Department of State registry filings of June 13, 2025 (GFC).

761. By July 2025, the disputed managers had approved the sale, engaged litigation counsel, removed the officers and rejected the member consents. Those steps gave interested managers control over the retained Company claims. Asset Acquisition Agreement (Jan. 31, 2025); Irrevocable Proxy (June 2, 2025); PRFG resignation letter from the GFC Board (Feb. 14, 2025); GFC Board resolution dated "March 21, 2025," with the April 1, 2025 transmittal; Notice of termination of the BGF CEO and CFO (May 6, 2025); P.R. Department of State registry filings of June 13, 2025 (GFC).

762. The newly engaged counsel then moved to end the Companies' claims against the Bank.

763. On July 11, 2025, Abesada filed the Companies' notice seeking dismissal with prejudice of their anti-tying claims against BPPR; the notice expressly left the individuals' claims outside it.

764. On July 16, 2025, at the initial conference in a separate Commonwealth suit for legal fees, *AMRC, LLC v. López-Vidal*, No. SJ2024CV10727, Abesada, appearing for GFC, told

the court that the company he represented "no está operando y no tienen activos" ("is not operating and they have no assets") and that he would conduct no discovery.

765. The engagement and those litigation decisions required independent consideration of the Companies' interests — particularly where the managers who selected counsel, and the Bank, benefited from abandoning the Companies' claims. No. 24-1569, Docket 63; *AMRC, LLC v. López-Vidal*, No. SJ2024CV10727, Minuta of July 16, 2025, at 1–2, filed as No. 22-1190, Docket 806-1, at 2–3.

**M. The federal authority rulings were carried into the Commonwealth collection case**

766. Two federal rulings accepted the Board's position on who speaks for the Companies.

767. The August 12, 2025 RICO order and the December 22 anti-tying decision accepted the Board-counsel position and rejected the competing member-consent theory.

768. Plaintiffs are pursuing appellate review of those rulings. The statutory derivative theory pleaded here is distinct from a claim to appoint Company counsel by majority vote. No. 22-1190, Docket 800; No. 24-1569, Docket 131.

769. The representation position was then used in the Commonwealth collection case, SJ2024CV04616.

770. On October 27, 2025, Abesada filed Docket Entry 285 there. It invoked the loan documents' no-claim and no-defense provisions, challenged Boyd's purported appearances for the Companies, and requested sanctions-related relief.

771. Docket Entry 287 later notified that court of the federal outcome. This interested control of the Companies' claims by Banco Popular's attorney protected BPPR across proceedings. SJ2024CV04616, Docket Entries 285, 287.

**N. The Bank endorsed Abesada as the Companies' counsel while he appeared for the Bank**

772. This section shows that Abesada appeared for the Bank in one case while appearing for the Companies in this one. It then shows that the Bank affirmatively supported his disputed authority as the Companies' counsel.

773. The first step was the removal of the Companies' prior counsel in this case.

774. Attorney Pedrosa had appeared for the Companies and answered the complaint on March 10. Docket 32.

775. On March 12, 2026, Abesada e-mailed Pedrosa concerning Pedrosa's withdrawal, copying Guillermo R. Picó and Carla S. Pérez of Picó Advisors. The same day, Pedrosa moved to withdraw his appearance and the Companies' answer. Docket 34.

776. The next day, the Court held that request in abeyance. Docket 36.

777. Pedrosa died on April 1, 2026; the March 12 e-mail and the motion that followed it are the record of that step. Docket 49-1 (Abesada e-mail of March 12, 2026); ECF Nos. 32, 34, 36, 49.

778. Meanwhile, the first RICO action ended.

779. On March 18, the court in No. 22-1190 dismissed the prior federal claims with prejudice. In discussing adequate representation, its opinion cited the Companies' earlier dismissal motions in that case, ECF Nos. 659 and 740 — the record that the managers' surrender of the Companies' litigation interests helped build. No. 22-1190, Docket 874 at 22–25, 36.

780. The concurrent representation became concrete in April.

781. On April 24, Abesada appeared for Banco Popular in *Catalá-Del Valle v. NSSK San Juan, LLC*, No. 3:26-cv-01205 (D.P.R.). Four days later, on April 28, he appeared in this case for GFC and BGF, opposed member-selected counsel, and sought sanctions. He relied on Board authority and prior rulings, and his filing did not disclose the concurrent Bank appearance. Advancing those positions for the Companies required independent consideration of the conflict. The two appearances establish concurrent conflicting representation. Docket 49; Notice of Appearance, *Catalá-Del Valle v. NSSK San Juan, LLC*, No. 3:26-cv-01205-JAG, Docket 9 (D.P.R. Apr. 24, 2026).

782. Plaintiffs learned of the relationship only in May 2026.

783. Boyd discovered Abesada's history of representing the Bank that month, while helping prepare a response to the April 28 appearance; neither Plaintiffs nor their counsel had known of it before. The April 24 and April 28 filings directly establish the concurrent representations relied on here. Decls. of May 26, 2026, Docket 73; Docket 49; Notice of Appearance, *Catalá-Del Valle v. NSSK San Juan, LLC*, No. 3:26-cv-01205-JAG, Docket 9 (D.P.R. Apr. 24, 2026).

784. Abesada also represents MAPFRE PRAICO Insurance Company, the surety on bond No. 1301208000513, in TA2025CE00044 before the Court of Appeals, where he filed that company's petition for certiorari in June 2025 and its later opposition to a motion for reconsideration.

785. Under the bond's performance conditions only BGF, as obligee, can declare the joint venture in default and call on the surety (paragraphs 571–580). The Board's chosen counsel for the Companies therefore represents the party the Companies would have to sue on the bond.

Court of Appeals docket, TA2025CE00044, entries 4–5, 7; MAPFRE payment and performance bond No. 1301208000513, performance conditions.

786. The Bank then supported Abesada's authority in its own court filing.

787. On May 7, 2026, BPPR filed its Informative Motion to Correct Inaccuracies in Appellants' Docketing Statement and Case Caption in First Circuit No. 26-1357. In its twelfth paragraph, the motion identifies Abesada as the Companies' counsel according to the district-court record and rejects Becker and Miñana as their counsel. BPPR also relies on its account of the docketing statement and asks for a caption naming only Boyd and Lassers. The Bank thereby affirmatively supported the disputed authority of its own lawyer — the lawyer who had sought dismissal of the Companies' claims against the Bank. No. 24-1569, Docket 63; No. 24-1569, Docket 131; BPPR Informative Motion to Correct Inaccuracies in Appellants' Docketing Statement and Case Caption, No. 26-1357 (1st Cir. May 7, 2026), Doc. 00118443427.

788. The First Circuit docket shows no appearance by Abesada: the docket of No. 26-1357, as read on October 10, 2026, lists appearances by Miñana and Becker for the four appellants and none by Abesada. BPPR's motion refers to the district-court record; it does not claim that Abesada had entered an appellate appearance. On June 11, the First Circuit vacated its May 27 order granting the caption request, as issued in error, and left the motion pending; it remained pending on October 10, 2026, when BPPR had tendered its appellee's brief (October 7, 2026). No. 26-1357, docket read Oct. 10, 2026; June 11 order, document 00118460622.

**O. The defendants moved together to defer scrutiny of the conflict and misdescribed the record**

789. This section shows how the defendants acted together to end the Companies' participation, defer inquiry into counsel's conflict and keep sanctions requests alive. It also shows that three of their descriptions of the record are contradicted by the documents.

790. On June 9, Abesada renewed the request to withdraw Pedrosa's appearance and the Companies' answers, to deny Docket 41, and to impose sanctions. That same day, he told the Commonwealth Court of Appeals that the Companies had not appealed and had no interest in Boyd's collection appeal. The Court of Appeals' June 16 judgment expressly records that appearance. The judgment affirmed the partial collection judgment on its stated procedural and evidentiary grounds, including the summary-judgment record, and denied the requested auxiliary relief. Plaintiffs challenge the managers' decision to disclaim the Companies' interest. Docket 91, at 1–7 (June 9, 2026); Sentencia, TA2025AP00276 cons. TA2025AP00277 (June 16, 2026) at 6, 17–19; TA2025AP00277, Docket Entry 19 (June 9, 2026) at 1–2.

791. The Bank supported deferring inquiry into the very arrangement it had endorsed. In Docket 93, filed June 9, BPPR and Ferrer joined the Companies' request to hold disqualification and limited discovery in abeyance. They identified proposed discovery involving BPPR, Popular and PMA, and they urged the Court to resolve standing, preclusion, service and representation questions first.

792. Semillero/Borschow joined the abeyance arguments in Docket 92.

793. On July 6, the Companies, BPPR/Ferrer, Semillero/Borschow and the identified VRM defendants jointly requested referral and a sequence of threshold decisions; in Docket 115 they stated that dismissal could moot most remaining disputes while leaving sanctions requests.

The Court granted the referral in Docket 118. The requested sequence would preserve the challenged control of the claims while deferring scrutiny of counsel's conflicts. ECF Nos. 88, 92–96; Docket 115, ¶¶ 3–5 and signatures; Docket 118.

794. VRM's sanctions motion said Plaintiffs had not appealed; the record showed they had.

795. VRM's May 21, 2026 sanctions motion stated that Plaintiffs had not appealed the amendment denial, although the April 17 notice expressly designated the denial and the reconsideration ruling. VRM's June 29 filing acknowledged the appeal.

796. On August 25, the Court declined to strike Plaintiffs' reply, granted the specified abeyance requests and allowed surreplies by September 8. Banco Popular and Semillero filed surreplies that day. Those filings were authorized by that order and are not pleaded as racketeering acts. No. 22-1190, Docket 877, pp. 2–3; Docket 68; Docket 106, at 2 ¶ 3 (June 29, 2026); Docket 128 (Aug. 25, 2026); ECF Nos. 129–130 (Sept. 8, 2026).

797. Three of the defendants' descriptions of the record are contradicted by the documents themselves.

798. First, BPPR's September 8 surreply describes the Asset Acquisition Agreement as unrelated to the Bank, while the agreement expressly releases BPPR and its attorneys in § 3.6(c).

799. Second, VRM's Docket 106 ¶ 3 characterizes the May 26 order as holding the irrevocable proxy ineffective, while the attached order identifies the absence of a Company resolution and untimeliness as its grounds.

800. Third, Humacao RNG's August 31 opposition to certiorari states that the June 16 judgment does not even mention the Companies' appearance. Yet page 6 of that judgment describes the Companies' June 9 filing and their stated lack of interest in Boyd's appeal.

801. The Supreme Court of Puerto Rico denied review on September 3 without giving reasons, and Boyd's motion for reconsideration of September 17, 2026 is pending.

802. Plaintiffs seek recovery for the loss of any available corporate claim or defense caused by the challenged management decisions, and no recovery here for Boyd's personal sanctions. Docket 129, pp. 6–8; Asset Acquisition Agreement (Jan. 31, 2025); Docket 106, p. 2 ¶ 3 and attached order, pp. 7–8; Docket 113; Humacao RNG Mem. in Opp. to Certiorari, CC-2026-0633 (Aug. 31, 2026) at 20; Sentencia, TA2025AP00276 cons. TA2025AP00277 (June 16, 2026) at 6; Resolución, CC-2026-0633 (Sept. 3, 2026).

803. Taken together, the repeated efforts to end the Companies' participation, defer scrutiny of the conflict and keep sanctions pressure in place served an attrition strategy that protected the challenged transactions and releases.

804. The March 31, 2022 notes supply earlier evidence that certain managers and advisers discussed litigation expense as settlement pressure.

805. The Bank's later motion and joinders supply the Bank-specific conduct. GFC/BGF Board minutes and notes; ECF Nos. 93, 115, 129; BPPR Informative Motion to Correct Inaccuracies in Appellants' Docketing Statement and Case Caption, No. 26-1357 (1st Cir. May 7, 2026), Doc. 00118443427.

**P. Humacao RNG demanded the full debt from Boyd without the $13,000,000 credit**

806. This section shows that the assignee of the Bank's loan demanded from Boyd a debt figure that ignores the $13,000,000 credit the Asset Acquisition Agreement provides. It also shows that the assignee expanded the words of his guaranty to do so.

807. On September 18, 2026 at 4:57 p.m., Humacao RNG filed Docket Entry 312 in SJ2024CV04616, a motion for summary judgment against Boyd and the other personal guarantors.

Its asserted undisputed facts 50–51, at page 19, state the December 2024 debt as $13,418,352.07 plus $2,950.03 per day and say that it remains payable in full because no party has satisfied it.

808. The prayer at page 25 seeks that amount from December 10, 2024 forward "hasta el pago en su totalidad" ("until paid in full"). Humacao thus demanded the full December 2024 figure plus the daily accrual. Alfredo Fernández Martínez, Pedro A. Hernández Freire and Daniel Limés Rodríguez signed the motion for Humacao. The motion attached, as its Anejo 1 (Attachment 1), the Supreme Court's September 3, 2026 notification denying certiorari. At page 2, citing that attachment, it asserted that the partial judgment was final, had been affirmed on appeal, and faced no impediment to enforcement. When the motion was filed, Boyd's motion for reconsideration under Rule 45 of the Supreme Court's Rules, filed September 17, 2026, was still pending.

809. The demand omits the debt credit the asset transaction required and seeks payment beyond the remaining guaranteed obligation. Humacao RNG, Motion for Summary Judgment, SJ2024CV04616, Docket Entry 312 (Sept. 18, 2026), at 1–2, 19, 25–26, and its Attachment 1 (Resolución, CC-2026-0633 (Sept. 3, 2026)); Humacao RNG Mem. in Opp. to Certiorari, CC-2026-0633 (Aug. 31, 2026).

810. The Asset Acquisition Agreement itself provides the credit.

811. In § 2.7, the January 31, 2025 agreement provides for a $13,000,000 partial payment in kind of the "PCC Loans" and the "Popular Loan" through the transferred assets.

812. In § 2.10, it fixes a remaining Loan Balance of $7,052,292 that "the Buyer, as creditor" agreed not to collect for five years, to be cancelled at the end of that period unless one of the clause's two conditions occurs. Those provisions postdate the December 2024 balance that Humacao invokes.

813. On August 31, 2026, BPPR and Humacao jointly filed in the Supreme Court of Puerto Rico an opposition to Boyd's motion in aid of jurisdiction; it states that the adjudicated debt of $13,418,352.07 accrues $2,950.03 per day. Neither that opposition nor Docket Entry 312 mentions the $13,000,000 credit, the $7,052,292 balance or the five-year forbearance.

814. The completed transfer must be credited as agreed before any remainder is collected. Asset Acquisition Agreement (Jan. 31, 2025), §§ 2.7, 2.10; BPPR and Humacao RNG Opposition to the Motion in Aid of Jurisdiction, CC-2026-0633 (Aug. 31, 2026) at 2; Docket Entry 312, at 19, 25.

815. The agreement does not divide the $13,000,000 between the two loans it groups, and the law assigns the credit to the Popular Loan. Section 2.7 describes "a partial payment of THIRTEEN MILLION DOLLARS ($13,000,000) of the indebtedness of BGF under the Popular Loan and the PCC Loans," and § 2.10 repeats that formula and fixes the combined Loan Balance.

816. No schedule or clause divides the payment. Nor does the agreement accelerate the PCC Loans.

817. Section 2.10 provides that the Loan Balance "shall be payable and continue to accrue interest as provided under the Popular Loan and the PCC Loans," and the PCC Loans by their terms mature September 15, 2027. They have not been accelerated.

818. The law therefore supplies the allocation. The former Civil Code governs these 2020 obligations. Under that Code, two rules come first: imputation by the debtor's designation (31 L.P.R.A. § 3176 (art. 1126)) and imputation to interest first (§ 3177 (art. 1127)). When neither resolves the question, the debt most onerous to the debtor among those due is deemed satisfied, 31 L.P.R.A. § 3178 (art. 1128). The 2020 Code carries the same rules forward, 31 L.P.R.A. §§ 9171–9173.

819. On January 31, 2025, only the Popular Loan was due: it had been accelerated, reduced to a partial judgment against the Companies at the default rate, and was accruing $2,950.03 per day. The PCC Loans were not due: they mature September 15, 2027, bear 4.83%, and could not be prepaid before the seventh anniversary of the closing. The Popular Loan was also the more onerous of the two. On either test, the credit is imputed to the Popular Loan — the only loan Boyd guaranteed and the only one whose guaranty Humacao invokes. Asset Acquisition Agreement (Jan. 31, 2025), §§ 2.7, 2.10; definitions of "PCC Loans" and "Popular Loan"; QLICI Loan and Security Agreement (Sept. 15, 2020), § 1.1; QLICI Loan A and Loan B Notes (Sept. 15, 2020); SJ2024CV04616, Docket Entry 1; SJ2024CV04616, Docket Entry 195 (Dec. 18, 2024 minutes); Docket Entry 312, at 19.

820. The arithmetic follows from the assignee's own figures.

821. At $13,418,352.07 on December 10, 2024, plus $2,950.03 per day, the Popular Loan stood at $13,571,753.63 on January 31, 2025 (52 days) and at $13,592,403.84 on February 7, 2025 (59 days).

822. After the $13,000,000 credit, the balance of the only loan covered by the guaranty Humacao invokes was $571,753.63 on the date of the agreement and $592,403.84 on the date of closing. Those figures are before any interest the agreement itself allows, and before any later payment or collateral proceeds. The agreement's own figures may leave even less.

823. The $7,052,292 balance it fixes for both loans together is smaller than the $7,200,000 principal of the PCC Loans alone, which would mean that nothing remained on the Popular Loan. Even the agreement's worst case — if one of § 2.10's conditions were found to have occurred — is the $7,052,292 balance with the interest that clause provides. It is not $13,418,352.07, and it is not $2,950.03 per day; those conditions accelerate that balance and do

not restore the credited $13,000,000. Asset Acquisition Agreement (Jan. 31, 2025), §§ 2.7, 2.10; Docket Entry 312, at 19, 25.

824. The same motion also expands the words of Boyd's guaranty when it argues for personal collection.

825. At page 23, the motion adds "and any other Loan Party" to the description of the guaranteed obligations and "or any other Loan Party" to the collection condition; Boyd's signed § 2 contains neither insertion.

826. At page 24, it adds "the Administrative Agent or any Lender" where his § 4 says "the Lenders."

827. The motion's own asserted fact 25 uses the narrower formulation. This was knowing use of materially expanded language to obtain relief beyond Boyd's actual undertaking. Docket Entry 312, at 13, 23–24; its Exhibit 4 (the Guaranty), §§ 2, 4, pp. 1–3.

828. Humacao participated in the debt acquisition and the asset transaction, and it attached the actual guaranty to its demand.

829. BPPR joined the August 31, 2026 opposition that likewise stated the uncredited balance. Boyd seeks the Count X declaration; the Companies seek the accounting and transaction remedies pleaded in their counts. BPPR and Humacao RNG Opposition to the Motion in Aid of Jurisdiction, CC-2026-0633 (Aug. 31, 2026) at 1–2 and signatures.

**Q. VRM Penzini used the Companies' NDA-protected models to divert Ponce and Salinas (Count XI)**

830. This section identifies the communications through which VRM Penzini's principals obtained the Companies' proposed strategy and models in 2023, before the rescue proposals described in section 8 above. It then shows what became of that information.

831. Boyd and Lassers took part in every one of those communications and state them on personal knowledge; Schedule A, Part 13 sets them out.

832. On January 18, 2023, Boyd and Lassers signed the confidentiality agreement — the NDA — with VRM Penzini Capital, doing business as Star Power; Rojo, Diego Rodríguez and Penzini signed it by name as VRM's representatives. On January 19, Lassers opened a due-diligence Dropbox to the three of them, and on Sunday, January 22, the group held its first video conference on Rojo's Zoom account. On January 24, 2023, VRM finalized a letter of intent to the GFC Board — $3.2 million of preferred units, a first right of refusal to a majority of GFC's units and exclusivity to April 30, 2023 — which Boyd and Lassers were not shown. On January 26, 2023, Boyd presented the Regeneration Partners plan from his laptop in VRM's San Juan conference room, with Rojo in the room and Lassers, Penzini and Rodríguez on Zoom. At the end of that presentation Rojo said: "We want to be your partners — we will only work with you two to acquire this project," and "You have our commitment that we will not go around you."

833. On February 9, 2023, the parties signed the First Amendment to the NDA described in paragraphs 840–843, and at the 2:00 p.m. meeting and Zoom call that day Rojo said: "now we have a plan to get control of BGF." The complete tax-credit, finance and banking strategies that Boyd had withheld until the covenant was signed followed on that call and on the February 20 video conference. On March 15, 2023, at VRM's office in San Juan, Lassers presented the projections by Zoom from Uruguay while Penzini asked detailed questions about the inputs. On March 27, at the "Plan B" meeting, Boyd described the control strategy if the settlement failed.

834. The August 15 negotiations and the August 20 Revenue Sharing Agreement followed that course. The assurances were used to secure access to the Companies' information while the participants concealed their contrary acquisition plan; the later use of that information

and the later transactions are the basis for that inference. NDA (Jan. 18, 2023); First Amendment to Confidentiality and Non-Disclosure Agreement (Feb. 9, 2023); VRM Penzini Capital letter of intent to the GFC Board (Jan. 24, 2023), No. 22-1190, Docket 300-1; e-mail chains of January 17 – February 20, 2023; calendar entry "At VRM Office" and meeting agenda (Mar. 15, 2023); Revenue Sharing Agreement (Aug. 20, 2023); Schedule A, Part 13.

835. The El Coquí contract also set rules for future projects.

836. BGF's July 19, 2019 amendment with El Coquí added § 11.20.

837. For a covered project whose design and physical site preparation would begin before the fifth anniversary of the December 28, 2018 Effective Date, § 11.20 required an initial written offer process. In the specified circumstances, it also required a fifteen-day opportunity to match the material terms of a third-party offer. It also addressed unsolicited proposals. For later projects, § 11.20(b) required a good-faith effort to negotiate but preserved the developer's freedom to contract with others. El Coquí Landfill Gas Sale and Purchase Agreement (Dec. 28, 2018), with First Amendment (July 19, 2019), source pp. 57–58; Semillero Partners and CDVCA conditional support letters on the Ponce project (Sept. 17, 2021).

838. The information disclosed in the January–March 2023 discussions came from two owners. The Companies' own information was the nonpublic development work and site information BGF had compiled for the Ponce project since 2020–2021, including the conditional support letters of September 17, 2021; BGF's plant data, contract terms and off-take terms; and the terms and position BGF held under § 11.20 of the El Coquí agreement for future landfill-gas projects on EC Waste property, which the Companies' development work analyzed. The rest — the strategy for buying the Bank's loan, the financial models and projections for the integrated gas and CO2 business, the site-development economics for Ponce and Salinas and the financing and

acquisition sequence — was the work of Boyd and Lassers, prepared as Regeneration Partners with their own time and at their own expense. That work was the means by which the VRM-Penzini group learned what the Companies held and how to take it. Plaintiffs identify the January 26, 2023 presentation, the February 9 and February 20, 2023 calls and the March 15, 2023 meeting at VRM's office, described in paragraphs 830–834, as the communications through which Rojo, Penzini and Diego Rodríguez obtained that information.

839. The protected information is the nonpublic compilation and analysis as it existed when disclosed — not the publicly known identity of the landfills, not publicly filed contracts, and not a general idea of producing renewable gas. NDA (Jan. 18, 2023), §§ 1–2; Schedule A, Part 13.

840. The January 18, 2023 NDA set the limits on use. It identifies Boyd and Lassers as the disclosing parties and identifies the recipient as VRM Penzini Capital, doing business as Star Power Systems, LLC; its signature page identifies Star Power and bears the representatives' signatures. Its § 2.A provides that, "[o]ther than for the Business Purpose, the receiving party shall not use the Confidential Information of the Disclosing Party for its own or any third party's benefit or use," and its § 4 keeps all right, title and interest in the information with the Disclosing Party. The First Amendment of February 9, 2023, described in paragraphs 492–495, added Regeneration Partners, LLC as a Disclosing Party, confined the agreement to information about the Humacao and Ponce facilities, and bound VRM not to use the financial structuring, banking, equity-investor, off-take, insurance, human-resources and management strategies disclosed to it to circumvent the Business Purpose as to those facilities. The disclosures that followed were made under those two instruments. NDA (Jan. 18, 2023), §§ 2.A, 4; First Amendment to Confidentiality and Non-Disclosure Agreement (Feb. 9, 2023).

841. Section 2 restricts use outside the stated financing/acquisition discussions and makes the recipient responsible for its representatives.

842. Plaintiffs rely on the NDA and the restricted-purpose presentations as confidentiality measures and as notice of the limits on use.

843. The VRM/Semillero complaint also describes an earlier confidentiality arrangement, from October 2022, between BGF and Star Solar. NDA (Jan. 18, 2023), source pp. 1–2, 8; SJ2024CV07694 Compl., ¶¶ 12–17.

844. VRM Penzini Capital and Star Power, acting through the identified recipients, used the disclosed information — the Companies' Ponce work and § 11.20 position, and the founders' models and expansion strategy — to pursue the Ponce and Salinas developments for their own platform rather than for the proposed collaboration with the Companies. Ponce RNG, LLC, organized on June 24, 2024 for the Ponce landfill, with Penzini as its treasurer and resident agent and Kalt as its president, took the very facility the February 9, 2023 amendment named as one VRM would not circumvent.

845. Ponce RNG received and exploited the Ponce opportunity.

846. On information and belief, Island Renewable Energies knowingly used the resulting Company information and development work in its multi-site business. That inference rests on the particular disclosures, the subsequent acquisition sequence, the June 24, 2024 organization of Ponce RNG, and the later public presentation of the same three sites. On information and belief, EC Waste agreements for Ponce and Salinas were obtained without any compensation to the Companies for the information and opportunities diverted. NDA (Jan. 18, 2023); Schedule A, Part 13; P.R. Department of State record, Island Renewable Energies LLC.

847. The later platform, Island Renewable Energies LLC (IRE), shares Star Power's address.

848. IRE was incorporated in Delaware on April 15, 2024 and registered in Puerto Rico on July 3, 2024 (Registry No. 533735). Its president and resident agent is Brian Kalt. Its registered office, 322 Ave. de Diego, Suite 301, San Juan, is the address Star Power Systems uses. Its stated purpose is to "manage[] special purpose vehicle companies that own, operate and maintain biogas facilities."

849. IRE's public project page, captured September 22, 2026, lists Humacao, Ponce and Salinas under a thirty-year term — Humacao 900,000, Ponce 300,000 and Salinas 150,000 MMBtu per year. It identifies EC Waste and VRM Penzini among its partners. The page corroborates the later platform's identity. P.R. Department of State record, Island Renewable Energies LLC; IRE project page (captured Sept. 22, 2026).

850. The value of what the Companies held before IRE entered is estimated in Addendum A to Boyd's valuation of September 22, 2026.

851. The addendum values the EC Waste gas-rights package as BGF held it — or was entitled to hold it — immediately before IRE existed as a competing developer on the same landfills. That period runs from December 31, 2023 to the first quarter of 2024. It uses the commercial structure of BGF's Humacao contract: BGF does the processing; El Coquí receives 14.5% of off-take revenues; BGF keeps the balance and the liquid $CO_2$; and the term is twenty-five years plus ten-year additional terms.

852. The Ponce and Salinas volumes are taken from IRE's own published book.

853. On the volume originally instructed — Humacao 1,500 MMBtu per day plus IRE's Ponce and Salinas volumes — the going-concern but-for value of the three-site platform is $187,000,000.

854. On IRE's own three-landfill book of 1,350,000 MMBtu per year, it is $270,000,000. And if the finder of fact concludes that only Ponce and Salinas were diverted, the developed value of those two sites to BGF is $92,000,000.

855. The platform figures include the Humacao operation valued in paragraphs 692–693; the Companies claim the Humacao value once, under whichever count the finder of fact sustains. Those figures are the mid-points of Boyd's valuation on stated assumptions. They are stated before the deductions and credits pleaded in paragraphs 692–711 and 985–1013, and they will be proved through expert testimony. They are pleaded so that the measure claimed in Counts VI and XI — the value of the information and opportunity actually lost — is stated, not left to inference. Boyd valuation, Addendum A (Sept. 22, 2026); NDA (Jan. 18, 2023); El Coquí Landfill Gas Sale and Purchase Agreement (Dec. 28, 2018), with First Amendment (July 19, 2019), § 11.20.

## IX. THE BANK RELEASED LOAN MONEY WITHOUT INSPECTIONS OR AUDITS AND KEPT LENDING AFTER NOTICE

856. Schedule A to this Complaint carries the particulars of the financing claims, and the paragraphs that follow summarize what it and the dated records show: loan money released without the inspections the contracts required, money running ahead of the work, late amendments, no audits ever delivered, and continued lending after written notice.

857. Schedule A, Part 1, identifies each control on which the financing and governance claims rest, the actor responsible for it, and its source.

858. Part 2 states, instrument by instrument, the deadlines, conditions and releases of the Credit Agreement and its seven amendments as executed.

859. Part 3 states, for each challenged transaction, the required use, the payment made, the departure alleged and the net loss claimed.

860. Part 4 sets out the particulars of the financial reporting and inspection records.

861. Part 5 sets out the particulars of the notices, demands, responses and subsequent conduct.

862. Part 6 shows that each amendment after the First was executed after the deadline it replaced had already passed. Each of Parts 1 through 6 is incorporated by reference under Rule 10(c).

**A. Releases without inspections, money ahead of the work, late amendments, no audits**

863. The inspection record comes from López Vidal. He attended every inspection and received the reports. Through his settlement production he supplied Plaintiffs the complete inspection-report set and the draw materials for Drawdowns 1–22 and 24. He did not have Certificate 23, and Draw 1 occurred at the September 15, 2020 closing without a separate certificate packet. That complete production, read with the dated funding records, shows that the specifically identified required inspections did not occur before release. esi Inspection Certificate 011 (Nov. 12, 2021); esi Inspection Certificate 013 Addendum (Mar. 9, 2022); esi Inspection Certificate 012 and Drawdown Certificate 13 (Mar. 2022).

864. The complete inspection file that López Vidal produced contains five inspection certificates of the Bank's independent inspector, esi, inc.: Certificates 007 (April 23, 2021), 009 (June 8, 2021), 011 (November 11, 2021), and 012 and 013 (March 9, 2022) with the 013

Addendum. Against those five certificates stand twenty-three post-closing drawdowns (Nos. 2–24). Eighteen of them — Nos. 2–6, 8, 10 and 14–24 — were funded or released without an inspection report specific to that request.

865. In the seventeen-credit sample analyzed in Schedule A, Part 4, five credits totaling $3,827,638.97 of $10,167,658.17 (37.65%) preceded the associated inspection or lack a qualifying inspection; the remaining unreported draws are identified there with any earlier report and its scope.

866. The challenged releases lacked the required inspection or an effective waiver applicable to that release. The practice ran from the second drawdown in October 2020 through the last release in October 2023. esi Inspection Certificate 011 (Nov. 12, 2021); esi Inspection Certificate 013 Addendum (Mar. 9, 2022); esi Inspection Certificate 012 and Drawdown Certificate 13 (Mar. 2022); esi Inspection Certificate 007 (Apr. 23, 2021); esi Inspection Certificate 009 (June 8, 2021); Construction Contract (June 18, 2020) and JV Agreement (May 15, 2020).

867. Two Bank officers approved the releases.

868. Rodríguez Barnes, the Bank's Commercial Relationship Officer, approved every release from the closing through Draw 10: the $898,247.40 direct-loan advance at the closing and the $6,219,460.87 of loan credits between October 5, 2020 and August 3, 2021 identified in Schedule A, Part 4 (F01–F09). Those releases include Draws 2, 3, 5 and 6 ($3,204,055.24), released with no inspection certificate or report in the complete inspection file.

869. Boyd states this from his participation on BGF's board during those draws, and the October 29, 2020 Board notes record it: "[a]ll drawdowns have been approved by Popular" and management "[c]ommunicate[s] with Joval at BPPR weekly by phone and email". The notes show

that the Bank had approved every drawdown to that date and that management dealt with Rodríguez Barnes weekly.

870. The inspection certificates the Bank did obtain in 2021 were addressed to Rodríguez Barnes. He left the Bank in the second half of 2021. By then, as management had reported to the Board on July 12, 2021, $21.3 million, 72% of the budget, had been drawn against a plant the Bank's own inspector would certify in November 2021 as 39% built.

871. Laura Medina Castillo approved every release from Draw 11 (November 5, 2021) onward, beginning with the $623,583.73 released before the site visit. NMTC closing Flow of Funds (Sept. 15, 2020); GFC/BGF Board minutes and notes, source pp. 21–22; esi Inspection Certificate 007 (Apr. 23, 2021); esi Inspection Certificate 009 (June 8, 2021); esi Inspection Certificate 011 (Nov. 12, 2021); Schedule A, Part 4, F01–F11.

872. The money ran ahead of the work throughout.

873. At the July 12, 2021 Board meeting management reported $21.3 million drawn, 72% of the budget. On November 2, 2021, it reported $23.8 million of $29.3 million, 81%.

874. Ten days later the Bank's inspector certified construction 39% complete and the project 52% complete overall, while the contractor's AIA application reported 85.53% of its $5 million contract completed or stored.

875. On August 3, 2022 Venture Engineering reported that the project was not operational and needed twenty to twenty-six weeks to substantial completion.

876. In March 2023 management reported Parcels A and B 95% and 99% substantially complete, with the TPI system not commissioned.

877. On August 28, 2023 the Bank's own engineer reported that neither LNG nor CO2 was being produced.

878. In August 2024 the eventual acquirers alleged that approximately $40 million had been spent and $7 to $10 million more was needed.

879. The releases continued through that whole period: twenty-three post-closing drawdowns, the $610,152.15 and $500,000 restricted-account releases, the tax-credit proceeds, and Certificates 17, 19, 21, 22 and 24 (July 2022 to October 2023), each obtained on the same certification method. GFC/BGF Board minutes and notes, source pp. 21–22, 34; esi Inspection Certificate 011 (Nov. 12, 2021), ESI011 pp. 1, 7; AIA007 p. 1; Venture Engineering Independent Assessment (Aug. 3, 2022); SURI notice approving the tax-credit sale (Mar. 14, 2023); González Caraballo e-mail to López Vidal (Aug. 28, 2023); SJ2024CV07694 Compl., ¶¶ 46, 90–105; Schedule A, Parts 3, 4 and 7.

880. The amendments followed the same course.

881. Every amendment after the First was executed after the deadline it replaced had already passed.

882. The Second came 168 days after September 15, 2021.

883. The June 1, 2022 letter came 32 days after April 30, 2022.

884. The Third came 26 days, the Fourth 8 days, the Fifth 5 days and the Sixth 27 days after the dates they replaced.

885. The Seventh came 89 days after June 30, 2023.

886. The Third, Fourth and Fifth carried the borrower's representation that no default had occurred and was continuing, while the Bank's own statements showed $168,437.12 past due on April 1, 2022 and the May 1 installment unpaid.

887. The Sixth named the federal case and required cure of El Coquí's defaults.

888. The Seventh acknowledged the defaults the earlier amendments had recited away.

889. Each instrument recited a larger principal balance than the last ($10,272,105.07; $11,237,946.53; $12,284,862.34; $12,590,109.80; $12,869,250). Schedule A, Parts 2 and 6; No. 22-1190, Docket 50-4; Plaintiffs' counsel letter to Trelles-Hernández (May 26, 2022); Banco Popular–BGF extension letter agreement (June 1, 2022); Third Amendment to Credit Agreement (July 26, 2022); Fourth Amendment to Credit Agreement (Nov. 8, 2022); Seventh Amendment and Forbearance Agreement (Sept. 27, 2023).

890. No audited financial statements were ever delivered.

891. QLICI Loan and Security Agreement § 6.3(b) required BGF's audited annual statements within 120 days after each fiscal year end. None was delivered for fiscal 2020, 2021, 2022, 2023 or 2024 — five consecutive deadlines, April 30, 2021 through April 30, 2025 — and the 2020 audit engaged with Grant Thornton was never completed.

892. Counsel's 2021 warnings and Boyd's 2022 letters reported the omission to the Bank. BPPR continued to fund, release and amend through September 2023 without the audits.

893. In August 2024 the acquiring investors alleged the same missing statements. QLICI Loan and Security Agreement (Sept. 15, 2020), § 6.3(b), p. 33; Marsh letter to Ferrer and Coleman Tió (Dec. 2, 2021); Boyd e-mails and letter to López Vidal and the GFC members (July 25, 2022); Boyd letter to González Caraballo (Dec. 30, 2022); SJ2024CV07694 Compl., ¶¶ 75, 77, 109.

894. Three sets of completion figures appear in the record, each with its own scope. AIA007, the contractor's application, reports $4,276,644.14 completed or stored against the $5 million contractor price, or 85.53%. ESI011's 52% overall and 39% construction figures use different scopes.

895. The July and November 2021 board statements about 90% completion refer to particular components. From the identified work and the remaining costs, Plaintiffs allege false

eligibility and completion-funding representations. GFC/BGF Board minutes and notes, pp. 21–22, 34; AIA007; ESI011.

**B. The Bank released $677,094.76 the day after written notice, then reported no irregularity**

896. The notice record establishes knowledge before later lending. A separate $623,583.73 credit on November 5 preceded ESI011's inspection.

897. On November 11, 2021, Carballido notified Ferrer of the identified payment irregularities. A $677,094.76 credit followed November 12.

898. The December warning package preceded BPPR's December 20 assurance that its review found no irregularity. Marsh letter to Ferrer and Coleman Tió (Dec. 2, 2021); Carballido Clerch e-mail to Ferrer (Nov. 11, 2021); BGF bank statement showing the November 5 and 12, 2021 loan draws; esi Inspection Certificate 011 (Nov. 12, 2021); BGF operating-account statements and check images, Nov.–Dec. 2021; Trelles-Hernández letter to Marsh (Dec. 20, 2021).

## X. DISCOVERY, ACCRUAL AND LIMITATIONS

899. Plaintiffs knew of financing injury when they filed on April 25, 2022, and the conduct did not stop on that date.

900. The drawdowns, restricted-account releases, amendments and certifications continued through October 2023; the releases were procured in September 2023 and January 2025; and the collection demand on the uncredited balance was made in September 2026.

901. Counts I–II seek timely, distinct losses from the April 25, 2022 vendor payments and the later releases pleaded above.

902. The February 7, 2026 complaint described those payments before four years had elapsed.

903. Count III concerns obligations created by the September 2020 contracts. For those obligations Plaintiffs invoke the former contract law and the former fifteen-year personal-action period, which 31 L.P.R.A. §§ 11717–11719 preserve for them.

904. The amendments expressly disclaimed extinctive novation — the replacement of the old obligations by new ones.

905. For separate obligations created under the new Code, Plaintiffs invoke the applicable four-year personal-action period, § 9495, and interruption under § 9489.

906. The April 25, 2022 action and its contract count asserted the financing misconduct against BPPR.

907. The challenge to the September 27, 2023 release and the claims on the January–February 2025 transfer were pleaded in the February 7, 2026 complaint.

908. Claims against existing defendants arising from those transactions relate back under Rule 15(c)(1)(B).

909. Plaintiffs separately identify the 2026 acts and injuries that support supplementation. Island Renewable Energies, LLC, the one defendant this Complaint adds, is sued for conduct from April 2024 forward — Predicate Act 8 and Count XI — that is timely without relation back.

**XI. THE RICO ENTERPRISE**

910. The enterprise for Counts I and II is an association-in-fact. Its members were Banco Popular throughout; Economou from the closing in September 2020 until the last release in October 2023; and, from 2023, the VRM-Penzini group — Rafael Rojo, Carlos Penzini and Diego Rodríguez; VRM Penzini Capital, LLC, doing business as Star Power Systems, LLC; VRM

Penzini Fund I, LLC and its Renewable Series II; Humacao RNG, LLC; Ponce RNG, LLC; and Island Renewable Energies, LLC ("IRE").

911. Olmar López Vidal and the other López-family participants, and Brian Kalt, took part in its affairs; they are not defendants.

912. The enterprise had one purpose from beginning to end: the Bank's own return from the plant it financed.

913. The Bank wanted the plant's gas for its own El Señorial facility at $14 per MMBtu; it wanted "any current and future environmental incentives and tax credits" that went with the gas, which the contract left with the Bank without charge — the carbon, environmental and Puerto Rico recycling credits, which can be worth more than the gas itself; and it wanted its loan repaid on its own terms.

914. While the Lópezes ran the plant, the enterprise pursued that purpose by releasing BGF's money on eligibility presentations the Bank knew to be untrue, so that the plant would be built and the gas would flow.

915. When the Lópezes failed, the Bank replaced them. It admitted the VRM-Penzini group in 2023, accommodated the group's money and its executive in the Sixth and Seventh Amendments, set a consent judgment as the price of time in June 2024, sold the group its loan in November 2024 and January 2025 at a price it has never disclosed to the Companies or the members, wrote its own release into the sale, let the group take the Companies' assets for a $13,000,000 reduction of the loan the group now held rather than a payment to BGF's debt, and left the collection of the full earlier balance to the group — against Boyd personally.

916. Each member had a role.

917. The Bank controlled the lending decisions, the releases, the restricted accounts, and in the end the sale of the loan and the release. Economou prepared and explained the draw requests.

918. Rojo, Penzini and Rodríguez obtained the Plaintiff founders' strategy, took the group's seats on GFC's Board, dealt with the Bank directly, bought the loan, set the price to the members and took the assets through the companies they formed for each step.

919. The members had the relationships of a working arrangement: Economou dealt with the Bank's approving officers directly; management dealt with Rodríguez Barnes weekly; VRM asked the Board in February 2023 for leave to deal with the Bank directly and did so; Penzini signed the Bank's letter agreement on the day Humacao RNG was organized.

920. The arrangement has lasted from September 2020 to today.

921. Members did not have fixed roles, and different members did different things at different times; the law does not require more.

922. Each member is a "person" under 18 U.S.C. § 1961(3).

923. The enterprise is the association of all of them. It is not the Bank alone, not Economou alone, not the VRM-Penzini group alone, and it is not a defendant. GFC and BGF were its targets, never its members. BGF–Banco Popular RLNG Off-Take Agreement (July 18, 2022); Sixth Amendment to Credit Agreement (Apr. 27, 2023); Seventh Amendment and Forbearance Agreement (Sept. 27, 2023); Banco Popular letter to Pujol (June 19, 2024); Banco Popular–VRM Penzini Fund I (Renewable Series II) letter agreement (Nov. 14, 2024); Asset Acquisition Agreement (Jan. 31, 2025); P.R. Department of State records for the six VRM entities.

924. The enterprise affected interstate and foreign commerce.

925. The closing participants were on the mainland, and the vendor payments were routed through New York and Italy.

926. Penzini and Rodríguez joined the 2023 calls from Miami, Florida, and Lassers from Uruguay.

927. The January 18, 2023 agreement and its February 9, 2023 amendment were signed and exchanged by e-mail among San Juan, Miami and Uruguay.

928. The Bank's loan sale ran through Capital One, the majority owner of the NMTC lender. IRE is a Delaware company, and the resident agent of VRM Penzini Capital is a Miami company.

929. The gas the plant produces, and the environmental attributes that go with it, move in interstate commerce.

930. BPPR directed its financing-and-payment functions through Rodríguez Barnes, Medina Castillo and the other identified personnel, and its exit through Bigio and the officers who approved the sale.

931. Economou directed the preparation and implementation of the challenged draws. Rojo, Penzini and Rodríguez directed the group's part. Rodríguez Barnes closing e-mail (Sept. 14, 2020); Banco Popular debit advices (Apr. 25, 2022); Certificate 14 e-mail chain, Economou and Medina Castillo (Mar. 29–31, 2022); No. 22-1190, Docket 50-4; e-mail chains of January 17 – February 20, 2023; Banco Popular–VRM Penzini Fund I (Renewable Series II) letter agreement (Nov. 14, 2024); P.R. Department of State records, VRM Penzini Capital, L.L.C. and Island Renewable Energies LLC.

932. Knowledge is pleaded separately for each member.

933. The Bank's knowledge is pleaded from its own closing records, its receipt of the November and December 2021 warnings, its December 20, 2021 assurance, Medina Castillo's

March 2022 review, its receipt of GFC's 2023 Board minutes, its June 19, 2024 letter, and the letter agreement it signed on November 14, 2024.

934. Economou's knowledge is pleaded from his preparation of the requests, his handling of the vendor-payment conditions and his explanation of the tax-credit objective.

935. Rojo's knowledge is pleaded from the letter of intent he and Penzini signed on January 24, 2023, from the promises he made two days later, and from his e-mails of February 6 and 8, 2023 setting out what the group would and would not promise.

936. Penzini's involvement is pleaded from that same letter, from his signature on the February 9, 2023 amendment, from his questions on the projections, from the Bank letter he signed on November 14, 2024 and the letter he wrote to the members the next day.

937. The agreement and knowledge of Borschow, Semillero Partners, Villarini, PRFG and CDVCA are pleaded in paragraphs 1075 and 1076.

938. Rodríguez's involvement is pleaded from his part in each 2023 call and his signature on both 2023 agreements.

939. The companies knew what the three men who ran them knew; Kalt knew through his offices in IRE and Ponce RNG.

940. There was coordinated knowing conduct. Marsh letter to Ferrer and Coleman Tió (Dec. 2, 2021); Carballido Clerch e-mail to Ferrer (Nov. 11, 2021); Trelles-Hernández letter to Marsh (Dec. 20, 2021); Certificate 14 e-mail chain (Mar. 29–31, 2022); VRM Penzini Capital letter of intent to the GFC Board (Jan. 24, 2023); e-mail chains of February 5–9, 2023; Banco Popular–VRM Penzini Fund I (Renewable Series II) letter agreement (Nov. 14, 2024); Penzini status letter to the GFC members (Nov. 15, 2024).

941. The September 2023 episode adds three facts to that record: BPPR's own default notice, its explicit recognition of the pending RICO suit, and its acceptance of the challenged authority representation in return for releases benefiting BPPR and its representatives. This was an intentional step to preserve the gains of the financing scheme and impair Company recovery rights. Seventh Amendment and Forbearance Agreement (Sept. 27, 2023), §§ 1(b), 7(a)(ii), 8(a), 8(e), 13, and Schedule I.

**A. The scheme and the predicate acts**

942. The scheme had two phases and one object.

943. In the first phase, from the closing in September 2020 through October 2023, BPPR and Economou obtained the release of BGF's money — loan proceeds that became BGF's property and BGF's debt when advanced, and funds already in BGF's accounts at the Bank — by presenting uses as eligible under the Credit Agreement when they were not.

944. The method had three steps, repeated each time: a written request presented a use as eligible; the Bank, which held the documents showing it was not, released the money anyway; and the plant fell further behind while the debt grew. The persons deceived were the Companies' own governing bodies and members other than the insiders who signed the requests, to whom management reported false completion figures (paragraphs 302–304), and the NMTC lender, PCC Sub-CDE 13, whose QLICI funds the Bank released as Disbursing Agent on approvals it knew to be unfounded (paragraphs 345–356 and 1079). The Companies, whose money and debt were the object, need not themselves have been deceived.

945. In the second phase, from January 2023 through February 2025, the enterprise, now with the VRM-Penzini group in the Lópezes' place, took three more things by deception. It took

the founders' strategy, models and development work for buying the Bank's loan and expanding to Ponce and Salinas, under promises of partnership the group did not mean to keep. It used that work to take the Ponce and Salinas developments that BGF had the contractual right to pursue. And it took the Companies' plant, contracts and gas rights at a price fixed by a false statement to the members about the buyer's rights, with the Bank's own release written into the sale, and then kept the deal undisturbed by a further false statement after the closing.

946. The object never changed: the Bank's return from the plant — its money back on its terms, the plant's gas and the credits that go with it, and a release — with the group taking the plant and the gas rights for itself.

947. The property obtained was money in the first phase, and in the second phase confidential business information, which is property in the hands of its owner, development rights, and the plant and its contracts. It was never a right to accurate information.

948. Eleven acts are designated as predicate acts: ten of wire fraud under 18 U.S.C. § 1343 and one of theft of trade secrets under 18 U.S.C. § 1832, each "racketeering activity" under 18 U.S.C. § 1961(1)(B). Predicate Acts 1 through 4 are pleaded in paragraphs 952 through 955, and Predicate Acts 5 through 11 in paragraphs 956 through 963, each with eight things stated: the statute; who acted; when; where the transmission went from and to; what it said and why that was false; how each element is met; how the act carried on the enterprise's affairs; and what the Companies lost.

949. No other act is designated as a predicate. The conduct pleaded elsewhere in this Complaint is relied on for knowledge, intent, relatedness and continuity, and for the Commonwealth claims — not as additional predicates.

950. The investment instruments — the April 12, 2023 Convertible Note Purchase Agreement, the preferred-unit purchases and the Membership Interest Purchase Agreements — are not predicates; conduct actionable as fraud in the purchase or sale of a security is excluded under 18 U.S.C. § 1964(c).

951. None of the eleven designated acts is conduct actionable as fraud in the purchase or sale of a security. Predicate Acts 1 through 4 concern loan advances, closing uses and vendor payments. Predicate Acts 5 through 7 obtained information under promises of partnership; no security was bought or sold by reason of those promises, and the injury claimed from them is the loss of the Ponce and Salinas developments and the sale of the Companies' assets, not any investment. Predicate Act 8 is the receipt and use of that information. Predicate Acts 9 through 11 concern the sale of the Companies' plant, contracts and gas rights for a debt credit and cash; no security was purchased or sold in that transaction. The April 12, 2023 Convertible Note Purchase Agreement, the preferred-unit purchases and the Membership Interest Purchase Agreements are not relied on as predicates or as the source of any injury claimed in Counts I and II.

**B. Predicate Acts 1 through 4: the first phase**

952. **Predicate Act 1 — wire fraud, 18 U.S.C. § 1343: the September 14, 2020 closing schedule.**

(a) The statute. Wire fraud under 18 U.S.C. § 1343 is racketeering activity under 18 U.S.C. § 1961(1)(B).

(b) Who. BPPR, acting through Joval F. Rodríguez Barnes, its Commercial Relationship Officer for this financing, who signed the Credit Agreement for the Bank.

(c) When. September 14, 2020, at 9:38 p.m., the night before the closing.

(d) Where. Rodríguez Barnes sent the e-mail from Puerto Rico to the closing group, which included Jacen Killebrew of CohnReznick and Brett Heyman of Jones Day on the United States mainland; the chain identifies Killebrew's mainland telephone contact. On information and belief, based on that chain, the transmission went from Puerto Rico to the mainland.

(e) What it said, and why that was false. The e-mail circulated a closing-expense schedule that placed a "P&P Bond" premium of $70,500 in BGF's Direct Loan column. A paid bond was a prerequisite of the loan, not a cost of it: Credit § 3.1(h) made a paid payment-and-performance bond covering 100% of the Direct Costs, with BGF and the Bank as dual obligees, a condition of the Agreement's effectiveness and of the first advance, to be satisfied before the Bank lent a dollar. The line represented that the required bond was in place and that its premium was a proper closing use of BGF's borrowing, to be paid from the loan after closing. That presentation was false in three respects. The premium was the joint venture's own expense: the Construction Contract placed the bond on the contractor, and JV Agreement ¶ 8 allocated the venture's insurance premiums between ITS and ASC. A premium still to be paid, from the loan itself, after closing, could not satisfy a condition that had to be met before the first advance; the line itself showed the condition unmet, and the Bank closed and funded anyway. And the only bond was the contractors' $5,000,000 bond for their own contract, with BGF as its only obligee; no bond covering the $18,679,651 of budgeted Direct Costs, with BGF and the Bank as dual obligees, existed. The Bank knew each of those facts. Its officer scheduled the payment himself. It held the bond, the Project Budget and the Credit Agreement. It closed the next day without a written waiver. The line was a half-truth: it disclosed a premium and concealed that the bond it paid for was not the bond the Credit Agreement required and that the prerequisite it was meant to satisfy was unmet. The Bank converted a prerequisite of the loan into a charge against the loan. It reached Boyd, who was copied and who became bound

the next day on the strength of the written protections (paragraphs 251–252 and 268–270), and the closing participants who funded on the schedule.

(f) The elements. The scheme was to obtain money by a false pretense of eligibility. The intent to defraud is pleaded from the Bank's knowledge of its own documents and from its arrangement of a post-closing payment from BGF's funds for a condition that should have been met before closing. The e-mail was a wire communication in interstate commerce. It furthered the scheme: the closing proceeded on that schedule, and the debit followed two days later. The statement was material: the schedule governed what was paid at closing and from whose money, and whether the required bond was in place determined whether BGF and the Bank had a surety bound to complete the work or pay, up to the full $18,679,651 of Direct Costs, when the contractors failed. No such surety existed; the only bond was the contractors' $5,000,000 bond, which BGF alone could call. The object was BGF's money.

(g) The enterprise. The act set the method the association used throughout — a use presented as eligible and released by the Bank that knew otherwise. BPPR controlled the lending decisions of the association; Rodríguez Barnes acted within his authority as the Bank's relationship officer.

(h) The victim and the loss. BGF was debited $70,560 on September 16, 2020 — the $70,500 premium and a $60 fee — for an expense that was not its own (Schedule A, Part 3, L01). Plaintiffs seek under 18 U.S.C. § 1964(c) the timely injury identified in paragraphs 899–902 and 985–1013; the act is a predicate act whether or not its own loss is recovered. Rodríguez Barnes closing e-mail (Sept. 14, 2020), pp. 1–3; Credit Agreement (Sept. 15, 2020), § 3.1(h) and Project Budget; Construction Contract (June 18, 2020) and JV Agreement (May 15, 2020), ¶ 8; MAPFRE

payment and performance bond No. 1301208000513; Popular Insurance $70,560 bond-premium transfer record (Sept. 16, 2020).

953. **Predicate Act 2 — wire fraud, 18 U.S.C. § 1343: the December 20, 2021 assurance.**

(a) The statute. Wire fraud under 18 U.S.C. § 1343 is racketeering activity under 18 U.S.C. § 1961(1)(B).

(b) Who. BPPR, through María D. Trelles-Hernández of Pietrantoni Méndez & Alvarez LLC, the Bank's outside counsel, writing the Bank's response to the notices its General Counsel, Ferrer, had received on November 11 and December 2, 2021.

(c) When. December 20, 2021.

(d) Where. By e-mail from San Juan, Puerto Rico, to John F. Marsh, Boyd's lawyer, in Ohio.

(e) What it said, and why that was false. The letter stated that the Bank's review to date had found no irregularities in underwriting, approval or disbursement, and it promised continued careful administration. When it was sent, the Bank held: its own November 5, 2021 release of $623,583.73 for Certificate 11, made before the inspection the Credit Agreement required for it; Carballido's November 11 e-mail to Ferrer with the November 7 independent inspection; Marsh's December 2 letter identifying misrepresentations in the drawdown certificates, the missing audited statements and the loan officer's personal loans; and esi's Certificate 011, which recorded 39% construction progress and no testing while management had reported 72% of the budget drawn. The Bank had released $677,094.76 the day after the November 11 e-mail. The irregularity — money released without the inspections the loan documents required — was recorded in the Bank's own funding records, and those records were the Bank's to review. Either the Bank had not

reviewed its own disbursement records, and the statement that its review had found nothing was false as to the review itself, or it had reviewed them and found the November 5 release, and the denial was false as to the result. The letter was also silent on the audits that QLICI § 6.3(b) required and that BGF had never delivered, a departure the Bank knew from its own files.

(f) The elements. The scheme is the one stated in paragraphs 942–951. The intent to defraud is pleaded from the gap between what the Bank's records showed and what the Bank said, and from what the statement accomplished. The e-mail was a wire communication in interstate commerce. It furthered the scheme as a lulling communication: it answered the founders' written challenge to the certification-and-release method with a denial, and the Bank kept funding on that method — Certificate 12, Certificate 13 on duplicated inspection evidence, and Draw 14. The statement was material: a lender's written word that its review had found no irregularity bore directly on whether the founders could obtain the inspection and the halt in disbursements they had demanded. The object was BGF's money released afterward. The Bank's February 9, 2022 refusal to disclose its internal analysis and Boyd's continuing objections (paragraphs 324–327) are part of this record. They show that the founders were not lulled, and the act is not pleaded on their reliance; it is pleaded for what it did at the Bank — it answered the demand for an inspection and a halt with a denial, and the Bank's own officers then kept releasing on the method the notices had identified, through Draw 14.

(g) The enterprise. The Bank's denial protected the method from scrutiny, and Economou's requests continued to be funded on it.

(h) The victim and the loss. BGF. The release this act kept in motion was Draw 14 and its wires of April 25, 2022 — $1,137,400 (Schedule A, Part 3, L03 and L04). Predicate Acts 3 and 4 carried that release out; the loss is counted once. Trelles-Hernández letter to Marsh (Dec. 20,

2021); Marsh letter to Ferrer and Coleman Tió (Dec. 2, 2021); Carballido Clerch e-mail to Ferrer (Nov. 11, 2021); BGF bank statement showing the November 5 and 12, 2021 loan draws; esi Inspection Certificate 011 (Nov. 12, 2021); esi Inspection Certificate 013 Addendum (Mar. 9, 2022).

954. **Predicate Act 3 — wire fraud, 18 U.S.C. § 1343: the April 25, 2022 wire of $108,000 to TPI through Italy.**

(a) The statute. Wire fraud under 18 U.S.C. § 1343 is racketeering activity under 18 U.S.C. § 1961(1)(B).

(b) Who. BPPR executed the wire from BGF's account at the Bank after approving, on March 31, 2022, the advance that funded it. Economou, BGF's Chief Financial Officer, prepared Drawdown Certificate 14, submitted it on March 29, 2022, and designated TPI's final payment among its uses; he caused the wire that followed in the ordinary course. Laura Medina Castillo, the Bank's approving officer, reviewed the request, revised its classifications and approved it. López Vidal, BGF's president, gave the Bank the transfer instruction (paragraphs 385–386); he is not a defendant.

(c) When. April 25, 2022, the date of the wire; March 28–31, 2022, the dates of the certificate and the approval that caused it.

(d) Where. From BGF's account at Banco Popular in San Juan, Puerto Rico, to the account of Tecno Project Industriale S.r.l. at a bank in Bergamo, Italy — a wire in foreign commerce.

(e) What was represented, and why that was false. Drawdown Certificate 14, dated March 28, 2022, represented in § 3.2 that each scheduled item qualified as satisfactorily performed work, delivered stored materials, goods in transit, indirect costs or other permitted costs; in § 3.1 that the project-cost spreadsheet was "true, correct and complete"; and in § 3.6 that the available advances

and free cash sufficed to achieve substantial completion by the project termination date. The schedule included TPI's $108,000 final payment. The representations were false. TPI's Equipment Purchase Agreement, Annex C, made the final ten percent payable only after startup, training, commissioning and performance testing, through an irrevocable letter of credit, and none of those milestones had occurred; the TPI system was not commissioned. The Bank's own loan statements showed $168,437.12 past due on April 1, 2022, which contradicted the completion-funding representation. Economou knew the milestones: he handled the vendor-payment conditions, and his own declaration identifies the second Act 73 tax-credit sale as the main impetus for the vendor payments. The Bank knew the default from its own statements and the state of the plant from its inspector, and it reallocated the request itself, without the § 2.13 approval the Credit Agreement required.

(f) The elements. The scheme is the one stated in paragraphs 942–951. The intent to defraud is pleaded from that knowledge and from the stated purpose of the payment. The wire transfer to Italy was a wire communication in foreign commerce. It furthered the scheme: it was the payment the scheme sought. The eligibility representations were material, because eligibility was the condition of release. The object was BGF's money.

(g) The enterprise. Economou prepared and explained the request; BPPR approved, reclassified and released it. Those were the two members' roles in the association.

(h) The victim and the loss. BGF lost $108,000 paid for startup, training, commissioning and performance testing that were never performed, plus the $60 fee, together with the completion leverage the unpaid final installment would have supplied. The TPI system was never commissioned. The next afternoon TPI reported that it was buying equipment for a project outside the Project (Schedule A, Part 3, L03; paragraphs 413–416). Banco Popular debit advices (Apr. 25,

2022); Drawdown Certificate 14 and Notice of Borrowing (Mar. 28, 2022), §§ 3.1–3.2, 3.6; Certificate 14 e-mail chain, Economou and Medina Castillo (Mar. 29–31, 2022); No. 22-1190, Docket 50-4, ¶¶ 3, 21; TPI Equipment Purchase Agreement (Jan. 20, 2021), Annex C; Banco Popular business-loan statements and past-due notices, April–June 2022; TPI e-mail to López Vidal (Apr. 26, 2022).

955. **Predicate Act 4 — wire fraud, 18 U.S.C. § 1343: the April 25, 2022 wire of $1,029,400 to Galileo through New York.**

(a) The statute. Wire fraud under 18 U.S.C. § 1343 is racketeering activity under 18 U.S.C. § 1961(1)(B).

(b) Who. BPPR executed the wire from BGF's account at the Bank after approving the Draw 14 advance on March 31, 2022; Economou prepared and submitted Drawdown Certificate 14 and designated Galileo's final installment among its uses; Medina Castillo reviewed, revised and approved the request; López Vidal gave the transfer instruction (paragraphs 385–386).

(c) When. April 25, 2022, the date of the wire; March 28–31, 2022, the dates of the certificate and the approval.

(d) Where. From BGF's account at Banco Popular in San Juan, Puerto Rico, to Galileo Technologies Corporation through a bank in New York — a wire in interstate commerce.

(e) What was represented, and why that was false. The same Certificate 14 representations — eligibility of each scheduled item (§ 3.2), a "true, correct and complete" cost spreadsheet (§ 3.1) and sufficient funding to reach substantial completion (§ 3.6) — covered Galileo's $1,029,400. Galileo had already been paid $10,164,600 in four wires between October 2020 and August 2021; the April 25 wire was its final installment, payable only on the conditions of its Equipment Sale and Purchase Agreement, including its acceptance provisions. Plaintiffs allege

that those conditions had not occurred: the Bank's inspector had certified the plant 39% built and recorded no testing in November 2021 and had reused one site visit for two certificates in March 2022; to Boyd's knowledge no further payment was then due; and the contracts and invoices that had been requested had not been supplied. The completion-funding representation was false for the reason stated in the preceding paragraph. Economou's and the Bank's knowledge is pleaded as it is there.

(f) The elements. The scheme is the one stated in paragraphs 942–951. The intent to defraud is pleaded from that knowledge and from the stated purpose of the payment. The wire to New York was a wire communication in interstate commerce. It furthered the scheme: it was the payment the scheme sought. The representations were material. The object was BGF's money.

(g) The enterprise. The same two roles as in Predicate Act 3.

(h) The victim and the loss. BGF lost $1,029,400 released for a Services Completion — startup, training and commissioning (paragraph 461) — that had not occurred, plus the $60 fee, together with the completion leverage the unpaid installment would have supplied, net of the equipment and work actually received (Schedule A, Part 3, L04). Banco Popular debit advices (Apr. 25, 2022); Drawdown Certificate 14 and Notice of Borrowing (Mar. 28, 2022), §§ 3.1–3.2, 3.6; Certificate 14 e-mail chain, Economou and Medina Castillo (Mar. 29–31, 2022); No. 22-1190, Docket 50-4; Galileo Equipment Sale and Purchase Agreement (Oct. 9, 2020); BGF Master Budget workbook, Certificate #15 Budget Recap (May 23, 2022), Certificate 3, 5, 8 and 9 sheets; esi Inspection Certificate 011 (Nov. 12, 2021); esi Inspection Certificate 013 Addendum (Mar. 9, 2022); Boyd Decl. in support of the TRO motion, No. 22-1190 (May 26, 2022).

**C. Predicate Acts 5 through 11: the second phase**

956. **Predicate Act 5 — wire fraud, 18 U.S.C. § 1343: the January 26, 2023 promises.**

(a) The statute. Wire fraud under 18 U.S.C. § 1343 is racketeering activity under 18 U.S.C. § 1961(1)(B).

(b) Who. Rojo, speaking for VRM Penzini Capital and Star Power, to Boyd and Lassers. Penzini and Rodríguez were on the video call and heard him.

(c) When. January 26, 2023, at the end of the presentation described below.

(d) Where. Boyd presented from his laptop in VRM's conference room in San Juan, Puerto Rico, with Rojo in the room. Lassers joined by Zoom from Uruguay. Penzini and Rodríguez joined by Zoom from Miami, Florida. The call was on Rojo's Zoom account. The slides were shared on screen, and the words were spoken over the same connection. On information and belief, based on where each person was, the transmission went from Puerto Rico to Florida and to Uruguay.

(e) What was said, and why it was false. Boyd and Lassers presented their plan for restructuring the Companies' financing and growing the business: buy the Bank's loan position, the related NMTC loan and all rights under them; use the tax-credit and incentive structure; refinance; deal with the preferred and common interests; and expand to Ponce, with the name of the EC Waste contact for that site. Every page of the presentation was marked "All Content Confidential." When it ended, Rojo said: "We want to be your partners — we will only work with you two to acquire this project." And: "You have our commitment that we will not go around you." Both statements were false when he made them. Two days earlier, on January 24, 2023, at 6:28 p.m., Penzini and Rojo had finalized a "Letter of intent subject to contract" to the GFC Board, signing as Managing Partners of VRM Penzini Capital. That letter offered $3.2 million for new

preferred units. It asked for a first right of refusal on any further issuance "up until VRM Penzini Capital reaches a majority of all outstanding membership units." It asked for exclusivity binding the Board through April 30, 2023. VRM's own later complaint says the letter stated VRM's intention to obtain control of GFC. Boyd and Lassers were not shown the letter and did not know its terms. A company that has already committed in writing to take control of GFC for itself, on terms that leave Boyd and Lassers out, does not intend to "only work with you two." It intends to go around them. What the group did afterward — pleaded in paragraphs 496–499, 609–617, 844–849 and 959 through 963 — shows the intent that existed on January 26.

(f) The elements. The scheme was to obtain the strategy, the models and the development work by a false promise of exclusive partnership. The intent to defraud is shown by the January 24 letter and by what followed. The Zoom call was a wire communication in interstate and foreign commerce. It carried the scheme forward: the promises were the bait, and the disclosures of February 9, February 20 and March 15 were made because of them. The promises were material. Whether VRM would work only with Boyd and Lassers was the whole reason the information was being shared. The object was the information.

(g) The enterprise. This act opened the second phase. Rojo spoke as the group's chief executive and negotiator; Penzini and Rodríguez, who would later sign the agreements, the Bank letter and the asset agreement, heard the promise and did not qualify it. The strategy obtained that day — buy the Bank's loan, take the plant — was the plan the group then carried to the Bank: three weeks later it asked the Board for leave to deal with the Bank directly, and in April 2023 its money funded the Sixth Amendment. It set the pattern the group used every time afterward: a promise, then the taking.

(h) The victim and the loss. The property this act obtained was the strategy and models that belonged to Boyd and Lassers, and the Ponce development information and position described in paragraphs 838–839. The Companies' injury under 18 U.S.C. § 1964(c) is pleaded in paragraphs 985–997: the loss of the Ponce and Salinas opportunities that BGF had the right to pursue, and the sale of the Companies' assets on the terms described in paragraphs 692–711. Regeneration Partners presentation (Jan. 26, 2023), described and not exhibited; VRM Penzini Capital letter of intent to the GFC Board (Jan. 24, 2023), No. 22-1190, Docket 300-1; SJ2024CV07694 Compl., ¶ 16; Schedule A, Part 13; Declaration of Gregory S. Boyd under 28 U.S.C. § 1746 (Oct. 10, 2026) ("Boyd Decl.") and Declaration of Jonathan Lassers under 28 U.S.C. § 1746 (Oct. 9, 2026) ("Lassers Decl."), filed with this Complaint.

957. **Predicate Act 6 — wire fraud, 18 U.S.C. § 1343: the February 9, 2023** First **Amendment** to the Confidentiality and Non-Disclosure Agreement **and the 2:00 p.m.** meeting and Zoom **call.**

(a) The statute. Wire fraud under 18 U.S.C. § 1343 is racketeering activity under 18 U.S.C. § 1961(1)(B).

(b) Who. Rojo, Penzini and Rodríguez, for VRM Penzini Capital and Star Power.

(c) When. February 9, 2023. Rojo sent the clean draft at 9:25 a.m. Lassers sent Boyd's and his own signatures at 11:24 a.m. Rojo signed at 12:35 p.m. Penzini signed at 12:37 p.m. Penzini sent the agreement "signed by the three of us" at 2:43 p.m. The status call took place at 2:00 p.m. that day.

(d) Where. By e-mail among San Juan (Rojo and Boyd), Miami (Penzini and Rodríguez) and Uruguay (Lassers), and by video conference among the same places. Based on where the

senders and recipients were and on the e-mail chain itself, each transmission crossed state or national lines.

(e) What was said, and why it was false. This agreement was VRM's answer to Boyd's e-mail of February 6. Boyd had written: "We have not disclosed our complete strategies to you pertaining to the tax credits, finance and banking structure." He wrote that those strategies would be shared once a non-circumvention covenant was in place. Rojo set the terms on February 8 at 6:20 p.m.: "including banking and financial strategies, as long as the only facilities for which we could not circumvent, where those under agreements with BGF (Humacao and Ponce)." The instrument they signed is the "First Amendment to Confidentiality and Non-Disclosure Agreement," effective in San Juan on February 9, 2023. It added Regeneration Partners, LLC to the "Disclosing Party." It confined the NDA, as amended, to "Confidential Information related to EC Waste's facilities that have a contract with Biomass Green Fuels, LLC (i.e. the Humacao and Ponce facilities)." It bound VRM: "VRM shall not use Confidential Information disclosed to VRM by the Disclosing Party under the NDA without the Disclosing Party's consent," except for a Business Purpose in which Regeneration Partners is directly involved, in which VRM has a controlling interest, and related to those facilities; "[i]n particular, VRM agrees not to use the disclosure of financial structuring strategies, banking, equity investors, offtake agreements, insurance, human resources strategies and management employees to be presented to VRM to circumvent the Business Purpose solely in relation to the Existing BGF Facilities." It closed with this sentence: "In disclosing Confidential Information to VRM, the Disclosing Party is relying on VRM's assent to these terms and its intent to be bound by the terms set forth herein." Rojo, Diego Rodríguez and Penzini signed for Star Power Systems, LLC; Boyd and Lassers signed for themselves; Lassers signed for Regeneration Partners, LLC as its Managing Member. By signing,

each of the three men represented that VRM assented to those terms and intended to be bound by them. At 2:00 p.m. that day, with the amendment signed, the group held the status meeting and Zoom call for which Lassers had sent the agenda the day before. On that call Rojo said: "now we have a plan to get control of BGF." Boyd and Lassers heard him say those words; Lassers heard them over the Zoom connection from Uruguay. The representation was false when they signed, for the reason in paragraph 956 and for a second reason. Eight days later, on February 17, 2023, VRM sent the GFC Board a capital proposal. It asked the Board to let VRM deal directly with EC Waste and the Bank. It put VRM's own executive, Rodrigo Zavala, into the Companies as Vice-President and Chief Operating Officer at $12,500 a month, paid by BGF. It gave VRM a first right of refusal to buy up to a 25% equity stake. And it had Semillero recognize VRM as "Leading Fund" and agree that GFC would pay VRM the advisory fees under Semillero's existing Advisory Services Agreement. That was the banking and financial strategy, pursued for VRM's own account, without Boyd and Lassers. The proposal itself refers back to "our January 24, 2023 letter."

(f) The elements. The scheme is the one stated in paragraphs 942–951. The intent to defraud is shown by the January 24 letter, by Rojo's words on the 2:00 p.m. call that day — a plan to get control of BGF, spoken as the covenant not to go around Boyd and Lassers was being signed — by the February 17 proposal, and by the use later made of what was disclosed. Each e-mail and the video call were wire communications in interstate and foreign commerce. They carried the scheme forward: the signed covenant was the condition on which the complete banking and financial strategies were then disclosed, starting on the 2:00 p.m. meeting and Zoom call that day and continuing on the February 20, 2023 call. What was disclosed was what Boyd's February 6 e-mail had withheld, and what the amendment itself describes as the matters "to be presented to VRM": the financial structuring, banking, equity-investor, off-take, insurance, human-resources and

management strategies for the Humacao and Ponce facilities. The representation was material: Boyd had said in writing that the disclosure depended on it, and the amendment itself says the Disclosing Party was relying on VRM's assent. The object was the information.

(g) The enterprise. The three principals acted together, each adding his signature by wire within the day, and Penzini signed as Managing Partner of VRM Penzini Capital. The covenant was the tool the group used to get the complete banking and financial strategy — the strategy for dealing with the Bank that the group pursued for its own account eight days later and, with the Bank, through 2024.

(h) The victim and the loss. As stated in paragraph 956(h). E-mail chains "Meeting Request" (Feb. 5–6, 2023) and "Agenda for Status Update" (Feb. 8–9, 2023); First Amendment to Confidentiality and Non-Disclosure Agreement (effective Feb. 9, 2023); VRM Penzini Capital Emergency Capital Contribution Proposal to the GFC Board (Feb. 17, 2023); No. 22-1190, Docket 305-1, ¶¶ 36–41; Boyd Decl.; Lassers Decl.

958. **Predicate Act 7 — theft of trade secrets, 18 U.S.C. § 1832(a)(1), and wire fraud, 18 U.S.C. § 1343: the March 15, 2023 meeting at VRM's office.**

(a) The statute. Section 1832, which concerns theft of trade secrets, and § 1343 are each racketeering activity under 18 U.S.C. § 1961(1)(B).

(b) Who. Penzini, Rojo and Diego Rodríguez, for VRM Penzini Capital and Star Power.

(c) When. Wednesday, March 15, 2023, from 11:00 a.m. to 1:00 p.m. Atlantic Standard Time — the calendar entry "At VRM Office."

(d) Where. At VRM's office in San Juan, Puerto Rico, where Boyd and Rojo were the only people in the room, and by Zoom video conference to Lassers in Uruguay, who presented, and to

Penzini and Diego Rodríguez in Miami, Florida. Based on where each person was, the transmission went from Uruguay to Puerto Rico and to Florida.

(e) What was taken, and how. Lassers had sent VRM the agenda for the meeting, the Plaintiff founders' due-diligence request list, and the acquisition cost model for BGF — the purchase of the Bank's debt at a discount, the NMTC loan, the buy-out of the investors and members, the cost to complete the plant, and the financing. The agenda listed the Act 73 tax-credit status, the off-take agreements, the EC Waste default, the settlement with the plaintiffs, "Funding of our Deal to acquire GFC/BGF" and "Structure of Deal with VRM." Lassers presented the financial projections for the combined gas and CO2 business: the pro forma, the value of the environmental attributes, and the tax credits. The projections also set out and valued the additional gas rights available to BGF under § 11.20 of the El Coquí agreement for the Ponce and Salinas sites. Penzini questioned the inputs in detail. This information was a compilation. It had value because it was not generally known. Its owners had kept it secret — by the January 18 agreement, by the February 9 covenant, by marking the materials confidential, and by limiting each disclosure to the stated purpose. It related to a product, renewable natural gas and liquid CO2, that is used in and intended for use in interstate commerce. The group obtained it by artifice and deception. The promises of January 26 and the covenant of February 9 — neither of which the group meant to keep — were the reason it was shown. The group intended to use it for its own benefit and knew that doing so would injure the owners and the Companies, as its later use shows. Nothing false was said on March 15 itself. The deception was the continuing pretense of an exclusive partnership, kept up twelve days before VRM and the Companies signed the Mediation Agreement and four weeks before VRM invested on its own terms.

(f) The elements. Under § 1832(a)(1): a trade secret related to a product in interstate commerce; obtained by fraud, artifice or deception; with intent to convert it to the economic benefit of someone other than the owner; intending or knowing that the offense would injure the owner. Under § 1343: the scheme stated in paragraphs 942–951; the video call as a wire communication in foreign and interstate commerce that carried it forward; materiality and intent as pleaded above.

(g) The enterprise. Penzini, who would sign the Bank letter and the asset agreement, took the projections. They were the numbers on which the group later built its own platform, and the numbers that told the group and the Bank what the plant and the gas rights were worth before the price to the members was set.

(h) The victim and the loss. The projections' treatment of the Ponce and Salinas gas rights is the part of this act that touched Company property directly, because the § 11.20 rights were BGF's. Calendar entry "At VRM Office" (Mar. 15, 2023, 11:00 a.m.–1:00 p.m. AST); Meeting Agenda 15th March 2023 VRM Regeneration Partners; Due Diligence List VRM (Feb. 23, 2023); Negotiating Cost BGF March 2023 v3 (described, not exhibited); Schedule A, Part 13; El Coquí Landfill Gas Sale and Purchase Agreement (Dec. 28, 2018), with First Amendment (July 19, 2019), § 11.20; Boyd Decl.; Lassers Decl.

959. **Predicate Act 8 — theft of trade secrets, 18 U.S.C. § 1832(a)(3): receiving, holding and using the information through Ponce RNG and IRE.**

(a) The statute. Section 1832 is racketeering activity under 18 U.S.C. § 1961(1)(B).

(b) Who. Ponce RNG, LLC and IRE, through Kalt as president of each and Penzini as treasurer and resident agent of Ponce RNG. VRM Penzini Capital and Star Power, through Rojo, Penzini and Rodríguez, passed the information to them.

(c) When. IRE was incorporated on April 15, 2024 and registered in Puerto Rico on July 3, 2024. Ponce RNG was organized on June 24, 2024. The EC Waste agreements for the Ponce and Salinas sites came after that. The Companies are not parties to those agreements and do not have them; on information and belief, based on IRE's own project page, they were made after Ponce RNG and IRE were formed, and their dates will be fixed from the agreements in discovery. The holding and use continue today, as IRE's project page of September 22, 2026 shows.

(d) Where. In Puerto Rico, through companies organized in Delaware and Puerto Rico, in a business that sells renewable natural gas in interstate commerce.

(e) What was done. Ponce RNG received and exploited the Ponce opportunity. IRE received, now holds, and uses the compilation of models, site economics and strategy taken in 2023, in a three-landfill platform — Humacao, Ponce and Salinas — that IRE advertises under thirty-year terms with EC Waste and VRM Penzini as its partners. Each of them knew the information had been obtained without authorization. Section 2.A of the January 18 agreement said that "[o]ther than for the Business Purpose, the receiving party shall not use the Confidential Information of the Disclosing Party for its own or any third party's benefit or use." The February 9, 2023 amendment named "the Humacao and Ponce facilities" as the facilities VRM could not circumvent. Penzini signed both agreements and is an officer of both companies. Ponce had been a Company project since at least September 2021, when Semillero Partners and CDVCA issued conditional support letters for it. Until December 28, 2023, BGF held, under § 11.20(a) of the El Coquí agreement, a thirty-day first-offer right and a fifteen-day right to match any third-party offer for any new landfill-gas project on EC Waste property in Puerto Rico.

(f) The elements. A trade secret related to a product in interstate commerce; received, held and used knowing it was obtained without authorization; with intent to convert it to the economic

benefit of Ponce RNG, IRE and the group; intending or knowing that the Companies and the information's owners would be injured.

(g) The enterprise. Ponce RNG and IRE are the vehicles the group formed to hold what it had taken; the gas from the three landfills is the enterprise's product. This act is the step where the second phase paid off.

(h) The victim and the loss. BGF lost the Ponce and Salinas developments it had the contractual right and the prepared position to pursue. The measure is in paragraphs 853–855: $92,000,000 for Ponce and Salinas alone on the Companies' estimate, before the deductions and credits stated there. P.R. Department of State records, Island Renewable Energies LLC and Ponce RNG, LLC; IRE project page (captured Sept. 22, 2026); Confidentiality and Non-Disclosure Agreement (Jan. 18, 2023), § 2.A; Semillero Partners and CDVCA conditional support letters on the Ponce project (Sept. 17, 2021); El Coquí Landfill Gas Sale and Purchase Agreement (Dec. 28, 2018), with First Amendment (July 19, 2019), § 11.20.

960. **Predicate Act 9 — wire fraud, 18 U.S.C. § 1343: the November 15, 2024 letter to the members.**

(a) The statute. Wire fraud under 18 U.S.C. § 1343 is racketeering activity under 18 U.S.C. § 1961(1)(B).

(b) Who. Penzini, for VRM Penzini Capital and Renewable Series II. He wrote it the day after Humacao RNG was organized and the day after he signed the Bank's letter agreement for Renewable Series II.

(c) When. November 15, 2024.

(d) Where. By e-mail from Puerto Rico to the members of GFC, with the Bank's November 14 letter attached. The letter is addressed to the members of GFC and says so on its face. The

members included Lassers, who lives in Punta del Este, Uruguay, and Community Development Venture Capital Alliance, in New York. On information and belief, based on where the members live, the e-mail went from Puerto Rico to Uruguay and to New York.

(e) What it said, and why it was false. The letter told the members that the proposed recovery had fallen from $7.1 million to $4.1 million. It put the entire $1 million reduction on the common holders. And it said: "VRM now holds comprehensive rights under the Credit Agreement, granting us the authority to pursue and collect all amounts currently owed to BPPR as the sole secured lender." It added that VRM "reserves the right to act upon its rights as secured creditor" against any member who did not "adhere to the spirit of the accepted LOI." On that day VRM held no such rights. The Bank's letter, attached to the e-mail, set out indicative terms subject to credit-committee and Capital One approval. Humacao RNG's own statement of facts in SJ2024CV04616 dates the assignment January 31, 2025. The Bank first reported the assignment to the Commonwealth court on February 14, 2025. Penzini had signed the Bank's letter the day before. He knew what it did and did not give VRM.

(f) The elements. The scheme was to buy the Companies' assets at a price the group set, and to get the members to go along with terms they had never voted on. The intent to defraud is shown by Penzini's knowledge of the letter he had signed, by the timing, and by the use he made of the statement — a threat of secured-creditor action against members who objected. The e-mail was a wire communication in interstate and foreign commerce. It carried the scheme forward: it reset the price and warned off objection, and the closing followed on terms that paid the common holders nothing. The statement was material. Whether the buyer already stood in the Bank's shoes as sole secured lender went to the heart of what the members could do. The Bank's attached letter did not cure it: a one-page letter of indicative terms addressed to VRM told the members nothing

about whether a later step had been completed, and the letter's own threat — secured-creditor action against any member who did not adhere to the "spirit" of the letter of intent — is what the statement was for. The members it reached included the preferred holders and noteholders whose approval § 5.1(f) required and who were paid under Schedule 2.9; none objected after the letter, and the Board's January 31, 2025 consent recited their September approval as if it covered the changed terms (paragraphs 631–637). Apart from López Vidal's January 31, 2025 resolution (paragraphs 638–640), the only members who objected were the two whose strategy the group had taken (paragraphs 641–644). The object was the Companies' property — the plant, the contracts and the gas rights — obtained through the acquiescence of the members whose approval the agreement required.

(g) The enterprise. Penzini acted for the acquiring companies he managed, using the position the Bank's letter of the day before gave the group; the Bank had sold its loan to the group with its own release written into the deal, and Humacao RNG, organized that same day, was the company that would take title and then collect the loan from Boyd.

(h) The victim and the loss. The Companies: the difference between the value of what was transferred and what was received, pleaded in paragraphs 692–711, and the release of the Bank written into the transfer. The $13,000,000 the buyer gave for the assets was not paid to BGF or applied to BGF's debt as the Credit Agreement required (paragraphs 656–664); it was taken as a reduction of the loan the buyer had acquired from the Bank at an undisclosed price, and the buyer then demanded the full earlier balance from Boyd (paragraph 1106). Penzini status letter to the GFC members (Nov. 15, 2024), pp. 1–2; Banco Popular–VRM Penzini Fund I (Renewable Series II) letter agreement (Nov. 14, 2024); SJ2024CV04616, Docket Entries 207 and 312; Asset Acquisition Agreement (Jan. 31, 2025); Boyd Decl. ¶ 16; Lassers Decl. ¶ 14.

961. **Predicate Act 10 — wire fraud, 18 U.S.C. § 1343: the March 31, 2025 notice to the members.**

(a) The statute. Wire fraud under 18 U.S.C. § 1343 is racketeering activity under 18 U.S.C. § 1961(1)(B).

(b) Who. Alexander Borschow, signing as "Authorized Signatory" under the January 31, 2025 written consent, for the Board majority that approved the transfer and together with the acquiring group. He is sued in Count II.

(c) When. March 31, 2025, at 1:31 p.m.

(d) Where. By e-mail from Puerto Rico to the members of GFC, including Lassers in Uruguay and Community Development Venture Capital Alliance in New York. The notice is addressed to the members of GFC and says so on its face. Based on where the members live, the e-mail went from Puerto Rico to Uruguay and to New York.

(e) What it said, and why it was false. The notice announced that the Asset Acquisition Agreement had "closed" on February 7, 2025. It announced a new four-person Board. And it told the members that "certain funds have been deposited into an escrow account for the benefit of the Companies." That was false. Under §§ 2.9 and 6.8 of the agreement, the $321,403 holdback was part of the members' own consideration, retained by the buyer to fund the Approving Members' indemnity of the buyer against specified claims and payable to those members pro rata when the two-year indemnity period expires; no line of Schedule 2.9 runs to either Company. The Companies had no interest in it. Borschow had signed the consent authorizing the agreement. He knew its terms.

(f) The elements. The scheme is the one stated in paragraphs 942–951. The notice was a wire communication in interstate and foreign commerce. It carried the scheme forward as a lulling message. It was sent after the property had been transferred. It told the members that money had

been set aside for the Companies when none had. It kept the transfer undisturbed while the new Board, within the following week, hired the lawyer who then moved to dismiss the Companies' claims. The statement was material. Whether the Companies had been provided for bore directly on whether the members would act.

(g) The enterprise. The act protected what the enterprise had taken — the plant for the group, the release for the Bank. It was made by the manager who had signed the consent for the transfer and who then signed the engagement of Abesada, the lawyer the Bank endorsed.

(h) The victim and the loss. The Companies. The loss is the one caused by the transfer this act kept in place, counted once under paragraph 960(h). Borschow communication to the GFC members (Mar. 31, 2025) and e-mail to Villarini (Mar. 31, 2025); Asset Acquisition Agreement (Jan. 31, 2025), §§ 2.9, 6.8; GFC Board Written Consent approving the Asset Acquisition Agreement (Jan. 31, 2025); López Vidal Decl. (May 26, 2026), ¶ 3; Boyd Decl. ¶ 17; Lassers Decl. ¶ 15.

962. **Predicate Act 11 — wire fraud, 18 U.S.C. § 1343: the February 7, 2025 closing payments.**

(a) The statute. Wire fraud under 18 U.S.C. § 1343 is racketeering activity under 18 U.S.C. § 1961(1)(B).

(b) Who. Humacao RNG, through Penzini, as buyer; Renewable Series II as the payor of record under Schedule 2.9. The payees were the noteholders and preferred holders listed in Schedule 2.9. Three of them are defendants and are pleaded in Count II for what they received — Renewable Series II ($761,221), PRFG ($528,526) and CDVCA ($208,576); the common holders, including Boyd and Lassers, received nothing; the other payees are not parties.

(c) When. February 7, 2025. Borschow's March 31, 2025 notice to the members confirmed that the closing took place on that date and that the funds were paid.

(d) Where. On information and belief, by wire transfer from the buyer's account to the noteholders and preferred holders listed in Schedule 2.9, who include payees outside Puerto Rico — among them CDVCA in New York, allocated $208,576. The payment records are in the hands of the buyer, the Bank and the payees, and the Companies have requested them in discovery.

(e) What was sent. The wires that carried out the purchase on the terms the November 15, 2024 letter had set: $4,465,966 of cash, including the $321,403 holdback, divided among the noteholders and the preferred holders — $428,417 and $332,804 of it to Renewable Series II itself — and nothing to the common holders.

(f) The elements. The wires were the payments the scheme set out to make on those terms. Nothing false was said in the wires themselves; their function in the scheme was that of the payment that completed the taking, on the terms the November 15, 2024 letter had set and before the March 31, 2025 notice kept the transfer undisturbed. On information and belief, based on the location of the payees, they were wire communications in interstate commerce that carried forward the scheme stated in paragraphs 942–951.

(g) The enterprise. The buyer and its parent moved the money and took the property; the Bank took its release and its price.

(h) The victim and the loss. As in paragraph 960(h). Asset Acquisition Agreement (Jan. 31, 2025), §§ 2.7–2.10 and Schedule 2.9; Borschow notice to the members (Mar. 31, 2025); the closing payment records (requested in discovery).

963. The following are relied on for knowledge, intent, relatedness and continuity, and for the Commonwealth claims, not as predicates: the January 18, 2023 agreement and its transmission; the January 19 Dropbox and the January 22 video call; the January 24, 2023 letter of intent; the February 17, 2023 proposal; the February 20, 2023 call; the March 27, 2023 "Plan

B" meeting, subject to the Mediation Agreement of the same date; the Sixth and Seventh Amendments; the investment instruments, which 18 U.S.C. § 1964(c) excludes; the Revenue Sharing Agreement of August 2023; the September 11, 2023 board consent; the Bank's June 19, 2024 letter; the September 2024 letters of intent and vote; the Bank's November 14, 2024 letter agreement; the Bank's release in the Asset Acquisition Agreement; and the collection of the loan from Boyd. Schedule A, Parts 7 and 13.

**D. The scheme continued after the designated acts**

964. Predicate Acts 1 through 4 are the routed acts of the first phase, not the end of it.

965. The certification-and-release method they carried out continued, without interruption, for eighteen more months: Certificate 17 (July 20, 2022), with $889,095 of unapproved contractor additions; the 2023 tax-credit proceeds and the $500,000 release; on September 27, 2023, the procurement of Company claim waivers through a disputed authority representation; and Certificate 24 (October 2023). Schedule A, Part 7 identifies the actors, the Company money and recovery rights targeted, and the completion and financing injuries to which each act is linked. Plaintiffs rely on that conduct for the express-duty, financial-office and account claims, as evidence of the continuing scheme, and as the basis for open-ended continuity.

966. The post-April 2022 episodes have specific content.

967. López Vidal's July 20 Certificate 17 sought $843,257.10 while representing eligible costs, adequate completion funding, permitted prior uses and disclosed changes. The associated BPPR-revised sheet added $889,095 of ITS costs without written construction change orders.

968. In 2023, the tax proceeds and Certificate 24 sought additional Company funds under changing restrictions.

969. Economou's October 13 e-mail denied overpayment to ITS and Accurate, described Bank authorization of an October 10 transfer, and expressed concern that construction-contract information would reach Boyd and Lassers for use in the RICO suit.

970. The concealment of the cost and approval departures was done to continue obtaining and retaining Company money.

971. The construction side matched the certification side. ASC billed the energy-storage system in stages it labeled "Certification # 1," "# 2" and "# 3 (Final Invoice)," the last on October 4, 2021; and Acosta Martín signed and sealed the certification that the J208 had been commissioned in October 2021 and the ESS in November 2021 — seven weeks before the failed start-up attempts of November 23, 2021 (paragraphs 169–175). Drawdown Certificate 17 with Notice of Borrowing (July 20, 2022); Certificate 17 source worksheet ("Revised by BPPR"); Certificate #24 cost sheet (Oct. 4, 2023); Request for Advance, Certificate 24 (Oct. 6, 2023); Economou–Picó e-mail chain of Oct. 12–13, 2023.

**E. The later transactions are pleaded for knowledge and relatedness, not as predicates**

972. Schedule A, Part 7, to this Complaint, incorporated by reference under Rule 10(c), identifies the later communications and transactions relied on for knowledge, relatedness and the separate Commonwealth claims, and the count to which each is directed.

973. The designated scheme sought Company money through materially deceptive eligibility presentations.

974. Each payment obtained by a false eligibility presentation was the object of the scheme whether or not the equipment or work later proved to have value; the Companies'

recoverable loss is the part of each payment that bought nothing — the unearned payment, the lost completion leverage and the resulting financing and completion cost.

975. Plaintiffs therefore plead the net losses, transaction by transaction, in Schedule A, Part 3. Conduct actionable as securities fraud, including the identified MIPA and securities transactions, is excluded from the predicate basis under § 1964(c).

**F. Schedule A, Part 12 states each defendant's conduct and the counts retained against it**

976. Schedule A, Part 12, states the retained counts and the conduct attributed to each defendant. The López-family settlement parties and the identified nondefendant officers and lawyers remain participants in the chronology.

## XII. RELATEDNESS AND CONTINUITY

977. The acts are related, and they continued.

978. All eleven had the same purpose — the Bank's return from the plant it financed — and the same victims, BGF and GFC.

979. In the first phase the method was a written presentation of eligibility followed by a Bank release; the result was money out of BGF's accounts for uses the loan documents did not permit; the participants were the Bank's financing officers and counsel and the Borrower's financial officer.

980. In the second phase the method was a promise or a statement of fact, sent by wire, known to be untrue, followed by the taking; the result was the founders' work, the Ponce and Salinas developments and the plant itself in the group's hands and a release in the Bank's; the participants were the Bank and the group that replaced the Lópezes.

981. These were not isolated events. The routed predicates run from September 14, 2020 to March 31, 2025 — fifty-four months — in which the enterprise took money, information, opportunities and assets from the same two Companies by the same means: a statement the Bank or the group knew to be untrue, and then the taking. Plaintiffs plead closed-ended continuity over that period. The scheme was not a single project financing with a natural end at closing or completion: it outlived the construction loan, replaced its participants when the Lópezes failed, and took a new form after the plant changed hands.

982. Independently, they plead open-ended continuity.

983. The deceptive certification-and-release method was the regular way this financing was administered for three years, and the enterprise's exploitation of what it took is its regular way of doing business today: Ponce RNG and IRE hold and use the information taken in 2023 in a three-landfill platform under thirty-year terms, and advertise it (Predicate Act 8), while the group collects from Boyd the balance the credit extinguished.

984. The distinction Plaintiffs draw is this. The same certification-and-release method was used, and re-used, to obtain money from the Companies for three years, after warnings and after suit. It was then used to obtain releases protecting what had been obtained. That is a regular way of administering this financing, not a completed wrong prolonged by collection proceedings.

## XIII. COMPANY INJURY, CAUSATION AND NONDUPLICATION

985. Each Company seeks its own loss.

986. BGF seeks its net unauthorized or unearned payments and the directly resulting completion, financing and lost-earnings losses.

987. GFC seeks loss to its own property and rights. The measure depends on the transaction. For the asset transfer, damages compare fair value with all actual consideration,

discharged debt and assumed obligations. For restricted-account applications, damages include the loss of required principal reduction and directly caused financing cost, less authorized use and benefit. For an impaired or surrendered claim, the measure is its enforceable net value less consideration and overlapping recovery.

988. The second phase hurt the Companies in two ways, and each can be measured.

989. First, BGF lost the Ponce and Salinas developments.

990. Until December 28, 2023, BGF held the first-offer and matching rights of § 11.20(a) of the El Coquí agreement for any new landfill-gas project on EC Waste property in Puerto Rico, and after that date the good-faith negotiation right of § 11.20(b).

991. BGF had pursued Ponce since 2021.

992. The group used the strategy, the models and the position it had obtained in 2023 — under a promise not to go around the people who prepared them — to take those developments for Ponce RNG and IRE.

993. The measure is the one in paragraphs 853–855, subject to the credits and to the conditional nature of the § 11.20 process stated there.

994. Second, the Companies lost the difference between the value of the assets transferred and the consideration received, pleaded in paragraphs 692–711, on terms set by the November 15, 2024 statement and kept in place by the March 31, 2025 notice; the Bank's release was written into that transfer and no payment to the Companies for it was identified.

995. Each loss flows directly from a designated act: the first from Predicate Acts 5 through 8, the second from Predicate Acts 9 through 11. Both are carried in the loss ledger, Schedule A, Part 3, as L09 and L08, with the value received, the preexisting liabilities and the offsets that reduce each.

996. The Plaintiff founders' work itself, to the extent it was Boyd's and Lassers's rather than the Companies', is pleaded here as the property the racketeering acts obtained, not as a Company loss. The same facts support Counts VI, VII, VIII and XI; the Companies claim each item of loss once, and the Humacao value once, as paragraphs 853–855 states.

997. The injury is domestic. The Companies are Puerto Rico limited liability companies. The money was taken from BGF's accounts at the Bank in San Juan; the plant, the contracts and the gas rights are at the El Coquí landfill in Humacao, Puerto Rico; and the Ponce and Salinas developments were to be built on EC Waste's landfills in Puerto Rico. No part of the injury claimed in Counts I and II was suffered abroad. The foreign elements of the chronology — the Italian vendor's bank, Lassers's residence in Uruguay and the Zoom connections — are places through which acts passed, not the place of the Companies' loss.

998. The asset-transfer consideration is accounted for part by part.

999. The Asset Acquisition Agreement's cash component is $4,465,966, including the $321,403 holdback. Its $13 million reduction concerns the combined loan obligations and is allocated between them as pleaded in paragraphs 810–823.

1000. The separate $7,052,292 balance is conditional, with five-year, interest and security terms. All are accounted for according to actual performance. Asset Acquisition Agreement (Jan. 31, 2025), §§ 2.7, 2.9–2.10 and Schedule 2.9.

1001. Schedule A, Part 3, identifies the amounts at issue, recipients, approval defects and offsets.

**A. The diversions delayed completion and cost the Companies a finished plant's net earnings**

1002. Timely completion would have enabled the Companies to earn revenue from contracted renewable gas and CO2 sales and from environmental or tax attributes they owned and could lawfully monetize.

1003. The pleaded diversion, unapproved construction costs and premature payments depleted the resources available for completion, prolonged the delay and prevented those earnings.

1004. The contemporaneous budgets, offtake agreements, equipment specifications, tax determinations and operating projections support the anticipated business.

1005. Plaintiffs seek the lost net profits and lost net attribute proceeds caused by that conduct. The amount is determined from the supported completion date, production and sales volumes, enforceable prices, eligibility, operating and monetization costs, and actual results. BGF–Banco Popular RLNG Off-Take Agreement (July 18, 2022); El Coquí Landfill Gas Sale and Purchase Agreement (Dec. 28, 2018), with First Amendment (July 19, 2019); P.R. Treasury Act 73 tax-credit determination, Case 19-73-I-011 (Aug. 26, 2020); Construction Contract (June 18, 2020) and JV Agreement (May 15, 2020); GFC Board resolution authorizing the tranche-two tax-credit sale (2023); Banco Popular consent letter on the tranche-two sale (Mar. 9, 2023); SURI notice approving the tax-credit sale (Mar. 14, 2023); BGF operating-account transactions, April 2023; VGMM Agreed-Upon Procedures Report (Aug. 31, 2022); Galileo Equipment Sale and Purchase Agreement (Oct. 9, 2020); López Vidal e-mail to the GFC Board (Aug. 31, 2021), with attachments; Green CO2 investment summary (May 2022).

1006. Required reserves and valid debt service would precede member distributions. Boyd and Lassers seek those earnings derivatively for the Companies. Boyd's individual guaranty claim is separately addressed in Count X.

1007. The lost earnings are pleaded as a net amount.

1008. The Companies' net lost earnings include legally available tax-credit and environmental benefits only for periods and quantities in which the relevant Company held and could realize those rights. Act 73 credits already sold are credited at their actual net proceeds.

1009. The existing valuation's contingent RIN scenario is not treated as guaranteed revenue. Customer-owned attributes, avoided production costs, royalties, taxes, financing costs, mitigation and actual revenues are accounted for.

1010. Plaintiffs plead lost earnings that existed, were frustrated by the defendants' conduct and can be estimated on a reasonable basis. Because the plant had no sales history, they plead the contracts, prices and volumes from which the sales would have been made but for that conduct.

1011. The two-product analysis and transaction-credit schedule above supply the valuation framework.

1012. A completed-project counterfactual addresses loss caused by the alleged financing misconduct; the actual unfinished-asset value at the February 2025 sale separately deducts completion costs, delay and execution risk.

1013. The Bank and the transferees are not each charged the same decline in value twice.

## XIV. DERIVATIVE MEMBERSHIP, DEMAND AND ADEQUATE REPRESENTATION

1014. Boyd and Lassers continuously owned GFC units throughout the challenged period and at filing. GFC owns BGF. They sue for GFC and double derivatively through GFC for BGF.

1015. Boyd owns 4,252,500 units and Lassers owns 675,000 units. López Vidal's limited proxy covers 7,762,500 additional units and transfers no ownership.

1016. The June 13 consent's 13,365,000 total includes Dumas's 675,000 units and separate signature; the proxy does not give Plaintiffs control of Dumas's units. Irrevocable Proxy (June 2, 2025); GFC Majority Members' Written Consent (June 13, 2025); BGF Amended and Restated Operating Agreement (Sept. 14, 2020); BGF Second Amended and Restated LLC Agreement (Sept. 11, 2023).

1017. BGF's governing document is disputed.

1018. If the separately signed September 2023 BGF restatement is effective, GFC is BGF's sole member and manager; Plaintiffs challenge the authority for its adoption as pleaded above. A demand that GFC cause BGF to pursue the financing claims reaches the controlling decisionmakers at both levels.

1019. Under the earlier BGF Board structure, Boyd and López Vidal adopted the January 31, 2025 objection; the counterparties proceeded despite it. BGF Amended and Restated Operating Agreement (Sept. 14, 2020); BGF Second Amended and Restated LLC Agreement (Sept. 11, 2023); BGF Board resolution refusing the asset transfer (Jan. 31, 2025).

1020. Plaintiffs disclose their EFB interests and Becker Whitaker's and Vissepó's interests in the revenue-sharing arrangement. EFB is not a party to this action and its claims are not asserted here. Vissepó resigned. The Companies' damages exclude those interests. The complaint seeks recovery to the Companies, with distinct accounting for Boyd's guaranty claim and the existing settlements. Revenue Sharing Agreement (Aug. 20, 2023); Irrevocable Proxy (June 2, 2025); GFC Majority Members' Written Consent (June 13, 2025).

1021. This action is not collusive to create jurisdiction. Plaintiffs seek recovery into the respective Companies, and they commit not to exchange Company claims for Boyd's individual guaranty release.

1022. Any derivative dismissal or compromise is subject to notice and Court approval under Rule 23.1(c).

1023. If necessary to protect Company interests, Plaintiffs request separate adjudication or independent representation for Count X.

1024. Plaintiffs made the following demands.

1025. The June 5, 2022 Becker Whitaker letter asked the identified Board recipients to authorize an independent inspection, stop further disbursements to the Lópezes and related parties, and restore the disputed supplier payments.

1026. The February 6, 2025 objection sought to stop the disputed sale. The June 13 and July 3, 2025 consents sought the specified litigation and representation actions. Plaintiffs rely on those actual requests and the responses below for those claims. For additional remedies not demanded, they plead futility separately. Becker Whitaker letter to the GFC Board (June 5, 2022); Boyd and Lassers cease-and-desist notice (Feb. 6, 2025); GFC Majority Members' Written Consent (June 13, 2025); GFC Majority Members' Written Consent (July 3, 2025); GFC Board response to the members' consents (July 21, 2025).

1027. At this action's filing, the GFC Board comprised four managers — Borschow, Feliciano, Goytía and López Vidal — as the Board's own March 31, 2025 notice, the June 13, 2025 registry filing and the July 21, 2025 letter describe it.

1028. Borschow signed the sale and counsel consents while pursuing claims against the Companies through the Semillero side.

1029. Feliciano represented the buyer's designation interest and signed the disputed counsel consent protecting the resulting transaction. Both would have had to authorize litigation attacking their own identified decisions and the buyer's retained assets and release.

1030. López Vidal faced claims arising from his own earlier certifications and payments, despite his later settlement and cooperation. GFC Board resolution dated "March 21, 2025," with the April 1, 2025 transmittal; López Vidal Decl. (May 26, 2026); SJ2024CV07694 Compl.; PRFG resignation letter from the GFC Board (Feb. 14, 2025); P.R. Department of State registry filings of June 13, 2025 (GFC).

1031. Those interests disabled at least half of the Board, claim by claim.

1032. On the sale and claim-control disputes, Borschow's and Feliciano's particular interests disabled at least half of the asserted four-person Board.

1033. On the financing claims, Borschow's adverse claims and involvement in suppressing Company remedies, together with López Vidal's own participation, disabled at least half.

1034. If the disputed designations were invalid, the remaining managers after Villarini's February 14 resignation were Borschow and López Vidal, and their respective interests likewise prevented disinterested action. These are claim-specific grounds that an effort to cause action was unlikely to succeed under 14 L.P.R.A. §§ 4003–4005.

1035. The Company-information claim would likewise require Borschow and Feliciano to authorize litigation against the acquisition platform whose interests they supported in the challenged asset and claim-control decisions. The asserted disabling interests concern that specific adverse transaction, not designation alone.

1036. The bond claim shows the disability concretely. Only BGF, acting through its Board, can declare the joint venture in default under the bond's performance conditions and call on the surety, and the Board's chosen counsel represents that surety in TA2025CE00044 (paragraphs 784–785).

1037. A demand that the Board sue MAPFRE would ask its counsel to sue his own client.

1038. Borschow received Boyd's bond warning on March 15, 2021, and by August 2024 he was himself alleging in SJ2024CV07694 that management had failed to pursue the contractor's remedies (paragraphs 747–749); the Board he has sat on since then has issued no Notice of Intention.

1039. The Board refused the demands. The June 13 member consent sought withdrawal of the earlier RICO dismissal motion, replacement of counsel and participation in the anti-tying action.

1040. Picó's June 19 response, written at Abesada's and the Board's request and copied to them, rejected the requested member-directed action.

1041. The July 21 letter, signed by Borschow, Goytía and Feliciano, rejected the June 13 and July 3 consents and reaffirmed exclusive Board management.

1042. It disclosed that López Vidal did not participate because of his asserted conflict. These letters establish actual refusal of the specified requests.

1043. Plaintiffs challenge the refusals as interested decisions by the identified participants in the disputed transaction: neither reflected a disinterested, informed consideration of the Companies' claims, because each was signed or directed by the managers whose own transactions those claims challenge. GFC Majority Members' Written Consent (June 13, 2025); Picó letter to

Becker Whitaker (June 19, 2025); GFC Majority Members' Written Consent (July 3, 2025); GFC Board response to the members' consents (July 21, 2025).

1044. Plaintiffs allege adequate representation from continuous ownership, their specific efforts to obtain Company action, and their pursuit of net recovery to the Companies. Company damages exclude EFB revenue-sharing interests and personal member distributions.

1045. Plaintiffs submit to judicial supervision of any Company compromise and to the separate treatment of Boyd's individual claim described above.

1046. Counsel appears for the derivative plaintiffs.

1047. The claim to represent the Companies derivatively rests on statute and the particularized demand allegations, not on a member vote purporting to appoint Company counsel.

## XV. THE EFFECT OF THE PRIOR JUDGMENTS

1048. The March 18, 2026 judgment in No. 22-1190 dismissed the federal claims with prejudice and the Commonwealth claims without prejudice.

1049. Its opinion decided direct statutory injury and independent defects in particularity, derivative demand, verification and adequacy.

1050. The December 22, 2025 anti-tying opinion approved the Companies' dismissal and rejected the individuals' direct and belated derivative theories.

1051. Plaintiffs invoke no categorical exception based on a new caption, new evidence or a pending appeal. Schedule A, Part 9, states the independent basis advanced for each retained count. No. 22-1190, Docket 874; No. 22-1190, ECF Nos. 847, 855; No. 22-1190, Docket 877; No. 24-1569, Docket 131.

1052. The Commonwealth court's July 20, 2025 order, notified July 21, addressed López Vidal's separate derivative cross-claim and third-party pleading. It expressly declined to decide

that derivative action's merits and instead denied its joinder in the collection case. It also stated that the internal governance dispute did not alter the Companies' admitted matured debt. SJ2024CV04616, Docket Entry 248 (July 20, 2025), order pp. 1, 3–4.

1053. The Court should apply the earlier judgments claim by claim. Plaintiffs seek adjudication of the Commonwealth claims dismissed without prejudice and of the later decisions that are independently actionable, subject to the issues actually resolved. Plaintiffs preserve the overlapping federal claims pending appellate review and request a discretionary stay of that overlap if appropriate.

## XVI. CLAIMS FOR RELIEF

### COUNT I — CIVIL RICO, 18 U.S.C. § 1962(c)

1054. Count I is the Companies' civil RICO claim against the Bank, Economou and the VRM-Penzini group — Rafael Rojo, Carlos Penzini and Diego Rodríguez; VRM Penzini Capital, LLC; Star Power Systems, LLC; VRM Penzini Fund I, LLC and its Renewable Series II; Humacao RNG, LLC; Ponce RNG, LLC; and Island Renewable Energies, LLC — for conducting the enterprise's affairs through eleven designated racketeering acts. Plaintiffs incorporate paragraphs 142–185 (the parties and participants), 214–552 (the financing, the warnings, the April 25 wires, the restricted funds, the gas bargain, the extensions and the Seventh Amendment), 553–584 (the failed settlement and the acquirers' own allegations), 585–715 (the Bank's exit, the asset transfer and the valuation), 806–837 (the 2023 disclosures and Ponce and Salinas), 838–984 (the financing controls, limitations, the enterprise, the scheme, the predicate acts, continuity and injury) and 985–1030 (derivative standing and the prior judgments) into this Count. The designated acts are Predicate Acts 1 through 11, pleaded in paragraphs 952 through 963. Incorporation designates no additional crimes.

1055. Each defendant named in this Count violated 18 U.S.C. § 1962(c). Each is a "person" under § 1961(3), and each is distinct from the enterprise, which is the association of all of them (paragraph 910). Each was employed by or associated with that enterprise, and each took part in running its affairs. BPPR controlled the lending decisions and releases through which the first phase operated, and it controlled the sale of its loan, the release and the collection through which the second phase was carried out; it committed Predicate Acts 1 through 4, and the second-phase acts were committed with its loan, its letter and its release in hand.

1056. Economou prepared, submitted and explained the eligibility presentations; he committed Predicate Acts 3 and 4.

1057. Rojo, as the group's chief executive and negotiator, committed Predicate Acts 5 and 6. Penzini, as the Managing Partner who signed the group's agreements, the Bank letter and the asset agreement, and as an officer and the resident agent of the companies that took the assets, committed Predicate Acts 6, 7, 9 and 11.

1058. Rodríguez committed Predicate Acts 6 and 7. VRM Penzini Capital and Star Power acted through the three men in Acts 5 through 8; Ponce RNG and IRE committed Act 8; Renewable Series II and Humacao RNG committed Acts 9 and 11.

1059. The eleven acts are a pattern of racketeering activity: they are related, and they amount to and threaten continued criminal activity, as paragraphs 977–984 plead.

1060. The pattern is the enterprise's: eleven related acts over fifty-four months, through which each defendant conducted the enterprise's affairs during the time it took part. The Bank's own four acts run from September 14, 2020 to April 25, 2022; they were the regular way the Bank administered this financing (paragraph 984); and they are the acts of a defendant operating as part of a long-term association that existed for the purpose stated in paragraphs 942–951 and whose

affairs the Bank went on conducting through the second phase — its June 19, 2024 letter, its November 14, 2024 letter agreement, the release written into the sale and the collection it left to the buyer.

1061. Each defendant conducted the enterprise's affairs through that pattern, and each caused the Companies' directly resulting injury to business or property.

1062. The eleven acts are pleaded in full in paragraphs 952 through 963, each with its statute, its actor, its date, its route, its content and the reasons that content was false, the elements of the offense, its connection to the enterprise and the Companies' loss. Each obtained money or property. Predicate Act 1 obtained the $70,560 closing debit; Predicate Acts 3 and 4 obtained the $108,000 and $1,029,400 wires of the Draw 14 release, which Predicate Act 2 kept in motion; Predicate Acts 5, 6 and 7 obtained the strategy, models and development information described in paragraphs 838–839 and 956 through 958; Predicate Act 8 obtained the Ponce and Salinas developments; and Predicate Acts 9, 10 and 11 obtained the Companies' plant, contracts and gas rights on the terms the November 15, 2024 letter set, the Bank's release, and the Schedule 2.9 payments. None of them obtained a right to accurate information or a right to control a decision; each obtained money or property — the Companies' money, development rights, plant and contracts, and the work of Boyd and Lassers that paragraphs 985–997 describes. Count I adds nothing to those paragraphs and designates no other act.

1063. Each transmission and each taking was material to the property it obtained: the closing schedule and Drawdown Certificate 14 to the releases they produced; the promises of January 26, 2023 and the covenant of February 9, 2023 to the disclosures that followed them; the November 15, 2024 letter to the members' acquiescence in terms they had never voted on; the March 31, 2025 notice to leaving the transfer undisturbed. The loss from each act, and the value

received that is deducted from it, are identified in Schedule A, Part 3 (L01–L09) and in paragraphs 692–711, 853–855 and 985–997. Plaintiffs seek the timely net injury pleaded above under 18 U.S.C. § 1964(c), subject to the prior-judgment treatment they have expressly requested.

**COUNT II — RICO CONSPIRACY, 18 U.S.C. § 1962(d)**

1064. Count II is the Companies' RICO conspiracy claim against BPPR, Economou, Rodríguez Barnes, Álvarez and Ferrer; against the VRM-Penzini group named in Count I; and against Alexander Borschow, Semillero Partners, LLC, Ernesto Villarini, The Puerto Rico Fund for Growth, L.P. and Community Development Venture Capital Alliance.

1065. Plaintiffs incorporate the paragraphs incorporated in Count I and paragraphs 725–779 (the conflicted managers, the engagement of Abesada and the collection record).

1066. These defendants agreed to further the § 1962(c) endeavor.

1067. A conspirator need not commit a predicate act himself or agree to commit one; it is enough that he adopts the goal of furthering or facilitating the endeavor.

1068. The agreement of the Bank, Economou, Rodríguez Barnes, Ferrer and Álvarez is pleaded in paragraphs 1071–1073 from the first phase, and the Bank's continued agreement from its conduct in the second: its June 19, 2024 letter, its November 14, 2024 letter agreement, the release it took in the sale, and the collection it left to the buyer.

1069. The object of the agreement was the one stated in paragraphs 942–951.

1070. The independently wrongful racketeering conduct caused the injuries sought.

1071. Rodríguez Barnes's agreement is pleaded from his own acts: the closing instruction (Predicate Act 1), and his approval of every release from the closing through September 2021, four of them with no inspection at all. Predicate Acts 2 through 4 and the later releases are pleaded as

the acts of his co-conspirators in furtherance of the agreement he joined, not as his acts. The Companies' injury from those acts is the injury of that conspiracy.

1072. Ferrer's agreement is pleaded from specific acts after specific notice. As the Bank's General Counsel, he received Carballido's November 11, 2021 e-mail attaching the November 7 independent site inspection. He spoke with her on November 12. He received Marsh's December 2 letter, which identified misrepresentations in the drawdown certificates, the missing audited statements, the loan officer's personal loans, and the release of the pending drawdown the day before the scheduled inspection. After those notices the Bank did three things. It released $677,094.76 the day after the e-mail. On December 20 it answered, through the firm Ferrer co-founded, that its review had found no irregularity (Predicate Act 2). And it released Draw 14 and the April 25, 2022 wires (Predicate Acts 3 and 4) on the same certification method the notices had identified. On information and belief, based on his office, on the notices' being addressed to him and on the response's coming from the firm he co-founded, Ferrer directed or approved that response and the decision to keep funding.

1073. Álvarez's agreement is pleaded from what he knew and from the instrument he signed. Álvarez was President and Chief Executive Officer of Popular, Inc. and of the Bank, and a lawyer. The Bank was served in No. 22-1190 on April 29, 2022, in an action that pleaded this financing conduct. BGF had been in payment default since April 1, 2022; the Bank's own Third Amendment of July 26, 2022 recited $101,940.13 past due. The Bank's inspector had certified the plant 39% built. On July 18, 2022 — the day before PMA circulated the Third Amendment — Álvarez personally signed for the Bank the Off-Take Agreement, the agreement that took the plant's gas for the Bank's own operations. It fixed the price at $14 per MMBtu, gave the Bank the environmental credits "retained by Buyer" without charge, and gave the Bank a right to offset

against BGF's arrears. That gas was the benefit for which the Bank kept the certification-and-release method running. Plaintiffs allege that Álvarez joined the conspiracy with knowledge of what had gone before and with intent to pursue its object — the Bank's return from the financed plant. He is answerable with his co-conspirators for Predicate Acts 1 through 4 and for the Companies' injury from them. The Bank continued to fund, amend and release through his tenure; those releases and amendments are pleaded as the conspiracy's conduct during his participation, not as the injury. The gas agreement is pleaded as the Bank's benefit from the scheme; no anti-tying claim is asserted (paragraphs 96–97).

1074. The agreement of Rojo, Penzini and Rodríguez and of the VRM-Penzini companies is pleaded from their own acts: Predicate Acts 5 through 11 and the instruments that carried them. Each is answerable with the others for the racketeering acts committed in furtherance of the agreement after he joined it, from January 2023, and for the Companies' injury from them; they are not answerable for Predicate Acts 1 through 4, which were complete before they joined.

1075. Borschow's agreement is pleaded from his own acts: he signed, with Rojo and Penzini, the September 11, 2023 board consent; he signed the January 31, 2025 written consent approving the Asset Acquisition Agreement and authorizing himself to execute it with changes in his discretion; he sent the March 31, 2025 notice to the members (Predicate Act 10); and, within days of that notice, he engaged the counsel who then moved to dismiss the Companies' claims. Semillero Partners' agreement is pleaded from the February 17, 2023 proposal's term that Semillero would recognize VRM as "Leading Fund" and agree that GFC pay VRM the advisory fees under Semillero's existing Advisory Services Agreement with GFC, and from Borschow's acts as its principal. Voided DocuSign sole-member written consent (Sept. 11, 2023), signature page; GFC Board Written Consent approving the Asset Acquisition Agreement (Jan. 31, 2025);

Borschow communication to the GFC members (Mar. 31, 2025); GFC Board resolution dated "March 21, 2025," with the April 1, 2025 transmittal; VRM Penzini Capital Emergency Capital Contribution Proposal to the GFC Board (Feb. 17, 2023).

1076. Villarini's agreement, and through him PRFG's and CDVCA's, is pleaded from his own acts as their designee on GFC's Board: he signed the September 11, 2023 board consent and the January 31, 2025 written consent approving the Asset Acquisition Agreement; he received the November 15, 2024 letter, which went to all of GFC's members and names them as its addressees, as the member representative of PRFG and CDVCA, and he knew that its terms differed from the September 2024 vote; he approved the final terms, which paid PRFG $528,526 and CDVCA $208,576 and the common holders nothing, and told the members nothing of the change; and he resigned on February 14, 2025, one week after the closing, on the letterhead of PRFG and its general partner. CDVCA, in New York, received the November 15, 2024 and March 31, 2025 e-mails and the February 7, 2025 payment across state lines. Borschow, Semillero Partners, Villarini, PRFG and CDVCA are not alleged to have taken part in the acts of 2020–2023; their liability runs from the acts of 2024 and 2025 and the injury those acts caused, which flows from racketeering acts — Predicate Acts 9, 10 and 11 — and from no act that is wrongful only under some other law. *Beck v. Prupis*, 529 U.S. 494, 505–07 (2000). GFC Board Written Consent approving the Asset Acquisition Agreement (Jan. 31, 2025); PRFG resignation letter from the GFC Board (Feb. 14, 2025); Asset Acquisition Agreement (Jan. 31, 2025), Schedule 2.9.

1077. Under § 1964(c), Plaintiffs seek treble damages on the proven net RICO injury, together with costs and reasonable attorneys' fees. Commonwealth property and contract remedies supply the separate requests for restoration and an accounting.

**COUNT III — BREACH OF THE FINANCING AND DISBURSEMENT AGREEMENTS**

1078. Count III is the Companies' contract claim against BPPR for the obligations it owed BGF in its separate financing and disbursement capacities. Plaintiffs incorporate paragraphs 142–185 (the parties and participants), 214–412 (the financing, the warnings, the April 25 wires and the restricted funds), 458–552 (the extensions and the Seventh Amendment), 585–647 (the Bank's exit and the asset transfer), 838–889 (the financing controls and limitations) and 966–1030 (injury, derivative standing and the prior judgments) into this Count, including the controls and the transaction-to-loss schedules. This Count seeks contract remedies independently of RICO.

1079. First, BPPR breached express disbursement and account obligations. Those obligations are in Credit §§ 2.2(a)(iv), 2.2(b), 2.9(d), 2.13, 6.3.7, and in the Bank's own review-and-approval undertaking under QLICI Disbursing Agreement §§ 3.1, 3.3–3.4. BGF and PCC jointly appointed BPPR under that agreement. Plaintiffs allege that BPPR knowingly approved or applied funds contrary to the identified cost, progress, change and account restrictions. The claim concerns releases that lacked the written prerequisites of the QLICI conditional early-disbursement and report-waiver provisions. Count III rests on the covenants BPPR undertook to the Borrower in §§ 2.2, 2.9(d), 2.13 and 6.3.7 and on its review-and-approval undertaking in the Disbursing Agreement. It does not rest on Article VIII (§§ 8.1–8.2), which governs the Administrative Agent's duties to the Lenders and gives the Borrower no rights under it; it does not rest on § 8.2's inquiry disclaimers; and it does not rest on any duty to monitor. The no-fiduciary clause in § 10.11 does not eliminate the express undertakings on which the Count does rest. QLICI Disbursing Agreement (Sept. 15, 2020); Credit Agreement (Sept. 15, 2020).

1080. Second, BPPR deliberately performed its express obligations in bad faith. Its knowledge is pleaded from its preclosing funding schedule, its acceptance of the deficient bond, the later debit, the specific notices it received and its administration of the restricted accounts. Plaintiffs seek the net payment, financing and completion losses those acts caused. Separately, the unsatisfied § 3.1(h) condition challenges the agreement's effectiveness and BGF's entitlement to the initial advance, absent the required written waiver. The Bank's own knowledge of that departure is pleaded from its records.

1081. Plaintiffs seek damages and an accounting for the express breaches and the deliberate nonperformance. In the alternative, they seek resolution of the contract — its undoing for breach — if the Court finds that the Bank's protected-disbursement undertaking was an essential reciprocal obligation. BGF accepted the debt to obtain financing that would be released only for eligible, independently supported work, with the required completion protection. Plaintiffs allege that the Bank's knowing abandonment of those protections defeated that undertaking and depleted the resources needed to repay the debt. Resolution entails mutual restitution and credit for value actually received. The Seventh Amendment and Boyd's personal consent are addressed separately in Counts IX and X.

1082. Each release is applied to its own instrument and to the parties who signed it. The May 6, 2021 First Amendment released existing claims and ratified Boyd's guaranty; Boyd's own inducement challenge to it is pleaded in Count X. The later amendments bind their actual releasors. Sixth § 1(c), Seventh §§ 1(b), 13(a), and Asset Acquisition Agreement § 3.6(c) expressly reach the stated loan-related claims. Count IX challenges the specific consent given in the Seventh Amendment; Counts IV–VI challenge the authority for the Asset Acquisition Agreement and the interested approval of it. Former § 3019 and current § 9316 prohibit a prospective renunciation of

liability for deliberate nonperformance; the acknowledgments and releases in the Second through Sixth Amendments are null to that extent, and Plaintiffs challenge them as procured by the Bank's concealment of its own release records — the releases made before the required inspections and the unmet § 3.1(h) condition. The releasor, beneficiary, covered claims, consideration, authority, governing law and ground pleaded for each instrument are stated in Schedule A, Part 14. Credit § 10.4(c) and guaranty § 10(b) are applied with their final-nonappealable-judgment requirements; Plaintiffs allege the specific bad faith and seek the adjudication those exceptions require. Each instrument's release, the claimant it binds and the enforcement consequence are set out in Schedule A, Part 14. Guaranty Agreement (Sept. 15, 2020), Docket 50-5; Credit Agreement (Sept. 15, 2020); First Amendment to Credit Agreement (May 6, 2021); Sixth Amendment to Credit Agreement (Apr. 27, 2023); Seventh Amendment and Forbearance Agreement (Sept. 27, 2023); Asset Acquisition Agreement (Jan. 31, 2025).

**COUNT IV — BREACH OF THE OPERATING AGREEMENT AND FIDUCIARY DUTIES**

1083. Count IV is the Companies' claim against the Manager Defendants and Economou: Borschow, Semillero Partners, Villarini, PRFG, CDVCA, Economou and, for their service on GFC's Board in 2023, Rojo and Penzini. Plaintiffs incorporate paragraphs 142–185 (the parties and participants), 199–213 (governance), 214–552 (the financing, the warnings, the April 25 wires, the restricted funds, the gas bargain, the extensions and the Seventh Amendment), 602–746 (the asset transfer, the valuation and counsel), 806–837 (Ponce and Salinas) and 985–1030 (derivative standing and the prior judgments) into this Count, as to each actor's management, financial-reporting, notice, approval and Company-property conduct.

1084. Borschow, Villarini, Rojo and Penzini owed, during their service, the manager duties that the GFC Operating Agreement and 14 L.P.R.A. § 3977 establish. Rojo and Penzini signed the September 11, 2023 board consent that produced the BGF restatement on which the Seventh Amendment's signature rested. Economou owed the duties arising from his financial office and his undertakings for BGF. Plaintiffs allege three kinds of breach: knowing failures to protect Company funds and claims after the identified notices; interested approval of the challenged transaction; and Economou's false eligibility and reporting representations. The approval breached the Companies' own covenants. The managers approved a disposition of the Project whose proceeds did not pay the Advances in full (Credit Agreement § 5.2(g)(ii)(B)), a release of the Companies' claims outside the ordinary course (§ 5.2(e)) and, if Humacao RNG was an Affiliate of the Borrower, a transaction with an Affiliate that was not subordinate to payment in full of the Obligations (§ 5.2(f)). They approved it in January 2025, after extending VRM's exclusivity in December rather than putting the changed terms to the members, while the Cambrian/Cabrer proposal, which the Companies' own comparison recorded as "100% repayment of the Loans and 100% repayment of the interests owed" with a 40% interest for GFC's members, remained open (paragraphs 605–614, 624–630, 656–664). GFC Operating Agreement § 6.5(a) protects good-faith acts within authority, but it excepts gross negligence or willful misconduct; the specific knowing conduct alleged falls outside that protection. GFC Operating Agreement (Oct. 20, 2021), as amended; SJ2024CV07694 Compl.; Certificate 14 e-mail chain, Economou and Medina Castillo (Mar. 29–31, 2022); Boyd e-mail to the GFC Board (Mar. 15, 2021); Economou e-mail to López Vidal (Nov. 7, 2022, 8:07 a.m.).

1085. Semillero Partners acted through Borschow in the identified management and claim-control decisions, which it undertook for its management interests. Semillero Partners is

distinct from Semillero Investment Fund I. PRFG and CDVCA acted through Villarini, their designee, in the same decisions, and they received $528,526 and $208,576, respectively, under Schedule 2.9 of the sale he approved. SJ2024CV07694 Compl.; PRFG resignation letter from the GFC Board (Feb. 14, 2025); Borschow communication to the GFC members (Mar. 31, 2025); GFC Operating Agreement (Oct. 20, 2021), as amended; Borschow e-mail to Villarini (Mar. 31, 2025); Asset Acquisition Agreement (Jan. 31, 2025).

1086. Plaintiffs seek the incremental Company loss caused by each breach. That loss has four components: unauthorized compensation or payment; loss of enforceable contractor remedies; impaired Company claims; and loss of Company-owned opportunities. Villarini objection to pursuing Brugal outside GFC/BGF (Nov.–Dec. 2021); Semillero Partners and CDVCA conditional support letters on the Ponce project (Sept. 17, 2021); GFC Board–Island Renewable Energies meeting notes (May 2024); Becker Whitaker letter to the GFC Board (June 5, 2022).

**COUNT V — FIDUCIARY BREACH IN DECISIONS CONCERNING COMPANY CLAIMS**

1087. Count V is the Companies' claim against Borschow and Semillero Partners for the separately identified interested decisions over Company claims. Plaintiffs incorporate paragraphs 142–185 (the parties and participants), 180–198 (the prior cases), 199–213 (governance), 716–787 (counsel, the authority rulings and the joint requests) and 985–1030 (derivative standing and the prior judgments) into this Count — the engagement, demand, response and 2026 chronology — together with the agency basis alleged in Count IV.

1088. Borschow's March 2025 counsel consent, and his later refusal to change course, placed the Company claims against BPPR and the transaction participants under interested management. In 2026 that management, acting through retained counsel, sought withdrawal of the

Company answers and participation, and disclaimed a Company interest in the collection appeal. Plaintiffs allege that these decisions impaired available Company claims and defenses for the benefit of the adverse interests identified above. The Bank's May 7 endorsement and its June 9 joinder corroborate whose position those decisions served. GFC Board resolution dated "March 21, 2025," with the April 1, 2025 transmittal; SJ2024CV07694 Compl.; Docket 49; Notice of Appearance, *Catalá-Del Valle v. NSSK San Juan, LLC*, No. 3:26-cv-01205-JAG, Docket 9 (D.P.R. Apr. 24, 2026); BPPR Informative Motion to Correct Inaccuracies in Appellants' Docketing Statement and Case Caption, No. 26-1357 (1st Cir. May 7, 2026), Doc. 00118443427; Sentencia, TA2025AP00276 cons. TA2025AP00277 (June 16, 2026); TA2025AP00277, Docket Entry 19 (June 9, 2026); López Vidal e-mail to Borschow (Mar. 24, 2025); ECF Nos. 91–93.

1089. Plaintiffs seek disinterested consideration and preservation of the retained Company rights, an accounting, and the incremental injury from the challenged decisions. Count V permits no second recovery for an injury compensated under Count IV.

**COUNT VI — INVALIDITY OF TRANSFERS AND RECOVERY OF COMPANY PROPERTY**

1090. Count VI is the Companies' claim to recover their property from the Transferee Defendants — Humacao RNG, Ponce RNG, VRM Penzini Fund I, LLC Renewable Series II, and Star Power Systems — for their respective receipt, control and disposition of Company property described in the acquisition chronology. Plaintiffs incorporate paragraphs 142–185 (the parties and participants), 199–213 (governance), 214–257 (the resource and the financing), 585–715 (the Bank's exit, the asset transfer and the valuation), 806–837 (Ponce and Salinas) and 985–1030 (derivative standing and the prior judgments) into this Count.

1091. Plaintiffs allege that the final asset transaction materially exceeded the approvals actually given. The January Board consent, the September member vote and the preferred-holder support did not authorize the final terms. The claim addresses the difference between those authorizations and the final terms. Plaintiffs seek inopposability — a declaration that the acts cannot be asserted against the Companies — for acts exceeding representative authority under 31 L.P.R.A. § 6266(a), and invalidity and its consequences under §§ 6311–6318 and 6331. The transferees had notice of the concrete authority objections before closing. Humacao RNG's parent had told the members on November 15, 2024 that it already held the lender's rights, before any assignment had closed, and Humacao RNG took the collateral in partial satisfaction of the debt without the proposal to the guarantor that 19 L.P.R.A. § 2381(b) requires (paragraphs 609–614 and 656–664). Asset Acquisition Agreement (Jan. 31, 2025); GFC Operating Agreement (Oct. 20, 2021), as amended; BGF Board resolution refusing the asset transfer (Jan. 31, 2025); Boyd and Lassers cease-and-desist notice (Feb. 6, 2025); Penzini status letter to the GFC members (Nov. 15, 2024).

1092. Plaintiffs seek the return of the affected property — or, where return in kind has become impossible, its value — an accounting, and mutual restitution, crediting all lawful consideration and assumed obligations. Asset Acquisition Agreement (Jan. 31, 2025), §§ 2.1, 2.9–2.10 and schedules.

1093. The property has two parts. The first is the tangible project assets identified in § 2.1 of the Asset Acquisition Agreement and its schedules. The second is the particular contractual gas rights identified in the landfill agreements. For the tangible property, Plaintiffs seek recovery of retained title under §§ 8101–8102. For the intangible rights, they seek the applicable contract and invalidity remedies, with an accounting for actual fruits and proceeds. Asset Acquisition

Agreement (Jan. 31, 2025); El Coquí Landfill Gas Sale and Purchase Agreement (Dec. 28, 2018), with First Amendment (July 19, 2019), § 2.5.

1094. Plaintiffs request, upon the required showing and after notice and a hearing, preservation of the identified disputed assets and gas rights pending judgment — under Rule 65, as intermediate relief of the same character as the restitution this Count seeks, and in the alternative under Rule 64 and Rules 56.1, 56.4 and 56.5 of the Puerto Rico Rules of Civil Procedure, 32 L.P.R.A. Ap. V, by an annotated prohibition on transfer (prohibición de enajenar) of any registrable right and an order that the Transferee Defendants not transfer, encumber or remove the identified assets. Either measure would be limited to those assets and gas rights, would not restrict their ordinary-course operation, and would carry the security the Court fixes. Plaintiffs also request restoration and an accounting under the substantive property and invalidity claims.

**COUNT VII — UNJUST ENRICHMENT IN THE ALTERNATIVE**

1095. Count VII pleads restitution only in the alternative. It applies where a particular receipt lacks lawful cause and no contract, invalidity or other substantive remedy governs that same enrichment. Plaintiffs incorporate paragraphs 142–185 (the parties and participants), 214–320 (the financing, the contractor and the warnings), 585–715 (the Bank's exit, the asset transfer and the valuation) and 985–1030 (derivative standing and the prior judgments) into this Count. Plaintiffs identify the correlative Company loss and seek the net benefit the actual recipient retained. A benefit authorized by an enforceable agreement supplies no claim under this Count, because the doctrine does not apply where a contract governs the dispute. *P.R. Tel. Co. v. SprintCom, Inc.*, 662 F.3d 74, 97 (1st Cir. 2011).

1096. Against the identified VRM-Penzini recipients, PRFG, CDVCA, BPPR and Semillero Partners, Plaintiffs seek restoration of the Company value each actually received through

the challenged transfers or applications, as attributed in the narrative. The VRM-Penzini recipients include Renewable Series II, allocated $761,221 under Schedule 2.9, and, in the alternative, VRM Penzini Fund I, LLC as the limited liability company named on that payee line. PRFG received $528,526 and CDVCA received $208,576. Schedule 2.9 identifies the promised recipients. Semillero Partners is named for any Company value it received through the decisions Borschow made for it — its own complaint in SJ2024CV07694 claims $280,937 of defense-cost advancement from GFC (paragraphs 740–741) — and not for the Schedule 2.9 payment to Semillero Investment Fund I, which is not a party.

1097. Against Rodríguez Barnes individually, GFC seeks restitution of the unlawful portion of the alleged $66,000 repayment on his $30,000 personal advance. The December 2021 notice identifies the January 2019 checks, and VRM/Semillero's complaint repeats the transaction. The claimed recovery excludes principal, lawful interest, lawful charges and any additional actual advance. Marsh letter to Ferrer and Coleman Tió (Dec. 2, 2021); SJ2024CV07694 Compl., ¶ 70.

**COUNT VIII — DECLARATORY RELIEF**

1098. Count VIII requests declarations ancillary to the substantive Company claims against BPPR, the Manager Defendants and the Transferee Defendants holding the disputed rights. Plaintiffs incorporate paragraphs 142–185 (the parties and participants), 180–198 (the prior cases), 199–213 (governance), 214–552 (the financing, the warnings, the April 25 wires, the restricted funds, the gas bargain, the extensions and the Seventh Amendment), 585–715 (the Bank's exit, the asset transfer and the valuation), 716–787 (counsel, the authority rulings and the joint requests) and 985–1030 (derivative standing and the prior judgments) into this Count. Boyd's individual declaration is sought only in Count X.

1099. Plaintiffs seek four declarations: the effect of the actual financing releases; the validity and opposability of the final asset agreement; the authority for the specific Company-claim decisions; and that BGF remains the obligee of MAPFRE bond No. 1301208000513, that the Companies retained their rights under the bond's performance conditions under § 2.2(d) of the Asset Acquisition Agreement, and that those rights may be exercised by BGF or, derivatively, by Plaintiffs on its behalf (paragraphs 571–580 and 784–785). Section 3.6(c) of the Asset Acquisition Agreement expressly benefits BPPR even though the Bank was not a signatory. Plaintiffs seek to invalidate or limit that clause on the substantive grounds pleaded. Asset Acquisition Agreement (Jan. 31, 2025), §§ 3.6(c), 8.4, 8.16.

1100. The Declaratory Judgment Act, 28 U.S.C. § 2201, supplies the remedy, with jurisdiction under 28 U.S.C. § 1367. Plaintiffs seek no reversal of the Company debt judgment, the assignment ruling, or the insurance and contempt orders. The declaration sought in Count X concerns what Humacao RNG may collect from Boyd under the guaranty; it does not ask this Court to set aside the substitution of parties in SJ2024CV04616, which the Commonwealth court authorized to facilitate the proceedings and which adjudicated neither title nor amount.

**COUNT IX — SEVENTH AMENDMENT: AUTHORITY, EFFECTIVENESS AND ALTERNATIVE CONSENT RELIEF**

1101. Count IX is the Companies' challenge to the disputed acknowledgments and releases in the September 27, 2023 Seventh Amendment. It is asserted against BPPR for procuring those provisions, and against Humacao RNG insofar as it asserts assigned rights under them. Plaintiffs incorporate paragraphs 142–185 (the parties and participants), 199–213 (governance), 398–412 (the restricted funds), 482–552 (the rescue, Zavala and the Seventh Amendment), 585–647 (the Bank's exit and the asset transfer), 867–889 (limitations) and 985–1030 (derivative

standing and the prior judgments) into this Count. The Companies principally challenge the authority to bind them, and the satisfaction or valid waiver of the amendment's own effectiveness conditions. Consent-based relief is pleaded separately and in the alternative. The specific provisions challenged are set out in Schedule A, Part 10 — particularly §§ 1(b), 13(a) and 13(b), with the related debt, guaranty and collateral acknowledgments. The Companies seek preservation or restoration of their own claims and defenses, and credit for any actual forbearance benefit. The Seventh Amendment is pleaded as the operative transaction and as the alleged wrong in its procurement, not as a confession establishing the earlier fraud.

1102. The Companies allege that Zavala, who signed the Seventh Amendment for BGF and GFC as "Authorized Representative," lacked valid authority to give the disputed acknowledgments and releases for either Company. The pleaded grounds are four: the rejected appointment proposals; the absence of a BGF approval meeting; the disputed September 11 authority chain; and the failure to obtain the approvals that § 7(a)(ii) required. The requested remedy is a declaration that the unauthorized provisions are inopposable to the affected Company, or partial invalidity to the extent permitted, with restoration and credit for the actual consideration received. See 31 L.P.R.A. §§ 6263, 6266(a), 6268, 6311–6318. Seventh Amendment and Forbearance Agreement (Sept. 27, 2023); BGF Second Amended and Restated LLC Agreement (Sept. 11, 2023); GFC Operating Agreement (Oct. 20, 2021), as amended; GFC/BGF Board minutes and notes; Picó e-mail to the GFC Board (Sept. 11, 2023); voided DocuSign sole-member written consent (Sept. 11, 2023); Economou–Picó e-mail chain of Oct. 12–13, 2023.

1103. In the alternative, Plaintiffs allege that BPPR materially concealed the identified restricted-account departures when it obtained the releases. On that ground they seek consent-based relief for the affected provisions, to the extent that the concealment determined the

Companies' actual authorized consent. The alleged omission concerns the particular account applications and their effect on principal and on retained claims. Seventh Amendment and Forbearance Agreement (Sept. 27, 2023); BGF operating-account transactions, April 2023; BGF operating-account statement, June 2022.

1104. For the September 2023 representative acts, Plaintiffs apply the 2020 Code's rules on authority and ratification. The February 7, 2026 original complaint described this transaction within four years, and Plaintiffs invoke relation back under Rule 15(c)(1)(B) for the same instrument and occurrence. They separately invoke § 9316 against prospective immunity for deliberate nonperformance, while applying any valid settlement to the claims it lawfully released.

**COUNT X — BOYD'S INDIVIDUAL CLAIM CONCERNING HIS BPPR GUARANTY**

1105. Count X is Boyd's individual claim. He asserts it against BPPR and Humacao RNG concerning the lawful scope of, and the credits against, the guaranty they seek to enforce, and, in the alternative, concerning who may enforce it against him. He asserts it against BPPR for serious dolo — serious deceit that induced his consent — in obtaining his September 15, 2020 guaranty. Boyd incorporates paragraphs 142–185 (the parties and participants), 180–198 (the prior cases), 214–412 (the financing, the warnings, the April 25 wires and the restricted funds), 458–481 (the extensions, tax credits and investors), 585–647 (the Bank's exit and the asset transfer), 788–805 (the September 2026 demand), 867–889 (limitations) and 1021–1030 (the prior judgments) into this Count. His consent and his personal obligation are distinct from the Companies' consent and losses. He asserts no personal RICO claim.

1106. Humacao's September 18, 2026 demand uses the earlier Company debt balance and quotations broader than the guaranty Boyd signed. Boyd seeks application of the actual payments, the collateral proceeds and the Asset Acquisition Agreement credit legally attributable to the BPPR

obligation, under the imputation rules pleaded in paragraphs 815–823. Those rules leave a guaranteed balance of less than $600,000 as of the closing, or nothing, before the interest and credits the agreement itself provides. In the alternative, the balance is the § 2.10 balance of $7,052,292 with its own interest, and no more. A guarantor may bind himself for less, but never for more, than the principal debtor, former 31 L.P.R.A. § 4875 (art. 1725); what the debtor no longer owes after the credit cannot be collected from the guarantor. The guaranty consents to extensions, restructurings and compromises of the principal obligation (§ 3(e)–(g)); the claim is to the credit the debtor received and the assignee's demand omits. Boyd also seeks a declaration applying the signed language rather than words inserted into a litigation quotation. Humacao RNG accepted the collateral in partial satisfaction of the Popular Loan and the PCC Loans without sending Boyd, a secondary obligor, the proposal that 19 L.P.R.A. § 2381(b) requires (paragraphs 656–664). Under § 2386(a), once a debtor or secondary obligor questions the secured party's compliance, the secured party bears the burden of proving it, and the deficiency it may collect from a secondary obligor is limited to the amount by which the obligation exceeds the greater of the proceeds or what a complying disposition would have brought. Boyd questions that compliance here. BPPR and Humacao's own substitution motion of February 14, 2025 identified Humacao as the party responsible for the related contract, nullity and lender-duty claims. Docket Entry 207, ¶¶ 1–4, 6, Ap. 227–229; Asset Acquisition Agreement (Jan. 31, 2025), §§ 2.1, 2.7, 2.10; Guaranty Agreement (Sept. 15, 2020), Docket 50-5, § 3; Docket Entry 312.

1107. In the alternative, Boyd seeks a declaration about who may enforce the guaranty against him. The guaranty runs "in favor of the LENDERS from time to time parties to the Credit Agreement" and of the Bank "in its capacity as Administrative Agent for the Lenders"; its capitalized terms have "the meanings set forth in the Credit Agreement" (§ 1); and it is enforceable

by "the Lenders and their successors, transferees and assigns" (§ 6). Under the Credit Agreement an assignee acquires "the rights and obligations of a Lender hereunder" only "[u]pon execution, delivery, acceptance and recording of an Assignment Agreement"; "each such assignment shall be to an Eligible Assignee"; and "neither the Borrower nor any Affiliate of the Borrower shall qualify as an Eligible Assignee" (§§ 1.1, 9.1(a)(iii)–(iv), (c)). Chapter 9 of Puerto Rico's Commercial Transactions Act governs the Bank's sale of the loan (19 L.P.R.A. § 2219(a)(3)). Where a term restricting assignment is effective under other law but ineffective under § 2308(a), the buyer's interest may not be enforced against the person obligated on the note or the account debtor, imposes no obligation on them, and gives the buyer no right to enforce the note or the general intangible (§ 2308(d)(1), (2), (6)). The guaranty passes to an assignee as an accessory of the credit, and only as such (31 L.P.R.A. § 3943 (art. 1418)). If Humacao RNG was, when it acquired the Popular Loan, an Affiliate of the Borrower under § 1.1 of the Credit Agreement — on the facts pleaded in paragraphs 665–685 — then the assignment, although effective between the Bank and Humacao RNG, may not be enforced by Humacao RNG against the Borrower, imposes no obligation on the Borrower toward Humacao RNG, and confers on Humacao RNG no right to enforce the Notes or the Credit Agreement; and Humacao RNG may not enforce against Boyd the guaranty that is accessory to those obligations. This declaration concerns what Humacao RNG may collect from Boyd. It does not ask this Court to set aside the substitution of parties in SJ2024CV04616 or the Partial Judgment against the Companies. On May 26, 2026 the Commonwealth court denied, without stating reasons, Boyd's motion to dismiss Humacao RNG's claims on the ground that the assignment was void. Boyd seeks no review of that order. He pleads here not nullity, but the statute's limit on enforcement against the obligors, and he pleads it in the alternative and subject to the stay requested in Prayer H. Guaranty Agreement (Sept. 15, 2020),

Docket 50-5, §§ 1, 6; Credit Agreement (Sept. 15, 2020), §§ 1.1, 9.1(a), (c), (d); SJ2024CV04616, Docket Entry 263 (Sept. 2, 2025); Docket Entry 273 (Sept. 23, 2025), ¶ 10; Docket Entry 304 (May 26, 2026), Part I.

1108. Boyd signed the guaranty on September 15, 2020 as a condition of the financing. Rodríguez Barnes signed the Bank's acknowledgment and acceptance of it after circulating the previous night's schedule to pay the JV premium from BGF's borrowing. Boyd alleges that BPPR thereby obtained his undertaking while concealing the unsatisfied closing prerequisite and the deficient coverage. Guaranty Agreement (Sept. 15, 2020), Docket 50-5, pp. 1, 9; Rodríguez Barnes closing e-mail (Sept. 14, 2020).

1109. Before he became bound, Boyd understood the premium to be the JV's obligation. He believed BPPR had secured paid bond protection for 100% of the defined Direct Costs. He relied on the express disbursement safeguards and on the authorized signature release for the specified flow of funds. He did not understand the separate premium line to disclose either an unsatisfied effectiveness condition or the Bank's acceptance of $5 million instead of full-Direct-Cost coverage. He would not have assumed the same personal undertaking had BPPR disclosed those facts. Rodríguez Barnes knew the premium was to be paid after closing from BGF funds; the Bank held the bond and the budget, and it accepted Boyd's guaranty. Boyd therefore seeks annulment for serious dolo affecting his own consent, with the reciprocal adjustments required by the former Civil Code and the transition provisions, 31 L.P.R.A. §§ 11717–11718. His reliance concerns undisclosed compliance facts in BPPR's closing and account administration, despite counsel's participation and his receipt of the premium line. Guaranty Agreement (Sept. 15, 2020), Docket 50-5; Credit Agreement (Sept. 15, 2020), § 3.1(h); MAPFRE payment and performance bond No. 1301208000513; Rodríguez Barnes closing e-mail (Sept. 14, 2020); Popular Insurance

$70,560 bond-premium transfer record (Sept. 16, 2020); Heyman closing e-mail chain (Sept. 14, 2020); Fernández Agramonte and Boyd closing e-mails (Sept. 14, 2020); Heyman release e-mail (Sept. 15, 2020), with the executed Flow of Funds; Rodríguez Barnes additional-obligee letter to MAPFRE (Sept. 15, 2020).

1110. The guaranty is absolute and continuing. Its §§ 2–4 permit future amended obligations, independent enforcement and specified changes; § 6 extends its benefit to assigns and addresses payment without setoff. Boyd challenges his own induced consent and, alternatively, enforcement beyond the instrument's actual scope. Guaranty Agreement (Sept. 15, 2020), Docket 50-5, §§ 2–7.

1111. Boyd's March 15, 2021 objection concerned charging BGF the contractor's expense. On May 6, 2021 he signed the First Amendment to the Credit Agreement as one of the named "Personal Guarantors." Its § 1(b) states that "as of the date hereof" the Borrower and the Guarantors have no defenses, offsets, claims or counterclaims related to the outstanding indebtedness, and it waives and releases any such claims. Its § 6(c) ratifies the Loan Documents "including … the Personal Guaranties"; its § 7 confirms that each Personal Guaranty "shall continue to be in full force and effect" and is "RATIFIED AND CONFIRMED." The amendment's purpose was the $812,500 revolving facility for the standby letter of credit securing the Act 73 tax-credit bond (§ 2); it did not extend the construction deadline. First Amendment to Credit Agreement (May 6, 2021), pp. 1–2, 8, 11–12; Boyd e-mail to the GFC Board (Mar. 15, 2021).

1112. Boyd alleges that he signed the First Amendment unaware of the separate unpaid-premium closing prerequisite and of the full-Direct-Cost coverage deficiency — facts then known to the Bank from its own closing records and not disclosed. A release given "as of the date hereof" by a party who does not know the cause of nullity, while that cause continues, is not a confirmation.

Under former 31 L.P.R.A. § 3522 (art. 1263), confirmation, express or implied, presupposes knowledge of the cause of nullity and its cessation. The April 25, 2022 original complaint in No. 22-1190 already alleged the charge. The January 31, 2023 Second Amended Complaint alleged payment after closing despite the prerequisite. Boyd recognized the distinct coverage deficiency later, while rereading the Credit Agreement for another issue during preparation of the Third Amended Complaint. He challenges the May 6 release and ratification for the same material concealment, which persisted when BPPR obtained them. The later December 2021 assurance did not induce the May 2021 signature. First Amendment to Credit Agreement (May 6, 2021), pp. 1–2, 8, 11–12; No. 22-1190, Docket 1, ¶¶ 60–61, 93–94; No. 22-1190, Docket 147, ¶¶ 144–49, 156.

1113. In the alternative, Boyd seeks enforcement only of the undertaking he actually gave, and damages for his own directly caused loss from an obligation enforceable by him. He invokes the gross-negligence/willful-misconduct exception in guaranty § 10(b), according to its final-nonappealable-judgment terms. He seeks the declaration because BPPR commenced collection against him and Humacao continues to assert the assigned guaranty rights. Guaranty Agreement (Sept. 15, 2020), Docket 50-5, §§ 6, 10; Docket Entry 312.

1114. The Commonwealth orders frame what remains of Boyd's personal claims. The December 2024 partial judgment imposed the Company debt and left the personal-guaranty disputes pending. The July 14, 2025 order denied dismissal of Boyd's contract and guaranty counterclaims, dismissed only the anti-tying count as federally litigated, and authorized an amended counterclaim within ten days, with separation of the claims against BPPR and Humacao. That amended counterclaim was not filed after counsel's August 18, 2025 request for an extension. On May 26, 2026 the court struck the third-party complaint against BPPR for lateness and unauthorized Company representation, rejected the assignment-based dismissal theory, and left

the counterclaim against Humacao RNG standing. Boyd's timely personal annulment defense and claim remain available to the extent those orders permit. Independently, he seeks adjudication of the creditor's present scope and credit demand. If that relief belongs in the Commonwealth action, he requests dismissal of that separable portion without prejudice, or a stay — not federal reversal of the Commonwealth rulings. SJ2024CV04616, Docket Entry 195 (Dec. 18, 2024 minutes); Docket Entry 192 (Dec. 27, 2024); Docket Entry 242, at 2–4; Docket Entry 252; Docket Entries 269, 276; Docket Entry 304 (May 26, 2026), at 1–6.

1115. Former 31 L.P.R.A. § 3512 provides four years for the annulment action, measured from consummation in cases of deceit. Boyd asserted his own induced-consent position before the fourth anniversary of the September 15, 2020 closing. His July 12, 2024 answer, Docket Entry 13, expressly alleged false inducement to sign the personal guaranty and the First Amendment, including the Bank's preconditions and disbursement controls, in responses 9, 81 and 83. BPPR's August 30, 2024 motion identified a third counterclaim seeking the guaranty's nullity, and the July 14, 2025 order denied its dismissal while directing separation of the claims against BPPR and Humacao. Boyd relies on the timely exercise of that personal claim and on its surviving procedural effect. The separate scope and credit declarations concern the obligation actually enforceable, even if affirmative annulment in this action is time-barred. SJ2024CV04616, Docket Entry 13 (July 12, 2024), at 6, 52–53; SJ2024CV04616, Docket Entry 68 (Aug. 30, 2024), at 2–4; SJ2024CV04616, Docket Entry 242, at 2–4.

1116. Boyd requests four forms of relief. First, a declaration of the guaranty's actual scope and of the credits the law requires, including the burden and the limit that 19 L.P.R.A. § 2386(a) places on the secured party. Second, recovery of his own directly caused loss under the applicable duties and exceptions. Third, annulment of the BPPR guaranty for serious dolo, its resulting

unenforceability against him, and the required restitution. Fourth, in the alternative, the declaration pleaded in paragraph 1107 on Humacao RNG's right to enforce the guaranty. No personal recovery duplicates Company damages, and no relief reverses the existing Commonwealth orders.

**COUNT XI — MISAPPROPRIATION OF COMPANY TRADE SECRETS**

1117. Count XI is the Companies' trade-secret claim. GFC and BGF, through Plaintiffs derivatively, assert it against VRM Penzini Capital, LLC; Star Power Systems, LLC; Ponce RNG, LLC; Island Renewable Energies, LLC ("IRE"); and Rafael Rojo, Carlos Penzini and Diego Rodríguez individually, for the defendant-specific acquisition, disclosure or use alleged in the Ponce-and-Salinas narrative. Plaintiffs incorporate paragraphs 142–185 (the parties and participants), 458–481 (the extensions, tax credits and investors), 585–715 (the Bank's exit, the asset transfer and the valuation), 806–837 (Ponce and Salinas), 867–889 (limitations) and 985–1030 (derivative standing and the prior judgments) into this Count. This Count arises under 18 U.S.C. § 1836(b) and, alternatively and without duplicate recovery, under Puerto Rico's Trade Secret Protection Act, 10 L.P.R.A. §§ 4131–4141. The Company models and commercial-development information concerned the financing, equipment, production and sale of energy products in interstate commerce. Federal jurisdiction over this Count is independently supplied by § 1836(c).

1118. The Companies owned the information this Count concerns. BGF owned the nonpublic development work and site information it had compiled for the Ponce project since 2020–2021, its plant data and contract terms, its off-take terms, and the terms and position it held under § 11.20 of the El Coquí agreement for future landfill-gas projects on EC Waste property. GFC's claim concerns its own nonpublic financing and portfolio-development information. The strategy, models and projections that Boyd and Lassers prepared as Regeneration Partners were

theirs, not the Companies'; they are not claimed under this Count, and they are described in paragraphs 838–839 because they were the means by which the defendants learned what the Companies held. Each Company seeks recovery only for its own information and its own loss. The reasonable secrecy measures were the restricted-purpose disclosures made under the January 18, 2023 agreement and its February 9, 2023 amendment, described in paragraphs 840–843, and BGF's own confidentiality agreement of October 18, 2022 with the VRM Penzini entity Star Solar, which the VRM/Semillero complaint itself pleads (paragraphs 492–495 and 840–843). The information's independent value lay in the compiled site economics, contract terms and development position for Ponce and Salinas; that compilation would save a competing developer time and expense, and it would reveal the Companies' commercial position. Public facts and material independently obtained are excluded from the asserted secrets. See 18 U.S.C. § 1839(3)–(6).

1119. VRM Penzini Capital and Star Power are alleged to have obtained and used the information through Rojo, Penzini and Diego Rodríguez during the specified 2023 collaboration discussions. Each of the three signed the confidentiality agreement and its February 9, 2023 amendment by name as VRM's representatives, received the disclosures, and is liable for his own acquisition, disclosure and use. Plaintiffs allege that the recipients diverted the information's use to their competing acquisition and development plan. Ponce RNG is alleged to have knowingly received and used the resulting Ponce development information. IRE is alleged, on information and belief, to have knowingly used the protected compilation in the later multi-site platform. The recipient-specific basis is the disclosed models, the detailed 2023 presentation and acquisition chronology, Ponce RNG's organization and pursuit of the identified project, and IRE's corresponding project presentation. The Companies allege unauthorized use of their protected

information, not ownership of the landfill names or liability merely for competing. NDA (Jan. 18, 2023); First Amendment to Confidentiality and Non-Disclosure Agreement (Feb. 9, 2023); Schedule A, Part 13; P.R. Department of State record, Island Renewable Energies LLC.

1120. The NDA's § 7 release of existing claims, its § 9 limitation, and its § 10 termination on the second anniversary are addressed according to their scope. Plaintiffs allege misuse during the 2023–2024 restricted period. They contend that the limitation cannot be read to nullify the express non-use obligation and the unauthorized-use indemnity for the very restricted disclosures it governs. Any later statutory claim rests on independently established unlawful acquisition or knowing use, and on continuing secrecy, rather than on the expired contractual term alone. The asserted wrong is the subsequent misuse of the newly restricted information, with the scope of the existing-claim release and of any valid later disposition applied to the particular claim.

1121. The resulting Company injury is the loss attributable to the misuse of the protected work and the development advantage the particular user obtained. Plaintiffs seek actual loss and nonduplicative unjust enrichment, or a reasonable royalty in the alternative, and prospective protection of Company-owned information still protected from misuse. They seek exemplary damages and fees only on the statutory findings required for willful and malicious misappropriation. As the measure to be proved, the Companies claim the but-for value of the gas-rights package pleaded in paragraphs 850–852, subject to the stated credits. That value is $92,000,000 for Ponce and Salinas alone, or the three-site platform value if the Humacao diversion is also found. The conditional § 11.20 process, the actual capacity to obtain and finance a project, the defendant's independent contributions and the value paid are reflected in the causal measure. 18 U.S.C. § 1836(b)(3); El Coquí Landfill Gas Sale and Purchase Agreement (Dec. 28, 2018), with First Amendment (July 19, 2019), § 11.20.

1122. Plaintiffs invoke Rule 15(c)(1)(B) for the same 2023 disclosures, acquisition plan and Ponce diversion alleged in the prior factual account, not a new discovery date created by the September 2026 website review. Section 1836(d) measures three years from actual or reasonably diligent discovery and treats continuing misappropriation as a single claim. The January–March disclosures establish receipt, not by themselves discovery of misuse. Plaintiffs rely on the pleaded acquisition chronology and the previously asserted diversion allegations. The earlier proceedings' effect on this Count is stated in Schedule A, Part 9. No RICO predicate is designated solely from a breach of confidentiality or from this civil statutory claim. The Companies seek relief for the preclosing claims retained under § 2.2(d) of the Asset Acquisition Agreement, and alternatively restoration under Count VI if a challenged conveyance is held to have included the relevant rights. A valid transfer of a particular claim or information right is given effect; retained preclosing damages and postclosing ownership are not equated. Asset Acquisition Agreement (Jan. 31, 2025), §§ 2.1–2.2.

**XVII. PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and grant the following relief:

A. On Counts I and II, judgment for the Companies against the defendants named in those Counts for the net injury proved, trebled under 18 U.S.C. § 1964(c), with the costs of suit and reasonable attorneys' fees, and with credit for compensation already received for the same injury;

B. On Counts III, IV and V, compensatory damages against the respective Defendants for the Companies' net payment, financing and completion losses, their lost net operating profits and their lost net proceeds from the attributes they could lawfully monetize, with the credits that

prevent double recovery; an accounting — from BPPR of the restricted-account releases and applications, and from the Manager Defendants of the Company property and Company claims under their control, including the Companies' rights under MAPFRE bond No. 1301208000513; and, in the alternative on Count III, resolution of the financing agreements for the Bank's deliberate nonperformance of its protected-disbursement undertaking, with the mutual restitution and credit for value received that resolution entails;

C. On Count VI, a declaration that the transfer of the Companies' assets and gas rights under the Asset Acquisition Agreement dated January 31, 2025 is invalid and not opposable to the Companies; restitution to the Companies of the transferred assets and gas rights — or, where return in kind has become impossible, their value — with their fruits, on the terms of mutual restitution that 31 L.P.R.A. § 6316 requires; an accounting of the fruits and proceeds of those assets since February 7, 2025; and, upon the required showing and after notice and a hearing, an order preserving the identified disputed assets and gas rights pending judgment — under Rule 65 or, in the alternative, under Rule 64 and Rule 56 of the Puerto Rico Rules of Civil Procedure — limited to those assets and gas rights, without restricting their ordinary-course operation, and with the security the Court fixes. On Count VII, restitution from each Defendant named in that Count of the value it received without just cause;

D. On Count VIII, declarations (i) of the effect of each financing release on the Companies' claims, instrument by instrument, as set out in Schedule A, Part 14; (ii) that the Asset Acquisition Agreement, including its § 3.6(c) release of BPPR and its attorneys, is invalid or not opposable to the Companies on the grounds pleaded; (iii) of the authority, or the absence of it, for the specific Company-claim decisions pleaded, including the engagement of Company counsel and the surrender of Company claims and participation; and (iv) that BGF remains the obligee of

MAPFRE bond No. 1301208000513 and that the Companies retained their rights under its performance conditions under § 2.2(d) of the Asset Acquisition Agreement; together with the equitable relief Puerto Rico law allows on Counts VI, VIII and IX, including an accounting and the protection or restoration of identified Company property. Plaintiffs seek no order vacating, reducing or enjoining the Commonwealth collection judgment;

E. On Count IX, a declaration that §§ 1(b), 13(a) and 13(b) of the Seventh Amendment and Forbearance Agreement of September 27, 2023, and its related debt, guaranty and collateral acknowledgments, are not opposable to the affected Company for lack of valid representative authority or ineffective approval — or, in the alternative, their partial invalidity and consent-based annulment as pleaded — with the mutual restitution and credits the law requires; and a determination of counsel's authority and conflicts before any person purporting to represent a Company directly surrenders its claims in this action;

F. On Count X, declarations against Humacao RNG, as collecting assignee, and BPPR (i) that the $13,000,000 partial payment under § 2.7 of the Asset Acquisition Agreement is imputed to the Popular Loan, the only loan Boyd guaranteed; (ii) that the obligation enforceable against Boyd under his September 15, 2020 guaranty, if any, does not exceed the balance of that loan after that credit and the other credits the law requires, and in no event exceeds the § 2.10 Loan Balance with the interest that clause provides; (iii) that the guaranty is enforced as Boyd signed it, not as quoted in the September 18, 2026 motion; (iv) that Humacao RNG bears the burden under 19 L.P.R.A. § 2386(a)(2) of proving that its acceptance of the collateral complied with Chapter 9 of the Commercial Transactions Act, and that any deficiency enforceable against Boyd is limited as § 2386(a)(3) provides; and (v) in the alternative, that if Humacao RNG was, when it acquired the Popular Loan, an Affiliate of the Borrower within § 1.1 of the Credit Agreement — a Person that

the Agreement's "Eligible Assignee" definition excludes "[n]otwithstanding the foregoing" — then under 19 L.P.R.A. § 2308(d) the assignment, although effective between Banco Popular and Humacao RNG, may not be enforced by Humacao RNG against the Borrower, imposes no obligation on the Borrower toward Humacao RNG, and confers on Humacao RNG no right to enforce the Notes or the Credit Agreement, and that Humacao RNG therefore may not enforce against Boyd the guaranty that is accessory to those obligations (31 L.P.R.A. § 3943); annulment of the guaranty for the serious dolo that induced his consent; and, in the alternative, his proven personal damages and restitution against the responsible party, with all required credits and reciprocal adjustments. If the Court finds that any part of that relief belongs in the Commonwealth action, Boyd requests dismissal of that separable part without prejudice, or a stay. This relief is separate from the Companies' recovery and does not vacate or enjoin any Commonwealth judgment or order, or adjudicate El Coquí's separate guaranty;

G. On Count XI, recovery to the Company that owned the misappropriated information of its actual loss and the defendants' nonduplicative unjust enrichment, or a reasonable royalty in the alternative; appropriate prospective protection of its still-protected information; and exemplary damages and attorneys' fees upon the findings that 18 U.S.C. § 1836(b)(3) requires;

H. For any federal claim whose viability depends on the outcome of the pending appeals, a stay of that overlapping portion pending the First Circuit's decisions in Nos. 26-1357 and 26-1424, in place of a contrary adjudication of the same issue, as requested in paragraphs 204–207 and 1053;

I. An order that every recovery on the Companies' claims be paid to the Company that suffered the loss, and that any dismissal or compromise of those claims be made only with notice and the Court's approval under Rule 23.1(c);

J. Pre-judgment and post-judgment interest; the costs of suit; attorneys' fees where a statute or contract authorizes them; and, on the Commonwealth-law counts, attorneys' fees and prejudgment interest for obstinacy under Rules 44.1(d) and 44.3(b) of the Puerto Rico Rules of Civil Procedure; and

K. Such other and further relief as the Court deems just and proper.

## XVIII. JURY DEMAND

Plaintiffs demand a jury trial under Rule 38(b) on all issues so triable. The demand is subject to any valid and applicable contractual jury waiver, including Credit Agreement § 10.12 and Boyd's BPPR guaranty § 15. Plaintiffs preserve their objections to the scope and enforceability of any asserted waiver. Equitable issues remain for the Court. Credit Agreement (Sept. 15, 2020); Guaranty Agreement (Sept. 15, 2020), Docket 50-5.

RESPECTFULLY SUBMITTED.
In San Juan, Puerto Rico, this 12th day of October, 2026.

/a/JaneBeckerWhitaker________
JANE A. BECKER WHITAKER
USDC-PR No. 205110
P.O. Box 9023914, San Juan, PR 00902-3914
Tel.: (787) 585-3824
janebeckerwhitaker@gmail.com

/s/LuisEMiňana___________
LUIS E. MIÑANA
USDC-PR No. 225608
Espada, Miñana & Pedrosa Law Offices, PSC
123 Calle Manuel Domenech, Altos, Urb. Baldrich, San Juan, PR 00918
Tel.: (787) 758-1999
minanalaw@yahoo.com
Attorneys for Plaintiffs

**VERIFICATION OF GREGORY BOYD**

Pursuant to 28 U.S.C. § 1746 and Fed. R. Civ. P. 23.1(b), I, Gregory Boyd, declare under penalty of perjury under the laws of the United States of America that I have read the foregoing Verified First Amended and Supplemental Complaint; that the factual allegations concerning my own acts and observations are true of my personal knowledge; and that the remaining factual allegations are true to the best of my knowledge, information, and belief, formed after reasonable inquiry, including my review of the documents quoted or described in this Complaint; allegations expressly pleaded on information and belief, or in the alternative under Fed. R. Civ. P. 8(d), are identified as such and are verified in that character.

Executed on October 12, 2026, in Humacao, Puerto Rico.

________________________

Gregory Boyd

**VERIFICATION OF JONATHAN LASSERS**

Pursuant to 28 U.S.C. § 1746 and Fed. R. Civ. P. 23.1(b), I, Jonathan Lassers, declare under penalty of perjury under the laws of the United States of America that I have read the foregoing Verified First Amended and Supplemental Complaint; that the factual allegations concerning my own acts and observations are true of my personal knowledge; and that the remaining factual allegations are true to the best of my knowledge, information, and belief, formed after reasonable inquiry, including my review of the documents quoted or described in this Complaint; allegations expressly pleaded on information and belief, or in the alternative under Fed. R. Civ. P. 8(d), are identified as such and are verified in that character.

Executed on October 12, 2026, in Punta del Este, Uruguay.



Jonathan Lassers